**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No.: 2016-cv-17-S |
| BROWN UNIVERSITY IN PROVIDENCE | ) | |
| IN THE STATE OF RHODE ISLAND AND | ) | |
| PROVIDENCE PLANTATIONS, | ) | |
| | ) | |
| Defendant. | ) | |

## JOHN DOE'S PRETRIAL MEMORANDUM

The Plaintiff, John Doe, submits this Pre-Trial Memorandum regarding the factual background of this case, witnesses to be called, evidence to be introduced, and issues for trial.

### FACTS & TRAVEL

John Doe is now suspended from Brown University for two years on the basis that he sexually assaulted a mock trial teammate. In support of his claim that this adjudication was patently flawed and in violation of his contractual rights, John will prove the following facts in support of his claim at trial.

*Background*

In the spring of 2013, Brown University offered John admission to the Class of 2017. John had been accepted at other top tier universities, including the University of Chicago and Cornell, but John accepted Brown's offer with the goal of obtaining a quality liberal arts education and a competitive advantage to gain admission to an elite law school. He had been a member of his high school's mock trial team. He devoted hundreds of hours to developing his advocacy skills, and Brown's mock trial program appealed to him.

During freshman year, John again devoted hundreds of hours to practicing, preparing, and developing his advocacy skills. He also socialized with other members of the team. After he and his high school sweetheart broke up, John became flirtatious with and started texting more than one of the female members of the team, including Ann Roe and Kay Stiles.

Things with Kay went well at first. Then, Kay abruptly pulled back. She apologized to John, admitted to being "flirty," and "confusing and really severely awkward." She conceded that there were moments when she felt something for John, but the romance went no further. However, around the same time, John also began texting Kay's friend Ann, who proved much more receptive to his attention.

*John & Ann's Texts*

On November 6, 2014, John texted Ann, "The hardest part of freshman year was watching everyone else hookup with people. I'm kinda just waiting for the right girl." Ann responded, "good for you. I'm struggling with that a lot now. I mean I love my boyfriend but part of me just wants to go fuck someone I just met like everyone else is doing xD."[1] Ann followed up: "I know you're not supposed to fuck sleep with your friends but idk it's something Id want to try but who knows if I'll ever get that opportunity xD . . . I've just been really 'frustrated' lately because I haven't seen my boyfriend in like almost 2 months so I'm like dying for some sort of human contact haha. And I'm talking like PIV [penis in vagina] haha." John responded, "So maaaaybe you're a little less innocent than I thought . . . Still, it's just talk." Ann replied, "You think I'm all talk?" John answered, "Maybe just a little bit." Ann replied, "Well maybe you'll see, maybe you won't!"

---

[1] "xD" is a laughing emoticon.

John and Ann continued texting nearly all day long, and their conversation became decidedly more graphic. They shared sexual fantasies, and Ann described for John what she called "the best blowjob of your life." Similar exchanges continued over the following days, and John did not hide the fact that his interest in Ann was sexual.

Though Ann often said she felt confused, she continued to text John and engage in sexual banter. Together they planned to watch a movie and "cuddle" on November 10, 2014. John offered to back off. He told Ann "maybe we shouldn't, because I know I'll be tempted to make a move." John repeated, "maybe we shouldn't hangout until you're ready." But, Ann wanted to get together. She asked John, "What if you were sure there was no chance I would ever have sex with you? Where would you go from here?" John replied that they would be friends. Ann then asked, "And would you watch a movie with me?" John flatly said, "No."

*The Encounter*

Around 1:20 in the morning on November 10, 2014, Ann met John at J. Walter Wilson Hall to watch the movie with him. However, they couldn't gain access to any of the rooms because it was after hours. So, they left and went to Faunce House, where they decided to watch their movie in a storage room. Within minutes of starting the movie, John told Ann that she looked pretty in her sweatpants. They began to kiss, Ann pushed John on his back and straddled him. John put his hand over her breast on top of her shirt, and Ann continued to kiss him. John began to rub Ann's vagina over her sweatpants, and, at some point, reached his hand into Ann's pants. She subsequently pulled her sweatpants down with John's help.

After John finished digitally penetrating Ann, she told John that it was her turn. She unzipped John's pants and pulled them down to John's ankles with his help. She then proceeded to give John oral sex. During their encounter, the motion-activated light came on twice. Each time, Ann got up, walked approximately ten feet, turned off the lights, and came back to John.

As he neared ejaculation, John asked Ann if he could do so in her mouth. Ann agreed. After John ejaculated, John and Ann sat down, cuddled, and started kissing again. About ten minutes later, they left the storage room, went out the doors under the arch, gave each other a hug, and said goodbye.

*Hard Feelings*

When Ann got back to her dorm room, her friend Witness 1 and her roommate were watching "New Girl" on Netflix. Ann entered the room and said, "Oh my God, I have to tell you something. Do you guys remember that guy [John] I've been telling you about?" Witness 1 and Ann's roommate said they did. Ann then told them, "I just hooked up with him. It was like really weird because we were just in Faunce and hooked up." According to Witness 1, Ann made the whole thing sound "sexy and cool." Asked if she had sex, Ann replied, "No, but it was really hot. I mean, you know it wasn't reciprocal because he only fingered me - he didn't eat me out - but we might hook up again, I don't know." Ann elaborated further and stated that she gave John a "blowjob." Witness 1 said Ann made it sound as if she wished she and John had done more and was her typical "happy, bubbly" self.

John and Ann texted again on November 14, 2014. The UC-Irvine mock trial event was coming up in California, and John told Ann to "[r]emember to pretend like you didn't give me a mind blowing blowjob." She replied, "[o]nly if you remember to pretend you're not imagining fucking the shit out of me" and "no one will suspect how much you want to cum inside me." Ann finished by saying "sounds like we've got a plan [winking smile]." However, John was better at pretending than Ann expected, and Ann grew impatient.

John's texts became short and infrequent.  On November 15, 2014, Ann contacted John and asked, "whacha been up to stranger?"  John responded that he was busy and couldn't talk. Ann replied, "All righty no problem, we'll catch up later.  Night!"  The next day, Ann texted John about her mock trial performance and stated, "I wish I could see you in action." The day after that, November 16, Ann texted John again and hinted that she would like to get together. However, John replied that he had to get some work done.  Ann responded, "All righty . . . Hit me up sometime if you're bored [winking smile] see ya!"  On November 19, 2014, Ann told John that she was having boyfriend trouble and wanted him to cheer her up over the weekend. Upon information and belief, she had actually broken up with her boyfriend because of her feelings for John.  John, however, declined.

At that, Ann told John that she was "not trying to chase" him, but that he was torturing her and driving her "completely insane."  John replied that Ann needed to "reevaluate where we are," and told her he had feelings for someone else – Kay, one of Ann's best friends.  John asked Ann if she would put in a good word for him with Kay.  Ann agreed, but upon information and belief, her conversation with Kay was not what John expected.

*The Power of Suggestion*

Ann reported her November 10th encounter with John to Kay as follows:

> He literally hit play on the movie and turned my face and went to kiss me and I turned away and he was like no?  And I was like I can't do that im sorry.  And he was like can I kiss your cheek (as he was already doing it) and I was like I guess? So then he was like doing shit and he went to kiss me again and I was like fine and just kissed him.  And then he was like I bet you wanna fuck me right now and I was like I really can't do that.  And he was like ok so then how about you give me a blowjob and I was like I don't know.  And he was like cmon I know you want to and I was like idkkkkkk and he like convinced me.  And I guess I kind of got attached . . . Moral of the story: [John] is an asshole.

Kay replied "OMG STOP . . . Like he essentially assaulted U."  Then, on December 26, 2014, Kay suddenly sent John a snapchat of a woman with her middle finger up and the words "fuck

you" written across the screen. As for Ann, she enrolled John in a variety of online dating sites and began disparaging him to other members of the mock trial team, in one instance going so far as to coax another female friend to flirt with John and then rebuff his attention.

Ann's conversations with Kay and others began painting a picture of her encounter with John increasingly divorced from reality as Ann adopted Kay's suggestion that the encounter amounted to an assault. On January 22, 2015, Ann texted Kay that she had spoken to someone on mock trial about John and stated, "he can't continue to be on a team where he doesn't respect others." But, a few days later, on January 25, 2015, John texted Ann, "I do owe you an apology for how I treated you before." Ann replied, "Thank you!! Apology accepted, I really appreciate that . . . Im sorry for making the awkwardness worse and signing you up for obscure dating sites . . . I definitely overreacted . . . im sorry, I was upset . . . Does this mean you'll add me back on snapchat now loser!" John said, "perhaps." Ann replied, "Yassss best day everrr." The text message exchange progressed to a discussion of Kay. John told Ann that Kay hated him. Ann replied that he was correct, admitted that she was the reason why, and offered to help John get back in her good graces However, again, Ann did not discuss matters with Kay quite as John expected.

*Lingering Jealousy*

When John apologized to Kay, she did not respond. Ann told Kay, "you don't need to answer honestly he just makes me nervous." Kay agreed, "he's gonna try to flirt with us again." Ann replied, "I completely agree he's already doing it." Over the following months, Ann continued to pursue John. At times they worked together on mock trial preparation, but their relationship remained platonic. John still harbored feelings for Kay, and Ann continued to disparage him to others. John learned of this and stopped communicating with Ann.

Nonetheless, on March 31, 2015, out of the blue, Ann tried to get back on good terms with John and texted him, "Happy Birthday!!"  But, John had little to say, and Ann took note.

*A Belated Accusation*

When John announced that he was going to run for a position on the mock trial executive board, Ann promptly composed a letter to the captain of the team alleging that John had assaulted her.  She wrote:

> As you know, [John] and I had a bit of an "encounter" at the beginning of the year.  I made a lot of jokes about this because it was my way of dealing with a situation I wasn't comfortable with.  I'm not sure if I ever made clear to you just how not consensual that was.  I was manipulated into hanging out with him because he made me feel bad for rejecting him, but he promised we would just be hanging out as friends.  He ended up kissing me and more after I repeatedly said no and turned away when he grabbed my face.  I eventually let it happen after he wouldn't give up because I figured that was the easiest way to get it over with.
>
> - - -
>
> but if sexual assault is punishable by expulsion from Brown, I think it should at least warrant a talk with mock trial.

Needless to say, John was not elected to the mock trial executive board.  Ann repeated her accusations in May of 2015, and John then lost his position as team co-captain shortly thereafter.  Ultimately, in the fall of 2015, Ann took her complaint about John to the Title IX Program Officer, and on October 2, 2015, the office of student life issued an order prohibiting John from having any contact with Ann.

On or about October 30, 2015, Ann and Kay met in the Ratty around 6:30 PM and discussed their continued desire to "get rid" of John.  A few days later, on or about November 3, 2015, nearly one year after her intimate encounter with John, Ann filed a complaint with Brown's Title IX office accusing John of sexual assault.  In her complaint, Ann stated:

> On November 10, 2014 I got into campus very late due to travel delays.  Around 2am, I met [John] at the campus center to watch a movie in a public place.  When I arrived at the campus center he brought me back to a secluded room and had his

laptop up for the movie. Once he started the movie, he physically grabbed my face to kiss me. I immediately turned my head away to indicate my lack of consent and verbally told him that I don't want to kiss him. This also was meant to confirm that his sexual advances were unwanted. Rather than respecting my wishes, [John] kissed me on the cheek and then asked, "may I?" I was upset and confused, so asked, "may I what?" John then forced his fingers into my vagina to sexually assault me. I froze and did not respond. In my head, all I could think is that I wanted this to be over with, so when he kept kissing me I didn't resist. During the assault he said, "I know you want to fuck me right now." Fearing he would do more to me, I told him I really couldn't as an attempt to avoid him raping me. He replied, "well at least give me a blowjob then." I repeatedly stated that I did not want to and tried to avoid angering him by stating "I really shouldn't" and "I wasn't sure," but I never wanted to and wanted to leave as soon as possible. John kept replying, "I know you want to" and I knew I wasn't going to be able to leave unless it happened. I felt I had no choice to avoid being raped, so submitted to this coercive badgering out of fear and gave him oral sex. At one point, I stopped the oral sex and he said "put my dick back in your mouth." Around 3 a.m., I finally could leave and told him on the way out, that he was the kind of person that makes people do things they don't want to do. He again said, "I know you wanted to" as I was leaving. I then went home in shock and upset about what happened and just wanted to sleep.

On this basis, Ann requested that John be expelled. Brown launched an investigation.

### The Investigation and Hearing

On November 4, 2015, the day after John received notice of the complaint, Brown's associate general counsel advised in writing that Brown would adjudicate Ann's complaint according to the code in effect at the time of John's alleged misconduct, i.e., the 2014-15 Code of Student Conduct (the "2014-15 Code"), rather than the 2015-16 Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy (the "2015-16 Title IX Policy").

Brown engaged Djuna Perkins, an attorney licensed to practice law in Massachusetts, to investigate Ann's complaint, and Ms. Perkins began interviewing witnesses. During her interview with Ms. Perkins, Ann conceded that the lights came on while she was performing oral sex on John. She said that "the light came on and she asked if she should turn it off." John said yes, "so she walked over to the light switch to try to turn it off but couldn't." John then walked

over and turned off the light switch, which was right next to the door. Despite being next to the door as her alleged assailant was approaching with his pants around his ankles and a full erection, Ann did not run. According to Ann, she and John walked back to the middle of the room, and Ann stated, "I figured I was supposed to continue . . . ." Ann also did not dispute swallowing John's semen, but explained that she did so because "she didn't want to leave a mess on the carpeted floor." This information was included in her report.

Before sharing her report with John, Ms. Perkins provided a draft to Amanda Walsh, the Title IX Program Officer. The draft report referenced the relevant policy sections as those contained in the 2015-16 Title IX Policy. It also referenced the definitions of consent and coercion in that policy. Ms. Walsh directed Ms. Perkins to remove all references to the 2015-16 Title IX Policy from her report, including the definitions of consent and coercion. In the report submitted to the panel, Ms. Perkins listed a single policy section as applicable, "2014-15 Code of Student Conduct. Offenses III. Sexual Misconduct." As directed by Ms. Walsh, Ms. Perkins did not list or refer even once in her 29 page report to the 2015-16 Title IX Policy.

Despite the foregoing, and unbeknownst to John, Brown's general counsel "suggested" to Ms. Walsh, "that the panel could consider using the definition of consent found in the 2015/2016 policy . . . ." Ms. Walsh informed the Title IX Council Chair, Gretchen Schultz, of general counsel's suggestion.

John's Title IX adjudication panel convened on April 14, 2016. Dr. Schultz was chairman of the adjudicatory panel and she "began with the question of the definition of consent that was to be used." She informed the panel of general counsel's suggestion, and "the panel agreed that that would be an expedient way to proceed," that is, to apply the 2015-16 Title IX Policy on the issue of consent. Though the panel members' packets did not include a copy of the

2015-16 Title IX Policy, Ms. Walsh did include a copy in Dr. Schultz' packet, which she duly shared with the rest of the panel.

In reliance on the general counsel's November 4, 2015 representation, in all his written materials and testimony before the panel John addressed only the 2014-15 Code. Ann, however, focused on the 2015-16 Title IX Policy that the panel decided would control. The next day, Ms. Walsh again assured John that "The panel was provided with the 2014-2015 Code of Student Conduct and instructed to review Section III (Sexual Misconduct) of the listed Offenses when determining whether a violation of the policy occurred." She said not a word about general counsel's suggestion, about providing the 2015-16 Title IX Policy to Dr. Schultz, or that the panel agreed to rely on the definition of consent in the 2015-16 Title IX Policy.

With the green light from general counsel and a copy of the 2015-16 Title IX Policy in Dr. Schultz' packet, the panel applied the 2015-16 Title IX Policy to John and Ann's 2014 encounter. In its findings, the Panel Chairwoman wrote:

> Because the 2014-15 Code of Student Conduct does not explicitly define consent, the panel referred to the current [2015] Sexual and Gender-Based Harassment, Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy, which codified Brown University's existing community standards with respect to "maintaining a safe learning, living, and working environment where healthy, respectful, and consensual conduct represents campus cultural norms" (II).

> The current policy defines consent as "an affirmative and willing agreement to engage in specific forms of sexual contact with another" (VIIIa). Moreover, "consent cannot be obtained through (1) manipulation or (2) the use of coercion." Coercion is then defined as involving "verbal and/or physical conduct, including manipulation, intimidation, unwanted contact" (VIIIb).

Seizing upon the term "manipulation" in the new code and a text message from John to Ann in which he stated "I'm trying to manipulate you a lot," the panel found John had manipulated Ann into sex and held him responsible for sexual misconduct with her. As for Ann's decision to swallow John's semen, the panel did not consider that as evidence. Moreover, it declined to consider any of Ann's texts, conversations or conduct after her encounter with

John.  Though Ms. Perkins found such information to be relevant and included it in her report, Brown trains its panel members to disregard such information, and that is what the panel did.

*John's Suspension & Appeal*

As a sanction, Brown suspended John until Ann graduates in the spring of 2018, at which time John will have to petition for readmission for the fall 2018 semester.  John appealed the panel's decision, as did Ann, who wished the panel to impose a harsher sanction.  Brown, however, denied both appeals and declared that the panel's use of the 2015-16 Title IX policy was not a procedural error, that the new Title IX policy contained no substantive difference from the old policy, and that the University does not permit appellate review on the basis that a panel decision is "manifestly contrary to the evidence."  Thus, despite having already invested three years and over $150,000 in a Brown University education, John is now suspended until at least the fall of 2018 with no guarantee of readmission.

**WITNESSES TO BE CALLED**

1.    Ann Roe ...........................................................................................Title IX Complainant

2.    John Doe ...........................................................................................Title IX Respondent

3.    Djuna Perkins........................................................................................... Investigator

4.    Amanda Walsh........................................................................... Title IX Program Officer

5.    Gretchen Schultz............................................................................Title IX Council Chair

6.    Besenia Rodriguez ........................................................................ Title IX Panel Member

7.    Katherine Trimble .......................................................................... Title IX Panel Member

8.    Kimberley Charles ......................................................................... Title IX Panel Member

9.    Alana Sacks................................................................................................SHARE Advocate

10.   Colin Sullivan .............................................................................. Title IX Panel Member

11.   Alexandra Karppenin ..................................................................... Title IX Panel Member

12.    Amariah Becker .............................................................. Title IX Panel Member

13.    Maria Suarez ......................................................... Associate Dean, Office of Student Life

14.    Yolanda Castillo.................................................... Associate Dean, Office of Student Life

## DOCUMENTS TO BE INTRODUCED[2]

1.     2015-16 Sexual and Gender-Based Harassment, Sexual Violence, Relationship and
Interpersonal Violence and Stalking Policy

2.     2015-16 Complaint Process Pursuant to the Sexual and Gender-Based Harassment,
Sexual Violence, Relationship and Interpersonal Violence and Stalking Policy

3.     2014-15 Code of Student Conduct

4.     Djuna Perkins' Investigation Report (first draft)

5.     Djuna Perkins' Interim Investigation Report

6.     Djuna Perkins' Final Investigation Report and Appendices

   a.   *App. A: Ann Roe's Title IX Complaint*
   b.   *App. B: John Doe's Response to Title IX Complaint[3]*
   c.   *App. D: Compilation of Text Messages*
   d.   *App. E: Photos of the storage room*
   e.   *App. F: Texts between John Doe and Witness 8*
   f.   *App. G: Texts between John Doe and Witness 9*

7.     November 4, 2015 Email from General Counsel

---

[2] Counsel are meeting on July 12, 2016 to discuss documents to be introduced at trial. A complete exhibit list will be provided to the Court, which may not include all of the documents listed here. As discovery is ongoing it may include additional documents.

[3] Ms. Perkins' report also contained an App. C which was a compilation of text messages prepared and submitted to Brown by Ann Roe. Her compilation, however, contained gaps and included no texts after November 14, 2014. John Doe submitted a complete and otherwise identical compilation of text messages which is App. D. Ann acknowledged the authenticity of App. D. Therefore, Ms. Perkins' report referred exclusively to App. D.

8.    April 15, 2016 correspondence from Amanda Walsh

9.    Hearing Findings

10.   Notice of Suspension

11.   John Doe's Appeal

12.   Ann Roe's Appeal

13.   Notice of denial of Appeals

14.   Suspension/Expulsion Authorization Form

15.   Student Conduct Board Training Materials 2014-2015

16.   Suspension/Expulsion Authorization Form

17.   Ann's April 29, 2015 letter to the mock trial board

## ISSUES FOR TRIAL

John Doe asserts two causes of action against Brown University. The first cause of action sounds in contract, which requires a showing by a fair preponderance of the evidence that the contract exists, that a breach occurred, and that damages resulted. See *Turdo* v. *Main*, 132 A.3d 670 , 677 (R.I. 2016); *Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005). The second sounds in promissory estoppel and requires proof, also by a fair preponderance of the evidence, of a clear and unambiguous promise, and reasonable, justifiable yet detrimental reliance. See *Norton* v. *McOsker*, 407 F.3d 501, 507 (2005), citing *Filippi* v. *Filippi*, 818 A.2d 608, 626 (R.I. 2003); *Marbucco Corp.* v. *Suffolk Constr. Co.*, 165 F.3d 103, 104 (1st Cir 1999). The following addresses the law underlying these causes of action and the facts that support them.

*The Law of Student - University Contracts*

Numerous jurisdictions, including Rhode Island, have concluded that the relationship between student and university is contractual in nature. See *Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004); *Havlik* v. *Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007); *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998). The relevant terms of the contract "between a student and a university typically include language found in the university's student handbook." *Havlik*, 509 F.3d at 34, accord *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977) (construing College Manual and Academic Information booklet as terms of a contract between a student and college). The determination of whether handbook terms are contractually binding hinges on their specificity. *Doe* v. *Brown Univ.*, 2016 U.S. Dist. LEXIS 21027, at 33 (D.R.I. Feb. 22, 2016). The more specific handbook terms are, the more reasonable a student's reliance on those terms is. See *Mangla*, 135 F.3d at 83; *Goodman* v. *Bowdoin Coll.*, 135 F. Supp.2d 40, 58 (D. Me. 2001). Thus, whether a university has committed a breach of contract depends upon the specificity of the handbook term or terms at issue, and what meaning the university "should reasonably expect the other party to give it." *Mangla, 135 F.3d at 83*, quoting *Giles v. Howard University,* 428 F. Supp. 603, 605 (D.D.C. 1977). If the handbook lacks express terms, the Court must evaluate the university's disciplinary decisions under an arbitrary and capricious standard, finding in favor of a student if the university "has failed to act in good faith and on reasonable grounds." *Goodman*, 135 F. Supp.2d at 58.

*The Terms of Brown's Contract*

As part of its admissions packet, Brown provided John with copies of its school policies, including the 2013-14 Code of Student Conduct. The relevant portions of the 2013-14 version of the Code remained unchanged in the 2014-15 Code, which academic year is the timeframe in which John's encounter with Ann took place. As a general matter, the 2014-15 Code identified

substantive offenses and stated what conduct was not allowed.  By implication, everything else was allowed.   Among its provisions were the definition of sexual misconduct and a students' substantive rights as a respondent in a disciplinary adjudication.

With respect to sexual misconduct, the 2014-15 Code defined it as follows:

III. Sexual Misconduct

a. Sexual Misconduct that involves non-consensual physical contact of a sexual nature.

b. Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

Comment: Offense III encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity or impairment of which the offending student was aware or should have been aware . . . .

As for the substantive rights of respondents, they included the right to:

E.  To be informed of the evidence upon which a charge is based and accorded an opportunity to offer a relevant response.

F.   To be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer.

J.  To appeal a decision.

Procedurally, Brown's new "Complaint Process" also afforded John certain procedural evidentiary rights on which he was entitled to rely.   See *Cameron* v. *Otto Bock Orthopedic Indus*., 43 F.3d 14, 18 (1st Cir. 1994) (holding that rules of evidence are matters of procedure).

Among these were that:

Evidence includes any facts or information presented in support of an assertion and may include text messages, email exchanges, timelines, receipts, photographs, etc.

The investigator has the discretion to determine the relevance of any witness or other evidence.

> The investigator will produce a written report that contains the relevant information and facts . . . .

Finally, in addition to these terms is the implicit understanding that the adjudicatory process will be fundamentally fair. See *Havlik* v. *Johnson & Wales Univ.*, 490 F. Supp.2d 250, 261 (D.R.I. 2007) ("contracts contain an implied duty of good faith and fair dealing").

*Brown's Breach*

Brown breached its contract with John in a multitude of ways, including by: (1) applying the novel definition of consent contained in the 2015-16 Title IX policy retroactively to John's 2014 encounter with Ann, (2) failing to obtain and allow John to offer the text messages between Ann and Kay, (3) excluding relevant information in Ms. Perkins' report concerning the encounter, (4) excluding relevant information in Ms. Perkins' report concerning Ann's post-encounter conduct and communications, (5) refusing to consider John's sur-reply to Ann's response to his appeal, (6) implementing a Title IX regime that neglects male perspective on adjudicatory panels, and (7) affording no avenue for meaningful review of arbitrary panel decisions. The following addresses these *seriatim.*

1.  <u>Application of the new 2015-16 Title IX Policy to John's 2014 conduct</u>

John's panel applied the 2015-16 Title IX policy on the substantive issue of consent. However, the conduct at issue predated the adoption of that policy. John and Ann's encounter took place on November 10, 2014, over nine months before Brown's announcement of the new 2015-16 Title IX policy on September 3, 2015. As a basic proposition of contract law, a contract cannot be accepted before it is offered. *Haviland* v. *Simmons*, 45 A.3d 1246, 1257 (R.I. 2012). Such is the case with Brown's 2015-16 Title IX Policy. The new policy contained a definition of

consent not found in the prior 2014-15 Code.[4]  The conduct at issue between John and Ann occurred before adoption of the 2015-16 Title IX Policy.  Therefore, John was not bound by the new policy at the time of the encounter.

In light of the foregoing, what the panel should have done instead of applying the later adopted policy is focus on the 2014-15 Code, which provided as follows:

> III. Sexual Misconduct
>
> a. Sexual Misconduct that involves non-consensual physical contact of a sexual nature.
>
> b. Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.
>
> Comment: Offense III encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity or impairment of which the offending student was aware or should have been aware . . . .

Then, it should have asked, did Mr. Doe use physical force to overpower his accuser?  The answer would have been no.  Did Mr. Doe threaten his accuser?  Again, the answer would have been no.  Did Mr. Doe intimidate his accuser or place her in fear?  The answer, again, would have been no.  There is no contention that Mr. Doe's accuser was mentally incapacitated or impaired.  Therefore, the panel's task should have ended right there, and it should have found Mr. Doe *not responsible*.  Instead, the panel delved into the new 2015 Title IX policy, which was not in force at the time of Mr. Doe's offense and which the University repeatedly said it would

---

[4] The 2015-16 Title IX Policy added "manipulation" to the list of bases for the offense of sexual assault.  In pertinent part, the 2015-16 Title IX Policy reads as follows:

> Consent is an affirmative and willing agreement to engage in specific forms of sexual contact with another person. Consent requires an outward demonstration, through mutually understandable words or actions, indicating that an individual has freely chosen to engage in sexual contact. Consent cannot be obtained through: (1) manipulation; or (2) the use of coercion or force; or (3) by taking advantage of the incapacitation of another individual.

not apply.  For these reasons, Brown University breached its contract with John by suspending him on the basis of the definition of consent contained in the 2015-16 Title IX Policy.

2.  <u>Failure to obtain the text messages between Ann and Kay</u>

As a respondent in a university disciplinary proceeding, the 2014-15 Code guaranteed John the right to "an opportunity to offer a relevant response" to the accusations against him and "[t]o be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer."  John sought to offer his response by showing that Ann's messages to Kay were inconsistent with her belated claim against him.  Brown refused.

While the content of the text messages between Ann and Kay is unknown because Ms. Perkins never reviewed them, John believes that the messages would have contained substantial exculpatory evidence.  Ann has conceded that she had feelings for John and was upset by his rejection of her.  The select messages that Ann chose to reveal in support of her claim show that she confided in Kay.  She discussed John with her, and she did so via text.  There is no reason to assume that there are no other texts between Ann and Kay in which Ann discussed John, or that Ann would have said nothing more to Kay than what she said to John.

In addition to the foregoing, the texts that Ann submitted between herself and John were incomplete.  She included no messages after November 14, 2014, such as those in which Ann implied feelings for John and implored that she was "not trying to chase" him, but that he was torturing her and driving her "completely insane."  John's reply to Ann was that he was not interested and had feelings for Kay, one of Ann's best friends.  Thus, the messages between Ann and Kay were highly probable to contain relevant information as to Ann's feelings for and about John, and possibly her truthfulness.

Without so much as reviewing the texts, Ms. Perkins responded that to obtain the messages between Ann and Kay would be "overly burdensome" and "unlikely to lead to the discovery of any <u>non-duplicative</u> evidence that tends to undermine the Complainants claim that she was coerced." Without looking at the messages, Ms. Perkins truly had no idea whether they were duplicative. As for the burden, all that Ann needed to do was print them off. For these reasons, Brown's failure to obtain this evidence denied John a significant opportunity to articulate relevant concerns and issues, and present them to the hearing panel.

     3.  <u>Exclusion of Ann's rationale for not leaving the room and swallowing John's semen</u>

Brown's "Complaint Process" provides that "Evidence includes any facts or information presented in support of an assertion and may include text messages, email exchanges, timelines, receipts, photographs, etc." In her interview with Ms. Perkins, Ann acknowledged that John asked her if he could ejaculate in her mouth. Ann further acknowledged that she agreed, but claimed that the only reason she agreed to allow her alleged assailant to do this was because she did not want to leave a mess on the carpeted floor.

The import of this lurid detail is Ann's consent. She acknowledges her consent on this point. Yet, she denies having consented to the activity that led up to this moment. Moreover, her expressed concern for the carpet is, under the circumstances, perplexing. As the investigator, Ms. Perkins had discretion to determine the relevance of Ann's statement. She determined that it was relevant and included it in her report on page 11. However, Besenia Rodriguez, who was one of the panel members, stated that she did not consider this and other evidence based on the Title IX training she received from the SHARE Advocate. According to Dr. Rodriguez, the SHARE advocate gave a presentation about behaviors that someone who had been sexually victimized might exhibit and that are counterintuitive to a reasonable person. Dr. Rodriguez concluded that this training limited her ability to assess behaviors that she considered objectively

unreasonable. The decision to disregard John's verbal request, Ann's undisputed consent to his request, and her claim of concern for the carpet violated the parameters set forth in the Complaint Process as to what constitutes evidence, and usurped Ms. Perkins' role as the arbiter of relevance. Moreover, it violated John's implicit right to a fundamentally fair hearing.

4. <u>Exclusion of Ann's post-encounter communications and conduct</u>

Again, Brown's "Complaint Process" provides that "Evidence includes any facts or information presented in support of an assertion and may include text messages, email exchanges, timelines, receipts, photographs, etc." Ms. Perkins' report included details regarding Ann's conduct after her encounter with John. For instance, it contained the recollections of Witness 1 who spoke with Ann within an hour after the encounter. Witness 1 described Ann that night as her typical "happy, bubbly" self. Ann told Witness 1 she had given John a "blowjob" and described the night as "really hot." This and an abundance of other material, some of which shows Ann's subsequent pursuit of John and his rejection of her, were simply not considered at all by the panel. Ms. Rodriguez explained that, according to the training she received from Brown's SHARE Advocate, post-encounter conduct and communications are not relevant. That determination is inconsistent with Ms. Perkins's determination and violated the parameters set forth in the Complaint Process as to what constitutes evidence, and violated John's implicit right to a fundamentally fair hearing.

5. <u>Refusal to consider John's sur-reply</u>

The 2014-15 Code guaranteed John the right to "be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." In response to John's appeal of his suspension, Ann argued that "Under the 2014-'15 Code of Student Conduct, sexual misconduct is committed 'against a person's will' . . . ." The language that Ann quoted, however, is nowhere in the 2014-15 Code. Yet, Ann - a senior

staff writer for the *Brown Daily Herald* - set it off in quotes.  Accordingly, John submitted a sur-reply to the appeals panel to point out Ann's error and what was in itself a possible violation of the Code.  Offense IV on page 4 of the Code provides that "Lying or misrepresentation that inhibits or interferes with an official University investigation or hearing will be considered a serious offense."  However, the Title IX Office refused to provide John's sur-reply to the appeals panel or otherwise investigate whether Ann misrepresented the code or wrongfully sought to influence the appeals process.  This violated John's contractual right to "be given every opportunity to articulate relevant concerns and issues."

      6.   Lack of male perspective on the adjudicatory panel

The implied duty of good faith and fair dealing requires that disciplinary hearings be fundamentally fair.  However, to assess male-female relationships from an entirely female point of view does not meet that standard.  Men and women have differing perspectives on sex and relationships.  While neither gender has cornered the market on fairness and impartiality, it is also true that neither can justifiably claim that their own perspective forecloses that of the opposite gender.  Both perspectives are relevant and important, particularly on sensitive issues of sex, and John reasonably expected that his panel would include the perspective of his own gender.  The absence of that perspective violated John's reasonable expectation of a fundamentally fair hearing.  Furthermore, the SHARE training, which led at least one female panel member to completely disregard relevant evidence, demonstrates that the lack of a male perspective is a flaw at the very core of the adjudicatory process.

      7.   Lack of meaningful review of panel decisions

"[I]f the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations."  *Doe* v. *Brown Univ.*, 2016 U.S. Dist. LEXIS 21027, at 33.  Among these is the expectation that an appellate

panel would have power to toss a patently absurd result. According to Brown, its appellate panels have no such power. Its appeals policy does not allow for an appeal on the basis that "the panel's decision is manifestly contrary to the evidence and patently ridiculous." That, however, is inconsistent with any reasonable expectation accompanying the right to appeal.

To suggest that a patently ridiculous decision can only be overturned for new evidence or an error in procedure is to protect what is arbitrary. It defies reasonable expectations. Moreover, the 2014-15 Code which was in effect at the time of John and Ann's encounter is not so limited. The 2014-15 Code provided that "Appeals will *normally* be only considered" in the event of procedural error or new evidence. Use of the term "normally" leaves the door open for consideration of whether the panel's decision is manifestly contrary to the evidence, as John claimed in this instance. Yet Brown refused, despite undisputed evidence that is irreconcilable with the panel's decision.

For instance, as recounted on page 11 of Ms. Perkins' report, while Ann was performing fellatio on John, Ann "states that the light came on and she asked if she should turn it off." John said yes, "so she walked over to the light switch to try to turn it off but couldn't." With his pants around his ankles, John then walked over and turned off the light switch, which was right next to the door. Had Ann wanted to leave, this was a prime opportunity. She did not try. She did not run. If she had, with his pants around his ankles and a full erection, John was in no position to chase her down the hall. Then, according to Ann, not John, they walked back to the middle of the room, and Ann says, "I figured I was supposed to continue [performing oral sex] with him standing," so she knelt down in front of John and did. This is what she "figured" she should do.

This is not John's version of events. This is what Ann told Djuna Perkins. It is her story, and it is absolutely extraordinary that, in the middle of the assault, Ann would ask her assailant if he wanted the lights turned off. When he said yes, why would Ann not keep heading right out

the door?  At the very least, if this were an assault, why on earth would Ann not step out the door and run instead of turning off the lights, when John - ten feet away - began to waddle over toward her with a full erection and his pants around his ankles?  Plainly, she chose to stay.

Dr. Schultz was both the chair of John's hearing panel and a member of his appeals panel.  Thus, in this instance, we have the person who suggested the adoption of the 2015-16 definition of consent presiding over an appeal whose task was to review the propriety of the panel's assent to that suggestion.    While her role as chair of the appeals panel is not defined in the Title IX Complaint Process, the reasonable expectation was that she would remain impartial and limit her role to the administration of the appeal.  In fact, the Checklist for the Chair of Appellate Hearings provides that the chair's role is to preside "over the hearing panel as a non-voting member."  As such, "the Chair is responsible for the administration of the appeals hearing process and the overall decorum and conduct of the proceedings."  Certainly, the chair would not be expected to act as an advocate for either party or to provide the appeals panel documents that were not part of the record or previously disclosed to the parties.  Unfortunately, that is exactly what Dr. Schultz did in this case.

The primary basis of John's appeal was that the hearing panel erred by relying upon the 2015-16 Title IX Policy to define consent.  John claimed that this was a substantial procedural error that materially affected the Panel's decision because it enlarged the definition of sexual misconduct by adding the term "manipulation" to its scope.

According to Amariah Becker, a member of the appeals panel, Dr. Schultz referenced a "publicly available" document that was not part of the record or previously provided to John.  This "publicly available document" allegedly established that "the current [consent] definition was written to respect the values of the school already in place."  If it exists, the "publicly available document" was never referenced or appended to Ms. Perkins' report.  It also was not

shared with John, which is a violation of his contractual rights under the Title IX Complaint Process. The Complaint Process specifically states that "[i]f any additional relevant information is gathered after the investigation report is finalized, that information will be shared with both parties and each may submit a written response to the Chair within three (3) days of the date the information is received." Furthermore, John's reasonable expectations regarding the fairness of the appeals procedure were eviscerated by Dr. Schultz's dual role as the chair of both panels and her advocacy against a finding of procedural error.

*The Law of Promissory Estoppel*

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Restatement (Second) of Contracts* § 90 (1981); see also cmt. a, illus. 2 ("A promises B not to foreclose, for a specified time, a mortgage which A holds on B's land. B thereafter makes improvements . . . A's promise is binding and may be enforced by denial of foreclosure"). That is the familiar doctrine of promissory estoppel, and it applies here not to John's student handbook or contract with Brown, but to general counsel's written representation on November 4, 2015 that:

> We will be using the new Complaint Process that I emailed to you yesterday to resolve the complaint against your client [John Doe]. However, since the alleged incident took place last year, the provisions of last year's Code of Student Conduct will apply. I have attached a copy of that Code for your reference.

The code attached to the November 4, 2015 email was the 2014-15 Code.

The foregoing statement, which arrived by way of an email, presents a clear and unambiguous promise that "last year's Code of Student Conduct will apply." Procedurally, the new Complaint Process would be used. But, as to substance, general counsel's clear representation was that the 2014-15 Code would govern.

Despite the foregoing and unbeknownst to John, two members of Brown's Office of General Counsel "suggested" to Brown's Title IX Program Officer, Amanda Walsh, "that the panel could consider using the definition of consent found in the 2015/2016 policy . . . ." Ms. Walsh informed the Title IX Council Chair, Gretchen Schultz, of general counsel's suggestion.

When John's Title IX hearing convened, Dr. Schultz was chairman of the adjudicatory panel and she "began with the question of the definition of consent that was to be used." She informed the panel of general counsel's suggestion, and "the panel agreed that that would be an expedient way to proceed," that is, to apply the 2015-16 Title IX Policy on the issue of consent. Though the panel members' packets did not include a copy of the 2015-16 Title IX Policy, Ms. Walsh did include a copy in Dr. Schultz' packet. Dr. Schultz duly shared her copy of the 2015-16 Title IX Policy with the rest of the panel.

In reliance on the general counsel's November 4, 2015 representation, in his testimony before the panel John addressed only the 2014-15 Code. Ann, however, focused on the 2015-16 Title IX Policy that the panel decided would control.

The day after John's hearing, Ms. Walsh again assured John that "The panel was provided with the 2014-2015 Code of Student Conduct and instructed to review Section III (Sexual Misconduct) of the listed Offenses when determining whether a violation of the policy occurred." She said not a word about general counsel's suggestion or the fact that she had given the 2015-16 Title IX Policy to Dr. Schultz. In fact, she appears to have taken pains to prevent John from learning that the 2015-16 Title IX Policy would be applied. Ms. Perkins referenced the definition and new policy in her initial draft of the investigation report. Ms. Walsh directed Ms. Perkins to remove the reference before Ms. Perkins gave the interim report to John.

The rest is well known. The panel applied the definition of consent contained in the 2015-16 Title IX Policy and found John responsible for sexual misconduct. As a result of John's

reasonable and justifiable reliance upon general counsel's clear and unambiguous promise, such reliance has inured to John's detriment.

*John's Remedy*

The appropriate remedy for John's circumstance is twofold. First and foremost is a prohibitory injunction forbidding Brown from carrying out John's suspension. Second is an award of attorney's fees based on G.L. 1956, § 9-1-45. The following addresses these remedies in turn.

1.  A prohibitory injunction forbidding Brown from carrying out John's suspension

The primary remedy that John seeks is an injunction forbidding Brown from carrying out his suspension. The nature of this injunction is prohibitory rather than mandatory. The fundamental distinction between a prohibitory injunction and a mandatory injunction is whether the requested relief would preserve or restore the status quo, or would alter the status quo by creating a new situation on the ground. See *Giacomini* v. *Bevilacqua*, 372 A. 2d 66, 69 (R.I. 1977); *Tom Doherty Associates, Inc.* v. *Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Although the distinction has been described as whether an injunction "commands action from a party rather than preventing action," *King* v. *Grand Chapter of Rhode Island Order of the Eastern Star*, 919 A.2d 991, 995 (R.I. 2007), the line between command and prohibition can be difficult to draw. "An injunction that prohibits a party from refusing to permit some act may, as a practical matter, alter the status quo…. Moreover, many mandatory injunctions can be stated in seemingly prohibitory terms." *Tom Doherty Associates*, 60 F.3d at 34. As the Court of Appeals for the Second Circuit has observed:

> Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of "status quo." A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform

as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.

*Id.* The nature of the injunctive relief requested should thus be conceptualized based not on whether it is drafted in terms of an order "to do" or "not to do," but in terms of how it impacts the status quo.

The status quo, it has been held, "is the last peaceable status prior to the controversy." *E.M.B. Associates, Inc. v. Sugarman*, 372 A.2d 508, 509 (R.I. 1977) (emphasis added), citing 11A Wright and Miller, Federal Practice and Procedure, § 2948. "This standard allows the court to restore the status quo ante when the continuation of the changed situation would inflict irreparable harm on plaintiff." Wright and Miller, *supra*, § 2948. Thus, for instance, when in another case Brown University was ordered to reinstate its varsity women's volleyball team in order to equalize its educational opportunities under Title IX, the Court of Appeals for the First Circuit upheld the trial court's "broad discretionary power to take provisional steps restoring the status quo pending the conclusion of a trial." *Cohen v. Brown University*, 991 F.2d 888, 906 (1st Cir. 1993).

The status quo is properly understood as the last uncontested status of the parties. See Wright and Miller, *supra*. In this case, the last uncontested situation was in the Spring of 2016 before John was improperly suspended, when he was a student in his junior year preparing for his final year at Brown before graduation. A hearing had been held, and the Title IX panel found no force on John's part, no threat, intimidation, coercion or incapacitation. It is this situation to which John seeks to return, and before Brown arbitrarily imposed suspension based on the alternative, extra-contractual ground of the 2015-16 Title IX Policy, contrary to general counsel's clear representation as to which policy would apply.

The well-established principle of equity "regards as done that which ought to be done." *Alix* v. *Alix*, 497 A.2d 18, 22 (R.I. 1985), citing Dobbs, Law of Remedies § 2.3 at 34, 44 n.24 (1973). What ought to be done here is to restore John as a student at Brown permitted to attend classes and live on campus under such conditions as may be ordered by the Court. This order would do no more than reinstate the status quo ante and forestall the irreparable harm John will suffer if the Court does not intervene. As for Brown University, due to the academic calendar, it has been and is still in a state of hibernation. Thus, the requested injunction poses no prejudice or undue complications upon Brown.

2.   <u>An award of attorney's fees for absence of a justiciable issue</u>

The Court may award reasonable attorneys' fees to a prevailing party in a breach of contract dispute if it finds that there is a complete absence of any justiciable issue of either law or fact. *ADP Marshall, Inc.* v. *Fluor NE, Inc.,* 710 F.Supp.2d 197, 241 (D.R.I. 2010), citing G.L. 1956, § 9-1-45. To be justiciable, an issue must concern an actual controversy with respect to the facts involved or law to be applied. *State* v. *Beechum*, 933 A.2d 687, 689 (R.I. 2007). No such controversy exists in this matter.

The 2015-16 Title IX Policy simply did not exist at the time of John's alleged misconduct. General counsel acknowledged so much on November 4, 2015, and represented that the 2014-15 Code would be applied because of the timing of the conduct at issue. Nonetheless, general counsel advised the Title IX Office that use of the new policy on the issue of consent was permissible. The Title IX Office so advised the panel and took pains to make sure John did not learn of its intentions. It instructed Ms. Perkins to remove references to the new policy in the investigation report, and subsequently assured John that the 2014-15 Code was provided to the panel members, all the while knowing that it had passed along general counsel's advice and a copy of the 2015-16 Title IX Policy to Dr. Schultz, the panel chair. On the basis of the

foregoing, there is no actual controversy with respect to the facts of this case or law to be applied. An award of fees in this instance is, therefore, just and reasonable.

## CONCLUSION

On the basis of the law and facts contained herein and to be presented at trial, the Plaintiff, John Doe, requests that the Court enjoin the Defendant, Brown University, from carrying out his suspension, restore him as a student of the university, and award him his reasonable attorney's fees.

Dated: July 11, 2016

The Plaintiff, John Doe,
By his Attorneys,

/s/ J. Richard Ratcliffe
J. Richard Ratcliffe, #2603
Jeffrey Biolchini, #7320
Ratcliffe Harten Burke & Galamaga, LLP
40 Westminster Street, Suite 700
Providence, R.I. 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhbglaw.com
jbiolchini@rhbglaw.com

## CERTIFICATE OF SERVICE

I, J. Richard Ratcliffe, certify that on July 11, 2016, this document was electronically filed. The following attorneys are registered with and may access these filings through the CM/ECF system:

Beverly E. Ledbetter
*bel_atty@brown.edu*

Michael D. Grabo
*michael_grabo@brown.edu*

James M. Green
*jmgreen@brown.edu*

Steven M. Richard
*srichard@nixonpeabody.com*

Thomas R. Bender
*Thomas_Bender@brown.edu*

/s/ J. Richard Ratcliffe