IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CIVIL ACTION
JOHN DOE                *   16-0017
                        *
VS.                     *   JULY 22, 2016
                        *
BROWN UNIVERSITY        *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Bench Trial)

**VOLUME IV**


**APPEARANCES**:

FOR THE PLAINTIFF:          J. RICHARD RATCLIFFE, ESQ.
                            JEFFREY BIOLCHINI, ESQ.
                            Ratcliffe Harten Burke
                            & Galamaga, LLP
                            40 Westminster Street
                            Suite 700
                            Providence, RI  02903

FOR THE DEFENDANT:          STEVEN M. RICHARD, ESQ.
                            Nixon Peabody, LLP
                            One Citizens Plaza
                            Suite 500
                            Providence, RI, 02903

Court Reporter:             Anne M. Clayton, RPR
                            One Exchange Terrace
                            Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>

AMARIAH BECKER

   Cross-Examination by Mr. Richard:              3

GRETCHEN SCHULTZ

   Direct Examination by Mr. Ratcliffe:          29
   Cross-Examination by Mr. Richard:            125
   Redirect Examination by Mr. Ratcliffe:       138

<u>PLAINTIFF'S EXHIBITS</u>                                 <u>FULL</u>

22  -                                                  72
38  -                                                  40
47  -                                                  28
48  -                                                  28
49  -                                                 166

_____

1    22 JULY 2016 -- 9:00 A.M.

2    **AMARIAH BECKER**, Resumes stand.

3         THE COURT:  Welcome back, everyone.  We're ready

4    to continue the trial in the matter of Doe versus Brown

5    University.

6         Ms. Becker, you were still on the stand.  You're

7    still under oath and we've moved forward to

8    Mr. Richard's cross-examination.

9         MR. RICHARD:  Good morning, your Honor.

10        Good morning, Ms. Becker.

11            <u>CROSS-EXAMINATION BY MR. RICHARD</u>

12   **Q.**   Ms. Becker, you're a graduate student at Brown?

13   **A.**   Yes.

14   **Q.**   What department?

15   **A.**   Computer Science.

16   **Q.**   Are you a Ph.D. candidate?

17   **A.**   Yes.

18   **Q.**   When do you expect to get your Ph.D.?

19   **A.**   Probably three more years.

20   **Q.**   As a member of the Title IX Council, you underwent

21   training?

22   **A.**   Yes.

23   **Q.**   Was there discussion of the appellate process in

24   the training?

25   **A.**   Yes.

1    **Q.**   What do you recall the presentation addressing as

2    to the appellate process?

3    **A.**   So there was a specific training directly about

4    the appeals process.  We learned what our role would be

5    if we were in an appeals hearing, we learned what the

6    policy said with regard to grounds for an appeal, and

7    we went through some sample scenarios of -- kind of

8    mock appeals and discussed how we would handled those

9    cases.

10   **Q.**   What did you learn about your role in the appeals

11   process?

12   **A.**   That our role as a member of an appeals hearing

13   would be to review the appeals and review the -- any

14   additional content we were given specifically about the

15   original hearing and to determine whether or not the

16   grounds for an appeal were met.

17   **Q.**   What did you learn about the grounds for an

18   appeal?

19   **A.**   That there were two major grounds for an appeal.

20   One was the introduction of new evidence since the

21   original hearing or not included in the original

22   hearing, and the second being a significant procedural

23   error that had occurred in the original hearing that

24   significantly affected the outcome of the decision.

25   **Q.**   Did the training review the complaint process?

1    **A.**    The appeals process?

2    **Q.**    Was there -- strike that.

3         MR. RICHARD:  Your Honor, the ELMO isn't

4    working, so may I approach the witness?  At least my

5    screen is still dark.

6         THE COURT:  Be off the record for a minute.

7         (Discussion off the record.)

8         MR. RICHARD:  Showing the witness, your Honor,

9    the complaint process document, Exhibit 3, full

10   exhibit.

11        THE COURT:  Okay.

12   **Q.**    Ms. Becker, I direct your attention in Exhibit 3

13   to page six, the appeals process.

14   **A.**    Yes.

15   **Q.**    You mentioned that one of the grounds was a

16   significant procedural error.  I would just like you to

17   read the appeals process to address the grounds, review

18   the grounds for appeal.  So if you want to take a

19   minute to review that paragraph, please do so.

20        (Witness reads document.)

21   **Q.**    In the second line, what does it say as to the

22   nature of the procedural error?  It has to be what?

23   **A.**    I'm not sure exactly what line you're referring

24   to.

25   **Q.**    The document refers to a substantial procedural

1   error.  Is there a difference in your mind?  You said

2   "significant."  I just wanted to clarify.

3   **A.**   I just forgot the exact word, but substantial

4   error, yes.

5   **Q.**   Was there any discussion as to what would

6   constitute a substantial procedural error?

7   **A.**   When we were going through some of the examples,

8   that was a question that was asked, was, okay, perhaps

9   a procedural error occurred.  Is this substantial?  Is

10  this something that significantly affected the outcome?

11  **Q.**   And for this particular appeal, how much time did

12  you spend preparing in advance of the panel hearing?

13  **A.**   It probably took me about a day to read through

14  the materials, maybe ten hours.

15  **Q.**   Were the text messages included?

16  **A.**   Yes.

17  **Q.**   These are based on my notes, so if I'm

18  mischaracterizing what you said, please correct me.

19  Yesterday I believe Mr. Ratcliffe asked you if this was

20  a tricky case, and you responded it was a difficult

21  case; is that correct?

22  **A.**   I believe he rephrased it to "difficult," and I

23  said yes.

24  **Q.**   What about this case did you find to be difficult?

25  **A.**   So this was my first case.  I think that even

1    though we had had a lot of training and even a mock

2    hearing, to actually read something that was about

3    people's real lives I think made it feel a lot more

4    real and that I really wanted to be careful.  And I

5    think part of what was difficult was that I was giving,

6    like, through all of this text messages and through all

7    of this evidence and just getting kind of -- it felt

8    like a very personal view of these people and just

9    absorbing that in and then trying to understand or give

10   insight into what in the original hearing had happened

11   and knowing that I was going to be using my training to

12   then make a decision about this.

13          So if I recall correctly, the initial question

14   was -- asked in the deposition was, what were your

15   thoughts about after you read all this.  And my

16   thoughts were this was -- there was a lot to take in.

17   **Q.**   Were there particular questions that you had that

18   you wished to address going into the hearing?

19   **A.**   There were discussions that I wanted to have with

20   the other appeals hearing members.

21   **Q.**   What were those discussions that you wished to

22   have?

23   **A.**   I wanted -- specifically or probably most

24   prominently was whether or not it was appropriate to do

25   as the initial hearing did in using the definition of

1    "consent" that they did or referring to the current

2    policy in their justification of the definition that

3    they used.

4    **Q.**   Were there any other issues that you wished to

5    address going into the hearing?

6    **A.**   I wanted to discuss all of the components of each

7    of the appeals with them and as we did.

8         MR. RICHARD:  Your Honor, may I approach and

9    show the witness Exhibit 31?

10        THE COURT:  Yes.

11   **Q.**   Ms. Becker, I've handed you a document we've

12   marked in this case as Exhibit 31.  It's in evidence.

13   If you wish to take a moment to review it, please do

14   so.

15        Do you know what this document is?

16   **A.**   Yes.

17   **Q.**   What is it?

18   **A.**   This was a letter to Gretchen from Amanda, Amanda

19   Walsh, that was included in the documents that we

20   received prior to the appeals hearing.

21   **Q.**   Did you review it prior to the appeals hearing?

22   **A.**   Yes.

23   **Q.**   Were there any discussions at the appeals hearing

24   regarding this document?

25   **A.**   Yes.  We very early on acknowledged that we

1    received it, and we thought that the intention was to

2    make us aware of what had transpired and kind of the

3    current state of some of the developments, but we did

4    not think that this particular letter should be used in

5    the consideration of our decision at the time.  So we

6    decided collectively to not use this as part of our

7    discussion or decisions.

8    **Q.**   What particular parts of that discussion do you

9    recall as to whether or not to use it in the

10    deliberation process?

11    **A.**   I don't think that we collectively found it to be

12    something that we needed or something that we thought

13    was particularly appropriate to include.  I think that

14    we were -- it was unclear to us what -- perhaps why it

15    was included, why we were intended to receive this

16    other than just an update of what was happening and

17    that we didn't think that that was necessarily

18    appropriate to use moving forward.

19    **Q.**   Where were you at the time of the appeals hearing?

20    **A.**   I was in St. Louis.

21    **Q.**   For what reason?

22    **A.**   I went to St. Louis for my sisters' graduations.

23    **Q.**   You participated by conference call?

24    **A.**   Yes.

25    **Q.**   How long did the appeals hearing last?

1   **A.**   I don't remember specifically, but I think maybe

2   two or three hours.

3   **Q.**   What was Gretchen Schultz's role during that

4   appeals hearing?

5   **A.**   Gretchen acted as sort of a moderator and as an

6   administrative role.  She was kind of guiding the

7   discussion and referring us to the policy and reminding

8   us of our role and our duty as members of the appeals

9   hearing and then to -- I wasn't there, but I assume she

10   was taking notes in order to then write up the letter

11   eventually that summarized our decisions.

12   **Q.**   Did she express any opinions on the evidence?

13   **A.**   No.

14        MR. RICHARD:  Your Honor, I'd like to show the

15   witness Exhibit 36, please.

16        THE COURT:  That's fine.

17   **Q.**   Do you recognize this document?

18   **A.**   Yes.

19   **Q.**   What is it?

20   **A.**   This was the letter that Gretchen wrote that

21   summarized our decisions in the appeals hearing.

22   **Q.**   Yesterday during your examination by Attorney

23   Ratcliffe you mentioned that both students had filed

24   appeals?

25   **A.**   Yes.

1    **Q.**    What was the basis of Allie's appeal?

2    **A.**    Allie's appeal was that -- was suggesting that a

3    Facebook post by Beau should be considered as new

4    evidence.

5    **Q.**    And in what order did the panel address the two

6    students' appeals?

7    **A.**    So I believe that first we went over just

8    generally the appeals process, and then we addressed

9    Allie's appeal, and then we addressed Beau's appeals.

10   **Q.**    And in Exhibit 36, which you have in front of you,

11   about halfway down the page, it states "Rationale" and

12   then it refers to complainant's appeal?

13   **A.**    Yes.

14   **Q.**    Is that consistent with your recollection of the

15   findings reached by the panel as to Allie's -- strike

16   that.   Let me rephrase it.

17       Is that consistent with your recollection of the

18   appellate panel's conclusions as to Allie's appeal?

19   **A.**    Yes.

20   **Q.**    Were there any other grounds or reasons for

21   denying Allie's appeal that are not stated in this

22   letter?

23   **A.**    This is an appropriate summary of it.   Our

24   discussion was longer.

25   **Q.**    You mentioned yesterday that Beau raised several

1    grounds on appeal?

2    **A.**    Yes.

3    **Q.**    If you look at the bottom of page one through page

4    two, does the letter appropriately reflect the grounds

5    that Beau raised in his appeal?

6    **A.**    I believe so, yes.

7    **Q.**    And they're numbered one through three?

8    **A.**    Yes.

9    **Q.**    Let's look at number one.  What was the issue

10   before the panel as to Beau's first grounds for his

11   appeal?

12   **A.**    The issue was that the incident in question

13   occurred during the 2014-2015 school year and that the

14   2015-2016 policy was where the definition of "consent"

15   came from that the initial hearing used.

16   **Q.**    The letter on page one has a footnote, two

17   footnotes, with citations.  Do you know if the panel

18   discussed those two provisions cited in the footnotes?

19   **A.**    Yes.

20   **Q.**    What do you recall the panel discussing about

21   those two provisions?

22   **A.**    I remember that we noted that the idea of consent

23   was present in the 2014-2015 code, that -- here it says

24   sexual misconduct that involves non-consensual physical

25   contact.  Then in sexual assault, again the word

1    "consent" is used.  So consent was required at the

2    time -- consent was still a requirement at the time of

3    the 2014-2015 policy.  The policy just did not have a

4    clear definition of what "consent" meant.

5    **Q.**    As the panel deliberated, did it focus only on

6    Code provisions or did it also discuss the evidence in

7    the case?

8    **A.**    What are Code provisions?

9    **Q.**    For example, the two citations, the sections cited

10   in the letter we just reviewed.

11   **A.**    Yes, we considered these.

12   **Q.**    Did you also consider and discuss any evidence

13   that was in the case?

14   **A.**    Yes.

15   **Q.**    What evidence do you recall the panel discussing

16   in its deliberations?

17   **A.**    We used evidence from the initial investigation,

18   investigative report.  Specifically, we looked at the

19   text messages.  In our discussion, we used that to have

20   a discussion about whether or not it was appropriate or

21   a reasonable conclusion of the initial hearing that

22   manipulation had occurred over the course of the

23   exchange.

24   **Q.**    Were there particular portions of the texts that

25   were reviewed?

1    **A.**   Yes.  After we had each read the texts, various

2    texts stood out to us and we discussed those.  Each of

3    us had different parts that we pointed to and then read

4    it as a group and discussed those, yes.

5    **Q.**   You mentioned manipulation.  What do you recall

6    the panel discussing about manipulation during its

7    deliberations?

8    **A.**   So the initial hearing had stated that part of

9    their conclusion about why consent was not present was

10   that -- because of the presence of manipulation, and so

11   we -- I'm sorry.  Can you repeat the question?

12   **Q.**   I was just asking you what you recall the panel

13   discussing as to manipulation during its deliberations.

14   **A.**   Right.  So we discussed whether or not it was

15   reasonable for them to conclude that there was

16   manipulation present and whether or not it was

17   appropriate for them to use manipulation as part of the

18   definition of "consent" in their decision.

19   **Q.**   What was the conclusion?

20   **A.**   Our conclusion was that it was reasonable for them

21   to include manipulation in their definition of

22   "consent" because consent was not explicitly defined in

23   the policy that they were using that was relevant and

24   that it was reasonable that any one of them could have

25   included manipulation in their own personal definition

1    of "consent" and that it was additionally present in

2    the definition that's in the current Code that they did

3    use and it was, therefore, reasonable, their findings.

4    **Q.**   Was that a unanimous conclusion?

5    **A.**   So that was unanimous.  The fact that there was

6    manipulation present was unanimous.  The fact that it

7    was reasonable for someone's definition of "consent" to

8    include manipulation, that was unanimous.  It was not

9    unanimous, the vote.  We had discrepancies in whether

10   or not we thought that, although it was reasonable,

11   whether or not that substantially affected the outcome

12   of the case.

13   **Q.**   What was your conclusion?

14   **A.**   My conclusion was that while the initial hearing

15   did seem to rely on the fact that manipulation was

16   present, that it did not constitute a procedural error

17   because I thought that it was a reasonable use of the

18   definition.

19   **Q.**   What was the dissenting view?

20   **A.**   The dissenting view was -- my understanding of the

21   dissenting view was that -- is that the decision relied

22   on -- heavily relied on the use of the word

23   "manipulation" that appeared in the 2015-2016 document

24   but not the 2014-2015 document and that it, therefore,

25   did constitute a procedural error.

1    **Q.**   If you look at page one of the decision letter

2    that I believe you still have in front of you --

3    **A.**   Yes.

4    **Q.**   -- top portion lists the appeals panel members.

5    It lists you and the other two individuals, Alexander

6    Karppenin and Colin Sullivan; correct?

7    **A.**   Yes.

8    **Q.**   I don't think you remembered the last names

9    yesterday.  I just wanted to clarify that.

10   **A.**   That's correct.

11   **Q.**   On this particular issue, you mentioned the split

12   vote.  How did Ms. Karppenin vote?

13   **A.**   She voted in favor of granting the appeal.

14   **Q.**   And how did Mr. Sullivan vote?

15   **A.**   He voted against granting the appeal.

16   **Q.**   Now, in the decision letter, there are three

17   grounds raised by Beau and the analysis of the panel as

18   to each.  Were there separate votes taken as to each

19   ground?  How did the process work to address each of

20   Beau's grounds?

21   **A.**   We voted on each separately.

22   **Q.**   So just address the first ground.  If you read the

23   decision, in your view, does that accurately summarize

24   the consensus that was reached?

25   **A.**   Yes.

1    **Q.**   Focusing on the second ground raised by Beau on

2    page two, do you recall that Beau challenged the weight

3    of the evidence?

4    **A.**   Yes.

5    **Q.**   What discussions did the panel have as to that

6    particular ground?

7    **A.**   We went back to the policy about -- specifically

8    about grounds for an appeal and noted that it was very

9    explicit about what the two grounds for an appeal were,

10   and we did not feel like this met that policy.

11   **Q.**   What was the result of the vote?

12   **A.**   We were unanimously opposed to granting that

13   specific part of the appeal.

14   **Q.**   The third ground appears to have two subparts; is

15   that correct?

16   **A.**   Yes.

17   **Q.**   Okay.  But was it your understanding that the

18   basis of this ground was a concern about what Beau

19   called serious deficiencies in the evidence?

20   **A.**   Yes.

21   **Q.**   And was there a particular document that he was

22   referencing?

23   **A.**   My understanding was that he was referencing

24   either texts or e-mails or some -- here it says

25   electronic communications.  I don't remember exactly

1    what it was.

2    **Q.**   Did you have an investigative report?

3    **A.**   Yes.

4    **Q.**   Did the panel discuss the investigative report

5    during these deliberations?

6    **A.**   Yes.

7    **Q.**   What do you recall the panel discussing as to the

8    investigative report?

9    **A.**   We noted that there were discrepancies between the

10   set of texts we got from Allie and from Beau as was

11   noted.  We used the more exhaustive set in our

12   discussion, and -- as well as all of the other pieces

13   of evidence, and we did not feel that there were

14   substantial deficiencies present.

15   **Q.**   The letter reflects that Beau raised two

16   deficiencies regarding the evidence.  Focusing on

17   III(a), request for a complete set of electronic

18   communications between Allie, the complainant, and

19   Witness 9 relating to an alleged conspiracy claim, do

20   you recall the panel discussing that particular issue?

21   **A.**   Yes.

22   **Q.**   What do you recall the panel discussing as to that

23   issue?

24   **A.**   I remember that the discussion -- we talked about

25   the role of the investigator and that there has to be

1    some bounds to the investigation, to his or her role as

2    an investigator, and that there will always be

3    something that they don't think to ask for or don't end

4    up including just as a -- due to the nature of the role

5    and to make sure it's a speedy process and that we felt

6    that the investigator did a thorough job and, yes,

7    there were things that will always be missing, but we

8    did not think that that was a substantial deficiency

9    that was present.

10   Q.    What did the panel discuss regarding the

11   investigator's role?

12   A.    I don't recall very extensive conversations about

13   the investigator's role, but we did talk about the fact

14   that there is a reasonable limit to the amount of

15   evidence and inclusions that the investigator is going

16   to bring in and that at some point -- at some point

17   it's going to be maybe a judgment call on their part as

18   to when to stop or which leads to pursue but that we

19   felt that the evidence that we did have gave us a

20   pretty good view of what was going on.

21   Q.    And particularly in subpart III(a), did the panel

22   discuss whether or not the investigator should have

23   pursued the texts that were not part of the report?

24   A.    We did not feel like in this particular instance

25   that it was obvious that the investigator should have

1  given us more evidence there.

2  **Q.**   And III(a), there's a footnote in the decision,

3  Footnote 3, which is described at the bottom of the

4  page.

5  **A.**   Yes.

6  **Q.**   Do you recall any discussions as to the

7  investigative report, page 16, Footnote 26, as cited in

8  Footnote 3?

9  **A.**   I know that we read it and acknowledged it, but I

10  don't recall much of a discussion about it.

11  **Q.**   Subpart III(b), if you could read that, please.

12      I forgot to ask one question on III(a), so let

13  me take one step back.

14      Was there a vote of the panel as to the

15  appellate ground listed in III(a)?

16  **A.**   I know that we had a vote on III.  I don't recall

17  if we voted on III(a) and III(b) separately.

18  **Q.**   Okay.  III(b) relates to Beau's contention that

19  pages should have been deleted from the investigative

20  report.

21  **A.**   Yes.

22  **Q.**   What do you recall the appellate panel discussing

23  as to that ground?

24  **A.**   Our conversation for both III(a) and III(b) were

25  sort of similar in that there will always be a limit to

1    what the investigator will bring in.  There's maybe

2    things that the investigator brings in that are not

3    necessarily pertinent or not helpful for the hearing,

4    for the panel, and that it's the panel's job to sift

5    through that and not use what is not appropriate or not

6    relevant in their decision and that we did not find

7    that it was a procedural error or that it substantially

8    affected the outcome of the decision.

9    **Q.**   What was the vote as to ground three of the

10   appeal?

11   **A.**   The vote was unanimously against granting the

12   appeal.

13   **Q.**   After these votes were taken on each ground, were

14   there any other deliberations by the panel?

15   **A.**   I don't believe there was any more discussion

16   after the final vote besides maybe some logistics about

17   how this letter would be written and sent to us.

18   **Q.**   What do you recall about those logistics?

19   **A.**   Gretchen said that she was going to write up a

20   summary of our findings and then e-mail it to us in

21   order to get edits or feedback and then iterate until

22   we were ready to send it.

23   **Q.**   Did you review a draft?

24   **A.**   I did.

25   **Q.**   Did you have any revisions?

1   **A.**   No.

2   **Q.**   Is the document before you as Exhibit 36

3   consistent with the draft that you saw?

4   **A.**   Yes.

5   **Q.**   Do you know if anyone had any revisions?

6   **A.**   I do not, no.

7   **Q.**   As the panel went through each ground of Beau's

8   appeal and Allie's appeal, what was Gretchen doing?

9   **A.**   Gretchen was moderating our conversation and

10  making sure we were making progress and not getting too

11  sidetracked and reminding us of what it was that we

12  were supposed to be doing as an appeals panel.

13        I believe that she was reading along with us

14  when we were looking at documents.  But, again, I

15  wasn't in the room, so I'm not exactly sure what she

16  was doing the whole time.

17  **Q.**   In your view, does the decision letter, Exhibit

18  36, accurately reflect the results of the panel's

19  deliberations?

20  **A.**   Yes.

21        MR. RICHARD:  May I have a moment, your Honor?

22        THE COURT:  Yes.

23        (Pause.)

24        MR. RICHARD:  No further questions.

25        THE COURT:  Thank you.  Mr. Ratcliffe, do you

1    have any redirect?

2         MR. RATCLIFFE:  No redirect, your Honor.

3         THE COURT:  One minute.  I'm not sure I have any

4    questions.  I just want to check my notes.

5         (Pause.)

6         THE COURT:  Let me just check one thing with you

7    about what evidence you had before you or the record

8    that you had before you.  You had, as I understand it,

9    the decision letters, but you also had Djuna Perkins'

10   investigative report; is that right?

11        THE WITNESS:  Yes.

12        THE COURT:  And what else did you have?

13        THE WITNESS:  You had --

14        THE COURT:  You had all the appendices to that

15   report?

16        THE WITNESS:  We had all the appendices to that

17   report.  We had the initial complaint, the response to

18   that and then responses to those.  We had the appeals

19   from both sides and the responses to the appeals.  We

20   had the letter from Amanda Walsh.  We had the initial

21   findings.

22        THE COURT:  Let me just focus in on what you

23   said about the decision of the panel and the issue of

24   manipulation.  I thought I heard you say that the panel

25   was unanimous on the issue that there was manipulation

1    and that it was reasonable to use manipulation as part

2    of the definition of "consent" and reasonable that any

3    one of the hearing panel members might have used the

4    '15-'16 policy to help evaluate the issue of consent.

5        I thought I heard you say those two points were

6    unanimous but that the vote was not unanimous because

7    at least the dissenter thought that heavy reliance on

8    the '15-'16 policy and the issue of manipulation might

9    constitute procedural error.

10        So I'm having a hard time reconciling those two

11    things, so maybe I didn't hear it right.  Could you

12    just clarify it for me.

13        THE WITNESS:  Sure.  I think we were unanimous

14    in our believing that manipulation had occurred or that

15    it was appropriate for the initial hearing to conclude

16    that manipulation had occurred.

17        I think we were unanimous in thinking that any

18    one of the initial panel members' personal definition

19    of "consent" when they just see the word "consent"

20    might include the concept of manipulation or the lack

21    of manipulation and that given the 2014-2015 policy

22    that just says "consent," if they were to deliberate on

23    that, that they may have concluded that manipulation

24    occurred and so, therefore, consent was not possible.

25        What we disagreed on or I should say what the

1    dissenter -- what I understand the dissenter to have

2    believed was that it was quite possible that the three

3    collective personal definitions of "consent" would not

4    have included the concept of manipulation just as

5    easily as it could have included the concept of

6    manipulation and that it is possible that it was

7    brought into their personal definitions of "consent" by

8    seeing the definition that was present in the 2015-2016

9    definition and, therefore, it was a procedural error

10    because it is possible that they would not have come to

11    that conclusion without them seeing the current policy.

12    THE COURT:  And what did you think about that

13    view?  You disagreed with that?

14    THE WITNESS:  I disagreed with it.  It is -- I

15    did not think that it was an error, a procedural error

16    for them to collectively come to a conclusion that

17    manipulation is part of -- or the lack of manipulation

18    is part of consent.

19    THE COURT:  Okay.  Now, I think you said you

20    looked at the whole body of text messages.

21    THE WITNESS:  Yes.

22    THE COURT:  All right.  And does that include

23    the pre-encounter text messages as well as the

24    post-encounter text messages?

25    THE WITNESS:  Yes.

1    THE COURT:  Now, did you or the panel, I should

2    say -- it sounds like you talked about all of that as

3    well as the evidence that was in Djuna Perkins' report.

4    So it sounds like you kind of looked at the body of

5    evidence and whether it was within your purview or not,

6    you sort of took a look at it to evaluate maybe the

7    reasonableness of the panel's conclusion, or did you

8    just look at it as part of just background to try to

9    understand what the panel was doing?

10    Could you just describe sort of your thinking on

11    why it was necessary to -- and I'm not saying it was

12    wrong, I'm just asking you to explain it -- to review

13    the entire body of that evidence.

14    THE WITNESS:  So we were given the

15    investigation, which included the evidence, as well as

16    all of these documents and asked to review them in

17    advance of the hearing, as we did.

18    To me, we were going to have to make a decision

19    about the definition of consent and specifically about

20    this idea of manipulation, and the only insight into

21    what the initial hearing had done that we had was the

22    letter from Gretchen.

23    And so in my mind, yes.  No, it was not our job

24    to decide anything except for whether the procedural

25    error had occurred.  But to me, reading through that

1   helped me to gain insight into what the initial hearing

2   was even thinking or how their conclusions were made

3   that supplemented the letter that we got from Gretchen.

4          THE COURT:  So I take it that your panel didn't

5   spend a lot of time reevaluating all of the evidence

6   and trying to decide essentially the question that the

7   original panel tried to decide, which was the merits of

8   the complaint and the response, right?

9          THE WITNESS:  That's correct.

10          THE COURT:  Okay.  And that's consistent with

11   what you said about it was unanimous, I think you said,

12   within the panel that it was not your role to decide

13   the challenge on the weight of evidence; is that right?

14          THE WITNESS:  Yes.

15          THE COURT:  Okay.  All right.  That's all I

16   have.  Do either of you wish to follow up on my

17   questions?

18          MR. RATCLIFFE:  No, your Honor.

19          MR. RICHARD:  No, your Honor.

20          THE COURT:  Okay.  Thank you very much,

21   Ms. Becker.  You may step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  All right.  Your next witness.

24          MR. RATCLIFFE:  Gretchen Schultz.

25          Your Honor, one matter of housekeeping.

1          THE COURT:  Go off the record while we do this.

2          (Discussion off the record.)

3          THE COURT:  A couple of ministerial matters.

4     Parties have submitted the deposition of Alana Sacks,

5     which will be taken as a full exhibit, Number 48, as a

6     substitute for her live testimony.

7          The parties have also agreed to admit Document

8     Number 47 in full.

9          (Plaintiff's Exhibits 47 and 48 admitted in

10    full.)

11         MR. RICHARD:  Your Honor, one point on

12    Ms. Sacks' deposition.  To the extent I raised any

13    objections during the examination, I withdraw them.  So

14    it's in full.

15         THE COURT:  Thank you very much.  So the whole

16    deposition is in full.  Exhibit 47 is in lieu of any

17    stipulation on the point of what was told to the

18    respondent and his counsel about communicating with the

19    University.

20         Are you ready to call your next witness?

21         MR. RATCLIFFE:  Yes, your Honor.  Gretchen

22    Schultz.

23         **GRETCHEN SCHULTZ, PLAINTIFF'S WITNESS, AFFIRMED**

24         THE CLERK:  Please state your name and spell

25    your last name for the record.

1        THE WITNESS:  Gretchen Schultz, S-C-H-U-L-T-Z.

2        THE COURT:  All right.  Good morning,

3   Ms. Schultz.

4        THE WITNESS:  Good morning.

5        THE COURT:  Go ahead and inquire.

6        **DIRECT EXAMINATION BY MR. RATCLIFFE**

7   **Q.**   Good morning, Dr. Schultz.

8   **A.**   Good morning.

9   **Q.**   Now, you are employed by Brown University?

10  **A.**   That's right.

11  **Q.**   And how long have you been employed at Brown

12  University?

13  **A.**   About 25 years.

14  **Q.**   And you are a professor of French?

15  **A.**   That's right.

16  **Q.**   And you have a Ph.D. from Cornell?

17  **A.**   Yes.

18  **Q.**   And what's your Ph.D. in?

19  **A.**   It's in romance studies, romance literatures.

20  **Q.**   Now, you were the council -- Title IX Council

21  Chair at Brown University?

22  **A.**   Yes.

23  **Q.**   And you were the Chair of the panel hearing

24  involving the claim brought by or the complaint brought

25  by Allie against Beau; correct?

1    **A.**    Yes.

2    **Q.**    And you were also the Chair of the panel that

3    considered the appeal of the finding of responsibility

4    with respect to the complaint brought by Allie against

5    Beau?

6    **A.**    Yes.

7    **Q.**    Okay.  Now, the Title IX Council Chair, that was a

8    new position that was created for the 2015-'16 academic

9    year?

10   **A.**    Yes.

11   **Q.**    And President Paxson, President of the University,

12   asked you to Chair, to take that position; correct?

13   **A.**    Yes.

14   **Q.**    And did you -- did you receive any training with

15   respect to that position?

16   **A.**    Yes, quite a bit.

17   **Q.**    Okay.  Now, did you receive training in addition

18   to the training that the Title IX Council members

19   received?

20   **A.**    No.

21   **Q.**    So you received -- even though you were the Chair,

22   you received the same training?

23   **A.**    Yes, but I had quite a -- a more extensive

24   background than they did.

25   **Q.**    I'm focusing on the training you received for this

1    position.  You had the same training as everybody else?

2    **A.**    Yes.

3    **Q.**    Now, what did the training consist of?

4    **A.**    Well, as I said in my deposition, there were a

5    number of different one- to two-hour trainings.  Off

6    the top of my head, I couldn't reel them all off to

7    you.  There was a training, obviously, in the policy

8    and the process.  There was training by the SHARE

9    advocate and a few others.

10   **Q.**    You said you received training by the SHARE

11   advocate; correct?

12   **A.**    Yes.

13   **Q.**    Who is the SHARE advocate?

14   **A.**    Alana Sacks, is it?  Is that right?

15   **Q.**    It's your memory.

16   **A.**    Right.  My memory is poor.  It's Alana something.

17   **Q.**    Do you recall anything -- do you know what the

18   SHARE advocate is?

19   **A.**    She works with victims of sexual abuse.

20   **Q.**    And you say she works with victims of sexual

21   abuse.  What does she -- how does she work with victims

22   of sexual abuse?

23   **A.**    I think you'd have to ask her that.

24   **Q.**    You have no -- she gave an hour presentation to

25   you at the Title IX Council training; correct?

1    **A.**    Yes.

2    **Q.**    And you know that she works with victims of sexual

3    abuse?

4    **A.**    Yes.

5    **Q.**    You have no idea -- do you have any idea of what

6    she does with victims of sexual abuse?

7    **A.**    Well, the training focused more on the experience

8    of victims of sexual abuse than what she, herself,

9    counseled them.

10    **Q.**    You said the training focused on the experience of

11    the victims of sexual abuse?

12    **A.**    Yes.

13    **Q.**    And what specifically in the training did Alana

14    Sacks discuss regarding the experience that victims of

15    sexual abuse endure?

16    **A.**    Let me just say that I mentioned additional

17    experience I have in this area and --

18    **Q.**    I understand that.

19    **A.**    But I'm trying to explain to you why my memory of

20    what went on in that training merges quite a bit with

21    my experience, for example, on the Sexual Assault Task

22    Force and the readings I did there and the

23    presentations that were had there.

24         THE COURT:  Let me just interject for a minute,

25    help Mr. Ratcliffe out.

1          I understand what you're saying about that, and

2     that's an important point, and there are going to be

3     questions about that, either from counsel or from me.

4     But I want you to do the best you can as he asks his

5     questions and as everyone asks their questions to

6     differentiate those things so that we can try to put

7     them into their separate silos.  And then to the extent

8     it all merges together, you're going to get a chance to

9     talk about that.

10          THE WITNESS:  Okay.

11          THE COURT:  Just bear with the process here.

12     He's trying to do this in pieces, and we need to do

13     that.

14          THE WITNESS:  Okay, your Honor.

15          THE COURT:  Go ahead.

16     **Q.**   And so we were talking about the training that you

17     received by the SHARE advocate.

18     **A.**   Yes.  What do I recall about that?  I recall her

19     talking about how different populations of students are

20     affected differently by sexual abuse, how some

21     populations of students and of people more generally

22     tend to be more frequently the victims of sexual abuse,

23     for example, LGBT students was -- and people in general

24     was one example.

25          She also, I think, talked about the various and

1    often counter-intuitive ways that victims of sexual

2    abuse can behave following abuse, different reactions.

3    **Q.**   And what different -- what counter-intuitive ways

4    did Alana Sacks tell you that victims of sexual abuse

5    would react?

6    **A.**   Well, for example, one might expect such a person

7    to become withdrawn and tentative, and that often

8    happens.  But in addition to that, sort of promiscuity

9    is a counter-intuitive example of how a victim of

10   sexual abuse might behave.

11   **Q.**   So you learned from Alana Sacks that someone who's

12   been sexually abused may become promiscuous after

13   suffering the abuse?

14   **A.**   Again, I think this came from Alana's training;

15   but as I said, you know, I've done quite a bit of

16   reading.

17   **Q.**   I know you've done a lot of reading.  We'll get

18   into that.  But I'm just trying to, again, get you to

19   focus on what Alana said.  So anything else regarding

20   counter-intuitive reactions that you believe Alana

21   spoke about at the SHARE training?

22   **A.**   I can't recall specifically.

23   **Q.**   You also said that you've done a lot of reading on

24   sexual assault.

25   **A.**   Yes.

1    **Q.**    What have you read?

2    **A.**    Well, on the task force, we had a psychologist who

3    is a specialist in sexual assault on college campuses,

4    Dr. Borkowski, and she did at least one presentation.

5    We saw some films.  We were given a number of articles

6    to read.  I read a number on my own.

7    **Q.**    And what's your understanding of the various

8    counter-intuitive reactions that victims of sexual

9    assault experience?

10   **A.**    I'm sorry.  What do you mean what's my

11   understanding?

12   **Q.**    Well, you've done a lot of reading about the

13   trauma experience of victims of sexual assault;

14   correct?

15   **A.**    Yes.

16   **Q.**    And when I originally questioned you about what

17   Alana told you at the SHARE training, you indicated you

18   were having a hard time distinguishing between what

19   Alana told you and what you learned on your own.

20   **A.**    Right.

21   **Q.**    So now we're moving to what you know about it.

22   **A.**    Right.  Well, that some people experience PTSD and

23   its attendant symptoms.  Not all do.  Depression and

24   anxiety are frequently present, but not always.  I've

25   seen in students schoolwork suffer, withdrawal, social

1    withdrawal.  Yeah.

2    **Q.**    I'm jumping a little bit ahead here, but -- well,

3    in connection with the Allie complaint and the

4    investigative package, you read that; correct?

5    **A.**    Yes.

6    **Q.**    Okay.  And in reading everything, did you come to

7    the conclusion that Allie suffered any of the trauma

8    that you were taught about and became aware of in your

9    various training?

10   **A.**    That's a good question.  I don't know that I could

11   conclude one way or the other.

12   **Q.**    Okay.  So nothing jumped out at you?

13   **A.**    Nothing that resembled PTSD, no.

14   **Q.**    I'm just asking you.  When you read through

15   everything, you didn't say, This young woman has

16   experienced signs of trauma that we learned about?

17   **A.**    No.

18   **Q.**    Now, you also had training -- strike that.

19          You are also on the Student Conduct Board?

20   **A.**    Yes.

21   **Q.**    So maybe you can just tell us what's the

22   distinction between the Student Conduct Board and the

23   Title IX Council.

24   **A.**    Okay.  Well, the Student Conduct Board --

25   basically the Title IX piece was taken out from the

1   purview of the Student Conduct Board.  So under the old

2   regime, the Student Conduct Board addressed all issues

3   having to do with transgressions of the Conduct Code.

4   So it could be -- have to do with Title IX issues, such

5   as sexual assault and harassment, but could also have

6   to do with non-Title IX issues, such as physical

7   aggression, for example.

8          So one of the fruits of Sexual Assault Task

9   Force was to create a new office, the Title IX Office,

10   and to extract cases having to do with Title IX issues

11   from the Student Conduct Board and hear them there.

12   Q.   And what's your understanding -- what is Title IX?

13   A.   What is Title IX?

14   Q.   Yes.

15   A.   It's the Federal Government telling institutions

16   of learning that they can't discriminate on the basis

17   of sex.

18   Q.   Now, did you have -- you talked about the training

19   that you received to be the Chair of the -- the Title

20   IX Chair.  Did you receive training to be a member of

21   the Student Conduct Board?

22   A.   Yes, there was training.

23   Q.   Tell us about that training.

24   A.   That's farther ago, and, like I say, my memory is

25   not exactly photographic.

1    **Q.**   Are there any documents that would refresh your

2    recollection regarding training?

3    **A.**   I don't believe so.  I think that for that

4    information the best source would be Yolanda Castillo

5    in the Student Conduct Board Office about exactly what

6    kinds of trainings.  I mean, I do believe that the

7    Office of General Counsel appeared at one training.

8    **Q.**   So you have a memory of the Office of General

9    Counsel appearing at one training?

10   **A.**   Vaguely, yeah.

11   **Q.**   Would that be Mr. Green?

12   **A.**   I believe so.

13        MR. RATCLIFFE:  Exhibit 38.  May I approach,

14   your Honor?

15        THE COURT:  Yes.

16   **Q.**   Showing you what's been marked as Exhibit 38 and

17   ask you if you recognize that document.

18   **A.**   Do I recognize this?  No, I don't.  This specific

19   document?

20   **Q.**   Why don't you look at it in full.

21        (Witness reads document.)

22   **A.**   I certainly recognize the content, but the

23   document itself --

24   **Q.**   You said you recognized the content; correct?

25   **A.**   Well, I haven't read all the way through it --

1    **Q.**    Why don't you read through it.

2    **A.**    -- but this appears to be information concerning

3    the procedures of the Student Conduct Board in relation

4    to sexual assault complaints.

5    **Q.**    And I believe you testified that you sat through a

6    training that the Office of General Counsel provided.

7    **A.**    Yes.

8    **Q.**    And does this exhibit appear to be -- strike that.

9         Do you recall if the Office of General Counsel

10   showed you a PowerPoint?

11   **A.**    Oh, this was a PowerPoint.  Yeah, I believe they

12   did.

13   **Q.**    Do you recall Mr. Green coming in and giving you

14   -- the Student Conduct Board a PowerPoint to -- during

15   his presentation?

16   **A.**    Again, vaguely, yes.

17   **Q.**    And does this, to you, appear to be the PowerPoint

18   that Mr. Green used in giving his presentation?

19   **A.**    It could well be, but I think that was a good

20   three years ago.  So forgive me if I can't say with

21   certainty.

22        MR. RICHARD:  Your Honor, if it would help, we

23   will stipulate to this being a full exhibit and

24   stipulate that it was the training that Mr. Green gave

25   in the '14-'15 academic year.

1    THE COURT:  Okay.  Thank you.  Thirty-eight will

2    be full, and that stipulation is noted.

3    (Plaintiff's Exhibit 38 admitted in full.)

4    **Q.**    Now, perhaps we're going to go through a little

5    bit of this document.  Do you recall -- can you turn to

6    this -- it's marked Training Materials 2/14.  It's

7    Bates stamped, and on the Bates stamp there's a page.

8    If you could look at page 21.

9    **A.**    Yes.

10   **Q.**    And do you recall Mr. Green showing -- when you

11   were in the training for the Student Conduct Board

12   regarding sexual assault cases, do you recall this

13   slide?

14   **A.**    No.

15   **Q.**    Well, you were on -- when did you go on the

16   Student Conduct Board?

17   **A.**    My first case was in 2012.

18   **Q.**    And were you retrained each year?

19   **A.**    There was a training every year, yes.

20   **Q.**    So you had a training in 2012 for the 2012-2013

21   academic year?

22   **A.**    I believe so, yes.

23   **Q.**    And did you remain on the Student Conduct Board

24   for the 2013-2014 academic year?

25   **A.**    Yes.

1   **Q.**   You just have to speak up a little bit.

2   **A.**   Yes.

3   **Q.**   And you were on the Student Conduct Board for the

4   2014-2015 academic year; correct?

5   **A.**   Yes.

6   **Q.**   Okay.  And so there's been a stipulation that this

7   was presented to the training -- this was the training

8   materials presented to the 2014 --

9   **A.**   I believe you, yes.

10   **Q.**   So my question is, did you recall any discussion

11   as to how you as a member of the Student Conduct Board

12   reached decisions concerning responsibility for Offense

13   III(a)?

14   **A.**   Well, that would depend on the particularities of

15   the case.

16   **Q.**   I'm not asking about particularities of the case.

17   I'm asking about the training so that you could sit on

18   a panel and evaluate a case.

19   **A.**   I'm not quite sure what you're asking.

20   **Q.**   You don't understand my question?

21   **A.**   Did -- no.  Can you rephrase it, please.

22   **Q.**   Okay.  What was your role as a member of the

23   Student Conduct Board?

24   **A.**   To hear complaints about transgressions of the

25   Student Conduct Code.

1    **Q.**   And some of those transgressions involved sexual

2    misconduct?

3    **A.**   Yes.

4    **Q.**   And each year you were trained how to evaluate and

5    decide cases regarding sexual misconduct?

6    **A.**   Yes.

7    **Q.**   Okay.

8    **A.**   But I don't believe there was a discussion of

9    deliberations.  Is that what you mean?

10   **Q.**   Well, what's the ultimate decision that you as a

11   member of the student conduct -- strike that.

12         What's the ultimate decision that the Student

13   Conduct Board makes with respect to a complaint?

14   **A.**   Responsible or not responsible.

15   **Q.**   Okay.  And was any of the training that you

16   received to understand how you come to a responsible or

17   not responsible decision?

18   **A.**   You mean how the Title IX cases, how the sexual

19   assault cases --

20   **Q.**   We're not in Title IX now.

21   **A.**   Yes, I corrected myself.  Do you mean how a sexual

22   assault case would be different from, say, a physical

23   aggression case?

24         MR. RATCLIFFE:  Can you just advise -- I don't

25   mean to -- I'd just like the witness to be advised that

1    I cannot answer questions.

2         THE COURT:  Right.  It seems awkward, but the

3    process in court is different than normal conversation.

4    Okay?  He asks you questions.  You have to answer the

5    questions, but he can't really have you asking him

6    questions and him answering them.

7         So if you don't understand the question, just

8    say you don't understand the question, and he will try

9    to rephrase it.

10        THE WITNESS:  Yes, your Honor.

11        THE COURT:  I know it's awkward, but it's just

12   how we do things.

13        THE WITNESS:  Okay.  It's a lot different in the

14   classroom.

15        THE COURT:  Exactly.

16        THE WITNESS:  Okay.  Thank you.

17        THE COURT:  Give it another shot.

18   **Q.**  So did you receive any training with respect to

19   analysis of the evidence in a sexual misconduct case?

20   **A.**  The sexual misconduct cases and the other kinds of

21   cases were not compared and contrasted.

22   **Q.**  I'm not asking about comparing and contrasting.

23   I'm asking -- look at page 21.

24   **A.**  Okay.

25   **Q.**  Did you receive any training that would address

1   the issue was respondent responsible for committing

2   Offense III(a)?  Not Exhibit 21, excuse me.  Page 21 of

3   Exhibit 38.

4   **A.**   Yes.  Well, there was this sort of thing, the

5   question sort of taking apart of the definition and

6   looking at what non-consensual physical contact meant,

7   although that definition remained vague in the 2014-'15

8   Code of Student Conduct.

9   **Q.**   So the definition of "non-consensual physical

10  contact" remained vague in the 2014-'15 Code of Student

11  Conduct?

12  **A.**   Yes.

13  **Q.**   What do you mean by it remained vague?

14  **A.**   Well, I think that's what the substance of this

15  case is all about.  It was not defined in the small

16  passage in the Code.

17  **Q.**   So do you recall that during the training

18  Mr. Green said your role is to determine, the top

19  bullet, was there non-consensual physical contact of a

20  sexual nature?

21  **A.**   I believe that -- I believe you that he did, but

22  again --

23  **Q.**   I'm not asking you to believe me.  I'm asking do

24  you recall --

25  **A.**   No, I don't recall.  I have very little

1    recollection of that.

2    **Q.**   All right.  Well, when you sat on a student

3    conduct panel in -- how many panels did you sit on in

4    2014-'15?

5    **A.**   I'm guessing half a dozen.  Could be a few less.

6    **Q.**   Tell us about after -- the cases were much

7    different than they are currently; correct?  The

8    hearings were much different?

9    **A.**   Oh, the hearings, yes, were much different.

10   **Q.**   You'd actually hear evidence?

11   **A.**   Yes.

12   **Q.**   The complainant would come into the room and

13   provide his or her story?

14   **A.**   Yes, and there would be witnesses.

15   **Q.**   So you would actually be able to sit there and

16   evaluate the evidence?

17   **A.**   Yes.

18   **Q.**   It's different now; correct?

19   **A.**   Yes.  There's an investigator who investigates and

20   then writes up a report.

21   **Q.**   So back in 2014-2015, you finish your -- listening

22   to all the evidence?

23   **A.**   Yes.

24   **Q.**   And you have to make a decision at that point;

25   correct?

1    **A.**    Yes.

2    **Q.**    So you are deciding, back in 2014-2015, was there

3    non-consensual physical contact of a sexual nature;

4    correct?

5    **A.**    Yes.

6    **Q.**    In order to do that, you had to answer some

7    questions; correct?

8    **A.**    Yes.

9    **Q.**    And those questions are listed here:  Was there

10   physical contact?

11   **A.**    Yes.

12   **Q.**    And that's what you did in 2014-2015; correct?

13   **A.**    Yes.

14   **Q.**    You said, Well, was there physical contact?  Check

15   "yes;" correct?

16   **A.**    Yes.

17   **Q.**    Was the physical contact of a sexual nature?

18   **A.**    Yes.

19   **Q.**    If it was, you check "yes."  And then the next

20   question, Was any of the contact non-consensual;

21   correct?

22   **A.**    Correct.

23   **Q.**    In order to address that, at least in this

24   training material, Mr. Green asked the question, Did

25   the complainant consent?  Correct?  Is that what you

1   try to decide?

2   **A.**   Yes.

3   **Q.**   If it was non-consensual, you first have to say

4   did he or she consent?

5   **A.**   That's right.

6   **Q.**   And then the next question is, Or did the

7   complainant have the capacity to consent?  You'd ask

8   that question; correct?

9   **A.**   That was one of the questions.

10   **Q.**   I believe that oftentimes -- you've sat on a

11   number of student conduct panels?

12   **A.**   Yes.

13   **Q.**   And oftentimes the issue is alcohol; correct?

14   **A.**   I have to say that one great peculiarity of the

15   case at hand was that there was no alcohol or drugs

16   involved, so yes.

17   **Q.**   So often they involve students out drinking;

18   correct?

19   **A.**   Yes.

20   **Q.**   Hooking up; correct?

21   **A.**   That's right.

22   **Q.**   And sexual activity occurs after a night of

23   drinking?

24   **A.**   Or during, yes.

25   **Q.**   So that was a big issue.  So you addressed that.

1    That's on this list here; correct?

2    **A.**   It is.

3    **Q.**   And if there was a lack of capacity, did the

4    respondent know or should have known about the lack of

5    capacity.  That's one of the issues you'd address also,

6    would you not?

7    **A.**   That's right.

8    **Q.**   And the last one, Did the respondent use force,

9    threats or intimidation?

10    **A.**   Um-hum.  (Affirmative.)

11    **Q.**   Yes or no?

12    **A.**   Yes.

13    **Q.**   And that's -- you know where that language,

14    "force, threats or intimidation," comes from?

15    **A.**   I believe it may have been in the Code, but I

16    don't have the Code in front of me.

17         THE COURT:  Why don't we -- before you get to

18    the Code, let's take a ten-minute break and come back.

19         MR. RATCLIFFE:  Okay.

20         THE COURT:  Okay.  Take our morning break.

21         (Recess.)

22         THE COURT:  All right.  Mr. Ratcliffe, you may

23    proceed.

24    **Q.**   I'm showing you what's been entered as Exhibit 2

25    in full and ask you if you recognize that document.

1    **A.**    Yes.

2    **Q.**    And what is it?

3    **A.**    It's the Student Conduct Code from 2014-2015.

4    **Q.**    And did that document have any relationship to the

5    case involving Beau and Allie?

6    **A.**    Yes.

7    **Q.**    And what was the relationship between this

8    document and the case involving Beau and Allie?

9    **A.**    Well, the incident in question occurred during

10   this academic year, so this was the Code that was used

11   in the case.

12   **Q.**    Now, when we were previously looking at Exhibit

13   38, we were talking about was the respondent

14   responsible for committing Offense III(a); correct?

15   And we had gotten all the way down to the end, Did the

16   respondent use force, threats or intimidation?

17   **A.**    No.

18   **Q.**    You're talking about Beau.  Let me just ask -- I

19   wasn't asking you about the Beau case, but the

20   respondent in this case did not use force, threats or

21   intimidation; correct?

22   **A.**    No, not force or threats, no.  No, I wouldn't say

23   so.

24   **Q.**    I mean, there was no finding of force, threats or

25   intimidation?

1     **A.**   No.

2     **Q.**   But I was putting this up, this slide up generally

3     so that we're addressing the training that you

4     received, and you don't really recall the training.

5     But when you were on a student conduct panel, is that

6     one of the questions you would address, did the

7     respondent use force, threats or intimidation?

8     **A.**   Yes.  We considered that, yes.

9     **Q.**   And I believe you said that comes from the Code of

10    Student Conduct?

11    **A.**   I'd have to look at it.

12    **Q.**   So you have no memory as you sit here today as to

13    whether or not the 2014-'15 code has any reference to

14    force, threats or intimidation?

15    **A.**   I believe it does.  Let me just say that for a

16    living I do close readings of texts, and I always have

17    them before me.

18         MR. RATCLIFFE:  I would actually move to strike

19    that comment.

20         THE COURT:  Well, all right.  Strike it.  It was

21    non-responsive, but go ahead with the next question.

22    **Q.**   Is it difficult for you to read on the monitor?

23    **A.**   No.  So here the exact language, "penetration,

24    violent physical force or injury," is not the exact

25    language, I believe, that you pointed to earlier.  In

1    the comment, however, yes, "Offense III encompasses a

2    broad range of behaviors, including acts using force,

3    threat, intimidation or advantage gained by the

4    offended student's mental or physical incapacity," et

5    cetera.

6    **Q.**   So that comment was used by panels in 2014-'15 to

7    determine whether or not the offense of sexual

8    misconduct was committed?

9    **A.**   Was referred to, yes.  But as a comment, that's

10   not all-encompassing.  But just giving examples, it

11   encompasses a broad range of behaviors, including acts,

12   et cetera.  It, again, wasn't -- didn't address all

13   instances.

14   **Q.**   So when you had your training with Jim Green, do

15   you recall any discussion of why the last bullet is

16   there, Did the respondent use force, threats or

17   intimidation?

18   **A.**   I believe I've already said that I don't have a

19   very specific recollection of that training.

20   **Q.**   Now, you said the comment to this Code of Student

21   Conduct was not all-encompassing; correct?

22   **A.**   Yes.

23   **Q.**   And why were the comments -- if you know, why were

24   the comments there?

25   **A.**   I was not involved in writing this Code, so I

1    couldn't tell you.

2    **Q.**  Well, it's your opinion they're not

3    all-encompassing.  Upon what do you base that

4    conclusion?

5    **A.**  Well, the wording, it says it includes a broad

6    range of behaviors including, meaning but not

7    exhaustive.

8    **Q.**  Now, in the Code of Student Conduct, are you aware

9    of any other comments or information for a student to

10   determine what the other -- we've got "broad range of

11   behaviors."

12   **A.**  Um-hum.  (Affirmative.)

13   **Q.**  You say because it says "a broad range of

14   behaviors, including force, threat or intimidation,

15   advantage gained by the offended students's mental or

16   physical incapacity or impairment of which the

17   offending student was aware or should have been aware"

18   lets the student know there are additional acts that

19   are a violation of III(a)?

20   **A.**  Well, it's stating that it encompasses a broad

21   range of behaviors.

22   **Q.**  Where, to your knowledge, in the Code of Student

23   Conduct is there any reference to other behaviors other

24   than those listed in the comment?

25   **A.**  Well, in the Code itself, sexual misconduct that

1    involves non-consensual physical contact.  The question

2    of non-consensual involves a whole range of

3    possibilities from holding a gun on someone to cajoling

4    them into something that they don't want.

5    **Q.**   So Beau was at Brown University -- do you recall

6    what year he was when this --

7    **A.**   Was he a junior?  I don't recall, no.

8    **Q.**   Do you recall if he was a member of the Class of

9    2017?

10   **A.**   That rings a bell.

11   **Q.**   Okay.  So he was a sophomore in November of 2014?

12   **A.**   Okay.

13   **Q.**   I'm not -- does that refresh your memory that Beau

14   was a sophomore in November of 2014?

15   **A.**   Okay.  Yes.

16   **Q.**   And when you heard -- when the hearing occurred in

17   -- not actually until the spring of 2016, he was a

18   junior?

19   **A.**   Yes.

20   **Q.**   And he was supposed to graduate next year in 2017?

21   **A.**   Yes.

22   **Q.**   But now he can't come back on campus until the

23   fall of 2018 at the earliest and perhaps graduate in

24   2019; correct?

25   **A.**   That was the sanction, yes.

1    **Q.**   So you had been on campus for 25 years -- well, 23

2    years back in 2014; correct?

3    **A.**   Okay.  Yes.

4    **Q.**   Well, you've been there for 25 years now?

5    **A.**   Yes.  Yes.

6    **Q.**   So you've got a student that's been on campus for

7    basically a year and looks at the Code of Student

8    Conduct and reads it and it addresses a broad range of

9    behaviors.

10       Where in the Code of Student Conduct are there

11   any other behaviors that are mentioned other than those

12   in the comments?

13   **A.**   I'm not clear what other behaviors you mean.

14   **Q.**   Well, you're the one that said the comment itself

15   encompasses a broad range of behaviors, and you used

16   the hypothetical of holding a gun to somebody's head;

17   correct?

18   **A.**   Yes.

19   **Q.**   And if Beau had held a gun to Allie's head and

20   said, You must have sexual relations with me, that

21   would be one of the broad range of behaviors, would it

22   not, that is addressed in the comment?

23   **A.**   Correct.

24   **Q.**   Because it would be threats, intimidation and

25   probably force; correct?

1   **A.**   Correct.

2   **Q.**   Now, you also said non-consensual could be

3   cajoling somebody into having sexual relations?

4   **A.**   That they don't --

5   **Q.**   That they don't want to have?

6   **A.**   Yes.

7   **Q.**   Come on, let's do it, it will be fun; correct?

8   **A.**   Well, I would say a little more persistent than

9   that.

10  **Q.**   "I'm not sure."  And the respondent saying, Come

11  on, let's do it, it will be fun.  That's cajoling;

12  correct?

13  **A.**   If it's persistent and it's coercive, yes.

14  **Q.**   We're not getting to what it is.  I'm just

15  saying -- you're making a conclusion it's persistent or

16  it's coercive.  So you're the one that said cajoling

17  somebody into having relations.  So what do you mean by

18  that?

19  **A.**   Well, it seems as though you want this comment to

20  provide a definition of "non-consensual," which it does

21  not.

22  **Q.**   I don't want anything except answers to questions.

23  **A.**   I'm sorry, could you --

24       MR. RICHARD:  Objection, your Honor, a little

25  argumentative.

1          THE COURT:  Well, I don't think Mr. Ratcliffe

2     means to be argumentative.  I understand his

3     frustration.

4          I guess I need to counsel you to not to try to

5     read too much into what he's asking or interpret or

6     infer what he's getting at.  I know you're tempted to

7     do that, and I understand why.  But your job is just to

8     listen to the question and then answer it.

9          And so what he asked you was, What do you mean

10    by "cajoling"?  So just tell him what you meant by

11    "cajoling."

12    **A.**    Maybe coercing would be a better word because

13    "cajoling" suggests a kind of light-heartedness that

14    doesn't enter into this.

15    **Q.**    What I'm trying to get at is what -- not words but

16    what conduct.  What would constitute cajoling somebody

17    into --

18    **A.**    Coercing someone?

19    **Q.**    Correct.

20    **A.**    Well, persistent, repeated questioning, I would

21    say, in the face of refusal.

22    **Q.**    And anything else?

23    **A.**    That's one example of coercive behavior.

24    **Q.**    And my question is, where in the Code would one

25    look to find other behaviors that are prohibited other

1    than those listed in Section III(a)?

2    **A.**   The assumption is that they are contained in the

3    phrase "non-consensual."

4    **Q.**   And I believe the phrase "non-consensual" is not

5    defined.

6    **A.**   Correct.  Not in the Code.  Not in this Code.

7    **Q.**   And you sat on approximately six to eight panels

8    that addressed sexual misconduct under the old Code?

9    **A.**   Yeah.  Probably closer to six.

10   **Q.**   Okay.  And those were between 2013 and 2015?

11   **A.**   There was a sexual harassment in 2012.

12   **Q.**   Now, when you came to adjudicate whether or not a

13   violation of III(a) or III(b) occurred under the old

14   Code, you would address the issue of consent; correct?

15   **A.**   Correct.

16   **Q.**   And under -- adjudications under the old policy

17   were not more difficult, were they?

18   **A.**   More difficult?

19   **Q.**   Correct.

20   **A.**   I would say that they were, but I'm not clear in

21   what way you mean "difficult."

22   **Q.**   Well, as far as coming to a determination of

23   responsible or not responsible, under the old Code you

24   had to address consent; correct?

25   **A.**   Yes.

1  **Q.**   And it wasn't more difficult under the old Code to

2  come to a determination of responsible or not

3  responsible, was it?

4  **A.**   Well, I would say that it was because "consent"

5  was not defined within the Code, and so members of the

6  board -- that entailed a more in-depth discussion of

7  what the community standard of "consent" was.

8  **Q.**   And so there was a divergence of opinion as to

9  what the community standard of "consent" was?

10  **A.**   Well, I think it's pretty well spelled out in

11  other literature.

12  **Q.**   No, I'm asking you -- we're just discussing the

13  hearings that occurred in 2000 -- before this year, I

14  guess before the last academic year, before the

15  2015-'16 academic year.  So those would be have been

16  2013-14, 2014-'15.  You said they were more difficult

17  because there wasn't a definition of "consent;"

18  correct?

19  **A.**   Also because they went on all day long.

20  **Q.**   But you said -- we have to create a record here.

21  The question was, they were more difficult because

22  there was not a definition of "consent"?

23  **A.**   Correct.

24  **Q.**   And that's because members of the community came

25  together to sit on these panels; correct?

1    **A.**    Yes.

2    **Q.**    People who had been trained?

3    **A.**    Yes.

4    **Q.**    And people like yourself who had been at Brown

5    University for 23 years; correct?

6    **A.**    Yes.

7    **Q.**    And people like yourself and other panel members

8    brought differing opinions of what the community

9    standards of "consent" were?

10   **A.**    Well --

11   **Q.**    Yes or no?

12   **A.**    It was spelled out.

13   **Q.**    We're not talking about being spelled out in the

14   new policy.  We're talking about --

15   **A.**    No, I'm talking about the old policy as well.  The

16   definition of "consent" was spelled out on the health

17   ed. page.

18        MR. RATCLIFFE:  That's not my question.  I move

19   to strike the response.

20        THE COURT:  I'll grant the motion.

21        What he's asking you is just whether panel

22   members brought different views about the notion or

23   definition of "consent" to the hearing process, and

24   they either did or they didn't.  I mean, it's based on

25   your experience.

1    **A.**   Well, to a minimal extent, I'll say yes.  But I

2    believe in the hearings that I've been in, people were

3    pretty much on the same page most of the time, but

4    there was certainly discussion, yes.

5    **Q.**   Well, you said it was more difficult, did you not?

6    **A.**   Well, I said that -- yes, it was more difficult in

7    the sense that -- I mean, it wasn't -- you know, it

8    wasn't rocket science.  It was simply an added step

9    because it wasn't spelled out there.

10   **Q.**   Are you telling me that, or are you testifying

11   that everybody came to the hearing and had the same

12   exact definition of "consent" in mind in every hearing

13   panel that you sat on?

14   **A.**   No.  They -- no.

15   **Q.**   People brought -- you said the community came

16   together and certain members of the community had a

17   different understanding of what the community standard

18   was?

19   **A.**   Not wildly so, no.

20   **Q.**   Okay.  So where does the -- there's nothing in

21   this Code that addresses the definition of "consent;"

22   correct?

23   **A.**   Yes.

24   **Q.**   So the panel -- you've already testified the panel

25   had to come up with their own understanding of what

1    "consent" was?

2    **A.**   Correct.

3    **Q.**   And that there were some differing of opinions as

4    to what "consent" meant?

5    **A.**   Again, I'm sure people expressed it in different

6    ways because the language wasn't before them, but I

7    never found in -- I never really found great arguments

8    over whether an act was consensual or not.

9    **Q.**   We're talking about the definition of "consent,"

10   what consent is.

11   **A.**   Right.

12   **Q.**   Did you not testify that people had differing

13   opinions?

14   **A.**   To a certain degree.

15   **Q.**   Okay.  And to a certain degree in what way?

16   **A.**   In what way?

17        THE COURT:  Let me try to interject because I

18   think you're going and over the same topic.

19        So the way I assess what you testified to is

20   that people had to come to these hearing panels with

21   their own understanding of consent.  You testified that

22   there were minimal differences in how panels understood

23   the notion of consent.  You've testified that they were

24   pretty much on the same page, it's not rocket science.

25        And Mr. Ratcliffe is just trying to get you to

1    explain, okay, to the extent that people had different

2    views of consent or had these minimally divergent

3    points of view, in what way were they different or

4    divergent.

5          So he's trying to drill down on that question of

6    how were their views different.  Even if they were

7    minimally different, how were they different in your

8    experience?  I hope I've fairly characterized what he's

9    trying to get at, but I think that's what he's trying

10    to get at.

11          MR. RATCLIFFE:  Thank you, your Honor.

12          THE WITNESS:  Thank you.

13    **A.**   You know, one thing I do remember, and I'm sorry

14    if this is more associative than a direct response to

15    your question, but the student panelists were often the

16    clearest in terms of their understanding of "consent"

17    because they had gone through training about -- I think

18    it was health education training, and they -- so they

19    brought a clearer -- more clearly articulated

20    definition of "consent" to the proceedings.

21          I don't -- I'm sorry.  I can't recall particular

22    quibbles about -- but I do recall that in all cases

23    where consent was at issue the panel coming to a

24    consensus.

25          MR. RATCLIFFE:  I would move to strike the

1    statement regarding the panelists as nonresponsive --

2    the student panelists as non-responsive to my question.

3         THE COURT:  I'm not going to strike that.  I

4    think she's trying her best to give you an answer, and

5    the last thing she said was she just can't recall any

6    particular quibbles.  So I'm not sure there's much more

7    you're going to get out of it.

8    Q.   Now, I believe you testified that it took more

9    time to reach a decision under the old Code?

10   A.   That's right.

11   Q.   Now, you are the -- you've testified you're the

12   Chair of the Title IX Council; correct?

13   A.   I have.

14   Q.   And the Title IX Complaint Process addresses your

15   role as the Chair?

16   A.   It does.

17   Q.   And your role is to administer the hearing

18   process?

19   A.   Yes.

20   Q.   And your role is to provide consistent oversight?

21   A.   Yes.

22   Q.   And your role is to guide the panelists to a

23   finding?

24   A.   Yes.

25   Q.   And I believe it's not your role to come to a

1    conclusion?

2    **A.**    Correct.

3    **Q.**    You don't vote?

4    **A.**    No.

5    **Q.**    Now, the role of the panel, is it not, is to

6    review documents?

7    **A.**    Yes.

8    **Q.**    To listen to the parties that come in and testify,

9    if they so choose?

10   **A.**    Um-hum.   (Affirmative.)

11   **Q.**    Yes or no?

12   **A.**    Yes.

13   **Q.**    Ask questions?

14   **A.**    Yes.

15   **Q.**    And deliberate?

16   **A.**    Yes.

17   **Q.**    Now, the Beau/Allie case, I believe you testified

18   it was a difficult case -- excuse me.  Was it a

19   difficult case?

20   **A.**    It was.

21   **Q.**    Allie gave mixed messages?

22   **A.**    Well, there was a lot of sexual banter, but she

23   seemed ultimately pretty clear in the mountains of

24   sexting that she didn't want a sexual interaction.

25   **Q.**    Do you recall when you were deposed?

1    **A.**    Yes.

2    **Q.**    Deposed in my office twice?

3    **A.**    Yes.

4    **Q.**    And do you recall testifying there was a

5    complainant who sometimes gave mixed messages?

6    **A.**    Okay.

7    **Q.**    Do you recall testifying that?

8    **A.**    I believe I was deposed for seven hours.  Yeah.

9    Okay.

10   **Q.**    Would it help you if I showed you your testimony?

11   **A.**    No.

12   **Q.**    So did you have a complainant who showed, who

13   exhibited, who gave mixed messages?

14   **A.**    Yes.

15   **Q.**    And both parties were unappealing?

16   **A.**    I do remember saying that, yes.

17   **Q.**    I'm asking you, were both parties unappealing?

18   **A.**    Yes.

19   **Q.**    And I believe that you've already testified

20   because the events happened in 2014, the 2014 Code was

21   applicable?

22   **A.**    Yes.

23   **Q.**    Now, you received a packet of information in order

24   to be the Title IX Chair, act as the Title IX Chair for

25   this hearing panel; correct?

1    **A.**    Correct.

2    **Q.**    And what did that packet of information include?

3    **A.**    It included the 2014 Code.  It included the

4    investigator's report.  I can't remember whether or not

5    it included statements by the parties.  It also

6    included a folder with information about past Code

7    violations that was only to be addressed in the case of

8    a finding of responsible.

9    **Q.**    Okay.

10   **A.**    And it included the checklist, the Chair's

11   checklist that I read at the beginning of cases.

12   **Q.**    Anything else?

13   **A.**    Not that I recall.

14   **Q.**    Did it include the Title IX Policy?

15   **A.**    The current Title IX Policy?

16   **Q.**    Correct.

17   **A.**    No, I don't believe so.

18   **Q.**    Now, you met with Amanda Walsh prior to the

19   hearing?

20   **A.**    I did.

21   **Q.**    About a half-an-hour before the hearing started?

22   **A.**    Yes.

23   **Q.**    And you spoke about the case?

24   **A.**    Yes.

25   **Q.**    And Amanda Walsh told you that the Office of

1    General Counsel said it was okay to use the 2015-'16

2    policy?

3            MR. RICHARD:  Objection, your Honor.

4            THE COURT:  Grounds?

5            MR. RICHARD:  Well, if he's going to start

6    getting into substantive communications between OGC and

7    officers of the University, I thought we covered that.

8    I may have misheard the question, your Honor.

9            THE COURT:  I may have misheard it, too.  Hang

10   on.

11           Well, why don't you try to rephrase the

12   question.

13           MR. RATCLIFFE:  Well, there's been a waiver --

14           THE COURT:  I understand, but maybe you can do

15   it without getting into that, whatever Amanda Walsh

16   said to her.

17   **Q.**   What did Amanda Walsh tell you?

18   **A.**   Amanda said that one option to present to the

19   panel was to look to the current definition insofar as

20   it was a codification of community norms.

21   **Q.**   And did she tell you what she based that on?

22   **A.**   She said she had spoken to OGC.

23   **Q.**   And did she tell you that it had been suggested by

24   OGC?

25   **A.**   Yes.

1    **Q.**   She told you that it had been suggested by OGC

2    that the panel could consider using the definition of

3    consent found in the 2015-'16 policy?

4    **A.**   Yes.

5    **Q.**   And the reason was because there was no definition

6    of consent in the prior policy?

7    **A.**   Correct.

8    **Q.**   She didn't tell you because it was a codification

9    of community norms, did she?

10   **A.**   I believe she used that expression.

11   **Q.**   Well, Amanda Walsh wasn't here in 2014-'15, was

12   she?

13   **A.**   No, but the OGC was.

14   **Q.**   And did Amanda Walsh tell you that the OGC told

15   her that it was a codification of prior norms?

16   **A.**   I believe she conveyed that as the logic behind

17   the suggestion.

18   **Q.**   So at the hearing, you suggest to the panel that

19   they could consider using the definition of "consent"

20   found in the 2015-'16 policy?

21   **A.**   Yes.

22   **Q.**   And the panel decided that would be an expedient

23   way to proceed?

24   **A.**   Yes.

25   **Q.**   And you told the panel, did you not, that the

1    current definition of "consent" was a codification of

2    existing policy?

3    **A.**    Yes.

4    **Q.**    And where in the packet of information that the

5    panel had did it establish that the current definition

6    of "consent" was a codification of existing policy?

7    **A.**    It didn't.

8    **Q.**    So that was your opinion; correct?

9    **A.**    No.  It was also OGC's opinion.

10   **Q.**    You never spoke directly to OGC?

11   **A.**    No.

12   **Q.**    Are you aware of any notice that was provided to

13   Beau that the panel was going to consider the 2015-'16

14   definition of "consent" to adjudicate his conduct?

15   **A.**    I wasn't privy to that sort of information.

16   **Q.**    So my question was, were you aware of any

17   notification given to Beau?

18   **A.**    No, I was not.

19   **Q.**    And this wasn't something that was discussed

20   between you and Amanda during that half-hour conference

21   that you had before the hearing?

22   **A.**    I'm sorry, what wasn't discussed?

23   **Q.**    Well, was it discussed between you and Amanda --

24   strike that.

25          You had a half-an-hour conference with Amanda

1    prior to the hearing?

2    **A.**   Well, I spoke with her half-an-hour before.  I

3    don't believe it lasted a half-an-hour.

4    **Q.**   And it was in this conference that she told you

5    that it had been suggested by OGC that the panel could

6    consider using the definition of consent in the

7    2015-'16 policy?

8    **A.**   Yes.

9    **Q.**   And did you raise any concerns about fairness to

10   the respondent?

11   **A.**   No, because it didn't seem unfair to me.

12   **Q.**   Well, did you ask, Hey, did anybody let Beau know

13   that this is the definition we're going to use?

14   **A.**   No.

15   **Q.**   And that didn't concern you?

16   **A.**   No.

17   **Q.**   Do you consider one of your roles as the Title IX

18   Council Chair to ensure that the panel hearings are

19   fair?

20   **A.**   Absolutely.

21   **Q.**   Fair to the complainant?

22   **A.**   Fair to both parties.

23   **Q.**   I was going to get to that.  Fair to the

24   complainant?

25   **A.**   Yes.

1    **Q.**    And fair to the respondent?

2    **A.**    Indeed.

3    **Q.**    And you considered it -- now, you prepared for

4    this hearing; correct?

5    **A.**    I always do, yes.

6    **Q.**    So you read everything?

7    **A.**    I did.

8    **Q.**    And you prepared some notes?

9    **A.**    I always take -- I don't know about always, but I

10   usually take notes as I read, yes.

11   **Q.**    And this is so you can better perform your role as

12   the Chair of the hearing panel?

13   **A.**    Yes.

14        MR. RATCLIFFE:  Okay.  I believe it's Exhibit

15   22.

16   **Q.**    Showing you what's been marked Exhibit 22.  It's a

17   two-page document, and I'll show you both pages before

18   I ask you any questions.  Why don't you read through

19   the first page.

20        (Witness reads document.)

21   **A.**    I'm just looking at these -- oh, I see.  You're

22   using pseudonyms.  Um, yes.

23   **Q.**    Look at the second page.

24   **A.**    Yes.

25   **Q.**    Now, you've had an opportunity to review them?

1    **A.**   Yes.

2    **Q.**   And what are they?

3    **A.**   They're the notes that I took.

4    **Q.**   The notes that you took prior to the hearing?

5    **A.**   Yes.

6    **Q.**   In order to help guide the panelists to a finding?

7    **A.**   Well, those notes weren't the basis of my

8    guidance.  They were notes to myself, yes.

9    **Q.**   Notes to yourself so that you could perform your

10   role as helping to guide the panel as to a finding?

11   **A.**   Yes.

12        MR. RATCLIFFE:  I move that Exhibit 22 come in

13   as full.

14        MR. RICHARD:  No objection.

15        THE COURT:  All right.  Twenty-two will be full.

16        (Plaintiff's Exhibit 22 admitted in full.)

17   **Q.**   Now, do you recall when at the hearing you brought

18   up the issue of considering the 2015-'16 definition of

19   "consent"?

20   **A.**   At the beginning of deliberations.

21   **Q.**   Was there any discussion before deliberations?

22   **A.**   No.  With the panelists?

23   **Q.**   Correct, with the panelists.

24   **A.**   No.  Not that I recall, no.

25   **Q.**   Do you recall what time the hearing started?

1    **A.**   I'm guessing nine o'clock, but I don't recall

2    specifically.

3    **Q.**   It was in the morning?

4    **A.**   I believe so, yes.

5    **Q.**   And do you recall that the first thing you did was

6    go over the checklist?

7    **A.**   Yes.

8    **Q.**   And do you recall then you reminded everyone that

9    the panel was using the 2014-'15 Code of Conduct

10   because of the timing of the allegations?

11   **A.**   Yes.

12   **Q.**   You did that?

13   **A.**   I did that -- at the beginning of deliberations I

14   would have done that, and we would have reviewed that.

15   **Q.**   Well, is there a period of time when the panel

16   convenes that it's just you, Amanda and the panelists

17   there?

18   **A.**   In discussion, all of us together?  I don't recall

19   that.

20   **Q.**   So it's your memory that before the hearing began,

21   there was no -- strike that.

22         When you went over the checklist, who was in the

23   room?

24   **A.**   Oh, yes, Amanda would have been in the room then,

25   but she leaves before deliberations begin.

1    **Q.**    Okay.  But that's not until the end of the

2    hearing; correct?

3    **A.**    The second half, yes.

4    **Q.**    So we're just at the point where the panel

5    convenes.

6    **A.**    Yes.

7    **Q.**    And you recall going over the checklist?

8    **A.**    Yes.

9    **Q.**    And you recall reminding everyone that the panel

10   was using the 2014-'15 Code of Student Conduct because

11   of the timing of the allegations?

12   **A.**    I can't remember if that discussion happened when

13   I went over the checklist or when we began

14   deliberations.

15   **Q.**    Do you recall before anybody came in the room,

16   before Djuna Perkins came in the room, do you recall

17   telling the panel that they are not required to but may

18   use the 2015-'16 definition of "consent" because it may

19   be helpful in thinking about how the University has

20   viewed consent?

21   **A.**    That's not my recollection.

22   **Q.**    Now, what happens -- what's the first thing after

23   you go over the checklist?  What's the next thing that

24   happens?

25   **A.**    You mean in general?

1   **Q.**   Yes.

2   **A.**   The investigator comes in.

3   **Q.**   And --

4   **A.**   Well, I'm sorry.  Sometimes I -- I believe I

5   usually check in with panelists and ask if there are

6   any questions or discussions prior to the investigator

7   coming in.

8   **Q.**   And did you do that in this case?

9   **A.**   Undoubtedly, but I don't have a specific

10   recollection.

11   **Q.**   And do you recall any discussions or suggestions

12   or --

13   **A.**   I don't.

14   **Q.**   Okay.  Now, why does the investigator come into

15   the room?

16   **A.**   To answer any questions that the panelists might

17   have.

18   **Q.**   Okay.  And you had some questions, did you not?

19   **A.**   I believe I did, yeah.

20   **Q.**   In fact, you had questions in your -- on your

21   notes?

22   **A.**   Yes.

23   **Q.**   And your first question was what?  Can you read

24   that, Dr. Schultz?

25   **A.**   Yeah.  Confusion about John's prior findings.  Was

1    it?  Yes.

2    **Q.**   Confusion about John's prior findings and

3    sanctions, clarify what happened and to what extent

4    this can be taken into account?

5    **A.**   As I recall, I actually asked that question of

6    Amanda out of the hearing of the panelists because I

7    didn't want to introduce anything prejudicial.

8    **Q.**   Well, the report had reference to John's or Beau's

9    prior findings; correct?

10   **A.**   Yes, I think there was a footnote.  Yes.  And I

11   think Amanda may have clarified why for me.

12   **Q.**   Okay.  What did Amanda clarify for you?

13   **A.**   I think she might have said that Beau brought it

14   up himself and that it was part of his argument that he

15   was being targeted.

16   **Q.**   Okay.  Do you recall anything else that she said

17   about the inclusion of Beau's prior findings and

18   sanctions?

19   **A.**   No.

20   **Q.**   Now, do you recall discussions with -- asking

21   Djuna Perkins any questions -- strike that.

22       Do you recall asking Djuna Perkins what prompted

23   the complainant to come forward?

24   **A.**   I don't recall.  Sorry.

25   **Q.**   Did you have any discussions with Amanda Walsh

1   about what prompted the complainant to come forward?

2   **A.**   I kind of don't think so, but I really can't

3   recall.

4   **Q.**   Now, how did the -- just backing up a second to

5   the 2015-'16 policy, how was that conveyed to the

6   panel?  I mean, how did they read that policy?  Was it

7   in their packets?

8   **A.**   No.

9   **Q.**   Tell us the mechanics of how that happened.

10  **A.**   How that happened?  Well, I always bring my

11  computer with me to hearings, and I have documentation

12  on that, including the '15-'16 policy.  So when it was

13  agreed that we'd reference that for a definition of

14  "consent," I was able to produce it.

15  **Q.**   Did you print it out so everybody had it in front

16  of them, or did you just read it and let them hear what

17  it was?

18  **A.**   I didn't print it out, no.

19  **Q.**   How did the other panelists view that definition?

20  **A.**   Well, I think I showed them my computer.  I'm

21  sorry.  I don't really recall specifically, but I know

22  I did not print it out.

23  **Q.**   Now , did you recall asking a question, Can you

24  please clarify Allie's explanation for why she didn't

25  get up and leave during the event?

1    **A.**   Do I recall asking that question?  I don't.  I

2    recall just now seeing my notes that I asked -- that I

3    noted that.

4    **Q.**   Why was that important to you?

5    **A.**   Why was it important to me?  Because that's what I

6    would have done.

7    **Q.**   Okay.  But Allie didn't do that?

8    **A.**   No, she didn't.

9    **Q.**   And what inference did the panelists draw, you

10   were in the room, regarding her decision not to leave?

11   **A.**   I don't recall the specifics of that discussion.

12   **Q.**   Do you recall any discussion about it?

13   **A.**   You know, I don't, which doesn't mean it didn't

14   happen.

15   **Q.**   Do you recall asking a question, Doesn't someone

16   have to be lying?  She says she said no, and he says

17   she's an enthusiastic partner.

18        Do you recall asking that question?

19   **A.**   I do.

20   **Q.**   And do you recall the response that Djuna Perkins

21   gave?

22   **A.**   No, I don't specifically, but I believe it's in

23   the transcript, the notes that Amanda took.

24   **Q.**   And have you seen the notes that Amanda took?

25   **A.**   I did in your office.

1    **Q.**   Would it refresh your recollection if I showed you

2    those notes?

3    **A.**   It certainly would, yes.

4         (Witness reads document.)

5    **A.**   Yes.

6    **Q.**   Does that refresh your recollection as to the

7    response that Djuna Perkins gave?

8    **A.**   Yes.

9    **Q.**   Now, you've had a lot of training with respect to

10   being the Title IX Council Chair?

11   **A.**   Yes.

12   **Q.**   Okay.  And what's your understanding from that

13   training of the role of the investigator?

14   **A.**   The role of the investigator?

15   **Q.**   Correct.

16   **A.**   To interview witnesses, to look at evidence, to

17   write up what she found, to determine credibility.

18   Different investigators have different styles.  Some

19   more specifically spell out for each witness what --

20   how they rate that person's credibility.

21   **Q.**   Now, this sentence that Djuna told you or told the

22   panel that the idea that she was willingly jumping into

23   this sexual encounter doesn't match, but that's for the

24   panel to decide; correct?  Do you recall her saying

25   that?

1   **A.**   Not specifically, but it's in front of me, so I'm

2   sure she did.

3   **Q.**   Well, do you recall her sort of giving her opinion

4   on the ultimate issue in this case?

5   **A.**   No.  She didn't --

6   **Q.**   She didn't do that?

7   **A.**   She didn't come out and say Beau is responsible or

8   Beau is not responsible.

9   **Q.**   Okay.  But she did tell the panelists, if you look

10   at the text messages, it does show that he is

11   persistently making things sexual even though she is a

12   willing participant at times.  You would agree with

13   that; correct?

14   **A.**   In the text messages?

15   **Q.**   Yes.

16   **A.**   Yes, she willingly engaged in the sexual text

17   message exchange.

18   **Q.**   Very graphic?

19   **A.**   Very graphic.

20   **Q.**   Both parties?

21   **A.**   A hundred and thirty pages.

22   **Q.**   And Beau did convert things into something sexual;

23   correct?

24   **A.**   Yes.

25   **Q.**   And at times so did Allie, did she not?

1 **A.** She did.

2 **Q.** (Reading:) He did say he asked for consent and

3 she was enthusiastic, but that isn't consistent with

4 the text messages where you can see her hesitation.

5 The idea that she was willingly jumping into this

6 sexual encounter doesn't match, but that's for the

7 panel to decide.

8 So you're the Chair of this panel; correct?

9 **A.** Yes.

10 **Q.** And your role is to make sure that Beau and Allie

11 both receive a fair hearing?

12 **A.** Correct.

13 **Q.** And did you have any concerns about Beau receiving

14 a fair hearing where the investigator came in and made

15 a statement like that or made that statement?

16 **A.** No. No, the panelists came to their own

17 conclusions.

18 **Q.** Well, had they already come to their conclusion at

19 that point when that statement was made?

20 **A.** No. Based on their discussions they did, yeah.

21 **Q.** Is that -- I mean, there's no indication that the

22 panelists didn't use that information -- strike that.

23 That was something that the investigator, who

24 had spent hours putting this package together, had told

25 the panel; correct?

1    **A.**   Yes.

2    **Q.**   And the investigator -- is it your understanding

3    the investigator is a fact-finder; correct?

4    **A.**   Correct.

5    **Q.**   Or presents facts.  Just presents the facts;

6    correct?

7    **A.**   Yes.

8    **Q.**   You are the fact-finder?  The panel is the

9    fact-finder?

10   **A.**   Well, like I said, you know, they sometimes make

11   assessments about credibility and so forth.

12   **Q.**   Okay.  The ultimate fact-finder is the panel;

13   correct?

14   **A.**   Yes.  The panel comes to a decision, yes.

15   **Q.**   And is what Djuna Perkins is saying here akin to

16   fact-finding?

17   **A.**   I believe the pronunciation is Djuna.

18   **Q.**   Djuna.

19   **A.**   Did -- so your finding this to be inappropriate.

20   **Q.**   I'm asking --

21          THE COURT:  Don't read anything into his

22   statement.

23          THE WITNESS:  Okay.  I apologize.

24   **A.**   Can you repeat the question, please.

25   **Q.**   Was Djuna Perkins fact-finding?

1    **A.**   Yes.

2    **Q.**   You don't recall any discussions that the --

3    strike that.

4         Do you recall that because this case was being

5    heard in 2016, an extensive period of time had elapsed

6    before you heard the case?

7    **A.**   Correct.

8    **Q.**   So the event happened -- is it your recollection

9    that the event happened on November 10, 2014?

10   **A.**   In the fall of 2014, yes.  I don't recall the

11   exact date.

12   **Q.**   And the complaint was filed by Allie.  Do you

13   recall when?

14   **A.**   I don't recall the exact date, but it was later.

15   **Q.**   It wasn't until the fall of 2015; correct?

16   **A.**   Okay.  Yes.

17   **Q.**   Well, is that your memory?

18   **A.**   I don't have a specific memory for dates.

19   **Q.**   Well, there was no discussion during the

20   deliberations on why or any inference that the panel

21   should draw about Allie waiting to file a complaint;

22   correct?

23   **A.**   I can't recall whether that came up in the

24   deliberations, but it was certainly not unusual for

25   complaints to be brought as much as a year after the

1    event.  Not at all.

2    **Q.**    Now, was that -- my question was, was that

3    something that the panel addressed?

4    **A.**    I don't recall.

5    **Q.**    Now, you also said -- there was some discussion,

6    was there not, about Allie processing whether or not

7    she had been sexually assaulted?

8    **A.**    The deliberations were long.  It wouldn't surprise

9    me if that was part of the deliberations.  You know, I

10   don't have a clear memory.

11   **Q.**    Isn't it true that there was information in the

12   packet that Allie didn't realize that she was sexually

13   assaulted until sometime well after the event in

14   question?

15   **A.**    Yeah.  That's one way to put it, yeah.

16   **Q.**    You agree with me about that?

17   **A.**    I believe that shortly after she did make some

18   references to Beau being pushy or something.  But as

19   far as, yes, identifying it that way as a sexual

20   assault, that came later.

21   **Q.**    And in the training that you and the panelists

22   had, you learned that it often happens that assault

23   victims don't process what happens?

24   **A.**    Sometimes it takes them a while to do so, yes.

25   **Q.**    Okay.  But that's based on the SHARE training that

1    you received?

2    **A.**   I don't recall if that was specifically part of

3    the SHARE training or a different training.

4    **Q.**   But training you received at Brown University in

5    connection with your role as either Title IX Chair or

6    in connection with the Sexual Assault Task Force?

7    **A.**   Yes.

8    **Q.**   Now, at some point the panel has to make a

9    decision?

10   **A.**   Correct.

11   **Q.**   With all this information?

12   **A.**   Yes.

13   **Q.**   And there was a vote?

14   **A.**   Yes.

15   **Q.**   And what was the vote?

16   **A.**   I believe it was two-to-one for responsible.

17   **Q.**   Okay.  And you drafted a findings letter?

18   **A.**   I did.

19   **Q.**   And you circulated it?

20   **A.**   Yes.

21   **Q.**   And the findings letter captures the rationale of

22   the panel?

23   **A.**   Yes.

24   **Q.**   And the purpose of the findings letter was to

25   accurately reflect the panel decision?

1    **A.**    Yes.

2    **Q.**    It was to accurately reflect the rationale that

3    the panel used to reach the decision?

4    **A.**    Yes.

5    **Q.**    And that's the only characterization, written

6    characterization of the deliberations and rationale of

7    the panel; correct?

8    **A.**    Well, it's not meant to characterize the

9    deliberations.  It's meant to characterize the

10   decision.

11   **Q.**    But it's the only characterization of that

12   decision?

13   **A.**    Yes.

14   **Q.**    And it's the only characterization of the

15   rationale that the panel used to make that decision?

16   **A.**    Correct.

17   **Q.**    And I believe that the panel found that there was

18   manipulation?

19   **A.**    Yes.

20   **Q.**    And it was verbal manipulation?

21   **A.**    Yes.

22   **Q.**    And I believe that your understanding of

23   manipulation is, quote, "using words to twist other

24   people's, or to lead their thoughts in the direction

25   that they desire, pressure."

1    **A.**    Yes.

2    **Q.**    And you also refer to manipulation as game

3    playing, messing with someone's head, did you not?

4    That's your understanding of manipulation?

5    **A.**    Yes, leading someone to do something that they

6    don't want to do.

7    **Q.**    Now, during the deliberations, did you define

8    "manipulation"?

9    **A.**    I don't recall.  Did we get out a dictionary?  No.

10   **Q.**    Okay.  Do you recall, during the panel

11   deliberation, was there a discussion as to what

12   "manipulation" is?

13   **A.**    I don't recall.

14   **Q.**    Do you recall testifying at a deposition that the

15   panel did not discuss what "manipulation" is?

16   **A.**    I don't recall testifying that, but --

17   **Q.**    Would it help you if I showed you the transcript?

18   **A.**    If it's on there, I believe you.

19        THE COURT:  That's not the way we do it.  She

20   doesn't recall testifying that way.

21   **A.**    All right.  Let's see.

22        MR. RATCLIFFE:  Page 86.

23        MR. RICHARD:  Can I ask which session?

24        MR. RATCLIFFE:  A.  I call them A and B.

25        MR. RICHARD:  First session.

1    MR. RATCLIFFE:  Yeah, because I'm using 86.

2    It's easier if I say A and B.

3    **Q.**   If I could just direct your attention to question

4    13.  Do you see that?

5    **A.**   Yes.

6    **Q.**   And the question is, "And was there a discussion

7    as to what manipulation is?"  And then Mr. Richard

8    says, "In the deliberations, do you mean?"  And I

9    respond, "Correct.  I'm sorry."

10   And what was your response?

11   **A.**   It was, "No."

12   **Q.**   Now, some manipulation is okay; correct?  Sexual

13   interaction among students.  Some manipulation is okay?

14   **A.**   I don't think so, no.

15   **Q.**   Did you recall testifying that some manipulation

16   is okay and some is not okay?

17   **A.**   I don't recall that exchange.

18   MR. RATCLIFFE:  I hope I have it right.  I may

19   not.

20   If I could just have a moment, your Honor.

21   (Pause.)

22   MR. RATCLIFFE:  I withdraw that question.

23   **Q.**   Now, I believe that -- so what I'd like to do is

24   just get to the findings letter, 27.

25   Showing you what's been marked as Exhibit 27 and

1   ask you if you recognize that.

2   **A.**   Yes.

3   **Q.**   And that's the letter that you drafted regarding

4   the findings in this case?

5   **A.**   Yes.

6   **Q.**   Now, if we can just address -- we're going to get

7   to the rationale.  (Reading:)  Both parties agree that

8   a sexual encounter took place on November 10, 2014, in

9   a third-floor locker room in Faunce Hall.  They gave

10  their divergent accounts as to whether or not the

11  encounter was consensual.  The panel perceived the

12  complainant to be the more credible witness in finding

13  the respondent responsible for non-consensual physical

14  contact of a sexual nature, and you defined the Code.

15          The next paragraph, if you can just read it.

16  You go on to state, and I think we've covered this, but

17  I just want to be clear, that (Reading:)  The consent

18  definition in the 2015-'16 Title IX Policy codified

19  Brown University's existing community standards with

20  respect to, and you quote, "maintaining a safe

21  learning, living and working environment where healthy,

22  respectful and consensual conduct represents the campus

23  cultural norm."  And you have a reference to subsection

24  II of the Title IX Policy.

25          Are you saying that the Title IX Policy

1    specifically states that it codified Brown University's

2    existing community standards?

3    **A.**    I didn't say that, no.

4    **Q.**    Okay.  So that was -- and that did not come from

5    any of the information that the panel had in their

6    packet?

7    **A.**    No.

8    **Q.**    Okay.  That's what you told the panel?

9    **A.**    Yes.

10   **Q.**    And in your role as Chair of the Title IX Council,

11   you believed it was your role to tell the panel that?

12   **A.**    I'm sorry.  It was my role to tell the panel what?

13   **Q.**    You told them that?

14   **A.**    I offered that suggestion, yes.

15   **Q.**    Well, you say you offered that suggestion.  Was

16   anybody on that panel on Student Conduct Boards before?

17   **A.**    I don't know.

18   **Q.**    Okay.  You say you offered the suggestion?

19   **A.**    Yes.

20   **Q.**    So you didn't tell them that the definitions in

21   the Title IX Policy codified existing community

22   standards?

23   **A.**    Oh, yeah.  I didn't tell them to use that, though.

24   I told them that it did codify Brown's existing

25   community standards, yes.

1  **Q.**   And you did that in your role as the Chair of the
2  Title IX Council?

3  **A.**   And I was speaking from my experience and
4  knowledge, yes.

5  **Q.**   But you did it in your role as the Chair of the
6  Title IX Council?

7  **A.**   Yes.

8  **Q.**   And you did it in your role as the Chair of this
9  Title IX panel?

10  **A.**   Yes.

11  **Q.**   Now, the letter goes on to state that the current
12  policy defines "consent" as, quote, "an affirmative and
13  willing agreement to engage in specific forms of sexual
14  contact with another;" correct?

15  **A.**   Yes.

16  **Q.**   So there was no dispute that Allie had agreed to
17  engage in some forms of sexual contact on the night of
18  November 10, 2014?

19  **A.**   I'm sorry.  Did she willingly engage in sexual
20  contact?  It was the finding of the panel that she did
21  not.

22  **Q.**   Okay.  But at some point -- let me ask you another
23  question.

24       The panel finding was that, although she
25  literally consented, that consent was vitiated because

1    it was obtained by manipulation; correct?

2    **A.**   I don't think it was found that she literally

3    consented.

4    **Q.**   All right.  So is it your testimony that by her

5    actions there, that everything that happened in that

6    room, that she refused to perform certain sexual acts?

7            MR. RICHARD:  Objection, your Honor.

8            THE COURT:  I'm not sure I understood that

9    question, so I'll sustain the objection.  Try again.

10           MR. RATCLIFFE:  Okay.  I'll move on.

11   **Q.**   Now, the basis of the decision was that the

12   consent was obtained through manipulation; correct?

13   **A.**   That was part of it, yes.

14   **Q.**   Well, that's what it says here; correct?  The

15   current policy defines an affirmative -- consent as an

16   affirmative and willing agreement to engage in specific

17   forms of sexual contact with another, and it cites to

18   the Code provision or the policy provision.  Moreover,

19   consent cannot be obtained through manipulation or the

20   use of coercion; correct?

21   **A.**   Correct.

22   **Q.**   And then "coercion" is then defined as involving

23   verbal and/or physical conduct, including manipulation,

24   intimidation and unwanted contact; correct?

25   **A.**   Correct.

1    **Q.**   So I believe that we've gone over this, but the

2    basis of the panel's finding was that there was

3    manipulation; correct?

4    **A.**   And coercion, yes.

5    **Q.**   The basis of the panel's finding is that there was

6    coercion?

7    **A.**   Manipulation is coercive, yes.

8    **Q.**   Well, what we -- the Code -- you reference the

9    definition of "coercion"; correct?

10   **A.**   Yes.

11        MR. RATCLIFFE:  Let's look at that definition.

12        THE COURT:  How much more do you think you have,

13   Mr. Ratcliffe?  I'm just trying to think about timing a

14   lunch break.

15        MR. RATCLIFFE:  I have probably maybe a

16   half-hour more.  We haven't gotten to the appeal yet.

17        THE COURT:  Okay.  Why don't you get through

18   this piece, and then we'll take a break.

19   **Q.**   Please state the definition of "coercion."  Read

20   the definition of "coercion."

21   **A.**   "Coercion is verbal and/or physical conduct,

22   including manipulation, intimidation, unwanted contact

23   and express or implied threats of physical, emotional

24   or other harm that would reasonably place an individual

25   in fear of immediate or future harm and that is

1    employed to compel someone to engage in sexual

2    contact."

3    **Q.**    And in your -- in the findings letter, you don't

4    cite the whole definition of "coercion," do you?

5    **A.**    Correct.

6    **Q.**    You don't cite anything with respect to fear?

7    **A.**    No.

8    **Q.**    And you would agree that coercion requires that an

9    individual be placed in fear, reasonable fear of

10   immediate or future harm?

11   **A.**    Well, it's used to compel someone to engage in

12   sexual contact.  I think of coercion as not necessarily

13   tied to the fear of physical harm.

14   **Q.**    Well, you sat on the Sexual Assault Task Force?

15   **A.**    Yes.

16   **Q.**    And you're the Chair of the Title IX panel?

17   **A.**    Yes.

18   **Q.**    Are you saying that this definition of "coercion"

19   that's in the Title IX Policy is incorrect?

20   **A.**    No.

21   **Q.**    So coercion requires fear, does it not?

22   **A.**    This -- it appears that this reads this way.  But,

23   you know, again, there's that word "including" in

24   there, which doesn't seem to be exhaustive.  I mean, I

25   think it can also be read that coercion is verbal

1    conduct that is employed to compel someone to engage in

2    sexual contact.

3    **Q.**    So coercion -- let's break this down, then.

4    "Coercion is verbal and/or physical conduct," and then,

5    "including manipulation, intimidation, unwanted contact

6    and express or implied threat of physical, emotional or

7    other harm;" correct?  You got that first part?

8    **A.**    I do.  The syntax is a little ambiguous.  Whether

9    that --

10   **Q.**    So you believe the definition that's in the

11   Title IX Policy is ambiguous?

12   **A.**    I guess I really hadn't thought of it that way.

13   **Q.**    Well, is it ambiguous?

14   **A.**    It doesn't set with exactly how I think of

15   coercion, what I think of coercion.  Actually, after

16   that I believe the first deposition, the reason I'm

17   thinking like this is because I actually -- I looked in

18   the dictionary because we were talking about

19   manipulation and coercion and what's the difference.

20         So I looked up the definitions of "manipulation"

21   and "coercion," and I think it was the American

22   Heritage Dictionary, and it wasn't defined in this way.

23   So that's, I think, what's more prominently in my head

24   as I'm answering your question right now.

25         If we could go back to the letter and I could

1     take a look at that again.

2     **Q.**   I just want to follow-up just a couple of

3     questions about your last comment.  You've been at

4     Brown University for 25 years?

5     **A.**   Yes.

6     **Q.**   And you have vast experience with respect to

7     matters involving complaints brought against students

8     regarding sexual misconduct?

9     **A.**   I have a considerable amount, yes.

10    **Q.**   You actually sat on the Sexual Assault Task Force?

11    **A.**   I did.

12    **Q.**   And the Sexual Assault Task Force drafted a

13    document that suggested that the Title IX Complaint

14    Process be enacted; correct?

15    **A.**   Yes.

16    **Q.**   And the Sexual Assault Task Force provided

17    recommendations for coming up with definitions to

18    include in the sexual assault -- excuse me, in the

19    Title IX Policy; correct?

20    **A.**   Yes.

21    **Q.**   And one of those definitions is the definition of

22    "coercion;" correct?

23    **A.**   Correct.

24    **Q.**   And you, as somebody with that vast amount of

25    experience, have some difficulty determining what

1    exactly "coercion" encompasses?

2    **A.**   I wouldn't characterize it that way, no.  I look

3    up words in the dictionary a lot.  I'm interested in

4    etymology.  I'm interested in fine nuances.  So I

5    wouldn't say I don't know what that means, if that's

6    what you're trying to suggest.

7    **Q.**   I'm not trying to suggest anything.  I'm just

8    saying that you indicated, did you not, that this

9    definition was ambiguous?

10    **A.**   Well --

11    **Q.**   Did you or did you not?

12    **A.**   I corrected that subsequently and explained that I

13    had been thinking of "coercion" in terms of my most

14    recent contact with that word in the American Heritage

15    Dictionary, which defines it as leading someone to do

16    something that they do not want to do and that that can

17    happen in a variety of ways.

18         Why I'm not really focusing on the fear here is

19    because that was not -- that was not an element.

20    **Q.**   Okay.  So --

21    **A.**   That Allie did not appear to be in fear of

22    physical harm.

23    **Q.**   Physical or emotional harm; correct?

24         THE COURT:  Mr. Ratcliffe, why don't we take a

25    break now, and so let's go off the record.

1          (Discussion off the record.)

2          (Lunch recess.)

3          THE COURT:  Good afternoon, everyone.  Welcome

4     back.

5          And, Mr. Ratcliffe, are you ready to proceed?

6          MR. RATCLIFFE:  Yes.

7          THE COURT:  All right.

8     **Q.**   When we left, we were talking about the definition

9     of "coercion" in the Title IX Policy that you had

10    referenced in your decision letter, panel findings

11    letter; correct?

12    **A.**   Yes.

13    **Q.**   Now, you would agree with me, would you not, it's

14    up on the ELMO, that at least as referenced in the

15    policy, that manipulation is a subset of coercion?

16    **A.**   Yes.

17    **Q.**   And as a subset of coercion, manipulation, at

18    least in the Title IX Policy, required that an

19    individual would be -- the respondent was reasonably

20    placed in fear of immediate or future harm.  You would

21    agree with that; correct?

22    **A.**   I don't think the manipulation is meant to imply

23    physical harm.

24    **Q.**   So you agree with me that coercion -- that

25    manipulation is a subset of coercion?

1    **A.**   Yes.

2    **Q.**   And coercion is express or implied -- requires

3    express or implied threats of physical, emotional or

4    other harm; correct?

5    **A.**   I'm sorry.  Could you repeat that?

6    **Q.**   Coercion requires express or implied threats of

7    physical, emotional or other harm?

8    **A.**   Among other things.

9    **Q.**   Okay.  But it does -- coercion does require

10   express or implied threats of physical, emotional or

11   other harm?

12   **A.**   Among other things.

13   **Q.**   We can get to the other things later, but coercion

14   requires express or implied threats of physical,

15   emotional or other harm?

16   **A.**   I don't think it requires it.  According to this

17   definition, that seems to be one in an enumeration.

18   **Q.**   So it's your testimony that coercion does not

19   require express or implied threats or physical,

20   emotional or other harm?

21   **A.**   Correct.  Manipulation does not.

22   **Q.**   I'm not talking about manipulation.  I'm talking

23   about coercion.  Does coercion require express or

24   implied threats of physical, emotional or other harm?

25   **A.**   Yes.

1    **Q.**   And coercion also requires that those express or

2    implied threats would reasonably place an individual in

3    fear of immediate or future harm?

4    **A.**   Yes.

5    **Q.**   And that those threats were employed to compel

6    someone to engage in sexual contact?

7    **A.**   Yes.

8    **Q.**   Okay.  And it's your testimony that manipulation

9    is not a subset of coercion?

10   **A.**   I said it was.

11   **Q.**   Okay.  It is.  All right.  And as a subset of

12   coercion, does not manipulation as defined in the

13   2015-'16 policy require express or implied threats of

14   physical, emotional or other harm?

15   **A.**   I'm sorry.  Can you repeat that, please.

16   **Q.**   Does not manipulation as defined in the 2015-'16

17   policy require express or implied threats of physical,

18   emotional or other harm?

19   **A.**   No, it doesn't.

20   **Q.**   Okay.  Why not?

21   **A.**   Because "coercion" is defined as some verbal

22   conducts, some physical conducts, which include, A,

23   manipulation; B, intimidation; C, unwanted contact; and

24   D, express or implied threats of physical, emotional or

25   other harm that would reasonably place an individual in

1    fear of immediate or future harm.

2    **Q.**   So let me see if I get this correct.  You've got

3    the -- coercion is the big circle; correct?

4    **A.**   Yes.

5    **Q.**   And inside the big circle, you have other things;

6    correct?

7    **A.**   Yes.

8    **Q.**   And one of those things is manipulation?

9    **A.**   Correct.

10   **Q.**   So manipulation is a subset, you've already said

11   that, of coercion?

12   **A.**   Correct.

13   **Q.**   So if you have manipulation, you have coercion,

14   it's inside the circle?

15   **A.**   Correct.

16   **Q.**   And coercion requires a threat -- an express or

17   implied threat of physical, emotional or other harm?

18   **A.**   That's another thing that's within that circle,

19   correct.

20   **Q.**   So you've got little circles inside the circle?

21          MR. RATCLIFFE:  May I approach?

22          THE COURT:  Sure.

23          MR. RATCLIFFE:  Maybe you can show us.

24          THE COURT:  Maybe you should put it right next

25   to her chair.

1     **Q.**   Why don't you set up a circle for us, Dr. Schultz,

2     for your understanding of that definition.  You've got

3     the big circle with coercion?

4     **A.**   I'm going with your circle metaphor.

5         THE COURT:  Hang on one second.  I'm going to

6     give you a handheld microphone if you want to testify

7     as you're making this diagram.  Okay?

8         THE WITNESS:  Okay.  I'm just looking to get

9     this language.

10         (Witness draws diagram.)

11     **Q.**   All right.  So we have coercion, and we have

12     inside the circle -- the big circle is coercion, and

13     then inside the circle we have manipulation; correct?

14     **A.**   Yes.

15     **Q.**   Intimidation?

16     **A.**   Yes.

17     **Q.**   Unwanted conduct?

18     **A.**   Yes.  Contact.

19     **Q.**   Excuse me, contact.  And express or implied

20     threats of physical, emotional or other harm; correct?

21     **A.**   Yes.  I didn't write that all out.

22     **Q.**   And actually, that's the part of the definition

23     that you referenced in your findings letter; correct?

24     **A.**   What is --

25     **Q.**   The first sentence?

1    **A.**    The first line.

2    **Q.**    The first line, yes.  All right.  You didn't

3    reference the second line that starts with "that"?

4    **A.**    The second line that starts with what?

5    **Q.**    In the second line, after "other harm," there's a

6    "that"?

7    **A.**    Correct.

8    **Q.**    Okay.  In the findings letter, you didn't

9    reference that last portion of the definition that

10   reads "that would reasonably place an individual in

11   fear of" --

12   **A.**    No, I didn't.

13   **Q.**    Can I finish?  The one that starts "that would

14   reasonably place an individual in fear of immediate or

15   future harm and that is employed to compel a person to

16   engage in sexual contact"?

17   **A.**    No.

18   **Q.**    That's not referenced?

19   **A.**    Correct, nor is the following paragraph.

20   **Q.**    Now, is it your understanding that that phrase

21   that begins with "that" and ends with "contact" that

22   you didn't reference in your findings letter is another

23   circle of coercion or does everything in the circle

24   require "that would reasonably place an individual in

25   fear of immediate or future harm and that is employed

1   to compel someone to engage in sexual contact"?

2   **A.**   Actually, I would read this as that qualifier,

3   "that would reasonably place an individual in fear of

4   immediate or future harm," I would say that qualifies

5   the fourth element, "express or implied threats of

6   physical, emotional or other harm."  Given the

7   repetition of the word "harm," I would read that as a

8   qualifier of express or implied threats.

9   **Q.**   So that's your interpretation, that manipulation,

10   at least as defined in -- let me ask you another

11   question.

12          Coercion, though, requires that the individual

13   who is being coerced is reasonably placed in fear of

14   immediate or future harm; correct?

15   **A.**   When it manifests itself as express or implied

16   threats of physical, emotional or other harm.

17   **Q.**   So it's now your contention that coercion does not

18   always require an individual being placed in fear of

19   immediate or future harm?

20   **A.**   Correct.

21   **Q.**   And coercion does not require that it be employed

22   to compel someone to engage in sexual contact; correct?

23   **A.**   Well, this is about coercive sexual contact, so

24   yes.

25   **Q.**   All right.  So your understanding of this

1    definition is that coercion does not always require

2    that the individual be placed in near of immediate or

3    future harm, but it always has to be employed to compel

4    someone to engage in sexual contact?

5    **A.**    No.  You can coerce people to do other things.

6    **Q.**    Well, in this context, in the Title IX Policy, the

7    definition that you referenced in your letter?

8    **A.**    The Title IX Policy addresses sexual misconduct.

9    **Q.**    Coercion in the Title IX Policy requires that it

10   be employed to compel someone to engage in sexual

11   contact?

12   **A.**    Yes.

13   **Q.**    But it does not require that it reasonably place

14   an individual in fear of immediate or future harm?

15   **A.**    I wouldn't say so, no.

16   **Q.**    But in any event, that's your opinion; correct?

17   **A.**    What's my opinion?

18   **Q.**    That's your understanding of the "coercion"

19   definition in the Title IX Policy?

20   **A.**    Yes.

21   **Q.**    And you've already testified that the panel didn't

22   have any discussion as to -- excuse me.  You've already

23   testified that the panel did not define "manipulation"

24   during its deliberations; correct?

25   **A.**    I don't believe that it did, no.

1   **Q.**   And it would be reasonable for someone looking at

2   this definition, would it not, even though you don't

3   agree, to draw the conclusion that coercion requires

4   fear?

5   **A.**   I can't speak for how other people would read

6   that.

7   **Q.**   I'm not asking you.  You're a linguist, are you

8   not?

9   **A.**   Yes.

10  **Q.**   You deal with texts all the time, you testified;

11  correct?

12  **A.**   That's right.

13  **Q.**   And would a reasonable interpretation of someone

14  reading that definition be that coercion requires that

15  "reasonably placed individual in fear of immediate or

16  future harm"?

17          MR. RICHARD:  Objection, your Honor.

18          THE COURT:  What's the objection?

19          MR. RICHARD:  She can testify as to her

20  interpretation.  He's asking her to speculate what

21  others may believe it to be.

22          THE COURT:  Well, I don't think he's asking her

23  to speculate as to what others believed but, rather,

24  what would be a reasonable interpretation of this

25  paragraph.

1          And actually, with her experience as a linguist

2     and with her academic background, I actually think

3     she's in a pretty good position to testify as to what

4     might be reasonable ways to read that paragraph and

5     what might not be reasonable ways to read that

6     paragraph.

7          It seems to me that there are several ways that

8     one could read the words and the clauses in this

9     paragraph, and she's testified to how she reads it, but

10    I think she's actually in a good position to be asked

11    that particular question.  That's a long way of

12    overruling your objection.

13         MR. RICHARD:  My objection's noted.  Thank you,

14    your Honor.

15         THE COURT:  All right.

16    **A.**   So I told you how I read this and what I consider

17    to be a logical reading of it.  There's many ways to

18    misread a text.  I'm sure what you're trying -- I'm not

19    supposed to say what you're trying to get it.

20         THE COURT:  What he's asking you is, is it a

21    reasonable interpretation of this paragraph for one to

22    conclude that fear of immediate or future harm is

23    required in all circumstances of coercion?  I think

24    that's what he's asking you.

25         THE WITNESS:  Okay.  I wouldn't think that

1    manipulation -- that it's reasonable to assume that

2    manipulation requires fear of immediate or future harm,

3    no.

4         THE COURT:  You don't think that's a reasonable

5    reading of that text?

6         THE WITNESS:  No.  Manipulation to me as a

7    subset of coercion does not imply fear of harm.  So I

8    would necessarily attach that clause to the preceding

9    one, which, again, uses the word "harm" that's repeated

10   in the attendant clause.

11   **Q.**   Now, but my question wasn't manipulation.  It was

12   coercion.  Does coercion require express or implied

13   threats of physical, emotional or other harm?

14   **A.**   Well, if manipulation is one of the subsets of it,

15   then not in all cases, no.

16   **Q.**   So coercion does not require -- you're stating

17   that your understanding is that coercion does not

18   require express or implied threats of physical,

19   emotional or other harm?

20   **A.**   No, not in all cases.

21   **Q.**   And is it your testimony that someone reading this

22   text -- that a reasonable person reading this text --

23   strike that.

24        Could a reasonable person reading this text come

25   to the conclusion that coercion does require express or

1    implied threats of physical, emotional or other harm?

2    **A.**    I guess if -- well, I don't know what a reasonable

3    person is, for one thing.

4    **Q.**    Well, a student.

5    **A.**    Well, they are not reasonable, let me tell you.

6         No, I'm sorry.  Strike that.

7         Sure.

8    **Q.**    A student could come to that conclusion?

9    **A.**    Students come to all kinds of conclusions.  Yeah.

10   "Coercion," as I understand it, as I read it here, is a

11   global term --

12        THE COURT:  Wait.  Wait.  You have made very

13   clear, at least to me, and that's what counts, what you

14   think it means and whether you think it includes a fear

15   of imminent or future harm.  I've got what you think.

16        What Mr. Ratcliffe is trying to ask you is

17   whether a reasonable -- another person who's reading

18   this who is reasonable could come to a different

19   conclusion than that.

20   **A.**    Okay.  Well, I'll give you an example.

21   **Q.**    I don't want an example.  I'm asking you a

22   question.  Could another person come to that

23   conclusion, a student?

24   **A.**    Yes, if they don't read it carefully.

25   **Q.**    And a student could read that definition that you

1    referenced in your findings letter to state that

2    manipulation is a subset of coercion; correct?

3    **A.**   Yes, but let me just clarify that --

4         MR. RATCLIFFE:  I'm going to move to strike that

5    because I want to move this --

6         THE COURT:  Just answer the questions.

7    Mr. Richard will be able to follow-up afterwards.

8         Go ahead.

9         THE WITNESS:  All I wanted to say is --

10         THE COURT:  No, no, no.  You can only answer --

11    it's just the way we work.  You can only talk when it's

12    in response to a question.  You only answer questions.

13         THE WITNESS:  But what if the question contains

14    a falsehood?

15         THE COURT:  Mr. Richard will follow it up.

16    That's his job as counsel for the University.

17         THE WITNESS:  Okay.  Sorry.  Go ahead.  Can you

18    repeat it?

19    **Q.**   A student could read -- look at this definition,

20    look at this (b), coercion and force, and read it and

21    conclude that manipulation is a subset of coercion?

22    **A.**   Yes.

23    **Q.**   In fact, you've said that manipulation is a subset

24    of coercion?

25    **A.**   Many times.

1  **Q.**  And that a student could read this definition to,

2  or read this statement to be -- interpret this

3  statement that manipulation as a subset of coercion

4  requires express or implied threats of physical,

5  emotional or other harm?

6  **A.**  No, I wouldn't think so.

7  **Q.**  So that would not be a reasonable interpretation

8  by a student?

9  **A.**  I really don't think that a student or most people

10  would consider that manipulation understood in a verbal

11  sense necessarily implies fear of immediate harm.

12  **Q.**  I'm not asking you about manipulation in a verbal

13  sense.  We're focusing on this definition in the

14  Title IX Policy.

15      Could somebody who doesn't know what

16  "manipulation" means read that manipulation is a subset

17  of coercion and, as such, requires express or implied

18  threats of physical, emotional or other harm?

19  **A.**  Well, if they don't know what "manipulation"

20  means, it seems to me they'd have a hard time

21  understanding this sentence.

22  **Q.**  What's the purpose -- you worked -- one of the

23  things that you testified to was that in 2014-'15,

24  there was a Code of Student Conduct; correct?

25  **A.**  Correct.

1  **Q.**    And you testified that in 2014-'15, there was

2  reference to non-consensual sexual contact; correct?

3  **A.**    Correct.

4  **Q.**    And one of the problems with that 2014-'15 Code

5  was there was no definition of "consent"?

6  **A.**    Right.

7  **Q.**    And you were tasked with being the Chair of a

8  panel that had to address Beau's conduct in 2015-'16;

9  correct?

10  **A.**    Correct.

11  **Q.**    And conduct that occurred in 2014; correct?

12  **A.**    Yes.

13  **Q.**    And you had to come up with a definition of

14  "consent;" correct?

15  **A.**    Yes.

16  **Q.**    And you decided that you were going to go to the

17  Title IX Policy to come up with the definition of

18  "consent;" correct?

19  **A.**    No, I didn't decide that.

20  **Q.**    You suggested to the panel that they could?

21  **A.**    Yes.

22  **Q.**    And the panel, after you made the suggestion,

23  agreed that they would look at the Title IX Policy to

24  judge Beau's conduct in 2014; correct?

25  **A.**    Yes.

1    **Q.**   And you spent some time addressing the facts of

2    the case; correct?

3    **A.**   Correct.

4    **Q.**   And then it came time to make a decision, did it

5    not?

6    **A.**   It did.

7    **Q.**   And you had already come to a conclusion, had you

8    not, that -- referencing Exhibit 22.  You had already

9    come to a conclusion, Dr. Schultz, that Beau was

10   responsible?

11   **A.**   No.  As I testified in the deposition, I never

12   come to a hearing with a foregone conclusion.

13   **Q.**   You see those notes in front of you?

14   **A.**   I do.

15   **Q.**   And you wrote those notes in order to prepare for

16   the hearing?

17   **A.**   I did.

18   **Q.**   And you wrote those notes so that you could be the

19   Chair of the Title IX hearing; correct?

20   **A.**   Well, I wrote those notes as notes, yes.

21   **Q.**   All right.  And in order for you to guide the

22   panel to its finding?

23   **A.**   Okay.

24   **Q.**   Well, that's what I said you did, did you not?

25   **A.**   Yes, but these notes were not intended to be --

1    MR. RATCLIFFE:  Move to strike.

2    THE COURT:  All right.  I'll strike the last

3    portion after the word "yes."

4    Go ahead.

5    **Q.**   When you sat down on your computer and you

6    finished reviewing everything, you came to some

7    conclusions, did you not?

8    **A.**   No.

9    **Q.**   So when you wrote your notes, Beau affirms that he

10   manipulated Allie equals non-consensual, page eight,

11   that's not a conclusion that you came to?

12   **A.**   That was a question that I had, and I believe that

13   I said so in the deposition.  I did not conclude at

14   this time.

15   **Q.**   All right.  Now, you've testified you're a

16   linguist; correct?

17   **A.**   Well, I don't have a degree in linguistics, no,

18   but I work with language.  I'm a French teacher.

19   **Q.**   And there's no question mark after

20   "non-consensual;" correct?

21   **A.**   Well, there is not.  If I had been writing that

22   longhand, I would probably put a question mark over it,

23   but I don't know how to do that on a computer.

24   **Q.**   You don't know how to use a question mark on a

25   computer?

1  **A.**   I don't know how to put a question mark over an

2  equal sign.

3  **Q.**   So when you went to the hearing, you didn't

4  believe that manipulation equals non-consensual?

5  **A.**   No.  When I went to the hearing, I had recorded

6  that in his own words Beau had affirmed that he

7  manipulated.  That, to me, was something to consider

8  because if, in fact, that was the case, then whether or

9  not it was consensual, you know, was definitely open to

10  discussion.

11  **Q.**   And the panel agreed that because Beau admitted

12  that he had manipulated Allie in the text messages,

13  that that was the basis of finding manipulation and,

14  therefore, a violation of the Code; correct?

15  **A.**   It went beyond this word, but, yes, that was part

16  of it.

17  **Q.**   Now, there's nothing in the -- I believe you

18  testified that the type of manipulation was verbal

19  manipulation using words to twist other people or to

20  lead their thoughts in a direction they desire,

21  pressure.  That's how you viewed the manipulation that

22  Beau committed?

23  **A.**   Yes.

24  **Q.**   And it was game playing, messing with Allie's

25  head; correct?

1   **A.**   I think I, if I recall correctly, gave that as a

2   general rather than specific.

3   **Q.**   All right.  Now, in writing this letter, the panel

4   decision, you didn't reference any definition of

5   "manipulation," did you, that references or that

6   states, that is, using words to twist other people or

7   lead their thoughts in the direction they desire,

8   pressure?

9   **A.**   Correct.

10  **Q.**   That's because there's nothing in the 2015-'16

11  Title IX Policy that says that; correct?

12  **A.**   Correct.

13  **Q.**   And there's certainly nothing in the 2014-'15 Code

14  of Student Conduct; correct?

15  **A.**   Correct.

16  **Q.**   And we've already gone over this, but Beau was a

17  sophomore at the time the alleged misconduct occurred;

18  correct?

19  **A.**   Correct.

20  **Q.**   And you would agree that in order for Brown to say

21  he violated one of their policies, they have to define

22  the conduct; correct?

23  **A.**   I'm sorry.  Can you repeat that.

24  **Q.**   We talked about the 2015 -- strike that.  The

25  2014-'15 Code of Student Conduct tells students what

1    they can't do; correct?

2    **A.**    Correct.

3    **Q.**    And it tells them that they can't engage in

4    non-consensual physical contact of a sexual nature;

5    correct?

6    **A.**    Correct.

7    **Q.**    And the Code of Student Conduct does not tell a

8    student in Beau's position that they violate the Code

9    of Student Conduct if they use words to twist -- strike

10   that.

11        The Code of Student Conduct wouldn't tell

12   someone in Beau's position that if they used verbal

13   manipulation that they would be subject to the

14   sanctions stated therein; correct?

15   **A.**    Correct.

16   **Q.**    Now, you also were the Chair of the appeals panel

17   that heard Beau's case?

18   **A.**    Correct.

19   **Q.**    And you read a checklist, just like you did in the

20   panel hearing, when you presided over the appeal?

21   **A.**    Yes.

22   **Q.**    And Beau argued that the new policy -- that

23   reference to the new policy was a procedural violation;

24   correct?

25   **A.**    Yes.

1  **Q.**   And so that was the issue that the appeals panel

2  had to address; correct?

3  **A.**   Among others.

4  **Q.**   Well, with respect to procedural error?

5  **A.**   I recall there being three issues raised by Beau.

6  **Q.**   Okay.  Well, what do you recall as the three

7  issues being raised by Beau?

8  **A.**   He objected to the investigator not including some

9  content and not excluding other content.  I believe

10  those were the two additional issues.  And there was

11  also Allie's appeal as well.

12  **Q.**   What do you recall with respect to Beau's appeal

13  concerning procedural error?

14  **A.**   That he -- that the 2015-'16 policy was referred

15  to; that there was language contained in the report

16  that he believed to be prejudicial to him, that was the

17  second one; and third, that there were omissions of

18  certain text messages.  That's my best recollection

19  that I can give you without rereading my letter.

20  **Q.**   Why don't you review Beau's appeal.

21       MR. RICHARD:  Richard, what number?

22       MR. RATCLIFFE:  Thirty.

23  **Q.**   Showing you what's been admitted as full as

24  Exhibit 30 and ask you if you recognize that document.

25  **A.**   Who is this signed by?

1    **Q.**    Let's go to the last page.

2    **A.**    Okay.  So this was Beau's appeal, yes.

3    **Q.**    We've been using -- as you know, we've been using

4    pseudonyms.  So do you want to just look at the last

5    page?

6    **A.**    Yes, this is Beau's appeal.

7    **Q.**    So you recall that Beau -- this whole issue we've

8    been talking about, use of the 2015-'16 policy or

9    reference to the 2015-'16 policy, do you recall that

10   that was part of Beau's appeal regarding procedural

11   error?

12   **A.**    I do.

13   **Q.**    And Beau claimed that -- what was your

14   understanding of what Beau said?  What did he say was

15   wrong about that?

16   **A.**    What I recall was some faulty logic; that he

17   suggested that, irrespective of the Title IX Office's

18   and OGC's assurance that the 2014-'15 policy would be

19   used, he suggested that instead the 2015-'16 definition

20   of sexual misconduct was used when, in fact, the

21   definition -- the definitions in both documents are

22   essentially identical.

23   **Q.**    The definitions of sexual misconduct are

24   essentially identical in both documents; correct?

25   That's what you're saying?

1    **A.**   Yes, non-consensual sexual contact.

2    **Q.**   And he was saying, was he not, that it was error

3    for the hearing panel of which you chaired to reference

4    the definition of "consent" and other definitions found

5    in the 2015-'16 policy?

6    **A.**   I'm sorry.  Could you repeat that, please.

7         It would help me, actually, if I could have the

8    hard copy of this.

9         MR. RATCLIFFE:  Sure.  May I approach, your

10   Honor?

11        THE COURT:  That's fine.

12        MR. RATCLIFFE:  What I'll do is put up

13   another --

14        THE WITNESS:  Okay.  Thank you.  I'm sorry.  Are

15   you waiting for me?

16   **Q.**   So does this basically capture -- this paragraph

17   capture the essence of Beau's appeal with respect to

18   procedural error?

19   **A.**   Which paragraph?

20   **Q.**   Can you look at the --

21   **A.**   Do you want me to read this?

22   **Q.**   Read it to yourself.

23        (Witness reads document.)

24   **A.**   Yes.  That's his argument.

25   **Q.**   Okay.  So his argument was that you can't hold

1    somebody responsible for breaking a policy that didn't

2    exist at the time the conduct was committed; correct?

3    **A.**    Yes.

4    **Q.**    Now, you said it was faulty logic, and I just want

5    to see if I understand this.  You don't disagree that

6    holding someone responsible for breaking a rule or

7    policy is only fair if he or she is first advised of

8    the rule or policy first; correct?

9    **A.**    Yeah.  You can't find someone responsible for

10   something that didn't exist when it was conducted.  I

11   agree with that.

12   **Q.**    The whole basis of the claim of procedural error

13   was that the Title IX Policy didn't exist so,

14   therefore, it was not fair to find him responsible

15   based on reference to the Title IX Policy; correct?

16   **A.**    That's my understanding of his claim, yes.

17   **Q.**    And so the issue for the appeals panel was whether

18   or not that was unfair; correct?

19   **A.**    And whether or not that was an accurate assessment

20   of what happened.

21   **Q.**    Whether it was unfair and whether that amounted to

22   procedural error; correct?

23   **A.**    Correct.

24   **Q.**    So -- and while the panel was addressing that, you

25   told the panel, did you not, that the definitions in

1    the Title IX Policy were written to codify existing

2    community standards?

3    **A.**    Correct.

4    **Q.**    Okay.  And there was nothing in any of the

5    documents that the Title IX appeals panel received from

6    the Title IX office that confirmed that the definitions

7    in the Title IX Policy were written to incorporate

8    existing community standards?

9    **A.**    Correct.

10   **Q.**    Now, how did the appeals panel decide that case?

11   I mean, what was the decision?

12   **A.**    All of the appeals, all four points, three by the

13   respondent, one by the complainant, were denied.

14   **Q.**    And I believe they were all unanimous except for

15   Beau's claim of procedural error; correct?

16   **A.**    I don't have a clear recollection.  I do know that

17   at least one of them was a two-to-one vote.  I can't

18   remember whether other ones were as well.

19   **Q.**    And you wrote a findings letter?

20   **A.**    Yes.

21   **Q.**    And the basis -- I'm showing you what's been

22   previously marked and introduced as Exhibit 36.  Is

23   that the decision letter that you wrote?

24   **A.**    Yes.

25   **Q.**    And does what you wrote with respect to the

1    respondent's appeal concerning the claimed procedural

2    error for referencing the 2015-'16 Title IX Policy

3    accurately reflect the decision of the panel?

4    **A.**    I believe so, yes.

5         MR. RATCLIFFE:  May I have a moment, your Honor?

6         THE COURT:  Yes.

7         (Pause.)

8    **Q.**    I believe I asked you this, I'm not going to go

9    through this with you, but page one of your chronology

10   is all of the different events that you believe were

11   important in -- strike that.

12        The different chronology that you referenced in

13   your notes were things in the report that struck you as

14   important; correct?

15   **A.**    That was part of it, but also I just recall

16   finding the report itself so lengthy in referring to

17   numerous events that it helped me order them to spell

18   them out that way.

19   **Q.**    And in your reference of events, are there any

20   reference to statements that Allie made to other

21   individuals after November 10, 2014, regarding the

22   incident?

23   **A.**    Yes.

24   **Q.**    And which ones are those?

25   **A.**    Twenty-six of November -- wait, I'm sorry.  I

1    don't know who Kay is.

2    **Q.**    Kay was Witness 9.

3    **A.**    Okay.  Fall 2014, the 22nd, 26th, 30th text to

4    Kay, but it doesn't say from whom.

5    **Q.**    Isn't it true that all of your notes regarding the

6    post-encounter evidence supports Allie's version of

7    events?

8    **A.**    I don't think so.

9    **Q.**    Which one supports Beau's version of events?

10   **A.**    I don't see what the 5th of December has to do

11   with version of events.

12   **Q.**    Well, the 5th of December is Beau pursuing

13   somebody else; correct?

14   **A.**    Well, that doesn't -- I think they agreed on that,

15   so it's not supporting one over the other.  Maybe it

16   would help if you could be more specific.

17   **Q.**    Was there any evidence that tended to establish

18   that Allie may not be credible?

19   **A.**    Let's see.  I don't think any of this goes to the

20   question of credibility.  Discussing John's absence

21   from event, I don't know what that refers to.

22   **Q.**    Okay.  Let's go through them.

23          THE COURT:  I think you've covered this in

24   enormous detail, so I'm really not sure this is adding

25   anything.

1          MR. RATCLIFFE:  All right.  Thank you, your

2     Honor.  No further questions.

3          THE COURT:  Okay.  Thank you.

4          **CROSS-EXAMINATION BY MR. RICHARD**

5     **Q.**   Good afternoon, Professor Schultz.

6     **A.**   Good afternoon.

7     **Q.**   Were you a member of Brown's Sexual Assault Task

8     Force?

9     **A.**   Yes, I was.

10    **Q.**   What was the Sexual Assault Task Force?

11    **A.**   The Sexual Assault Task Force was a year-long

12    committee that included members from the

13    administration, student body, professors whose task it

14    was to look at the climate on campus.

15         It was -- didn't have one unique purpose.  It

16    was sort of assessing the climate, listening to input

17    from the students who were very -- were unhappy with

18    some incidences attached to the prior policy, and the

19    end result was the establishment of the Title IX Office

20    and the rewriting of the sexual assault and

21    gender-based harassment policy.

22    **Q.**   How were you appointed to that task force?

23    **A.**   I was appointed by the -- how was I?  I believe

24    the president asked me, or was that the Title IX

25    Council?  It was based on my prior experience with the

1    Student Conduct Board.

2    **Q.**   How many members were on the task force,

3    approximately, if you don't recall the exact number?

4    **A.**   Twenty-five, 20, something like that.

5    **Q.**   You mentioned in your answer a few moments ago it

6    was a year-long task force?

7    **A.**   Yes.

8    **Q.**   When did it convene?

9    **A.**   It met weekly for three hours.

10   **Q.**   When did it --

11   **A.**   Oh, when did it convene?  In September or October

12   2014.

13   **Q.**   Ended at what time?

14   **A.**   At the end of the academic year.

15   **Q.**   Was there any reports issued by the task force?

16   **A.**   Yes.  There was a preliminary report that was

17   submitted to the president at the end of the first

18   semester, so that would have been December 2014, and

19   then the final report I believe was April 2015.

20   **Q.**   Were policies discussed during the task force

21   work?

22   **A.**   Yes.

23   **Q.**   What specific policies were discussed?

24   **A.**   Well, the -- we reviewed the Student Conduct Board

25   policy on sexual misconduct.

1    **Q.**    Why did the task force do so?

2    **A.**    Because it was -- that was the point of the task

3    force.  It was to review that, review the policy,

4    understand how it functioned, to critique it and to

5    improve it.

6    **Q.**    Let me break that down.  What do you recall the

7    task force reviewing as to the sexual misconduct

8    policy?

9    **A.**    Do you mean which University document?

10   **Q.**    What issues did it review as to the sexual

11   misconduct policy?

12   **A.**    It reviewed all kinds of issues.  I mean --

13   **Q.**    Definitions?

14   **A.**    Yeah.

15   **Q.**    What definitions particularly, if you recall?

16   **A.**    Well, those contained in the ultimate report.  I

17   mean, many of those which we've been talking about at

18   great length here today, so the question of consent,

19   for example, coercion, how these are to be defined.

20   **Q.**    And what was the end result of the task force

21   review of the definition of "consent"?

22   **A.**    That definition was included in the new policy,

23   the 2015-'16 policy.

24   **Q.**    Was the definition that Mr. Ratcliffe put on the

25   screen during your direct examination the result of the

1    task force's work?

2    **A.**   Yes.

3         MR. RICHARD:   Showing the witness, your Honor,

4    Exhibit 22, which are her notes.

5    **Q.**   Would you explain the reason why you took these

6    notes?

7    **A.**   Why I took these notes?   I was -- I took notes as

8    I was reading through the -- not only the

9    investigator's report but also the appendices.   There

10   were -- as we know, there was a lengthy exchange of

11   text messages.   It served to orient me in terms of the

12   chronology.   There were a few questions that I was

13   uncertain about.   Yeah.   I mean, it was for my own

14   personal use.

15   **Q.**   Were they made before the hearing?

16   **A.**   Yes.

17   **Q.**   Do you recall approximately when you did so?

18   **A.**   Well, I generally read through -- yeah, I read

19   through the materials within a couple of days before

20   the hearing.

21   **Q.**   And the bottom of the page has a heading,

22   Questions for the Investigator?

23   **A.**   Yes.

24   **Q.**   Without going through each of them, what were you

25   notating there?

1    **A.**    Just some things I wanted clarified, some

2    reminders for myself, it looks like.  Supply the 2014

3    Code, but then that was included in the packet.

4    **Q.**    Let me ask you this.  If you turn the page,

5    Mr. Ratcliffe pointed you to Beau affirming that he

6    manipulated Allie equals non-consensual, page eight.

7    **A.**    Yes.

8    **Q.**    Does that refer to a question that you had for the

9    investigator?

10    **A.**    I'm sorry.  Can you turn the page.

11    **Q.**    Bottom of page one, questions for the

12    investigator, and I turned the page.  I'm focusing

13    on --

14    **A.**    I don't think those were for the investigator, no.

15    **Q.**    Why did you write the notation regarding the

16    manipulation?

17    **A.**    Well, as I was reading through the appendices and

18    the investigation report, I found that language

19    evocative and suggestive and worthy of discussion.

20    **Q.**    Prior to the hearing, had you reached any

21    conclusions regarding the evidence?

22    **A.**    No.

23    **Q.**    Can you talk a little bit about your role as the

24    Title IX Council Chair, what you see your functions to

25    be.  I'm talking about at the panel level, the initial

1    hearing level.  Well, you served both at the first

2    hearing and the appellate hearing; correct?

3    **A.**    Yes.  Yes.

4    **Q.**    I'm focusing on the first panel hearing.

5    **A.**    Kind of as a facilitator and a -- I guide the

6    discussion.  I try to guide the panelists towards a

7    decision.

8    **Q.**    What steps do you take to guide the panelists?

9    **A.**    Well, that depends on the case at hand.  Often I

10   begin with a straw vote.  I can't recall whether I did

11   in this case.  I give each -- I ask generally each

12   panelist to give first impressions, to throw out

13   questions.

14        So we just sort of put on the table reactions

15   and so forth and then tease it out, often referring --

16   I recall in this case referring very closely to not

17   only the investigator's report but also the appendices

18   themselves.

19        I forgot to mention when Mr. Ratcliffe asked me

20   one of the documents that was supplied was a copy of

21   the appendix.  So there was a copy of all the text --

22   **Q.**    The appendices to the investigation?

23   **A.**    Yes.

24   **Q.**    Your answer, as I understood it, referred perhaps

25   to the deliberations phase.  What about when the

1    investigator appears before the board, what role do you

2    play during that phase?

3    **A.**    Minimal.  In terms of questioning the

4    investigator?

5    **Q.**    Do you raise questions?

6    **A.**    Yeah, I do.

7    **Q.**    Why do you raise questions?

8    **A.**    Just for clarification's sake if it's not clear to

9    me from the investigator's -- if something is not clear

10   from the investigator's report or I feel as though it

11   could be fleshed out a little bit more, I'll ask a

12   question.

13   **Q.**    Are you a voting member of the panel?

14   **A.**    No.

15   **Q.**    As a non-voting member, why do you ask questions?

16   **A.**    Well, because it helps clarify things.  For

17   example, the question about drinking, was alcohol or

18   drugs involved, were alcohol or drugs involved.  In

19   practically all preceding cases that I've been in, they

20   play a really heavy role in the case and, therefore, in

21   the deliberations.  I didn't see any reference to that

22   in this report, so I just wanted to clarify that that

23   wasn't an element in play.

24   **Q.**    In the Beau and Allie disciplinary process, the

25   investigator was whom?

1    **A.**    Djuna Perkins.

2    **Q.**    She appeared before the panel?

3    **A.**    Yes.

4    **Q.**    Do you recall whether you asked her any questions

5    during her presentation?

6    **A.**    I did.  I believe I asked the question about

7    alcohol and then the question that we just reviewed

8    earlier today --

9         MR. RICHARD:  Let me just note I'm showing the

10   witness Exhibit 24, your Honor.

11        THE COURT:  Yes.

12   **Q.**    Does this help to refresh your recollection?

13   **A.**    Yes, yes, yes, it does.  So what prompted the

14   complainant to --

15   **Q.**    Well, let me ask the question.

16   **A.**    Okay.  Pardon me.

17   **Q.**    The first question noted in Amanda Walsh's summary

18   is that you asked what prompted the complainant to come

19   forward.  Do you recall your reason for asking that

20   question?

21   **A.**    Well, I think it was related to my sort of coming

22   up with this chronology.  I just wanted to understand

23   the cause and the effect.

24   **Q.**    And you also asked, looking down a bit, that the

25   investigator clarify Allie's explanation for why she

1    didn't get up and leave?

2    **A.**   Yes, that's right.

3    **Q.**   Why did you ask that question?

4    **A.**   I can't even recall her explanation for why she

5    didn't.  Because it seemed like an acceptable question

6    to ask, that many people might wonder why she didn't

7    get up and leave.

8    **Q.**   Was that question discussed during deliberations?

9    **A.**   I don't recall.  I'm sorry.

10   **Q.**   At least according to Amanda Walsh's notes, you

11   asked, "Doesn't someone have to be lying?  She said no,

12   and he says she's an enthusiastic partner.

13       Do you recall asking that question?

14   **A.**   I do, yes.

15   **Q.**   Do you recall the reason for asking that question?

16   **A.**   Well, it goes to the question of credibility.  I

17   mean, the two stories were so divergent that -- you

18   know, again, I don't have the report in front of me.  I

19   know some other investigators do list parties and

20   witnesses and determine their -- and assess their

21   credibility.  I don't believe Djuna Perkins did that.

22   So I just wanted more input on her sense of credibility

23   of the two parties.

24   **Q.**   Do you recall what she said?

25   **A.**   Well, just what's written here and what we

1   reviewed earlier today that seemed like she was saying

2   it was sort of ambiguous.  There was a certain amount

3   of ambiguity, but she did suggest that the idea that

4   Allie was willingly jumping into this sexual encounter

5   doesn't match with the text messages in which there's a

6   certain amount of hesitation.

7   Q.   When the panel convenes for its deliberations,

8   what is your role as the Chair?

9   A.   Well, there then I -- something of a facilitator,

10  provider of guidance and information.

11  Q.   What steps did you take to facilitate the

12  deliberations in this matter?

13  A.   I do recall that there were lengthy deliberations.

14  As I mentioned, I often begin with the straw vote.  I

15  don't recall whether I did that in this case or not.

16  And we -- I like to start by asking everyone to

17  contribute sort of their raw reactions to what they've

18  read and heard and any questions they might have,

19  uncertainties, sort of gauge what -- how close they are

20  to a consensus or how far away from it and where we

21  have to go in order to get to one.

22  Q.   During the deliberations in this case, do you

23  recall any particular issues that the panelists raised

24  as concerns about consent?

25  A.   Well, I do recall looking -- panelists looking

1   quite a bit at the appendices, at the exchange of texts

2   and noting that prior to the event Allie pretty

3   consistently saying that she wasn't interested in a

4   sexual encounter, just to watch a movie.

5        There was a lot that muddied the issue but

6   ultimately I think the majority of the panelists felt

7   to be not really pertinent.  I mean, the sexting

8   beforehand, everyone who participates in the Title IX

9   Council learns that prior sexual behavior, and I think

10   sexting can be considered prior sexual behavior, has no

11   bearing on subsequent sexual interactions.  So whereas

12   -- in some circles women who engage in such a thing are

13   automatically assumed to, you know, be promiscuous.

14   **Q.**  Were there particular texts that you recall the

15   panelists reviewing?  I know they were voluminous, but

16   was there a particular segment of the texts --

17   **A.**  Well, the discussion around getting ready to meet

18   up to watch a movie.  There was a lot of back and forth

19   about the nature of that get-together.

20   **Q.**  As the facilitator of the deliberations, how do

21   you assess whether they have reached an appropriate end

22   point?

23   **A.**  How do I assess that?  I ask -- when it seems that

24   people have indicated that they've reached their

25   conclusion, I say, Are we ready for a vote?  And when

1    they say yes, then we take a vote.

2    **Q.**    And at some point after the vote, you have to

3    write a decision?

4    **A.**    Yes.

5    **Q.**    How do you structure the decision based upon the

6    deliberations?

7    **A.**    I take notes by hand as we are going through the

8    deliberations, during the discussion.  I try to capture

9    the logic of the decisions as articulated by the

10   panelists during deliberations.  Sometimes I'll ask for

11   clarification, you know, is this what you mean, is this

12   why and so on.  And based on those notes, I write up

13   the rationale and --

14   **Q.**    Is it a draft or a final version?

15   **A.**    It's a draft.

16   **Q.**    What do you do with the draft?

17   **A.**    I circulate it to all members of the panel.

18   **Q.**    Did you do so in this matter?

19   **A.**    Yes, I did.

20   **Q.**    Do you recall whether you received any revisions

21   to the draft?

22   **A.**    I'm sorry, I don't.  Nothing substantive as far

23   as -- I do remember that Kate's a stickler for

24   punctuation, so she usually corrects mine, but nothing

25   substantive that I recall, no.

1   **Q.**   Let's move on to the appellate process.  What is

2   your role as the Title IX Chair during the appellate

3   phase of the proceeding?

4   **A.**   It's the same as during a regular case.  You know,

5   we review the materials and deliberate, and then I

6   write up the findings.

7   **Q.**   Are there any differences in the way that you

8   facilitate the appellate panel compared to the initial

9   hearing panel?

10   **A.**   I wouldn't say so, no.

11   **Q.**   How do you structure the deliberations at the

12   appellate stage?

13   **A.**   Well, I believe that it was quite similar, sort of

14   asking for input, answering any questions the panelists

15   might have, guiding the discussion, taking notes and

16   then writing up the report.

17   **Q.**   Do you go through the same process of circulating

18   a draft and then receiving comments?

19   **A.**   Yes, I do.

20        MR. RICHARD:  One moment, your Honor.

21        THE COURT:  Sure.

22        MR. RICHARD:  Nothing further.

23        THE COURT:  Okay.  Thank you.

24        MR. RATCLIFFE:  Just have one question.

25        THE COURT:  Redirect.

1    <u>**REDIRECT EXAMINATION BY MR. RATCLIFFE**</u>

2    **Q.**   I believe you mentioned that the panel didn't

3    consider some of the sexting that occurred prior to the

4    event?

5    **A.**   Didn't consider?  It considered it.  It didn't

6    assume that it was indicative of Allie's desire to

7    engage in sexual relations.

8    **Q.**   And that's how you're trained?

9    **A.**   Yes.

10   **Q.**   And that's because that's part of the Title IX

11   Policy that prior sexual behavior shouldn't be

12   considered as to whether or not subsequent sexual

13   activity occurs?

14   **A.**   Well, actually that was the PowerPoint that you

15   showed me from Jim Green that was in there as well from

16   2014, yes.

17          MR. RATCLIFFE:  That's all I have.  Thank you.

18          THE COURT:  Any recross?

19          MR. RICHARD:  No, your Honor.

20          THE COURT:  Okay.  Bear with me.  I think I have

21   just a couple of questions, not many.

22          THE WITNESS:  Okay.  Sure.

23          THE COURT:  And I'm not as organized as these

24   guys.  Let me start with -- I want to ask you a couple

25   of questions about the business that you testified at

1    length here about the definition of "coercion" and how

2    it evolved and the difference between the 2014-'15

3    policy and the consideration of the Title IX Policy or

4    the 2015-'16 policy.

5           So I think the way I'd like to go about this,

6    you talked about your experience under the prior

7    system.

8           THE WITNESS:  Yes.

9           THE COURT:  And that I think you said you had

10   sat on approximately six panels that considered

11   allegations of sexual misconduct?

12          THE WITNESS:  About that.  Sexual misconduct or

13   sexual harassment, yes.

14          THE COURT:  All right.  And those panels applied

15   the definition that was in the 2014-'15 policy that was

16   in play in this case, right?

17          THE WITNESS:  The definition of "sexual

18   misconduct"?

19          THE COURT:  Right.

20          THE WITNESS:  Yes.

21          THE COURT:  Okay.  And you noted that the

22   process was very different because the panel sat

23   effectively as a court and heard a lot of testimony, it

24   went on for a long time, right?

25          THE WITNESS:  Yes.

1          THE COURT:  Okay.  But the role of the panel in

2    those cases was essentially the same as the role of the

3    panel in this case with respect to interpreting the

4    sexual misconduct policy.

5          Even though the process was different in terms

6    of how they gathered the evidence or came to view the

7    evidence, the process of deliberating on the meaning of

8    the policy was essentially the same; is that right?

9          THE WITNESS:  Correct.  However, the panel

10   make-up was somewhat different.  There wasn't the

11   equivalent of the council chair, so there was not a

12   non-voting member.  The faculty member of the Student

13   Conduct Board was considered to be the Chair of those

14   three-people panels but was a voting member.

15         THE COURT:  Okay.  So that's a procedural

16   difference, but it doesn't affect the substance of what

17   the panel was doing, right?

18         THE WITNESS:  Yes.

19         THE COURT:  Now, I think what you said, and I'm

20   paraphrasing a bit, that was more difficult in the

21   prior setup because -- for two reasons.  One was

22   because the process was more cumbersome because you

23   heard testimony and so forth, and the second reason was

24   because you had less to go on with respect to

25   determining what the meaning of "coercion" was and the

1    meaning of "consent" was.  Is that about right?

2         THE WITNESS:  Yes, that's right.  And it was

3    also very grueling to the parties involved,

4    particularly the complainants and the respondents.

5         THE COURT:  Okay.  So then this is where I think

6    you started getting into this very lengthy bit of

7    testimony, but the way you started out with that

8    testimony was you said that there was no definition so

9    people needed more discussion about the standard for

10   "consent."

11        And you also said people pretty much were on the

12   same page, it's not rocket science, the differences

13   were minimally -- people came there, panel members came

14   to the process with maybe slightly different

15   perceptions of "consent," but they weren't radically

16   different and they were -- but they needed to hash that

17   out; is that right?

18        THE WITNESS:  Correct.  Yes.

19        THE COURT:  Okay.  So the first question I want

20   to ask you is, if you recall, and I don't want you to

21   guess and it's only if you recall, is whether in the

22   prior -- those prior six cases of alleged sexual

23   misconduct, was the issue of manipulation ever in play?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.  So can you characterize just

1    in general the context in which manipulation was in

2    play in some of those earlier cases.

3         THE WITNESS:  One case I recall, there was

4    persistent questioning, not taking "no" as an answer, a

5    certain amount, I think, of relying on past sexual

6    contact as license to proceed or assumption that things

7    would go forward.  Does that answer your question?

8         THE COURT:  Yes.  So that's one case.  Were

9    there others?

10        THE WITNESS:  You know, these cases really have

11   a way of sort of bleeding into each other.

12        THE COURT:  Right.  So I only want you to

13   testify what you recall, and you recall whatever you

14   recall.

15        THE WITNESS:  I mean, I can speak to how we did

16   often come to -- how discussions about consent often --

17        THE COURT:  I'm going to get to that.  I'm going

18   to ask you about that in a second.

19        THE WITNESS:  Okay.

20        THE COURT:  All right.  So the panel members

21   would come in with their own slightly different, not

22   radically different, ideas of what "consent" is.  At

23   least once the issue of manipulation was in play.  Do

24   you recall the outcome of that case that you just

25   described to me?

1          THE WITNESS:  Finding of responsible.

2          THE COURT:  Responsible?  Based on what you

3     recall to be mostly manipulation, but there might have

4     been other aspects to it?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.

7          THE WITNESS:  There was an element of -- alcohol

8     was in play there as well, but I don't believe to the

9     point of incapacity.

10         THE COURT:  Okay.  So now why don't you describe

11    for me how the panel members would sort out the issue

12    of coercion and consent in the prior system without --

13    well, you understand the question.

14         THE WITNESS:  Yes.  I recall, frankly, being

15    very frustrated that it wasn't defined and asking for

16    guidance from Yolanda Castillo, who oversaw student

17    conduct cases, and she insisted on the community

18    standard element.

19         So I did some of my own research and looked at

20    the health education website that has a whole page

21    about consent.  I recall there being a video that was

22    recorded by Brown students talking about what consent

23    was, how you knew that you were getting the go-ahead

24    message, and there was some language on the page as

25    well about ways that it was inappropriate to go about

1      entering into sexual relations, that kind of pestering,

2      not taking "no" for an answer, assuming that because

3      there's been some sort of sexual interaction in the

4      past that there's bound to be more in the future.  And

5      basically the bottom line was an encouragement of

6      healthy, but cautious, sexual interactions among

7      parties.

8            THE COURT:  Is this the video you're talking

9      about or are you talking about the website or what?

10           THE WITNESS:  Yes, the website.  There was a

11     video, but there was also language.  I believe it was

12     on the same page.  I remember red light, yellow light,

13     green light language.  So red light with things such as

14     someone's incapacitated by drugs, someone says "no" or,

15     you know, and having to ask -- you have to ask again

16     and again and again.  The assumption is that a

17     non-response is not a response.

18           THE COURT:  Well, I'm not sure that's what you

19     meant.  A non-response is not a response.  Did you mean

20     a non-response is not a consent?

21           THE WITNESS:  Yes, that's what I meant.  Yes.

22           THE COURT:  So is this the video where there are

23     a number of students and they're against a white

24     background and they're -- it kind of goes from one to

25     another to another?  Is that what you recall?

1         We can show it to you.  It's been introduced as

2    an exhibit.  I just want to make sure we're talking

3    about the same thing.

4         THE WITNESS:  I remember it starting with one

5    woman talking, and I think there's a white background.

6    I don't recall if it --

7         THE COURT:  Would it be convenient to put that

8    on for 30 seconds just so we can see if that's what

9    she's talking about?

10         MR. RICHARD:  I believe the clerk still has it,

11    your Honor.

12         THE COURT:  I just want to confirm if this is

13    the video.  I think it probably is.

14         THE WITNESS:  Okay.

15         (Video played.)

16         THE WITNESS:  Yes, this is it.

17         THE COURT:  This is the one?

18         THE WITNESS:  Yes.

19         THE COURT:  You can stop.

20         All right.  So this is something that you were

21    describing things that you reviewed.  So you reviewed

22    this video, you went to the website for the health

23    education part of the University, and so is this

24    material that you looked at or were the panelists

25    typically shown that video or expected that they had

1    reviewed it or reviewed it during training?  Do you

2    know?

3         THE WITNESS:  I believe the undergraduates had

4    seen this.  So as Chair of the Student Conduct Board

5    panels, I brought the fruits of my research in and

6    shared that with the members.  And as I said before,

7    the student members were often rich sources of

8    information as well because they had gone through

9    health education trainings and --

10        THE COURT:  Right.

11        THE WITNESS:  Yes.  And so I might add sometimes

12   more rigorous even and often young men than some of the

13   older women on the panels.

14        THE COURT:  Okay.  So then let's move from that

15   to the consideration of this case, the Allie/Beau case.

16   And in this case, you presented the panel with the

17   Title IX Policy, the 2015-'16 revised policy, as

18   something -- I think you said as something that they

19   could consider in the context of sorting out the issues

20   here, right?

21        THE WITNESS:  Yes.

22        THE COURT:  And we're not going to go back over

23   all of this, but it is -- Mr. Ratcliffe went through

24   with you, on your direct, referred to in the decision

25   letter as sort of explaining the rationale of the

1    panel.

2         So I just want to review some of the testimony

3    that you gave.  If I understand it correctly, you told

4    the panel that they would be using the 2014-'15 policy

5    because that's the timing of the event.

6         THE WITNESS:  Yes.

7         THE COURT:  I was a little unclear on what it is

8    you told the panel with respect to the use of the

9    2015-'16 policy.  My notes indicate that you didn't

10   recall telling the panel that they could use it as a

11   helpful guide, and you recalled something about having

12   it on your computer screen.

13        So could you just go back over that and try to

14   explain to me what it is that you told the panel with

15   respect to how they should use the 2015-'16 policy.

16        THE WITNESS:  Well, the conclusion of

17   responsible was based on the 2014-'15 policy.  We

18   looked to -- after I proposed -- I passed along this

19   idea of using the Title IX Policy, the 2015-'16 policy

20   for its definition of "consent," they agreed, and so I

21   brought it up on my computer.  I read it to them.  I

22   probably allowed them to read it on my computer if they

23   wanted to.  Mr. Ratcliffe asked me if I printed it out.

24   I didn't.

25        Is your question whether they were able to

1    sufficiently consult the language of it?

2              THE COURT:  No.  I just wanted to know what you

3    did with it and how you told them or what you said to

4    them with respect to how they could use it.  I just

5    want your recollection.

6              THE WITNESS:  Yeah, just as defining what wasn't

7    defined in the prior policy.

8              THE COURT:  Okay.  Now, if you could contrast

9    the way a panel looked at the issue of coercion and

10   consent under the prior system and the way this panel

11   looked at the issue of consent under the 2014-'15

12   policy but with the additional guidance or input of the

13   Title IX Policy, can you characterize for me the

14   difference, if any, in how those panels sorted out

15   issues of consent.

16             THE WITNESS:  Well, I think that the outcome

17   would have been identical if this had been heard before

18   the creation of the Title IX 2015-2016 document.

19             THE COURT:  Why do you say that?

20             THE WITNESS:  Because the same definition of

21   "consent," which was not made explicit in the earlier

22   cases, was nonetheless pretty much agreed upon and

23   understood.

24             THE COURT:  Okay.  So you spent a lot of time

25   testifying on questions from Mr. Ratcliffe about the

1    issue of manipulation and the word "manipulation,"

2    which is in the Title IX Policy but not in the '14-'15

3    policy.  There's no real definition of consent in the

4    '14-'15 policy.

5         And in your -- we heard a lot of testimony about

6    your own view about that, and so -- and as you went

7    along in your testimony, I think you clarified your

8    point of view that coercion does not require an express

9    or an implied threat of physical or emotional harm,

10   either immediate or future.

11        I think at the beginning you said coercion did

12   imply a threat.  And as the testimony went on, I think

13   you got to a conclusion that it doesn't because

14   manipulation doesn't require a threat of immediate or

15   future harm.  Is that a fair assessment of where you

16   came out on that?

17        THE WITNESS:  Yeah, I believe so.  I mean,

18   really --

19        THE COURT:  I'm getting to a question.

20        THE WITNESS:  Okay.

21        THE COURT:  Is that a fairly accurate

22   description of your testimony and where you are in

23   this?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.  So what I want to ask you

1   about is whether your views, whether your views of

2   consent and particularly manipulation as it relates to

3   the issue of consent, did they change or evolve as a

4   result of this Title IX Policy and your participation

5   in the task force that led to that policy?

6            THE WITNESS:  No.

7            THE COURT:  Okay.  So do you have a view of

8   whether the idea or the notion of manipulation as a

9   method of coercion or the ability of manipulation to

10  vitiate consent, did that change from the prior era to

11  the new era with the adoption of the new Title IX

12  Policy?

13           THE WITNESS:  No.  And can I just elaborate?

14           THE COURT:  Yes.  You can explain.

15           THE WITNESS:  For one thing, there's been a lot

16  of focus on this word "manipulate" because I believe it

17  was found in the respondent's text and also in the

18  language of the Title IX Policy.

19           Actually, when I wrote it down in the notes that

20  were shown here, it was before it had even been

21  proposed to me that the 2015-'16 policy might provide

22  an illuminating definition of "consent."

23           Really, I think the panel ultimately determined

24  the interaction not to be consensual not solely because

25  of this word but more over the respondent's

1    persistence, the complainant's refusal in the texts.

2         As the findings letter stated, panelists found

3    -- regardless of how sordid the whole affair is, found

4    the complainant's version to be more likely than not

5    what happened.

6         THE COURT:  Okay.  This is just a similar

7    question, but I want to get at the -- keep at this

8    issue a little bit.

9         So before the adoption of the Title IX Policy,

10   you said there was at least one case that you could

11   recall that involved manipulation.

12        THE WITNESS:  Yes.

13        THE COURT:  And there were other aspects to it

14   as well.

15        THE WITNESS:  Yes.

16        THE COURT:  But in that case, if you recall, do

17   you recall the panel trying to figure out how to define

18   either "coercion" or "manipulation" and to what sources

19   they would go to to try to figure that out?

20        THE WITNESS:  I think "consent" was really the

21   more operative word, and I believe that might have been

22   the case where I was moved to look for sources on

23   Brown's website.  And I brought that information, I did

24   a copy and paste, and I don't know if it was entered

25   here, but it was labeled an exhibit during my

1    deposition, these notes that I presented to the others

2    and, you know, which was pretty much confirmed by

3    student members.

4              THE COURT:  And that was on the issue of

5    consent?

6              THE WITNESS:  Yes.

7              THE COURT:  The word that was in play was

8    "consent," right?

9              THE WITNESS:  Yes.

10              THE COURT:  Not "manipulation"?

11              THE WITNESS:  Yes.

12              THE COURT:  All right.  Now, all of this

13    testimony you gave about your own opinion about what

14    coercion is and whether it includes manipulation or

15    includes the threat of harm and so forth, there was a

16    lot of testimony about that.

17              What I want to ask you is that all of these

18    opinions, did you express any opinion of any kind as

19    you've testified to it here or differently, did you

20    express any opinions about this, the definitions of

21    these topics and how they should be interpreted, to the

22    panel members in this case?

23              THE WITNESS:  I often express opinions during

24    deliberations.  I usually would keep out of sort of the

25    initial discussion.  I ask, you know, the panelists for

1    input.  You know, I think that in the appeal I might

2    have drawn more heavily on my experience with the

3    Student Conduct Board prior to the new Title IX Policy.

4         And I don't think of it as an opinion.  I think

5    of it as an affirmation that the unwritten standard was

6    the same or based on the same code of conduct, if you

7    will, as what was written down in the Title IX Policy.

8         And having served on the before and after and

9    witnessed the in between, I see continuity there that

10   does not -- I'm not troubled by the use of the

11   definition as written down.

12        THE COURT:  I understand.  I think you're going

13   a little beyond my question.

14        What I'm really trying to figure out is, of all

15   that testimony you gave about interpreting the

16   paragraph that we spent a lot of time on about whether

17   the clause at the end modified the last case or did it

18   modify every word in the paragraph, it was like an

19   English exam.  So there was a lot of testimony about

20   that.

21        What I'm trying to figure out is whether any of

22   that really is relevant at all because it's only

23   relevant if you discussed all that with your panelist

24   members, and that's what I'm trying to ask you about.

25        THE WITNESS:  No, and that part I don't believe

1    was even quoted in the findings letter.

2         THE COURT:  Okay.  So then just to come back to

3    the point that you were just making before I asked that

4    last question, there's also been a lot of -- you were

5    asked a lot of questions about whether the Title IX

6    Policy codified the community standards that were

7    implicit in the 2014-'15 policy.  And Mr. Ratcliffe

8    asked you a lot of questions about where did you get

9    that, where do you find that, and how would anyone know

10   that, that sort of thing.

11        So I think it would be helpful, actually,

12   because you served on the task force, if you could just

13   describe that, what the role of the task force was

14   specifically with respect to this issue of consent and

15   coercion.

16        So what I'm really asking you is, I don't want

17   to lead you, but I'm asking you to tell me was the task

18   force's job to just make more explicit what was in

19   place over the prior years or was the task force's job

20   to really enhance and modify and make more clear the

21   definition of "consent" and "coercion"?

22        THE WITNESS:  Well, certainly there was a

23   definition needed, and there had been a lot of

24   discussion not just at Brown but across the nation

25   about consent, about -- I believe there may have been a

1     discussion about whether we wanted to go to affirmative

2     consent, and I believe that was rejected, ultimately

3     spelling out some aspects of -- it's not that there

4     wasn't anything new in the Title IX Policy, but the

5     definition of "consent" that's found in there doesn't

6     diverge from anything relied on prior.

7              THE COURT:  When you say it doesn't mean there's

8     not anything new but that it doesn't diverge from what

9     was in there prior, that sounds like two different

10    things.

11             THE WITNESS:  What I meant, for example, there's

12    new language in the Title IX Policy about, just to give

13    an example, forbidden relationships.

14             THE COURT:  I don't want to talk about that.

15    That's a whole other kettle of fish.

16             THE WITNESS:  I don't blame you.  So this is an

17    example of why I was saying it's not that there was

18    nothing new.  There were things that were new.  But in

19    terms of the definition of "consent," that wasn't new.

20    That was sort of spelling out sort of what -- you know.

21             THE COURT:  So it's your view having sat on that

22    policy (sic), you're saying to me that the codification

23    or what's in the Title IX Policy with respect to

24    consent is truly just a codification of what everyone

25    in the community and on the hearing panels understood

1    the definition of "consent" to be.

2             THE WITNESS:  Correct.

3             THE COURT:  Is that what you're saying?

4             THE WITNESS:  Yes.

5             THE COURT:  All right.  And you're saying that

6    -- so consistent with that would be that the idea of

7    manipulation without threat of harm or -- either

8    emotional or physical harm is a form of coercion that

9    vitiates consent, both prior and after.  Is that what

10   you're saying?

11            THE WITNESS:  Yes.

12            THE COURT:  Okay.  Now, I want to shift a little

13   bit to Djuna Perkins' report, and that's Exhibit 18.

14            Counsel, would one of you just put on the ELMO

15   that last page.

16            All right.  Can you read that?

17            THE WITNESS:  Yes.

18            THE COURT:  Can you see the second to last

19   paragraph, the one just above "Conclusion"?

20            THE WITNESS:  Yes.

21            THE COURT:  Could you just read that to

22   yourself.

23            (Witness reads document.)

24            THE COURT:  What number is this?  I was

25   mistaken?

1      MR. RICHARD:  Eighteen.

2      THE COURT:  I don't think it was 18.

3      MR. RATCLIFFE:  Yeah, it is 18.  I have another

4  copy if you'd like.

5      THE COURT:  I have it here somewhere.

6      THE WITNESS:  Okay.

7      THE COURT:  All right.  I just want to focus you

8  on the -- actually, that's not what I wanted to ask you

9  about.  I'm sorry.  I want to ask you about Amanda

10 Walsh's notes, Exhibit 24, the paragraph in the middle.

11 I asked enough questions of Ms. Perkins about this

12 paragraph.  I don't need to ask you.

13     THE WITNESS:  Okay.

14     MR. RATCLIFFE:  Which page, your Honor?

15     THE COURT:  I think it's her second page in the

16 middle, the one in response -- the answer in response,

17 "Does someone have to be lying?"

18     So right in the middle there you asked the

19 question, "Doesn't someone have to be lying?  She says

20 she said no, and he said she's an enthusiastic partner.

21     You've looked at this before?

22     THE WITNESS:  Yes.

23     THE COURT:  I think you said this is an accurate

24 transcript, paraphrase of what Ms. Perkins said, right?

25     So I just want to focus you on -- starting with

1    the second sentence. I'm sorry, third sentence. "He

2    did say he asked for consent and she was enthusiastic,

3    but that isn't consistent with the text messages where

4    you can see her hesitation. The idea that she was

5    willingly jumping into this sexual encounter doesn't

6    match, but that's for the panel to decide. Her version

7    appears to be more consistent with the pattern that is

8    in the text messages. Her actions after the incident

9    are difficult to reconcile. Specifically, there is the

10   possibility that she would not have done anything about

11   it or filed a complaint if a relationship had come from

12   it. She may say she would have forgiven him or thought

13   about the incident in a different way."

14        Can you just give me your interpretation of what

15   Ms. Perkins was saying in her answer to your question.

16        THE WITNESS: Well, she was addressing the

17   complainant's behavior after the fact. And as she

18   said, they're difficult to reconcile. She was -- well,

19   they both struck me as fairly immature in the way they

20   conducted their intimate relations. So I think she was

21   just trying to make sense of that.

22        THE COURT: Okay. I understand that. But she's

23   saying something more than just trying to make sense.

24   I'm just asking you how you interpret -- specifically

25   how you interpret what she's saying there.

1          THE WITNESS:  You mean the bit about if there

2     had been a --

3          THE COURT:  Really the whole thing in this

4     context, yes.

5          THE WITNESS:  The whole thing?

6          THE COURT:  Yes.  I don't want to make this more

7     complicated, but I'm really not asking you to give me

8     how you view it now.  What I'm really asking you is, if

9     you read it now, if you can, can you tell me how you

10    interpreted what she said then.  Maybe you can't.

11         THE WITNESS:  I'm not sure that I can add much

12    more to that other than what --

13         THE COURT:  Let me ask it this way because I

14    think you're struggling with this.  So maybe I can be a

15    little more pointed because I think Mr. Ratcliffe asked

16    you this question.  Do you think she in her answer is

17    saying with respect to the pre-encounter text messages

18    that Allie's version is more consistent with the body

19    of those text messages than Beau's version?

20         THE WITNESS:  Yes.

21         THE COURT:  She's saying that?

22         THE WITNESS:  Yes.

23         THE COURT:  That's pretty obvious, right?

24         THE WITNESS:  Yes.

25         THE COURT:  That seems to be what she's saying.

1      And, again, not trying to put words in your mouth, but

2      you seem to have said the same thing in your testimony

3      here today, that that's how you viewed it, too.

4              THE WITNESS:  Yes.

5              THE COURT:  And I guess a fair question would

6      be, did you reach that independently or did you reach

7      that conclusion based on what Ms. Perkins said here?

8              THE WITNESS:  Well, I feel like I reached it

9      with the panel members.  I recall -- I didn't recall

10     this before this was shown to me, but I did recall the

11     panel looking over the text messages and reading

12     through them, so going to the source material rather

13     than what she had said and coming to its own conclusion

14     there.

15             THE COURT:  Okay.  So then Ms. Perkins says

16     something to the effect that her actions after the

17     incident are difficult to reconcile, specifically

18     there's the possibility that she would not have done

19     anything about it, and so forth.

20             So what is that saying to you about the

21     post-encounter text messages?

22             THE WITNESS:  I don't think that has a bearing

23     on the question of whether it was consensual or not.

24             THE COURT:  Is that what you're reading that to

25     mean or is that your opinion?

1         THE WITNESS:  Okay.  I think that what Djuna

2    Perkins is saying here is that her activity -- I mean,

3    some of her actions in her texts following the event

4    are hard to understand because you'd think that she

5    wouldn't want to have anything to do with him, I guess

6    is how I'm seeing that.

7         THE COURT:  Okay.

8         THE WITNESS:  Does that answer your question?

9         THE COURT:  Yeah.  Whatever you say answers my

10    question.  I'm not trying to put words in your mouth.

11    I just want your interpretation.

12         THE WITNESS:  But as I said earlier, you know,

13    people act all different kinds of ways after --

14         THE COURT:  Okay.  Well, let's move to that.

15    Take this -- my last question was trying to get you to

16    interpret what Djuna Perkins was saying here.  Now I

17    want to focus on what you thought about the

18    post-encounter behavior, both the text messages but

19    also the behavior that Allie engaged in with her

20    friends and roommates and so forth that's detailed in

21    the investigative report.  I refer to that as all

22    post-encounter behavior.

23         So what was your view with respect to how that

24    impacted, if at all, on the question of whether the

25    encounter was consensual or not?

1          THE WITNESS:  I don't have a clear recollection

2    of the specific content of the deliberations around the

3    post-encounter evidence.  I certainly believe it was

4    raised; but to my recollection, the pre-encounter

5    evidence was deemed more pertinent to the question of

6    consent.

7          THE COURT:  Okay.  So I'm just going to try to

8    put this in multiple choice.  Do I understand you to be

9    saying that the post-encounter evidence was, A, not

10   considered; B, considered but not given much weight; or

11   C, you don't know how it was considered by the panel?

12         THE WITNESS:  I think B would be the best answer

13   I can give.

14         THE COURT:  It was given consideration, but it

15   wasn't given much weight by the panel?

16         THE WITNESS:  That's what I recall.

17         THE COURT:  Okay.  So if it was given

18   consideration but not given much weight, what's your

19   view of what the reasons for that are?

20         Let me back up because I asked Professor

21   Rodriguez this question in this way.  It would be fair

22   to ask you this that way.

23         If you look at all of that evidence as a whole,

24   I think a common sense view of it is that it's, by and

25   large, reflective of a sexual encounter in which people

1    were happy or satisfied or pleased by it in some way,

2    and there was banter about that in the text messaging

3    going back and forth, and that was the testimony of the

4    discussions that Allie had with her friends and so

5    forth.  That would be a common sense reading of that

6    evidence.  I mean, do you agree with that?  I mean, we

7    could look at, but I really would prefer not to, to

8    tell you the truth.

9                THE WITNESS:  I don't blame you.

10               As I recall, there were -- yes, that she boasted

11   about hooking up to some people, but I think there was

12   also some articulation of feeling pressured.  I'm just

13   remembering from my own notes before me, but it seems

14   that there were a few instances in which she talked

15   about feeling pressured.

16               THE COURT:  Okay.  And that may have been a

17   little later on, perhaps?

18               THE WITNESS:  Possibly.

19               THE COURT:  So maybe you just don't have a good

20   enough recollection to answer this, but do you think

21   that that evidence using the common sense --

22               THE WITNESS:  I'm sorry.  Do I think that

23   evidence what?

24               THE COURT:  If you were using just a common

25   sense review of it reflected essentially someone who

1    was not upset or angry or any of those things in the

2    immediate aftermath, if you remember?

3              THE WITNESS:  In isolation?

4              THE COURT:  Yes.

5              THE WITNESS:  Yeah.  In isolation, someone

6    saying, Oh, I hooked up, it was great would be -- yeah.

7              THE COURT:  Okay.  You get, though, to the

8    point -- I think you and perhaps the rest of the panel

9    get to the point where you decide that that really

10   isn't informative of whether there was consent or not.

11   You said you gave it very little weight or gave it

12   little weight.

13             THE WITNESS:  I mean, in the balance of

14   everything that was put before us, I think that was

15   seen more as possibly the attempts of an immature

16   freshman who -- I mean, these young women who come to

17   college, I think -- was it her first semester?

18             THE COURT:  Yes.

19             THE WITNESS: -- enter into sexual relations,

20   have sexual relations.  Do they want it?  Do they not?

21   Do they think that they're supposed to want it?  I

22   mean, her -- yeah.  I think during the deliberations it

23   kept coming back to her saying very clearly beforehand,

24   Look, I don't want to have sex with you.

25             THE COURT:  Okay.  So I get that, and I think

1  we're almost there in terms of finishing this.  Okay.

2  So I understand that -- you to be saying that the panel

3  considered that evidence and decided not to give it

4  much weight, I'm talking about the post-encounter

5  evidence, decided not to give it much weight.  And I

6  think you just told me that the reason they didn't was

7  you saw it as just the ramblings of an immature girl

8  trying to figure out what just happened.  Is that a --

9        THE WITNESS:  That came from me.  I don't know

10  that that was articulated or not in the deliberation.

11        THE COURT:  Okay.  There's been other testimony

12  to the effect that the reason for giving that evidence

13  very little weight was that there was training, SHARE

14  advocate training that suggests that things that occur

15  after an encounter, after a sexual encounter are often

16  counter-intuitive and could be disregarded because they

17  don't reflect the real thinking of the victim.

18        Did that factor into your consideration of what

19  amount of weight to give to it or not?

20        THE WITNESS:  Yes, and I believe I mentioned

21  this this morning, I think I taught myself about some

22  counter-intuitive reactions.

23        THE COURT:  Okay.

24        THE WITNESS:  Although -- yeah, yeah.

25        THE COURT:  All right.  Just a minute.  Okay.  I

1    don't have anything further.  Let me just check with

2    counsel.  Do you have any follow-up?

3            MR. RATCLIFFE:  No.

4            MR. RICHARD:  Nothing, your Honor.

5            THE COURT:  Okay.  Thank you very much.  You may

6    step down, Professor Schultz.

7            THE WITNESS:  Thank you.

8            THE COURT:  Let's go off the record.

9            (Discussion off the record.)

10           THE COURT:  Back on the record.  The flip chart

11   page that was referred to and marked up by Professor

12   Schultz will be Exhibit 49 by stipulation.

13           (Plaintiff's Exhibit 49 admitted in full.)

14           THE COURT:  And Mr. Ratcliffe?

15           MR. RATCLIFFE:  Plaintiff rests.

16           MR. RICHARD:  Defendant rests, your Honor.

17           THE COURT:  The parties have rested.  We've

18   agreed that post-trial admissions with proposed

19   findings of fact and conclusions of law be submitted by

20   Friday, August 5th, 5:00 p.m., and closing argument

21   will be on Tuesday, August 16th, at 9:00 a.m.

22           Okay.  Thank you all.  We'll be in recess.

23           (Adjourned at 3:55 p.m.)

24

25

C E R T I F I C A T I O N

I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Anne M. Clayton

_____

Anne M. Clayton, RPR

July 27, 2016

_____

Date