IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CIVIL ACTION
JOHN DOE                *   16-0017
                        *
VS.                     *   JULY 21, 2016
                        *
BROWN UNIVERSITY        *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Bench Trial)

**VOLUME III**


**APPEARANCES**:

FOR THE PLAINTIFF:        J. RICHARD RATCLIFFE, ESQ.
JEFFREY BIOLCHINI, ESQ.
Ratcliffe Harten Burke
& Galamaga, LLP
40 Westminster Street
Suite 700
Providence, RI  02903

FOR THE DEFENDANT:        STEVEN M. RICHARD, ESQ.
Nixon Peabody, LLP
One Citizens Plaza
Suite 500
Providence, RI, 02903

Court Reporter:        Anne M. Clayton, RPR
One Exchange Terrace
Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

I N D E X

WITNESS                                                    PAGE

BESENIA RODRIGUEZ

    Direct Examination by Mr. Ratcliffe:             6
    Cross-Examination by Mr. Richard:               69
    Redirect Examination by Mr. Ratcliffe:          90

AMARIAH BECKER

    Direct Examination by Mr. Ratcliffe:           115

PLAINTIFF'S EXHIBITS                                      FULL

19   -                                                    36

———————————————————————————

1    21 JULY 2016 -- 9:00 A.M.

2            THE COURT:  Good morning, everyone.  We're ready

3    to continue trial in the matter of Doe versus Brown

4    University.

5            Mr. Ratcliffe, are you ready to call your next

6    witness?

7            MR. RATCLIFFE:  Yes.  I have one housekeeping

8    matter, your Honor.

9            THE COURT:  All right.

10           MR. RATCLIFFE:  I have a proposed Exhibit 47.

11   I don't believe there's any objection to the

12   authenticity of this document.  I've provided a copy to

13   the clerk.

14           This would be in the nature of rebuttal

15   evidence; it's just a letter to Beau from Amanda

16   basically advising him that his advisor has to

17   communicate with the Office of General Counsel.  It's

18   regarding a different matter involving

19   Witness Number 9, but I'm offering it as the nature of

20   rebuttal evidence with respect to Amanda Walsh's

21   testimony yesterday.  I know we've been trying this

22   case, witnesses are being called, so basically the

23   direct -- the defense case and our cases are sort of

24   going in at the same time.

25           So I'm offering it in the nature of rebuttal

1    evidence at this time.

2         THE COURT:  Is there any objection to this?

3         MR. RICHARD:  Your Honor, I do have an objection

4    on a few grounds.  Procedural, number one, Amanda Walsh

5    was examined on this.  It wasn't raised, it wasn't part

6    of the exhibit list.  It is what it is, but it's also

7    in the chain of a communication set between Attorney

8    Ratcliffe and Amanda, and ultimately General Counsel in

9    another disciplinary matter against Beau, particularly

10   concerning the University's role in that case as the

11   complainant and stepping in for the student.

12        I think we're opening the door to another case

13   that we've tried to stay away from in this matter.  I

14   do have concerns about the process by which this is

15   being offered.  The substance is unrelated to this

16   particular matter.  It says what it says.

17        I don't question its authenticity, but I did

18   want to raise these concerns that I have about this

19   exhibit in the context of this proceeding.

20        THE COURT:  Well, let's just walk through this.

21   Mr. Ratcliffe is, I think, trying to show as a matter

22   of rebuttal that he was directed, as Beau's advisor, to

23   communicate with General Counsel's Office.  He could in

24   his rebuttal case call Amanda Walsh and ask her that

25   question.  I suppose he could call one of the members

1    of the General Counsel's Office and ask that question

2    and the answer would be -- I imagine the answer would

3    be yes, that was the direction that was given to Beau.

4    But I respect your concerns about opening the door into

5    a whole other proceeding that has nothing to do with

6    this case.

7          So I'm wondering if the easiest way to deal with

8    this wouldn't be just to work out a simple stipulation

9    that that was the direction given to Beau and

10   Mr. Ratcliffe, that that's how communications were to

11   occur.

12         Can you put that in as a stipulation? Then you

13   don't need this document.

14         MR. RICHARD: My primary concern about this

15   document is the content --

16         THE COURT: I understand.

17         MR. RICHARD: Context not content. It says what

18   it says.

19         THE COURT: Right.

20         MR. RATCLIFFE: I have no objection to a

21   stipulation that basically Beau was advised that his

22   advisor must communicate -- correspond with Brown's

23   Office of General Counsel.

24         MR. RICHARD: The attorney acting as the

25   advisor. I mean, that's the fact, your Honor. This

1    document is just problematic.

2            THE COURT:  During the lunch break why don't the

3    two of you just work out a one- or two-sentence

4    stipulation that covers that and then you can read it

5    into the record and make it an exhibit, okay?

6            MR. RICHARD:  Okay.

7            MR. RATCLIFFE:  Thank you, your Honor.

8            THE COURT:  And then we'll not admit this.

9            MR. RATCLIFFE:  That's fine, your Honor.

10           THE COURT:  Very good.

11           Are you ready to call your next witness?

12           MR. RATCLIFFE:  Yes.  Besenia Rodriguez.

13           **BESENIA RODRIGUEZ, PLAINTIFF'S WITNESS, SWORN**

14           THE CLERK:  Please state your name for the

15   record and spell your last name.

16           THE WITNESS:  Besenia Rodriguez,

17   R-O-D-R-I-G-U-E-Z.

18           THE COURT:  Good morning, Ms. Rodriguez.

19           You may inquire, Mr. Ratcliffe.

20           **DIRECT EXAMINATION BY MR. RATCLIFFE**

21   Q.   Good morning.  Do you go by Dr. Rodriguez?  You

22   are a Ph.D.?

23   A.   That's fine.

24   Q.   Okay.  So Dr. Rodriguez, you are employed by Brown

25   University?

1    **A.**    Correct.

2    **Q.**    And you are the Assistant Dean for the College of

3    the Curriculum; is that correct?

4    **A.**    Associate.

5    **Q.**    Associate Dean.  Okay.  And what are your

6    responsibilities and duties as Associate Dean for

7    Curriculum?

8    **A.**    I oversee the entire undergraduate curriculum.  I

9    work closely with faculty and department curriculum

10   counsel, approving all courses offered for

11   undergraduates.  And I oversee several curricular

12   programs and work on academic advising of

13   undergraduates as well.

14   **Q.**    How long have you been employed at Brown

15   University?

16   **A.**    Since 2009.

17   **Q.**    And have you been a dean during your entire tenure

18   at Brown University?

19   **A.**    Yes, I have.

20   **Q.**    And you graduated from Brown University?

21   **A.**    Correct.

22   **Q.**    In 2000?

23   **A.**    Yes.

24   **Q.**    And you received a bachelor's in African American

25   Studies and Education; is that correct?

1    **A.**    Correct.

2    **Q.**    And then after Brown you went to Yale?

3    **A.**    Yes.

4    **Q.**    And you received a Ph.D.; correct?

5    **A.**    Correct.

6    **Q.**    What's your Ph.D. in?

7    **A.**    American Studies and African American Studies.

8    **Q.**    So at some point you become a member of the Title

9    IX Council; correct?

10   **A.**    Correct.

11   **Q.**    You were not on panels that heard disciplinary

12   complaints against students before the 2015-'16

13   academic year, were you?

14   **A.**    Correct.  I was not.

15   **Q.**    So this is new to you?

16   **A.**    Yes.

17   **Q.**    All right.  How did you come to be put on the

18   Title IX Council?

19   **A.**    I was invited by Amanda Walsh.

20   **Q.**    Did you apply, or how did it happen?  Just tell us

21   briefly how it happened.

22   **A.**    I did not apply.  She sent me an e-mail saying

23   that other colleagues had recommended me for the

24   position, for the role.

25   **Q.**    And you had a meeting with -- you followed up with

1    Amanda, obviously?

2    **A.**    Yes.  Over e-mail.

3    **Q.**    Did you have a meeting with Amanda at some point?

4    **A.**    Not that I recall.

5    **Q.**    Was it over e-mail that you said, Yes, I'll serve?

6    **A.**    Yes.

7    **Q.**    And what was your understanding when Amanda sent

8    you the e-mail as to what the Title IX Council did?

9    What was their role?

10           THE COURT:  Just a minute.  Kerrie, just lower

11    the volume; there's feedback there.

12           MR. RATCLIFFE:  Thank you, your Honor.

13    **Q.**    The question was what was your understanding of

14    the role of the Title IX Council?

15    **A.**    My understanding was that members of the council

16    would hear complaints from students related to sexual

17    harassment, stalking, or assault, and that we would

18    review the evidence provided in order to first make a

19    determination based on what the preponderance of the

20    evidence, so more likely than not was my understanding

21    of the standard applied; and that we would determine if

22    the respondent in any given case was responsible or not

23    responsible, and, if responsible, then determine a

24    sanction.

25    **Q.**    Have you served on any Title IX panels?

1    **A.**    Have I -- yes.

2    **Q.**    How many?

3    **A.**    Three.

4    **Q.**    What was the first that -- you served on the Beau

5    matter; correct?  The Beau/Allie matter?

6    **A.**    Yes.

7    **Q.**    And had you served on any matters before the

8    Beau/Allie matter?

9    **A.**    No.

10   **Q.**    So that was your first case?

11   **A.**    Yes.

12   **Q.**    Did you receive any training?

13   **A.**    Yes, I did.

14   **Q.**    And what did the training involve?

15   **A.**    We were required to participate in five hours of

16   training before we could hear our first case.

17   **Q.**    All right.  What did the five hours of training

18   include?

19   **A.**    So there were presentations by Amanda Walsh and by

20   others on campus about the new policy that was created

21   after a recent task force at Brown, so we talked about

22   the policy in great detail.

23          We also -- I think the training closed with two

24   hours of a sort of mock case.

25          We heard from the SHARE advocate.  We also heard

1   from the Men's Health liaison.  I'm not sure of his

2   exact title.

3   **Q.**   Now, you said the SHARE advocate.  Who is the

4   SHARE advocate?

5   **A.**   Her name is Alana Sacks.

6   **Q.**   Do you know what the SHARE advocate does?

7   **A.**   My understanding is that the SHARE advocate at

8   Brown serves as a resource to anyone who has concerns

9   about domestic relationships or sexual assault.

10  **Q.**   Now, how did you come to serve on this, your first

11  panel, the Beau/Allie panel?

12  **A.**   First, someone from the Title IX Council -- sorry

13  -- from the Title IX Office e-mailed me with the

14  students' names involved to make sure I didn't have any

15  prior relationship or there wasn't going to be the

16  perception of any kind of bias.  And then when I

17  confirmed that I did not know either of the students

18  involved, we worked around our schedules.

19          That's my understanding of how I came to serve

20  on this panel.

21  **Q.**   When you agreed to serve on the panel, what did

22  you -- did you receive a packet of information?

23  **A.**   I agreed to serve on the panel first, and then I

24  later received a packet of information.

25  **Q.**   And what did the packet of information include?

1    **A.**    There was a lot of evidence.  There was an

2    investigator's report.  There were statements from the

3    complainant and the respondent.  There were many, many

4    pages of text messages.  And I think there was also

5    photographic evidence of the space where the alleged

6    incident would have taken place.

7    **Q.**    And you read everything prior to the hearing?

8    **A.**    Yes, I did.

9    **Q.**    And your conclusion, after reading everything, was

10   that it was a complicated case?

11   **A.**    Yes.

12   **Q.**    Now, so you received the investigator's report?

13   **A.**    Correct.

14        MR. RATCLIFFE:  Eighteen.

15   **Q.**    I'm showing you what's been previously marked and

16   entered into evidence as Exhibit 18 and ask you if you

17   recognize that document.

18   **A.**    Yes, I do.

19   **Q.**    And what is it?

20   **A.**    It's a report of the investigation in this

21   proceeding.

22   **Q.**    I just want to back up a minute.  You said you

23   received the investigator's report.  Did you receive

24   any documents regarding the actual offense, describing

25   the offense that Beau was being alleged to have

1   committed?  If you look at section -- let me strike

2   that.

3          Do you see on that document, Exhibit 18, do you

4   see relevant policy sections?

5   **A.**   Yes.

6   **Q.**   And when you received this document, were the

7   relevant policy sections included with the package?

8   **A.**   I don't recall.

9   **Q.**   And at any point did you receive the relevant

10  policy section?

11  **A.**   Yes.  They were made available on the day of the

12  hearing in hard copy.

13  **Q.**   Okay.  But you don't recall if you received them

14  at the time that you received this document,

15  Exhibit 18?

16  **A.**   That's correct.

17  **Q.**   Prior to the hearing, did you read the relevant

18  policy section?

19  **A.**   I did.

20  **Q.**   And how did you find that relevant policy section?

21  **A.**   I believe that it had been provided with the

22  training materials and was available on, I believe, the

23  University's website still.

24  **Q.**   So you believe it had been provided with the

25  training materials for your training for the Title IX

1    Council?

2    **A.**   I think that was my recollection.  In discussing

3    the differences, the work of the task force, my

4    recollection is that we talked about what the policy

5    had been and what the policy now was.

6    **Q.**   So during your Title IX training, you talked about

7    the difference between the policy as it had been up

8    until September of 2015?

9    **A.**   That's correct.

10   **Q.**   And the changes that the task force brought about

11   to the policy?

12   **A.**   Right.

13   **Q.**   Now, I'm going to ask you if you -- let me know

14   when you're finished.  On page 15 of Exhibit 18, if you

15   can look at Footnote 26.  Can you read that?  Should I

16   make it a little bit larger for you?

17   **A.**   That size is fine.  I can read it.

18         (Witness reads document.)

19   **A.**   Okay.

20   **Q.**   I'm just going to turn to the next page.

21   **A.**   I'm sorry; can you turn back so I can read the end

22   of that sentence on the previous page?

23   **Q.**   Sure.  Why don't I just give you the document.

24         MR. RICHARD:  Your Honor, I have an extra copy.

25   **A.**   Thank you.

1          (Witness reads document.)

2    **A.**    I'm done.

3          MR. RATCLIFFE:  May I approach?

4          THE COURT:  Yes.

5    **Q.**    At any point either at the hearing or leading up

6    to the hearing, did you receive any documents from the

7    Title IX Office describing or identifying what is meant

8    by the term "coercion"?

9    **A.**    Not that I can recall.

10   **Q.**    At the hearing from the legal advisor or from the

11   Chair, did you receive any documents describing what

12   "coercion" means?

13   **A.**    I'm not sure that I understand the question.

14   Could you rephrase that.

15   **Q.**    Well, let me go back a second.  What's your

16   understanding of the purpose of this investigative

17   report?

18   **A.**    So my understanding is that the investigator has

19   gathered evidence through -- and conducted interviews

20   and that this report gives the investigator's account

21   of the substance of those interviews and that evidence

22   that was collected in a narrative form.

23   **Q.**    And with respect to the interviews and the

24   information, do you know why -- why is it included in

25   this investigative report?  Why did the investigator

1    put it there?

2    **A.**    I'm sorry.  Why did the investigator put --

3    **Q.**    Put all this information, 29 pages of information

4    in this report?

5    **A.**    To provide the hearing panel with a summary of the

6    most relevant facts of the case.

7    **Q.**    Okay.  So the investigative report is all of the

8    relevant evidence that the investigator obtained during

9    the investigation; correct?

10   **A.**    I think that's my understanding, yes.

11   **Q.**    So the investigator is telling you as a panel

12   member that the central issue in the case is whether or

13   not -- (Reading:)  Central issue in this case is not

14   whether certain sexual acts occurred or even whether

15   the complainant literally consented to them, but

16   whether the consent was obtained through coercion.  The

17   2014 Code of Student Conduct forbids non-consensual

18   physical contact of a sexual nature.  Implicit in any

19   common understanding of consent is that it is freely

20   and voluntarily given.  Thus, consent obtained by

21   coercion does not constitute consent.

22         Did anybody ever tell you what is meant by the

23   term "coercion"?

24   **A.**    To my recollection, it's something that we as a

25   hearing panel discussed, but I don't recall being told

1    by someone how "coercion" was to be defined.

2    **Q.**    Now, did you have any meetings with -- the hearing

3    in this matter was on April 14, 2016?  Is that your

4    memory?

5    **A.**    I don't recall the exact date, but that sounds

6    reasonable.

7    **Q.**    Sometime in April?

8    **A.**    Yes.

9    **Q.**    Did you have any meeting with any of the panel

10   members or the Title IX Council Chair prior to the

11   actual hearing?

12   **A.**    About this matter?

13   **Q.**    Yes.

14   **A.**    No, not that I can recall.

15   **Q.**    So tell me what happens when you get to the

16   hearing.  Is that Horace Mann?

17   **A.**    Yes.

18   **Q.**    And you assemble?

19   **A.**    Correct.

20   **Q.**    And it was early in the morning?

21   **A.**    Yes.

22   **Q.**    And who is Gretchen Schultz?

23   **A.**    She is the Faculty Chair of the Title IX Council.

24   **Q.**    And what's your understanding of the role of

25   Gretchen Schultz as the Faculty Chair?

1    **A.**   My understanding is that the Faculty Chair serves

2    as a sort of facilitator.  They don't weigh in on the

3    decision per se, but they are sort of responsible for

4    all of the sort of procedural matters.

5    **Q.**   When you say the Faculty Chair doesn't weigh in on

6    the decision per se, what do you mean by that?

7    **A.**   I mean that they do not have a vote.

8    **Q.**   But they -- Dr. Schultz in this case participated

9    in the deliberations; correct?

10   **A.**   Correct.

11   **Q.**   And she provided her opinion regarding

12   responsibility; correct?

13   **A.**   I don't recall that.

14   **Q.**   All right.  Well, you recall Dr. Schultz bringing

15   up the concept of "manipulation," do you not?

16   **A.**   Yes.

17   **Q.**   Okay.  And that if there's manipulation equals

18   lack of consent?

19   **A.**   So let me clarify that.  We talked about

20   manipulation, but I remember being the person to have

21   brought that out from the text messages that were

22   exchanged.

23   **Q.**   And you don't recall Dr. Schultz mentioning that

24   at all?

25   **A.**   Not that I can recall.

1    **Q.**    Okay.  Now, when you get to the -- what happens

2    when you first get to the hearing room?

3    **A.**    So the hearing panel was there, Gretchen Schultz

4    and Amanda Walsh.  We were -- the panelists were -- it

5    was explained to us what the materials were before us,

6    including a copy of all the materials that had been

7    sent electronically and a copy of the 2014-'15 policy

8    as well as a copy of the 2015-'16 policy.  And I

9    believe we were told what to expect from the day, the

10   sequence of events and provided an opportunity to

11   review any of the materials again and determine if we

12   had questions for the investigator.

13   **Q.**    Now, when you say the 2015-'16 policy, do you mean

14   the 2015-2016 complaint process or Title IX Policy?

15   **A.**    I think the Title IX Policy as well.

16   **Q.**    So there were two documents, 2015-2016.  One was

17   the Title IX Policy, and one was the Title IX Complaint

18   Process?  Is that your understanding?

19   **A.**    I don't remember the Title IX Complaint Process

20   was available, but I do remember that the policy was.

21   **Q.**    Just if I can -- is that the document, Sexual and

22   Gender-Based Harassment, Sexual Violence, Relationship

23   and Interpersonal Violence and Stalking Policy, that

24   you recall receiving on the morning of the hearing?

25   **A.**    I believe it is.

1    **Q.**    Was it a hard copy or were you directed -- strike
2    that.
3            Did you bring your laptop with you?
4    **A.**    I probably had my laptop with me, but I didn't use
5    it.
6    **Q.**    So is it your memory that you received a hard copy
7    of the Title IX Policy?
8    **A.**    Yes.
9    **Q.**    And was it explained to you why you were receiving
10   a hard copy of the Title IX Policy?
11   **A.**    As I recall, it was made available in case we
12   wanted to refer to it, but it was explained to us that
13   because of when the alleged incident took place, that
14   it fell under what would be the previous policy.
15   **Q.**    So why was it explained to you, if you're looking
16   at the previous policy, why are you being given the
17   current policy?
18   **A.**    So we have the option of looking at the current
19   policy because it was made more explicit.  Certain
20   aspects of what I think was the prior policy was much
21   more general, and so the newer policy codified or made
22   more explicit I think what had been our community
23   values and community sort of understanding of the prior
24   policy.
25   **Q.**    And who told you that?

1    **A.**    I can't remember exactly.

2    **Q.**    But prior to the hearing, you hadn't read any

3    documents, had you, or been provided with any documents

4    that established that the current policy, the Title IX

5    Policy, sort of codified the prior community values?

6    **A.**    That's what we had discussed during our training

7    and that's what was evident to me in serving -- while I

8    had not served on prior sexual nature cases, I had

9    served on prior student conduct cases, and those were

10   all managed by the same office under a single Student

11   Conduct Policy, so I was familiar with the earlier

12   policy.

13         And so it was mentioned during the orientation

14   that, you know, the statement that I just gave about

15   the sort of codification and maybe more explicit nature

16   of certain sort of -- making certain definitions clear

17   or more explicit in the newer policy; but that was also

18   an understanding that I brought to it as well.

19   **Q.**    So you were told during your Title IX training

20   that the current Title IX Policy made the former Code

21   of Conduct more explicit?

22   **A.**    So my understanding of the process was that the

23   people who served on this task force were, you know,

24   finding ways to make the process clearer for everybody,

25   more streamlined, and that the result of that process

1    was this new definition.

2    **Q.**   So that when a student was alleged to have

3    committed an offense, it would be clearly defined to

4    him as to what the conduct was that he was alleged to

5    have committed?

6    **A.**   Yes.

7    **Q.**   So that it was your understanding that the --

8    basically the stalking policy made it easier for

9    students to understand what was and what was not

10   allowed under Brown University policies?

11   **A.**   Yes.  I don't think it was a substantively

12   different set of expectations at all, but, rather, more

13   explicitly stated.

14   **Q.**   Now, when you received this -- you say you

15   received this document.  Did you discuss whether or not

16   you were going to use the definitions in the Title IX

17   Policy?

18   **A.**   I don't remember.

19   **Q.**   You don't recall any decision or any decision that

20   you came to make regarding whether or not you were

21   going to use the definitions?

22   **A.**   No, not at the start of the process.

23   **Q.**   At some point did you?

24   **A.**   I think towards the end of our deliberations, I

25   think that we talked about some of the language that

1    was in the Title IX Policy.

2    **Q.**    Did you decide as a group that you were going to

3    use the definitions in the Title IX Policy?

4    **A.**    I don't remember if we talked about it explicitly

5    or -- I don't really remember the details around that

6    decision.

7    **Q.**    Now, I believe that you testified at your

8    deposition that this was a difficult case to decide?

9    **A.**    Yes, I did.

10   **Q.**    And that you felt that neither the complainant nor

11   the respondent were a hundred percent credible?

12   **A.**    I did say that and feel that way.

13   **Q.**    And I believe that you also indicated that Allie

14   gave mixed signals?

15   **A.**    Correct.

16   **Q.**    Now, I believe -- can you look at Footnote 46.

17   **A.**    Yes.

18   **Q.**    Do you recall reading Footnote 46 when you

19   reviewed the materials prior to the hearing?

20   **A.**    I don't recall the specifics, no, but I know I

21   read all of the evidence, including the footnotes,

22   carefully.

23   **Q.**    And I believe you testified at your deposition

24   that John -- or, excuse me, Beau's violation of the

25   no-contact order suggested to you that he did not

1    accept boundaries?

2    **A.**    That's probably what I said, if that's on the

3    record.  I don't --

4    **Q.**    Did that -- that he violated the no-contact order,

5    did that suggest to you that he did not respect

6    boundaries or accept boundaries?

7    **A.**    Yeah, it suggested that to me.

8    **Q.**    Prior to the hearing, did anybody tell you how you

9    were supposed to view that evidence, sort of, you know

10    -- strike that.

11        The violation of the no-contact order didn't

12    involve Allie, did it?

13    **A.**    No, not that I remember.

14    **Q.**    Okay.  It involved another student?

15    **A.**    Yes.

16    **Q.**    And that student was known as Witness 9?

17    **A.**    Right.

18    **Q.**    And you recall there was a lot of information

19    about the interaction between Allie and Witness 9 in

20    the report?

21    **A.**    Right.

22    **Q.**    And did anybody prior to the hearing sort of give

23    you a cautionary instruction as to how to view all this

24    evidence about the interaction between Beau, Allie, and

25    Witness 9, how to weigh that evidence?

1   **A.**   I can't exactly remember.  I do remember that

2   there were aspects of the investigative report that

3   sort of gave a little bit of maybe context.  I don't

4   really remember details about how we were supposed to

5   interpret that.

6   **Q.**   But specifically at the hearing, prior to

7   deliberation, nobody said to you when you're looking at

8   information such as Beau's violation of the no-contact

9   order, you're not supposed to consider that as to

10  whether or not he committed the sexual assault?

11  **A.**   I can't say for certain.

12  **Q.**   But to you as a voting member, you drew the

13  conclusion that it suggested that here's a guy that

14  doesn't accept boundaries?

15  **A.**   I thought that was a possibility, yeah.

16  **Q.**   Did you just think it was a possibility or --

17  **A.**   Well, I understood that that was my

18  interpretation.

19  **Q.**   But your role, is it not, is to judge Allie and to

20  judge Beau; correct?

21  **A.**   That's right.

22  **Q.**   And you're receiving this information about Beau

23  and you drew the conclusion, did you not, that here's a

24  guy who doesn't accept boundaries?

25  **A.**   So I guess let me clarify why there's a sort of

1    tension in my response or some hesitation there, and

2    it's because I didn't -- I drew a conclusion based on

3    his violation of the no-contact order, but not on the

4    fact that there was -- that someone has placed a

5    no-contact order.  So I didn't take that as a sort of

6    character -- you know, I didn't judge or evaluate the

7    existence of a no-contact order but simply his response

8    to it.

9    **Q.**    So in Footnote 46 you're told, are you not, that

10   Witness 9 recalled this occurring shortly after

11   October 16 when she received notice that the respondent

12   had been found responsible for violating the no-contact

13   order on October 3.

14         So when you read that, you drew the conclusion

15   here's a guy who doesn't accept boundaries?

16   **A.**    Yes.

17   **Q.**    Now, the information you received, you said, was

18   voluminous?

19   **A.**    Yes.

20   **Q.**    And it starts with various text messages between

21   Allie and Beau; correct?

22   **A.**    Correct.

23   **Q.**    And then it -- then there are statements as to

24   what happened on November 10, 2014, in Faunce House;

25   correct?

1    **A.**    Correct.

2    **Q.**    And then there's a series of text messages between

3    Allie and Beau that post-date the incident?

4    **A.**    Yes.

5    **Q.**    And there's a series of interviews with witnesses

6    who testify as to Allie's statements regarding the

7    interaction that occurred after November 10, 2014;

8    correct?

9    **A.**    Correct.

10   **Q.**    And particularly you recall reading -- and you

11   also knew, did you not, from reading this report, that

12   Allie waited a considerable period of time before

13   reporting the alleged misconduct?

14   **A.**    That's correct.

15   **Q.**    And as somebody reviewing this report, you were

16   not concerned about the amount of time that had passed

17   between the alleged event and the report; correct?

18   **A.**    I was concerned about the lapse in time primarily

19   because I -- and I asked the investigator a question to

20   this effect -- but I wondered about the, sort of the

21   credibility or the authenticity of the interviews and

22   of the statements given how much time had transpired

23   since the event; how could everybody involved -- could

24   we trust their recollection of the events so far after

25   the fact.

1          MR. RATCLIFFE:  Exhibit 24.

2     **Q.**   Look at the -- these are notes of Amanda Walsh

3     that have previously been introduced into evidence, and

4     I just want to see if your memory of what you said and

5     then Amanda's notes are accurate, basically.

6     **A.**   Yes.

7     **Q.**   Could you look at that, and then Djuna Perkins'

8     response.

9     **A.**   Yes; I think this captures the way that I remember

10    asking the question.

11    **Q.**   So your concern was more of how can all these

12    witnesses have a good memory of communications and

13    things that occurred after the event; is that accurate?

14         (Reading:)  Besenia, lag time about when

15    incidents occurred and when incidents took place.  How

16    confident or hazy were they in their recollection

17    qualitatively, authenticity, what you were hearing,

18    given the span of time.

19         That was your concern, correct, the span of time

20    and the authenticity of the witnesses' statements?

21    **A.**   Correct.

22    **Q.**   But you weren't concerned about the lag in time

23    that Allie had in reporting the incident?

24    **A.**   Not at all.

25    **Q.**   And that was because of certain training that you

1    received; correct?

2    **A.**    Not solely for that reason.  There's no policy

3    around -- there's no sort of statute of limitations.

4    And I know it's common for people to never report

5    incidents or to report them long after the fact.

6    **Q.**    But it was based on the training that you

7    received; correct?

8    **A.**    It was discussed in the training I received.  I

9    wouldn't say that it was based in the training that I

10   received.

11   **Q.**    Okay.  Part of it was the training you received;

12   correct?

13   **A.**    In part.

14   **Q.**    And during the training you were told that you

15   shouldn't really draw a conclusion with respect to a

16   time lag in reporting; correct?

17   **A.**    That's not correct.  I wasn't explicitly told that

18   in the training.

19   **Q.**    Okay.  What were you told?

20   **A.**    So part of our training included the sort of

21   series of events that might happen, what options are

22   available to someone who wanted to report an incident,

23   a Title IX violation or an incident of a sexual

24   misconduct.  And so within that sort of span of --

25   within that context, I don't remember it being

1    specifically discussed, the lag time that somebody

2    might take in reporting an incident specifically; but I

3    remember it, sort of an explanation of what might be

4    going through a victim of sexual assault's mind, and

5    that led me to think about, well, if all these things

6    were going through somebody's mind, it's not

7    necessarily surprising that it might take them a long

8    time to report an incident that they felt occurred.

9    **Q.**   Let's look at what you testified to.  Do you

10   recall having a deposition?

11   **A.**   I do.

12        MR. RICHARD:  Your Honor, may I just have a

13   page.

14        MR. RATCLIFFE:  Excuse me.  Nineteen.

15   **Q.**   "Question:  Did it concern you that the

16   complainant had waited an extended period of time

17   before bringing a complaint?"

18        Your answer?

19   **A.**   "No."

20   **Q.**   "Question:  Why not?"

21        Your answer?

22   **A.**   "I think in my knowledge of, sort of as a person

23   in the world in terms of current events and also in the

24   training that I received, I had a sense that there were

25   a lot of extenuating factors that might, you know, lead

1    somebody to not file charges or not file a complaint at

2    all or right away."

3    **Q.**   And then going on with respect to training.

4        "Question:  And what were those factors that you

5    learned about?"

6        Your answer?

7    **A.**   "So I think one of the things that we discussed in

8    our training was the fact that a, sort of an alleged

9    victim or complainant might change their mind about

10   whether they wanted to bring a complaint, generally

11   speaking.  So they might feel like they don't want to,

12   and then at a later point actually there's a reason or

13   they have a desire to bring a complaint forward."

14   **Q.**   Now, I believe you also had a -- you also had a

15   question for the investigator, did you not, about --

16   the last paragraph of the report, correct, regarding

17   the -- let me just put this -- before I put it up, let

18   me put this up on the screen.  Exhibit 5?

19       MR. RICHARD:  Twenty-four.

20   **Q.**   Do you recall asking a question, (Reading:)  Can

21   you provide more information about the last paragraph?

22   What is the gap between perception of coercion and

23   coercion that is a policy violation?

24   **A.**   Yes, I do remember.

25   **Q.**   And the last paragraph you were referring to was

1    that -- it refers to by the respondent's own

2    admission -- why don't you read it and we can discuss

3    it.

4           (Witness reads document.)

5    **A.**   I read it.

6    **Q.**   So the last sentence, (Reading:)  Thus if the

7    panel concludes that the complainant generally believed

8    that she was --

9    **A.**   I'm sorry.  I'm going to have to read it.  I was

10   reading the conclusion section, so I'm going to need

11   another minute to read the previous paragraph.

12   **Q.**   Okay.  I apologize.

13         (Witness reads document.)

14   **A.**   Yes.

15   **Q.**   Okay.  So what was your concern about the

16   perception of coercion versus actual coercion?

17   **A.**   I think I was trying to access really the truth of

18   what happened, and so later in the notes, I do recall

19   Gretchen saying, Well, doesn't someone have to be

20   lying.  And I think that that's related to this idea

21   that a complainant might believe what they're saying is

22   true and yet they don't have to be lying in order for

23   me to find that there was no sexual misconduct, if that

24   makes any sense.

25        So I think I was trying to understand the space

1    between interpretation and sort of the subjectivity of

2    everybody involved in the situation and some semblance

3    of an objective truth of what happened.

4    **Q.**   So in connection with that, did anybody say, Well,

5    coercion requires these -- these are the elements of

6    "coercion"?

7    **A.**   I don't recall someone saying that, but I believe

8    that we looked at the newer policy in trying to define

9    what elements might constitute coercion.

10   **Q.**   So was that through Amanda Walsh or was that

11   through Gretchen Schultz?

12   **A.**   It was definitely not through Amanda Walsh because

13   she wasn't in the room during our deliberations, but I

14   don't recall how we came to that position beyond that.

15   **Q.**   So you wanted to come to some objective truth

16   regarding responsibility or non-responsibility?

17   **A.**   Correct.

18   **Q.**   And now, I believe -- so let's talk about the

19   evidence that you reviewed to try to come to this

20   objective truth.

21         You reviewed the pre-encounter text messages?

22   **A.**   Yes.

23   **Q.**   And you considered those important?

24   **A.**   Yes.

25   **Q.**   In fact, I believe you testified, already

1    testified that you believe that Beau's use of the word

2    "manipulate" in exhibit -- in the text messages was an

3    important text message?

4    **A.**   Yes.

5    **Q.**   Because he, in that text message, he indicates

6    that this banter back and forth between he and Allie,

7    and Allie says, You're trying to manipulate me;

8    correct?

9    **A.**   That's what I remember, yes.

10   **Q.**   And then Beau responds, Yes, I'm trying to

11   manipulate you a lot?

12   **A.**   Yes.

13   **Q.**   And that's yes?

14   **A.**   Yes.

15   **Q.**   And that's before they meet in the room?

16   **A.**   Yes, that's my recollection.

17   **Q.**   Well, it wasn't after they met in the room.

18   **A.**   Right.

19   **Q.**   So it was before they met in the room?

20   **A.**   Yes.

21   **Q.**   Now, then there are text messages that address the

22   communications between them after the event; correct?

23   **A.**   Correct.

24   **Q.**   And those text messages continue with sexual

25   banter about the event; correct?

1    **A.**   I don't remember exactly the nature, whether that

2    was involved in the after text messages.

3    **Q.**   What do you recall about the after text messages?

4    **A.**   I remember that there were a few text messages to

5    which -- that the complainant sent to the respondent,

6    to which the respondent did not reply.  And I remember

7    that at one point there was a discussion about whether

8    or not the -- whether the respondent asked the

9    complainant to put in a good word with another person,

10   and the complainant said that she would.  That's really

11   offhand what I can remember about the texts after the

12   incident.

13        MR. RATCLIFFE:  Give me a moment.

14        (Pause.)

15   **Q.**   So is it your memory that the incident happened on

16   November --

17        MR. RATCLIFFE:  I'm going to refer to

18   Exhibit 19, your Honor, page 134.

19        MR. RICHARD:  Your Honor, just for housekeeping,

20   I don't believe we put this into the record as a full

21   exhibit, but we've stipulated this exhibit is part of

22   the overall investigative report that was submitted

23   after.  It may be full, subject to completing the rest

24   of the -- submitting the full exhibit at the end of

25   the --

1      MR. RATCLIFFE:  We'll admit this in full and

2   supplement it with the other appendices.

3      THE COURT:  Right.  I think that was the

4   understanding, but just for now let's just make

5   Exhibit 19 full.

6      (Plaintiff's Exhibit 19 admitted in full.)

7   **Q.**   So I just want to get at -- is it your memory that

8   the incident occurred on November 10, 2014?

9   **A.**   Yes.

10  **Q.**   And do you recall some information in the report

11  that Beau was pledging to be in a fraternity at that

12  time?

13  **A.**   I don't remember that.

14  **Q.**   Do you remember anything about Beau was supposed

15  to be silent, not communicate with anybody outside the

16  fraternity for a period of time?

17  **A.**   I don't remember that in particular, no.

18  **Q.**   But in any event, you saw all the text messages?

19  **A.**   Yes.

20  **Q.**   You read all the text messages?

21  **A.**   Yes.

22  **Q.**   So the first post-encounter text message in what

23  you reviewed starts on 11/14; correct?

24  **A.**   Yes.

25  **Q.**   And it's quite graphic, but Beau says to Allie,

1    (Reading:)  Remember to pretend like you didn't give me

2    a mind-blowing blowjob; correct?

3    **A.**   Yes.

4    **Q.**   And Allie responds, (Reading:)  Only if you

5    remember to pretend that you're not imagining fucking

6    the shit out of me the whole time.

7         And then Beau responds, (Reading:)  Only if I

8    pretend like you don't want me to fuck you until you

9    orgasm the whole time.

10        And then Allie responds, (Reading:)  Good.  So

11   no will suspect how much you want to cum inside me.

12        With a little smiley; correct?

13   **A.**   Correct.

14   **Q.**   And you read those text messages, right?

15   **A.**   I did.

16   **Q.**   I believe that you testified at your deposition

17   that you considered the post-encounter text messages

18   subjective and not really evidence or not evidence?

19   **A.**   I don't think I said that they were not evidence.

20        THE COURT:  Well, Mr. Ratcliffe, why don't you

21   just ask her the question and then if you need the

22   deposition either to impeach her or refresh her, then

23   you can do that.

24   **Q.**   Did you say that the post-encounter texts were

25   subjective, not evidence?

1   **A.**   I don't know if I said -- I don't know if I said

2   that or not.

3   **Q.**   Would looking at your deposition --

4          THE COURT:  Hang on.  Counsel come forward.

5          (Sidebar off the record.)

6   **Q.**   Did you think that these post-encounter texts were

7   evidence?

8   **A.**   Yes.

9   **Q.**   Did you testify that they weren't evidence?

10  **A.**   I can't recall whether I specifically said that.

11         I think what I do recall saying during my

12  deposition --

13         THE COURT:  No.  That question is not before

14  you.

15         So if you want to use the deposition, use the

16  deposition.

17  **Q.**   Let me ask you another question.  Did you consider

18  the text messages to be an objective representation of

19  the parties' description of the event, the

20  post-encounter text messaging?

21  **A.**   No, I didn't.

22  **Q.**   Why is that?

23  **A.**   I thought that there could have been a number of

24  things, given the complaint, that would have been --

25  there could have been any number of reasons why they

1    were both sort of participating in this banter or

2    writing these texts.

3    **Q.**    So you felt like the post-encounter text messages

4    had limited value to you in determining what actually

5    happened; correct?

6    **A.**    I would say that's correct.

7    **Q.**    And you also thought that they were very

8    subjective?

9    **A.**    Right.

10   **Q.**    And you drew the conclusion that they were very

11   subjective because of the training you received;

12   correct?

13   **A.**    I would say the training that I received was part

14   of the reason why I thought they might have been

15   subjective.

16   **Q.**    Well, did you testify that you drew the conclusion

17   that they were subjective based on the training you

18   received from Ms. Walsh and the SHARE advocate and any

19   other training you received from the Title IX Council?

20   **A.**    I think what I testified was that based on my own

21   experience in the world, I think as a person in the

22   world, is what I said, and the training that I

23   received, that I drew that conclusion.

24   **Q.**    I'm going to ask you if you recall when I ask you

25   the question --

1       MR. RICHARD:  Page?

2       MR. RATCLIFFE:  Page 77.

3   **Q.**   "Question:  Did you draw the conclusion that they

4   were very subjective based on the training you had

5   received from Ms. Walsh and SHARE and the other

6   trainings that you discussed earlier today?"

7       What was your response?

8   **A.**   "I would say so, yes."

9   **Q.**   You didn't qualify it during your deposition, did

10  you?

11  **A.**   Not at this point, but I had qualified it already

12  earlier.

13  **Q.**   You didn't qualify it when I asked you the

14  question; correct?

15  **A.**   Correct.

16  **Q.**   And I believe that you testified during the

17  deliberations there was only a brief discussion

18  regarding the --

19      THE COURT:  Mr. Ratcliffe --

20      MR. RATCLIFFE:  Oh, strike that.  Strike that.

21      THE COURT:  -- remember what I just talked

22  about.

23      MR. RATCLIFFE:  Yes.

24  **Q.**   Do you recall, was there a discussion regarding

25  these post-encounter text messages during the

1    deliberations?

2    **A.**    Yes, I believe that there was some discussion.

3    **Q.**    And it was very short?

4    **A.**    Yes, to my recollection.

5    **Q.**    Now, you read the report regarding Witness

6    Number 1?

7    **A.**    I think I'll need a little more detail to refresh

8    my memory on Witness Number 1.

9    **Q.**    Do you recall Allie's comments to her roommate's

10   friend immediately after the event on November 10,

11   2014?

12   **A.**    Vaguely, yes, I recall.

13   **Q.**    What's your understanding, what's your memory of

14   those communications?

15   **A.**    I think she -- the complainant used the word,

16   something like it was weird, or she -- I remember the

17   witness testifying that she didn't seem like there was

18   a big deal, but I do remember her saying that -- using

19   a word like "weird," but otherwise not having a

20   particularly strong affect.

21        What I'm trying to say is that I don't -- the

22   witness didn't -- I think she said she didn't seem as

23   if she was upset.

24   **Q.**    In fact, she seemed that she was excited; correct?

25   **A.**    I don't exactly remember.

1    **Q.**   Would reviewing the report refresh your

2    recollection?

3    **A.**   It would.

4    **Q.**   Why don't you read the information regarding

5    Witness 1.  I can change the page after you've finished

6    reading it.

7    **A.**   "Witness 1 recalls" --

8         THE COURT:  You don't have to read it out loud.

9    Just read it to yourself and see if it refreshes your

10   memory about what you're being asked about.

11        (Witness reads document.)

12   **A.**   Okay.  I'm finished with this.

13   **Q.**   Do you want to read the next --

14   **A.**   Sure.

15        (Witness reads document.)

16   **A.**   Okay.

17   **Q.**   Did you believe that this information was not

18   relevant to whether or not -- strike that -- that this

19   information, Witness 1's statement, was not evidence

20   that she had or had not been sexually assaulted one way

21   or the other?

22   **A.**   Correct.

23   **Q.**   And that was based on training that you received?

24   **A.**   In part.

25   **Q.**   And the training that you received dealt with the

1   effects of trauma on victims of sexual assault?

2   **A.**   That was one part of it, yes.

3   **Q.**   And that was from the SHARE advocate?

4   **A.**   As I recall, yes.

5   **Q.**   And I believe that -- did you learn that the

6   training that -- during the training, did you learn

7   that the responses of victims to a sexual assault

8   sometimes are counter-intuitive to the lay person?

9   **A.**   I would say so.

10  **Q.**   And that victims of sexual assault may react in

11  certain ways that are not objectively reasonable to a

12  person who hasn't suffered a sexual assault?

13  **A.**   Yes.

14  **Q.**   So, for example, coming back to your room and

15  saying -- and being happy and bubbly and describing an

16  encounter that just occurred.

17  **A.**   That would be an example.

18  **Q.**   So the fact that the first statement that Allie

19  made regarding the event -- strike that.

20          So the fact is that you didn't consider the

21  first statements that Allie made after the event as

22  evidence as to whether or not she had been assaulted?

23  **A.**   So I think in answering that I would say that

24  there is a dispute about Allie's demeanor and what she

25  actually said during the encounter.  So that is --

1    **Q.**    Excuse me, I asked you a question.

2           MR. RATCLIFFE:  I'm sorry, your Honor.  Can you

3    instruct the witness.

4           THE COURT:  You need to just answer the question

5    that you're asked and if counsel, either Mr. Ratcliffe

6    or Mr. Richard wishes to follow-up or to ask you other

7    questions to give context or whatever, they may do

8    that, but you need to just stick to the question that's

9    asked.  Okay?

10   **A.**    Can you repeat the question, please.

11   **Q.**    So you would agree with me that the report that

12   you had, this is the evidence that you had in front of

13   you; correct?

14   **A.**    Correct.

15   **Q.**    And I believe you testified that this was the

16   relevant evidence that you had in front of you?

17   **A.**    Correct.

18   **Q.**    And of the relevant evidence that you had in front

19   of you, you had Allie's first statements to a non-party

20   after the event before you?

21   **A.**    Yes.

22   **Q.**    And those statements were very close in time to

23   the actual encounter?

24   **A.**    Yes.

25   **Q.**    In fact, immediately after the encounter?

1    **A.**   Yes.

2    **Q.**   And you did not consider those statements

3    evidence, did you?

4    **A.**   I did consider them evidence.

5    **Q.**   Okay.  You didn't consider them evidence as to

6    whether or not she had been sexually assaulted one way

7    or another?

8    **A.**   I would say that's correct.

9    **Q.**   And were you told by anybody, Amanda Walsh or

10   anybody that gave you the training, that you're

11   supposed to consider all of the evidence?

12   **A.**   Yes.

13        THE COURT:  Why don't we take our morning break

14   now.  We can go off the record.

15        (Discussion off the record.)

16        (Recess.)

17        THE COURT:  Proceed.

18   **Q.**   Now, in the package that you received from the

19   investigative report, there was a lot of information

20   regarding statements that Allie made after the

21   encounter to others besides Witness 1; correct?

22   **A.**   Yes.

23   **Q.**   In fact, there were various statements made to

24   people on mock trial, which she participated on?

25   **A.**   Yes.

1    **Q.**   And do you recall how Allie referred to the

2    encounter to these individuals?

3    **A.**   Not specifically, no, I don't recall.

4    **Q.**   Do you recall her referring to her encounter with

5    Beau as a "hookup"?

6    **A.**   That sounds familiar, yes.

7    **Q.**   And is this something, based on your training, not

8    to consider one way or another in determining whether

9    or not a sexual assault occurred?

10   **A.**   Could you repeat or rephrase the question.  I'm

11   not sure I understand.

12        THE COURT:  I agree.

13   **Q.**   Did you consider the comments or the statements

14   that Allie made regarding the encounter as a "hookup"

15   as evidence as to whether or not a sexual assault had

16   or had not occurred?

17   **A.**   I considered it all evidence, but I didn't feel

18   that I could reliably judge or -- judge those comments

19   as a reliable indicator of what actually happened.

20   **Q.**   So I guess your testimony is you considered it,

21   but you discounted it?

22   **A.**   That's not my testimony.  I didn't discount it.  I

23   think I considered it, but I didn't evaluate its

24   ability to tell me about whether something happened --

25   whether or not she was telling the truth about what

1    happened.

2    **Q.**   So it's your testimony that you considered them as

3    to whether or not a sexual assault occurred?

4    **A.**   I guess what I want to say is that I weighed all

5    of the evidence.  I did consider it, yes.

6    **Q.**   Did you testify that you did not consider the

7    statements -- at your deposition did you testify that

8    you did not consider the statements regarding the

9    hookup one way or another in determining whether or not

10   a sexual assault occurred?

11   **A.**   That's correct.

12   **Q.**   And is that still your testimony?

13   **A.**   Yes.

14   **Q.**   Okay.  So you had this evidence of Allie's

15   statement to a number of witnesses, Beau and I hooked

16   up; correct?

17   **A.**   Yes.

18   **Q.**   Those statements are all throughout the materials,

19   the evidence that you received from Amanda Walsh --

20   **A.**   Yes.

21   **Q.**   -- in the investigator's report; correct?

22   **A.**   Correct.

23   **Q.**   And you read through them?

24   **A.**   Yes.

25   **Q.**   And you determined I can't use this evidence one

1    way or another in determining whether or not Allie's

2    telling the truth about a sexual assault?

3    **A.**    That's right.

4    **Q.**    And that's because you didn't want to put yourself

5    in her shoes?

6    **A.**    Right.

7    **Q.**    And you didn't want to judge her behavior?

8    **A.**    I wouldn't say that I didn't want to judge her

9    behavior, but rather that I felt like I was not in some

10   ways equipped to judge her behavior.

11   **Q.**    So you determined it was best not to judge her

12   behavior?

13   **A.**    I would say I was not equipped to judge her

14   behavior.

15   **Q.**    Did you testify that you thought it was best not

16   to attempt to judge her behavior?

17   **A.**    That sounds right.

18   **Q.**    So that sounds -- that refreshes your recollection

19   as to what you testified?

20   **A.**    Yes.  That sounds closer to what I remember.

21   **Q.**    Well, do you want me to show it to you?  Do you

22   want me to show you your testimony?

23   **A.**    Yes.

24          (Pause.)

25          MR. RATCLIFFE:  It's not working.

1      THE COURT:  You can do it orally.  You can just,

2  you know:  Did I ask you this question and did you give

3  this answer.

4      MR. RATCLIFFE:  I have an extra copy.

5      THE COURT:  Show it to her.

6      MR. RATCLIFFE:  Do you want a copy, your Honor?

7      THE COURT:  If you have an extra, that would be

8  great.  Thank you.  What page?

9      MR. RATCLIFFE:  Page 73.

10 **Q.**   Maybe you can look at it and let me ask you --

11 okay.  Let's start with the question that starts at

12 line 7.

13 **A.**   Okay.

14 **Q.**   "Okay.  Do you recall a series of witnesses

15 stating that Ms. Doyle had referred to her encounter

16 with Beau as a quote "hookup"?

17      Do you recall that question?  Do you see that

18 question?

19 **A.**   Yes.

20 **Q.**   And your response was?

21 **A.**   "Yes, I do recall that."

22 **Q.**   "Question:  And is this something that you decided

23 based on your training not to consider one way or

24 another in determining whether or not a sexual assault

25 occurred?"

1    And your response was?

2  **A.**   "I think that's accurate."

3  **Q.**   And "Question:  And why is that?"

4    And your answer is:

5    "I think I really didn't try to -- I tried not

6  to consider it because I felt like it couldn't -- I

7  couldn't really put myself in her shoes to understand

8  why she was representing it that way, so best not to

9  attempt to judge her behavior."

10  **A.**   That's correct, yes.

11  **Q.**   So based on the training that you received from

12  the Title IX or -- the Title IX training you received,

13  you determined that it was best not to try to judge a

14  complainant's behavior in a sexual assault matter?

15  **A.**   Their behavior after the incident, yes; correct.

16  **Q.**   So basically, to you, the objective evidence or

17  the evidence that you considered was the information

18  leading up to the encounter?

19  **A.**   I would say that I weighed all of the evidence and

20  the evidence that I -- that sort of I found the most

21  salient was the evidence provided of the incident prior

22  to the incident.

23  **Q.**   You said you weighed all the evidence.  You didn't

24  weigh the evidence regarding Allie's statements after

25  the encounter, did you?

1   **A.**   I did weigh it.  I just determined that it wasn't

2   illuminative in one way or another.

3   **Q.**   So you decided not to consider it in reaching your

4   determination that Beau was responsible for the sexual

5   assault?

6   **A.**   Could you repeat that?

7   **Q.**   Okay.  You had all this evidence.  You had all the

8   text messages leading up to the event; correct?

9   **A.**   Correct.

10  **Q.**   You considered those?

11  **A.**   Yes.

12  **Q.**   To you those were the most objective, the most

13  objective, the best evidence; correct?

14  **A.**   As well as the reports of what actually happened

15  on the night of as well.

16  **Q.**   So then you have the report.  You have the

17  statements leading up to the encounter.  You considered

18  those?

19  **A.**   Yes.

20  **Q.**   You considered the statements of the parties as to

21  what happened in the room?

22  **A.**   Yes.

23  **Q.**   And then you had all this evidence regarding the

24  interaction with the parties after the event?

25  **A.**   Yes.

1    **Q.**   And regarding the information about what occurred

2    after the event, you said you considered that; correct?

3    **A.**   Yes.

4    **Q.**   But after considering it, you determined not to

5    use it in any way to determine whether or not Beau

6    committed a sexual assault?

7    **A.**   I would say that's accurate.

8    **Q.**   And you did that because you didn't want to judge

9    Allie's behavior after the event?

10    **A.**   Yes.

11    **Q.**   And you didn't want to judge Allie's behavior

12    after the event because you had received training from

13    the SHARE advocate?

14    **A.**   In part.

15    **Q.**   Okay.  So you received training from the SHARE

16    advocate, and the SHARE advocate told you that there

17    are all sorts of psychological reactions that people

18    have to trauma; correct?

19    **A.**   Yes.

20    **Q.**   And that those reactions are counter-intuitive to

21    what an ordinary person would find reasonable?

22    **A.**   That was my interpretation of --

23    **Q.**   So basically Alana Sacks comes in and gives you

24    all this information about trauma; correct?

25    **A.**   Correct.

1    **Q.**   And you drew the conclusion, based on the

2    training, that the reactions of a sexual assault

3    victim, the trauma that a sexual assault victim suffers

4    may lead to certain post-encounter behaviors?

5    **A.**   What I'm trying to say is that --

6    **Q.**   Can you --

7    **A.**   Can you rephrase the question then.

8         THE COURT:   Well, do you understand the question

9    or not?

10   **Q.**   Do you understand the question?

11   **A.**   No.

12        THE COURT:   Let's have it read back, and if you

13   don't understand it, you can rephrase.

14        (Pending question read by the reporter.)

15   **A.**   In part.

16   **Q.**   In part?

17   **A.**   Yes.

18   **Q.**   So let's discuss that.  So you have this training?

19   **A.**   Yes.

20   **Q.**   And you learn about trauma?

21   **A.**   Yes.

22   **Q.**   And what does Alana Sacks tell you about the

23   effect, about the effect of trauma on a sexual assault

24   victim?

25   **A.**   That it -- she said a lot of things, and I don't

1    feel like I can accurately convey all of that here.

2    **Q.**   Well, you learned about psychological effects;

3    correct?

4    **A.**   I think so, yes.

5    **Q.**   And you learned about behaviors that a sexual

6    assault victim may engage in after an encounter?

7    **A.**   Yes.

8    **Q.**   And you learned that some of those behaviors, or

9    you drew the conclusion based on that presentation that

10   many of those behaviors are counter-intuitive to what a

11   person who has not suffered trauma would view the

12   behaviors?

13   **A.**   No.  It was not solely based on that presentation.

14   **Q.**   Did you draw the conclusion, after the training,

15   that a sexual assault victim engages in behaviors that

16   are counter-intuitive to the ordinary person?

17   **A.**   I would say that I brought that understanding to

18   the training and the training added to my

19   understanding.

20   **Q.**   Confirmed your understanding?

21   **A.**   Sure.

22   **Q.**   And have you had experience with sexual assault

23   victims?

24   **A.**   Yes.

25   **Q.**   In what way?

1  **A.**   I've talked with other students who had

2  participated in complaint processes at Brown.  I

3  believe that may be the extent of it.

4  **Q.**   So you didn't have any specific training regarding

5  or experience regarding trauma suffered by sexual

6  assault victims, did you?

7  **A.**   Any training?

8  **Q.**   Correct.

9  **A.**   No.

10  **Q.**   So the only training that you had was the training

11  by Alana Sacks?

12  **A.**   Yes.  Well, that's not exactly true.  I did have

13  training on the prior student conduct process, even

14  though I didn't actually hear any cases prior to this

15  case.

16  **Q.**   Did you conclude that it was beyond your degree of

17  expertise to assess Allie's post-encounter conduct?

18  **A.**   Yes.

19  **Q.**   And that was because of a possibility that it was

20  a response to trauma?

21  **A.**   That's right.

22  **Q.**   And the training that you received from the SHARE

23  advocate dealt with responses that people sometimes

24  experience after trauma?

25  **A.**   Yes.

1   **Q.**   And the SHARE advocate told you about those

2   responses; correct?

3   **A.**   To some degree.

4   **Q.**   Well, they told you about responses in the

5   presentation; correct?

6   **A.**   Yes.

7   **Q.**   And some of the responses, for example, not being

8   able to remember facts clearly?

9   **A.**   That's right.

10   **Q.**   And they also talked about certain neurological

11   factors; correct?

12   **A.**   I don't exactly remember that.

13   **Q.**   All right.  Did you testify that the SHARE

14   advocate told you about certain neurological and

15   psychological factors that might impact someone's

16   behavior in the aftermath?

17   **A.**   Yes.

18   **Q.**   And as a result of receiving that information, did

19   you take it as limiting your ability to assess certain

20   behaviors that you might have thought of as being

21   objectively unreasonable?

22   **A.**   Could you repeat the first part of the question?

23   **Q.**   As a result of learning about the neurological and

24   psychological factors that you were told about, did you

25   determine that that limited your ability to assess

1    certain behaviors that you may have thought were

2    objectively unreasonable?

3    **A.**    To some extent.

4    **Q.**    Well, did you try -- as a result of this training,

5    did you determine that it's best not to judge -- you

6    can't put yourselves in the shoes of a sexual assault

7    victim; correct?

8    **A.**    I wouldn't say that that was as a result of the

9    training.

10   **Q.**    But you came to this hearing with the belief that,

11   you know, I can't put myself in Allie's shoes because

12   she suffered trauma?

13   **A.**    No, I didn't take it as a given that she had

14   suffered trauma.

15   **Q.**    Well, based on your training, you determined that

16   you couldn't consider this information in determining

17   whether or not the assault occurred?

18   **A.**    If I could use my own words, I would say that I --

19   she might have been responding in a particular way

20   because she was not victimized, or, because she was and

21   this was a response to that victimization.

22            So that is what I mean when I say that I

23   couldn't -- it wasn't evidence one way or the other as

24   to whether an assault had happened.

25   **Q.**    All right.  Let's talk about that.  So you didn't

1    want to pass judgment on certain actions that occurred

2    at the event; correct?

3    **A.**    Correct.

4    **Q.**    And because you didn't want to put yourself in her

5    shoes?

6    **A.**    Yes.  I think I said that, yes.

7    **Q.**    And it was your role as a member of the Title IX

8    Council to consider all the evidence; correct?

9    **A.**    Correct.

10   **Q.**    And the evidence that you received was there

11   because someone had determined it was relevant;

12   correct?

13   **A.**    Yes.

14   **Q.**    Now, at some point the panel addresses whether or

15   not Beau is responsible for the assault; correct?

16   **A.**    Yes.

17   **Q.**    And I believe you testified that the panel

18   considered the 2015-'16 Title IX Policy in reaching

19   that determination?

20   **A.**    We considered both policies in reaching that

21   determination.

22   **Q.**    Okay.  Tell us how you considered the 2014-'15

23   policy.

24   **A.**    So I would say that was probably the basis of our

25   deliberations or of our consideration, and we looked to

1    the '15-'16 policy for certain clarification.

2    **Q.**   Well, let's talk about --

3        MR. RATCLIFFE:  May I retrieve the official

4    exhibit binder, your Honor?

5        THE COURT:  Yes.

6        MR. RATCLIFFE:  Exhibit Number 2.

7    **Q.**   So what in the 2014-'15 Code of Student Conduct

8    did you consider?

9    **A.**   On page four, we were told that the respondent was

10   being -- that the complaint was based on Offense

11   Number III, that that was the charge.

12   **Q.**   Okay.  And what was your understanding of what the

13   charge was?

14   **A.**   I believe it was both offense III(a) and (b), is

15   my recollection.

16   **Q.**   And what was Offense III(a)?

17   **A.**   Do you mean --

18   **Q.**   What constituted -- you found him responsible for

19   Offense III(a); correct?

20   **A.**   Correct.

21   **Q.**   And what was the conduct that comprised Offense

22   III(a)?

23   **A.**   I believe it was digital penetration.

24   **Q.**   And what about III(b)?

25   **A.**   I think it was digital penetration as well.  There

1  was also, I believe, oral sex.

2  **Q.**   So III(a) and III(b) were both digital penetration

3  and oral sex?

4  **A.**   Correct.  I think -- my understanding was that

5  III(b) referred specifically to the digital

6  penetration.

7  **Q.**   We'll get to that.  But in any event, you then

8  read the comment; correct?

9  **A.**   Yes.

10  **Q.**   And did you talk about the comment?

11  **A.**   We did.

12  **Q.**   Tell us about the discussions regarding the

13  comment.

14  **A.**   We talked about whether there was force, threat,

15  intimidation or mental or physical incapacity or

16  impairment.

17  **Q.**   And you determined that there was no force?

18  **A.**   Correct.

19  **Q.**   And you determined that there was no impairment?

20  **A.**   Yes.

21  **Q.**   You determined that there was no threat?

22  **A.**   Right.

23  **Q.**   Now, at some point you said you looked at the

24  definition -- you looked at the 2015-'16 policy;

25  correct?

1    **A.**    Yes.

2    **Q.**    And that was for what reason?

3    **A.**    I think that we were looking for more explicit

4    definitions.

5    **Q.**    More explicit definitions of what?

6    **A.**    As I recall, I think the topic was coercion or

7    intimidation.

8    **Q.**    Well, let's look at the 2015-'16 policy.  What did

9    you consider in the 2015-'16 -- what's your memory of

10   what you considered in the 2015-'16 policy?

11   **A.**    I think it was the definition of "intimidation" or

12   "coercion."

13   **Q.**    I'm showing you what's been marked as Exhibit 25.

14   Do you recognize that document?

15   **A.**    I do.

16   **Q.**    What is it?

17   **A.**    It is a findings e-mail that I was asked to review

18   before it was sent to the parties.

19   **Q.**    What's your understanding of why you were being

20   asked to review the findings letter?

21   **A.**    To confirm that it was an accurate representation

22   of our deliberations and findings.

23   **Q.**    And did you review the findings letter?

24   **A.**    I did.

25   **Q.**    And it was sent to you on April 14, 2016?

1    **A.**    That sounds reasonable.

2    **Q.**    Do you remember receiving it on the same day you

3    attended the hearing?

4    **A.**    Yes.

5    **Q.**    And when you read this letter, the events and the

6    discussions at the hearing were fresh in your mind?

7    **A.**    Yes.

8    **Q.**    And you read the letter?

9    **A.**    Yes.

10   **Q.**    And you concluded that it accurately reflected the

11   discussions and decisions of the panel?

12   **A.**    Yes.

13   **Q.**    And you did not suggest any changes to the letter?

14   **A.**    No.

15   **Q.**    And you agree that the rationale is correct in the

16   letter?

17   **A.**    Can I reread it?

18   **Q.**    Sure.

19        (Witness reads document.)

20   **A.**    Okay.  Can you repeat the question.

21   **Q.**    So this letter, when you received it, accurately

22   stated the rationale of the panel in reaching its

23   decision?

24   **A.**    It did.

25   **Q.**    And the hearing the panel looked at the definition

1    of "consent" in the current Title IX Policy; correct?

2    **A.**   Yes.

3    **Q.**   And that is because the 2014-'15 Code does not

4    define "consent"?

5    **A.**   Right.

6    **Q.**   And so the 2014-'15 Code says non-consensual

7    sexual contact, right?

8    **A.**   Right.

9    **Q.**   And then the 2014-'15 Code goes on to provide a

10   comment to certain types of behavior that constitutes

11   non-consensual sexual conduct; correct?

12   **A.**   Yes.

13   **Q.**   You believe that in order to reach a decision you

14   had to go outside of that Code itself and look at other

15   definitions of "consent;" correct?

16   **A.**   We believed it was helpful.  I wouldn't say that

17   we believed that we couldn't make a determination

18   without that.

19   **Q.**   You believed it was helpful?

20   **A.**   Yes.

21   **Q.**   All right.  So in any event, in determining

22   whether or not a violation occurred, you looked at the

23   "consent" definition in the current code?

24   **A.**   Yes.

25   **Q.**   And the "consent" definition that is referenced in

1  the letter is that the current policy defines "consent"

2  as an affirmative and willing agreement to engage in

3  specific forms of sexual contact with another; correct?

4  **A.**   Yes.

5  **Q.**   And then the panel references that consent cannot

6  be obtained through manipulation or the use of

7  coercion; correct?

8  **A.**   Yes.

9  **Q.**   And you go on to say, or the panel goes on to say

10  that coercion is defined as involving verbal and/or

11  physical conduct, including manipulation, intimidation,

12  unwanted contact; correct?

13  **A.**   Yes.

14  **Q.**   And there's a reference to VIII(b) in the

15  definitions.  The definition is VIII(b); correct?

16  **A.**   Yes.

17  **Q.**   When you got this letter, did you take out -- did

18  you look at what the definition of VIII(b) was?

19  **A.**   No, I did not.

20        MR. RATCLIFFE:  May I approach the witness, your

21  Honor.

22        THE COURT:  Yes.

23  **Q.**   I'm showing you the sexual assault policy -- the

24  Title IX Policy, excuse me, Exhibit 4.

25        And in Dr. Schultz's proposed findings letter,

1  does she include the full definition of "coercion"?

2  **A.** No. She doesn't give the full definition of

3  "coercion."

4  **Q.** Because coercion, does it not, requires that the

5  individual be reasonably -- that the actions reasonably

6  place an individual in fear or immediate future harm

7  and that it is employed to compel someone to engage in

8  sexual contact; is that correct?

9  **A.** Yes, it includes that.

10  **Q.** Now, there's nothing in the findings letter, is

11  there, that the panel concluded that Allie was

12  reasonably placed in fear of immediate or future harm?

13  **A.** I'm sorry. Just repeat the beginning of the

14  question.

15  **Q.** There is nothing in the findings letter, is there,

16  that Allie was found to have been placed in

17  immediate -- excuse me -- in fear of immediate or

18  future harm?

19  **A.** Correct. There's nothing in the findings letter

20  that suggests that.

21  **Q.** And it's your testimony that this findings letter

22  accurately reflects the rationale of the panel?

23  **A.** Yes. It summarizes the discussion of the panel.

24  **Q.** And your responsibility as a panel member when you

25  received this is to make sure it's accurate?

1    **A.**    Yes.

2    **Q.**    And you determined it was accurate?

3    **A.**    Yes.

4    **Q.**    And there's nothing in the findings letter, is

5    there, that the conduct that Beau engaged in was

6    employed to compel Allie to engage in sexual contact,

7    was there?

8    **A.**    There was in saying that it was non-consensual.

9    **Q.**    Well, there's nothing in the findings letter --

10   I'm just asking you about the findings letter.

11   **A.**    Right.

12   **Q.**    The findings letter says it's non-consensual;

13   correct?

14   **A.**    Correct.

15   **Q.**    The reason it's non-consensual is because there's

16   manipulation or coercion; correct?  You can look at it

17   again.

18   **A.**    Yeah, that would be helpful.

19   **Q.**    What's your memory of --

20            MR. RATCLIFFE:  May I approach, your Honor?

21            THE COURT:  Yes.

22            (Pause.)

23   **A.**    Yes.

24   **Q.**    And the basis of the manipulation or coercion is

25   that verbal and/or physical conduct, including

1   manipulation; correct?  That's what "coercion" is

2   defined as; correct?

3   **A.**   Yes.

4   **Q.**   So basically the panel looked at "consent" and

5   said, okay, consent cannot be obtained through

6   manipulation or -- manipulation; correct?

7   **A.**   Right.

8   **Q.**   And then they went to look at the definition of

9   "coercion," because coercion references manipulation?

10  **A.**   Yes.

11  **Q.**   And the panel concluded that -- strike that.

12          And then the panel said, okay, is there a

13  definition of "coercion"?  And "coercion" is defined as

14  involving verbal and/or physical contact, including

15  manipulation, intimidation, unwanted contact; correct?

16  **A.**   Yes.

17  **Q.**   But the panel didn't conclude that the alleged

18  coercion involved Allie reasonably being placed in fear

19  of immediate or future harm?

20  **A.**   We inquired about that.  I wouldn't say that we

21  didn't conclude that.  It's not in the findings letter.

22  **Q.**   You testified that the findings letter is the most

23  accurate representation of what the rationale of the

24  decision was?

25  **A.**   Yes.

1    **Q.**   And this findings letter was on the exact day that

2    you received it?

3    **A.**   Yes.

4    **Q.**   And you reviewed the findings letter?

5    **A.**   Yes.

6    **Q.**   And you reviewed it carefully?

7    **A.**   Yes.

8    **Q.**   And after reviewing the findings letter, you

9    didn't say, oh, we left something out; we decided that

10   Allie was placed in fear?

11   **A.**   That's correct.  I didn't say that.

12   **Q.**   In fact, you sent an e-mail back or you responded,

13   Looks good, thank you.

14        Correct?

15   **A.**   Yes.

16   **Q.**   And I believe -- and this findings letter captured

17   the deliberation process; correct?

18   **A.**   It did.  It wasn't a verbatim accounting of it,

19   but it captured the broad strokes.

20   **Q.**   And it's an accurate representation of the

21   rationale that the panel came to?

22   **A.**   Yes.

23        MR. RATCLIFFE:  May I have a moment, your Honor?

24        THE COURT:  Yes.

25        (Pause.)

1     MR. RATCLIFFE:  No further questions.

2     THE COURT:  Okay.  Thank you.

3     All right.  Mr. Richard, cross-examination.

4          **CROSS-EXAMINATION BY MR. RICHARD**

5  **Q.**   Good morning, Dr. Rodriguez.

6  **A.**   Good morning.

7  **Q.**   Just briefly, what are your responsibilities as

8  Dean of Curriculum?

9  **A.**   Yes.  I oversee all of Brown's undergraduate

10  offerings and the integrity of our courses, as well as

11  majors, and I'm responsible for academic advising.

12  **Q.**   Do you interact with student?

13  **A.**   Every day.

14  **Q.**   When you say "academic advising," what does that

15  entail?

16  **A.**   It entails being assigned to a number of students

17  for whom I serve as their primary academic advisor,

18  helping them think through course selection, majors,

19  research opportunities, that sort of breadth.  I'm also

20  available to answer questions that students who are not

21  assigned advisees might have either in person, via

22  e-mail or phone.

23  **Q.**   When Amanda Walsh asked you to join the Title IX

24  Council, why did you accept?

25  **A.**   So first I consulted with my supervisor, who is

1    the Dean of the College.  And I accepted because I felt

2    like it was my duty as an academic dean at Brown to

3    participate in this important function in the

4    University.

5    **Q.**    Regarding the training, what do you recall as the

6    topic of the Men's Health liaison's presentation?

7    **A.**    I can't say I really recall in a lot of great

8    detail that particular part of the five hours of

9    training.

10    **Q.**    Who presented it?  Do you recall?

11    **A.**    Mark Peters.

12    **Q.**    And what is his title, if you know?

13    **A.**    I'm not a hundred percent sure of his title.

14    **Q.**    The session presented by Alana Sacks, how long did

15    that last?

16    **A.**    About an hour.

17    **Q.**    Was there anyone else who spoke at that session?

18    **A.**    Amanda Walsh also spoke.

19    **Q.**    Do you recall what Amanda said?

20    **A.**    She both introduced and closed Alana's

21    presentation.  She presented Alana's presentation as

22    being sort of one approach or one -- one approach, I

23    would say, to understanding sexual assault.

24    **Q.**    How did Alana's presentation impact your weighing

25    of evidence in this case?

1    **A.**   I would say that it added some detail to my own

2    prior conceived notions about how I would approach this

3    work.

4    **Q.**   What were your prior conceived notions?

5    **A.**   So sexual assault had been in the media a lot in

6    the weeks and months leading up to my orientation and

7    training.  There had been some high-profile cases.  And

8    so I had discussed it casually with people in my life.

9         And really, of course, whenever there's an

10   instance or a charge of sexual assault, the person

11   bringing forth the charge is evaluated, their

12   credibility is questioned, as well as the person being

13   charged of the assault itself.  So I had been in

14   conversations with people and myself giving thought to

15   how we treat people who bring forward those complaints

16   as well as people who are the respondents of those

17   complaints.

18   **Q.**   How did it impact your review of the post-incident

19   evidence?

20   **A.**   So I think it highlighted -- I found it useful

21   because it in some ways confirmed my own perspective

22   that I brought previously, which is that someone who

23   has been victimized by a crime might -- we often, as a

24   society, critique actions that they might take, but

25   that there are other factors that might be shaping

1    actions that a victim of an assault might take.

2    **Q.**   How did you weigh the complainant's credibility as

3    you reviewed the evidence?

4    **A.**   I had concerns and questions about the

5    complainant's credibility.  I believe I stated earlier

6    that I found some of the -- within the body of texts

7    themselves I found some, I would say, maybe some

8    contradictions.

9    **Q.**   When you -- take a step back.  You mentioned I

10   believe to Mr. Ratcliffe that the SHARE advocate's

11   training impacted you in part; correct?

12   **A.**   Yes.

13   **Q.**   Were there other influences as to how you reviewed

14   post-incident evidence?

15   **A.**   I think I had my own common sense understanding

16   that really, that I used to weigh the evidence.

17   **Q.**   You received materials?

18   **A.**   Yes.

19   **Q.**   Do you recall when you received them in relation

20   to the hearing?

21   **A.**   I believe it would have been about five days

22   prior, which is set forth in our policy.

23   **Q.**   How much time did you spend to prepare for the

24   hearing?

25   **A.**   I spent several hours preparing for the hearing.

1    **Q.**   What did you do to prepare?

2    **A.**   I read all of the materials that I was provided.

3    I read the text messages first, so I could read the

4    actual evidence before reading the narrative from the

5    investigative reporter.

6    **Q.**   After your reviewing the evidence, in your

7    preparation, were there particular questions that you

8    had in mind?

9    **A.**   I think my primary question was about, as

10   mentioned earlier, just about the lag of time that had

11   transpired and whether -- the accounts all seemed

12   incredibly detailed, which I found really surprising

13   and confusing, given the amount of time that had

14   elapsed.

15         So my primary question was really around how

16   trustworthy were the accounts that I had reviewed.

17   **Q.**   At the hearing, Mr. Ratcliffe raised with you one

18   question you asked; but were there others that you

19   raised during the course of the hearing?

20   **A.**   I believe I did raise other questions.  I can't

21   quite recall what they were.

22   **Q.**   Would it help to refresh your recollection if I

23   show you Exhibit 24, which Mr. Ratcliffe presented to

24   you as the notes of the hearing?

25   **A.**   Yes, it would.

1        MR. RICHARD:  May I approach, your Honor.

2        THE COURT:  Yes.

3        (Witness reads document.)

4   A.   Yes, this helps.

5   Q.   Does your review help refresh your recollection?

6   A.   Yes.

7   Q.   What other questions did you make?

8   A.   I was concerned about the -- whether this -- I was

9   trying to understand the complainant's charge that she

10  feared, and so I did ask a few questions about where

11  his hands were placed and just trying to seek

12  clarification about the extent of what the complainant

13  was reporting as fear.

14  Q.   Why were you seeking that clarification?

15  A.   I think I was trying to understand whether or not

16  it was consensual and if -- yeah.

17  Q.   How did that issue impact your review of consent?

18  A.   So I understood that because they were on mock

19  trial, in various points throughout the evidence there

20  was the sense of his relative -- the respondent's

21  relative power to the complainant.  So that was one

22  dimension.

23       I think as I was trying to understand consent, I

24  was trying to sort of evaluate where her fear or where

25  her inability to give consent may have lied.  Part of

1    that was though my understanding of a power

2    deferential, and then the other part of it was really

3    trying to understand physically did she have reason to

4    physically fear for her safety.  So I was thinking

5    about fear from harm or, you know, from sort of

6    multiple vantage points.

7    **Q.**    What were you trying to understand as to any power

8    differentials?

9    **A.**    So there was a number of -- there was a lot of

10   discussion in the investigator's report about whether

11   she could have left the room if she really was not

12   giving consent, and because she didn't leave, why then

13   did she not leave.  And so there was some discussion

14   about the automatic light sensor turning off.

15          So I was really trying to understand why the --

16   whether or not she consented and why she would have

17   stayed in the room.

18   **Q.**    Were you able to reach an understanding?

19   **A.**    I did.  I evaluated the evidence and thought about

20   what might have happened in that room in light of the

21   way that I saw them interacting in their text messages

22   to one another.

23   **Q.**    How did you see them interacting in their text

24   messages?

25   **A.**    So the complainant was both participating in

1    pretty explicit sexual banter, while simultaneously

2    reiterating throughout their exchanges that she had a

3    boyfriend and she didn't want to have a sexual

4    relationship with the respondent.

5        The respondent continuously kind of brought the

6    topic back to a sexual nature even when the topic might

7    deviate to another arena.

8        So the dynamic that I saw was sexual banter that

9    they both participated in; the complainant defining a

10    boundary or a barrier, and the respondent continuing to

11    push and continuing to make known his desire for a

12    sexual relationship.

13    **Q.**    What, if any, boundaries did you conclude that the

14    complainant stated?

15    **A.**    The complainant was pretty adamant that she would

16    not have any sexual relations with him while she had a

17    boyfriend.

18    **Q.**    Were you able to reach any conclusions of whether

19    those boundaries were respected?

20    **A.**    In my estimation it was more likely than not, I

21    believed, that those boundaries were not respected

22    because they were not respected in the text messages

23    whereas he didn't drop the topic; he continued to try

24    to push their relationship in a more sexual direction.

25    **Q.**    Was there any particular texts or series of texts

1    that influenced your decision?

2    **A.**    There was a series that was actually mentioned in

3    the findings letter that I found really the most, sort

4    of clearest articulation, and that was a text in which

5    the respondent -- they actually used the term

6    "manipulate."

7    **Q.**    Any others?

8    **A.**    There were a lot of others.  I think that that was

9    the most sort of crystalized moment, which I took as a

10   sort of standard for a whole series of texts.

11   **Q.**    What about the post-incident texts?  How did you

12   weigh that?

13   **A.**    So I found them confusing and troubling, so I did

14   consider them, and we did talk about them as a group;

15   especially that question of whether or not she -- why

16   would someone accusing someone of sexual misconduct say

17   that, in the aftermath, that they would put in a good

18   word for that person.  So we certainly -- I personally

19   grappled with the post-encounter texts.

20          And in the end, as I said earlier, I felt like I

21   was sort of limited in my ability to evaluate those

22   behaviors because they could have either been evidence

23   that she was lying, or they could have been evidence

24   that in some ways she was telling the truth and was --

25   this was sort of a response to that trauma.

1    **Q.**   Were you able to reach a conclusion that you had

2    properly considered the post-incident texts?

3    **A.**   Yes.

4    **Q.**   On what basis?

5    **A.**   I'm sorry, could you --

6    **Q.**   On what basis did you conclude that you gave

7    proper weight?

8         MR. RATCLIFFE:  Objection, your Honor.

9         MR. RICHARD:  I'll rephrase.

10        THE COURT:  Okay.  Rephrase.

11   **Q.**   When you were reviewing the post-incident texts,

12   what particular issues were of significance to you?

13   **A.**   I would say that there was a moment where another

14   panelist asked a question about what might be

15   motivating the complainant to lie, if she were lying,

16   and that was, was she jealous or was the complainant

17   rebuffed, and this was maybe what was a motivation in

18   any kind of fabricated story.

19        And I personally felt like while there -- I

20   considered it, and I really thought and looked at the

21   texts and decided for myself that it didn't seem to me

22   from those after-the-fact texts that she wanted a

23   relationship with the respondent and that was what was

24   motivating her.

25   **Q.**   During the hearing, each student appeared?

1  **A.**    Yes.

2  **Q.**    When the students appeared, did you make

3  assessments of their credibility?

4  **A.**    When they appeared?

5  **Q.**    As they spoke.

6  **A.**    As they spoke, no; they both were very poised and

7  passionate in their, you know, in their comments to us.

8  In that moment they both -- I don't quite remember, but

9  I didn't think that they were not credible in that

10  moment.

11  **Q.**    You mentioned to Attorney Ratcliffe you felt this

12  was a complicated case.  What were the complicated

13  factors that you thought existed?

14  **A.**    So first it was just the volume of evidence that

15  was provided.  I thought that it was just a lot of

16  detail, and in some ways I felt like I was trying to

17  determine who was the more credible of the two parties

18  and felt like really neither was wholly credible in my

19  eyes.

20  **Q.**    In what way was the complainant not wholly

21  credible?

22  **A.**    I think because, you know, here she was on the one

23  hand saying that she didn't want a sexual relationship

24  with this person, but on the other hand, she was

25  talking about really explicit sexual things.  So that's

1    one reason why I thought -- I sort of questioned her

2    credibility.

3    **Q.**   In what ways did you believe that the respondent

4    may not have been credible?

5    **A.**   Well, it wasn't -- I think the respondent's

6    version of events, his behavior departed so drastically

7    from his behavior in the text messages that it was hard

8    to reconcile that that was the same person.

9    **Q.**   What do you mean, it was hard to reconcile?

10   **A.**   So I felt like the version of events and his role

11   in them from the encounter really didn't align with the

12   way that I saw him interacting in the text messages.

13   It sounded like it wasn't the same person.

14   **Q.**   Was there a particular example?

15   **A.**   I can't think of a specific example but there was

16   a sort of general tone, tone in the text messages that

17   was much more, I would say, for lack of a better term,

18   in some ways more aggressive.

19   **Q.**   Were you -- strike that.

20        When the panel began its deliberations, how did

21   you start the process?

22   **A.**   I don't exactly remember how we started.  I

23   remember that early on we referred back to the text

24   messages and really started actually reading through

25   and rereading the actual evidence.

1  **Q.**   Who were the other panelists?

2  **A.**   Kimberley Charles, who was an undergraduate, and

3  Kate Trimble, who was a sophomore at Brown.

4  **Q.**   How long did the deliberations last?

5  **A.**   They lasted quite a while.  I can't say a specific

6  amount of time, but we spent a lot of time discussing

7  the case.

8  **Q.**   What particular pieces of evidence do you recall

9  the panelists reviewing?

10  **A.**   We looked at the photograph that was provided of

11  the room, but I think we spent the most time looking at

12  the text messages between the two parties.

13  **Q.**   What do you recall the panelists discussing about

14  those text messages?

15  **A.**   We tried to determine whether we thought it was

16  more likely that --

17       MR. RATCLIFFE:  Objection.  I don't think that's

18  responsive.  He asked what was the discussion regarding

19  the text messages.

20       THE COURT:  I think it is responsive.

21  Overruled.

22       Go ahead.

23  **A.**   So we discussed whether it was sort of, whether it

24  was more likely that, you know, whose version of events

25  seemed to be the most credible based on the nature of

1    their interaction via text message.

2    **Q.**    When you say the text messages, was there a

3    particular portion of them, or all of them?

4    **A.**    I would say all of them.

5    **Q.**    What other pieces of evidence do you recall were

6    discussed during your deliberations?

7    **A.**    So we referred to the investigator's report and to

8    the witness testimony, and I think also -- I think

9    that's what I recall.

10   **Q.**    Do you recall any discussions about the

11   credibility of these two parties?

12   **A.**    Yes.

13   **Q.**    What do you recall?

14   **A.**    I recall personally talking about how difficult

15   the decision was for me because I felt like there were

16   inconsistencies in both of their sort of

17   self-presentation.  So I think because there were so

18   many texts, we saw a lot of back and forth, and I had a

19   hard time determining, you know -- I guess assessing

20   whether I thought her story was more credible or his

21   was.

22   **Q.**    Was Gretchen Schultz present during the

23   deliberations?

24   **A.**    Yes, she was.

25   **Q.**    What role did she play in the deliberations?

1   **A.**   I would describe her role as more as a

2   facilitator.  She asked questions.  She asked follow-up

3   questions.  We had a lot of discussion, and in between

4   there she took straw polls to get a sense of where each

5   panelist was in thinking about responsibility or not.

6   **Q.**   When you mentioned straw polls, were they on a

7   particular factual issue or on the question of

8   responsibility?

9   **A.**   On the question of responsibility.

10  **Q.**   How many straw polls were taken?

11  **A.**   I think that there were about two.

12  **Q.**   What was the topic of the first straw poll?

13  **A.**   So the first straw poll was fairly early on in our

14  deliberations, and the topic was whether or not the

15  respondent was responsible, but it was early on and

16  Gretchen really asked us each to provide to the other

17  panelists our rationale of how we arrived at that

18  decision or had that sense of responsibility early on.

19  **Q.**   How did you vote in that first straw poll?

20  **A.**   I actually don't remember how I voted because I

21  really went back to the evidence a lot and found myself

22  swayed, you know, really trying to grapple with there's

23  this piece of evidence, but wait, that seems

24  contradictory in light of this.  This is where the

25  standard of more likely than not really, I think,

1    captures what my vote was.

2    **Q.**   Do you recall the result of that first straw poll?

3    **A.**   I don't.

4    **Q.**   What happened after that first straw poll?

5    **A.**   So we looked really carefully at all of the

6    evidence and really went sort of through the different

7    pages trying to really assess and gain an understanding

8    of what we thought happened.

9    **Q.**   Did you do this before looking at any Code

10   provisions or after?

11   **A.**   I don't remember.

12   **Q.**   At some point the panel did reference Code

13   provisions; correct?

14   **A.**   Yes.

15   **Q.**   Which Code provisions?

16   **A.**   We looked at Sections III(a) and (b), the actual

17   charge of the 2014-'15 sexual assault policy.

18   **Q.**   Was there a particular question that the panel had

19   about that policy provision?

20   **A.**   We were trying to determine whether we believed it

21   was consensual or not and whether there was any kind of

22   manipulation or -- yeah, manipulation.

23   **Q.**   In the deliberations, how did the panelists decide

24   what "consent" meant?

25   **A.**   So I personally used a sort of combination of my

1    own.

2            MR. RATCLIFFE:  Objection.

3            THE COURT:  What's the objection?

4            MR. RATCLIFFE:  How did the panelists decide

5    what "consent" meant, and then she said, "I personally

6    used."

7            THE COURT:  I think that's part of her process.

8            So you can answer that.  Go ahead and continue

9    your answer.

10   **A.**   So I personally used my own sort of common sense

11   definition of "consent," and really once we had ruled

12   out that there was any alcohol involved or there was

13   any kind of impairment, we really focused on the

14   question of the power dynamic and what would have made

15   her, the complainant, fearful and in some ways not --

16   what could have been mitigating factors in whether or

17   not there was consent.

18   **Q.**   What did you discuss about the power dynamic?

19   **A.**   We knew that -- we talked about the fact that the

20   respondent was an older student who had positions of

21   implied and then later actual leadership within mock

22   trial group and that this group was very important to

23   both of them.  And we talked about her -- the

24   complainant's claim and our own sense of whether she

25   might have feared humiliation or retribution or

1    anything like that if she didn't comply with his

2    wishes.  We also talked about whether or not there

3    might have been any physical harm; and that's where my

4    previous question about whether his hand was really on

5    her throat or on her neck --

6         We just tried to understand all of the factors

7    that would have gone into whether there was consent or

8    not.

9    **Q.**   In addition to the power dynamic, I thought I

10   heard you say mitigating factors?

11   **A.**   Yes.

12   **Q.**   What mitigating factors were discussed?

13   **A.**   In addition to the power dynamic, there was a

14   point where the complainant talked about fear, that if

15   she didn't, you know, participate in oral sex, that she

16   would be raped.  So that was really not so much a

17   factor of, you know, the sort of social power but

18   actual physically, whether it was reasonable for her to

19   fear that she would be overpowered.

20   **Q.**   While this discussion was ongoing about power

21   dynamics and mitigating factors, was the Title IX

22   Policy ever referenced, the current version?

23   **A.**   I believe that it was.

24   **Q.**   And why was it referenced?

25   **A.**   I think because it gave a little bit -- made a

1    little bit more explicit and maybe gave us around the

2    table a common, more concrete language.  We -- yeah.

3    **Q.**    I'm just looking for an exhibit.  I'm sorry.

4    **A.**    So I think for me it was -- there are several

5    clauses that are explicated in the newer policy that

6    are not -- that I didn't understand to be required, but

7    I understood to be sort of a part of whether or not

8    there was coercion.

9         So the term "including" is used a fair amount,

10    and so that we used those adjectives or verbs and

11    decided with each one, okay, well, if coercion includes

12    these factors, were these factors present, were there

13    other factors present as well.

14    **Q.**    Do you recall the panelists discussing

15    specifically the word "coercion"?

16    **A.**    Yes.

17    **Q.**    Do you recall any statements about how to define

18    it?

19    **A.**    I don't really recall specifically.

20    **Q.**    At some point was another vote taken?

21    **A.**    Yes.  That's the final vote.

22    **Q.**    How did you vote?

23    **A.**    I voted responsible.

24    **Q.**    On what basis did you vote to find Beau

25    responsible?

**A.**   I think of all of the evidence, what I found most

salient was reviewing Beau's own text messages to get a

sense of -- and that helped me get a sense of what I

thought his behavior would have been like on that

evening.

**Q.**   What was the result of that vote?

**A.**   Two of us voted responsible and one voted

non-responsible.

**Q.**   Were there any other votes taken as to the issue

of responsibility after that vote?

**A.**   No, not that I can remember.

**Q.**   What did the panel do after it voted to hold, by a

split vote, the respondent responsible?

**A.**   We moved on to deliberate on a sanction.

**Q.**   And how did you deliberate as to the sanction?

**A.**   Gretchen provided us a document from the Student

Conduct process, so we were told that there were sort

of two factors that we could consider in determining a

sanction; and one of those was that we found him guilty

of III(b), which involved penetration, and part of the

policy was that that would involve a more severe

sanction, and then other -- being found guilty of any

other violations.  So the fact that he was already on

probation, to me, I weighed that in voting for probably

a more severe sanction.

1  **Q.**  What was the document that Gretchen showed you?

2  **A.**  I think that that was a report of -- maybe the

3  findings report, I believe, of the hearing around a

4  no-contact order violation.

5  **Q.**  What were the range of sanctions that were

6  discussed in the deliberations?

7  **A.**  So we -- I think the range was from reprimand to

8  expulsion.  That was the range.

9  **Q.**  What was your view?

10  **A.**  My view, given that the respondent was already on

11  probation, was that they should not be on campus

12  together and that he should be -- I thought somewhere

13  in between those two extremes of a reprimand and an

14  expulsion made the most sense, which was a suspension.

15  So my view was a suspension made sense.

16         And someone else on the panel I believe

17  suggested that he be suspended for the amount of time

18  that she -- you know, until she graduated, that they

19  shouldn't be on campus.

20         I considered that and thought that was

21  reasonable because of the nature of the offense that he

22  had been responsible for with Student Conduct, which

23  was violation of a no-contact order.

24  **Q.**  What role did Gretchen play during the

25  deliberations as to the sanctions?

1     **A.**    We asked her about the range of sanctions in

2     previous cases for a similar set of offenses.  I think

3     we were trying to have an eye towards some sort of

4     consistency in some ways.  We didn't want to apply a

5     sanction that was too far out of line, but would have

6     been applied in similar cases.

7     **Q.**    How many votes were taken as to the sanction?

8     **A.**    I don't remember a vote.  I think we -- my

9     recollection of it was a sort of consensus.

10          MR. RICHARD:  May I have a moment, your Honor.

11          THE COURT:  Yes.

12          (Pause.)

13          MR. RICHARD:  No further questions, your Honor.

14          THE COURT:  Is there redirect?

15          MR. RATCLIFFE:  Yes, just a couple, your Honor.

16          THE COURT:  All right.

17          **REDIRECT EXAMINATION BY MR. RATCLIFFE**

18    **Q.**    Dr. Rodriguez, maybe I just misunderstood you.

19    Did you say that you viewed the post-encounter text

20    messages between Allie and Beau as Allie not wanting a

21    relationship or wanting a relationship?

22    **A.**    I didn't get the sense that she wanted a sexual

23    relationship after that encounter.

24    **Q.**    Did you -- I didn't ask you about a sexual

25    relationship.  Did you draw the conclusion that she did

1    not want a relationship with the respondent?

2    **A.**   No, not a relationship in the broad sense.

3    **Q.**   So the text messages clearly established that

4    Allie wanted a relationship with Beau after the event;

5    correct?

6    **A.**   I don't think that I would say that, no.

7    **Q.**   Well, did you -- you read the report?

8    **A.**   I did.

9          (Pause.)

10         MR. RATCLIFFE:  May I approach the witness, your

11   Honor.

12         THE COURT:  Yes.

13   **Q.**   Showing you the final report and ask you -- first,

14   before you look at that, what sort of interaction did

15   you conclude that, if any, that Allie wanted with Beau

16   after the event?

17   **A.**   I don't feel like I can tell what kind of

18   interaction she wanted.

19   **Q.**   Well, what kind of conduct did she -- what kind of

20   messages did she send to Beau?

21   **A.**   They were fairly casual.

22   **Q.**   Okay.  And she's continuing to text him; correct?

23   **A.**   Yes.

24   **Q.**   And she says at one point, do you recall reading

25   in the report, that the respondent said after their

1    trip -- do you recall information about their trip to

2    California?

3    **A.**   Yes.   Vaguely.

4    **Q.**   What do you recall about their trip to California?

5    **A.**   I remember that there was a trip to California,

6    but I don't remember any details about it.

7    **Q.**   Do you recall reference in the report to a text

8    message on or about November 25th where the respondent

9    says to the complainant, "I could tell you wanted to

10   fuck me the whole time," referring to the California

11   trip?

12   **A.**   Do I recall that?   Now that you mention it I

13   remember having read it, but I didn't read it.

14   **Q.**   Do you recall what the complainant responded?

15   **A.**   No.

16   **Q.**   Do you recall whether or not she said, (Reading:)

17   Oops, was that obvious?   On the other hand you were

18   very good, acting like you didn't know me.   Think you

19   can torture me and then no answer me, do ya?

20        Do you recall that?

21   **A.**   Yes.

22   **Q.**   And to which the respondent replied:   "Yup"?

23   **A.**   Okay.

24   **Q.**   So isn't it true that Allie was pursuing Beau

25   after the event?

1          MR. RICHARD:  Objection, your Honor.

2          THE COURT:  Well, you can ask her what her view

3     of it is.

4     **Q.**   What's your view of it?

5     **A.**   So my view is that Beau was -- it seemed like he

6     was sort of ignoring Allie at that point.

7     **Q.**   And Allie is texting Beau saying, What have you

8     been up to stranger, things like that; correct?

9     **A.**   Correct.

10    **Q.**   Now --

11         THE COURT:  How much more do you have?

12         MR. RATCLIFFE:  Just probably five minutes.  Do

13    you want me to finish?

14         THE COURT:  Let's go off the record for a

15    minute.

16         (Discussion off the record.)

17         (Lunch recess.)

18         THE COURT:  Welcome back, everyone.  And

19    Mr. Ratcliffe, you had a few more questions, I believe.

20         MR. RATCLIFFE:  I actually just have a couple,

21    your Honor.

22    **Q.**   I believe during your cross-examination you talked

23    about you had some questions or there was some

24    discussion regarding where Beau's hands were on Allie's

25    neck or throat?

1    **A.**    Yes.

2    **Q.**    And that was actually something that was discussed

3    with Djuna Perkins; correct?

4    **A.**    Correct.

5    **Q.**    And that was before the deliberations?

6    **A.**    Yes.

7    **Q.**    And do you recall that you actually asked the

8    question; correct?

9    **A.**    Correct.

10   **Q.**    And do you recall -- was your question --

11         MR. RATCLIFFE:  I'm referring, your Honor, to

12   Exhibit 24.

13   **Q.**    (Reading:)  Their versions are different regarding

14   hands.  I got the sense it was actually on or near her

15   neck, not necessarily her throat.

16         The question is on the first page.

17         B.R., do they both agree that he had his hand on

18   her head during the oral sex?  Were his hands on her

19   throat?

20         Do you recall asking that question?

21   **A.**    Yes.

22   **Q.**    And do you recall what Djuna Perkins's response

23   was?

24   **A.**    Yes, I do.

25   **Q.**    What was it?

1   **A.**   I think she clarified that they weren't

2   necessarily on her throat, though they may have been on

3   her neck.

4   **Q.**   Anything else?

5   **A.**   Not that I can recall.

6   **Q.**   Do you recall Djuna Perkins saying, (Reading:)

7   I didn't take either version to mean his hands were on

8   her throat in a threatening manner?

9   **A.**   Yes, I recall that.

10   **Q.**   Djuna Perkins interviewed both the complainant and

11   the respondent; correct?

12   **A.**   Correct.

13   **Q.**   And she drew inferences from her interviews of the

14   complainant and the respondent; correct?

15   **A.**   Correct.

16   **Q.**   And she told you, as a panel member, that she

17   didn't take either version to mean his hands were on

18   her throat in a threatening manner; correct?

19       Did you draw the conclusion that those hands

20   were on Allie's throat in a threatening manner?

21   **A.**   When I was reading -- just to get clarification --

22   when I was reading the report on my own prior to that,

23   do you mean?

24   **Q.**   No.  When you went into the deliberations.

25   **A.**   No, I didn't see a place where Allie had talked

1     about it as being sort of in a particularly threatening

2     kind of way.  It was stated, as I recall, kind of

3     matter-of-factly.

4     **Q.**   In any event, the panel didn't find that there

5     were any threats?

6     **A.**   Correct.

7     **Q.**   And they didn't find that his hands were in any

8     way forcing her to perform the oral sex?

9     **A.**   Correct.

10          MR. RATCLIFFE:  Nothing further.

11          THE COURT:  Okay.  Thank you.

12          All right.  I have a few questions for you, a

13    couple of different areas that I want to just get some

14    clarity on, and hopefully it will be fairly brief.

15          You testified on direct and you were talking

16    about these text messages, okay, and I believe you

17    said, if I wrote this down, I tried to write this down

18    fairly close to what you said, that you did not believe

19    the text messages -- and here I think we're talking

20    about the post-encounter text messages -- you did not

21    believe that they were an objective representation of

22    the parties' description of the event.  You said there

23    could have been a lot of reasons for them; they had

24    limited value, that they were very subjective, and

25    based on the training you had received and as a person

1    in the world, was the language I think you used.

2         The first question I wanted to ask you about

3    that is what do you mean by they were very subjective?

4    I'm not sure I understand what the term "subjective"

5    means in that description or in that context.

6         THE WITNESS:  Well, I guess I would

7    differentiate them from, say, a journal entry that

8    somebody might write privately where they might be

9    expressing their thoughts, their sentiments in a sort

10   of unfiltered kind of way.

11        In a communication to somebody else there might,

12   you know, any number of filters that might go through a

13   person's mind between what they're thinking at the time

14   and what they've actually sent in their messages.

15        THE COURT:  Okay.  So that's what you meant by

16   "subjective"?

17        THE WITNESS:  Yes.

18        THE COURT:  All right.  So I'm going to stick

19   with this business of these text messages for a minute.

20   So you've made a substantial distinction, which I want

21   to get into a little bit, between the pre-encounter

22   text messages and the post-encounter text messages;

23   right?

24        THE WITNESS:  Right.

25        THE COURT:  I think you testified that you

1    found, you and the panel -- or at least you found the

2    pre-encounter text messages to be the most important

3    evidence that led you to the conclusion that there was

4    a lack of consent.  Is that a fair statement?  I'm not

5    trying to put words in your mouth.  If you don't agree

6    with me, just tell me.  It's just how I'm interpreting

7    your testimony, so you correct me if I'm not getting it

8    right.

9              THE WITNESS:  That's a fair statement.

10             THE COURT:  Okay.  You found those text messages

11   extremely important.  But then you testified, and I

12   want you to clarify this for me, but you have testified

13   at least once, you said, that you did not consider the

14   post-encounter text messages in determining whether

15   Allie had been sexually assaulted or whether the event

16   had been consensual.

17             So I'm trying to reconcile that with the

18   statement you made earlier about the text messages not

19   being an objective representation of the parties'

20   description and that they were subjective, using your

21   definition of "subjective," and so forth.

22             Can you describe to me why the pre-encounter

23   text messages stand so differently in your view as

24   evidence than the post-encounter text messages, and put

25   it in reference to that description you just gave me.

1    Does that make sense?

2         THE WITNESS:  Yes, it does.  So Allie, in the

3    investigator's report, as well as in her own statement,

4    had said that she was still processing the event in the

5    aftermath and that she didn't -- I think she used the

6    term "processing," but that it wasn't until a fair

7    amount of time afterwards, and maybe not even in a

8    single moment, but it wasn't until later that she began

9    to sort of interpret or process the events of that

10   night, as she would say it, more fully.

11        So I think I found that to be a credible

12   statement, and so that's why I didn't sort of

13   challenge, use those text messages after the fact as a

14   way of sort of challenging what might what have

15   happened on that evening; because by her own admission,

16   her understanding of the events in the immediate

17   aftermath or her understanding of the events shifted

18   between the immediate aftermath and sometime

19   afterwards.

20        THE COURT:  Well, okay.  But why does that

21   affect the value of text messages that were before

22   versus after?

23        It seems like you disregarded all the text

24   messages that were after.  I think that's what you

25   said.  You maybe didn't use that word, but you said it

1    in different ways.  You felt that they were not

2    valuable evidence.

3          THE WITNESS:  I felt that I could not evaluate

4    them.  I would say I considered them and I weighed them

5    as part of the evidence, but I felt that I couldn't

6    reconcile them.

7          THE COURT:  Okay.  Well, that's very different.

8    Considering them and weighing them and not being able

9    to reconcile them with what happened is very different

10   than I think what you said earlier, which was you did

11   not consider the statements immediately after in

12   determining whether she had been sexually assaulted.

13   Those are two very different statements, so I'm trying

14   to figure out which it is.

15         THE WITNESS:  So I struggled, I think, to make

16   my rationale clear here, and I think what I'm trying to

17   say is that I considered all of the evidence, but

18   whether or not that particular bit of evidence could be

19   put in the she's lying column or the she's telling the

20   truth column, I couldn't make that determination.  I

21   didn't feel comfortable or equipped to put that piece

22   of evidence either on the one hand or on the other

23   hand.  I certainly considered it; I just didn't

24   consider that it would firmly sit in one column or the

25   other.

1          THE COURT:  All right.  But you did feel that

2     the pre-encounter text messages, you were able to

3     evaluate those and judge those and factor those into

4     determining whether it was consensual?

5          THE WITNESS:  Yes.

6          THE COURT:  And I think that what Mr. Ratcliffe

7     threw out at you in his questioning is that you did

8     that based on your training that you had received and

9     your own experience in life.  Is that fair?

10          THE WITNESS:  Yes.  That's fair.

11          THE COURT:  So I want to get to that in a

12     minute, but before I do though, just so I do this in

13     order in my notes; another thing you said that I just

14     didn't really understand, you said you were not

15     equipped to evaluate the post-encounter text messages.

16          But then you also said that, just now and

17     before, that your own training and your experience

18     taught you to not factor them in in making a

19     determination of credibility or a determination of

20     whether the encounter was consensual.  So again I guess

21     I'm trying to reconcile that.

22          So first of all, what do you mean by "not

23     equipped to evaluate"?

24          THE WITNESS:  So I just want to correct

25     something that I felt like was a misinterpretation of

1       what I said.

2               My training never indicated that there was

3       evidence that shouldn't be factored in, of any kind, so

4       I just want to make sure that that's clear.  All of the

5       evidence is to be reviewed and weighed.

6               What I meant by "equipped" is really -- as

7       someone who is not trained in psychology or in the

8       various kinds of trauma theory, that I could not

9       evaluate whether her statement -- whether her behavior

10      in the text messages were inconsistent either for one

11      set of reasons, because she was lying, or they were

12      inconsistent because of other reasons, including the

13      fact that maybe she was telling the truth.

14              THE COURT:  Well, maybe I'm misunderstanding

15      this, but isn't that exactly what you did?  Didn't you

16      reach a conclusion?  I think you said based on the

17      training you had received, and your other experience,

18      that you could not factor it in, factor those text

19      messages and other behavior into the assessment of

20      whether the event was consensual, and, therefore, you

21      did not factor them in for those purposes?

22              I mean, frankly, I'm just not understanding you.

23      You're saying that you didn't feel equipped to evaluate

24      them, and I just wrote down because you are not trained

25      in psychology or trauma theory.

1      I'm not sure what trauma theory is.  But, so you

2  felt because of that you were not equipped to evaluate

3  them?  But then you also said that you disregarded

4  them.

5      Now, those two things don't, at least to me,

6  they don't reconcile with each other because if one is

7  saying I'm not equipped to evaluate those things or get

8  beyond what they appear to be on face value, then I

9  would just apply them on face value.

10      But you didn't do that.  You disregarded them.

11  So you obviously evaluated them and then judged them to

12  be non-informative and non-helpful in deciding whether

13  it was consensual.

14      THE WITNESS:  I guess I don't -- I feel like I'm

15  being a little bit confused by your terminology.

16      So I would not say that I disregarded any piece

17  of evidence.  I mean, I would think I sort of put it on

18  a shelf and didn't know what -- I didn't assign it any

19  type of significance.  But I don't equate that to mean

20  that I disregarded it.  That to me sort of implies a

21  sort of ignoring it, and I wouldn't say that I ignored

22  that portion of the evidence.

23      THE COURT:  Well, okay.  So let's say you didn't

24  ignore it.  You say you considered it, but you did

25  disregard it or devalue it; right?

1      THE WITNESS:  No.  I don't think it's accurate

2   to say I devalued it.  I didn't know how to interpret

3   it.

4      THE COURT:  Well, okay.  So maybe I can try to

5   come at this a different way.

6      Would you agree with me that a common sense

7   understanding of this text message exchange, putting

8   aside everything else, trauma theory, psychology,

9   anything else that we bring to the table, if you were

10   just reading this text message exchange with the simple

11   knowledge that two people had had a sexual encounter,

12   would you agree with me that the common sense

13   understanding of this exchange is that those were two

14   people who enjoyed their sexual encounter and now were

15   having a banter about it?

16      THE WITNESS:  Yes, I would agree with you on

17   that.

18      THE COURT:  Okay.  So that's a common sense

19   understanding of this exchange; right?  So if one was

20   to take it in as evidence, that is how you would

21   interpret it as evidence; right?  Putting everything

22   else aside.

23      THE WITNESS:  Right.

24      THE COURT:  Okay.  So to get to the conclusion

25   that it doesn't have the common sense understanding and

1    common sense value that most everyone would bring,

2    would interpret it with, there must be a reason for

3    that, right?

4              THE WITNESS:  Yes.

5              THE COURT:  Okay.  So I think your testimony has

6    been that because of your training by the SHARE

7    advocate and your own experiences, you reached a

8    conclusion that this banter should not be given its

9    common sense understanding.

10              THE WITNESS:  I think that's accurate.

11              THE COURT:  Okay.  And so that's what you did,

12    and whatever term we apply to that, whether it's

13    disregarded or devalued it or considered it less

14    probative, or however you want to phrase it, that's

15    pretty much what you did and that was the reason why

16    you did it.  I mean, is that right?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.  So then let me ask you this,

19    if you're able to answer this.  If you were able to

20    just take that part of the equation away, that is, the

21    SHARE training and your past experiences, and you were

22    just to have considered that evidence on its common

23    sense understanding, in a close case like this, do you

24    think it would have changed your view of the outcome?

25              THE WITNESS:  No, I don't think so.

1          THE COURT:  Why not?

2          THE WITNESS:  Because I think it was such a huge

3     departure from the prior text messages where she was

4     really clear that she didn't want to have a sexual

5     relationship with him, that that sort of remained an

6     inconsistency or an incongruity in sort of my

7     understanding of the series of events.

8          THE COURT:  Okay.  I understand that.  And I

9     thought of that myself; there's a gap in these text

10    messages.

11         But the training you received and the training

12    that all the students receive, and it's right in all

13    the policies, or at least in the '15-'16 policy, is

14    that consent is an ongoing process, right?

15         THE WITNESS:  Yes.

16         THE COURT:  So what that could mean, another

17    common sense understanding is that someone could

18    consent to something and change their mind and say no,

19    right?

20         THE WITNESS:  Right.

21         THE COURT:  And then the converse of that is

22    true, too.  Someone could say no, I don't want to do

23    that, but then change their mind and say yes, right?

24         THE WITNESS:  That's possible.

25         THE COURT:  And I think all the training says

1    you have to, students, you have to evaluate as you go

2    along in any encounter where you are on that spectrum,

3    right?

4              THE WITNESS:  That's my understanding, yes.

5              THE COURT:  Okay.  So wouldn't it be at least

6    informative, and I'm not saying that you'd have to

7    reach the conclusion, but wouldn't it be informative,

8    the post-event, the post-encounter behavior and text

9    messages, wouldn't those be just as informative as to

10   what was going on in that gap period between the

11   pre-event text messages and behavior and post-event

12   text messages and behavior as to that spectrum of

13   consent?

14             THE WITNESS:  That's possible.

15             THE COURT:  Okay.  But you're still saying that

16   you still don't think that it would have tipped the

17   balance for you if you had been just considering it

18   straight up, without considering the training, you

19   know, about trauma and so forth?

20             THE WITNESS:  I don't think so.  I really -- I

21   came in wondering about, you know, the question that

22   people might ask themselves:  Well, she had to have

23   known that maybe sex was on the table by going

24   someplace secluded with someone at one o'clock in the

25   morning.

1          I asked myself those questions, and I ultimately

2     decided that that's not -- that that's not indicative

3     of whether or not there was consent.

4          And that's something that I brought before --

5     outside and beyond any kind of training.  I think the

6     training resonated with me because it fit with my own

7     sort of world view about the limits, the limits that

8     somebody in my position might have, limitations.

9          THE COURT:  Okay.  But in any event, what we do

10    know from your testimony is that you did either

11    disregard or weigh or find the post-encounter behavior

12    and texting to be unhelpful to determining whether the

13    encounter was consensual because of the training and

14    your life experience.  You know that.

15         THE WITNESS:  Yes.

16         THE COURT:  All right.  Now, you had the report

17    from Djuna Perkins; right?

18         THE WITNESS:  Yes.

19         THE COURT:  And she spends a good amount of

20    space talking about these text messages and these

21    behaviors as the witness has recounted them; right?

22         THE WITNESS:  Yes.

23         THE COURT:  Now, do you know the background of

24    Ms. Perkins as an investigator?  Is that provided to

25    you?

1        THE WITNESS:  Not at all.

2        THE COURT:  She's just a person, a random person

3    who has done an investigation?

4        THE WITNESS:  That's all I know about her.

5        THE COURT:  And the panel doesn't ask for

6    anything about her background or anything like that?

7        THE WITNESS:  No.

8        THE COURT:  Okay.  All right.  Did you or anyone

9    else feel that you could ask her about that question,

10   about whether these post-encounter behaviors and texts

11   could be given face value or should be evaluated

12   through some other prism?  Did that ever come up with

13   her?

14       THE WITNESS:  I believe we did ask her about

15   that and she -- I think her answers were pretty -- I

16   think she was really hesitant to make any judgment or

17   assessment.  I think she answered in a really sort of

18   matter-of-fact way that was something to the extent of,

19   yes, that is concerning or troubling.

20       I'm not exactly sure of the language that she

21   used, but I do remember that we did ask her; and it was

22   part of the questioning when Kate Trimble asked if

23   there was -- if she thought there was any jealously

24   involved.

25       I think we asked Djuna about contradictions, and

1      I think her response wasn't really illuminative.

2           THE COURT:  Did you feel it was part of your

3      role as a panel member to seek any additional

4      information or expert assistance if you thought that

5      would be helpful to help you evaluate the evidence that

6      you'd received from Ms. Perkins?

7           THE WITNESS:  I did think that was within my

8      role to seek that.

9           THE COURT:  Okay.  Did that occur to you at all?

10          THE WITNESS:  No, I don't think so.

11          THE COURT:  Okay.  So the reason I'm asking you

12     that is I just wondered if, given the way that you were

13     perceiving these post-encounter behaviors and texts,

14     through a prism of psychology or what you referred to

15     as trauma theory, that that was influencing how you

16     were viewing them.  I wondered if you or any other

17     panel members ever considered getting any, like a true

18     expert to talk to you about that sort of thing.

19          Did that ever come up?

20          THE WITNESS:  No, that never came up.

21          THE COURT:  Okay.  What is "trauma theory," by

22     the way?

23          THE WITNESS:  I don't know a lot about it, but

24     it's my sort of layperson's understanding is that it's

25     an approach to thinking about the impact of a

1    traumatizing event on an individual.

2            THE COURT:  Okay.  What would it have to do with

3    viewing the evidence in this case?

4            THE WITNESS:  So, for example, if someone said

5    that they don't remember whether it was, you know,

6    whether they got to Faunce House at 12 o'clock or one

7    o'clock, somebody might interpret that to mean that,

8    well, maybe they're lying because otherwise you would

9    know something like that, how could you not remember.

10           Another approach might be to say, well, after

11   you've had a traumatic experience, your memory might be

12   hazy, it might be difficult for you to recall certain

13   facts.

14           And so in that event it's hard for me to

15   evaluate someone's uncertainty around a timeline of

16   events.

17           THE COURT:  There's something else that you said

18   that I'm a little confused about.  In determining

19   credibility, you said that -- I think I got this right,

20   and you tell me if I didn't.

21           I think you said that neither Allie nor Beau

22   were wholly credible, and you were asked to explain why

23   you thought that, and you gave two examples.

24           You said, with respect to Allie, that she was

25   saying that she wasn't interested in a sexual

1      relationship, but on the other hand she was engaging in

2      very graphic sexting, sexual texting with Beau, and

3      those things seemed inconsistent.

4           And that with Beau, you said his version of what

5      happened in the encounter was very different from his

6      text messages, that his tone was more aggressive.  Is

7      that what you said, pretty much?

8           THE WITNESS:  Yes, pretty much.

9           THE COURT:  But then you concluded that Allie

10     was more credible.

11          Again, I was trying to reconcile that because I

12     took your testimony to be that you found his story less

13     credible than her story, even though they both had

14     these kinds of what you perceived as inconsistencies.

15          Can you explain that to me?

16          THE WITNESS:  So I think the moment when I -- as

17     I grappled with this decision, the moment that I felt

18     most comfortable with the finding of responsible, or

19     felt my sort of intellect and heart leading in that

20     direction, was in thinking about the way each person

21     represented themselves in the text message as sort of

22     giving a baseline.  And then because the text messages

23     were -- could be -- their veracity wasn't under

24     question or their authenticity.

25          So in looking at this event that was heavily

1    contested in which they're sort of presenting two

2    different narratives, I thought it was very helpful to

3    use what -- sort of how they had behaved prior to that

4    as a lens or as a way of viewing what was more likely

5    to have been their behavior in the moment.

6         THE COURT:  Okay.  Well, if that's the case,

7    then wouldn't the graphic sexual texting by Allie be

8    indicative of her being interested in sex in the

9    moment?

10        THE WITNESS:  No, I didn't interpret it that

11   way.

12        THE COURT:  Why not?  I'm not sure I understand.

13        THE WITNESS:  So I read the text messages from

14   Allie to be flirtatious but to be really clear that she

15   didn't want to have a sexual relationship with him.

16        THE COURT:  Okay.  And this is my last question,

17   I think.

18        Do you have an opinion about whether a person,

19   man or woman, who engages in a sexual encounter could

20   effectively consent to that sexual encounter in the

21   moment, as you said, but later come to a view that it

22   was really not consensual and so effectively change his

23   or her opinion about whether consent was given?

24        THE WITNESS:  I think that's possible.  I still

25   think that there's a sort of objective truth and

1     that -- your question, your Honor, speaks to a question

2     that I asked of the investigator, which was about the

3     line between someone's understanding of what happened

4     and an objective truth about what happened.

5          So I think it's certainly possible for someone

6     to have given consent and then later feel like they did

7     not give consent, but I think objectively they would

8     have still given consent in that situation.

9          THE COURT:  So in that situation, if that

10    occurred, you would find -- if there was a complaint,

11    you would say there was consent or not?

12         THE WITNESS:  Correct, I would say that there

13    was consent and have heard complaints in that spirit

14    and have voted in that way.

15         THE COURT:  Okay.  I think that's all I have.

16         Do either of you wish to follow-up on anything?

17         MR. RATCLIFFE:  No, your Honor.

18         MR. RICHARD:  No, your Honor.

19         THE COURT:  Then your testimony is complete.

20    You may step down.  Thank you.

21         All right.  Are you ready to call your next

22    witness?

23         MR. RATCLIFFE:  Yes, I am, your Honor.  Amariah

24    Becker.

25

1      **AMARIAH BECKER, PLAINTIFF'S WITNESS, SWORN**

2           THE COURT:  Good afternoon, Ms. Becker, is it?

3           THE WITNESS:  Yes.

4           THE COURT:  Amariah Becker?

5           THE WITNESS:  Amariah Becker.

6           THE COURT:  All right.  Good afternoon.  You may

7      inquire.

8           **DIRECT EXAMINATION BY MR. RATCLIFFE**

9      **Q.**   Tell me a little bit about you.  You're at Brown

10     University?

11     **A.**   Yes.  I'm a grad student at Brown.

12     **Q.**   And you're a grad student in the Computer Science

13     Department?

14     **A.**   That's correct.

15          MR. RICHARD:  Your Honor, could the witness put

16     the mic a little closer.

17          THE COURT:  Yes.

18          THE WITNESS:  Is that better?

19          THE COURT:  Yes.  Just keep your voice up.

20          THE WITNESS:  Okay.

21     **Q.**   And you're in the Ph.D. program?

22     **A.**   Yes.

23     **Q.**   And you just finished your second year?

24     **A.**   Yes.

25     **Q.**   And you are a -- you're originally from St. Louis,

1    Missouri?

2    **A.**    Yes.

3    **Q.**    And are a graduate of Carleton College in

4    Minnesota?

5    **A.**    Yes.

6    **Q.**    All right.  Now, you are a member of the Title IX

7    Council?

8    **A.**    Yes.

9    **Q.**    And you responded to a notice that you saw asking

10   for people to volunteer to be on the Title IX Council

11   at Brown University?

12   **A.**    Yes.

13   **Q.**    All right.  And why did you decide to join the

14   Title IX Council?

15   **A.**    So my first year at Brown as a grad student kind

16   of involved getting used to grad school life and moving

17   to a new city and meeting new people, so I didn't

18   really get as involved in the Brown community as I

19   would have liked to, and so at the start of my second

20   year I was actively looking for opportunities to be

21   more involved and that notice went around right around

22   that time, and I thought that it would be a good way to

23   do so.

24   **Q.**    Now, how did you become a member of the Title IX

25   Council?  What did you have to do?

1   **A.**   I applied, and then I was notified that I would be

2   brought in for an interview.  And then I was

3   interviewed, and then I was notified that I was one of

4   the selected grad school reps.

5   **Q.**   Who interviewed you?

6   **A.**   So it was members of the GSC put together a

7   committee to interview people for this position, and

8   Sara Matthiesen of the Title IX Council or -- sorry --

9   of the Title IX Office was also there.

10  **Q.**   So you were interviewed by the GSC.  Is that the

11  Graduate Student Council?

12  **A.**   I don't know exactly what the acronym is, but it's

13  essentially the governing body of the grad school

14  students.

15  **Q.**   Was Amanda Walsh at that meeting?

16  **A.**   Amanda Walsh, I don't believe Amanda Walsh was at

17  that interview.

18  **Q.**   What kind of questions were asked of you?

19  **A.**   I was asked to describe my background, my

20  qualifications, my interests in applying, and I believe

21  that there were maybe a few hypothetical situations

22  that were brought up or things to consider and reflect

23  on in the interview.

24  **Q.**   Were you asked any questions about your

25  understanding or your belief about the Title IX process

1    in general?

2    **A.**    I don't believe I was specifically asked the

3    question about the Title IX process.  At the end they

4    asked if I had any questions, and I asked a question

5    about the process, and it was discussed at the

6    interview, but I don't believe that was a question from

7    them.

8    **Q.**    What was the question that you asked?

9    **A.**    I asked how often it would be likely to occur that

10   once the Title IX Council made the decision that a

11   higher up in the Brown administration would simply

12   overrule that decision.  That was something that I

13   experienced in a previous council, and I wanted to know

14   if that was likely to occur in this council.

15   **Q.**    You said you experienced that in the previous

16   council.  Tell us about that.

17   **A.**    I served on the Academic Standing Committee at

18   Carleton College where I did my undergrad, and that was

19   something we experienced from time to time and I found

20   frustrating about the process, and I wanted to know if

21   we were likely to see that in this council.

22   **Q.**    And what were you told?

23   **A.**    I was told that it was not likely and that the

24   entire Title IX process and policy had been in flux

25   recently and there were a lot of discussions about

1    various aspects, including this one, and so it was

2    something that was being considered.

3    **Q.**    So there was discussion about Title IX Policy and

4    council being in flux.  Tell us about those

5    discussions.

6    **A.**    Just that there was a lot more attention across

7    the nation on bringing Title IX resources to

8    universities, and Brown was participating in this in

9    reviewing their policy and trying to provide resources,

10   and that the Title IX Office itself was relatively new

11   and the hiring of new people to fill the University's

12   need for that space.

13   **Q.**    Did anybody actually tell you what Title IX is?

14   In your training or your meetings, what's your

15   understanding of what is Title IX?

16   **A.**    My understanding of what Title IX is, is that it's

17   a law that requires in this case universities that are

18   receiving federal funds to avoid participating in sex

19   or gender-based discrimination.

20   **Q.**    So that Title IX basically deals with gender

21   discrimination; correct?  Is that your understanding?

22   **A.**    My understanding is that it deals with sex and

23   gender-based discrimination.

24   **Q.**    And basically your understanding that the Title IX

25   Council was hearing cases, the reason they were is

1    because so that there would be equal educational

2    opportunities for women; correct?  Strike that.  Let me

3    ask you this.

4          Is your understanding that the reason that

5    Title IX cases are brought or that the universities

6    have to bring them is that women would not have equal

7    educational opportunities if they were on campus with a

8    man who had sexually assaulted them?

9    **A.**   I don't know that the law is specifically

10   one-sided to only protect women or to be designed to do

11   so, but I know that's something that it should be --

12   that it's considered to be protected under that law.

13   **Q.**   All right.  So do you recall anything else about

14   your interview?

15   **A.**   About the questions that were asked?

16   **Q.**   Correct.  Yes.

17   **A.**   No.

18   **Q.**   So after the interview, I assume you still wanted

19   to be on the Title IX Council?

20   **A.**   That's correct, yes.

21   **Q.**   And you were chosen for the Title IX Council?

22   **A.**   Yes.

23   **Q.**   And what happened next?

24   **A.**   Over the course of the school year, there were

25   various trainings that we were required to go to.  We

1    had to have at least five hours of training in order to

2    be able to be on a specific hearing; and so throughout

3    the year Amanda or other members of the office would

4    contact us when there was a new training to attend.

5    **Q.**    And did you attend trainings?

6    **A.**    Yes.  I attended I believe six of the training

7    sessions, five or six of them.

8    **Q.**    And what was the training that you received?

9    **A.**    So there were several sessions throughout the year

10   covering various topics.  We received the training that

11   was just about Title IX and the Title IX Office in

12   general, and what our role was in connection with the

13   office, and what our responsibilities would be as a

14   council member.

15          We had a training that was led by the Men's

16   Health Coordinator over some of the programming and

17   resources that are offered or provided to students.

18          We had another training that was led by I think

19   one of the SHARE advocates or maybe not advocates, but

20   someone who works in the SHARE program.

21   **Q.**    Do you recall the name of that person?

22   **A.**    I think her name is either Alana or Elaina.

23   **Q.**    Alana Sacks?

24   **A.**    I'm not sure what her last name is.

25          Over some of the resources and counseling that

1   Brown offers, and the process that somebody -- a

2   student would go through if they chose to bring a

3   complaint forward; or, if they chose not to, the

4   support that was there for the students, and different

5   considerations to make with regard to what the students

6   might be going through.

7           We had another training that was specifically

8   about the appeals process.  And we had a training that

9   was essentially a mock hearing.

10  **Q.**   Do you recall that the training by Alana Sacks,

11  the SHARE advocate, covered trauma theory?

12  **A.**   I don't know what trauma theory is.

13  **Q.**   Did it cover the effects of trauma on a sexual

14  assault survivor?

15  **A.**   Yes.

16  **Q.**   Okay.  Now, you get on the council.  How many

17  cases have you sat on?

18  **A.**   One.

19  **Q.**   And that's the case that -- we're going to call it

20  Beau, Beau and Allie.  That case?

21  **A.**   Yes.

22  **Q.**   We're not using last names here.

23  **A.**   Okay.

24  **Q.**   So were you on -- you were on the appeals panel;

25  correct?

1    **A.**    Yes.

2    **Q.**    All right.  And you said you went to a hearing

3    about the role of the appeals panel or the appellate

4    panel; correct?

5    **A.**    Yes.

6    **Q.**    And tell us about your training to be on the

7    appeals panel.

8    **A.**    During that training, we went over the specific

9    policy and wording of what those participating in the

10   appeals panel would be responsible for, and we also

11   went over what the grounds for an appeal were, and I

12   believe we had several sort of mock appeals that we

13   then discussed.  We would read an appeal and then

14   discuss how we would handle that, were it to be a

15   hearing.

16   **Q.**    And what was your understanding of the grounds for

17   an appeal?

18   **A.**    My understanding was that there were two primary

19   grounds for an appeal.  One was the finding of new

20   evidence, and the other was when a procedural error had

21   occurred with the initial hearing.

22   **Q.**    What about if something was manifestly against the

23   weight of the evidence?

24   **A.**    I don't recall that being a specific grounds that

25   we discussed at that training.

1  **Q.**   As a member of the appeals panel, are you aware of

2  any procedure at Brown that allows for an arbitrary

3  decision to be reversed?

4  **A.**   Can you repeat the question, please.

5  **Q.**   Sure.  Are you aware of any appeals procedure that

6  allows for the reversal of an arbitrary decision?

7  **A.**   No.

8  **Q.**   Did you discuss in your training or any of the

9  training like what if the hearing panel just gets it

10  completely wrong; how do we address that?

11  **A.**   I don't remember that question happening at that

12  training.

13  **Q.**   Now, do you recall anything else that happened at

14  your appeals training?

15  **A.**   Not besides what I've already mentioned.

16  **Q.**   So you said you were selected for the appeals

17  panel in this case, Beau's case --

18  **A.**   Yes.

19  **Q.**   -- and Allie's case.  How did you -- what happens?

20  How do you get on this panel?  What happens?  Tell us

21  what happened.

22  **A.**   So in early May, as the school year was winding

23  down, I was contacted by Jessica Katz to ask if I was

24  available and willing to participate on an upcoming

25  appeals panel, and I responded that I was going to be

1    traveling but that I was available to Skype or phone

2    in.  And she got back to me then with the names, with

3    Beau and Allie's names, to ask if I knew who they were.

4    I'm under the impression that I had already been vetted

5    by them at that point.

6          I responded that I did not know them, and then

7    there were several back and forth e-mails trying to

8    nail down a specific time for the hearing.

9    **Q.**   At some point did you receive information?

10   **A.**   Yeah.  So roughly a week or so before we actually

11   convened, we received a packet of all of the original

12   evidence and reports and complaints and responses from

13   the original hearing.  We received all those, in

14   addition to the appeals.  There were appeals from both

15   Beau and Allie.

16   **Q.**   And did you read everything that you received?

17   **A.**   I read everything that I received.

18   **Q.**   Okay.  And do you recall what Beau's, the basis of

19   Beau's appeal was?

20   **A.**   I remember that there were a couple of components.

21   The one that we focussed on mainly was that the --

22   there was a procedural error that occurred in the first

23   hearing because the definition of "consent" that they

24   referred to was one that was from a policy that was

25   dated after the events had occurred.

1    **Q.**   And you thought that was a tricky question;

2    correct?  Or a difficult question?

3    **A.**   Yes.

4    **Q.**   And do you recall any other bases for Beau's

5    appeal?

6    **A.**   I don't remember the exact wording, but there was

7    another component of the appeal that suggested another

8    procedural error had occurred, I guess, or -- I don't

9    remember the wording, but I do remember that there was

10   another component.

11   **Q.**   Okay.

12        MR. RATCLIFFE:  Exhibit 30.

13   **Q.**   Would it help you to review -- you don't have a

14   clear memory of other bases of Beau's appeal as you sit

15   here today?

16   **A.**   I remember that it was suggesting that some type

17   of misconduct or error had occurred.

18   **Q.**   But you don't know the nature of the misconduct or

19   error?

20   **A.**   One component that we discussed was whether there

21   was sufficient evidence that there was -- that the

22   investigator may have left out some components.

23   **Q.**   Did that relate to text messages between Allie and

24   an individual known as Witness 9 in the papers?

25   **A.**   I don't recall specifically.

1    **Q.**   Do you know what -- do you recall what was left

2    out?

3    **A.**   I do remember that there was a discrepancy between

4    two different appendices we had -- or two different

5    sources of evidence we had with regard to text

6    messages.

7    **Q.**   So you recall that there was a discrepancy

8    regarding two different sources of text messages;

9    correct?

10   **A.**   Yes.

11   **Q.**   And you recall -- or do you recall that the

12   discrepancy was that Allie had submitted text messages

13   up until the point of the encounter but none after the

14   encounter?

15   **A.**   I don't remember the specifics of when the texts

16   stopped, but my impression was that we had an extensive

17   set of the text messages provided by Beau and that the

18   text messages provided by Allie were not as extensive.

19   I don't remember the exact cutoff point.

20   **Q.**   Do you recall anything about, in reading through

21   the materials, do you recall anything about any text

22   messages between Beau and an individual known as

23   Witness 9?

24   **A.**   I remember that there were other conversations

25   that we received.  I don't specifically remember the

1    witness number of them.

2    **Q.**    But you recall that Beau -- do you recall an issue

3    with respect to whether or not there was an error by

4    the investigator not requesting additional text

5    messages?

6    **A.**    I don't remember the specifics of it.

7    **Q.**    Do you recall anything else about the appeal?

8    **A.**    We also had an appeal from Allie that we

9    discussed.

10   **Q.**    All right.  What did Allie appeal?

11   **A.**    Allie's appeal suggested that there was new

12   evidence that we should consider, specifically in

13   reference to a Facebook post that I believe Beau made.

14   **Q.**    And was the Facebook post after the event -- after

15   the hearing?  Excuse me.  Strike that.

16        Do you recall when the Facebook post was made by

17   Beau?

18   **A.**    I don't remember the exact date, but given the

19   content of the post, I believe that it was after the

20   hearing.

21   **Q.**    Do you recall anything else about either of the

22   appeals after reading through the paperwork?

23   **A.**    Not beyond what I've already mentioned.

24   **Q.**    Okay.  So you said you were traveling --

25   **A.**    Yes.

1   **Q.**   -- during the appeal?  So how did you participate

2   in the appeal?

3   **A.**   I called in, and we had a conference call for the

4   appeal.

5   **Q.**   Who participated in the -- so members of the

6   appeals panel were at Brown University?

7   **A.**   Yes.  I believe so.

8   **Q.**   So they were all in a room, and you were calling

9   in?

10  **A.**   That's correct.

11  **Q.**   So had you met any of the people that were on the

12  appeals panel prior to the commencement of the appeals

13  hearing?

14  **A.**   I don't remember if I had met Colin before, but I

15  had met the other members during trainings.

16  **Q.**   And who were the other members?

17  **A.**   Colin, Gretchen.  Jessica Katz was there, but she

18  was doing more administrative stuff, and I don't

19  believe she was actually present in the room during our

20  conversations.  And Alex.

21  **Q.**   Alex.  When you say Colin, Colin Sullivan?

22  **A.**   I don't know his last name.

23  **Q.**   Do you know Alex's name, full name?

24  **A.**   I don't know her full name.

25  **Q.**   Okay.  So how does the appeals -- the hearing

1    start?  What happens?

2    **A.**   So after we make introductions, Gretchen goes

3    over -- Gretchen went over the policy that was

4    specifically relevant to us with regard to what our

5    role was as an appeals panel and what were grounds for

6    an appeal.  She read out that policy to us, and we had

7    it in front of us, too.

8          And then we began to discuss the appeals that

9    were presented.

10   **Q.**   So the policy that -- who's Gretchen?

11   **A.**   Gretchen is a non-voting member of the panel who

12   has additional administrative responsibilities in terms

13   of she was the one who wrote up the decision.  And I'm

14   not entirely sure what the exact title of her position

15   is, but she holds a special role in the panel.

16   **Q.**   Do you know why she's non-voting?

17   **A.**   My understanding is that her role is more to guide

18   us through the process and keep us on track and to make

19   sure that we're doing what we need to be doing, and

20   rather than someone who's contributing her opinions

21   or -- yes.

22   **Q.**   Excuse me.  I didn't mean to -- so she's more like

23   the neutral; correct?

24   **A.**   Correct.

25   **Q.**   And did you learn that during your training that

1    Gretchen acted more as the neutral in connection with

2    these hearings?

3    **A.**    Yes.

4    **Q.**    And she would be a resource for the panel to rely

5    on if you had any questions?

6    **A.**    Yes.

7    **Q.**    Now, with respect to -- we can look at the policy.

8         You said you went over the role from the policy

9    regarding -- the role that the appeals panel had.  Tell

10   us what your understanding of that role is.

11   **A.**    My understanding is that the role requires us to

12   read the documents that were provided and then to

13   discuss them at the panel, at the panel hearing, and to

14   make a decision as to whether the grounds for the

15   appeal were met and to vote on it.

16   **Q.**    And is it your understanding that the appeals

17   panel -- you got all this information, this packet of

18   all the -- strike that.

19        You got the information that the appeals --

20   excuse me -- that the hearing panel had received, the

21   investigative report, all of the text messages and the

22   attachments to the investigation report; correct?

23   **A.**    Yes.

24   **Q.**    What else did you -- did you receive anything

25   else?  You received the appeals?

1    **A.**    Yes.

2    **Q.**    And did you receive any other documents other than

3    the appeals and the hearing investigative report?  And

4    I assume you also received the hearing decision?

5    **A.**    Yes.

6    **Q.**    Anything else?

7    **A.**    I believe that there were also a few more

8    components, including a letter from Amanda Walsh and --

9    that might have been it; I don't know.  Yes, there were

10   a few other documents.

11   **Q.**    Well, did you receive the 2014-'15 Code of Student

12   Conduct?

13   **A.**    We had access to the Code of Conduct.  I don't

14   remember if it was in the packet.  There were several

15   policy-related items that maybe are available online

16   that we were pointed to.

17   **Q.**    What were those policy-available materials that

18   were online that you were pointed to?

19   **A.**    So for example, the various publicly available,

20   like the Code of Conduct or the -- I don't know the

21   titles of these things, but anywhere where there was

22   relevant policy, we had access to it.

23   **Q.**    So showing you what's been marked as Exhibit 3,

24   the complaint policy, is this something that you were

25   directed to by Jessica Katz online or something that

1    was -- were you directed to read that, Exhibit 3?

2    **A.**   I don't remember if we were directed to this

3    specific document.

4    **Q.**   You can't recall if you were directed to the

5    Title IX Complaint Process.  How about the Title IX

6    Policy?  Were you directed to the Title IX Policy,

7    Exhibit 4?

8         THE COURT:  Could we just go off the record for

9    a moment.

10         (Discussion off the record.)

11         THE COURT:  So we'll go back on the record, and

12    when you're ready, you can answer.

13         MR. RATCLIFFE:  Go off the record for one other

14    thing?

15         THE COURT:  Sure.

16         (Discussion off the record.)

17         THE COURT:  Back on the record.

18    **Q.**   So I showed you the Title IX Policy.  Is this --

19    which was admitted as Exhibit 4.  Is this something

20    that you were directed to in connection with dealing

21    with the matters of this appeal?

22    **A.**   Yes.

23    **Q.**   Anything else that you recall?

24    **A.**   About the appeal?

25    **Q.**   About any other documents.  Were you directed to

1    the 2014-'15 Code of Student Conduct?

2    **A.**   We were directed to the 2014-2015 policy that was

3    relevant.  I don't remember if that was from the

4    title that you just said.

5    **Q.**   What was your understanding of what that policy --

6    that you were directed to -- covered, the 2014-'15

7    policy?

8    **A.**   My understanding was that the policy -- that that

9    covered what the original hearing -- that that was the

10   policy that was used for the original hearing.

11   **Q.**   And would it refresh your recollection if I showed

12   you the document?

13   **A.**   Yes.

14   **Q.**   Showing you Exhibit 2.

15        (Pause.)

16   **A.**   I believe that we reviewed aspects of this policy.

17   **Q.**   And what aspects did you review?

18   **A.**   Whether or not the original hearing had the

19   procedural error with reference to using this document

20   to -- for the hearing.

21   **Q.**   When you say "this document," which one are you

22   referring to?

23   **A.**   The 2014-2015 Code of Student Conduct.

24   **Q.**   What was your understanding of what the claimed

25   error was regarding the 2014-'15 Code of Student

1    Conduct?

2    **A.**   The claim of error was that, as I said before,

3    that the definition of "consent" that was used in the

4    original hearing was not something that was present in

5    the 2014-2015 policy.

6    **Q.**   And what's your understanding of where the panel

7    got -- what the panel did that was error regarding

8    that, the lack of definition?

9    **A.**   I believe that the error that was claimed was that

10   they used a definition of "consent" from a more recent

11   policy that did not exist at the time.

12   **Q.**   And was that policy the Title IX Policy that you

13   looked at, Exhibit 4?

14   **A.**   I believe so.

15   **Q.**   All right.  So I just want to make sure we have

16   the universe of documents that you were directed to

17   review prior to the appeals panel hearing.  Have we

18   gone over everything?  We can go through them.  You

19   received -- I just want to make sure of your memory as

20   to what you had to consider.

21          You had the original investigation report;

22   correct.

23   **A.**   Yes.

24   **Q.**   You had the decision of the panel; correct?

25   **A.**   Yes.

1  **Q.**   You had the various appeals of the -- appeals and

2  responses of both Allie and Beau; correct?

3  **A.**   Yes.

4  **Q.**   And you had the -- you did not actually have a

5  hard copy of the 2014-'15 Code of Student Conduct;

6  correct?

7  **A.**   I did not have a hard copy of the 2014-2015.

8  **Q.**   First let's just talk about the documents, the

9  universe of documents, just the hard copies.  There's

10  four; correct?  Are there any more -- oh, and there's a

11  letter from Amanda that I forgot to say.  So there's

12  five documents; correct?  We'll go over this.

13      There's the investigation report.  Tell me if

14  there's anything else.  The investigation report;

15  correct?

16  **A.**   Yes.

17  **Q.**   The decision?

18  **A.**   Yes.

19  **Q.**   The two appeals?

20  **A.**   Yes.

21  **Q.**   And the responses?

22  **A.**   Yes.

23  **Q.**   And a letter from Amanda Walsh?

24  **A.**   Yes.  We also had all of the initial evidence and

25  the initial complaint and responses.

1  **Q.**   And that was all attached to the investigation

2  report?

3  **A.**   We received them as separate documents.  I don't

4  know what --

5  **Q.**   Now, in your role as an appeals panel member, in

6  reviewing the complaint process, is it proper -- is it

7  your understanding that you could go outside of the

8  documents that you received in order to decide the

9  appeal?  Could you get evidence that was outside of all

10  of these documents that you received?

11  **A.**   I don't think we were allowed to get evidence from

12  outside of the documents we received, but the documents

13  we received were not an exhaustive set of the relevant

14  policy, and so there were times when in order to see

15  what was relevant we had to go outside of what we were

16  given.  I would not call that evidence, but, yes.

17  **Q.**   You said you had to go outside of what you were

18  given.  Can you explain that?

19  **A.**   So if there were publicly-available documents,

20  they weren't included in what we were sent.  Many of

21  them we had seen before in trainings and read and

22  perhaps owned hard copies that we had received in the

23  trainings.  So these were documents that we had been

24  given or given access to at some point, but they

25  weren't necessarily part of the set of documents we

1    were sent in relation to the specific hearing.

2    **Q.**   What publicly-available documents?

3    **A.**   So a lot of the policy that's, for example, linked

4    to in the Title IX Office website.

5    **Q.**   You mean the Title IX Policy that you looked at,

6    the Sexual and Gender-Based -- Exhibit 4?

7    **A.**   Yes.

8    **Q.**   Anything else?

9    **A.**   Again, because I was in a conference call, they

10   may have had these all physically present.  I used the

11   website to read the publicly-available documents.

12   **Q.**   And what publicly-available documents did you

13   read?

14   **A.**   This policy that you've given me.

15   **Q.**   The policy, the Title IX Policy, Exhibit 4?

16   **A.**   Correct.

17   **Q.**   Anything else?

18   **A.**   I don't remember if there was anything else.

19   **Q.**   All right.  So you get to the decision -- you have

20   to decide whether or not there's -- you address the

21   different appeals; correct?

22   **A.**   Yes.

23   **Q.**   You address Allie's appeal first?

24   **A.**   Yes.

25   **Q.**   And you decided not to grant that appeal; correct?

1    **A.**   Correct.

2    **Q.**   That was a three-to-nothing decision?

3    **A.**   Yes.

4    **Q.**   The next thing, you moved to Beau's appeal?

5    **A.**   Yes.

6    **Q.**   Is the first one you addressed the procedural

7    error?

8    **A.**   I believe the first one we addressed was -- again,

9    I don't remember the exact wording of the grounds for

10   appeal, but the one that was not about the definition

11   of "consent."

12   **Q.**   All right.  We can get to that one.  Let's talk

13   about the definition of "consent."  Let's talk about

14   that one.

15        How did you go about deciding that, making a

16   decision on that?

17   **A.**   We together discussed the various documents that

18   we had received; in particular, the initial findings

19   document where their reasoning was explained.

20   **Q.**   Can we stop there.  I'm just going to show you the

21   additional findings, the panel hearing letter.  You

22   referenced that.

23   **A.**   Yes.

24   **Q.**   I'm showing you what's been marked as Exhibit 27

25   and ask if you recognize that document.

1  **A.**   Yes, I recognize this document.

2  **Q.**   And I believe you said the basis for their

3  decision was explained.  You mean the hearing panel;

4  correct?

5  **A.**   Yes.

6  **Q.**   And who explained the basis for the hearing panel

7  decision?

8  **A.**   The letter that we received was written by

9  Gretchen.

10  **Q.**   And so did Gretchen then explain the basis for the

11  hearing panel decision?

12  **A.**   In our appeals hearing, she did not provide more

13  insight into the original hearing beyond what we had

14  available to us in this letter.

15  **Q.**   But she did tell you, did she not, that the

16  '15-'16 definition was intentionally written to reflect

17  the values of the school, of the University, that

18  already existed at the time; correct?

19  **A.**   Yes.

20  **Q.**   And she also told you, did she not, that there

21  were publicly-available documents that demonstrated

22  this?

23  **A.**   There were publicly-available documents that

24  stated that.

25  **Q.**   And Gretchen told you that there were

1    publicly-available documents that stated that the

2    '15-'16 definition was intentionally written to reflect

3    the values of the school that existed at the time that

4    it was written?

5    **A.**   Correct.  Yes.

6    **Q.**   And did Gretchen tell you the publicly-available

7    documents that established that basically the consent

8    definition that the panel, the hearing panel used, was

9    written to reflect the values that were in existence at

10   the time that the alleged conduct occurred?

11   **A.**   No.

12   **Q.**   And did you ask?

13   **A.**   No.

14   **Q.**   So you said there was -- Gretchen was giving you

15   evidence; correct?

16   **A.**   I don't believe Gretchen was giving us more

17   evidence than we had access to.

18   **Q.**   So why not?  You didn't have access -- in your

19   packet you didn't have any documents, did you, that

20   established that on November 10 of 2014, when the

21   alleged conduct occurred, that the definition of

22   consent was consistent with that in the Title IX

23   Policy, did you?

24   **A.**   There was a discrepancy in the two policies.  One

25   used the word "consent" without defining it, and the

1    newer one defined "consent;" and we wanted to get at

2    the heart of that discrepancy, which included talking

3    about where that definition came from.

4    **Q.**   And my question was, specifically, did you see any

5    documents that established that on November 10, 2014,

6    that there was a written definition of "consent"

7    somewhere, on any of these Brown University websites,

8    that was consistent with the definition of "consent"

9    that was in the Title IX Policy that the hearing panel

10    relied on?

11    **A.**   My understanding was that the documents from 2014

12    used the word "consent" without providing a definition.

13    **Q.**   I'm just trying to get you to answer the question.

14        You talked about Gretchen telling you that there

15    were these publicly-available documents to establish

16    that the definition of "consent" was intentionally

17    written to reflect the values of the school that

18    existed in November of 2014.

19        Am I accurately conveying what you said?

20    **A.**   Yes.

21    **Q.**   Okay.  And Gretchen also told you that there was a

22    document that established that?

23    **A.**   Yes.

24    **Q.**   You didn't read the document?

25    **A.**   I believe that it was pointed to -- at some point

1    during our discussion.

2    **Q.**   That's not my question.  Did you read the

3    document?

4    **A.**   I did not read the entire document.  I believe

5    that I read that -- a quote that got to the heart of

6    the fact that the newer policy was a reflection of the

7    community standards.

8    **Q.**   All right.  So that's a little bit different, is

9    it not?

10        The newer policy was a reflection of the

11   community standards.  Isn't that different from saying

12   that it was promulgated, that the definition of

13   "consent," in the newer policy, was in existence in

14   November of 2014?

15   **A.**   Your question isn't clear to me.

16   **Q.**   Well, we can look at the -- you've got the policy

17   in front of you; correct?

18   **A.**   Yes.

19        (Pause.)

20   **Q.**   Maybe what we can do is -- the decision letter --

21   maybe you can address your attention to the decision

22   letter, the April 19, 2016, decision letter from Amanda

23   Walsh.  You recall reading that, right?

24   **A.**   To Amanda Walsh.  Yes.

25   **Q.**   Actually from Amanda Walsh.

1    **A.**    I believe that the letter was written by Gretchen

2    to Amanda Walsh.

3    **Q.**    Yes.  Excuse me.  Do you recall that the decision

4    letter said that the rationale for the hearing panel

5    was that the current Title IX Policy -- which you have

6    in front of you --

7    **A.**    Yes.

8    **Q.**    -- codified Brown University's existing community

9    standards with respect to maintaining a safe learning,

10   living, and working environment where healthy --

11   healthy, respectful and consensual conduct represents

12   the campus norms?

13   **A.**    Yes.

14   **Q.**    So the decision of the hearing panel was that the

15   current definition of "consent" was -- codified Brown

16   University's existing community standards with respect

17   to maintaining a safe living and working environment

18   where healthy, respectful and consensual conduct

19   represents campus cultural norms; correct?

20   **A.**    Yes.

21   **Q.**    Now, when you were reviewing your packet, did you

22   check to see where the panel got that information?

23   **A.**    There was no more insight into the initial panel

24   beyond that letter.

25   **Q.**    All right.  So if one would go to the policy, if

1    you look at -- all right.

2         The panel findings, Exhibit 27, we just went

3    over that; correct?

4    A.   Yes.

5    Q.   Now, isn't it true that Gretchen references

6    Section II of the policy?

7    A.   Yes.

8    Q.   And she references it for codification of existing

9    community standards; correct?

10   A.   Yes.

11   Q.   And she references Section II, Statement of

12   Purpose of the Policy For Codification of Existing

13   Community Standards; correct?

14   A.   Yes.

15   Q.   Can you read through the Statement of Purpose and

16   tell me where says in the Statement of Purpose that the

17   Title IX Policy codified existing community standards?

18        (Witness reads document.)

19   A.   I don't believe that this specific section that

20   you referenced mentions that.

21   Q.   But Gretchen mentions that in her decision in the

22   panel findings; correct?

23   A.   Yes.

24   Q.   And Beau was claiming that was error; correct?

25   A.   My understanding was that Beau was claiming that

1    the fact that a newer definition was used was an error.

2    I don't know that he was claiming specifically that

3    this quotation was an error.

4    **Q.**    But he was claiming that reference to the Title IX

5    Policy was error?

6    **A.**    Reference to the current policy was error, yes.

7    **Q.**    Reference to the "consent" definition in the Title

8    IX Policy was error?

9    **A.**    That was what was being claimed, yes.

10   **Q.**    And so that was what you had to determine;

11   correct?

12   **A.**    Yes.

13   **Q.**    And then you had the person who was the Chair of

14   the hearing panel presiding over the appeals panel;

15   correct?

16   **A.**    Yes.

17   **Q.**    And she obviously knew the most about the case;

18   correct?

19   **A.**    Yes.

20   **Q.**    She was there?

21   **A.**    Yes.

22   **Q.**    And she's the person who's the neutral?

23   **A.**    Yes.

24   **Q.**    And you relied on her for information?

25   **A.**    We relied on her to preside over our appeals

1    panel.

2    **Q.**   And one of the things that you relied on was that

3    she told you, Gretchen told you that the current

4    definition of "consent" was intentionally written to

5    respect the values of the school already in place when

6    the conduct occurred?

7    **A.**   That's what I understood after reading this, yes.

8    **Q.**   I'm not asking you what you understood.  I'm

9    asking is that what Gretchen told you?

10   **A.**   Yes.

11   **Q.**   And not only did Gretchen tell you that the

12   current definition of "consent" was written to reflect

13   the values of the school in place in 2014, but there

14   was publicly-available documentation to confirm that?

15   **A.**   I believe so.

16   **Q.**   And that's something that you relied on in making

17   your decision?

18   **A.**   It's something we considered when we were making

19   our decision.

20   **Q.**   And it's something you relied on; correct?

21   **A.**   I'm not sure how the vote would have gone had that

22   not been present.  I don't know --

23   **Q.**   But it's something that you considered and relied

24   on in making a decision not to grant the appeal;

25   correct?

1    **A.**   It was a component of our considerations, yes.

2    **Q.**   It was a component of your decision-making process

3    as a panel member?

4    **A.**   Yes.

5    **Q.**   And the panel voted not to grant that appeal;

6    correct?

7    **A.**   Correct.

8    **Q.**   And it was a two-to-one decision?

9    **A.**   Yes.

10   **Q.**   And so --

11       MR. RATCLIFFE:  May I have a moment, your Honor.

12       THE COURT:  Yes.

13       (Pause.)

14   **Q.**   To this day, have you ever seen that

15   publicly-available document that Gretchen referenced

16   that established that the existing "consent" definition

17   was written to reflect the values in place in 2014?

18   **A.**   I did not look for that document, no.

19   **Q.**   That's not my question.  To this day, have you

20   seen it?

21   **A.**   No.

22       MR. RATCLIFFE:  No further questions.

23       THE COURT:  Thank you.

24       All right.  Mr. Richard.

25       MR. RICHARD:  Your Honor, we have a hard stop at

1   4:00?

2           THE COURT:  Yes, we do.

3           MR. RICHARD:  I could be more than ten minutes.

4           THE COURT:  Would you prefer her to come back

5   tomorrow?

6           MR. RICHARD:  It will be probably about 20

7   minutes or so until we get done.  I just don't think

8   I'll get through --

9           THE COURT:  Okay.  So let's go off the record.

10          (Discussion off the record.)

11          (Adjourned at 4:00 p.m.)

<u>C E R T I F I C A T I O N</u>

       I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

                 /s/ Anne M. Clayton

          _____

                 Anne M. Clayton, RPR

                 July 26, 2016

          _____

                 Date