IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *    CIVIL ACTION
JOHN DOE                *    16-0017
                        *
VS.                     *    JULY 19, 2016
                        *
BROWN UNIVERSITY        *    PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Bench Trial)

**VOLUME I**

**REDACTED**

**APPEARANCES**:

FOR THE PLAINTIFF:          J. RICHARD RATCLIFFE, ESQ.
                            JEFFREY BIOLCHINI, ESQ.
                            Ratcliffe Harten Burke
                            & Galamaga, LLP
                            40 Westminster Street
                            Suite 700
                            Providence, RI  02903

FOR THE DEFENDANT:          STEVEN M. RICHARD, ESQ.
                            Nixon Peabody, LLP
                            One Citizens Plaza
                            Suite 500
                            Providence, RI, 02903

Court Reporter:             Anne M. Clayton, RPR
                            One Exchange Terrace
                            Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

<u>I N D E X</u>

WITNESS                                                    PAGE

AMANDA WALSH

   Direct Examination by Mr. Ratcliffe:          26
   Cross-Examination by Mr. Richard:            142

PLAINTIFF'S EXHIBITS                                      FULL

1    -                                                   141
2    -                                                    39
3    -                                                    28
4    -                                                    29
5    -                                                    31
6    -                                                    34
7    -                                                    64
8    -                                                    43
9    -                                                    45
10   -                                                    49
11   -                                                    56
12   -                                                    61
13   -                                                    70
14   -                                                    71
15   -                                                    77
16   -                                                    81
17   -                                                    99
18   -                                                    99
23   -                                                   119
24   -                                                   104
25   -                                                   112
26   -                                                   116
27   -                                                   121
28   -                                                   121
29   -                                                   130
30   -                                                   130
31   -                                                   131
32   -                                                   133
33   -                                                   133
34   -                                                   134
35   -                                                   134
36   -                                                   137
37   -                                                   139
45   -                                                   163

_____

1    19 JULY 2016 -- 9:00 A.M.

2         THE COURT:  Good morning.  We're here in the

3    matter of John Doe versus Brown University.  We're here

4    for trial.

5         And let's begin by having all counsel identify

6    themselves for the record, please.

7         MR. RATCLIFFE:  For the Plaintiff, John Doe,

8    Richard Ratcliffe.

9         MR. BIOLCHINI:  For the Plaintiff, John Doe,

10   Jeff Biolchini.

11        MR. RICHARD:  Good morning, your Honor.  For the

12   Defendant, Brown University, Steven Richard.  With me

13   today are in-house counsel, James Green, and General

14   Counsel for Brown University, Beverly Ledbetter.

15        THE COURT:  All right.  Thank you.

16        So before we begin, there's just one or two

17   preliminary matters I need to address on the record.  A

18   motion has been filed by the Plaintiff to proceed

19   pseudononymously at trial.  I previously granted the

20   motion to file pleadings pseudononymously.

21        My understanding is Brown has not objected to

22   the Plaintiff's motion; is that correct?

23        MR. RICHARD:  That is correct, your Honor.

24        THE COURT:  All right.  So we are going to

25   proceed in this trial pseudononymously.  I consulted

1    with counsel about how to proceed with that

2    logistically, and the way we're going to handle it for

3    the most part is to use first names with respect to the

4    individuals who are involved in the matter, and

5    witnesses and counsel will be advised to make best

6    efforts to utilize only first names.

7         All right.  With that out of the way, are we

8    ready to proceed?  Do counsel wish to give a brief

9    opening statement?

10        MR. RATCLIFFE:  Yes, your Honor.  One matter of

11   housekeeping.  The exhibits that I put on the witness

12   stand for the witness, I would ask to retrieve those,

13   and I'll publish those exhibits with the ELMO.

14        THE COURT:  That's fine.  Go ahead.

15        MR. RATCLIFFE:  Good morning, your Honor.

16        In the spring of 2013, Brown University offered

17   my client admission to the Class of 2017.  He was

18   accepted to other top tier universities, including the

19   University of Chicago and Cornell.  He accepted Brown's

20   offer to attend Brown University, and his goal was to

21   complete his education in four years and apply to law

22   school.  His family prepaid, actually prepaid four

23   years of tuition at a cost of $177,600.

24        I guess Brown had a program whereby you could

25   prepay your tuition at the amount that it was when he

1    was a freshman.  Each year he paid, the three years he

2    was at Brown, he paid room and board.

3         This case involves -- and I'm going to try not

4    to get into too many of the details of the encounter

5    and the events leading up to the encounter.  There will

6    be exhibits admitted that have text messages attached

7    to the exhibits regarding the interaction between Beau

8    and another young woman at Brown University that

9    occurred in November of 2014.  Those text messages are

10   sexually-charged on both sides.

11        In any event, the parties did meet up, you'll

12   hear testimony, and it's part of the -- you'll see that

13   there's a report that was prepared that about 1:20 in

14   the morning on November 10, 2014, John and this woman,

15   Allie, met to watch a movie.  They started to watch the

16   movie, and a sexual encounter occurred where Allie gave

17   Beau oral sex.

18        There'll be -- in the report, there's evidence

19   of a witness after the event, when Allie went back to

20   her room and recounted what had happened that evening

21   with Beau or early morning with Beau, referred to the

22   encounter as a hookup.  And through -- excuse me --

23   Djuna Perkins, who was the investigator, you'll hear

24   about different witnesses who recounted Allie's

25   description of the event as a hookup.

1           There are also post-encounter texts between

2    Allie and Beau where the inference can certainly be

3    drawn from those post-encounter texts that Allie was

4    pursuing Beau and that Beau wasn't interested.

5    Fast-forward -- so this encounter occurred in November

6    of 2014.  So at that time Allie was a freshman, and

7    Beau was a sophomore.

8           Fast-forward to 2015, late September.  Allie

9    files a complaint with the Title IX Program Officer,

10   who is Amanda Walsh, accusing Beau of sexual assault on

11   November 10, 2014.  So we're into 2015, so it's nearly

12   a year had passed.

13          There will be evidence that I believe it was on

14   November 2nd -- excuse me -- October 2nd, 2014, that

15   Beau was notified of the allegation, and it was a

16   couple of days later when General Counsel confirmed

17   that the 2014-'15 policy would be -- actually, it's

18   called the Code of Student Conduct would apply to

19   adjudicate the substantive portions of the charges.

20   That will be introduced.  The 2014-'15 Code of Student

21   Conduct defines what "non-consensual encounter" is, and

22   there's a comment that lists what a non-consensual

23   encounter is.

24          So actually, Beau received notice on November

25   2nd of 2015.  November 4th was General Counsel's e-mail

1    confirming how the matter was going to be adjudicated.

2           General Counsel did indicate that the 2015 --

3    and it's called the Sexual and Gender-Based Harassment

4    Sexual Violence Relationship and Interpersonal Violence

5    and Stalking Policy -- for purposes of this matter,

6    I'll be referring to that as the 2015 Title IX

7    Policy -- that that would govern procedural matters.

8           Djuna Perkins interviewed various witnesses and

9    prepared a report.  There'll be evidence presented that

10   prior to sharing her report with Beau and the

11   complainant, she provided, Ms. Perkins provided a draft

12   to Amanda Walsh, the Title IX Program Officer.  The

13   draft report referenced the relevant policy sections as

14   those contained in the Title IX Policy.  When she

15   references it, and it'll be introduced as an exhibit,

16   she references the definition of "consent" in the

17   2015-'16 Title IX Policy.  She references the

18   definition of "coercion" in the 2015-'16 Title IX

19   Policy.

20          What happened was -- and you'll hear evidence

21   that Amanda Walsh returned an e-mail to Ms. Perkins and

22   sent a red-line version of the report that Ms. Perkins

23   had prepared and excised references to the 2015 Title

24   IX Policy, specifically with respect to the conduct

25   that was -- the definition of the conduct that was

1    being alleged to have been violated or the section that

2    was alleged to have been violated.

3          So basically, your Honor, you're going to hear

4    about this sort of -- there's really three, three

5    operative documents at play here.  There's the 2014-'15

6    Code of Student Conduct.  There's a 2015-'16 Title IX

7    Complaint -- Policy, and there's the 2015-'16 actual

8    Title IX Policy.

9          So the Title IX Policy was the one that defined

10   the offenses.  The Title IX, actually it's the Title IX

11   Complaint Process defines how matters are adjudicated.

12         So what was conveyed to Beau was that the

13   2014-'15 Code of Student Conduct would apply, the

14   2015-'16 Title IX Complaint Process would also apply.

15         Now, so Ms. Walsh redacted the references to the

16   Title IX Policy, sent the red-line version back to

17   Ms. Perkins, who then prepared an interim report, which

18   was shared with the complainant, Allie; and Beau.

19         The Title IX -- you'll hear evidence that the

20   Title IX adjudication panel convened on April 14, 2016,

21   and the Chair of the adjudicatory panel was

22   Dr. Gretchen Schultz, a professor of French at Brown

23   University.  She's referred to as the Title IX Panel

24   Chair.  She's a non-voting member and sits on all of

25   the panels.

1          You'll hear evidence that although the panel

2     received a copy of the complaint process, the 2015

3     Title IX Complaint Process and the 2014-'15 Code of

4     Student Conduct, you'll hear that Amanda Walsh put a

5     copy of the 2015-'16 Title IX Policy into Gretchen

6     Schultz's packet.

7          You'll hear that Gretchen Schultz and Amanda

8     Walsh met before the hearing, and there was a

9     conversation where Gretchen Schultz advised -- excuse

10    me -- where Amanda Walsh advised Gretchen Schultz that

11    the panel could consider the definition of "consent" in

12    the 2015-'16 Title IX Policy.

13         Up to that point, Beau was never advised that

14    any definitions in the 2015 Title IX Policy would apply

15    to adjudicate his conduct.  In fact, quite to the

16    contrary, he was assured that the 2014-'15 Code of

17    Student Conduct would apply.

18         You'll hear evidence that the Title IX panel

19    reviewed the definitions in the 2015-'16 Title IX

20    Policy and agreed to proceed using the definition of

21    "consent" contained in the 2015-'16 policy.  That was

22    on April 14, 2016.

23         That evening, you'll hear evidence that Gretchen

24    Schultz sent an e-mail to Amanda Walsh with a draft of

25    the opinion, of the decision, which references the

1   2014-'15 Code of -- excuse me -- the 2015-'16 Title IX

2   Policy for the definition of "consent."

3         You'll hear evidence that Ms. Walsh received the

4   e-mail but did not open the letter, the attached

5   letter, but in any event the next day sent a letter to

6   Mr. ██████████ advising him that at the hearing

7   Mr. ██████████ referred to the 2014-'15 Student

8   Conduct -- excuse me.  Beau referred to the 2014-'15

9   Code of Student Conduct, and Allie referred to the

10  2015-'16 Title IX Policy.  In any event, what happened

11  was the letter said that the panel was directed to look

12  at the 2014-'15 Code of Student Conduct.

13        On the 19th, Beau received a letter indicating

14  that he had been found responsible, and it references

15  the definition -- actually it says in the letter,

16  Because the Code of Student Conduct does not explicitly

17  define "consent" -- that's the 2014-'15 Code of Student

18  Conduct -- the panel referred to the current Sexual and

19  Gender-Based Harassment, Sexual Violence, Relationship

20  and Interpersonal Violence and Stalking Policy, which

21  codified Brown University's existing community

22  standards with respect to maintaining a safe learning,

23  living, and working environment where healthy,

24  respectful, and consensual conduct represents the

25  cultural norms.

1       Mr. ████████ appealed, and there'll be

2   evidence introduced regarding the appeal and references

3   to information that Gretchen Schultz provided to the

4   appeal panel regarding the Title IX Policy

5   incorporating existing -- allegedly incorporating

6   existing cultural norms.  There'll be evidence that

7   none of that information was included in the report

8   that Ms. Perkins provided.

9       Our complaint, the issues at trial, our

10  complaint is basically a breach of contract, that the

11  terms of the contract are the Code of Student Conduct.

12  The Code of Student Conduct was not applied.  What was

13  applied was a policy that didn't exist when the alleged

14  misconduct occurred, and it was contrary to

15  representations made by General Counsel, as well as

16  information that -- excuse me -- that Beau had received

17  throughout this process.

18      We also have a second count, which is pending,

19  on promissory estoppel, which requires proof by a fair

20  preponderance of the evidence of the clear and

21  unambiguous promise and reasonable justification in

22  detriment to reliance.

23      That's the outline of our case, your Honor.

24  Thank you very much.

25      THE COURT:  Thank you very much, Mr. Ratcliffe.

1          Mr. Richard.

2          MR. RICHARD:  Thank you, your Honor.  Good

3    morning, your Honor, Counsel, Beau.

4          As your Honor has written in another case

5    recently, Brown has Title IX obligations to address and

6    respond to complaints of sexual misconduct involving

7    students.  As the Court well knows, there has been

8    considerable national attention on this issue as to how

9    campuses should address complaints of sexual

10   misconduct.  What's the process?  What is the

11   procedure?  And what is the role of the University?

12   This trial will involve a breach of contract claim, not

13   a Title IX claim.

14         I respectfully submit, your Honor, there have

15   been some allegations that have been pled in this case

16   and some questions during discovery that seem to be a

17   disguised Title IX claim.  We have allegations of

18   anti-male bias, et cetera, which are factually

19   unsupported, and we'll show that, but I think that

20   they're misplaced in what we're here to address at this

21   trial.

22         Not many cases, if any, have recently gone to

23   trial before the federal courts on this issue of a

24   university's processing of a sexual misconduct

25   complaint.  As we've discussed with the Court, I

1  believe I only know of one that went to trial about

2  five years ago, **Doe v. University of the South**, and I

3  would just like to paraphrase briefly from that case

4  because I think it sets the framework of what we are to

5  do over the next few days.

6  We will hear and receive a lot of information

7  about the interactions between Beau and Allie.  There's

8  over 130 pages of texts between the two students,

9  portions of it very sexually graphic.  But we're not

10  here to determine which of those two students is

11  telling the truth.  We're not here to try to understand

12  and confirm what precisely happened in the room at

13  Faunce House on November 10th, 2014.  We're here to

14  address whether Brown breached any contractual

15  obligations to Beau.

16  In this breach of contract claim, the evidence

17  will address certain central questions.  What is the

18  contract?  How should it be interpreted?  Has there

19  been substantial performance by Brown, or did the

20  University breach its obligation?

21  Your Honor, I would submit that the educational

22  contract is a dynamic contract, and we'll show that

23  through the evidence.

24  Mr. Ratcliffe appropriately identified three

25  core documents that will be at the center of this case,

1    one being the '14-'15 Code of Student Conduct; the

2    second being what we call the Title IX Policy; and the

3    third being the Title IX Complaint Process.  The latter

4    two documents were enacted and took effect at Brown

5    University in the past academic year, the 2015-'16

6    academic year.

7          The central question in interpreting breach of

8    contract claims concerns Offense III and in the

9    2014-'15 Code of Student Conduct which relates to

10   sexual misconduct.  That offense describes sexual

11   misconduct involving non-consensual physical contact of

12   a sexual nature.  It's undisputed that the 2014-'15

13   Code did not define "consent."  It's not otherwise

14   described in the 2014-'15 Code, but there is a comment

15   to that offense that has been a central point both in

16   discovery and will be a central point during this

17   trial.  The comment reads, Offense III encompasses a

18   broad range of behaviors including acts using force,

19   threat, intimidation, or advantage gained by the

20   offended student's mental or physical incapacity or

21   impairment of which the offending student was aware or

22   should have been aware.

23         The evidence before your Honor will be

24   addressing what is the scope of those broad-range

25   behaviors that could constitute a non-consensual sexual

1  act to subject a student to charges by the University

2  under Offense III.

3      And as your Honor has written in other cases,

4  and we acknowledge here, the contract has to be

5  interpreted based upon the reasonable expectations of

6  the student.  What is the student's reasonable

7  expectation as the meaning of those broad range of

8  behaviors?  We will hear a lot of evidence about what

9  that set of words encompasses, including Beau's rather

10  narrow interpretation of those words.

11      There's a central word that will come up

12  throughout this case and in the evidence, and that's

13  "coercion."  Coercion is not specifically mentioned in

14  Offense III of the 2014-'15 Code; but Beau has

15  acknowledged in his deposition that "coercion" is a

16  word that he's heard frequently at Brown.  He heard it

17  frequently before November 10, 2014.  As part of a

18  pre-enrollment tutorial, he had to answer questions.

19  Over the summer of 2013, all incoming students at Brown

20  had to take the tutorial.  It's mandatory for admission

21  and enrollment.  That tutorial raises questions about

22  consent and what it means.  It informs the student that

23  coercion can invalidate consent.

24      Upon Beau's arrival at Brown University in

25  September of 2013, he and all other freshmen attended

1    mandatory training as part of the orientation weekend.

2    First, there was a 90-minute presentation at the

3    Pizzitola Center where there was a PowerPoint

4    presentation, a video played, a play performance about

5    the issues of sexual relationships and consent.   And

6    Beau acknowledges there were instructions about

7    coercion invalidating consent in a relationship.

8         He also went through separate training that

9    evening in a smaller unit.   The groups break down, the

10   freshmen break down into residential peer groups, and

11   they have an hour to 90-minute discussion about

12   consent.   Beau will say that he also saw around campus

13   a flyer, a poster, "Brown Students Ask For Consent."

14        He also attended mandatory training as part of

15   his fraternity, he recalls, either in the spring of

16   2013 or the beginning of 2014, but certainly before

17   November 10, 2014, where again the instruction

18   addressed coercion invalidating consent.

19        Yet before the hearing panel convened, during

20   the hearing and after the hearing, Beau takes a very

21   limited and narrow view of what "coercion" means and

22   whether it can even fall under the broad ranges of

23   offenses under Offense Number III in the '13-'14 Code.

24        Let's be clear, your Honor, that Brown

25   acknowledged and does not dispute here that the

1   2014-'15 Code of Conduct controlled as to the substance

2   of the charges against Beau.

3       The act in question occurred on November 10,

4   2014, the fall semester of 2014.  The report of Allie

5   did not come to the University until nearly a year

6   later, on October 30, 2014 (sic).  In the interim,

7   there were some dynamic changes at Brown University as

8   to its Title IX policies.

9       THE COURT:  I think you meant '15.

10      MR. RICHARD:  I'm sorry, your Honor.  Did I say

11  '14?

12      THE COURT:  October 30th, 2015.

13      MR. RICHARD:  '15.  My mistake.  Thank you for

14  correcting me, your Honor.

15      In the interim, there were dynamic changes at

16  Brown University as to its Title IX  policies and

17  procedures.

18      The University convened a Sexual Assault Task

19  Force, which took a comprehensive look at Title IX

20  policies, protocols, procedures, and concerns on campus

21  and, of course, the University.  The task force issued

22  an interim report in December 2014 and a final report

23  in April 2015.  All of this led to the creation of the

24  Title IX Office at Brown and the hiring of the Title IX

25  Program Coordinator, Amanda Walsh, who will be our

1    first witness.

2         As part of this process, for the 2015-'16 year

3    Brown enacted a new Title IX Policy, which is the

4    substantive document, and includes definitions of

5    "consent" and "coercion" as well as detailed

6    descriptions of offenses, and it also enacted a new

7    complaint process; sort of Brown's rules of procedure

8    as to how it would process complaints consistent with

9    its Title IX obligations.

10        So again, your Honor, there's no dispute that

11   Beau was charged with violations of the 2014-'15 Code,

12   which govern the substance of the offense, for which he

13   may or may not be found responsible for.  But it's

14   important to note that the 2015-'16 Complaint Process

15   controlled.  That was told to him.  At times during

16   discovery Beau was going back and forth between the

17   current complaint process and the prior procedures.

18   The procedures here are those delineated in the

19   complaint process.

20        At the hearing on April 14, 2016, the Title IX

21   Council convened.  There is a Chair who is a non-voting

22   member, Gretchen Schultz, and three panelists who vote

23   to decide the case.  It's undisputed that they did

24   reference the 2015-'16 definition of "coercion" and

25   "consent" by the panelists' choice as a guide to

1    interpret those broad range of behaviors subject to

2    Offense III in the '14-'15 Code.

3           The question before your Honor and the evidence

4    you will hear will address whether or not that was

5    consistent with Brown's community expectations and

6    contract with this student or inconsistent.  And that

7    will ultimately be the question for your Honor to

8    decide.

9           But I do just want to briefly address the other

10   breach of contract claims that the Plaintiff has

11   raised, because it goes beyond this central issue of

12   those broad range of offenses and how they're

13   interpreted.  He's challenged the investigative

14   process.

15          As Mr. Ratcliffe indicated, Brown hired an

16   investigator, Djuna Perkins, who is a very experienced

17   investigator in issues of campus assaults or sexual

18   misconduct.  She's done over 40 of them for campuses

19   nationwide as a former prosecutor.

20          This is a big change from the way Brown did

21   things in the past.  Brown previously had case

22   administrators through the Office of Student Life.

23   There would be a process that would ultimately result

24   in a hearing in which students would testify, a Student

25   Conduct Board hearing.

1        This new investigative model, as delineated in

2   the complaint procedures, entrusts the investigator to

3   conduct a comprehensive investigation, and the

4   complaint process empowers her to do so but also gives

5   her discretion to make choices as to what is or is not

6   relevant evidence.

7        Ms. Perkins wrote a 29-page single-spaced

8   report.  She interviewed Allie three times, Beau twice.

9   She interviewed 11 witnesses.  She was hired in

10   November 2015, finalized her report in March 2016, over

11   a five-month span.

12        As your Honor knows, the Office of Civil Rights

13   and the Department of Education targets 60 days as the

14   time that these investigations should proceed to a

15   hearing.  The thoroughness of this investigation speaks

16   for itself.

17        Mr. ███████ challenges one decision --

18   excuse me.  Beau challenges one decision made by the

19   investigator to exclude or not seek certain text

20   messages between Allie and Witness Number 9.  Djuna

21   Perkins will explain why she did so.  But the

22   investigator has the discretion to make those choices

23   under the complaint process.

24        Also, your Honor, briefly, the Plaintiff

25   challenges the composition and training of the Title IX

1    Council.  The Title IX Council is a newly-enacted

2    council that came into place at Brown as part of these

3    new complaint procedures.  He claims that the training

4    of the Title IX Council was not balanced and

5    particularly focuses on the training session offered by

6    a woman named Alana Sacks.  She's called a SHARE

7    advocate at Brown, and she presented on the impacts of

8    trauma upon victims and complainants.

9        The Plaintiff challenges why that training was

10   offered.  Well, the answer is simple.  It's mandated by

11   federal law, as Ms. Walsh will say in her testimony.

12       But also this was just one part of a

13   comprehensive training program.  All Title IX Council

14   members had to undergo at least five hours of training

15   before they could sit on a case.  That included a

16   two-hour session by Ms. Walsh on Title IX and the

17   University's processes and procedures, a presentation

18   by the Men's Health Council as to issues relating to

19   masculinity, the SHARE advocate's presentations,

20   Flaherty Act presentations, campus security

21   presentations.  There was a broad spectrum of training

22   that each panelist received.  It wasn't as narrow and

23   biased as the Plaintiff claims.

24       Also, your Honor, the Plaintiff alleges that one

25   of the panelists who presided at the disciplinary

1    hearing on April 14, Dean Besenia Rodriguez, wrongly

2    excluded evidence, because she was somehow influenced

3    by the SHARE advocate's training that post-event

4    interactions between Allie and Beau are just totally

5    irrelevant.  Dean Rodriguez will say that she weighed

6    the evidence, but she gave more weight to other

7    evidence.  That's her prerogative as a panelist, just

8    as it would be a juror's prerogative in this court as a

9    decision-maker.

10          Lastly, your Honor, the Plaintiff challenges the

11   appellate process at Brown.  First, he claims that he

12   should have been able to proceed with an appeal based

13   on the weight of the evidence.

14          The complaint process does not allow that type

15   of appeal.  The Plaintiff does not get to rewrite his

16   contract as part of the process for this litigation.

17          The appellate stage under the complaint process

18   focuses on two grounds:  Procedural error that

19   materially affected the outcome, or material evidence

20   not reasonably available at the time of the hearing.

21          Beau did raise procedural error.  He challenged

22   whether or not the panel should have referenced the

23   '15-'16 definition of "coercion" and ultimately cites

24   to it in its decision.

25          That part was properly before the appellate

1    panel.  His claims that he should have been allowed to

2    challenge what he thought was a ridiculous decision was

3    properly not considered.

4          He also raises one minor procedural point

5    regarding the appellate process, your Honor.  He claims

6    that he should have been allowed to file a surreply.

7          What happened here was after the panel ruled,

8    both Beau and Allie filed appeals, as they are allowed

9    to do so under Title IX.  We had cross-appeals by both

10   students.  The complaint process allows the appellee to

11   respond to the appellant's appeal.  But there is no

12   surreply mentioned in the complaint process.

13         Beau claims that he essentially should have had

14   the last word.  Ms. Walsh will testify the reason why

15   the complaint process is this way, which she

16   essentially wrote, is to ensure a level playing field

17   under Title IX.  Each student has a chance to speak.

18   But if Beau has a chance for surreply, does Allie get a

19   chance to reply to that?  The complaint process

20   delineates the filing and the process, and Beau tries

21   to rewrite it.

22         Lastly, your Honor, you'll be dealing with the

23   issues of remedy.  We've addressed that at length in

24   our pretrial memo, so I won't elaborate here.  I will

25   just emphasize the point that Beau has not produced in

1    discovery a single document of fact that suggests that

2    he has a dollar in damages in this case.  We have no

3    evidence of any counseling.  He says he's had none.  No

4    medical treatment as a result of stress.  He says he

5    has none.  This case is not about damages.  It's a

6    purely injunctive relief case.

7         Your Honor, as the Title IX Program Officer,

8    investigator, hearing and appellate panels will

9    testify, this matter presented vexing issues about

10   consent and whether and when, to what extent it existed

11   between Beau and Allie.

12        Both decisions in this case, the hearing panel

13   and the appellate decision on Beau's appeal, were

14   two-to-one votes.  We have a substantial investigation

15   that spanned six months that followed the complaint

16   procedures.

17        Your Honor, Beau obviously disagrees with the

18   result and the sanction, and I certainly respect his

19   opinion and subjective right to do so, but there was no

20   breach of Brown's contractual relationship with Beau.

21        Thank you.

22        THE COURT:  Thank you, Mr. Richard.

23        Before we call the first witness, just a couple

24   of matters that I want to put on the record and have

25   counsel just state your agreement to.

1        The first one is that, and I should have

2   mentioned this earlier, that counsel have by consent

3   agreed to consolidate the preliminary injunction

4   hearing with the trial on the merits and have agreed to

5   try this matter to the Court, without a jury, in order

6   to get an expeditious ruling.  If I could just get

7   counsel to acknowledge that on the record, that that is

8   what you have agreed to and have asked for.

9        MR. RATCLIFFE:  That is correct, your Honor.

10        MR. RICHARD:  Yes, your Honor.

11        THE COURT:  All right.  Very good.  And the

12   second preliminary matter is have you discussed -- do

13   you have a view of whether you want witnesses in the

14   matter sequestered?

15        MR. RATCLIFFE:  Yes, we have discussed that.

16   We've agreed to sequester witnesses, obviously except

17   for my client.

18        THE COURT:  Okay.  You agree with that?

19        MR. RICHARD:  Yes, your Honor.

20        THE COURT:  All right.  Very well.

21        Thank you for your opening statements and your

22   more detailed, excellent pretrial memos.

23        Mr. Ratcliffe, are you ready to call your first

24   witness?

25        MR. RATCLIFFE:  Yes, your Honor.

1        Amanda Walsh.

2            **AMANDA WALSH, PLAINTIFF'S WITNESS, SWORN**

3        THE CLERK:  Please state your name and spell

4    your last name for the record.

5        THE WITNESS:  Amanda Walsh, W-A-L-S-H.

6        THE COURT:  Good morning, Ms. Walsh.

7        You may inquire, Mr. Ratcliffe.

8            **DIRECT EXAMINATION BY MR. RATCLIFFE**

9    **Q.**   Good morning.

10   **A.**   Good morning.

11   **Q.**   Where are you currently employed?

12   **A.**   Brown University.

13   **Q.**   In what capacity?

14   **A.**   I'm the Title IX Program Officer.

15   **Q.**   And you are also an attorney?

16   **A.**   Yes.

17   **Q.**   And you graduated from Roger Williams Law School

18   in 2011?

19   **A.**   Yes.

20   **Q.**   When did you become employed by Brown University?

21   **A.**   The early part of May.  My first day, I believe,

22   was May 4th, 2015.

23   **Q.**   So you're the Title IX Program Officer?

24   **A.**   Yes.

25   **Q.**   And that was a new position at Brown University?

1    **A.**    Yes.

2    **Q.**    And as a Title IX Program Officer, what are your

3    responsibilities and duties?

4    **A.**    To oversee effectively the Title IX Policy and the

5    accompanying complaint procedures related to all

6    incidents that fall under the policy, so that would

7    include sexual and gender-based harassment, sexual

8    assault, stalking, interpersonal violence --

9             THE COURT:  Slow it down a little.

10            THE WITNESS:  Sure, sure.

11   **A.**    So that would include sexual and gender-based

12   harassment, sexual assault, stalking, interpersonal

13   violence.  And again, that experienced by students,

14   faculty, or staff.

15   **Q.**    So you oversee the whole Title IX process?

16   **A.**    Yes.

17   **Q.**    And the Title IX process, is that the Title IX

18   Complaint Process?  That's basically what you oversee;

19   correct?

20   **A.**    The complaint process that you're referencing is

21   the complaint process for complaints against student

22   respondents.

23            MR. RATCLIFFE:  We've premarked some exhibits,

24   your Honor.  This would be Exhibit 3.

25            MR. RICHARD:  Your Honor, I would stipulate to

1    the admissibility of this document.

2              THE COURT:  Very well.  Three will be full.

3              (Plaintiff's Exhibit 3 admitted in full.)

4              MR. RATCLIFFE:  May I approach.

5              THE COURT:  Yes.

6    **Q.**   And showing what's been marked as Exhibit 3,

7    that's referred to as the Title IX Complaint Process?

8    **A.**   Yes.

9    **Q.**   And basically what's covered under the complaint

10   process?

11   **A.**   I'm sorry?

12   **Q.**   What does the complaint process address?

13   **A.**   All issues that would fall under the Sexual and

14   Gender-Based Harassment, Sexual Assault, Stalking,

15   Interpersonal Violence.

16   **Q.**   Does it provide substantive definitions of what

17   those offenses constitute?

18   **A.**   In the complaint process?

19   **Q.**   Yes.

20   **A.**   No.

21   **Q.**   And was it your understanding that the Title IX

22   Complaint Process was applied to Beau's, to the matter

23   at hand -- to Beau's -- to the complaint that was filed

24   against Beau?

25   **A.**   Yes.

1    **Q.**   Now, also your duties -- there is another document

2    you referred to; correct?

3    **A.**   Yes.

4    **Q.**   The policy?

5    **A.**   Yes.

6         MR. RICHARD:  Your Honor, likewise I stipulate

7    to the admissibility of this document.

8         THE COURT:  Is this 4?

9         MR. RATCLIFFE:  Yes.

10        MR. RICHARD:  Yes.

11        THE COURT:  All right.  Four will be full.

12        (Plaintiff's Exhibit 4 admitted in full.)

13   **Q.**   So showing you Exhibit 4 full, the Title IX

14   complaint -- excuse me -- the Title IX Policy, it's

15   actually referred to the Sexual and Gender-Based

16   Harassment, Sexual Violence Relationship, Interpersonal

17   Violence and Stalking Policy; correct?

18   **A.**   Yes.

19   **Q.**   For purposes of brevity, we've been referring to

20   it as the "Title IX Policy."

21   **A.**   Okay.

22   **Q.**   Is that fine with you?

23   **A.**   Yes, that's fine.

24   **Q.**   What's the distinction between the Title IX Policy

25   and the Title IX Complaint Process?

1    **A.**    The Title IX Policy delineates the conduct as it's

2    defined at Brown.  It also applies University-wide, so

3    to our entire community.  There are three sets of

4    accompanying complaint procedures. The one you

5    referenced applies to student respondents, and it is

6    how the case will proceed, how it will be investigated

7    and adjudicated.

8    **Q.**    Prior to coming to Brown University, were you

9    employed?

10   **A.**    Yes.

11   **Q.**    And where were you employed?

12   **A.**    I was a staff attorney at a law center up in

13   Boston, a non-profit called the Victim Rights Law

14   Center.

15   **Q.**    Called the Victims Rights Law Center?

16   **A.**    Yes.

17   **Q.**    And you had experience at the Victims Rights Law

18   Center being involved in student disciplinary

19   proceedings?

20   **A.**    Yes.

21   **Q.**    And that was what type of disciplinary

22   proceedings?

23   **A.**    The Law Center represented victims of rape and

24   sexual assault, so that the victim could have been a

25   complainant or a respondent, depending on the

1    disciplinary proceeding.

2         So it was all forms of disciplinary proceedings,

3    but oftentimes a complainant would bring before it an

4    allegation of sexual assault at a university.

5    **Q.**    So you were involved in university disciplinary

6    proceedings involving allegations of sexual misconduct?

7    **A.**    Yes.

8    **Q.**    How long did you do that?

9    **A.**    I started at the Victim Rights Law Center in the

10   fall or the late summer of 2011.

11   **Q.**    And you worked there until being hired by Brown?

12   **A.**    Yes.  Through April 2015.

13   **Q.**    Now, do you recall when Allie filed a complaint in

14   this matter?

15   **A.**    I believe it was October 30th, 2015.

16         MR. RATCLIFFE:  Exhibit 5, your Honor.

17         THE COURT:  Is this also stipulated to?

18         MR. RICHARD:  Yes, your Honor.  This may be

19   admitted.

20         THE COURT:  All right.  Five will be full.

21         (Plaintiff's Exhibit 5 admitted in full.)

22   **Q.**    Showing you what's been marked as Exhibit Number 5

23   and ask you if you recognize that document.

24   **A.**    Yes.  It's Allie's complaint.

25   **Q.**    And you said that complaint was filed on

1    October 30th, 2015?

2    **A.**    Yes.

3    **Q.**    And the conduct, the event that allegedly

4    occurred, what date did that occur on?

5    **A.**    I believe it was November 10th, 2014.

6    **Q.**    Now, when a complaint is filed, what is your

7    responsibility as the Title IX Program Officer?

8    **A.**    It initiates the complaint process as delineated

9    in the complaint process document, so I follow the

10   steps as outlined.  The first one is to provide notice

11   to the respondent.

12   **Q.**    When you say "the complaint process," you're

13   referring to Exhibit Number 3; correct?  I can show you

14   again.

15   **A.**    Yes.

16   **Q.**    So you have -- your first obligation is to provide

17   notice to the respondent?

18   **A.**    Yes.

19   **Q.**    And in this case that was Beau?

20   **A.**    Yes.

21   **Q.**    Do you recall when you provided Beau notice?

22   **A.**    The complaint I believe came in on a Friday night,

23   and I believe I contacted him via e-mail on Sunday,

24   November 1st, to meet with me the following Monday, the

25   first day back to -- the first business day.  And that

1    meeting happened late in the day on Monday,

2    November 2nd, 2015.

3    **Q.**   And at the meeting that you had with Beau on

4    November 2nd, he was really anxious and wanted to give

5    his side of the story; correct?

6    **A.**   Yes.

7    **Q.**   And what did you tell him?

8    **A.**   That I try to discourage students, both

9    complainants and respondents, from giving me a lot of

10   factual information about what happened at those

11   meetings just because I'm not the investigator, and I

12   want to be clear about the roles; that I will be

13   meeting with both the complainant and the respondent as

14   necessary, but that I will not be the investigator.

15         So I wanted to reassure him that he would be

16   able to tell his side of the story, but it wouldn't be

17   to me, that my role would be to oversee the process,

18   provide him with information as necessary, et cetera.

19   **Q.**   And overseeing the process, making sure that the

20   complaint process was filed with -- was followed?

21   **A.**   Yes.

22   **Q.**   Anything else?

23   **A.**   Anything else from that meeting?

24   **Q.**   No.  Anything else other than making sure that the

25   complaint process is followed?

1   **A.**   I also am a point of contact that students can use

2   to offer them any sort of remedial measures that they

3   might need.

4        So, for example, students are assigned academic

5   support deans that they can utilize, understanding that

6   this is going to, you know, have a detrimental impact

7   potentially on their academics throughout the semester;

8   and also to make sure that they are in communication,

9   if they would like to be, with a student support dean

10  in the Office of Student Life, which at that point I

11  knew that Beau was because he had met with a dean

12  already, and I was aware of that.  And then just to

13  make sure people are aware of different resources on

14  campus, including perhaps counseling and psych

15  services, things like that.

16       So my role is really both to oversee the

17  complaint process, but I would include making sure that

18  students had access to, sort of, remedial measures as

19  part of that.

20            MR. RATCLIFFE:  Exhibit Number 6.

21            MR. RICHARD:  Stipulated as full, your Honor.

22            THE COURT:  All right.  Thank you.  Six will be

23  full.

24            (Plaintiff's Exhibit 6 admitted in full.)

25  **Q.**   I'm showing you what's been previously marked as

1    Exhibit Number 6.  Do you recognize that document?

2    **A.**    Yes.  It's a letter that I sent to Beau as a

3    follow-up to the meeting on November 2nd.

4    **Q.**    So at the meeting -- in your letter you indicate

5    that you provided Beau with a copy of the complaint.

6    In your letter you indicated you provided Beau with a

7    copy of the complaint?

8    **A.**    Yes.  I generally provide them with a redacted

9    copy that they can keep, and then I also show them an

10   unredacted copy that they can review in my office.

11   **Q.**    And you provided Beau with a copy of the complaint

12   process?

13   **A.**    Yes.

14   **Q.**    The complaint process, being Exhibit 3?

15   **A.**    Yes.

16   **Q.**    Now, you said, As outlined in the process, you

17   have five business days to submit a written statement,

18   but are not required to do so.  And you indicate,

19   Because you met at the close of business hours on

20   Monday, I ask that you submit your statement by

21   5:00 p.m. on Monday, November 9th.

22        Is that correct?

23   **A.**    That's correct.

24   **Q.**    What does the complaint process provide regarding

25   the submission of a written statement?  What is that?

1    What's the purpose of the written statement?

2    **A.**   It provides a written opportunity for a student to

3    respond to the allegations contained within the

4    complaint.

5    **Q.**   And Beau was also advised he could have an advisor

6    at this point?

7    **A.**   Yes.

8    **Q.**   At that meeting, did you have any discussion

9    regarding the substantive -- which Code would apply,

10   whether it was the Code that was in existence when the

11   alleged misconduct occurred, or the Title IX Policy?

12   **A.**   I can't recall specifically.

13   **Q.**   In any event --

14         MR. RATCLIFFE:   Exhibit 7.

15   **Q.**   Let me ask you this first.   At some point, did you

16   become aware that Mr. ██████████ was notified through

17   counsel that Brown would be using the new complaint

18   process to resolve the complaint, but also since the

19   alleged incident took place last year, the provisions

20   of last year's Code of Student Conduct would apply?

21   **A.**   Yes.

22   **Q.**   Did you ever see a copy of an e-mail that was sent

23   from a member of the Office of General Counsel to

24   Beau's attorney?

25   **A.**   I can't recall specifically.

1   **Q.**   But in any event, you learned that that was what

2   had been agreed?

3   **A.**   I recall that a member of the Office of General

4   Counsel had indicated that the question had been asked

5   by Beau's advisor and was confirming a discussion that

6   we had had previously, which was moving forward all

7   cases submitted the 2015-'16 academic year would be

8   controlled by the Complaint Process, but the conduct by

9   the existing Code at the time that the conduct or the

10   incident occurred.

11   **Q.**   When you say "the existing Code," that would be

12   the 2014-'15 Code of Student Conduct?

13   **A.**   In this case, yes.

14   **Q.**   And you weren't at Brown University when -- strike

15   that.

16         You weren't the Title IX Program Officer when

17   matters were being adjudicated under the Code of

18   Student Conduct, were you?

19   **A.**   Only for the month of May 2015, when I arrived at

20   Brown.

21   **Q.**   And did you have responsibility for overseeing

22   those cases?

23   **A.**   No.  I acted more as a support person and

24   really -- I watched the cases and understood how the

25   process was working at the time.

1    **Q.**   And I believe that at that point in the spring of

2    2015, although Brown was adjudicating the cases under

3    the 2014-'15 Code of Student Conduct, they had moved to

4    an investigator model in May of 2015?

5    **A.**   My understanding is that following the interim

6    report of the Sexual Assault Task Force, there were

7    some recommendations made that were implemented in the

8    interim.  So I think, before the start of the spring

9    2015 semester, one of those was to utilize an

10   investigator, but the students were still given access

11   to the rights afforded to them under the Code, was my

12   understanding.  So there was still a hearing.

13   **Q.**   In any event, when you got there, you said you

14   oversaw -- you were present when a couple of hearings

15   occurred; correct?

16   **A.**   Yes.

17   **Q.**   And those were hearings that were done under the

18   old -- with an investigator?

19   **A.**   They were cases that were adjudicated under the

20   old hearing process but that also utilized an

21   investigator.

22   **Q.**   In any event, at some point you familiarized

23   yourself with the 2014-'15 Code of Student Conduct?

24   **A.**   Yes.

25   **Q.**   Particularly with respect to Offense III?

1    **A.**   Yes.

2           MR. RATCLIFFE:  I would ask that Exhibit 2 be

3    marked as full.

4           MR. RICHARD:  No objection, your Honor.

5           THE COURT:  Exhibit 2?  I thought that had

6    already been done, but if not, it is full.

7           (Plaintiff's Exhibit 2 admitted in full.)

8    **Q.**   Now, showing you what's been previously marked as

9    Exhibit 2, that is an excerpt from the 2014-'15 Code of

10   Student Conduct; correct?

11   **A.**   Yes.

12   **Q.**   And that Offense III is the sexual misconduct

13   offense; correct?

14   **A.**   Yes.

15   **Q.**   And III(a) is sexual misconduct that involves

16   non-consensual physical contact of a sexual nature;

17   correct?

18   **A.**   Yes.

19   **Q.**   And III(b) is sexual misconduct that includes one

20   or more of the following:  Penetration, violent

21   physical force, or injury?

22   **A.**   Yes.

23   **Q.**   Now, there is a comment, is there not?

24   **A.**   Yes.

25   **Q.**   And perhaps you can read the comment.

1    **A.**    (Reading:)   Offense III encompasses a broad range

2    of behaviors including acts using force, threat,

3    intimidation, or advantage gained by the offended

4    student's mental or physical incapacity or impairment,

5    of which the offending student was aware or should have

6    been aware.   Harassment without physical contact will

7    not be deemed sexual misconduct under these provisions.

8    Violations of Offense III(b) will result in more severe

9    sanctions from the University, separation being the

10   standard.   Note:   Some forms of sexual misconduct may

11   also constitute sexual assault under Rhode Island

12   criminal laws and are subject to prosecution by state

13   law enforcement authorities which can take place

14   independent of charges under the University Student

15   Code of Student Conduct.

16   **Q.**    So under the comments on Offense III, it's

17   basically the student would be directed to four

18   different types of behaviors, range of behaviors are

19   four; correct?

20   **A.**    There are four listed, yes.

21   **Q.**    That would be force?

22   **A.**    Yes.

23   **Q.**    Threat?

24   **A.**    Yes.

25   **Q.**    Intimidation?

1  **A.**   Yes.

2  **Q.**   Or advantage gained by the offended student's

3  mental or physical incapacity or impairment --

4  **A.**   Yes.

5  **Q.**   -- of which the offending student was aware or

6  should have been aware?

7  **A.**   Yes.

8  **Q.**   In this case there was no indication of any

9  alcohol or drugs?

10  **A.**   No, there was not.

11  **Q.**   Now, at some point Beau provided a response to

12  Allie's complaint; correct?

13  **A.**   Yes.

14  **Q.**   And that came to you?

15  **A.**   Yes.

16  **Q.**   And at the time that you received the response,

17  you were in the process of retaining an investigator?

18  **A.**   Yes.

19  **Q.**   Now, I know that when you received Allie's

20  complaint there were text messages attached; correct?

21  **A.**   Correct.

22  **Q.**   And the text messages ended at the -- strike that.

23      There were no text messages provided by Allie

24  after the -- related to communications after the

25  alleged event; correct?

1    **A.**   I don't remember specifically.  I do remember that

2    she had -- hers excluded some text messages.  I don't

3    remember exactly what they excluded.

4    **Q.**   In any event, you recall that Beau provided the

5    entire universe of text messages?

6    **A.**   I recall that he, when he submitted his response

7    statement, he had also indicated that he had provided a

8    full set of text messages, and both were provided to

9    the investigator ultimately.

10   **Q.**   And that Beau was representing that his text

11   messages included communications that occurred after

12   the encounter on November 10, 2014?

13   **A.**   Again, I don't recall exactly what he said his

14   included, but I know he said something to the effect

15   of, I'm providing a full set; she provided an abridged

16   version, or something like that.

17   **Q.**   As a Title IX Program Officer, did you ever check

18   to see or compare to see whether or not Allie had, in

19   fact, not provided a full set of text messages?

20   **A.**   I recall doing so at the time, but that's also,

21   too, a function of the investigator.  So I made sure

22   that she knew that Beau had indicated it wasn't a full

23   set, so she could consider it and weight that

24   information.

25   **Q.**   So you said you had looked at it at the time that

1    Beau submitted them?

2    **A.**   Yes.

3    **Q.**   And you looked at -- you compared Allie's text

4    messages and Beau's text messages?

5    **A.**   Yes.  At the time, yes.

6    **Q.**   And at the time you concluded that Allie did not

7    provide a full set?

8    **A.**   Yeah, I recall that Allie's were missing some.  I

9    just don't recall the exact dates hers were missing

10   right now.

11   **Q.**   You don't recall whether or not Allie's were

12   missing communications that occurred after the alleged

13   event?

14   **A.**   I'm not sure exactly what hers were missing, no.

15        MR. RATCLIFFE:  Exhibit 8.

16        MR. RICHARD:  This may be full, your Honor.

17        THE COURT:  Thank you.  Exhibit 8 may be full,

18   without objection.

19        (Plaintiff's Exhibit 8 admitted in full.)

20   **Q.**   Now I'm showing you what was previously marked as

21   Exhibit 8 and ask you if you recognize that.

22   **A.**   Yes.  It is the response statement from Beau.

23   **Q.**   And you read that?

24   **A.**   Yes.

25   **Q.**   And do you recall the gist of what Beau was

1    alleging?

2    **A.**   Well, in many respects that they had a flirting

3    relationship and that this was consensual, this being

4    the event on November 10th.

5    **Q.**   And you also recall that Beau addressed the delay

6    in reporting the event and her continued pursuit of him

7    after the event?

8    **A.**   Yes.

9    **Q.**   And he provided text messages to corroborate that,

10   did he not?

11   **A.**   Yes.

12   **Q.**   Just getting back to Exhibit 2, there was -- in

13   the Code of Student Conduct, I had asked you to address

14   the comment regarding the Offense III sexual

15   misconduct, which Beau was ultimately charged with.

16   Are you aware that there's a comment, there's a note

17   that deals with comments?

18   **A.**   Yes.

19   **Q.**   And that note provides, The comments contained

20   herein are offered as a guide to understanding the

21   University's policy and are not to be confused with the

22   policies themselves.

23   **A.**   Yes.

24   **Q.**   So it was your understanding that that comment

25   to -- that comment to sexual misconduct would guide the

1    student to understanding the types of behaviors that

2    were prohibited under the 2014-'15 Code of Student

3    Conduct?

4    **A.**    My understanding is, yes, that that comment that I

5    read would guide a student to help understand

6    Section III(a) and III(b).

7    **Q.**    Now, you retained an investigator to investigate

8    Allie's complaint?

9    **A.**    Yes.

10   **Q.**    And that was Djuna Perkins?

11   **A.**    Yes.

12   **Q.**    And you, on behalf of Brown University, executed a

13   retainer agreement with Ms. Perkins?

14   **A.**    Yes.

15         MR. RATCLIFFE:  Exhibit 9.

16         MR. RICHARD:  Full exhibit, your Honor.

17         THE COURT:  All right.  Nine will be full.

18         (Plaintiff's Exhibit 9 admitted in full.)

19   **Q.**    Now, I'm showing you -- do you recall when that

20   retainer agreement was executed?

21   **A.**    In my mind I think it's around November 6th,

22   approximately.

23   **Q.**    There's an e-mail here that says, Subject:

24   Engagement letter, from Djuna Perkins to you.  And

25   what's the date of that e-mail?

1    **A.**    November 6th, 2015.

2    **Q.**    Okay.  And Djuna was returning to you the executed

3    engagement letter?

4    **A.**    Yes.

5    **Q.**    And she said that, As you can see from the date of

6    my signature, I scanned it right away but then forgot

7    to actually send it to you.

8    **A.**    Yes.

9    **Q.**    And the date of her signature was 11/4/2015;

10   correct?

11   **A.**    Yes.

12   **Q.**    But as of November 6th, 2015, you had engaged her

13   to investigate the complaint?

14   **A.**    Yes.

15        THE COURT:  Mr. Ratcliffe, before you get too

16   far into the substance of this line of inquiry, this

17   probably would be a good time for us to take a break.

18        And my understanding is that in order to

19   accommodate Ms. Walsh, we're going to take a

20   one-half-hour break, unless we can reconvene earlier

21   than that.

22        So the plan will be to reconvene just before

23   11 o'clock.  All right?

24        MR. RATCLIFFE:  Thank you.

25        THE COURT:  Okay.  We'll be in recess.

1      (Recess.)

2      THE COURT:  All right.  Mr. Ratcliffe, you may

3  continue.

4      MR. RATCLIFFE:  Thank you, your Honor.

5  **Q.**   Hello.  When we left off, I believe we were

6  discussing that you, as the Title IX Program Officer,

7  had retained Djuna Perkins as an investigator.

8  **A.**   Yes.

9  **Q.**   And the Title IX Complaint Process addresses the

10  role of the investigator, does it not?

11  **A.**   Yes.

12  **Q.**   And primarily the role of the investigator is to

13  find facts; correct?

14  **A.**   To find facts and synthesize those into a report

15  that also includes facts and credibility assessments.

16  **Q.**   Okay.  And, in fact, that's addressed in the

17  complaint process?

18  **A.**   Yes.

19      MR. RATCLIFFE:  Your Honor, I've spoken to

20  Mr. Richard.  We were copying a lot of these documents

21  yesterday and one of them that got copied had some

22  underlining on it, some highlighting.  I'm going to

23  substitute that later.  But he has no objection to me

24  publishing it to the witness with some highlighting on

25  it and substituting later.

1        MR. RICHARD:  That's no problem, your Honor.

2        THE COURT:  Okay.  Thank you.  That's fine.

3    **Q.**   Now I'm showing you the Title IX Policy,

4    Exhibit 3, which has been introduced.  That's a full

5    exhibit.  That addresses the role of the investigator;

6    correct?

7    **A.**   Yes.

8    **Q.**   And basically, as you said, the role of the

9    investigator will be to gather additional information

10   through interviews of the complainant, respondent and

11   witnesses, and synthesize the information into a report

12   that will be provided to the Title IX Council?

13   **A.**   Yes.

14   **Q.**   Basically the report, the policy, the complaint

15   process, the purpose of the investigator gathering the

16   report is so that the Title IX panel would have all the

17   facts that they would need to make their decision;

18   correct?

19   **A.**   Correct.

20   **Q.**   Now, in this case you received a draft of

21   Ms. Perkins' report; correct?

22   **A.**   Correct.

23   **Q.**   And you received that on or about February 29,

24   2015?

25   **A.**   Yes.

1          MR. RATCLIFFE:  Exhibit 10.

2          MR. RICHARD:  It may come in as full, your

3     Honor.

4          THE COURT:  All right.  Thank you.  Ten will be

5     full.

6          (Plaintiff's Exhibit 10 admitted in full.)

7     Q.   I'm showing you what's been marked as Exhibit 10

8     in full and ask you if you recognize that document.

9     A.   Yes.  It is the draft report that Djuna Perkins

10    sent to me via e-mail.

11    Q.   And in the draft report, Djuna Perkins references

12    relevant policy sections that applied to the complaint;

13    correct?

14    A.   She includes relevant policy sections that --

15    Q.   Well, it says relevant policy sections.

16    A.   Right.  Yeah.

17    Q.   And those relevant policies that she includes in

18    her draft report are what?

19    A.   Are two different -- both the Title IX Policy and

20    the 2014-2015 Code of Student Conduct.

21    Q.   Now, the relevant policy section, the first one

22    actually refers to the Brown University Sexual and

23    Gender-Based Harassment, Sexual Violence, Relationship

24    and Interpersonal Violence and Stalking Policy?

25    A.   Correct.

1  **Q.**  And that's been previously introduced as

2  Exhibit 4; correct?  Showing you Exhibit 4.

3  **A.**  Yes, that's the policy she's referencing.

4  **Q.**  And that, just for the -- that's the policy that

5  was adopted in September of 2015?

6  **A.**  Yes.

7  **Q.**  And that's the policy, to your knowledge, that

8  Mr. ███████ -- strike that.

9  To your knowledge, Mr. ███████ was never

10  told that the 2014-'15 -- excuse me -- the 2015-'16

11  Title IX Policy would apply to his case; correct?

12  **A.**  Correct.

13  **Q.**  Now, with respect to -- she references -- and then

14  she references specific offenses -- two specific

15  defenses; correct?

16  **A.**  Correct.

17  **Q.**  And those two specific defenses are offenses under

18  the Title IX Policy; correct?

19  **A.**  Correct.

20  **Q.**  And that's VII(a) and VII(b)?

21  **A.**  Correct.

22  **Q.**  And I'm showing you what's previously marked as

23  Exhibit 4, I believe.

24  VII(a) is what offense?

25  **A.**  VII(a) is sexual or gender-based harassment.

1    **Q.**   And VII(b) is?

2    **A.**   VII(b) is sexual assault.

3    **Q.**   And the definition of sexual assault is?

4    **A.**   (Reading:)  Sexual assault, as defined in the

5    '15-'16 Title IX Policy:  Sexual assault is having --

6         THE COURT:  Slow down.  Slow down.

7         Go ahead.

8    **A.**   (Reading:)  Sexual assault is having or intending

9    to have sexual contact with another individual without

10   consent.

11        And then it goes on, it references, (Reading:)

12   See below for the definition of "consent."

13        And then it goes on to say, (Reading:)  Sexual

14   contact includes, one, sexual intercourse, in

15   parentheses, anal, oral or vaginal, including

16   penetration with a body part, for example, penis,

17   finger, hand, or tongue, or an object or requiring

18   another to penetrate himself or herself with a body

19   part or an object, however slight; or, Section II,

20   sexual touching, including, but not limited to,

21   intentional contact with the breast, buttocks, groin,

22   genitals, or other intimate part of an individual's

23   body.

24   **Q.**   Now, moving to the definition -- in the Title IX

25   Policy Djuna Perkins also referenced VIII(a), the

1    definition of "consent."

2    **A.**    Yes.

3    **Q.**    And would you read that.

4    **A.**    (Reading:)  Consent is an affirmative and willing

5    agreement to engage in specific forms of sexual contact

6    with another person.  Consent requires an outward

7    demonstration through mutually-understandable words or

8    actions, indicating that an individual has freely

9    chosen to engage in sexual contact.  Consent cannot be

10   obtained through --

11            THE WITNESS:  I can't see that.

12            MR. RATCLIFFE:  Now you can.

13            THE WITNESS:  Thanks.  Okay.  I can see that.

14            MR. RATCLIFFE:  You can see that now?

15   **A.**    -- through, one, manipulation; or, two, the use of

16   coercion or force; or, three, by taking advantage of

17   the incapacitation of another individual.  Silence,

18   passivity, or the absence of resistance does not imply

19   consent.

20            It is important not to make assumptions.  If

21   confusion or ambiguity arises during a sexual

22   interaction, it is essential that each participant

23   stops and clarifies the other's willingness to

24   continue.  Consent can be withdrawn at any time.  When

25   consent is withdrawn, sexual activity must cease.

1          Prior consent does not imply current or future

2     consent.  Even in the context of an ongoing

3     relationship, consent must be sought and freely given

4     for each instance of sexual contact.

5          An essential element of the consent is that it

6     be freely given.  Freely-given consent might not be

7     present or may not even be possible in relationships of

8     a sexual or intimate nature between individuals where

9     one individual has power, supervision, or authority

10    over another.

11         More information, policy, and guidance regarding

12    such relationships can be found below.

13         In evaluating whether consent was given,

14    consideration will be given to the totality of the

15    facts and circumstances, including, but not limited to,

16    the extent to which a complainant affirmatively uses

17    words or actions indicating a willingness to engage in

18    sexual contact, free from manipulation, intimidation,

19    fear, or coercion; whether a reasonable person in the

20    respondent's position would have understood such

21    person's words and acts as an expression of consent;

22    and whether there are any circumstances known or

23    reasonably apparent to the respondent demonstrating

24    incapacitation or fear.

25    Q.   Then Ms. Perkins also referenced Section VII(b),

1      "Coercion;" correct?

2    **A.**   Correct.

3    **Q.**   The definition that she referenced for "coercion,"

4    could you read that, please.

5    **A.**   Sure.  (Reading:)  Coercion is verbal and/or

6    physical conduct, including manipulation, intimidation,

7    unwanted contact, an express or implied threat of

8    physical, emotional, or other harm, that would

9    reasonably place an individual in fear of immediate or

10   future harm and that is employed to compel someone to

11   engage in sexual contact.

12          Force is the use of threat of physical violence

13   or intimidation to overcome an individual's freedom of

14   will to choose whether or not to participate in sexual

15   contact.

16   **Q.**   And the definition in the Title IX Policy for

17   "coercion" requires that the person being coerced is

18   placed in -- reasonably placed in fear of immediate or

19   future harm; correct?

20   **A.**   I'm sorry.  Can you say that again.

21   **Q.**   This definition of "coercion" in the Title IX

22   Policy requires that someone be placed in fear of

23   immediate or future harm; correct?

24   **A.**   Yes.

25   **Q.**   And that they reasonably be placed in fear of

1    immediate or future harm?

2    **A.**   Correct.

3    **Q.**   So it's a reasonable person standard?

4    **A.**   Yes.

5    **Q.**   And you're familiar with reasonable person's

6    standards, having gone to law school?

7    **A.**   Yes.

8    **Q.**   Now, the complaint process, the Title IX Complaint

9    Process, previously marked as Exhibit 3, provides -- do

10   you want to see that, the prior section?  I'll start

11   out on page four.  But that section, Section III deals

12   with the investigative report; correct?

13   **A.**   Yes.

14   **Q.**   And it continues on to page four?

15   **A.**   Yes.

16   **Q.**   And it goes on to state that, (Reading:)  The

17   investigation report will be shared with the Title IX

18   Program Officer, as well as the complainant and

19   respondent to review before it is finalized.

20   **A.**   Correct.

21   **Q.**   There's nothing in the Title IX Complaint Process

22   that provides that you -- strike that.

23         To your knowledge, neither the complainant, Beau

24   or Allie, received a copy of Exhibit 10?

25   **A.**   And Exhibit 10 is the draft report?

1  **Q.**   I'll show it to you.

2  **A.**   No.  They didn't receive a copy.

3  **Q.**   So it provides that the investigation work will be

4  shared with the Title IX Program Officer as well as the

5  complainant and respondent to review before it's

6  finalized?

7  **A.**   Correct.

8  **Q.**   There's nothing in the complaint process that

9  provides for you to receive an initial draft copy

10  before the interim report is sent to the complainant

11  and respondent?

12  **A.**   It doesn't specifically state that, no.

13  **Q.**   In any event, you received the draft report from

14  Ms. Perkins?

15  **A.**   Yes.

16  **Q.**   Now --

17       MR. RATCLIFFE:  Eleven.

18       MR. RICHARD:  It's fine, your Honor, full.

19       THE COURT:  All right.  Eleven will be full.

20       (Plaintiff's Exhibit 11 admitted in full.)

21  **Q.**   I'm going to show you Exhibit 11.  I want to start

22  with the e-mail chain.  The third page of Exhibit 11

23  references an attachment?

24  **A.**   Yes.

25  **Q.**   To your knowledge, was that the draft report which

1    has previously been entered as Exhibit 10?

2    **A.**    Yes.

3    **Q.**    In fact, the e-mail is dated February 29 to you.

4    So on Monday, February 29, 2016, at 2:36 p.m., Djuna

5    Perkins wrote, (Reading:)  Attached is a draft report

6    as well as photographs that comprise Appendix E.

7    Should I resend the exhibits as I have labeled them, or

8    will you assemble those?

9         And then you respond at 3:22 p.m.; correct?

10   **A.**    Correct.

11   **Q.**    And eventually, there is another e-mail where you

12   discuss or where Djuna sends you an e-mail indicating

13   that, (Reading:)  I meant to say, when I sent you the

14   report, that the last section on the respondent's

15   conspiracy claim, that this claim forced me to include

16   some information about the respondent's interactions

17   with -- I felt that it was important to include some

18   discussion of the claim because he was so adamant about

19   me interviewing  -- name expunged -- and I think

20   it's -- it is -- this conversation that convinced him

21   there was some conspiracy against him.  However, now

22   that he sees this explanation, he accepts it.  I

23   thought it would be easy to simply redact that section

24   so there is no mention of the respondent interaction.

25        Correct?

1    **A.**   Correct.

2    **Q.**   And you then respond to Ms. Perkins; correct?

3    **A.**   Correct.

4    **Q.**   And what do you say in your response?

5    **A.**   Would you like me to read it in full?

6    **Q.**   Sure.

7    **A.**   I say, (Reading:)  Hi, Djuna:  Attached is a

8    red-lined version.  I want to make sure you are

9    comfortable with any proposed changes.  Some are

10   technical, (specific titles of Brown

11   offices/positions), and a few are substantive (this

12   case is proceeding under the old Code definitions

13   because it occurred prior to the implementation of the

14   new policy).  In some cases, I made comments with

15   clarifying questions.  If you want to discuss any of

16   those, let's arrange a time to talk tomorrow.

17          Once you approve -- you agree with and we

18   address any outstanding comments, I will have Jessica

19   redact student names and send a finalized PDF to you.

20   At that point you can share it with the parties and

21   request statements and response -- clarifying details,

22   corrections, et cetera.  I think Jessica sent a

23   template e-mail that she generally uses, but if not,

24   she can.  Let me know.

25          Next paragraph.  (Reading:)  I agree that if

1    John wants the conspiracy claim in, it requires the

2    context of the other claims/allegations; otherwise, it

3    is very confusing about how a conspiracy exists.  He

4    can outline any concerns he may have in his response

5    statement with you, and it can be addressed before it

6    goes to the panel.  The panel will not receive

7    information outside the report in any referenced

8    materials.

9         I would really like to get this to them by the

10   end of the day tomorrow.  With thanks, Amanda.

11   **Q.**   And in that e-mail you say, The panel will not

12   receive information outside the report in any

13   referenced materials.

14        What does that mean?

15   **A.**   I was referencing understanding that the

16   respondent, as the complainant, may request changes to

17   the report and that information be removed from the

18   report, and helping Djuna, to remind her about our

19   process, that the panel wouldn't receive this interim

20   draft, so that it was a safe chance to them to respond,

21   knowing that the finalized report could address their

22   concerns.

23   **Q.**   So basically the complaint process requires that

24   all of the information that the panel receives, factual

25   information, comes in the form of the investigative

1    report; correct?

2    **A.**   Correct.  The investigative report and attached

3    exhibits or reference materials.

4    **Q.**   Now, also in this e-mail that you send to

5    Ms. Perkins, you reference some substantive changes --

6    strike that.

7          First you reference some technical changes;

8    correct?

9    **A.**   Correct.

10   **Q.**   Those are specific titles of Brown officers and

11   positions?

12   **A.**   Correct.

13   **Q.**   And you also reference a few substantive changes?

14   **A.**   Correct.

15   **Q.**   And "substantive" means important or meaningful;

16   correct?

17   **A.**   Yes.  It had more substance to it than changing

18   the name of Brown Department of Public Safety, for

19   example.

20   **Q.**   And one of the substantive changes was that this

21   case is proceeding under the old Code definitions

22   because it occurred prior to the implementation of the

23   new policy?

24   **A.**   Correct.

25   **Q.**   And now --

1          MR. RATCLIFFE:  Twelve.

2          MR. RICHARD:  Full, your Honor.

3          THE COURT:  Twelve will be full.

4          (Plaintiff's Exhibit 12 admitted in full.)

5     **Q.**   Show you what's been marked as Exhibit 12 and ask

6     you if you recognize that.

7     **A.**   I do.

8     **Q.**   What is Exhibit 12?

9     **A.**   This is the red-lined version I referenced in the

10    e-mail to Djuna.

11    **Q.**   Okay.  And so Exhibit 12, basically what you did

12    is you took Exhibit 10 and provided comments in the

13    form of a red-line version?

14    **A.**   Correct.

15    **Q.**   And that's Exhibit 12?

16    **A.**   Correct.

17    **Q.**   And in your e-mail you reference the substantive

18    changes, some of the substantive changes, and those

19    substantive changes, you excised reference to the Brown

20    University Sexual and Gender-Based Harassment, Sexual

21    Violence, Relationship and Interpersonal Violence and

22    Stalking Policy?

23    **A.**   Correct.

24    **Q.**   And you excised reference to, under that policy,

25    Offense VII(a), Sexual and Gender-Based Harassment?

1    **A.**    Correct.

2    **Q.**    You excised reference to Offense VII(b), Sexual

3    Assault?

4    **A.**    Correct.

5    **Q.**    You also excise reference to definition VIII(a),

6    Consent?

7    **A.**    Correct.

8    **Q.**    And definition VIII(b), Coercion?

9    **A.**    Correct.

10   **Q.**    And that's because Brown was proceeding under the

11   2014-'15 Code of Student Conduct?

12   **A.**    Correct.

13   **Q.**    And the 2014-'15 Code of Student Conduct didn't

14   have the definitions of "consent" that we read into the

15   record earlier that were in the Title IX Policy?

16   **A.**    Correct.  The 2014-'15 Code did not have a

17   definition of "consent."

18   **Q.**    It didn't have the definition of "coercion" that

19   we read into the record that was from the Title IX

20   Policy; correct?

21   **A.**    It did not have a definition of "coercion."

22   **Q.**    Now, prior to receiving Ms. Perkins' draft report,

23   Exhibit 10, you had at least one telephone conference

24   with the Office of General Counsel about whether the

25   Title IX panels could reference the 2015-'16 Title IX

1      Policy for the issue of consent?

2              MR. RICHARD:  Objection, your Honor, to the

3      extent it's seeking to get into attorney-client

4      privileged communications.  She can answer if they had

5      a communication.  The substance I would object to.

6              THE COURT:  Are you going there?

7              MR. RATCLIFFE:  They have raised -- in the

8      deposition they have raised privilege.  At her

9      deposition she did answer this question.  I will not go

10     there if they're continuing to assert the privilege.

11             THE COURT:  All right.  Well, clearly they are

12     continuing to assert the privilege, so I don't think

13     you can inquire into the substance unless you can show

14     that it's been waived.

15             MR. RATCLIFFE:  Fine.

16             THE COURT:  Okay.

17  **Q.**    You had at least one conference with the Office of

18     General Counsel; correct?

19  **A.**    Correct.

20  **Q.**    In fact -- strike that.

21             You had one conference with the Office of

22     General Counsel regarding whether or not Title IX

23     panels could consider -- strike that.

24             You had one communication with Title IX panel --

25     excuse me -- one communication with the Office of

1    General Counsel.  That was a general communication,

2    correct, regarding whether a panel that's hearing a

3    case in 2015-'16 could consider that addressed conduct

4    had occurred the prior year could consider the current

5    definition of "consent"?

6         MR. RICHARD:  Objection, your Honor.  I believe

7    the question is asking the witness to confirm the

8    content of a privileged communication.

9         THE COURT:  It sounds like you are, but doesn't

10   it -- isn't this essentially demonstrated by the e-mail

11   that is Exhibit 7, I believe, from Mr. Grabo to you

12   stating that because the incident took place last year,

13   the provisions of last year's Code will apply?

14        MR. RICHARD:  I don't think 7's been admitted

15   yet, your Honor, but --

16        THE COURT:  Oh, I'm sorry.  It has been referred

17   to.  Maybe you didn't move it.

18        MR. RATCLIFFE:  I can move it as full.  I

19   believe that there's no objection.

20        MR. RICHARD:  There's no objection to it.

21        THE COURT:  Okay.  So let's make 7 full.

22        (Plaintiff's Exhibit 7 admitted in full.)

23        THE COURT:  So what I'm asking you is doesn't

24   that provide the information that you need without

25   having to ask this witness about privileged

1    communications?

2         MR. RATCLIFFE:  It does not, your Honor,

3    because --

4         THE COURT:  It does not?

5         MR. RATCLIFFE:  No, because the issue is she had

6    communications -- what I will do, your Honor, is I can

7    just make an offer of proof that there is information

8    that Ms. Walsh communicated --

9         THE COURT:  Stay at the mic so we can pick it

10   up.

11        MR. RATCLIFFE:  I'll make an offer of proof that

12   Ms. Walsh communicated to Gretchen Schultz, the Chair

13   of the Title IX panel, that she had spoken with the

14   Office of General Counsel, and that the Office of

15   General Counsel indicated that panels sitting this

16   year, 2016, addressing conduct that occurred the prior

17   year, could consider the definition of "consent" in the

18   Title IX Policy.  That definition, which was excised

19   from or reference of that definition was excised from

20   Exhibit 12, that's my offer of proof.

21        THE COURT:  All right.  Well, let's just think

22   this through.  Can't you establish factually that this

23   occurred between Ms. Walsh and Ms. Schultz, in your

24   examinations of those two, without inquiring into what

25   advice they were given by the Office of General

1    Counsel?

2         MR. RATCLIFFE:  Sure.

3         THE COURT:  I think you can do that and

4    establish what the facts are, and I'm not sure you then

5    have to go into the nature of the advice.

6         Do you agree, Mr. Richard?

7         MR. RICHARD:  Yes, your Honor . Ms. Schultz will

8    testify there was a discussion that Ms. Walsh and

9    Ms. Schultz had the morning of the panel hearing.

10        THE COURT:  All right.  Go ahead.

11        MR. RATCLIFFE:  I just want it on the record

12   that I want to address because -- I'm not going to get

13   into the content, but that there were two specific

14   communications that Ms. Walsh had with the Office of

15   General Counsel.

16        THE COURT:  Okay.  I think you can ask if she

17   had those conversations, but not what the substance of

18   them were.

19   **Q.**   You had two specific communications with the

20   Office of General Counsel regarding the consideration

21   of the definition of "consent" in the 2015-'16 Title IX

22   Policy with respect to allegations that occurred in

23   2014-'15; correct?

24        MR. RICHARD:  Objection, your Honor.  Same

25   objection.  He seems to be summarizing the substance of

1    what he believes the privileged communications

2    entailed.

3              THE COURT:  I agree.  Sustained.

4              (Pause.)

5              THE COURT:  If I could just interject.  I think

6    it would be permissible for you to ask if she had two

7    conversations with the Office of General Counsel about

8    this report and about the relevant policy sections that

9    apply.  I think that would be perfectly permissible,

10   and then you can get into the other substance that

11   occurred between her and Ms. Schultz.

12   **Q.**   You had two communications with the Office of

13   General Counsel regarding generally about

14   application -- you had two communications with the

15   Office of General Counsel, correct, regarding the issue

16   of consideration of consent?

17   **A.**   Yes.

18   **Q.**   And those communications, one was general;

19   correct?

20   **A.**   Correct.

21   **Q.**   And it was just generally how are we going to deal

22   with this next year?

23             MR. RICHARD:  Objection, your Honor.

24             THE COURT:  Sustained.

25   **Q.**   One was specific to Beau's case?

1    **A.**    Correct.

2          THE COURT:  I think you're digging around in the

3    conversation between Ms. Walsh and General Counsel, and

4    I think that really --

5          MR. RATCLIFFE:  That has been disclosed.

6          THE COURT:  The fact that she had the

7    conversations, but they're asserting the privilege.

8    And I don't think you've established that it's been

9    waived, have you?  I don't think you've tried to.

10         MR. RATCLIFFE:  I have not, your Honor.  They

11   have asserted the privilege.  Certain information was

12   provided, but they have asserted the privilege and they

13   have asserted it throughout the deposition, so I won't

14   go any further.

15         THE COURT:  So I think it's a matter of just

16   establishing that without getting into the substance of

17   what the conversations with General Counsel was or

18   were, did you take certain actions with respect to this

19   or that, and so forth.  I think that's how you can do

20   it.

21   **Q.**    When you excised reference to the definition of

22   "consent" in Exhibit 12, you had had at least one

23   communication with the Office of General Counsel;

24   correct?

25   **A.**    At that point, yes.

1  **Q.**   And I believe you -- you don't recall when the

2  second communication occurred, do you?

3  **A.**   I don't recall.

4  **Q.**   You don't know if it was before or after

5  February 29 of 2016?

6  **A.**   It was after.

7  **Q.**   It was after.  Okay.

8       Now, at some point after you sent back your

9  red-line version of the draft report to Ms. Perkins,

10  she provided you another version of the report;

11  correct?

12  **A.**   Correct.

13  **Q.**   And for purposes of identifying the different

14  versions, we have been referring to this as the interim

15  report; correct?

16  **A.**   Correct.

17  **Q.**   And the interim report was the one that was shared

18  with Beau and Allie so that they could make comments;

19  correct?

20  **A.**   Correct.  Interim or initial; in the complaint

21  process it's referred to as "initial."

22  **Q.**   We can refer to it as "initial."

23       So the initial report, the initial report

24  actually wasn't the initial report.  The initial report

25  that you received, you received a report prior to the

1   report being shared with the respondent and the

2   complainant?

3   **A.**   Correct.

4   **Q.**   So just for the sake of clarity, I'll refer to

5   this as the interim report.

6        THE COURT:  This is Exhibit 13?

7        MR. RATCLIFFE:  Yes.

8        THE COURT:  Is there any objection?

9        MR. RICHARD:  No, your Honor.

10        THE COURT:  All right.  Thirteen will be full.

11        (Plaintiff's Exhibit 13 admitted in full.)

12   **Q.**   I'm showing you Exhibit 13 and ask if you

13   recognize that.

14   **A.**   Yes.

15   **Q.**   And that is, as we've referred to it, the interim

16   report that was shared with the complainant and the

17   respondent?

18   **A.**   Correct.

19   **Q.**   And under Section III, relevant policy section,

20   what section is referenced?

21   **A.**   The offense is III, Sexual Misconduct, under the

22   '14-'15 Code of Student Conduct.

23   **Q.**   And there's no reference to the definition of

24   "consent" in the Title IX Policy?

25   **A.**   There is not.

1    **Q.**    There's no definition -- there's no reference to

2    the definition of "coercion" in the Title IX Policy?

3    **A.**    No, there is not.

4    **Q.**    Now, the policy -- the Title IX Policy provides

5    that the complainant and the respondent may file

6    comments to the initial report?

7    **A.**    Not the Title IX Policy.  The complaint process.

8    **Q.**    The complaint process.  Excuse me.

9    **A.**    Yes.

10   **Q.**    And in fact in this case both the complainant and

11   the respondent filed comments; correct?

12   **A.**    Correct.

13          MR. RATCLIFFE:  Fourteen.

14          MR. RICHARD:  Fourteen may be full, your Honor.

15          THE COURT:  Thank you.  Fourteen will be full.

16          (Plaintiff's Exhibit 14 admitted in full.)

17   **Q.**    I'm showing you what's been marked as Exhibit 14

18   and admitted as a full exhibit.  Do you recognize that

19   e-mail?

20   **A.**    Yes.

21   **Q.**    And who is that from?

22   **A.**    The e-mail is from Laura Dunn, who is the advisor

23   for the complainant.

24   **Q.**    And the e-mail references Allie's comments;

25   correct?

1    **A.**    Correct.

2    **Q.**    And there's also a letter.  So in the comments,

3    there's a letter from Laura Dunn; correct?

4    **A.**    Correct.

5    **Q.**    Does the complaint process allow for direct

6    communication between counsel and you?

7    **A.**    The complaint process -- effectively

8    administrators don't coordinate directly with

9    attorneys, to the best that we can.  Attorneys often

10   reach out to us.  So it's really in the capacity if

11   they're acting as an advisor, they often are reaching

12   out to administrators directly.

13   **Q.**    So is it your testimony that the complaint process

14   allows for advisors to communicate directly with you

15   without going through the student?

16   **A.**    Advisors often participate in calls and meetings

17   with the student and can participate in those calls and

18   meetings.  What we don't permit them to do is

19   communicate with us without the student being privy to

20   the conversation.

21   **Q.**    The complaint process is silent -- the complaint

22   process is silent with respect to advisors who are

23   attorneys communicating directly with you; correct?

24   **A.**    The complaint process addresses the role of

25   advisors.  Some of those advisors may be attorneys, but

1   students can select whoever they want, so some advisors

2   are not attorneys.

3   **Q.**   I'm showing you Exhibit 3, and Section V deals

4   with advisors; correct?

5   **A.**   Correct.

6   **Q.**   And could you read that into the record.

7   **A.**   Sure.  (Reading:)  Complainants and respondents

8   are entitled to be accompanied and assisted by an

9   advisor of their choosing at both formal and informal

10  meetings, investigation interviews, and, if applicable,

11  a subsequent Title IX Council panel hearing.  A pool of

12  trained advisors is available to the parties, subject

13  to their availability.  There is no requirement that

14  the advisor be chosen from this pool or be an

15  individual from the Brown community.

16          Advisors may not participate in the process or

17  speak on behalf of complainant or respondent, although

18  they may ask to suspend any meetings, interviews or

19  hearings briefly to provide consultation.

20          Complainants and respondents may choose to have

21  an attorney serve as their advisor, but accommodations,

22  include scheduling of interviews or hearings, will not

23  be made for advisors, including attorneys, if they

24  unduly delay the process.

25  **Q.**   Where in that complaint process does it provide

1    that an advisor on the behalf of the complainant may

2    communicate directly with you, as the Title IX

3    coordinator?

4    **A.**    It doesn't say that they may communicate directly,

5    but it says that they may be accompanied or assisted,

6    so often advisors, in accompanying or assisting, do

7    send scheduling e-mails, other e-mails, et cetera.

8    **Q.**    Well, advisors accompany or assist their advisee

9    when they're being interviewed; correct?

10   **A.**    I'm sorry.  Can you ask that again.

11   **Q.**    Advisors accompany and assist their advisee when

12   the advisee is being interviewed; correct?

13   **A.**    If the advisee chooses, yes.

14   **Q.**    And at that interview the advisor may not

15   participate in the process; correct?

16   **A.**    At that interview they can't speak on behalf of

17   their advisee; correct.

18   **Q.**    In any event, in this e-mail to you, Laura Dunn

19   was speaking on behalf of Allie; correct?

20   **A.**    She was submitting something for her client and

21   Allie was included on the e-mail, yes.

22   **Q.**    In fact, Allie's comments were in two sections;

23   correct?  Allie's comments that are under her name --

24   correct?

25   **A.**    I don't have --

1    **Q.**   Why don't we just do this.  We can go through the

2    document.

3         So there is the response statement, and you've

4    been using Ann Roe, but that's Allie; correct?

5    **A.**   Correct.

6    **Q.**   And she references various portions of the report

7    that she would like changed; correct?

8    **A.**   Correct.

9    **Q.**   It goes on to address other things.  For example,

10    Respondent states that the complaint is disclosure,

11    that she was -- that she wants certain things out

12    regarding sexual history; correct?

13    **A.**   Correct.

14    **Q.**   She wants certain information redacted from the

15    report relating to prior sexual history.  And those are

16    Allie's comments, correct, to Djuna?

17    **A.**   Correct.

18    **Q.**   It goes on; there's further commentary,

19    page three, four, five, six, seven, eight, nine.

20         So Allie provides nine pages of commentary

21    regarding your draft report -- not the draft report --

22    the interim report; correct?

23    **A.**   Correct.

24    **Q.**   And then she has excerpts from a note that was

25    written by the advisor; correct?

1    **A.**    Correct.

2    **Q.**    And that's addressed to the Title IX officer;

3    correct?

4    **A.**    It's addressed to both me and to Attorney Djuna

5    Perkins, the investigator.

6    **Q.**    It says, To Title IX Coordinator Amanda Walsh and

7    Attorney Djuna Perkins?

8    **A.**    Correct.

9    **Q.**    And she goes on to reference compliance with

10   certain federal law; correct?  Look at the letter.

11   Maybe you can tell us what the letter was.

12   **A.**    I haven't reviewed the letter in some time, but,

13   yes, I do recall that she was reiterating in some

14   respects some of what was included in the other letter;

15   for example, removal of the reference to her sexual

16   history.

17   **Q.**    And there is a four-page -- the letter is four

18   pages; correct?

19   **A.**    I don't see page numbers, but, yes.  Oh, yes.

20   **Q.**    Ms. Dunn was communicating directly with you on

21   behalf of Allie; correct?

22   **A.**    Yes.

23   **Q.**    And nowhere in the complaint process does it

24   indicate that that is allowed; correct?

25   **A.**    It doesn't indicate that that's allowed, no.

1    **Q.**    In fact, the complaint process says that -- we can

2    put it on here.

3         Can you read that?

4    **A.**    Yes.

5    **Q.**    It says that it provides that may not speak on

6    behalf of the complainant, correct, or respondent?

7    **A.**    Correct.  So advisors cannot answer questions on

8    behalf of the complainant or the respondent.

9         MR. RATCLIFFE:  I move to strike that last

10   portion.

11        MR. RICHARD:  Objection, your Honor.

12        THE COURT:  No.  Sustained.  The motion to

13   strike is granted.

14        You can always follow-up on cross.

15        MR. RATCLIFFE:  Exhibit 15.  Is this full?

16        MR. RICHARD:  Let me just locate it.  Sure.

17   Full.

18        THE COURT:  All right.  Fifteen will be full.

19        (Plaintiff's Exhibit 15 admitted in full.)

20   **Q.**    I'll show you what's marked as 15.  Do you

21   recognize that?

22   **A.**    It's an e-mail to me from Djuna Perkins on

23   March 7th that looks like it's in response to Laura

24   Dunn's letters that you were just referencing.

25   **Q.**    Could you read the e-mail.

1    **A.**   It says, (Reading:)  Hi Djuna:  The letter Laura

2    Dunn sent in addition to Ann's response includes

3    requests that are largely up to the investigator.  It

4    would be helpful if you could review those proposed

5    changes, in addition to those contained in the

6    response, and we connect by phone at some point to

7    discuss your decisions.  Anything that doesn't get

8    changed I will address by letter to -- it's redacted,

9    but I believe it says -- Allie and Laura.

10         Let me know when you expect to review these

11   letters and incorporate the changes and we can schedule

12   a time to discuss.  Hope you had a nice weekend.

13   Warmly, Amanda.

14   **Q.**   And there's nothing in the complaint process that

15   allows you, as the Title IX Program Officer, to

16   communicate directly with an advisee's attorney;

17   correct?

18   **A.**   There's nothing that prevents me from --

19   **Q.**   Advisor.

20   **A.**   Generally how I handle the situation is by adding

21   the student --

22   **Q.**   I just asked a question.  Is there anything in the

23   complaint process that allows --

24         MR. RICHARD:  Objection, your Honor.  Can she

25   answer?

1          THE COURT:  She has to answer the question

2    that's actually put to her, not comment on it.

3          So just listen to the question and answer it.

4    Mr. Richard will have an opportunity, if he wishes to

5    follow-up, when he examines you.

6          So reask your question.

7    **Q.**   Is there anything in the Title IX Complaint

8    Process that permits you, as the Title IX Program

9    Officer, to communicate directly with an advisor for an

10   advisee?

11   **A.**   There's nothing that states that, no.

12   **Q.**   You didn't send a letter to Beau addressing his

13   concerns that he raised, did you?

14   **A.**   I didn't.

15         MR. RATCLIFFE:  Sixteen.

16         MR. RICHARD:  It's full, your Honor.

17         THE COURT:  All right.  Sixteen will be full.

18   Maybe this is the -- is this the letter that you just

19   referred to?  I'm a little confused.

20         MR. RICHARD:  I thought it was 16.

21         MR. RATCLIFFE:  Sixteen.  There are --

22         THE COURT:  Let me -- I just want to make sure.

23   The e-mail that you just referred to, which is

24   contained in Exhibit 15, from Ms. Walsh to Ms. Perkins,

25   says the letter Laura Dunn sent in addition to Ann's

1    response, please request, et cetera.

2         So that's a reference to the letter that is

3    attached to -- it's the last of the group of documents

4    that is in Exhibit 14; correct?

5         MR. RATCLIFFE:  Correct.

6         THE COURT:  And then at the end of that e-mail

7    it says, (Reading:)  Anything that doesn't get changed,

8    I will address by letter to Allie and Laura.

9         Now, I thought you then asked her a question

10   about did she send a letter to Beau addressing his

11   concerns, and she answered no.  So has that letter been

12   admitted yet?

13        MR. RATCLIFFE:  That letter has not been.

14        THE COURT:  But you're going to get to that?

15        MR. RATCLIFFE:  We have not received it in

16   discovery, your Honor.  We didn't receive any letter.

17        THE COURT:  Why not?  I don't understand.

18        MR. RICHARD:  Your Honor, we've given everything

19   we have, so --

20   **Q.**   Did you send the letter?

21   **A.**   I don't believe I did.

22        THE COURT:  Just so it's all clear in the record

23   at the same place, you're saying that even though your

24   letter refers to a letter that you're going to write to

25   Ann/Allie and Laura, you never actually wrote such a

1    letter?

2         THE WITNESS:  I don't believe so, because my

3    intent was to draft a letter if the items couldn't be

4    addressed by the investigator.  So in the event that

5    there were no remaining items, there would be no need

6    for me to address those.

7         THE COURT:  Okay.

8         MR. RATCLIFFE:  Exhibit 16.

9         MR. RICHARD:  Sixteen, Richard?

10        MR. RATCLIFFE:  Yes.

11        MR. RICHARD:  Full, your Honor.

12        THE COURT:  All right.  Sixteen is full.

13        (Plaintiff's Exhibit 16 admitted in full.)

14   **Q.**   Showing you what's been marked as Exhibit 16, I'm

15   going to ask you if you recognize that.

16   **A.**   I'm not on these e-mails, but I believe it was

17   forwarded to me, and it is Beau's response statement to

18   the interim report, directed to Djuna.

19   **Q.**   And --

20   **A.**   And then, I suppose, a follow-up with maybe an

21   updated version.

22   **Q.**   In any event, you received a copy of Beau's

23   request -- his comments to the interim report; correct?

24   **A.**   Correct.

25   **Q.**   The first concern that Beau raised was the sexual

1  assault standard; correct?  The sexual misconduct

2  standard?

3  **A.**  Yes.

4  **Q.**  And he indicates that, (Reading:)  My encounter

5  with Allie at Faunce Hall occurred on November 10,

6  2014.  The Code of Student Conduct applicable to my

7  conduct at the time 2014-'15 Code.  Associate counsel,

8  Michael Grabo, confirmed this to me in writing on

9  November 4, 2015.  In that version of the Code, the

10  definition of the sexual misconduct is vastly different

11  than what it is now.  In 2014-'15 -- excuse me.  In the

12  2014, the Code defines "sexual misconduct" as follows.

13       And Beau then references what we have already

14  referenced, the sexual misconduct, III(a) and III(b),

15  and then references the comment.

16       And he goes on to discuss that, (Reading:) Quite

17  a bit of the report, including Footnote 22, focuses on

18  the possibility that I coerced Allie to engage in

19  sexual conduct.  That, however, is not part of the 2014

20  definition of this offense.  The term does not appear

21  in that definition, so I respectfully suggest that your

22  statement in Footnote 22 that, quote, "The central

23  issue in this case is whether the consent was obtained

24  through coercion," is incorrect.  In any event, because

25  panels are now trained to apply a different definition

1    of "sexual misconduct" than what was applied in my

2    case, the distinction is important and should --

3              THE COURT:  Slow down.  Slow down.

4              MR. RATCLIFFE:  Sorry.  All right.

5    **Q.**   I'm going pick up at the top of page two,

6    referring to panels, (Reading:)  Now trained to apply a

7    different definition of "sexual misconduct" than what

8    applies in my case.  This distinction is important and

9    should be conspicuously set forth in your report.

10             Furthermore, your report does not contain a

11   definition of coercion, which is the use of force or

12   intimidation to obtain compliance.  There's absolutely

13   no evidence that I intimidated or threatened the

14   complainant in order to satisfy my sexual desires.

15             Did I read that correctly?

16   **A.**   Yes.

17   **Q.**   In fact, he's -- strike that.

18             Now, if we look at -- now, to your knowledge,

19   was this issue addressed?  Was this issue -- how was

20   this issue resolved with respect to Mr. ████████

21   -- excuse me -- to Beau's comments?

22   **A.**   I don't recall exactly how the report was updated.

23   **Q.**   In any event, there was a final report that was

24   issued?

25   **A.**   Yes.

1    **Q.**   And the final report was issued after

2    consideration of both Allie's and Beau's comments by

3    Djuna Perkins and you?

4    **A.**   Yes.

5    **Q.**   You communicated with Djuna Perkins regarding the

6    various issues at play; correct?

7    **A.**   I gave Djuna Perkins the opportunity to

8    communicate questions that she felt like were less

9    discretion to the investigator and implicated the

10    complaint process itself.

11    **Q.**   You communicated with her regarding, for example,

12    one of the issues that Djuna Perkins communicated with

13    you was Beau's objection to including prior bad acts in

14    the report; correct?

15    **A.**   Correct.

16    **Q.**   And in fact, Ms. Perkins indicated that perhaps

17    you should communicate with Beau or with Beau and his

18    advisor or just Beau and say, Okay, if you want to

19    allege the conspiracy claim, we're going to leave this

20    in; but if you don't, we're going to take it out?

21    **A.**   When you say that, are you referencing the e-mail

22    I read earlier?

23    **Q.**   Well, I'm referencing a communication that you had

24    with Djuna Perkins regarding Beau's objection to prior

25    bad acts.  We can look at that portion of his objection

1    if you'd like.

2    **A.**   I recall that he asked for certain information to

3    be excluded about prior bad acts.

4    **Q.**   Okay.  Let's go over that.

5         MR. RICHARD:  What exhibit is this?

6         MR. RATCLIFFE:  Exhibit 19.

7    **Q.**   Beau references, (Reading:)  On pages 26 and 27,

8    On these pages are several paragraphs of statements

9    largely from Witness 9 but also from others that you

10   state on page two are presented only to the extent they

11   are relevant to respondent's claim that Witness 9 and

12   the complainant conspired against him to present

13   fabricated charges.

14        Do you recall what information Beau conveyed to

15   Ms. Perkins regarding the allegation of conspiracy?

16   **A.**   I recall that he put forward a witness that he

17   felt supported that claim.

18   **Q.**   He put forward a witness that overheard them

19   conversing, I believe it's called the Ratty?

20   **A.**   Yes.

21   **Q.**   What's the Ratty?

22   **A.**   The Ratty is a dining hall at Brown.

23   **Q.**   And overheard Allie and Witness 9 conversing about

24   Beau; correct?

25   **A.**   Correct.

1  **Q.**    And in fact, there's reference to that

2  communication in Ms. Perkins' report?

3  **A.**    Correct.

4  **Q.**    And the witness that Beau put forward confirmed

5  that he overheard Allie and Beau -- excuse me, Allie

6  and Witness 9 communicating about Beau?

7  **A.**    I believe he did, yes.

8  **Q.**    And so the complaint process itself indicates that

9  prior bad acts is generally not -- character evidence

10 generally isn't admissible or shouldn't be in the

11 report?

12 **A.**    Correct.  There's a section relating to character

13 evidence.

14 **Q.**    We can address that.  We can show that.

15     There's reference in the complaint process to

16 types of evidence that refer to additional evidence;

17 correct?  Section II on the page I'm showing you?

18 **A.**    Correct.

19 **Q.**    It has -- from Exhibit 3.  It indicates, does it

20 not, that both the complainant and the respondent are

21 committed to provide other relevant evidence to the

22 investigator.  Evidence includes any facts or

23 information presented to support an assertion that may

24 include text messages, e-mail exchanges, timelines,

25 receipts, photographs, et cetera.  Any documentation

1     shared by the complainant or the respondent with the

2     investigator will be provided to the other party.  The

3     investigator may also consider additional documents or

4     documents, items or other relevant information.

5          Goes on to say, does it not, information that

6     does not directly relate to the facts at issue but

7     instead reflect upon the reputation, personality,

8     quality or habits of an individual is character

9     evidence and is not relevant to the determination of

10    whether there is a policy violation.

11    **A.**    Correct.

12    **Q.**    And in any event, in this case, Mr. ███████

13    was objecting to -- excuse me, Beau was objecting to --

14    was referring to portions of Ms. Perkins' report;

15    correct, under pages 26 and 27?

16    **A.**    Yes.

17    **Q.**    And that includes information regarding Witness 4

18    posing at a party at his apartment with numerous

19    members of mock trial, including Witness 9, Witness 4

20    and Witness 3 but not complainant were present at the

21    party which Witness 3 states took place the day of the

22    Harvard-Brown football game, which occurred on

23    September 26th.  The respondent confronted Witness 9 in

24    a hostile manner and mocked her for reporting him to

25    the E-Board.  To Witness 4, it was clear that the

1    respondent was angry about the decision not to make him

2    a captain and angry at Witness 9 for complaining about

3    him.  Witness 9 states that she told her parents and

4    the complainant about what happened with the respondent

5    at the party the next day and all were very upset.

6    Witness 5 said after the incident at the party the

7    complainant seemed very shaken even though she had not

8    even attended the party and it did not directly impact

9    her.  Witness 9 said her parents told her to seek help

10   from the University so she called Brown's Department of

11   Public Safety, DPS, and asked how to report an incident

12   of bullying.  DPS referred her to the Title IX Program

13   Officer.  The complainant states --

14         MR. RICHARD:  Objection, your Honor.  Are we

15   going to read the entire document?  Is there a

16   question?

17         THE COURT:  No, I think that's a good point.  I

18   think much of what's being read is really not

19   necessary, so maybe we could just refer to the

20   documents.  I think it will make things go a little

21   faster.  And you can talk about the gist of the

22   documents and be more effective.

23   Q.   So in any event, Beau was objecting to the

24   inclusion of character evidence in the report, correct?

25   A.   I'm sorry.  If you could flip back to the prior

1    page on this it would be helpful.

2          (Witness reads document.)

3    **A.**   So yes, he's saying that they should be removed

4    entirely.

5    **Q.**   And it was -- you had a conversation with

6    Ms. Perkins about this request; correct?

7    **A.**   Correct.

8    **Q.**   And Ms. Perkins told you that she would be willing

9    to take it out if Beau agreed to forego the conspiracy

10   claim?

11   **A.**   My recollection of the conversation was

12   Ms. Perkins was asking me how we address -- asking me

13   whether this section as included was a violation of our

14   complaint process, the character evidence section.

15   **Q.**   Did you have any discussion with Ms. Perkins about

16   taking out the character evidence reference?

17   **A.**   I recall that again she was asking whether or not

18   that was permitted under our complaint process.

19   **Q.**   Did you have a discussion with Ms. Perkins as to

20   whether or not the character evidence should be removed

21   from the report if Beau in return agreed to waive the

22   conspiracy claim?

23   **A.**   I'm sorry.  Can you repeat the question.

24   **Q.**   Did you and Ms. Perkins discuss whether or not to

25   contact Beau and basically say to him, You want the

1　character evidence out, remove your conspiracy claim?

2　**A.** I don't recall that specifically. If we -- it

3　generally sounds like a conversation that we may have

4　had. Had she asked me that question, I would have told

5　her that that wasn't permissible under our complaint

6　process to do that.

7　　　　THE COURT: Whether what was permissible under

8　the complaint process?

9　　　　THE WITNESS: That we would tell Beau -- that we

10　would -- it sounds like what Attorney Ratcliffe is

11　asking me is we would essentially negotiate the

12　information that Beau provided and say if you withdraw

13　these statements we would remove these other

14　statements.

15　　　　THE COURT: Okay.

16　**Q.** Basically, Beau provided information from one

17　witness that overheard a conversation between Allie and

18　Witness 9 at the Ratty; correct?

19　**A.** Correct.

20　**Q.** And that information was basically to the extent

21　that we got to get him, we got to get Beau; that they

22　were out to get him in some way; correct?

23　**A.** I don't remember the exact conversation but it was

24　something that he felt indicated a conspiracy against

25　him.

1    **Q.**   Indicated animus and a desire to get him in

2    trouble?

3    **A.**   I believe that was, yes, the content of the

4    conversation.

5    **Q.**   And as a result of raising that one conversation

6    and pointing Ms. Perkins to that one conversation, the

7    report contained -- it's referenced in the report as

8    well as in Beau's response, goes on for -- you can look

9    at it briefly.  Goes on for one, two -- basically

10   almost two full pages, reports pages 26 and 27 of the

11   report, which is all character evidence regarding Beau?

12   **A.**   I missed what the question was.

13   **Q.**   Let's look at the interim report.  I'll just put

14   it up here so you can --

15        MR. RICHARD:  Which exhibit, please?

16        MR. RATCLIFFE:  Exhibit 13.

17   **Q.**   Can you read that?

18   **A.**   Yes.

19   **Q.**   Why don't you look at it, take as much time as you

20   need and indicate -- I have a question.

21   **A.**   Okay.

22        (Witness reads document.)

23   **A.**   Can you just flip to the next page.  Thank you.

24        (Witness reads document.)

25   **A.**   Okay.

1    **Q.**    And on pages 26 and 27, that you would agree is

2    character evidence regarding Beau; correct?

3    **A.**    The pages included both information that might be

4    character evidence and also the testimony provided to

5    Djuna Perkins from Witness 11, yes.

6    **Q.**    That information didn't address what occurred on

7    November 10, 2014, at Faunce House?

8    **A.**    In those two pages, no, it did not.

9    **Q.**    It was addressing other things that Witness 9 or

10   complainant or maybe others witnessed Beau do?

11   **A.**    Correct.

12   **Q.**    And that information is the type of information

13   that's generally not allowed.  In fact, it states in

14   the -- (Reading:)  Information that does not directly

15   relate to the fact at issue but instead reflects upon

16   the reputation, personality, qualities or habits of an

17   individual as character evidence is not relevant to the

18   determination of whether there is a policy violation.

19   **A.**    Yes, it says that.

20   **Q.**    And the panel was addressing whether or not there

21   was a policy violation regarding an allegation of

22   sexual misconduct that occurred on November --

23   allegedly occurred on November 10, 2014?

24   **A.**    Correct.

25   **Q.**    And eventually, Ms. Perkins prepared a final

1  report; correct?

2  **A.** Correct.

3  **Q.** And the final report was prepared after addressing

4  the comments made by both the complainant and the

5  respondent?

6  **A.** Correct.

7        MR. RATCLIFFE: Seventeen.

8        MR. RICHARD: Sorry. What number, 17?

9        MR. RATCLIFFE: Seventeen.

10       MR. RICHARD: Letter to Beau?

11       MR. RATCLIFFE: I can do 18. Seventeen and 18.

12       THE COURT: You finish your conversation --

13       MR. RICHARD: We were just conferring about the

14  exhibit, your Honor. I didn't mean to --

15       THE COURT: No, no. You're not. So let's go

16  off the record for a minute.

17       (Discussion off the record.)

18       (Lunch recess.)

19       THE COURT: All right. Are we ready to

20  continue, Mr. Ratcliffe.

21       MR. RATCLIFFE: Yes, your Honor. Thank you very

22  much.

23       THE COURT: Okay. Go ahead.

24  **Q.** Just a couple of questions regarding -- now, you

25  had testified that when I had asked you about their

1    removal of the character evidence from the report, do

2    you recall that discussion we discussed removal of the

3    character evidence from the report?

4    A.   Yes.

5    Q.   And I believe it was your testimony that the

6    complaint process didn't allow for a respondent to

7    raise a theory of conspiracy and then withdraw the

8    theory when it doesn't work out?

9    A.   Well, it was my testimony that the complaint

10   process doesn't have an interim -- it provides for both

11   students to be able to respond to the report and for

12   the investigator to incorporate those.  It doesn't

13   allow for I felt like the type of discussion that you

14   were asking about.

15   Q.   My question is so both the complainant and the

16   respondent provided information to the investigator?

17   A.   Yes.

18   Q.   And the complainant asked for certain things to be

19   taken out of the report; correct?

20   A.   Correct.

21   Q.   And certain things were taken out of the report?

22   A.   Correct.

23   Q.   And the respondent asked for certain things to be

24   taken out of the report; correct?

25   A.   Correct.

1    **Q.**    And one of those things that the respondent asked

2    to be taken out of the report as improper was the

3    character evidence?

4    **A.**    He asked for certain paragraphs, yes, to be

5    removed that contained character evidence in your

6    assessment, yes.

7    **Q.**    Because -- the information that was being provided

8    in the report didn't deal specifically with the

9    interaction between the complainant and the respondent

10   on November 10th, 2014; correct?

11   **A.**    It dealt with his allegation regarding conspiracy.

12   **Q.**    But the information that he was asking to be

13   withdrawn had nothing to do with the actual interaction

14   between the complainant and the respondent either

15   before, during or after the events in question?

16   **A.**    I'm sorry.  Can you repeat the question.

17   **Q.**    The information, we went through it, you looked at

18   the information that Beau asked to be removed from the

19   report.  That information dealt with other character

20   evidence of Beau regarding interaction with other

21   people other than the complainant for the most part;

22   correct?

23   **A.**    Correct.  For the most part, correct, yes.

24   **Q.**    And specifically Witness Number 9?

25   **A.**    Yes.  Some of it had to do with Witness Number 9.

1  **Q.**   And some of it had to do with other people that

2  had parties and other interaction with women on campus?

3  **A.**   Correct.

4  **Q.**   So you said that the complaint process didn't

5  allow for that information to be taken out because he

6  put forward the conspiracy allegation and he couldn't

7  change his mind after the fact?

8  **A.**   My understanding was that he didn't withdraw the

9  conspiracy allegation.  He asked for the character

10  evidence to be removed but the conspiracy allegation to

11  remain in the report.

12  **Q.**   And my question to you earlier was did Ms. Perkins

13  suggest to you that perhaps a compromise would be Beau

14  removes the conspiracy allegation or withdraws the

15  conspiracy allegation and we withdraw all that

16  character evidence?

17  **A.**   I said I didn't recall specifically that

18  discussion, but that had she asked that, I would have

19  said that that wasn't included in the complaint

20  process.

21  **Q.**   Where in the complaint process?

22  **A.**   I'm saying that there is not an interim step in

23  the complaint process that allows the investigator to

24  go back and make those sorts of suggestions to the

25  student.

1  **Q.**   Exhibit Number 3.  Do you recognize this language

2  from -- I will show you the earlier page.  The

3  investigation report, this is on page four?

4  **A.**   Yes.

5  **Q.**   And do you want to look at that first, Section III

6  there, and then I'll refer you to the top of page five.

7  **A.**   Okay.

8  **Q.**   Now, there's nothing -- this section refers to the

9  investigative report being shared -- excuse me, being

10  shared with the Title IX Program Officer as well as the

11  complainant and respondent.  And it then goes on to say

12  that -- and I don't want to read this whole thing but

13  within basically three days the complainant and

14  respondent made comments; correct?

15  **A.**   Correct.

16  **Q.**   And basically, it's up to the investigator as to

17  how to deal with those comments; correct, whether to

18  change things or to leave it the same?

19  **A.**   That would depend on the comment made by the

20  student.

21  **Q.**   Now, there's nothing in here specifically that

22  would have prevented Ms. Perkins from going back to

23  Mr. ████████ and suggesting to him, Hey, look it, I

24  saw what you said about the character evidence; we'll

25  take it out if you withdraw the conspiracy claim?

1    **A.**   It doesn't give her permission or prevent her from

2    doing so.

3    **Q.**   And basically, the complaint process, the whole

4    purpose of hiring a trained investigator is so that

5    there can be an accurate and fair report; correct?

6    **A.**   That's one of the reasons, yes.

7    **Q.**   And do you recall another concern that Beau had

8    regarding not obtaining all of the text messages

9    between Witness 9 and the complainant?

10   **A.**   Yes.

11   **Q.**   Okay.  And that was included in his request for --

12   in his comments; correct?

13   **A.**   Right.

14   **Q.**   And do you know if -- Ms. Perkins did not make any

15   changes to the report regarding that -- strike that.

16        Do you know if Ms. Perkins attempted to get the

17   additional text messages between Witness 9 and the

18   complainant?

19   **A.**   My understanding is that she did not attempt to

20   get.

21   **Q.**   And the text messages that were being provided

22   between Witness 9 and the complainant were sort of in

23   the nature of a fresh complaint; correct?

24   **A.**   I'm sorry.  What are you --

25   **Q.**   Well, they were being presented to show that

1    Witness 9 and the complainant had some communication in

2    December of 2014 regarding the interaction between Beau

3    and Allie?

4    **A.**   I don't remember specifically why they were

5    introduced.  That would have been a function of the

6    investigator.

7    **Q.**   But in any event, you are aware, are you not, that

8    there was not a complete set of text messages provided

9    by either Witness 9 or the complainant concerning their

10   communications at or about the time that they were

11   texting back and forth regarding Beau?

12   **A.**   I'm aware that a request was made for Beau to ask

13   for a complete set, yes.

14   **Q.**   And a complete set was not obtained?

15   **A.**   Correct.

16        MR. RATCLIFFE:  We've already marked 17 and 18,

17   your Honor.

18        MR. RICHARD:  If I didn't do so I'll stipulate

19   to the full admission.

20        THE COURT:  Seventeen and 18?

21        MR. RATCLIFFE:  Yes.

22        THE COURT:  Will be full.

23        (Plaintiff's Exhibit 17 and 18 admitted in

24   full.)

25   **Q.**   So showing you Exhibit 17, ask you if you

1    recognize that.

2    **A.**    I can't see the top so I'm not certain who it's

3    addressed to.

4    **Q.**    Sorry about that.  See it now?

5    **A.**    Um-hum.  (Affirmative.)  It is an e-mail from

6    Djuna Perkins to Beau, to you and I am cc'd that says,

7    Attached is the finalized report and exhibit.  And it

8    looks like it was sent on March 12th at 6:00 p.m.

9    **Q.**    And Exhibit 18 is the final report.  What I will

10   show you if this will assist you in determining this is

11   the final report, show you the last page.  This

12   document has 29 pages, I believe.  The prior document

13   had 28.

14         Do you have a memory as to how many pages the

15   final report had?

16   **A.**    I believe this is the final -- yes, I think this

17   is the final report.  I remember having an extra page.

18   **Q.**    Now, with respect to Beau's concern regarding the

19   reference to coercion in the report, do you know if the

20   footnote that he had objected to, do you know if that

21   was changed?

22   **A.**    I believe it was still in the final report.

23   **Q.**    It was then changed from Footnote 22 to Footnote

24   26?  I can show you Footnote 26.  Can you read that?

25   **A.**    No, I'm sorry.  I can't.

1  **Q.**   That's the footnote that he had requested -- or at

2  least he had requested reference to coercion be taken

3  out of the interim report; correct?

4  **A.**   Correct.

5  **Q.**   It was not?

6  **A.**   Correct.

7  **Q.**   And the final report also included the character

8  evidence that he had objected to; correct?

9  **A.**   Correct.

10  **Q.**   Now, as the Title IX Program Officer, you were

11  responsible for choosing a panel to hear Beau and

12  Allie's case?

13  **A.**   Correct.

14  **Q.**   And who served on that panel?

15  **A.**   Dean Besenia Rodriguez, Katherine Trimble and

16  Kimberley Charles.

17  **Q.**   And who was the Chair?

18  **A.**   The Chair for all hearings during this academic

19  year was Gretchen Schultz.

20  **Q.**   And there were no men on Beau's panel; correct?

21  **A.**   Correct.

22  **Q.**   And I believe that you had approximately 18 or 19

23  qualified members to serve on panels?

24  **A.**   Approximately, yes.

25  **Q.**   And of the 18 or 19, three were men?

1   **A.**   Correct.

2   **Q.**   And that because of conflicts there were no

3   qualified men to serve on Beau's panel; correct?

4   **A.**   Correct.  All three men had conflicts in this

5   case.

6   **Q.**   Now, the complaint process indicates that all of

7   the information that the panel needs to make its

8   determination is found in the investigation report;

9   correct?

10  **A.**   The factual information, yes.  All of the factual

11  information is contained in the report.

12  **Q.**   And the final report here references the relevant

13  policy section; correct?

14  **A.**   Correct.

15  **Q.**   And the relevant policy section is the 2014-'15

16  Code of Student Conduct?

17  **A.**   Correct.

18  **Q.**   And you provided the panel members with copies of

19  2014-'15 Code of Student Conduct; correct?

20  **A.**   Yes.

21  **Q.**   And you also provided them a copy of the

22  investigative report?

23  **A.**   Correct.

24  **Q.**   And the appendices?

25  **A.**   Correct.  And the complaint process.

1    **Q.**   So you provided them with Exhibit 18; Exhibit 2

2    and Exhibit 3, Complaint Process?

3    **A.**   Correct.

4    **Q.**   You didn't provide the panel members with

5    Exhibit 4, the Title IX Policy, correct?

6    **A.**   Correct.

7    **Q.**   And the Title IX Policy, Exhibit 4, you had

8    excised reference to in Ms. Perkins' original report?

9    **A.**   Correct.

10    **Q.**   But you did provide a copy of Exhibit 4 to the

11    panel Chair, didn't you?

12    **A.**   The Title IX Policy is Exhibit 4?

13    **Q.**   Yes.

14    **A.**   Yes, I did.

15    **Q.**   And that's the same policy that you told

16    Ms. Perkins didn't apply to this case; correct?

17    **A.**   Correct.

18    **Q.**   And in fact, you met with Dr. Schultz the morning

19    of the hearing on April 14th; correct?

20    **A.**   Yes.

21    **Q.**   And you told Dr. Schultz that her packet was

22    different than the other panelists' packets; correct?

23    **A.**   Yes.

24    **Q.**   And that her packet included the Title IX Policy,

25    Exhibit 4?

1    **A.**   Correct.

2    **Q.**   You told her that if the panel chose, they could

3    choose -- they could consider the definition of

4    "consent" in the Title IX Policy?

5    **A.**   If the panel chose, correct, yes.

6    **Q.**   And that was the same definition that you had

7    excised from the original draft report that Ms. Perkins

8    had sent you?

9    **A.**   Correct.

10   **Q.**   Now, you took notes at the Title IX hearing on

11   April 14th?

12   **A.**   Yes.

13        MR. RATCLIFFE:  Exhibit 24.

14        MR. RICHARD:  Stipulate to full, your Honor.

15        THE COURT:  Thank you.  That's Exhibit 24, it

16   will be full.

17        (Plaintiff's Exhibit 24 admitted in full.)

18        MR. RATCLIFFE:  May I approach, your Honor?

19        THE COURT:  Yes.

20   **Q.**   I'm showing you what's been marked as Exhibit 24

21   admitted as full.  Are those your notes?

22   **A.**   Yes.

23   **Q.**   And those are notes that you took during the

24   Title IX hearing on April 14th, 2016?

25   **A.**   Correct.

1    **Q.**   And you indicate at the beginning of your notes,

2    do you not, first thing is, (Reading:)  Faculty Chair

3    goes over the checklist and Faculty Chair reminds

4    everyone we're using the 2014-'15 Code of Conduct

5    because of the timing of the allegation.  Gretchen read

6    through the relevant sections of the panel.  Gretchen

7    reminds the panel that the former Code did not define

8    "consent" but read through the current definition and

9    reminded the panel they are not required to use it but

10   it may be helpful in thinking about how the University

11   has viewed consent.

12         Those are your notes?

13   **A.**   Correct.

14   **Q.**   And in the investigative report that Djuna Perkins

15   prepared, was there any indication contained there

16   whatsoever that indicated how the University had viewed

17   consent prior to 2015?

18   **A.**   I'm sorry.  Can you repeat the question.

19   **Q.**   Well, she says here -- in your notes, she says --

20   it says, (Reading:)  Gretchen reminds the panel that

21   the former Code did not define "consent" but read

22   through the current definition and reminded the panel

23   they are not required to use it but it may be helpful

24   in thinking about how the University has viewed

25   consent.

1              In Ms. Perkins' investigative report, was there

2     any information for the panelists about how the

3     University had defined "consent"?

4     **A.**    No.

5     **Q.**    So as the Panel Chair, Gretchen Schultz was going

6     outside of the four corners of the investigative

7     report; correct?

8     **A.**    Well, the report sets forth the factual

9     information.  It would be the Code that would set forth

10    the information that she is describing here or the

11    relevant policy that they would look to.

12    **Q.**    All right.  Well, let's address that.  The Code,

13    the 2014 Code did address, I believe we've gone over

14    this, at least with respect to -- I believe you

15    testified that the comment to Section III, Sexual

16    Misconduct, provided some guidance to students with

17    respect to how the University had viewed non-consensual

18    physical conduct of a sexual nature; correct?

19    **A.**    Correct.

20    **Q.**    And the University -- again, we don't have to go

21    over it again, but basically they had indicated that it

22    encompasses a broad range of behavior, acts including

23    force, threat, intimidation or advantage gained by the

24    offending student's mental or physical incapacity.

25              MR. RICHARD:  Objection, your Honor.  I don't

1     think that's a proper reading of what it said.

2            MR. RATCLIFFE:  I was trying to paraphrase.  I

3     could read the whole thing.

4            THE COURT:  All right.  Well, let's --

5            MR. RICHARD:  He left out the word "including."

6            THE COURT:  Why don't you back up, do it again.

7            MR. RATCLIFFE:  Okay.  I will read it again.  I

8     was trying to paraphrase.  I apologize.

9     **Q.**   (Reading:)  Comment:  Offense III encompass a

10    broad range of behaviors including acts using force,

11    threat, intimidation or advantage gained by the

12    offended student's mental or physical incapacity or

13    impairment of which the offending student was aware or

14    should have been aware.

15            That was the guidance that the University

16    provided to students in 2014 and '15 as to the type of

17    behavior that violated Section III of the Code;

18    correct?

19    **A.**   Correct.

20    **Q.**   And Gretchen Schultz provided no documentary

21    evidence, did she, to the panel that the current Code

22    incorporated a definition of "consent" that had been

23    used prior to 2015 by the University; correct?

24    **A.**   Correct.

25    **Q.**   Basically, she told them what her opinion was?

1    **A.**   Correct.

2    **Q.**   Now, your notes indicate, do they not -- maybe we

3    can just go through this just briefly.

4         The Court will have this, but the way that the

5    procedure works is the opening comments by the Panel

6    Chair, Dr. Schultz; correct?

7    **A.**   Correct.

8    **Q.**   And she went through the checklist?

9    **A.**   Correct.

10   **Q.**   And we'll get to that later.  And then she --

11   we've already discussed the consent issue.

12        Then Ms. Perkins came into the room?

13   **A.**   Correct.

14   **Q.**   And answered questions from the various panel

15   members?

16   **A.**   Yes.

17   **Q.**   Based on the report?

18   **A.**   Yes.

19   **Q.**   And those questions -- that's when you were there

20   as the Title IX Program Officer, you were taking notes

21   as to the questions and the responses of Ms. Perkins?

22   **A.**   Yes, I was.

23   **Q.**   And Dr. Schultz, one of the questions that she

24   asked as the Panel Chair is what prompted the

25   complainant to come forward; correct?

1   **A.**   Correct.

2   **Q.**   And what was Ms. Perkins' response?

3   **A.**   Djuna Perkins states something along the lines,

4   this is a summary, that Witness 9 became fearful, in

5   her words, and after an incident at a party it seemed

6   like together they became increasing afraid of

7   retaliation and prompted them to report.

8   **Q.**   In fact, you had -- you had initially met with

9   Witness 9; correct, regarding an issue of a no-contact

10   order with Beau; correct?

11   **A.**   I had initially met with Witness 9 because she

12   came forward to share information about what happened.

13   **Q.**   And it was Witness 9 that brought to your

14   attention Allie's allegations; correct?

15   **A.**   Correct.

16   **Q.**   And then Witness 9 said that she was going to go

17   back and speak with Allie; correct?

18   **A.**   Correct.

19   **Q.**   And after that, Allie then contacted you?

20   **A.**   Correct.

21   **Q.**   That synopsis isn't in the information that Djuna

22   Perkins provided to the panel; is it?

23   **A.**   The synopsis --

24   **Q.**   That the complainant came forward at the urging of

25   Witness 9?

1    **A.**   That is not contained in -- are you asking is that

2    how Djuna answered the question at the date of the

3    hearing?

4    **Q.**   Right.

5    **A.**   No.

6    **Q.**   After Ms. Perkins answered questions from the

7    panel, the panel decided that they wanted to hear from

8    Beau first; correct?

9    **A.**   Correct.

10    **Q.**   There's nothing in the process that says the

11    complainant goes first?

12    **A.**   No.

13    **Q.**   But they decided they wanted to hear from Beau

14    first and they heard from Beau?

15    **A.**   Yes.

16    **Q.**   And at the hearing, Beau addresses which policy or

17    which standard would apply, right?  He says,

18    Investigator conflates two different policies.  Current

19    policy covered all aspects of sexual assault.

20        To your knowledge, was Beau referring to the

21    Title IX Policy?

22    **A.**   That's the way I understood it to be at the time.

23    **Q.**   Old policy requires force or threat of force.

24        Is that what your understanding was, that he was

25    referring to 2014-'15 Policy Code of Student Conduct?

1    **A.**    Yes.

2    **Q.**    That's what we previously marked as Exhibit 2.

3    He says, Not indicating there was a sexual

4    assault, mentioning it to clarify regardless of the

5    fact there was consent, there is a difference, there

6    are references to attempts of coercion.  The

7    complainant attempts to allege that if they were they

8    wouldn't fall under the old policy.

9    Did I read that correctly?

10    **A.**    Yes.

11    **Q.**    That's your memory of the synopsis of what Beau

12    said to the hearing panel?

13    **A.**    Yes.

14    **Q.**    And then there's a reference to Allie coming in to

15    the hearing.  And there's a reference in your notes

16    that Allie go through Brown's consent definition in

17    current policy; correct?

18    **A.**    Yes.

19    **Q.**    And she says, Told him that if I change my mind I

20    would express it in words.  Our mutual understanding is

21    that it was platonic, no sex would occur.  Brown policy

22    states that consent cannot be obtained through

23    manipulation, coercion or force.  His response is that

24    we would be friends but not watch a movie.  He cites a

25    series of statements where she articulates that she

1    does not want to engage in sexual interaction.

2         So Allie's referring to the definition of

3    "consent" in the Title IX Policy in her hearing

4    presentation; correct?

5    **A.**   Correct.

6    **Q.**   And that's, again, the same definition that you

7    had excised from the draft report that Ms. Perkins had

8    provided to you?

9    **A.**   Correct.

10        MR. RATCLIFFE:  Exhibit 25.

11        MR. RICHARD:  Twenty-five may be full, your

12   Honor.

13        THE COURT:  All right.  Are you moving 25?

14        MR. RATCLIFFE:  Yes, I am, your Honor.

15        THE COURT:  Okay.  Twenty-five will be full.

16        (Plaintiff's Exhibit 25 admitted in full.)

17   **Q.**   Can you read that?

18   **A.**   Yes.

19   **Q.**   Show you what's been marked as Exhibit 25 and ask

20   you if you recognize that document.

21   **A.**   Yes.  It's an e-mail from Gretchen to the panel

22   thanking them for their work on the case and attaching

23   a draft of the findings and asking them for edits or

24   corrections, then she forwarded -- it looks like some

25   hours later forwarded me that e-mail.

1   **Q.**   And you received that e-mail on April 14th, 2016?

2   **A.**   Yes.  The e-mail was sent on April 14th, 2016.

3   **Q.**   At 6:30 p.m.?

4   **A.**   Yes.

5   **Q.**   And that was the same day as the hearing?

6   **A.**   Correct.

7   **Q.**   And there's an attachment to the e-mail?

8   **A.**   Correct.

9   **Q.**   And the attachment is the findings?

10  **A.**   Is the draft that she was sharing with the panel,

11  yes.

12  **Q.**   Now, that draft report references, does it not --

13  or draft findings letter, references the Title IX

14  Policy; correct?

15  **A.**   I can't find the reference.  Yes.  Yes.

16  **Q.**   The second --

17  **A.**   Yes.

18  **Q.**   Well, under "Rationale," it's the second

19  paragraph?

20  **A.**   Yes.

21  **Q.**   And it says, (Reading:)  Because the 2014-'15 Code

22  of Student Conduct does not explicitly define

23  "consent," the panel referred to the current Sexual and

24  Gender-Based Harassment, Sexual Violence, Relationship

25  and Interpersonal Violence and Stalking Policy, which

1   codified Brown University's existing community

2   standards with respect to maintaining a, quote, safe

3   learning, living and work environment where healthy,

4   respectful consensual conduct represents a campus norm.

5        Was that in the draft findings letter?

6   **A.**   Yes.

7   **Q.**   So the draft findings letter clearly references

8   the Title IX Policy; correct?

9   **A.**   Correct.

10  **Q.**   The Title IX Policy that you had excised from

11  Djuna Perkins' initial draft investigation report;

12  correct?

13  **A.**   Yes.

14  **Q.**   And it's specifically, the definition of "consent"

15  that you had specifically excised from Djuna Perkins'

16  draft investigation report; correct?

17  **A.**   Correct.

18  **Q.**   Now, did you open the draft findings letter when

19  you received it on April 14?

20  **A.**   I did not, I don't believe, realizing that there

21  was an attachment on that e-mail.

22  **Q.**   So this e-mail states, does it not, (Reading:)

23  Thank you for your conscientious work on this difficult

24  case.  I'm attaching a draft of the findings.  Please

25  let me know if you have any additions or corrections to

1    suggest.

2    **A.**    Right.  I was understanding that to mean that she

3    was just updating me about where they were in the

4    process, but I didn't realize that the attachment was

5    on that e-mail or I certainly didn't open it if I had.

6    I get a finalized findings letter.

7    **Q.**    So when you got that e-mail, you didn't see that

8    there was an attachment to it in the header?

9    **A.**    Well, I would have opened this on my phone and not

10   at my desk because it was after hours so, no, I hadn't

11   seen it.

12   **Q.**    So it's your testimony you didn't see that draft

13   findings letter on April 14 when you received the

14   e-mail?

15   **A.**    No, I don't recall.

16   **Q.**    You specifically recall opening it on your phone?

17   **A.**    I would have been home at this time so that's the

18   only way I review my e-mail at night.

19   **Q.**    My question is do you specifically recall opening

20   it on your phone?

21   **A.**    I don't specifically remember opening it on my

22   phone.

23   **Q.**    Okay.  But you specifically recall, though, that

24   when you received the e-mail you did not open the draft

25   findings letter?

1    **A.**    I specifically recall that, yes.

2    **Q.**    Even though it refers to the attached findings

3    letter, the body of the e-mail itself?

4    **A.**    Right.

5         MR. RATCLIFFE:  Twenty-six.

6         MR. RICHARD:  Full exhibit, your Honor.

7         THE COURT:  All right.  Thank you.  Twenty-six

8    will be full.

9         (Plaintiff's Exhibit 26 admitted in full.)

10   **Q.**    Showing you what's marked as Exhibit 26, do you

11   recognize that document?

12   **A.**    Yes.

13   **Q.**    And you wrote that document?

14   **A.**    Yes.

15   **Q.**    And that's a letter that you sent to Beau?

16   **A.**    Correct.

17   **Q.**    And what's the date of the letter?

18   **A.**    April 15th, 2016.

19   **Q.**    And that's the day after the hearing?  The hearing

20   was on the 14th; correct?

21   **A.**    Correct.

22   **Q.**    And it's the day after you had received the draft

23   findings letter that you didn't open?

24   **A.**    Right.

25   **Q.**    And in this letter, you tell both -- you sent the

1   same letter to Allie, did you not?

2   **A.**   I did.

3   **Q.**   So you say to -- (Reading:)  I'm writing to both

4   you and the complainant, Allie, as a follow-up to the

5   hearing held yesterday, April 14, 2016.  During both

6   statements, references were made to the relevant policy

7   procedures applicable to this matter.

8          THE COURT:  Use the microphone.

9   **Q.**   Why don't you read the letter.

10  **A.**   Read the letter?

11  **Q.**   Yes.

12  **A.**   It says, (Reading:)  Dear Beau, I am writing to

13  both you and the complainant, Allie, as a follow-up to

14  the hearing held yesterday, April 14th, 2016.  During

15  both statements, references were made to the relevant

16  policy and procedures applicable in this matter.  As

17  Djuna Perkins cites in her investigation report, the

18  relevant policy the 2014-2015 Code of Student Conduct.

19  The relevant process is Brown's Complaint Process,

20  which was in effect at the time the complaint was

21  submitted.  The panel was provided with the 2014-2015

22  Code of Student Conduct and instructed to review

23  Section III (Sexual Misconduct) of the listed offenses

24  when determining whether a violation of the policy

25  occurred.  I've attached both documents for your

1 reference.  Please let me know if you have any

2 questions.  Best regards, Amanda Walsh.

3 **Q.** Now, you didn't tell Beau, did you, that you had

4 given Gretchen Schultz the Title IX Policy?

5 **A.** I did not.

6 **Q.** And you didn't tell Beau, did you, that you had

7 told Gretchen Schultz that the panel could consider the

8 definition of "consent" in the Title IX Policy?

9 **A.** I did not.

10 **Q.** And to your knowledge, up to this point, Beau was

11 under the impression that his conduct would be

12 governed under -- solely under the 2014-'15 Code of

13 Student Conduct?

14 **A.** Correct.

15 **Q.** Now, I believe you testified that Dr. Schultz was

16 the Chair of the Title IX panel.  Is that her title,

17 Title IX Council Chair?

18 **A.** That's not her title at Brown, but that's her

19 title within this complaint process, yes.

20 **Q.** She's a French professor?

21 **A.** Yes.

22 **Q.** And she sits in on, or she's a member of all the

23 panels that hear Title IX complaints?

24 **A.** Yes.

25 **Q.** And she's a non-voting member?

1    **A.**   Correct.

2    **Q.**   And there is a -- your notes, which we had

3    previously referenced as Exhibit 24, references a

4    checklist that Gretchen had -- Dr. Schultz as the

5    Title IX Panel Chair went over with the hearing panel;

6    correct?

7    **A.**   Right.

8         MR. RATCLIFFE:  Exhibit 23.

9         MR. RICHARD:  May be full, your Honor.

10        THE COURT:  All right.  Thank you.  Twenty-three

11   will be full.

12        (Plaintiff's Exhibit 23 admitted in full.)

13   **Q.**   I believe that, and you can correct me if I'm

14   wrong, that the document, the title on this document

15   was not prepared by your office.  It's an actual cover

16   page of Exhibit 23; correct?

17   **A.**   The cover page was not prepared by my office, no.

18        MR. RICHARD:  Just for the record, this is a

19   cover page we prepared in discovery to segregate

20   documents.

21        THE COURT:  Okay.  Thank you.

22   **Q.**   The actual checklist begins on page two of Exhibit

23   23; correct?

24   **A.**   Correct.

25   **Q.**   And who prepared this checklist?

1  **A.**   I prepared the initial draft and then shared it

2  with our Title IX investigator, Jessica Katz, for

3  review and she did a series of revisions, and

4  ultimately that was submitted to Gretchen Schultz, the

5  Council Chair, for review and revisions, and I

6  finalized the draft and the final document is what

7  appears here.

8  **Q.**   The role of the Chair, the information that you

9  got for this regarding the role of the Chair came from

10  the Title IX Complaint Process?

11  **A.**   Correct.

12  **Q.**   And the Chair's responsible for the administration

13  of the hearing process?

14  **A.**   Correct.

15  **Q.**   Including procedural matters and decisions leading

16  up to the hearing?

17  **A.**   Correct.

18  **Q.**   Determinations about information that would be

19  considered or not, appropriate and inappropriate lines

20  of questioning and the overall decorum of the

21  proceeding?

22  **A.**   Correct.

23  **Q.**   Now, you did receive a copy of the actual

24  findings, the final findings letter; correct?

25  **A.**   Correct.

1          MR. RATCLIFFE:  Twenty-eight.

2          THE COURT:  Any objection?

3          MR. RICHARD:  No, your Honor.  I was just

4     locating it.  It's fine.

5          THE COURT:  Twenty-eight will be full.

6     **Q.**   I'm showing you what's been marked as Exhibit 28

7     and ask if you recognize that document.

8          MR. RICHARD:  Your Honor, this is 27.

9          MR. RATCLIFFE:  Excuse me.  I'm sorry.

10    Twenty-seven.  Change this, please.

11         THE COURT:  All right.  So we're talking about

12    27.  Twenty-seven will be full.

13         MR. RICHARD:  Twenty-seven and 28 both can be

14    full, your Honor.

15         THE COURT:  That's fine.  Both are full.

16         (Plaintiff's Exhibits 27 and 28 admitted in

17    full.)

18    **Q.**   Show you what's been marked as Exhibit 27, do you

19    recognize that?

20    **A.**   Yes.

21    **Q.**   And we just reviewed the draft findings letter

22    that Dr. Schultz sent on the 14th.  This exhibit is

23    basically that same letter in final form, is it not?

24    **A.**   I haven't compared them to know if there are

25    changes but this is the final findings letter, yes.

1 **Q.** Well, we had reviewed the rationale in the draft

2 findings letter, the same rationale specifically with

3 respect to what we read regarding the reference to the

4 consent definition in the Title IX Policy; correct?

5 **A.** Correct.

6 **Q.** Now, there is a quote in that document referring

7 to the Title IX Policy; correct?

8 **A.** Correct.

9 **Q.** And the reference that Dr. Schultz is referencing

10 in her letter, which you just read, is the Statement of

11 Purpose on page one of the Title IX Policy; correct?

12 **A.** Correct.

13 **Q.** And the statement of purpose says that Brown

14 University is committed to establishing and maintaining

15 a safe learning, living and working environment where

16 healthy, respectful and consensual conduct represents

17 the campus norm; correct?

18 **A.** Correct.

19 **Q.** There's nothing in the complaint process that

20 indicates, does it, that the Title IX Policy codified

21 Brown University's existing community standard with

22 respect to maintaining a safe learning, living and

23 working environment where healthy, respectful and

24 consensual conduct represents campus norms?

25 **A.** In the complaint process, you said?

1    **Q.**    In the complaint process.

2    **A.**    No, it doesn't say that.

3    **Q.**    And the panel had, the Title IX panel that heard

4    Beau's case had nothing before them to indicate that

5    the definition of "consent" in the Title IX Policy

6    codified Brown University's existing community

7    standards?

8    **A.**    No, they did not.

9    **Q.**    And so that was information that Dr. Schultz

10   provided to the panel that was outside of the four

11   corners of the investigation report; correct?

12   **A.**    By drafting it in this letter?  I guess I'm

13   confused by your question.

14   **Q.**    She drafted the letter but the panel had to agree

15   to it; correct?

16   **A.**    The panel had to determine how they would view

17   consent, yes.

18   **Q.**    And she sent the draft letter to the panel?

19   **A.**    Yes.

20   **Q.**    And the panel concurred that this letter

21   accurately reflected our deliberations and findings?

22   **A.**    Correct.

23   **Q.**    And the panel found, did it not, that -- made a

24   determination that they were going to use the

25   definition of "consent" in the Title IX Policy?

1    **A.**    Correct.

2    **Q.**    And the rationale for using that was that it

3    codified existing community standards, or it

4    codified -- again, there, because the 2014-'15 Code of

5    Student Conduct does not explicitly define "consent,"

6    the panel referred to the current Sexual and

7    Gender-Based Harassment, Sexual Violence, Relationship

8    and Interpersonal Violence and Stalking Policy, which

9    codified --

10           THE COURT:  You're a little close to the

11   microphone.

12           MR. RATCLIFFE:  Excuse me, your Honor.

13   **Q.**    -- which codified Brown University's existing

14   community standard.

15   **A.**    Well, it doesn't specifically say that that was

16   their rationale in deciding whether to use that, but

17   yes, you are reading -- it does say here that she's

18   writing, "Which codified Brown University's current

19   existing community standards."

20   **Q.**    Well, you weren't present at the deliberations?

21   **A.**    I was not.

22   **Q.**    And all as you know is that the panel was told

23   they could consider the definition of "consent" in the

24   Title IX Policy.

25   **A.**    My understanding is that they were told that was

1    one of the definitions that they could consider.

2    **Q.**    Well, you were there when they were told that?

3    **A.**    Are you referring to the section where Gretchen

4    Schultz read the definition of "consent" at the start

5    of the hearing?

6    **Q.**    Yes.

7    **A.**    Yes.  And I believe she said something, it might

8    be helpful in thinking about how --

9    **Q.**    They could consider but weren't required to use

10   this definition?

11   **A.**    Yes.

12   **Q.**    But in any event, they decided to use the

13   definition?

14   **A.**    Yes, they did.

15   **Q.**    And the rationale for using that definition was

16   that it codified existing community standards?

17   **A.**    Like I said, I'm not certain that that was their

18   rationale in deciding that.

19   **Q.**    In any event, that's what the letter says;

20   correct?

21   **A.**    The letter says, "Which codified Brown

22   University's existing community standards," yes.

23   **Q.**    There was nothing before the panel in any of the

24   documents that established that the current definition

25   of "consent" in the 2015-'16 Title IX Policy codified

1    Brown University's existing community standards with

2    respect to consent?

3    **A.**    There was not.

4    **Q.**    And I'm showing you Exhibit 3, Title IX Complaint

5    Process.  If you look at the language starting here, it

6    states, does it not, "The Chair has complete discretion

7    to approve or deny the request."  If you start there

8    and go at the top.

9          It says in this complaint process, does it not,

10   or the hearing panel, that the presumption is that the

11   investigator has identified and interviewed all

12   relevant witnesses and supplied all information

13   necessary for the hearing panel to render its decision

14   and determine sanctions; correct?

15   **A.**    It doesn't say "supplied all information."  It

16   says, "Supplied the information that is necessary,"

17   yes.

18   **Q.**    (Reading:)  Has identified and interviewed all

19   relevant witnesses and supplied the information

20   necessary for the hearing panel to render its decision

21   and determine a sanction.

22   **A.**    Right.

23   **Q.**    And in this case, Gretchen Schultz, as the Chair,

24   added additional information -- strike that -- provided

25   additional information to the hearing panel regarding

1    the codification, the current "consent" definition in

2    the Title IX Policy codifying existing Brown University

3    community standards.

4    **A.**   Well, the panel does consider other documents.

5    This is in reference to the factual information.  So

6    they all consider the complaint process and the

7    relevant policy.

8    **Q.**   The relevant policy was the 2014-'15 Code of

9    Student Conduct?

10   **A.**   Correct.

11   **Q.**   And in fact, to anybody looking at Beau or Allie

12   looking at Djuna's report wouldn't draw an inference in

13   any way that the panel would consider the 2015-'16

14   definition of "consent" in the Title IX Policy?

15        MR. RICHARD:  Objection, your Honor.  Calls for

16   speculation by two people he referenced in his

17   question.

18        THE COURT:  I'm going to sustain the objection.

19   Why don't you try to reask the question.

20   **Q.**   Was there anything in Djuna Perkins' investigative

21   report which would have led Beau to believe that the

22   Title IX panel hearing his case would be considering

23   the definition of "consent" contained in the 2015-'16

24   policy?

25   **A.**   No.

1          MR. RATCLIFFE:  Twenty-eight.  This is 28.

2  **Q.**   I'm showing you what's been marked as Exhibit 28.

3  Do you recognize that document?

4  **A.**   Yes.

5  **Q.**   And that was a letter that you sent to Beau

6  regarding the panel decision?

7  **A.**   Yes.

8  **Q.**   And as a result of the panel decision, Beau was

9  suspended from Brown University until the fall of 2018;

10  correct?

11  **A.**   Correct.

12  **Q.**   And at the time this letter was sent, do you

13  recall what year Beau was at Brown University?

14  **A.**   I believe that he just finished his junior year.

15  **Q.**   So he would have had one year left.  He would be

16  graduating next spring in 2017; correct?

17  **A.**   Correct.

18  **Q.**   So now he at a minimum has to wait until the fall

19  of 2018 to matriculate at Brown; correct?

20  **A.**   Correct.

21  **Q.**   And he's not guaranteed that he'll be able to

22  matriculate at Brown in the fall of 2018 semester;

23  correct?

24  **A.**   Correct.

25  **Q.**   He basically has to reapply?

1    **A.**   So that's actually handled by the Office of

2    Student Life.

3    **Q.**   But in any event, he can't go back on campus, do

4    anything, can't come on Brown University campus, can't

5    do anything until he's readmitted to Brown University?

6    **A.**   Correct.

7    **Q.**   Now, there was an appeal in this case?

8         THE COURT:   Why don't we take a break before you

9    get into the appeal.   So we'll take our afternoon

10   break, about ten minutes.   Thank you.

11        (Recess.)

12        THE COURT:   Okay.   You may proceed,

13   Mr. Ratcliffe.

14   **Q.**   Now, both the complainant and the respondent filed

15   appeals in this case?

16   **A.**   Correct.

17   **Q.**   The complainant appealed the sanction?

18   **A.**   Correct.

19   **Q.**   She wanted Beau dismissed from the University;

20   correct?

21   **A.**   I believe so.   Yes.   I believe so, yes.

22   **Q.**   And Beau filed an appeal claiming one of the

23   grounds was procedural error?

24   **A.**   Correct.

25   **Q.**   Do you recall what the other grounds were?   I can

1    show you.

2         MR. RATCLIFFE:  Why don't I mark both of the

3    appeals as exhibits.

4         MR. RICHARD:  It's 29 and 30, your Honor.  They

5    may be full.

6         THE COURT:  All right.  Twenty-nine and 30 will

7    be full without objection.

8         (Plaintiff's Exhibits 29 and 30 admitted in

9    full.)

10   **Q.**   Show you what's been marked as Exhibit 29.  Do you

11   recognize that document?

12   **A.**   Yes.  It looks like Allie's appeal.

13   **Q.**   And 30?

14   **A.**   Is Beau's appeal.

15   **Q.**   And one of the bases of Beau's appeal was the

16   definition of "consent" in the -- or the Title IX panel

17   referring to the definition of "consent" in the

18   2015-'16 Title IX Policy; correct?

19   **A.**   Correct.

20   **Q.**   So basically, Beau was contending that there was

21   error for the Title IX hearing panel to include a

22   definition of "consent" that didn't exist or the

23   definition of "consent" that was not included in the

24   2014-'15 Code of Student Conduct; correct?

25   **A.**   Correct.

1  **Q.**    Now, he also alleged the same reference, back to

2  the conclusion of the character evidence; correct?   In

3  his objection to Djuna Perkins' report, he referenced

4  the character evidence on pages 27 and 28 of the

5  report; correct?

6  **A.**    Correct.

7  **Q.**    Now, after the appeals were filed -- the appeals

8  were filed on April 25th, 2016?   At least Beau's was;

9  correct?

10 **A.**    That's the date, yes.

11 **Q.**    You wrote a letter to Gretchen Schultz?

12 **A.**    Yes.

13         MR. RATCLIFFE:   Thirty-one.

14         MR. RICHARD:   Full.

15         THE COURT:   Thirty-one will be full without

16 objection.

17         (Plaintiff's Exhibit 31 admitted in full.)

18 **Q.**    Exhibit 31, do you recognize that document?

19 **A.**    I do.

20 **Q.**    What is that document?

21 **A.**    It's a letter from me to Gretchen Schultz.

22 **Q.**    And as a result of sending that letter, Gretchen

23 Schultz asked for a meeting with you?

24 **A.**    Correct.

25 **Q.**    And you had a meeting with Gretchen Schultz

1    regarding the substance of that letter?

2    **A.**    Actually, my memory of the meeting was that it was

3    not about the substance of this letter so much as it

4    was about the appeals process generally because this

5    was the first appeal heard under the new complaint

6    process.

7    **Q.**    And in fact, the checklist for -- you had

8    identified Exhibit 23, I believe, the checklist for the

9    hearing panels; correct?

10   **A.**    Yes.

11   **Q.**    And at the time that the appeal was filed, a

12   checklist hadn't even been prepared for the appeals

13   panel; correct?

14   **A.**    Correct.

15   **Q.**    In fact, you had left for maternity leave by the

16   time the checklist for the appeals panel was prepared;

17   is that right?

18   **A.**    I don't know the date that the checklist for the

19   appeals panel was prepared, but I did go out on

20   maternity leave within -- I don't see the date on this

21   letter, but within -- it was the end of this week, the

22   Friday of this week.

23   **Q.**    The date of this letter is April 28th?

24   **A.**    And I believe my last day on campus was April

25   29th.

1          MR. RATCLIFFE:  Exhibits 32 and 33.

2          MR. RICHARD:  Full.

3          THE COURT:  Thirty-two and 33 will be full

4    without objection.

5          (Plaintiff's Exhibits 32 and 33 admitted in

6    full.)

7    **Q.**   And Beau's response to Allie's appeal is dated

8    April 29th; correct?

9    **A.**   Correct.

10   **Q.**   And Allie's response to Beau's appeal is dated the

11   same day; correct?

12   **A.**   Correct.

13   **Q.**   And in Allie's response to Beau's appeal, it

14   states, does it not, that under the -- go to the second

15   paragraph on page four of her response, (Reading:)

16   Under the 2014-'15 Code of Student Conduct, sexual

17   misconduct is committed, quote, "Against a person's

18   will," unquote.  The evidence relied upon and reason

19   given by the Title IX Council for its decision support

20   that Beau committed such misconduct against my will.

21          Correct?

22   **A.**   Yes.  It states that.

23   **Q.**   And you've read the 2014-'15 Code of Student

24   Conduct?

25   **A.**   Correct.

1   **Q.**   And is there anything in the 2014-'15 Code of

2   Student Conduct where it states specifically, as Allie

3   had in this document, that sexual misconduct is

4   committed, quote, "against a person's will"?

5   **A.**   I do not believe so, no.

6   **Q.**   Do you want to check?

7   **A.**   I can take a look.

8          (Witness reads document.)

9   **A.**   No, I don't see it quoted there, or the

10  information that was in the quotations.

11          MR. RATCLIFFE:  Exhibit 34.

12          MR. RICHARD:  I'll stipulate to both 34 and 35,

13  your Honor.

14          THE COURT:  All right.  Both 34 and 35 will be

15  full.

16          (Plaintiff's Exhibits 34 and 35 admitted in

17  full.)

18  **Q.**   I know that you were on maternity leave at the

19  time but, subsequent to your maternity leave, did you

20  come to learn that Beau had attempted to file a

21  surreply addressing the quote that Allie referenced in

22  her objection to his appeal?

23  **A.**   I actually haven't returned from maternity leave

24  so I'm still -- I'm on maternity leave.

25  **Q.**   I apologize.  Have you come to learn that Beau

1    attempted to file a surreply?

2    **A.**   I do know that.  I believe that I learned really

3    of it mostly from my deposition.

4    **Q.**   In any event, I believe at your deposition you

5    reviewed this surreply.  That's the surreply, to your

6    knowledge, that Beau filed; correct?

7    **A.**   Yes.

8    **Q.**   And he was addressing the double quote referred by

9    Allie to the part of the Code that was, the 2014-'15

10   Code that was not -- strike that.

11       He was referring to Allie's misstatement of the

12   2014-'15 Code; correct?

13   **A.**   Correct.

14   **Q.**   And who is Jessica Katz?

15   **A.**   Jessica Katz is Brown's Title IX investigator.

16       MR. RATCLIFFE:  Thirty-five.

17       MR. RICHARD:  I stipulated already to 35, I

18   believe.

19   **Q.**   And you're aware that, are you not, that Jessica

20   Katz -- she was acting in your stead, or she is acting

21   in your stead while you're on maternity leave; correct?

22   **A.**   Correct.

23   **Q.**   And Jessica Katz sent a response to Beau that

24   surreplies are not -- the complaint process does not

25   allow for surreplies; correct?

1    **A.**   I don't believe I've seen this e-mail before but,

2    yes, it looks like she's saying that the complaint

3    process does not allow for surreplies.

4    **Q.**   And to your knowledge, the complaint process does

5    not forbid surreplies, does it?

6    **A.**   It is silent as to surreplies.

7    **Q.**   It's silent on surreplies; correct?

8    **A.**   Yes.

9    **Q.**   And I believe it was your testimony at your

10   deposition that if someone misstates something in -- a

11   respondent or a complainant misstates something in a

12   document that that should be brought to the attention

13   of the panel that's hearing the matter; correct?

14   **A.**   If it's a misstatement -- I would have to review

15   the documents to say about a specific case.  But if the

16   misstatement was material, then I would address it,

17   yes.

18   **Q.**   Do you view misquoting language of the policy as a

19   material misstatement?

20   **A.**   Well, in this case, I assume the appeals panel

21   also had the '14-'15 Code in front of them, too.  So

22   they would have the ability to look at that section.

23   But again, without reading both documents fully, which

24   I have not done, I really can't say.

25          MR. RATCLIFFE:  Thirty-six.

1          MR. RICHARD:  May come in as full.

2          THE COURT:  Thirty-six will be full without

3     objection.

4          (Plaintiff's Exhibit 36 admitted in full.)

5     **Q.**   Have you seen Exhibit 36?

6     **A.**   I have not.

7     **Q.**   Now, this is a full exhibit.  Now, we can review

8     the findings.  Your understanding is that Beau was

9     claiming a series of errors that occurred at his

10    hearing; correct?

11    **A.**   It seems like based on the letter that you just

12    showed me that it was some related to the investigation

13    report and some related to the consent issue.

14         MR. RICHARD:  Your Honor, I would just object.

15    The document speaks for itself.  This witness was on

16    maternity leave.

17         THE COURT:  Right.

18         MR. RATCLIFFE:  She is still the program -- I'm

19    going to ask her a couple of questions about some of

20    the representations in the letter.

21         THE COURT:  Well, you can ask her -- I think she

22    said she hadn't seen this letter.

23         MR. RATCLIFFE:  Why don't you review the letter.

24         THE COURT:  Have you seen this letter before?

25         THE WITNESS:  No.

1          THE COURT:  All right.  I think before she can

2     talk about it she needs to review it.

3          (Witness reads document.)

4          THE COURT:  Counsel, the microphones are picking

5     up your whispering.  So you might want to mute them if

6     you're consulting with each other.

7          MR. RICHARD:  It really wasn't consulting.

8          THE COURT:  Whatever.  If you're talking about

9     dinner or whatever it is, you should just mute them.

10    **Q.**   You've had a chance to review the letter?

11    **A.**   Yes.

12    **Q.**   Okay.  One of the issues that the panel addressed

13    on Section III was deficiencies regarding the

14    investigator's report being substantial prejudicial

15    error.  You saw that?

16    **A.**   Yes.

17    **Q.**   And the Section (b), III(b) refers to the

18    character evidence that we addressed; correct?

19    **A.**   Correct.

20    **Q.**   And the appeal on that ground was denied and the

21    appeals panel did not find inclusion of this passage

22    constituted a substantial procedural error that

23    materially affected the outcome of the hearing.

24         It goes on to state, (Reading:)  The appeals

25    panel noted, moreover, that Title IX Council panels are

1    instructed to consider only relevant information and

2    disregard prejudicial character evidence.

3         Correct?

4    **A.**   Correct.

5    **Q.**   Now, the checklist that Gretchen reads to the

6    hearing actually says something a little bit different,

7    doesn't it?  Under Section (b) where we have role of

8    the panel members, do you see that there?

9    **A.**   Yes.

10   **Q.**   This is something that you drafted?

11   **A.**   Yes.

12   **Q.**   And actually, when Gretchen reads through her

13   checklist to the panel, she tells them that only

14   information that has been deemed relevant is included

15   in the investigation report; correct?

16   **A.**   Correct.

17        MR. RATCLIFFE:  Exhibit 37.

18        MR. RICHARD:  May be full.

19        THE COURT:  Thirty-seven will be full without

20   objection.

21        (Plaintiff's Exhibit 37 admitted in full.)

22   **Q.**   I note that you didn't sign this extension,

23   extension authorization form, but is that the form that

24   the Title IX Office used when someone is found

25   responsible of the violation of either the Title IX

1    Policy or the Code of Student Conduct?

2    **A.**   Yes.

3    **Q.**   And that's what was issued to Beau in this case?

4    **A.**   Yes.  Or I assume so.  Yes, it looks like it was.

5    **Q.**   It's the same form?

6    **A.**   Yes.

7    **Q.**   And that's something that you then send to the --

8    where does that form go?

9    **A.**   There's a few people that it goes to, but

10   including the Office of Student Life and Registrar

11   Office to indicate that a student has been suspended or

12   expelled.

13   **Q.**   Okay.  And are you aware of how his record is

14   noted, how his transcript is noted, that his transcript

15   remarks suspended for disciplinary reasons will show on

16   his transcript if he requests a transcript, for

17   example, to go to law school?

18   **A.**   Yes.

19   **Q.**   So it will show that he went to Brown starting in

20   2013 through 2016, and then it will say "suspended for

21   disciplinary reasons"?

22   **A.**   Yes.

23   **Q.**   And if he's let back in, he can then complete his

24   education, but when he applies to law school or any

25   graduate school it will show that for the two years he

1    was suspended for disciplinary reasons between 2016 --

2    May of 2016 and September of 2018?

3    **A.**   I'm not certain.  That would be something that

4    falls within the registrar how it would appear.

5    **Q.**   But in any event, it's your understanding that

6    there's a transcript, it says on the form and that

7    there's a transcript remark?

8    **A.**   At this time, yes.

9         MR. RATCLIFFE:  May I have a moment, your Honor?

10        THE COURT:  Yes.

11        (Pause.)

12        MR. RATCLIFFE:  Just a matter of housekeeping

13   just so that -- I believe we agree that the 2013-'14

14   Code of Student Conduct would be admitted as a full

15   exhibit.  That was the Code of Student Conduct that was

16   in existence when Beau was a freshman.

17        MR. RICHARD:  Exhibit 1, your Honor, yes.

18        THE COURT:  Exhibit 1?

19        MR. RICHARD:  Yes.

20        THE COURT:  All right.  That will be full.

21        (Plaintiff's Exhibit 1 admitted in full.)

22        MR. RATCLIFFE:  I have nothing further of this

23   witness at this time.  I pulled a couple of exhibits

24   out.  I'm just so going to put them back so Mr. Richard

25   will be able to find them quickly.  Just take me about

1    two minutes.

2              THE COURT:  Let's go off the record for a

3    minute.

4              (Discussion off the record.)

5              <u>**CROSS-EXAMINATION BY MR. RICHARD**</u>

6    **Q.**   Good afternoon, Ms. Walsh.  Just briefly, I'd like

7    to ask you a few questions about your background.

8              Can you tell us your educational background,

9    please.

10   **A.**   I went to Northeastern University and graduated

11   with a bachelor of science degree, and then went on to

12   Roger Williams School of Law and graduated in 2011.

13   **Q.**   Did you go from undergraduate straight to law

14   school?

15   **A.**   No.  I worked in Portland, Oregon at an

16   educational non-profit in the interim from -- I left

17   Northeastern around January 2007, and I began law

18   school in the fall of 2009.

19   **Q.**   What did you do after graduation from law school?

20   **A.**   I went on to work at the Victim Rights Law Center,

21   which is a non-profit based in Boston that represents

22   individuals who have been raped or sexually assaulted.

23   **Q.**   How long did you stay at that position?

24   **A.**   I stayed there from approximately August of 2011

25   through April of 2015.

1    **Q.**    And in April of 2015, you came to Brown?

2    **A.**    Yes.

3    **Q.**    What is your background in Title IX?

4    **A.**    When I was at the Victim Rights Law Center, I

5    represented individuals in student conduct, student

6    disciplinary proceedings.  They were often complainants

7    but sometimes they were respondents in a particular

8    matter.  And I also consulted for the Department of

9    Justice for different universities that were campus

10   grantees.

11         So the University had received a grant

12   effectively to handle specifically cases involving

13   sexual and gender-based violence, and there was a list

14   of approved consultants effectively, and I was part of

15   that.

16   **Q.**    Did you do any Title IX training?

17   **A.**    So I presented at a lot of different conferences,

18   both directly through my organization but also again

19   through the Department of Justice, Office on Violence

20   Against Women in conjunction with the Clery Center,

21   which is based in Philadelphia.  So I presented at many

22   conferences.

23   **Q.**    What led you to apply for the position at Brown?

24   **A.**    That I was often consulting with universities on

25   helping them draft policies and processes but wasn't

1    able to fully implement those, then I would leave and

2    leave it to the university to continue that function.

3    And so I was looking for a change to be able to see the

4    process through and to be able to execute the policies

5    and processes that I had helped to draft.

6    **Q.**    Was the position for which you applied the

7    Title IX Program Officer?

8    **A.**    Yes.

9    **Q.**    Is that a new position at Brown?

10   **A.**    Yes.

11   **Q.**    Was there a selection committee in the hiring

12   process?

13   **A.**    There was an extensive selection process.

14   **Q.**    Do you know what led to the creation of this

15   position at Brown?

16   **A.**    Yes.

17        MR. RATCLIFFE:  Objection, your Honor.  I

18   believe that she wasn't at Brown when the position --

19        THE COURT:  First of all, it's background.  And

20   if you want Mr. Richard to lay a better foundation for

21   her personal knowledge, he can do that, but I don't

22   think that's really necessary.

23        MR. RATCLIFFE:  That's fine.  I'll withdraw the

24   objection.

25   **A.**    My understanding is that the Sexual Assault Task

1    Force was formed in the 2014-2015 academic year, and it

2    was in response to a few high-profile cases.  That

3    group convened and came out with two reports.  One was

4    in December of 2014, and the second was in April of

5    2015 and that laid out a series of both some historical

6    context at Brown and globally and then also some

7    recommendations for how the University would proceed

8    moving forward.

9         Some members were duplicative of who also

10   participated in my selection process.  But when I

11   visited campus, I did meet with a lot of members of the

12   Sexual Assault Task Force.

13   **Q.**   You were hired in May of 2015?

14   **A.**   I believe that I began in May of 2015.  I believe

15   I was hired in March of 2015 and the announcement was

16   made in April of 2015.

17   **Q.**   To whom do you report?

18   **A.**   I report to Liza Cariaga-LO, who is the

19   Vice-President for Diversity and Inclusion.

20   **Q.**   Is the Title IX Office a new office at Brown?

21   **A.**   Yes.  It basically existed -- effectively, it came

22   into existence when I began at Brown but really was

23   fully functioning when the new process and policy were

24   implemented in September of 2015.

25   **Q.**   What are the program officer's responsibilities?

1    **A.**    I oversee all of the Title IX Policy, so any

2    claims by students, faculty or staff that involve

3    allegations of sexual or gender-based harassment,

4    stalking, sexual violence or interpersonal violence.

5    So if they needed resources, remedial measures, et

6    cetera; if they wanted to submit a complaint.  Some

7    want to report to Brown DPS or local law enforcement so

8    I would provide them with information and connect them

9    with the necessary resources to achieve whatever

10   resources they were looking for.

11   **Q.**    Do you work with the Office of Student Life?

12   **A.**    Yes.  Very often as it relates to cases involving

13   student respondents or student complainants.

14   **Q.**    What role, if any, does the Office of Student Life

15   have in the process relating to student complaints?

16   **A.**    I work with the Office of Student Life largely in

17   two respects.  One is that the Office of Student Life

18   implements -- they execute all campus-issued no-contact

19   orders and many of the complainants and respondents in

20   the Title IX cases are seeking no-contact orders.  And

21   I collaborate with them to both request a no-contact

22   order on behalf of the student or to give them a

23   heads-up that one will be requested.  They also enforce

24   violations of no-contact orders.

25        The second way I work with them heavily is with

1    student support, which are deemed -- who can be helpful

2    when students are needing academic or support,

3    accommodations, extensions, other sorts of things.  And

4    they work with students who are going through a whole

5    series of challenges, but one of them would be acting

6    as a complainant or a respondent in a case like this.

7    Q.    As far as Title IX issues at Brown, is there any

8    type of oversight boards?

9    A.    Yes.  So in addition to reporting to Liza

10   Cariaga-Lo, the President also formed a Title IX

11   Oversight and Advisory Board, which is Chaired by

12   Michele Cyr, who is also the Chair of the Sexual

13   Assault Task Force.  The goal was to create some

14   continuity between the two.

15         The Oversight and Advisory Board is made up of

16   faculty members, staff members, very senior

17   administrators.  It includes three vice-presidents, and

18   then representation from undergraduate, graduate and

19   medical students.

20   Q.    Was this Board formed this past academic year?

21   A.    Yes.  It was formed -- it was included in the task

22   force report but fully formed in the fall of 2015 and

23   met monthly throughout this academic year.

24   Q.    Showing you what's previously been marked and

25   admitted as Exhibit 4, it's called the Title IX Policy?

1     **A.**    Yes.

2     **Q.**    When did that come into effect?

3     **A.**    September of 2015.

4     **Q.**    Who approved it?

5     **A.**    It was initially drafted -- an initial draft was

6     created by the Sexual Assault Task Force and attached

7     to the final report as Appendix A.  It was then

8     subsequently revised by a whole series of people.  I

9     weighed in on it.  It was revised by a law firm in

10    Boston, Holland and Knight were retained to do a review

11    of it, and then was fully implemented after all

12    policies and processes are finalized by Brown's

13    corporation.

14    **Q.**    When did the complaint process come about?

15    **A.**    The complaint process as we're referring to it

16    today for cases involving student respondents went

17    through a similar process and was implemented on the

18    same timeline in September of 2015.

19    **Q.**    Who drafted the complaint process?

20    **A.**    I drafted the complaint process in its current

21    form.  I pulled the information heavily from the final

22    report of the Sexual Assault Task Force, but it was --

23    the information about how complaints would be handled

24    was contained in the final report, but it wasn't a

25    stand-alone document until I drafted it.

1    **Q.**    Focusing on page nine of the Title IX Policy,

2    specifically Section 10 or X, Resources Reporting,

3    Filing a Complaint, can you summarize for the Court the

4    resources that Brown provides under this Title IX

5    Policy?

6    **A.**    Sure.  So for students who are seeking resources,

7    there's a whole host of offices at Brown that can help

8    them.  We direct students to confidential resources

9    like the chaplain's office, counseling and psych

10   services, which on campus is referred to as CAPS.  The

11   SHARE advocates, which are located in Health Services

12   and then, of course, Health Services as confidential

13   resources.

14           Students also get various support roles.  For

15   example, students are assigned academic deans if they

16   need support throughout an investigation.  They also

17   utilize student support, which is part of the Office of

18   Student Life.  They can seek help from DPS.  There's an

19   advocate in DPS that does support safety planning,

20   things like that.  And then, of course, they come to

21   the Title IX Office to gather information about the

22   process or to sometimes request a fear remedial measure

23   like a no-contact order, an escort, a housing transfer,

24   et cetera.

25   **Q.**    Were any resources offered to Beau?

1    **A.**   Yes.   Beau was assigned an academic dean just as

2    all complainants and respondents involved complaints

3    that allege sexual assault are.   He was also in contact

4    with a student support dean, Dean Maria Suarez,

5    throughout this and --

6         MR. RATCLIFFE:   I'm going to object to this.

7    There's no foundation for that, and I don't know the

8    basis of knowledge as to her representation that she

9    was in contact with Dean Maria Suarez regarding various

10   matters.

11        THE COURT:   All right.   That's fine.   Why don't

12   you lay a better foundation.

13   **Q.**   You testified that there were resources offered to

14   Beau?

15   **A.**   Yes.

16   **Q.**   Did you offer any resources to Beau?

17   **A.**   Yes.   Contained in the letter that I provided to

18   him, I believe on November 2nd, summarizing our

19   conversation, I let him know about available resources.

20   Specifically I remember that it made reference to

21   counseling and psych services, which is CAPS.   I am the

22   person who assigns the academic deans.   And in this

23   case, I was the person who notified him that he had an

24   academic dean.

25        There were other requests for accommodations.

1    For example, he had mock trial -- I believe a mock

2    trial engagement around the time the complaint was

3    submitted and asked for an extension to submit his

4    response statement, which was granted.  And he asked

5    for other academic extensions.

6    **Q.**    Now, the Title IX Policy under the resource

7    recording complaint references resources offered

8    whether as complainant or respondent.  Is there a

9    difference between the types of resources that are

10   offered to complainants or respondents?

11   **A.**    From the Title IX Office the resources are exactly

12   the same that I offer to both parties.  The only

13   distinction on campus would be that our SHARE advocates

14   largely work with or are there.  There are sexual

15   harassment and assault resource education advocates,

16   and they work with students who are often in the role

17   of the complainant.

18   **Q.**    This section also deals with reporting.  What is

19   it specifically that the Title IX Office does as to the

20   reporting of complaints?

21   **A.**    "Reporting" is really a global term that can refer

22   to reporting to the Title IX Office to share

23   information.  It doesn't necessarily mean a student

24   wants to go through submitting a complaint.  It can

25   also refer to reporting to DPS or Providence Police.

1    The Title IX Office will help support those goals if a

2    student wants to do that.

3    **Q.**   Page 11 of the complaint, Section (b), Timeframe

4    for Reporting.  Is there a timeframe by which a

5    complaint must be received by Brown?

6    **A.**   No, there is not.

7    **Q.**   And the policy also refers in Section (e) to

8    Remedial Protective Measures.  What are they?

9    **A.**   Again, some -- when we think about remedial

10   measures, we often think about addressing safety,

11   well-being, could be academic, et cetera.  So to remedy

12   things that have been impacted as a result of an

13   investigation.  Safety measures are often things like a

14   request for a housing transfer or a request for a

15   no-contact order.

16   **Q.**   How many people work in the Title IX Office?

17   **A.**   There are -- really in the Title IX Office alone

18   there are two full-time employees.  The Title IX

19   Program Officer, which is my role; and the Title IX

20   investigator, which is Jessica Katz's role.

21   **Q.**   Page 11 going onto 12 speaks of applicable

22   procedures under this policy.  What does that

23   reference?

24   **A.**   Again, this delineates the conduct that is

25   expected, the Code of Conduct, the community standards

1     that are expected at Brown and then the accompanying

2     procedures would be how -- if a complaint was

3     submitted, how an investigation and adjudication would

4     be handled, and there were three sets of complaint

5     procedures at Brown, one that relates to student

6     respondents.

7     **Q.**   That's the complaint process that you discussed

8     today?

9     **A.**   Yes.

10    **Q.**   What is the Title IX Council?

11    **A.**   The Title IX Council is the body of people that

12    include undergraduates, graduate students, medical

13    students, faculty and staff.  And their role is to

14    serve as panelists, to be the decision-makers of cases

15    that involve sexual and gender-based harassment,

16    stalking, interpersonal violence or sexual violence.

17    **Q.**   Why are students on the panel?

18    **A.**   It has long been the culture at Brown that

19    students demand to be on these panels, and they have

20    been very successful members of these panels predating

21    my time at Brown.

22         MR. RATCLIFFE:  Objection.  Move to strike.

23         THE COURT:  Sustained.

24    **Q.**   How are they selected, the students?

25    **A.**   Students are selected through committee processes.

1    So for example, for undergraduate students there's

2    something called UCS, the Undergraduate Council of

3    Students.  In order to have students sitting on

4    committees at Brown, there is a process for that and

5    that process is dictated by UCS.  So you submit to UCS

6    the students that you need and the function that they

7    will serve and they effectively interview, vet and

8    assign the students to your panel.

9         It's a similar process for graduate students,

10   which is GSC, the Graduate Student Council.  And for

11   medical students it's the med student senate goes

12   through a similar process.

13        So you indicate how many students you need, and

14   they assign the students.

15   **Q.**   What role do you have in the student selection

16   process?

17   **A.**   I have as much of a role as the student selection

18   process permits me to have.  So my understanding is

19   that most administrators don't have a role but

20   understanding that this was an incredibly important

21   function and also a new process, I met with the student

22   who was the UCS president for the '15-'16 year to my

23   recollection twice last summer to discuss, again, the

24   function of the Title IX Council, the role of the

25   students, and what I was hoping those students would be

1    able -- how I wanted those students to be vetted in

2    order for them to be successful members of the Title IX

3    Council.

4    **Q.**   You say how you want students vetted, what do you

5    mean by that?

6    **A.**   In recent years, there has been a lot of --

7        MR. RATCLIFFE:  I'm going to object.  Not

8    responsive.

9    **Q.**   What are the --

10       THE COURT:  Let me rule on the objection.

11   Overruled.  I don't know if it's responsive yet.  She

12   hardly said anything.

13       So you asked her what you meant by vetting.  So

14   let's hear her answer to that.

15   **A.**   What I mean by vetting is that there were

16   particular questions I was hoping that the UCS process

17   would ask of students who were interested in these

18   positions.  Specifically, I remember specifically

19   stating I didn't want to have --

20       MR. RATCLIFFE:  Objection.

21       THE COURT:  I think you answered the question.

22   Mr. Richard may follow-up.

23   **Q.**   Were you focusing on male or female members?

24   **A.**   I was not.  I was focusing on the ideas they had

25   around issues related to Title IX.  I was hoping to not

1   have any activists or have any students who expressed

2   that universities shouldn't be addressing these cases.

3   I was seeking students who could be objective and

4   open-minded.

5   **Q.**   Have you taken any steps to have male students

6   serve on the Title IX Council?

7   **A.**   When I met with the UCS president, I asked to get

8   a representative group --

9           MR. RATCLIFFE:  Objection.

10          THE COURT:  What's the objection?

11          MR. RATCLIFFE:  I don't believe it's responsive.

12   He said have you taken any steps to ensure males on the

13   process, and then she starts talking about meeting with

14   the UCS president.

15          THE COURT:  Well, I understand your concern, but

16   I'm going to overrule the objection because I think

17   she's just leading up to her substantive answer.

18          So go ahead.  You may answer.

19   **A.**   When I met with the UCS president, I had asked him

20   to provide as close as he could a representative group

21   from the six slots that he was seeking, including as

22   gender equality.  So I would have ideally liked to have

23   three males and three females.

24   **Q.**   What about the non-student members, how are they

25   selected?

1    **A.**    When I came to Brown, I began the selection

2    process by meeting with people who had worked in

3    Student Life, and they identified Student Conduct Board

4    members who had served a similar function on the

5    Student Conduct Board panel in the past.  And I asked

6    them more questions, looking for people who had

7    approached these cases fairly, had found both favorably

8    towards complaints and had, you know, responsible or

9    not responsible.  I wanted people who had had a

10   balanced approach to these cases in the past.  And then

11   I would meet with them.  I would discuss the new role

12   of the Title IX Council, how it was different from the

13   Student Conduct Board and engage with them to see

14   whether I thought it was a good fit.

15        And I continued to ask for various

16   recommendations, again trying to seek a representative

17   group of faculty and staff.

18   **Q.**    When did this selection process occur?

19   **A.**    I began meeting with people throughout all of last

20   summer immediately when I came to Brown in anticipation

21   of the complaint process and the policy being

22   implemented in September, but it went on a rolling

23   basis into the early part of the fall 2015 semester.

24   **Q.**    When was the first Title IX Council convened?

25   **A.**    I believe the first panel was convened in the

1    first days in February of 2016.

2    **Q.**    Prior to membership of the panel, I believe you

3    testified there were 18 or 20 members?

4    **A.**    Approximately.

5    **Q.**    How many are male?

6    **A.**    Three.

7    **Q.**    How many are female?

8    **A.**    The remaining.  Approximately 15 to 17.  I can't

9    remember exactly how many were serving last year.

10   **Q.**    In Beau's case, did you consider males on the

11   Title IX Council panel?

12   **A.**    Yes.  I tried to put males on the panel that was

13   hearing Beau's -- the complaints that involved Beau.

14   **Q.**    Who were they?

15   **A.**    There were two students and one staff member, and

16   all had conflicts in this case and weren't able to

17   serve.

18   **Q.**    Were there other males who could have served?

19   **A.**    There were not.  We had recruited additional

20   males, but they were not fully trained to hear cases at

21   that point.

22   **Q.**    Is there any training provided to the Title IX

23   Council members?

24   **A.**    Yes.  We say that there's a five-hour training

25   requirement, but it actually ends up to be a bit more

1    than that.

2    **Q.**   What does that training entail?

3    **A.**   The first two hours of the training -- the first

4    hour of the training is an overview of Title IX

5    generally, helping the -- making sure the council is

6    all on the same page regarding what Title IX is, why it

7    applies to these cases, and why Brown addresses these

8    cases at all.

9         The second hour involves what their function is

10   in our specific complaint process.  There's two

11   additional hours that almost all of the council members

12   did as well.  One involved an extensive review of how

13   appeals will be handled, and another is effectively a

14   mock panel hearing so that we can see how it runs, and

15   we divided the Title IX Council into panels of three or

16   as close to three as we could and heard a mock case.

17   And then there were other hours that were offered that

18   were not facilitated by me but were facilitated by

19   other administrators at Brown.

20   **Q.**   What were the topics of the other presentations?

21   **A.**   One was something that Mark Peters, our Men's

22   Health Coordinator, put on that involved masculinity.

23   He gave a lot of background information on

24   socialization of males and kind of societal norms and

25   expectations of males.

1          And the other training was facilitated by Alana

2     Sacks, who is one of Brown's Chair advocates, and she

3     talked about effectively the impacts of trauma on

4     people, on victims.

5     **Q.**   How is it that the topic is selected for the

6     subject session?

7     **A.**   The training facilitated by Alana Sacks was

8     effectively chosen for me in the sense that the

9     guidance documents issued by the Department of

10    Education's Office for Civil Rights states that the

11    impacts of trauma -- decision-makers need to understand

12    the impacts of trauma.  The questions and answers on

13    sexual violence guidance documents addresses that

14    specifically.  It goes through what decision-makers'

15    involvement in a grievance process needs to know and

16    one of the things it says is the impact of trauma.

17         I selected the other training facilitated by

18    Mark Peters in many respects to balance that training.

19    Understanding that I had to facilitate the impacts of

20    trauma training, I did not want the council to walk

21    away thinking that this was one perspective.  I also

22    wanted them to understand another point of view or

23    additional contextual information.

24    **Q.**   Do you attend the training presented by others?

25    **A.**   Yes.  I attended every training for the Title IX

1    Council.

2    **Q.**   Do you speak at those trainings?

3    **A.**   I begin the training explaining what the function

4    of this content is, why it's been selected.  And then

5    in both of those cases I ended the training discussing

6    that this was contextual information and it wasn't

7    intended to be -- that they should always be

8    considering the facts of every case; that this

9    information was solely for the purpose of helping them

10   understand the broader context of the areas that we

11   delve into in Title IX but, again, they should be

12   considering the investigation report in every hearing

13   that they participate in as a panelist.

14   **Q.**   And the mock hearing training, who presents that?

15   **A.**   The mock hearing panel, there's a series of

16   materials that are fictional that have been drafted.

17   It's presented.  I act as the Chair, so in Gretchen

18   Schultz's, I acted as Gretchen Schultz in the mock

19   hearing, Jessica Katz acted as the Title IX

20   investigator, and the panelists acted as panelists in

21   that.

22   **Q.**   Are there particular instructions that you

23   offered?

24   **A.**   In the mock hearing?

25   **Q.**   Yes.

1    **A.**   We basically have it run through exactly -- we try

2    to have it run through how an actual panel hearing

3    would run throughout that.  So they considered the

4    investigation report and go through a deliberation.

5    They can ask questions of the investigator, et cetera.

6    There were also fictional statements submitted by the

7    fictional complainant and respondent.

8    **Q.**   Do the attendees deliberate?

9    **A.**   Yes.  And they deliberate in my presence.  So that

10    in the event that they were considering information, I

11    would effectively -- you know, we would talk through

12    why they were considering certain information, what

13    weight they were giving that information, et cetera.

14    **Q.**   In the two-hour training that you mentioned, who

15    presents that session.

16    **A.**   The first two-hour session is presented by me.

17    **Q.**   What do you present?

18    **A.**   So I present in the first hour really an in-depth

19    understanding of Title IX.  Specifically, again, what

20    does Title IX cover.  We look at the different guidance

21    documents.  We look at some of the documents in the

22    Dear Colleague Letter from 2011.  I reference the 2014

23    guidance, the questions and answers on sexual violence.

24    We talk about the amendments to the Clery Act a bit.

25         And then in the second hour, again, we talk in

1    more detail about what our complaint process is at

2    Brown.  We talk about the standard preponderance of the

3    evidence.  We talk about how to identify conflicts that

4    they may have with complainants or respondents.

5    Confidentiality.  Again, maintaining the privacy of the

6    parties involved.

7    **Q.**   Were there materials that you presented?

8    **A.**   In the first two hours, there's two separate slide

9    show PowerPoint presentations.

10          MR. RICHARD:  Your Honor, I'm marking this

11   exhibit as Exhibit 45, full exhibit.

12          MR. RATCLIFFE:  No objection.

13          THE COURT:  What number is it?

14          MR. RICHARD:  Forty-five.

15          THE COURT:  Forty-five will be full.

16          MR. RATCLIFFE:  Actually, I have the official

17   exhibit book.  You were using your own exhibits.

18          THE COURT:  Off the record.

19          (Discussion off the record.)

20          (Plaintiff's Exhibit 45 admitted in full.)

21          MR. RICHARD:  Your Honor, may I just show this

22   to the witness?

23          THE COURT:  Yes.

24   **Q.**   Showing you what's been marked as Exhibit 45, do

25   you recognize that?

1   **A.**   Yes.  This is the first two hours of training that

2   I give to the Title IX Council.

3   **Q.**   That's your PowerPoint presentation?

4   **A.**   Yes.

5   **Q.**   Showing you a particular slide and captioned,

6   "Grievance Process," can you describe the reason why

7   you included the second bullet as to the 60-day

8   guidance?

9   **A.**   The 60-guideline for a typical investigation is

10  contained in a guidance document that was issued by the

11  Office for Civil Rights, the Department of Education.

12  That guideline or similar language is also contained in

13  Brown's complaint process that we aim to complete an

14  investigation in 60 days to the extent possible.

15  **Q.**   Does the 60-day period include panel hearings?

16  **A.**   It includes the panel hearing but does not include

17  the appeal process.

18  **Q.**   The third bullet says, "Trained Decision-makers."

19    do you recall what you presented as to that issue?

20  **A.**   So this was to talk about -- again, reminding them

21  that this is why they were being trained because it was

22  a requirement, but I also talked a bit at that point

23  about the -- Gretchen Schultz also participated in

24  those trainings and so she was there.  We talked about

25  that, et cetera.  So it was to help them understand why

1    they were being trained.

2    **Q.**    The grievance process speaks about adequate,

3    reliable, impartial investigation of complaints.  The

4    second bullet refers to timeframes.  Are there

5    timeframes set during the process?

6    **A.**    In the complaint process, it makes reference to

7    deadlines.  For example, the response statement must be

8    submitted within five business days or that the parties

9    have three days to review the final report.

10          To the extent that we can, we designate

11   timeframes with the aim that the whole process will

12   take approximately 60 days, but there isn't a specific

13   timeframe, for example, for the entirety investigation.

14   **Q.**    And the slide that you presented captioned

15   "Brown's Policy of Community Standards," what do you

16   recall presenting as to this slide?

17   **A.**    Oftentimes when I presented -- so I talked at this

18   point about the fact that, yes, we have a legal

19   obligation, but we also have a cultural obligation to

20   address these cases fairly, impartially, et cetera.

21          So it was -- the reason I included this was that

22   so that people understood that it wasn't just a legal

23   obligation, that we also did this in the work of the

24   Sexual Assault Task Force, which is referenced there,

25   the SATF, the Sexual Assault Task Force report, is

1    again because we were aiming to have a culture in which

2    all members are equally valued.

3    **Q.**   This slide references apparently a topic, "What

4    Are Some of the Barriers to Reporting at Brown."  Why

5    did you raise this issue?

6    **A.**   I raised this issue because we do not have a

7    delineated timeframe on how long it can take somebody

8    to submit a complaint, and also because it is often the

9    case that complainants take a long time to submit

10   complaints.  So I was providing some information about

11   what those barriers could be.

12   **Q.**   This referenced some of the resources that you

13   mentioned a few moments ago?

14   **A.**   Yes, it does.

15   **Q.**   What is the SHARE Office?

16   **A.**   Share stands for Sexual Harassment and Assault

17   Resources and Education Office, and it -- again, there

18   it says confidential counseling for survivors of

19   interpersonal violence.  That's how they advertise

20   their office.  Discuss -- and what some of the roles

21   that they could offer to students, so discuss options

22   for moving forward, connecting to additional resources.

23        This slide was intended for the Title IX Council

24   to understand, one, that the Title IX Office is only

25   one of many resources available to students; and two,

1    to also help them understand what the Title IX Office's

2    role was and was not.

3           So it was to provide information, but it wasn't

4    -- that I wasn't, for example, an advocate for a

5    complainant or a respondent but rather providing

6    information.  So I always say we're a spoke in a larger

7    wheel sort of thing.

8    **Q.**   And a portion of this slide references reports of

9    both complainants and respondents.  Why did you include

10   that?

11   **A.**   People feel strongly in both directions but some

12   might think Brown only provides support for

13   respondents.  Historically that has been the sense at

14   Brown.

15          Some people feel like Brown only provides

16   support for complainants.  I wanted them to be clear

17   that, for example, we were making academic dean

18   assignments for both complainants and respondents and

19   acknowledgement that this is hard on both students

20   involved.

21   **Q.**   This slide is dealing with feedback of a former

22   process.  Why did you include this topic?

23   **A.**   This information I included because it was pulled

24   heavily from the final report of the Sexual Assault

25   Task Force, which synthesized the feedback that they

1    had gathered throughout the '14-'15 academic year and

2    also because, of course, these are things that we want

3    to correct and why the complaint process was drafted

4    the way it was, to correct some of the feedback, the

5    negative feedback that students had offered.

6    **Q.**   What does this slide address?

7    **A.**   This slide addresses basically how we go through

8    the reporting process.  So a report at Brown isn't

9    necessarily a complaint.  It's that information is

10   shared with the Title IX Office.  At that point, the

11   complainant is informed of the University's resources

12   and procedures and we also ask is there a threat to

13   community safety.

14        Complainant can decide to utilize none or all of

15   these options.  Again, this is to allow the panel to

16   understand that the complaint process is given as an

17   option among different options available to a

18   particular complainant but that remedial and safety

19   measures are also available.

20   **Q.**   What is an informal resolution?

21   **A.**   An informal resolution, some students come to the

22   Title IX office and are seeking a resolution that

23   doesn't necessarily require a full investigation.  So

24   for example, some come and say, I would like this

25   student to agree to move out of my housing and because

1  of this incident that occurred.  Assuming that

2  student's willing to and we haven't determined that

3  there's a larger threat to community safety, we would

4  try to accommodate that.  It's not something that we

5  typically -- we don't see it in sexual assault cases or

6  allegations of sexual assault but something that often

7  arises or could arise in a gender or sexual harassment

8  case.

9  **Q.**   The last topic in this presentation relates to

10  challenges.  Why did you include that?

11  **A.**   It was intended to be an acknowledgment that this

12  is a really complicated and vexing process and that it

13  can take a toll on the Title IX Council members and

14  that it is really hard to look at these cases and to

15  deliberate around these cases, and so I intended to

16  outline what some of those challenges would be.

17  **Q.**   The next slide relates to the Title IX Council

18  Role and Challenges.  The first bullet states,

19  "Applying More Likely Than Not Standard," and there are

20  topics underneath it.  What do you recall presenting as

21  to this particular topic?

22  **A.**   I presented that the preponderance of the evidence

23  or more likely than not standard is one that Brown is

24  required to use because of the Department of

25  Education's guidance, and also I was helping -- I was

1    trying to make sure that the council understood that we

2    are looking at whether or not there is sufficient

3    information to support a finding of responsible.  And

4    if there is not, then finding is not responsible.

5         I wanted them to be clear that they could feel

6    sympathy for a complainant or they could feel that they

7    believed the complainant but that didn't mean that is

8    was necessarily a responsible finding, that they had to

9    ensure that they met the preponderance of the evidence

10   standard in order to come to a finding of responsible.

11   **Q.**   The second bullet says, "Understanding How To" --

12   and I believe is a typo --"Weigh Pieces of

13   Information."  What did you say to the panelists about

14   weighing pieces of information?

15   **A.**   This is also addressed -- so what I said to them

16   in this training was, for example, that victim impact

17   or mitigation statements by complainants and

18   respondents they could consider in determining an

19   appropriate sanction but only if they had already

20   determined responsibility.

21        So for example, a victim's impact statement can

22   be really compelling and I understood that and

23   acknowledged that, but that I didn't want them to

24   consider a compelling impact statement in order to say,

25   okay, well, there's sufficient information to support a

1    responsible finding.

2         So I was helping them -- I was trying to make

3    sure that every student -- and similarly mitigation.

4    This can be really hard for respondents.  Students

5    provide a lot of information about their personal

6    history or background that again can be really

7    compelling.  And I wanted the council to understand

8    that this wasn't -- this wasn't information that should

9    be considered in coming to a determination about

10   responsible or not responsible but could be something

11   perhaps that could be considered after that point in a

12   finding or sanction.

13   Q.   Last bullet says, "Generally No Direct Interaction

14   with Complainant, Respondent and Witnesses."  What did

15   you discuss as to that topic?

16   A.   I discussed that the Sexual Assault Task Force had

17   gathered a lot of information, that that was the most

18   difficult part of the hearing process and that that was

19   intended to be addressed in the complaint process.  So

20   we reduced that contact and now their direct

21   interaction was largely between the complainant,

22   respondent and witnesses with the investigator, who was

23   in a better position to gather information and to make

24   credibility assessments because she had, or whoever it

25   was, but that these investigators had this expertise

1    and background as opposed to the former process that it

2    would be one student, one faculty member, one staff

3    member that aren't necessarily trained in

4    investigations.  They aren't attorneys, perhaps.

5    They've never done an investigation.

6          So I talked about why this was a significant

7    change at Brown, and I was helping them to understand

8    why it happened.

9          MR. RICHARD:  Your Honor, at this point I'm

10   going to transition to this case, but I think it would

11   be helpful --

12         THE COURT:  So good time to take a break.

13         MR. RICHARD:  Thank you.

14         THE COURT:  All right.  Let's go off the record.

15         (Discussion off the record.)

16         (Adjourned at 4:50 p.m.)

17

18

19

20

21

22

23

24

25

## C E R T I F I C A T I O N

        I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on August 5, 2016, and incorporating redactions of personal identifiers requested by the following attorney of record:  J. Richard Ratcliffe, in accordance with the Judicial Conference policy.  Redacted characters appear as a black box in the transcript.


                    /s/ Anne M. Clayton
        _____
                  Anne M. Clayton, RPR


                    August 29, 2016
        _____
                        Date