IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *    CIVIL ACTION
JOHN DOE                *    16-0017
                        *
VS.                     *    JULY 20, 2016
                        *
BROWN UNIVERSITY        *    PROVIDENCE, RI
* * * * * * * * * * * * *
```

HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

CHIEF JUDGE

(Bench Trial)

**VOLUME II**

**REDACTED**

**APPEARANCES**:

FOR THE PLAINTIFF:            J. RICHARD RATCLIFFE, ESQ.
                             JEFFREY BIOLCHINI, ESQ.
                             Ratcliffe Harten Burke
                             & Galamaga, LLP
                             40 Westminster Street
                             Suite 700
                             Providence, RI  02903

FOR THE DEFENDANT:            STEVEN M. RICHARD, ESQ.
                             Nixon Peabody, LLP
                             One Citizens Plaza
                             Suite 500
                             Providence, RI, 02903

Court Reporter:               Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903


Proceeding reported and produced by computer-aided
stenography

2

I N D E X

WITNESS                                         PAGE

AMANDA WALSH

  Continuation of cross-Examination
  by Mr. Richard:                                 3
  Redirect Examination by Mr. Ratcliffe:         47

DJUANA PERKINS

  Direct Examination by Mr. Ratcliffe:           83
  Cross-Examination by Mr. Richard:             144

BEAU ▓▓▓▓▓▓▓▓

  Direct Examination by Mr. Ratcliffe:          186
  Cross-Examination by Mr. Richard:             199
  Redirect Examination by Mr. Ratcliffe:        223
  Recross-Examination by Mr. Richard:           224

PLAINTIFF'S EXHIBITS                            FULL

40  -                                           210
42  -                                           215
43  -                                           217
46  -                                           213

_____

1    20 JULY 2016 -- 9:00 A.M.

2    **AMANDA WALSH**, Resumes stand.

3         THE COURT:  Good morning, everyone.  We're ready

4    to resume trial in the matter of John Doe versus Brown

5    University.  Ms. Walsh is still on the stand.

6         You're still under oath.

7         And, Mr. Richard, are you ready to continue your

8    examination?

9         MR. RICHARD:  Two quick housekeeping matters.

10   First, Ms. Walsh has availability to 11:00.

11        THE COURT:  Okay.  Good.

12        MR. RICHARD:  And Ms. Perkins has called me and

13   indicated she was on her way, so I told her to wait in

14   the attorney's lounge.

15        Mr. Ratcliffe and I conferred about one exhibit,

16   I believe Exhibit 25.  There's a redaction error that

17   we needed to fix on it, so we just wanted to alert the

18   Court.

19        THE COURT:  Okay.  Very well.  All right.  Let's

20   proceed.

21        **CONTINUATION OF CROSS-EXAMINATION BY MR. RICHARD**

22   **Q.**   Good morning, Ms. Walsh.

23   **A.**   Good morning.

24   **Q.**   Yesterday we spoke about the complaint process.

25   Who drafted that document?

1    **A.**    My screen isn't on anymore.

2    **Q.**    Oh, I'm sorry.

3    **A.**    Thank you.

4    **Q.**    This is Exhibit 3.

5    **A.**    I drafted this document.

6    **Q.**    Was anyone else involved in the drafting?

7    **A.**    The information was pulled heavily from the Sexual

8    Assault Task Force final report from April 2015, which

9    was drafted by I believe the Chairs of the Sexual

10   Assault Task Force.

11          Following an initial draft of this, it was

12   reviewed by an outside law firm in Boston, Holland &

13   Knight, also by Brown's Office of General Counsel and

14   the Chairs of the Sexual Assault Task Force in part of

15   the revision process.

16   **Q.**    When was it finalized?

17   **A.**    In September of 2015.

18   **Q.**    On page three of the complaint process, there is a

19   list of 14 items.  What is that?

20   **A.**    This is a brief overview of the process.  So it is

21   a brief statement of what is contained in the following

22   pages of the complaint process.  It's intended to be

23   used as a tool for students, their advisors, et cetera,

24   to run through the steps quickly to see them in brief.

25   **Q.**    What is your role as the Title IX Program

1    Coordinator in the process?

2    **A.**   It's to oversee these procedural steps to make

3    sure that they're followed.

4    **Q.**   And on page two, "Advisors"?

5    **A.**   Yes.

6    **Q.**   What is the role of the advisor?

7    **A.**   The role of advisor is to accompany and assist the

8    complainant or respondent throughout the process.

9    **Q.**   Do you interact with the advisor?

10   **A.**   Oftentimes advisors join meetings, telephone

11   calls.  They often reach out to me, even though we ask

12   that the student reaches out to us directly; but

13   advisors continue to reach out.  Basically the way I

14   respond to them is by making sure the student is

15   included in the correspondence.

16   **Q.**   Were there advisors in the disciplinary proceeding

17   at issue in this case?

18   **A.**   Yes, both Beau and Allie had advisors.

19   **Q.**   Who was Beau's advisor?

20   **A.**   Was Richard Ratcliffe.

21   **Q.**   Who was Allie's advisor?

22   **A.**   Was Laura Dunn and Myka Held.

23   **Q.**   Who was Myka Held?

24   **A.**   Is Laura Dunn's colleague.  So they acted

25   interchangeably for different meetings.

1    **Q.**   When did you learn that each student had an

2    advisor?

3    **A.**   I learned that Allie had an advisor or planned to

4    use an advisor I believe earlier on October 30th before

5    she submitted a complaint.

6          Her advisor reached out to me with an e-mail to

7    the effect of, I plan to submit a complaint, can you

8    advise me about how to do that, can you provide

9    information about how a student would do that.

10          I learned that Beau had an advisor within days

11    of the complaint, I think before the response statement

12    was submitted.

13    **Q.**   I'll go through the formal resolution process in a

14    moment.  I'd like to direct you to page six, the

15    appeals process.

16    **A.**   Yes.

17    **Q.**   Who has the right to file an appeal?

18    **A.**   Both parties, both the complainant and the

19    respondent.

20    **Q.**   Why is it that both parties have that right?

21    **A.**   Because the process is equitable to both students

22    involved, both because that's important to the

23    University, to Brown, and also because that's mandated

24    by federal guidance.

25    **Q.**   How are appeals filed?

1    **A.**    Appeals -- students can submit an appeal based on

2    the grounds listed in Section (d), and they submit a

3    statement to me as the Title IX Program Officer.  Both

4    parties can file an appeal or one party can file an

5    appeal.  That document is provided to the other student

6    who has an opportunity to respond in writing.

7    **Q.**    After the other student responds in writing, did

8    you consider additional -- did you consider the

9    possibility of allowing additional filings?

10   **A.**    The process -- we didn't.  The process is really

11   it has to -- some of these steps have to end somewhere.

12   This is certainly a guideline.  We anticipated that

13   there were going to be procedural requests that were

14   outside the bounds of this document.  I think our goal

15   is to have a document that contemplates as many

16   situations as possible, but certainly it can't

17   contemplate all of them.

18   **Q.**    What are the grounds for an appeal?

19   **A.**    The grounds are substantial procedural error or

20   discovery of new evidence that wasn't available at the

21   time of the hearing.

22   **Q.**    While drafting this document, did you consider

23   other possible grounds?

24   **A.**    Some of those were -- certainly other grounds were

25   considered both by the Sexual Assault Task Force and in

1  drafting this, but these were the two grounds that we

2  settled on.

3  **Q.**   What other grounds did you consider in your

4  drafting?

5  **A.**   We considered the potential of a third ground

6  being something to the effect of against the weight of

7  the evidence but determined that that would invite an

8  appeal in probably nearly every case from the student

9  who didn't have a favorable result.

10  **Q.**   And if an appeal is on a procedural ground, what

11  happens if the appeal is granted?

12  **A.**   That depends on what -- the rationale for granting

13  the appeal.  So, for example, if the appeal is granted

14  on new evidence, that new evidence is sent back to the

15  original panel who considers that in conjunction with

16  the other information they had available to them during

17  the hearing process and in the investigation report.

18        If it's a procedural error, it will be a new

19  panel that's convened because in order to cure the

20  error, we would need to have a rehearing of the case.

21  **Q.**   If it's remanded for a rehearing, is there a right

22  to appeal after that step?

23  **A.**   There would be a right to appeal after a rehearing

24  if there was another ground.  There would need to be,

25  again, a substantial procedural error or new evidence

1    not reasonably available at the time.

2    **Q.**   Focusing on the process in this case, we marked

3    yesterday Exhibit 5?

4    **A.**   Yes.

5    **Q.**   Do you recognize this document?

6    **A.**   Yes.  It is Allie's complaint.

7    **Q.**   When did you receive that?

8    **A.**   The evening of October 30th, 2015.

9    **Q.**   On page three of Allie's complaint, she states

10   that she went to speak with you.  Do you recall meeting

11   with her?

12   **A.**   Yes.  I met with her in the very last days of

13   September or the very beginning of October.

14   **Q.**   What was the purpose of that meeting?

15   **A.**   Following a meeting with another student, who is

16   referenced in this case as Witness 9, Witness 9 went

17   back and encouraged Allie to meet with me to discuss an

18   experience that Allie had in November of 2014 that

19   Witness 9 knew about.

20          So she had encouraged her to come and meet with

21   me.  The primary focus of the meeting was that Allie

22   was asking questions about options available to her,

23   resources available to her, et cetera.

24   **Q.**   What options, if any, did you offer to Allie?

25   **A.**   I generally go through a list of all the remedial

1    and safety measures available at Brown.  So I remind

2    students that there are SHARE advocates that are

3    confidential resources.  The chaplain's office is a

4    confidential resource, that they can seek support at

5    Counseling and Psych Services or CAPS.

6         I remind students that they can report to the

7    Department of Public Safety or Providence Police or

8    that they can file a complaint in Brown's complaint

9    process through the Title IX Office.

10   **Q.**   When did you reach out to Beau after receipt of

11   the complaint?

12   **A.**   I reached out to Beau following receipt of the

13   complaint on Sunday, November 1st, via e-mail to

14   arrange an in-person meeting for Monday, November 2nd.

15   **Q.**   This is the document we marked as Exhibit 6

16   yesterday?

17   **A.**   Yes.

18   **Q.**   And it's to Beau?

19   **A.**   Yes.

20   **Q.**   It mentions "a follow-up to our conversation."

21   Did you meet with him?

22   **A.**   Yes.  I met with him I believe very late in the

23   day on Monday, November 2nd.  Again, I believe the

24   meeting was started at 4:30.

25   **Q.**   What did you discuss with Beau during that

1  meeting?

2  **A.**   I discussed the complaint.  I give the student the

3  opportunity to review the complaint and ask questions

4  about the process, if they have them.  I also remind

5  students that there are available support services

6  offered, and I believe it's included in the letter.

7          So I encourage them to seek help from Student

8  Support Services, from Counseling and Psych Services if

9  they find that that would be helpful to them and answer

10  any procedural questions they have about the process,

11  trying to make sure that everybody is aware of what

12  will happen next throughout.

13  **Q.**   The first bullet in the letter references

14  documents.  Did you share those with Beau?

15  **A.**   Yes.  I provided Beau with a copy of Allie's

16  complaint and supporting documentation that she

17  provided attached to her complaint and also a copy of

18  Brown's complaint process, again, so that he would be

19  aware of what would happen throughout the

20  investigation.

21  **Q.**   Were any other documents shared?

22  **A.**   Not at that time.

23  **Q.**   The second and third bullets appear to relate to

24  timeframes.  What did you discuss with Beau regarding

25  timeframes?

1      **A.**   I indicated that in the complaint process the

2      respondent is given five business days.  Because we

3      were meeting late in the day on Monday, out of fairness

4      to students, I tend to not count the day that we were

5      meeting in.  So his statement would have been due on

6      Monday, November 9th.

7           He had requested or indicated that he had an

8      engagement, I believe it was related to mock trial, and

9      asked for an extension.  I think there was a tournament

10     or something over the weekend and he would be

11     traveling.  So he was granted a 24-hour extension until

12     5:00 p.m. on Tuesday, November 10th.

13          And I also reminded him that he could have an

14     advisor throughout the process and could contact that

15     advisor before he drafted a statement.

16     **Q.**   The last paragraph refers to CAPS.  What is CAPS?

17     **A.**   CAPS stands for Counseling and Psychological

18     Services, which is the counseling center, which is a

19     confidential resource at Brown.

20     **Q.**   Exhibit 9.  We've referenced yesterday that you

21     retained an investigator?

22     **A.**   Yes.

23     **Q.**   Who was that?

24     **A.**   That is Djuna Perkins.

25     **Q.**   Did you know Ms. Perkins prior to this engagement?

1    **A.**   Yes.   From my time at Victim Rights Law Center,

2    she had acted as an investigator in some of the cases.

3    She had also participated in some, or had been invited

4    to speak at some of the same panels and conferences in

5    Boston that I participated in.   So we had a

6    professional relationship and some mutual professional

7    colleagues.

8    **Q.**   The engagement letter was signed on what date?

9    **A.**   November 4th.

10   **Q.**   The complaint process at page three under

11   "Investigation" indicates that you will appoint an

12   advisor.   Why did you hire an external advisor?

13   **A.**   At that time --

14   **Q.**   Excuse me.   Investigator.   My mistake.

15   **A.**   At that time Brown did not have an internal

16   investigator.   Jessica Katz was hired and started on

17   November 30th, 2015.   And so this was happening about a

18   month before that.

19        Also, throughout this academic year, for cases

20   involving sexual assault specifically, we had engaged

21   or had planned to engage and did throughout the year

22   engage an external investigator because we knew those

23   cases may be more complicated and time-consuming.

24   **Q.**   Was this Ms. Perkins' first engagement with the

25   Title IX Office?

1    **A.**    Yes.

2    **Q.**    When you engaged her, what did you tell her about

3    the scope of work?

4    **A.**    When I engaged her, I referenced a conversation

5    that we had back in the spring of 2015 where I met with

6    a series of potential investigators to discuss Brown's

7    process, what their role would be in the process, what

8    their experience was.  I requested sample reports,

9    resumes, references, et cetera.

10          So we revisited that conversation now in light

11    of the fact that the complaint process had been

12    finalized.  I provided her with a copy of the complaint

13    process so that she had an understanding of what her

14    role would be, answered any questions she had, and

15    indicated what the policy that she would be reviewing

16    would be, which was a '14-'15 Code.

17    **Q.**    When you reviewed the complaint process with

18    Ms. Perkins, did you review the discretion that the

19    investigator has under the process?

20    **A.**    Yes, extensively.  I am always cautious to make

21    sure that the investigator understands the distinction

22    between my role and their role.  And because the

23    investigator is doing the investigation and is meeting

24    with the witnesses, et cetera, there's a lot that falls

25    within their discretion.

1    **Q.**   Is there any limit on that discretion?

2    **A.**   The limit on that discretion would be if they did

3    something that was outside of the complaint process at

4    Brown.  So if their discretion doesn't exceed the

5    bounds that would be violative of Brown's process or

6    policy, and it's prescriptive in the complaint process

7    where their discretion lies.

8    **Q.**   Who monitors that boundary?

9    **A.**   I do in my capacity as the Title IX Program

10   Officer.

11   **Q.**   What is your role as the investigation is ongoing?

12   **A.**   My role is fairly limited.  I am a resource for

13   students who might have procedural questions.  I'm also

14   a resource for the investigator who might have

15   procedural questions.

16        Sometimes questions might implicate both an

17   investigator's discretion and Brown's complaint

18   process, so I would be available to answer those.  And

19   oftentimes students are making requests of the

20   investigator for extensions, et cetera, that are really

21   more appropriate for the Title IX Program Officer.

22        But for some investigations, my role is very

23   limited and I have minimal contact with the students

24   and the investigator throughout that process.

25   **Q.**   If we could step back for one minute.  When you

1    met with Beau on November 2nd, was that the first time

2    that you had met with him?

3    **A.**   It wasn't.  I had met with him once in earlier

4    October.  I'm not sure exactly of the date, but at some

5    point in early to mid-October I had met with him once.

6    **Q.**   What did you discuss with Beau during that

7    first meeting?

8    **A.**   Beau requested the meeting with me.  He was -- it

9    was following a meeting he had with a dean, Dean Maria

10    Suarez, in Student Support.  She had provided him with

11    a no-contact order or two no-contact orders requested

12    by Allie and Witness 9, and Beau had received

13    information that those no-contact orders were at my

14    request.  And so he -- which they were not, but he had

15    thought that they were and wanted to meet with me.

16         So he came to my office, and he wanted to

17    discuss a bit about his relationship with Allie and

18    Witness 9.  I told him at that time there was no

19    complaint submitted, the Title IX Office wasn't

20    conducting an investigation, that we didn't request the

21    no-contact order and that those are both implemented

22    and enforced by Student Life.

23    **Q.**   When you retained the investigator, did you set a

24    timeframe for the completion of the investigation?

25    **A.**   Our complaint process aims to conform with the

1    2011 Dear Colleague Letter, which says that a typical

2    investigation will last 60 days.  I tried to encourage

3    and maintain the timelines as they're outlined; but for

4    the investigation, once the response is received, there

5    is very few timelines for the witness interviews and

6    the report drafting.

7         This case I knew was going to be a little bit

8    longer because it fell both over the Thanksgiving

9    break, the winter break, and students aren't on campus

10   largely for the entire month of January.

11   **Q.**   And the timeframe is referenced in the complaint

12   process as Section IX; correct?

13   **A.**   Correct.

14   **Q.**   You mentioned the scheduling due to the breaks.

15   Was it your goal to complete this process by a

16   particular date?

17   **A.**   Throughout, I continued to encourage.  My aim was

18   to have -- there was some indications that I have with

19   Djuna Perkins where I had asked her please complete the

20   investigation by mid to late January, I believe, and I

21   had hoped that it would be completed at that time.

22        It was held up a bit because we always

23   prioritize a student's ability to be interviewed in

24   person by the investigator should they choose to.

25   Because this process allows the investigator to make

1  credibility assessments, it's important that if a

2  student wants to appear in person versus by telephone

3  or Skype, that we give them that opportunity.

4       In this case, I believe that Beau had elected --

5  he had indicated to Djuna that he wanted to meet in

6  person but wasn't on campus throughout most of January.

7  I believe the last week in January his advisor wasn't

8  available, so she wasn't able to meet with him from

9  some point in December until February 2nd.

10  **Q.**   Between October 2nd and the start of the winter

11  break, did you meet with Beau?

12  **A.**   Yes.  I met with Beau on November 2nd.

13  **Q.**   I misspoke.  I meant to say November 2nd.

14  **A.**   Oh, okay.

15  **Q.**   After the meeting on November 2nd, were there any

16  meetings with Beau during the fall semester?

17  **A.**   I do not believe so, no.

18  **Q.**   Did you have any meetings with Allie between

19  November 2nd and the remainder of the fall semester?

20  **A.**   I do not believe so, no.

21  **Q.**   Approximately when did the spring semester begin?

22  **A.**   The spring semester begins at the very end of

23  January of 2016 (sic).

24  **Q.**   At the start of the spring semester, did either

25  student contact you?

1    **A.**    Both students, I believe, had contacted me for

2    various either requests for updates.  I remember Allie

3    had requested an update about the status of the

4    investigation.  Beau contacted me for other procedural

5    reasons, but I don't recall meeting with either of

6    them.

7    **Q.**    Exhibit 11, we referenced this yesterday, it's a

8    full exhibit.  I want to ask you a few questions about

9    this e-mail.  What is it?

10   **A.**    This is an e-mail from me to Investigator Djuna

11   Perkins following receipt of what's being called as the

12   draft or initial investigation report.

13   **Q.**    Prior to your receipt of this e-mail, had you been

14   in contact with Ms. Perkins?

15   **A.**    Yes.  When she would meet with students on campus

16   to interview them, she would come in and provide status

17   updates and meet with me briefly during kind of those

18   times to let me know the status of the investigation.

19   **Q.**    And the first paragraph mentions revisions that

20   you made?

21   **A.**    Yes.

22   **Q.**    And they're called technical and other

23   substantive.  What's the difference between the

24   technical and substantive revisions you made?

25   **A.**    The technical -- when I wrote "technical," I was

1    really referring to -- I didn't really change the

2    meaning of what she drafted.

3         So, for example, I think she called Brown's

4    Department of Public Safety something slightly

5    different.  She was still referring to DPS, and I just

6    changed it to indicate what we actually call the

7    Department of Public Safety at Brown.

8         "Substantive" meaning it would -- it changed the

9    meaning of the edit that I made, and so that's why I

10   indicated -- I wanted to make sure she was comfortable

11   with any proposed changes.

12   Q.   What are you addressing in the second paragraph?

13   A.   I'm addressing the -- I'm responding to her e-mail

14   below where she is discussing Beau's -- what she refers

15   to as Beau's conspiracy claim and that she felt that

16   she had to put in more information about prior bad acts

17   in order to provide context to the conspiracy claim

18   perhaps than she would have otherwise if he hadn't put

19   forward the conspiracy claim.

20   Q.   What was your understanding of the conspiracy

21   claim?

22   A.   My understanding of his conspiracy claim was that

23   a witness had overheard a conversation in the Ratty,

24   which is a dining hall at Brown, and that something

25   about the conversation between two students who the

1    witness believed to be Allie and Witness 9 indicated

2    that they were trying to -- they were out to get him or

3    they were trying to get him in trouble, have him suffer

4    some sort of consequences, conspiring against him.

5    **Q.**    When did you first learn of this conspiracy claim?

6    **A.**    I don't recall learning of it before this

7    February 29th e-mail and the attached report.

8    **Q.**    Exhibit 12, is this the red-line attachment

9    referenced in Exhibit 11?

10    **A.**    Yes.

11    **Q.**    Who made these revisions?

12    **A.**    I did.

13    **Q.**    The relevant policy sections, why did you strike

14    this certain language?

15    **A.**    I did because the offense alleged in the complaint

16    occurred in November 2014; and, therefore, the

17    2014-2015 Code of Student Conduct would apply, and I --

18    and the Offense VII(a) and VII(b) wouldn't have

19    applied.

20         I removed the consent and coercion definitions

21    because I felt it would have indicated to a panel that

22    they were required to review those, which they weren't

23    because those definitions weren't contained in the

24    '14-'15 Code, but there were no definitions for those

25    terms in the '14-'15 Code.

1    **Q.**    Did you discuss this revision with Ms. Perkins?

2    **A.**    Yes.  She had been given the '14-'15 Code and knew

3    that that's the policy that we were using.  I believe

4    that she -- we provide a template for our -- a sample

5    investigation report to our investigators who are

6    external so that visually the reports will look the

7    same, and I believe that she was just using that

8    information contained in a sample template.

9    **Q.**    Page 27, there's a comment that says WA-3.  Does

10   the "WA" refer to Walsh?

11   **A.**    Yes.

12   **Q.**    Is that your comment?

13   **A.**    Yes.

14   **Q.**    And do you recall why you made this comment?

15   **A.**    Could you just zoom in a little bit?

16   **Q.**    Is that better?

17   **A.**    Yes.  Yes.  So one is, I made the comment because

18   Witness 9 had not elected to submit a complaint, and

19   this was giving information about conversations that I

20   had with Witness 9 and about Witness 9's experience in

21   a report that involved two other students.  And I

22   didn't -- I was inquiring with the investigator, Djuna

23   Perkins, why she thought this was relevant because it's

24   within her discretion; but if she didn't believe that

25   it was relevant, then I thought it would be something

1    that would be in my territory to remove because there

2    were some FURPA implications in my mind.

3    **Q.**    Page 28, another comment.  WA-4, is that your

4    comment?

5    **A.**    Yes.

6    **Q.**    Do you recall why you made this comment?

7    **A.**    Yes.  So I understood Beau had a right to put

8    forward a defense.  And in this case, his defense was

9    that this was a conspiracy between the students and

10   this was fabricated in some way.

11        So I understood why it was included.  He has a

12   right to put that forward, and I think that that's an

13   important part of our process.

14        What I supposed I was confused about is the

15   information that was contained wasn't accurate.  Like I

16   said, there was no suit between Beau and the University

17   at the time that this October 30th, 2015, conversation

18   happened.  So I was just ensuring that -- I was

19   concerned about the accuracy of the statement.

20   **Q.**    Were you concerned about character evidence in

21   this draft?

22   **A.**    I am concerned about character evidence to the

23   extent that it violates our policy.  In this draft,

24   Djuna had given instructions that the panel would

25   review about the purpose for which they would consider

1      that information that I felt like were appropriate.

2           I also understood that, again, Beau put forward

3      this conspiracy defense, and that is well within his

4      right to do that.  But as a result, Djuna had felt that

5      she needed to put in this additional information, and

6      it really would be inappropriate and slightly violative

7      of Title IX and our responsibility to be equitable if

8      Djuna or I would be advising Beau to remove this

9      defense in order to remove the character evidence.

10          Students bring forward the information that they

11     want, and that's included in the report unless, again,

12     it's a violation of the complaint process.

13     Q.   And under the complaint process, is a report

14     shared with the students?

15     A.   Yes.  So the students receive a copy of the

16     investigator's report before a panel sees it and the

17     reason being that we want them to have an opportunity

18     to respond before who ultimately becomes the

19     decision-making panel is able to review it.

20          MR. RICHARD:  One moment, your Honor.

21          THE COURT:  That's fine.

22          (Pause.)

23     Q.   We addressed yesterday that you received a

24     communication from Attorney Dunn.  Do you recall that?

25     A.   Yes.

1    **Q.**    What did that address?

2    **A.**    Attorney Dunn submitted an e-mail with two

3    attachments, one that was a letter directed to me that

4    effectively was a second response to the initial report

5    that was received by Allie, and then the other

6    attachment was her response to the report as outlined

7    in the complaint process.

8    **Q.**    Exhibit 16, do you recognize this document?

9    **A.**    I do.  That is an e-mail from me to Djuna Perkins

10   after receiving the correspondence from Laura Dunn, and

11   I did this because I was trying to -- again, this was

12   in the investigator's discretion.  The information that

13   was contained in both the letter and the response was

14   largely in the investigator's discretion, and so I

15   wanted Djuna to address those points.  And I ideally

16   felt like she could probably address all of them and I

17   may not need to respond to Laura Dunn.

18   **Q.**    Exhibit 17.  Do you recognize this document?

19   **A.**    Yes.  This is an e-mail from the investigator,

20   Djuna Perkins, to Beau; his advisor, Richard Ratcliffe,

21   and copying me that was indicating that the report was

22   finalized and giving him a copy of the finalized report

23   and exhibits on March 12th.

24   **Q.**    After the report is finalized, what happens next

25   in the process?

1    **A.**   Once the report is finalized, we work to convene a

2    panel, a three-member panel, to review the report and

3    ultimately have the hearing.

4         So the next step is, as part of convening that

5    panel, I vet for conflicts with the students two ways.

6    So first I provide the names of potential panelists to

7    students, ask if they know them.  I do it this way to

8    protect their privacy before I send their names to

9    administrators or faculty members or other students.

10        So I ask, do you have a relationship or a

11   conflict with any of these potential panelists.  Once

12   those are cleared, I send their names to the potential

13   panelists and assign a panel and begin the scheduling

14   process.

15   **Q.**   Exhibit 24, what is that?

16   **A.**   These are my notes from the hearing from April

17   14th, 2016, on the case related to Beau and Allie.

18   **Q.**   So the report was finalized as of March 12th;

19   correct?

20   **A.**   Yes.

21   **Q.**   The hearing occurred a month later on April 14th?

22   **A.**   Yes.

23   **Q.**   And what happened during that month?

24   **A.**   During that month, we worked to schedule this

25   because we have three members in a panel, the panel

1   Chair, the two students and their advisors.  It's

2   complicated to schedule a period of time that's

3   sufficient to have the hearing.  I know for one of

4   these weeks, for example, Attorney Ratcliffe had said

5   that he was unable for a week.

6        So we try to accommodate the students and their

7   advisors to the extent that we can, and this was the

8   earliest date that we were able to identify.

9   **Q.**   Who were the panelists?

10  **A.**   The panelists were Besenia Rodriguez, who is a

11  dean in the college; Kate Trimble, who is a deputy

12  director of Brown's Swearer Center; and an

13  undergraduate student at the time, Kimberley Charles,

14  who was a senior.

15  **Q.**   Were there any males considered?

16  **A.**   There were -- all of the males were considered,

17  all of the males who had been trained and were part of

18  the Title IX Council.  The student participated -- one

19  of the male students participated in mock trial and,

20  therefore, knew both of the students and likely knew

21  more information than was contained in the report.

22       One of the other students had a friendly

23  relationship with Allie.  They served on a board of

24  some sort together.  And one of the other males was the

25  Director of Student Activities, Tim Shiner, and he was

1    aware of, again, a lot of details that, out of fairness

2    to Beau, he couldn't serve on the panel.  In his

3    capacity, we had met with a lot of the members of mock

4    trial; and, again, he knew more details than perhaps

5    were contained in the report.

6    **Q.**    How do you select the panelists from those who do

7    not have a conflict?

8    **A.**    I tried to put together a panel that's

9    representative of the Brown community to the greatest

10   extent possible, so age, gender, professional capacity

11   and also their own time capacity.  And so that's how I

12   come up with potential panelists and then start the

13   conflict process.

14   **Q.**    Ms. Charles was a student?

15   **A.**    Yes.

16   **Q.**    Why did you put a student on the panel?

17   **A.**    Under the complaint process, every case involving

18   a student respondent will have a student on the panel.

19   **Q.**    What is your role at the panel hearing?

20   **A.**    My role at the panel hearing is very limited.  I

21   am there to answer procedural questions that are

22   outside of the norm.

23       So the Chair is really the one who is overseeing

24   the decorum and the conduct of the proceedings, but

25   sometimes there are questions that are procedural in

1    nature, again, that are outside of the hearing itself

2    or haven't been contemplated.  So my role there is to

3    ensure consistency among all of the hearings and also

4    to take notes, to keep a record.

5    **Q.**    Who was the Title IX Council Chair?

6    **A.**    It's Gretchen Schultz.

7    **Q.**    Is she employed at Brown?

8    **A.**    She is a professor -- a tenured professor in

9    French studies.

10   **Q.**    Who selected her to be the Chair?

11   **A.**    She is appointed by the President and the Dean of

12   the Faculty.

13   **Q.**    The complaint process at page five discusses the

14   role of the Chair.  What are the Chair's

15   responsibilities to prepare for the hearing?

16   **A.**    The Chair reviews the materials in just the same

17   way that the panelists would.  If there are requests by

18   students or panelists to hear from particular witnesses

19   that are identified in the report, they would make that

20   request to the Chair.

21         So any procedural decisions leading up to the

22   panel that impact the panel would be made by Gretchen

23   Schultz.  So leading up to the hearing, that's her

24   role.

25   **Q.**    Before the hearing, is any information given to

1    the panelists?

2    **A.**    Prior to the hearing, the panelists have at least

3    five business days to review all of the material.  So

4    that would include the report, the attached exhibits.

5    They've been given numerous copies of the relevant

6    policies and processes, but I make sure that they're

7    aware of those and provided those as well.  And

8    oftentimes I highlight particular sections, again, to

9    remind them of what their role as a panelist would be.

10   **Q.**    Would they received the investigative report?

11   **A.**    Yes.

12   **Q.**    How voluminous was the investigative report in

13   this case?

14   **A.**    This was a very detailed investigative report.  I

15   believe the final version was 29 single-spaced pages.

16   There were extensive footnotes, references to other

17   materials, and then the full appendix included I think

18   a hundred pages of text messages.  It was voluminous,

19   certainly.

20   **Q.**    On April 14th, you attended the hearing?

21   **A.**    Yes.

22   **Q.**    Why did you take these notes?

23   **A.**    Well, we are required under the guidance to keep a

24   record of the hearing, and this -- in my role it's

25   certainly my responsibility to do that, and also just

1     -- I think it's important for the Title IX Office to

2     have a record of the hearing as well.

3     **Q.**    Is there a recording?

4     **A.**    There is no audio recording, no.

5     **Q.**    The document, Exhibit 24, your notes indicate the

6     panel convened at 8:15 in the morning?

7     **A.**    Yes.

8     **Q.**    Where was the hearing held?

9     **A.**    It was in a building on campus called Horace Mann.

10    **Q.**    What time did you arrive?

11    **A.**    Probably like 7:30.

12    **Q.**    Between approximately 7:30 and 8:15, what did you

13    do?

14    **A.**    I set up the room by laying out the documents for

15    the panelists, laying out the documents for the Chair.

16    I make a laptop available with the exhibits if they

17    want an easier way to search them.  Breakfast gets

18    delivered, coffee, things like that.  So I handle some

19    of the logistical details and generally set up a white

20    noise machine outside the room, things like that, to

21    set up the logistics of the room.  I also always meet

22    with Gretchen Schultz briefly before each panel

23    hearing.

24    **Q.**    Did you meet with Professor Schultz before this

25    panel hearing?

1    **A.**    Yes.

2    **Q.**    Approximately how long was that meeting?

3    **A.**    She generally arrives 15 or 20 minutes early, and

4    I would say that we probably spoke for most of that

5    time.

6    **Q.**    What did you discuss?

7    **A.**    We discussed -- I gave her the opportunity to ask

8    any procedural questions.  We don't tend to discuss

9    anything about the specific facts of the case, but we

10   often discuss how the panel hearing will be run.

11          I indicate what is in her packet that is

12   different than what is in the panel's packet.  In this

13   case, there were two items that she had that the

14   panelists would not have, and I told her why, reminded

15   her why.

16          One was a conduct history of the respondent,

17   which is not provided to the panel unless they

18   determine the respondent is responsible.  Then it can

19   be considered for sanctioning only.  And the second

20   was, I had indicated she had a copy of the '15-'16

21   Title IX Policy and the panelists did not.

22   **Q.**    Why did you include the '15-'16 Title IX Policy?

23          MR. RATCLIFFE:  Objection, your Honor, as to why

24   she included it.

25          THE COURT:  I think that's relevant.  Overruled.

1      Go ahead.

2      **A.**   I included the '15-'16 policy because there was no

3      "consent" definition in the '14-'15 Code.   And under

4      the old Code, the panelists would determine --

5            MR. RATCLIFFE:   Objection, your Honor.   This is

6      getting into -- I don't believe there's going to be any

7      foundation for this.   She wasn't here in '14-'15.

8            THE COURT:   Overruled.   I think her explanation

9      of why she included it is very relevant.   Overruled.

10           Go ahead.

11     **A.**   So there was no "consent" definition in the

12     '14-'15 Code.   And during the '14-'15 academic year,

13     each individual panel hearing a case like this would

14     come to an agreement about the way they would view

15     "consent."   They would make a determination.

16           This panel would be advised by Gretchen that

17     they would do -- it was their right to decide which

18     "consent" definition that they would use, how they

19     would view "consent."

20           So, therefore, I wanted to provide her with the

21     '15-'16 as an option that the panel could consider but

22     also wanted to be clear with Gretchen and wanted

23     Gretchen to be clear with the panel that they were

24     never required to use it.

25           By excluding it from their packets and including

1    it in hers, I felt like this was hopefully making that

2    clear.

3         MR. RATCLIFFE:  Objection, your Honor.

4         THE COURT:  Overruled.

5    Q.   Did you discuss during this meeting with Professor

6    Schultz prior to 8:15, did you discuss the document

7    itself in any way, the Title IX Policy?

8    A.   Just simply that it had these definitions that the

9    '14-'15 Code didn't have.

10   Q.   And when the panel convened, Attorney Ratcliffe

11   reviewed with you yesterday Professor Schultz's

12   statements, which are under Roman numeral I.  Did you

13   make any statements at that time to the panel?

14   A.   I did not.

15   Q.   As you're -- were you making these notes as the

16   hearing occurred?

17   A.   Yes.  I sit further down the table with a laptop

18   and take the notes contemporaneously.

19   Q.   After Professor Schultz gave her opening

20   statement, what happened next?

21   A.   She gives her opening statement and inquires about

22   whether there are questions from the panelists that

23   they would like to discuss before anybody else is in

24   the room, and they indicated that there were none.  And

25   then the investigator, Djuna Perkins, was brought in.

1  **Q.**   After the investigator was brought in, what

2  happened next?

3  **A.**   The investigator is brought in, and the panelists

4  have the opportunity to ask questions of the

5  investigator, clarify parts of the investigation

6  report.

7         During the training, I tell them any information

8  that you do not have that you need in order to make a

9  finding either way, you need to make sure you ask that

10  question.  So that's why the investigator was brought

11  in, and she was asked a series of questions.

12  **Q.**   When the investigator speaks with the panel, who

13  else is in the room?

14  **A.**   When the investigator speaks with the panel, it's

15  the three panelists; the Faculty Chair, Gretchen

16  Schultz; I am there taking the notes; and the

17  investigator.

18  **Q.**   Where are the students?

19  **A.**   The students are not present in the room at that

20  time.

21  **Q.**   And after the panel met with the investigator,

22  completed that process, what happened next?

23  **A.**   The investigator leaves the room, and again the

24  panel has an opportunity to convene.  In this case,

25  both students indicated that they would like to make

1    verbal statements, which is their right to do under the

2    complaint process.

3        And the panel, because the complaint process

4    doesn't dictate an order of who will speak first, the

5    panel in this case determined that they would like to

6    hear from the respondent.

7    **Q.**   And in parentheses, there's an AW.  That's you,

8    Amanda Walsh?

9    **A.**   Yes.

10   **Q.**   Is this a statement you made?

11   **A.**   It is.  In this case, the respondent entered the

12   room with his advisor.  And, again, Gretchen goes

13   through the role of the advisor; and Beau had asked,

14   because he was speaking first, if he would be permitted

15   to make a rebuttal statement.

16       And so this is the type of procedural question

17   that I would answer, and so it indicates my response

18   was the process doesn't permit rebuttal statements.

19   And I think they also inquired, Beau and his advisor, I

20   think his advisor directly asked how this determination

21   was made.  And I told him that it's made by the panel,

22   and they decided they wanted to hear from the

23   respondent first.

24   **Q.**   And at the top of the page it indicates, Below is

25   a summary of the respondent's statement?

1    **A.**    Yes.

2    **Q.**    When did you type that summary?

3    **A.**    Contemporaneously as the respondent was speaking.

4    **Q.**    And the words in the first paragraph about five

5    lines down, "revenge plot," were those words that Beau

6    said?

7    **A.**    Yes.

8    **Q.**    What do you recall him saying about a revenge

9    plot?

10    **A.**    I recall that he was indicating that Allie had a

11    revenge plot against him because he wasn't interested

12    in dating her after a consensual -- what he was saying

13    was a consensual hookup, or something to that effect,

14    in November of 2014.

15    **Q.**    Then the paragraph starting "The fact is," six

16    lines down, there's a statement to a pattern of

17    revenge.  Were those Beau's words?

18    **A.**    Yes.

19    **Q.**    What do you recall him saying about a pattern of

20    revenge?

21    **A.**    So I believe he was referencing the fact that the

22    complainant had taken actions after the November 2014

23    event that were vengeful in his mind, and he had

24    described what some of those were.  One was signing him

25    up for a dating website, like Farmers Only, and another

1    was that he was communicating with a person or

2    effectively -- he thought he was communicating with

3    somebody on Tinder but didn't know he was really

4    speaking through Allie or she was speaking on Allie's

5    behalf, something to that, so that Allie had continued

6    to engage in behavior that was vengeful against him.

7    **Q.**    The next paragraph states, "Investigator conflates

8    the two policies."  Did Beau say the verb "conflates"?

9    **A.**    Yes.

10   **Q.**    Did he mention which policies?

11   **A.**    Well, when he referred to current policy, my

12   understanding of that is he was referring to the

13   '15-'16 Title IX Policy.  And when he referred to old

14   policy, my understanding is that he was referring to

15   the '14-'15 Code of Student Conduct.

16   **Q.**    The next sentence says, "Current policy covers all

17   aspects of sexual assault."  Do you recall if he said

18   anything else about the current policy?

19   **A.**    I don't recall.

20   **Q.**    There's a reference to the old policy.  Did he

21   state what the old policy is?

22   **A.**    He didn't state specifically.  I don't recall.

23   **Q.**    Did he say anything else about the old policy

24   other than it requires force or threat of force?

25   **A.**    He didn't -- I don't recall that he did, and

1   besides what's listed there is that -- yeah.  I don't

2   recall him saying anything in addition to what's listed

3   there.

4   **Q.**   When Beau and his advisor are in the room, where

5   is Allie?

6   **A.**   We arrange for both the complainant and the

7   respondent to have a space on campus.  They were in

8   separate rooms.  I believe in this case that Allie was

9   in a private room in the Sarah Doyle Women's Center

10  with her advisor, but she has telephone access to the

11  statement.  So she would have been on the phone

12  listening to this.

13  **Q.**   After Beau completes his statement, what happens

14  next?

15  **A.**   After Beau completes his statement, the panel is

16  provided with the opportunity to ask him questions if

17  they would like to, and then -- I don't believe they

18  did in this case, and then effectively we switch.

19       And so Beau returns to the space that was

20  arranged for him, which I believe was in the Faculty

21  Club, and then the complainant is brought down, and we

22  confirm that Beau and his advisor are on the phone, and

23  then Allie begins her statement.

24  **Q.**   The next statement is the summary of Allie's

25  presentation?

1    **A.**   Yes.

2    **Q.**   There's a reference in the paragraph, "He got me

3    in a dark room."  Third line down, it says, "Per

4    Brown's policy."  Did she mention which policy?

5    **A.**   She didn't specifically mention which policy; but

6    based on the other information that she was giving, I

7    understood this to be a reference to the '15-'16 Title

8    IX Policy.

9    **Q.**   Were there references to any other policies by

10   Allie?

11   **A.**   I don't believe so.

12   **Q.**   The panel asked Allie a few questions?

13   **A.**   Yes.

14   **Q.**   After Allie's appearance is completed, what

15   happens next?

16   **A.**   So the panel has an opportunity -- the panel

17   convenes, and basically they're given the opportunity

18   to ask any -- what they believe to be procedural

19   questions that would be outside of the scope of the

20   Chair's role, ask questions of me.  In this case, there

21   was one question of me related to prior conduct

22   history.

23   **Q.**   Is that the KT question?

24   **A.**   Yes.  That refers to Kate Trimble asked are prior

25   conduct issues something we should consider.

1   **Q.**   The last page of this document has two notations,

2   AW.   Is that you?

3   **A.**   That's me.

4   **Q.**   The first is your response to Ms. Trimble's

5   question?

6   **A.**   Yes.

7   **Q.**   What did you tell her?

8   **A.**   I told her that prior conduct history is not

9   relevant to whether a violation of the policy occurred

10   and that information would only -- if it existed, would

11   only be disseminated in the event that a person was

12   found responsible.   And so in determining a sanction,

13   they could consider prior conduct history.   And that

14   would be, again, only disseminated if there was a

15   finding of responsibility.

16   **Q.**   The final notation, AW, were you asked a question?

17   **A.**   I wasn't.   I elected to state that because of

18   Allie's references throughout to the policy, I wanted

19   to again reiterate to the panel, make sure there was no

20   confusion about which was the relevant policy that

21   applied.

22   **Q.**   When the panel deliberates, are you part of that

23   process?

24   **A.**   I'm not.

25   **Q.**   Did you leave?

1   **A.**   I immediately leave and -- yes.  That's why

2   there's no notes.

3   **Q.**   After you left, what did you do next?

4   **A.**   I went back to my -- I believe I went back to my

5   office and had a brief meeting with Jessica Katz, the

6   Title IX investigator, about a separate issue.  And

7   Allie had requested a meeting with me and her advisor

8   and had asked if they could come to my office at that

9   time, and they did.

10  **Q.**   On that day?

11  **A.**   On that day.

12  **Q.**   What was discussed in that meeting?

13  **A.**   They wanted to anticipate -- Allie had expressed

14  safety concerns, and of course at that point we didn't

15  know what the outcome of the hearing would be.  So we

16  discussed what her safety concerns would be if Beau was

17  found responsible and what her safety concerns would be

18  if Beau was found not responsible.

19       I also took that opportunity based on, again,

20  Allie's statement to the panel to remind them that, as

21  I had told them before and as Djuna Perkins had listed

22  in the investigation report, that the '14-'15 Code was

23  what applied.  Those were the two topics that we

24  discussed.

25  **Q.**   When the panel deliberates, is there a record kept

1    of those deliberations?

2    **A.**    The findings letter is effectively the record of

3    those deliberations.

4    **Q.**    When did you first learn the result of the panel

5    deliberations?

6    **A.**    I meet up with Gretchen Schultz, the Chair, after

7    each panel hearing to gather the documents because they

8    are unredacted in that format.  I have developed a

9    system of getting those exact documents back and

10   shredding them myself just to make sure they're not

11   floating around on campus, and she collects them from

12   every single panelist.  I collect them back from her.

13   She generally briefly says what the results would be,

14   meaning responsible or not responsible, and the

15   sanction.

16   **Q.**    Did you have such a meeting with Professor

17   Schultz?

18   **A.**    In this case, it was -- I wouldn't call it a

19   meeting.  It was after meeting with Allie and her

20   advisor, I had a meeting in University Hall.  And when

21   Gretchen was leaving Horace Mann, we sort of met in the

22   stairwell of University Hall.  She was handing me the

23   documents.  Because we had no privacy, she just said,

24   "Responsible, suspension," and I said, "Okay," and that

25   was the end of the conversation.

1    **Q.**    Exhibit 26, do you recognize this letter?

2    **A.**    Yes.  It is a letter that I wrote -- this specific

3    version is the one I wrote to Beau.  I wrote an

4    identical or nearly identical version except the

5    references -- the names and references to complainant

6    and respondent the day after the hearing to both of the

7    parties.

8    **Q.**    Why did you write this letter?

9    **A.**    I wrote this letter because of Allie's final

10   statement to the panel where she went through the

11   "consent" definition being the '15-'16.  At this point,

12   I didn't know the "consent" definition used by the

13   panel.  And in the meeting that I had with Allie and

14   her advisor, Laura Dunn, even though I verbally said

15   multiple times that the panel was under no obligation

16   to use the "consent" definition and that the applicable

17   Code was '14-'15, it seemed like that wasn't very

18   clear.

19         So I decided to -- in thinking this over, I

20   decided to write this letter.  Because I was writing it

21   to Allie, I wanted to write it to Beau as well.  So

22   that was really my motivation in drafting the letter.

23   **Q.**    Exhibit 27, do you recognize this document?

24   **A.**    This is the findings letter, the final findings

25   letter from Gretchen Schultz to me on April 19th

1  regarding the Beau and Allie hearing.

2  **Q.**  And the rationale stated, did you know of that

3  rationale prior to this letter?

4  **A.**  I didn't.

5  **Q.**  When you read this letter, did you have any

6  concerns?

7  **A.**  Because of the discussion about the relevant

8  policy and process, I knew that it may raise some

9  concerns for specifically Beau.  And so as a result, I

10  reached out to Beau and arranged a telephone call to

11  give him the results, and I pointed this out to him and

12  his advisor on that call before I sent this document to

13  them.

14  **Q.**  Did you speak with Professor Schultz?

15  **A.**  I don't believe I spoke to Gretchen Schultz about

16  the rationale, no.

17  **Q.**  Both students appealed?

18  **A.**  Yes.

19  **Q.**  And I'm showing you what is marked as Exhibit 31.

20  Do you recognize this?

21  **A.**  Yes.  This is a letter from me to Gretchen Schultz

22  that outlines effectively some of the procedural

23  history of this case from the time of the findings

24  letter through that date.

25  **Q.**  And the cc to the panel members, why aren't their

1    names listing --

2    **A.**    I wrote this letter on April 26th knowing that at

3    any time I might have a baby and be out of the office,

4    and the appeals panel wasn't yet convened or vetted for

5    conflict, so I didn't know who it would be.  But I was

6    trying to indicate -- my goal in writing that both in

7    the final paragraph, I believe you should make the

8    panelists aware, and also to cc was to indicate that it

9    was my -- I wanted the appeals panel members, whoever

10   they ultimately were, to get a copy of this letter or

11   at least the substantive information contained within

12   it.

13   **Q.**    And the final paragraph indicates -- you state

14   that it would be in the University's best interest to

15   address the Court's concerns regarding any procedural

16   errors before this case becomes final.  Why did you

17   feel it would be in the University's best interest to

18   do so?

19   **A.**    Well, because, again, I knew that the concern was

20   a procedural error related to the "consent" definition.

21   And because this is a University process, I wanted it

22   to be addressed by the Title IX Council.  I wanted them

23   to hear the appeal to see whether the three members of

24   an appeals panel would feel like this was a substantial

25   procedural error.

1          MR. RICHARD:  Your Honor, may I have one moment?

2          THE COURT:  Yes.

3          (Pause.)

4          MR. RICHARD:  No further questions, your Honor.

5          THE COURT:  Thank you.

6          MR. RICHARD:  Let me just clean up first here.

7          THE COURT:  Sure.

8          What exhibit number was that last exhibit?

9          MR. RICHARD:  The letter, April 26th, your

10    Honor, was 31.

11          THE COURT:  Thirty-one.  Thank you.

12          **REDIRECT EXAMINATION BY MR. RATCLIFFE**

13    **Q.**   Good morning.

14    **A.**   Good morning.

15    **Q.**   I believe in your cross you testified that you had

16    background in Title IX, which includes representing

17    complainants and sometimes respondents?

18    **A.**   Yes.

19    **Q.**   And approximately how many respondents?

20    **A.**   So when I refer to "respondent," I mean a

21    respondent in a disciplinary hearing, not necessarily

22    in a sexual misconduct case.

23    **Q.**   So in sexual misconduct cases, you never

24    represented a respondent?

25    **A.**   No.

1   **Q.**   So disciplinary cases, what types of allegations?

2   **A.**   So at times if a student made statements that they

3   were sexually assaulted by another student, the

4   responding or the student who was accused would file

5   false representation or harassment allegations against

6   the person who was identifying themselves as a victim

7   of sexual assault.

8   **Q.**   And these were at different -- you didn't -- the

9   services you provided weren't at one specific

10  university?

11  **A.**   No.

12  **Q.**   And when you were representing a respondent, you

13  would go about to determine which rules applied;

14  correct?  You would look at the Code, whatever the Code

15  that the university had?

16  **A.**   Yes.

17  **Q.**   Okay.  And you'd look at a definition of what the

18  respondent was alleged to have -- the charge that the

19  respondent -- the violation the respondent was alleged

20  to have committed?

21  **A.**   I'm sorry?

22  **Q.**   Tell me what you would do -- were you representing

23  a respondent at a disciplinary hearing in a university,

24  your first time at this -- representing an individual

25  at this university, how do you do your due diligence?

1    **A.**   I would pull the relevant policy that was either

2    provided by the administrator who the client met with

3    or pull it off a website, whatever was available.

4    **Q.**   When you said "the relevant policy," that would

5    include the allegation against the student?

6         You would have to look to see, for example, if a

7    student was alleged to have submitted a false report of

8    sexual assault?

9    **A.**   Yes.

10   **Q.**   You would look at the university's Code as to what

11   the violation -- what were the -- what the university

12   had to prove to show a violation; correct?

13   **A.**   I would look at the relevant section.

14   **Q.**   Yes, of the charge?

15   **A.**   Yes.

16   **Q.**   So if it was -- often, like I know you didn't do

17   criminal law, but if it was a criminal charge, you'd

18   look at a statute?

19   **A.**   Right.

20   **Q.**   In this case it's a student conduct proceeding,

21   but there's a policy or a Code that's akin to a

22   statute?

23   **A.**   Yes.

24   **Q.**   And the Code states filing a false complaint, for

25   example, the respondent knowingly filed a false

1    complaint?

2    **A.**   Correct.

3    **Q.**   And you would then say and that -- you'd go

4    through the Code to determine what the university had

5    to prove?

6    **A.**   Yes.

7    **Q.**   Okay.  And you'd also look at the procedure that

8    applied?

9    **A.**   Yes.

10    **Q.**   Now, in this case, Beau was alleged to have

11    committed Violation III in the 2014 Code,

12    non-consensual -- sexual misconduct, non-consensual

13    sexual misconduct with Allie; correct?

14    **A.**   Correct.

15    **Q.**   And that was the central issue in Beau's -- the

16    central charge against Beau; correct?

17    **A.**   Yes.

18    **Q.**   So it would be reasonable for Beau to go to the

19    Code of Student Conduct to determine what the

20    University had to show he did; isn't that true?

21    **A.**   Yes.

22    **Q.**   Okay.  That's the notice that the University is

23    giving to Beau; correct?

24    **A.**   That it was a non-consensual sexual -- yes.

25    **Q.**   We went through this yesterday.  That's the notice

1    that's being provided?

2    **A.**   Yes.

3    **Q.**   And that's just like you did when you represented

4    respondents at various universities?

5    **A.**   Yes.

6    **Q.**   You'd go to the Code, this is what they have to

7    prove?

8    **A.**   Yes.

9    **Q.**   Now, in this case, the allegation is

10   non-consensual -- we can put up the --

11          MR. RATCLIFFE:  Excuse me, your Honor.

12          THE COURT:  Mr. Ratcliffe, while you're getting

13   ready, I just want to remind you this is redirect.  So

14   you don't need to repeat anything that you've done on

15   direct.  Just address yourself to the cross.

16   **Q.**   So the allegation is non-consensual physical

17   conduct of a sexual nature; correct?

18   **A.**   In this case, it was (a) and (b).

19   **Q.**   And so the central issue is whether or not it was

20   non-consensual?

21   **A.**   Yes.

22   **Q.**   Okay.  And it wasn't Beau's responsibility to

23   prove that it was consensual; correct?

24   **A.**   Correct.

25   **Q.**   Okay.  It was by a preponderance of the evidence

1    that the encounter was non-consensual?

2    **A.**   Right.

3    **Q.**   You referenced that you often communicate with

4    advisors as you communicated with Laura Dunn?

5    **A.**   I referenced that advisors often communicate with

6    me, yes.

7    **Q.**   Are you aware that Beau's advisor sent a letter

8    directly to you?

9    **A.**   Yes.

10   **Q.**   Okay.  And are you aware that -- and upon receipt

11   of that letter, did you forward that letter to the

12   Office of General Counsel?

13   **A.**   I don't recall specifically.  My response is

14   generally to write back to the student and to reach out

15   to General Counsel and ask that they coordinate

16   directly with attorneys.

17   **Q.**   And are you aware as to whether or not when Beau's

18   advisor sent a letter to you that the Office of General

19   Counsel advised his advisor not to communicate directly

20   with you?

21   **A.**   I'm sorry.  Can you repeat the question.

22   **Q.**   Did you receive a cc of a letter from the Office

23   of General Counsel indicating that there should be no

24   direct communication between Beau's advisor and you as

25   a Title IX Program Officer?

1        MR. RICHARD:  Objection.

2        THE COURT:  Grounds?

3        MR. RICHARD:  No such document has been put in

4    evidence.  She said she doesn't know it.

5        THE COURT:  Well, I'm not sure she said that.

6    So let's let her answer that question.

7    **A.**   I don't recall the document specifically.  But as

8    a practice, when attorneys reach out to me, I advise

9    them directly or General Counsel reaches out to them

10   and says attorneys have to speak with the Office of

11   General Counsel.  This is if the student is not present

12   as part of the communication or the call.

13   **Q.**   And you referenced a meeting that you had with

14   Beau where he discussed the no-contact order that was

15   filed against him?

16   **A.**   Yes.

17   **Q.**   Okay.  And I believe it was -- and correct me if

18   I'm wrong, did you indicate that you had no involvement

19   in requesting that no-contact order?

20   **A.**   I did not request the no-contact order.

21   **Q.**   Did you send an e-mail to the Office of Student

22   Life saying words to the effect of I think we need

23   no-contact orders here?

24   **A.**   I sent an e-mail to them that I -- indicating,

25   which I often do, when I believe those students are

1   going to request a no-contact order.  In this case, two

2   students had indicated to me that they were going to

3   request no-contact orders, which they did not

4   ultimately do.

5   **Q.**   They did not request no-contact orders?

6   **A.**   No.  Dean Suarez put the no-contact orders in

7   place in this case.  She made the request.

8   **Q.**   Now, on cross-examination, we discussed the e-mail

9   that Djuna Perkins sent you and that Beau was convinced

10  there was some sort of conspiracy claim against him --

11  conspiracy against him?  You discussed that on

12  cross-examination?

13  **A.**   Yes.

14  **Q.**   And I believe you said that the last sentence,

15  however, if -- now that he sees this explanation, he

16  accepts it, I thought it would be easy to simply redact

17  that section so that there is no mention of the -- and

18  that would be Witness 9 respondent interaction?

19  **A.**   Yes.

20  **Q.**   She wasn't suggesting that you provide Beau with

21  legal advice?

22  **A.**   I take that suggestion to be that she was saying

23  that if in his response to the report he withdraw his

24  conspiracy claim on his own, that she would also remove

25  the character -- what's being described as character

1    evidence.

2         Beau's redactions did request that some

3    character evidence be removed, but he also, I believe,

4    still included -- he wanted included the conversation

5    that occurred in the Ratty.

6    **Q.**   So -- and it's your understanding that if Djuna

7    Perkins said, "Beau, I'll take it out, you've got to

8    remove the conspiracy claim," that that would be

9    providing advice to Beau?

10   **A.**   That would be overstepping, yes.

11   **Q.**   That would be providing advice, legal advice to

12   Beau?

13   **A.**   I'm not saying -- I didn't state it would be

14   providing legal advice.  I would just say it would be

15   advising him about how to proceed with his comments or

16   his case.

17   **Q.**   Well, I believe you said that the guidance from

18   the Department of Education doesn't allow legal --

19   doesn't allow legal advice.  Is that what you said?

20   **A.**   No.  I said that the guidance requires us to be

21   equitable to the students involved in a case.  And by

22   providing advice to one student about the strategy that

23   they would take, you know, in removing this conspiracy

24   claim, then we'll remove this, and not doing it for

25   another student would create an imbalance and inequity.

1          So it's not the legal advice.  It's just

2    advising one party versus another, and it's not our

3    role to advise either of the parties.  It's the role of

4    their advisors.

5    **Q.**   And it's your understanding that just by saying,

6    "Okay, you made this claim, take it out, we'll take out

7    all this character evidence," that's advice?

8    **A.**   Yes, because the basis of asking to remove that

9    claim is because you're basically suggesting it doesn't

10   look so good.  So yes, I believe that that's advice.

11   **Q.**   And I believe that you -- that you discussed that

12   Gretchen had the prior conduct history regarding Beau?

13   **A.**   Gretchen had copies of the prior conduct history

14   in her packet at the panel.

15   **Q.**   And that was the violation of the no-contact order

16   regarding Witness 9?

17   **A.**   Yes.

18   **Q.**   And that was also in Djuna's -- in the

19   investigator report, that information?

20   **A.**   There were references to that information, yes.

21          MR. RATCLIFFE:  May I have a moment, your Honor.

22          THE COURT:  Yes.

23          (Pause.)

24          MR. RATCLIFFE:  Nothing further.

25          THE COURT:  Thank you, Mr. Ratcliffe.

1           Mr. Richard, do you have anything further on

2     recross?

3           MR. RICHARD:  No, your Honor.

4           THE COURT:  Okay.  I do have some questions,

5     Ms. Walsh, I'd like to ask you.

6           Let me start with some background questions

7     picking up on the development of this policy.  I'm

8     wondering if based on your experience, not just at

9     Brown but in your prior experience, is the model that

10    was adopted here by Brown, is it a common model, that

11    is, the model of a single investigator who prepares a

12    thorough report and then presents that to a panel or is

13    that a model that Brown has just come up with on its

14    own?

15          THE WITNESS:  It's increasingly very popular.

16    This is the model many institutions are moving toward,

17    I would say that more common in institutions -- peer

18    institutions of Brown.  It's, frankly, a fairly

19    expensive model because of hiring external or role of

20    an investigator versus a hearing.

21          So I think many institutions I worked with

22    didn't have that capacity, but most of our peer

23    institutions have a very similar model, which would be

24    referred to as an investigator model.

25          THE COURT:  Now, something that I think very

1   much can play in this hearing, and I want to ask you

2   about how you got to the conclusion about the role of

3   the investigator, is that the policy contemplates, if I

4   understand it correctly, that the investigator gathers

5   all the evidence and also is permitted to make

6   credibility findings and report those to the panel; is

7   that right?

8           THE WITNESS:  That's correct.

9           THE COURT:  Okay.  Now, it would seem to me that

10  in a case of this nature where you have conflicting

11  stories of the participants that making credibility

12  findings is essentially reaching a conclusion as to

13  responsibility, isn't it?

14          THE WITNESS:  It can feel that way, certainly,

15  and that's something that we contemplated.  When the

16  investigators include credibility assessments, they

17  often do so by pointing out the supporting

18  documentation or other witness testimony to direct the

19  panelists to that.  And I think that question was asked

20  directly of Djuna by one of the panelists in terms of,

21  you know, who do you believe.

22          So I think the investigator in a case like this

23  can have a fairly significant weight to the panel's

24  decision if the investigator is asked the question

25  effectively which of the parties do you believe.

1          My memory in this case is Djuna actually found

2     both of them fairly credible when she was asked that

3     question but, again, felt like it came down to whether

4     coercion was present in the room on November 10th,

5     2014.

6          THE COURT:  Okay.  But she essentially reached

7     the conclusion, didn't she, that coercion was used by

8     Beau?  Would you agree with that?

9          THE WITNESS:  I don't think I would.

10          THE COURT:  No?

11          THE WITNESS:  No.  I don't think that Djuna did

12     reach that conclusion.  I felt like she thought and she

13     indicated to the panel it's really your role as

14     administrators and community members at Brown to

15     determine whether this is coercion under the community

16     standards here.

17          THE COURT:  Okay.  So you feel -- and maybe this

18     is right, and I only reviewed parts of the report

19     quickly and other parts more thoroughly, but your view

20     of the report is that it doesn't reach a conclusion as

21     to credibility findings that Allie is more credible

22     than Beau?

23          THE WITNESS:  I wouldn't -- I didn't read the

24     report and walk away thinking that Allie was more

25     credible than Beau or Beau more than Allie.  I think

1    there were certain sections that witnesses and

2    supporting documentation seemed to support their

3    version of events.

4              THE COURT:  Okay.  All right.  Now, so part of

5    your role is to review the report and comment on it;

6    right?

7              THE WITNESS:  I review the reports for, again,

8    consistency because we use different investigators,

9    external investigators, internal investigators.

10             THE COURT:  Right.

11             THE WITNESS:  So part of my role is to review

12   the report and ensure compliance with both Title IX and

13   also specifically with our complaint process and other

14   kind of various rules but not to impose my judgment on

15   the investigator.

16             THE COURT:  I'm going to end up asking questions

17   of Ms. Perkins about this, but since I -- let me ask

18   you this.  Do you think it's part of your role to

19   evaluate the information that the investigator is

20   evaluating and commenting upon to ensure that it makes

21   sense?

22             THE WITNESS:  I just want to make sure I'm

23   understanding your question.  So to say that the

24   information that she's gathering makes sense as part of

25   the investigation?

1          THE COURT:  Right.  Well, let me put it to you

2     this way.  Do you think that -- is it part of your role

3     to assess the investigator's evaluation of evidence and

4     information and her assessment of it to see if it

5     logically makes sense?  Is that part of your role?

6          THE WITNESS:  The investigator is given a lot of

7     discretion under our process, and I aim to not

8     intervene with that inappropriately.  With that being

9     said, my role is, again, to ensure compliance with the

10     guidance and our process, and that is making sure that

11     the process is fair and equitable.

12          So if I believe that there's something that

13     should -- a conclusion or the inclusion of some

14     material that I think makes no logical sense and

15     therefore it rises to the level of unfairness or

16     inequity, yes, I think in that situation it would be my

17     role to interject and to inquire about how she got

18     there or her role or remedy that in some way.

19          THE COURT:  All right.  So let me focus you on

20     the end of the investigator's report.  In the paragraph

21     right before the conclusion, the investigator -- I'll

22     just read this because it's not that long.

23          THE WITNESS:  Okay.

24          THE COURT:  "By the respondent's own admission,

25     he treated the complainant poorly regardless of whether

1    their sexual activity was consensual or not.  The

2    complainant's dislike of him is, therefore, reasonable

3    even if he didn't assault her as is her desire to seek

4    support from other like-minded individuals.  The

5    complainant's and Witness 9's negative feelings toward

6    the respondent do not assist the panel in evaluating

7    whether the complainant's claims are fabricated,

8    neither does the conversation overheard by Witness 11,

9    because there is no evidence that their reasons for

10   wanting to get him," that's in quotes, "were unfounded

11   or that they wanted to take any action other than that

12   to which they were entitled.

13         Moreover, fabricating allegations requires a

14   person to make statements knowing them to be false.

15   Thus, if the panel concludes that the complainant

16   genuinely believed that she was coerced into sexual

17   activity, her claims would not amount to fabrication

18   even if the panel concludes that no sexual misconduct

19   occurred."

20         I'm wondering, do you think that that paragraph

21   is logically consistent?

22         THE WITNESS:  Well, what I gather from that

23   paragraph is that the investigator -- the investigator

24   essentially feels that while the panel might not find

25   that coercion was present by Brown's community

1    standards, that Allie was credible and at least that

2    she felt coerced.  But that doesn't necessarily mean it

3    amounts to a policy violation at Brown.

4         Some students will describe situations where

5    they feel like they were coerced, but from a policy

6    standpoint, the University wouldn't necessarily take

7    that position.

8         So what I gather from that is she was really

9    saying in some respects you may believe the

10   complainant, but that doesn't mean the respondent is

11   responsible and I don't find enough here to support

12   that they were fabricating this to get him.  Therefore,

13   the conspiracy didn't have -- she didn't find that the

14   claim for conspiracy was credible.

15        THE COURT:  Okay.  I understand what you're

16   saying, and that makes sense.  Let me ask you this.

17   Why wouldn't the conversations and the text messages

18   between the complainant and Witness 9 and the

19   conversations overheard by Witness 11, et cetera, about

20   wanting to get him, why wouldn't that be relevant to

21   considering whether the allegations were potentially

22   fabricated?  I think that's a separate question from

23   what you just said.

24        THE WITNESS:  I do, too.  I think she agrees

25   that they would be -- I guess I don't take that to mean

1    they wouldn't be relevant for the question of

2    conspiracy but, rather, there wasn't information to

3    support the conspiracy claim and, therefore, they

4    wouldn't be relevant to the determination of whether a

5    policy violation of Section III of the '14-'15 Code

6    occurred.

7            THE COURT:  Why not?  I'm not sure I understand

8    why they wouldn't be.

9            THE WITNESS:  Because those conversations --

10   because she found a lot of information in her mind to

11   support that these students had consistently -- that

12   they had consistently brought forth these claims.  And

13   while the University may not agree that they were a

14   policy violation, that they weren't fabricated; that

15   they had talked about this long before they had ever

16   come to the University to seek any action.

17           So, for example, these discussions, you know,

18   they brought this to the Executive Board of Mock Trial

19   in the earlier academic year, so an entire academic

20   year before they sought any support or any

21   ramifications through the University.

22           So I think what she's getting at is, this shows

23   that they weren't fabricating this for the purpose of

24   the Title IX complaint about whether a policy

25   violation, so there's not enough to support a

1    conspiracy.

2          THE COURT:  Okay.  So if I understand this

3    correctly, and maybe I don't, but there's a lot of

4    information in this report about these conversations

5    and about the back and forth with Witness 9 and the

6    complainant and what was overheard and so forth.  All

7    that's in there, right?

8          THE WITNESS:  Right.

9          THE COURT:  Now, I read that sentence to say

10   that the panel can't reach any conclusion based on

11   that.  The investigator is telling the panel that that

12   evidence is not relevant to the assessment of whether

13   there was a violation of the policy or not, whether it

14   was consensual or not.  Do you agree that's the reading

15   of that sentence?

16         THE WITNESS:  Is it possible to put it up on the

17   screen so I can look at it again?

18         THE COURT:  Sure.  Counsel can do that.  This is

19   Exhibit 18, last page.

20         THE WITNESS:  Thank you.

21         MR. RICHARD:  Last paragraph, your Honor.

22         THE COURT:  The paragraph right above

23   "Conclusion."

24         MR. RICHARD:  By the respondent.

25         THE COURT:  By the respondent, right.  So the

1    third sentence beginning, The complainant's and

2    witness's denied negative feelings toward the

3    respondent do not assist the panel in evaluating

4    whether complainant's claims are fabricated, neither

5    does the conversation overheard by Witness 11, etc.

6    That's what I'm talking about.

7              THE WITNESS:  Okay.  So I guess how I take this

8    to be is that the respondent had admitted that he

9    hadn't always treated specifically the complainant or

10   he had treated her poorly, I don't know if those were

11   his words or those were her words, and that, therefore,

12   by his own admission, if the investigator is finding

13   him credible and it's his own admission, that he had or

14   they had justified feelings of some negativity towards

15   him and, therefore, that is the likely reason they were

16   having this conversation in the Ratty versus any form

17   of fabrication.

18              So really to me this is a credibility assessment

19   that the respondent made this statement, I have no

20   reason to disagree with him, the complainant also made

21   a similar statement that he had treated -- you know,

22   had outlined events he had treated her poorly and,

23   therefore, this was the likely reason for the

24   conversation in the Ratty based on the timeframe versus

25   any form of fabrication.

1          So that's how I understand that to be kind of

2     her assessment of the conversation in the Ratty and

3     what relevance that would have.

4          THE COURT:  Well, do you think that that

5     sentence in this paragraph is essentially telling the

6     panel that they have to disregard that evidence with

7     respect to determining the credibility of the

8     complainant or the respondent?

9          THE WITNESS:  Well, I don't think this weighs on

10    the credibility of the complainant or the respondent

11    necessarily because this is really about the

12    conversation in the Ratty.  So it's more how to view

13    the information about --

14         THE COURT:  Well, that's my point.  If the panel

15    could consider those conversations as evidence of

16    fabrication, wouldn't that logically lead you to the

17    conclusion that the complaint might be fabricated and,

18    therefore, the encounter might have been consensual?

19         Isn't that the logical inference that one could

20    draw from concluding that there was a -- you know, this

21    term "conspiracy" has been used, that there was a

22    conspiracy to retaliate or to get him?  Isn't that the

23    logical inference?

24         THE WITNESS:  That could be a logical inference.

25         THE COURT:  So isn't the opposite of that also a

1    logical inference?  That is, there's not enough

2    information -- you can't consider this evidence.  It

3    doesn't amount to enough evidence to show that they

4    were out to get him.  Therefore, it can't be considered

5    by you to suggest that there's fabrication.  Therefore,

6    it's not evidence of consensual behavior.  Do you

7    follow my question?

8        THE WITNESS:  I think so.  I follow your

9    question in the sense that I believe that you're saying

10   that either could be a logical inference, that either

11   this was a claim for fabrication and, therefore,

12   information to support Beau's account that this was

13   consensual or enough information to say that this

14   wasn't fabricated.

15       THE COURT:  Let me put it a different way.  The

16   investigator could have said, Look, there's all this

17   conversation that took place between all these

18   witnesses.

19       THE WITNESS:  Sure.

20       THE COURT:  You can assess that however you see

21   fit.  And just left it at that.  But instead of doing

22   that, the investigator said, There is all this

23   information about these conversations.  There is no

24   basis for you to conclude that there was an effort to

25   fabricate -- to get him and, therefore, it can't be

1    evidence of fabrication.

2          Well, therefore, I'm saying the logical

3    inference from that is that it, therefore, can't be

4    taken by the panel as evidence of consensual behavior.

5          THE WITNESS:  So part of the -- it does say in

6    the complaint process, it says that the investigator

7    can draw reasonable inferences and provide that.  This

8    is a synthesizing of information for the panel, and

9    this was the way the investigator synthesized this

10   information and the assessments or inferences that she

11   came to.

12         THE COURT:  Right.  So here's my question.  If

13   the panel was on the fence -- let's say like we say to

14   juries all the time.  Imagine two scales; they're

15   evenly balanced.  The Government has to tip the scale

16   or the Plaintiff has to tip the scale.  If the panel

17   was evenly balanced, do you think that that commentary

18   about that evidence would have any impact on how they

19   viewed the evidence?

20         THE WITNESS:  I don't because I think there was

21   a lot of information without this paragraph in the

22   report to reject a claim of fabrication or conspiracy

23   especially from Witness 9's consistency with her

24   reporting throughout.

25         So I think even if you disregard this paragraph,

1    in my opinion the panel has the information contained

2    in the report to come to a very similar conclusion or

3    the same conclusion.

4              THE COURT:  Okay.  Let me ask you about another

5    part of the report.  You were asked some questions

6    about --

7              MR. RICHARD:  Do you want me to turn the page?

8              THE COURT:  Sure.  Put up page 15 at the bottom,

9    Footnote 26.

10             So you were asked some questions about this

11   footnote and we can just go through it.

12             THE WITNESS:  Sure.

13             THE COURT:  The messages in this document are

14   not dated but Witness 9 recalled receiving a series of

15   text messages along these lines on December 29, 2014.

16             I suppose we should take a look back up to where

17   the footnote is, which is right above it.

18             In the text it says, On December 26, 2014,

19   complainant sent Witness 9 another series of text

20   messages in which she discussed the incident with the

21   respondent.

22             So then the footnote says, The respondent

23   requested a complete set of electronic communications

24   between the complainant and Witness 9 to support his

25   claim that the two conspired to fabricate claims

1    against him.  As discussed further below, Witness 9 and

2    the complainant freely admit that the respondent's

3    behavior was a frequent subject of discussion and both

4    freely admit that they harbor significant animus toward

5    him.  Neither is enough to suggest the complainant

6    fabricated facts underlying the allegations of the

7    complaint, as the complainant's reaction is a typical

8    response to perceived inappropriate behavior.

9         More importantly, asking the complainant and

10   Witness 9 to disclose all their communications is

11   overly burdensome where the central issue in this case

12   is not whether certain sexual acts occurred or even

13   whether the complainant literally consented to them but

14   whether the consent was obtained through coercion.

15        And then it goes on to cite the 2014 Code.

16        So the reference in that footnote is to the part

17   of the report that I just asked you about a few minutes

18   ago at the end where she reaches her conclusion about

19   there's not enough evidence to reach a conclusion that

20   there was a quote, unquote, conspiracy.

21        But what I'm wondering about is why would the

22   investigator conclude that she should -- if she's going

23   to make that conclusion, why would she conclude that

24   she should not look at and the panel should not look at

25   the full body of text messages?  How is it that she

1   concludes that it was too burdensome to do that?

2   Wouldn't that be relevant for both the investigator and

3   the panel to see those text messages if she's going to

4   reach a conclusion, because she reaches a conclusion in

5   this report that there's not enough information to

6   conclude that there was an effort to get him, and then

7   says it would be too burdensome to look at all the

8   communications.

9            THE WITNESS:  Yes.  In discussing with Djuna

10  Perkins about this specific issue was that she was

11  conceding the point -- in her mind the request was made

12  by the respondent and his advisor for the full set to

13  show that they frequently talked about Beau and how to

14  proceed with the University reporting, et cetera.  And

15  Djuna was conceding that they agree that they did that

16  and they agree that they harbor animosity towards him.

17  So they've agreed to what the respondent is stating is

18  going to be found in those text messages.  That was her

19  description to me about why she didn't feel like a full

20  set was necessary because she was conceding the point

21  that she shared with me that the respondent was looking

22  to get at.

23           THE COURT:  But there could be -- you have to

24  agree that this was -- this is a case where the

25  complainant's position about whether this was a

1    consensual encounter or not evolved over a fairly

2    significant amount of time, right?  She didn't get to

3    the conclusion that it was non-consensual and make a

4    complaint until many months after the encounter, right?

5              THE WITNESS:  Yes.

6              THE COURT:  There's a lot of evidence that could

7    be taken in different ways that maybe she thought it

8    was consensual, maybe she was confused, maybe she

9    didn't know what to make of it, all sorts of things.

10   And that's another matter, but she didn't get to the

11   conclusion that it was non-consensual until much later,

12   right?  And a lot -- well, you can answer that.

13             THE WITNESS:  Yes.  I don't recall specifically

14   in this case at this point, but I know there's some

15   reference in the report about some experience that she

16   had that she viewed it differently at that point.

17             THE COURT:  Right.  She went to a presentation.

18   It was on consent.  She then came to the realization,

19   she says, that this was not consensual, right?

20             THE WITNESS:  Correct.

21             THE COURT:  But there's also a lot of other

22   evidence that a lot of other things transpired between

23   Beau and Allie regarding whether they would continue to

24   have a relationship or not.  I don't need to get into

25   it all.  You know what all that evidence is, right?

1          THE WITNESS:  Yes.

2          THE COURT:  And the feelings evolved to a

3    negative, very negative point of view toward him,

4    right?

5          THE WITNESS:  Yes.

6          THE COURT:  And there's also these conversations

7    and things that get overheard.  So just given all of

8    that, I come back to the question, wouldn't you want to

9    see, if you were making a judgment about who is telling

10   the truth here, wouldn't you as an investigator or as a

11   panel member want to see those conversations?

12         THE WITNESS:  So the panelists are instructed

13   that if there's information that they feel prohibits

14   them from making a final determination that they can

15   and have the opportunity to request that, either at the

16   panel or as a procedural matter to the Chair of the

17   Title IX Council beforehand.  And again, different

18   people might have different information in this report

19   that they would wish to see further and inquire about

20   that with the investigator.

21         In this case, they didn't raise those text

22   messages.  So, yes, if I was acting as the

23   investigator, I suppose it's hard to put myself in

24   those positions having not done all of the interviews

25   and sat with Witness 9, with Allie and with Beau.  But

1  certainly I can't deny that there may be some relevant

2  information contained in there.  But again, I think

3  that Ms. Perkins came to the conclusion that she was

4  conceding the point that the respondent was -- the

5  information that the respondent was looking to obtain

6  from those text messages.

7          THE COURT:  All right.  I want to shift now to

8  go back over a couple parts of your testimony.

9          THE WITNESS:  Sure.

10         THE COURT:  You testified, if I understand it

11 correctly, that the reason that you placed a copy of

12 the 2015-'16 Title IX Policy, I think we're calling it,

13 into Gretchen Schultz's packet but not into the panel

14 member packets was that you wanted to give the panel

15 the option of looking to that policy as a potential

16 source or definition on the issue of consent.  Did I

17 get that about right?

18         THE WITNESS:  Yes.  I provided it to Gretchen

19 and not to the panel because I wanted the panel to be

20 able to come up -- to use the "consent" definition that

21 they wanted.  This was one of any number of options.

22 In the past, panels have gone to the sex ed website,

23 for example, and pulled information about consent from

24 that.  Or had -- you know, when Gretchen was a Student

25 Conduct Board member, she had created sort of a cheat

1    sheet based on a basic dictionary definition of

2    "consent" and had used that.

3         So part of why the policy was changed and

4    updated to include a "consent" definition was because

5    of the lack of consistency with panels in using

6    different "consent" definitions and we wanted to create

7    that consistency moving forward.  Of course, in this

8    case, because it was an old case, we had to give the

9    panel an opportunity to come to a definition of

10   "consent" in the same way the old panels did.

11        And so now that this option existed and it

12   didn't in '14-'15, I gave it to Gretchen so that in the

13   deliberation when they were determining, you know,

14   there's the non-consensual section of the definition,

15   well, how do we determine non-consensual.  We have to

16   know what is consent.  If they wanted to use the

17   '15-'16, that that was one option.  I didn't know what

18   option they would elect, certainly, but that was one

19   that hadn't existed formerly.

20        I chose not to put it in their packet so as not

21   to send the message that that was the appropriate

22   definition that they had to use.

23        THE COURT:  Maybe these are very fine

24   distinctions but they could be important.

25        So you took the step of red-lining the draft

1    policy to exclude the Title IX Policy as the standard,

2    right?

3              THE WITNESS:  Correct.

4              THE COURT:  So obviously you felt that including

5    it as the standard was incorrect because there had to

6    be some difference between the '14-'15 policy and the

7    '15-'16 Title IX Policy, right?  Or not?

8              THE WITNESS:  Well, it wasn't as if there was a

9    difference.  It was that there was no "consent"

10   definition in '14-'15, and there was a "consent"

11   definition.  So I don't know if there is -- basically,

12   the panel would determine in '14-'15 how they would

13   view consent.  But the '14-'15 Code didn't dictate how

14   they would view consent.

15             THE COURT:  Right.

16             THE WITNESS:  So I excised that to indicate that

17   the panel in this case was not required to review that.

18   They would go through the process in the same way they

19   would have if this case was heard in the '14-'15

20   academic year, for example.

21             THE COURT:  But you have to agree you've

22   reintroduced it by including it in Gretchen Schultz's

23   packet, I mean, at least as something that the panel

24   could discuss.

25             THE WITNESS:  Yes.

1    THE COURT:  Okay.  And that was intentional,

2  right, to do that, to at least give them that option to

3  discuss it?

4    THE WITNESS:  It was intentional to include that

5  as one of the options.

6    THE COURT:  Okay.  Now, there's been some --

7  well, I think it's actually in the finding of the panel

8  and I forget the exhibit number, but I believe that the

9  panel says it referred to the Title IX Policy because

10  it embodies the -- maybe the best thing to do would be

11  to put it up because I don't want to misstate it.

12    Could you put the decision of the panel up.  I

13  think it's Exhibit 18 or -- no, it's not.  Is it 18?

14    MR. RATCLIFFE:  I left the exhibit book --

15    MR. RICHARD:  Twenty-seven.

16    THE COURT:  Twenty-seven?  All right.  We can

17  just read it right off the screen.

18    THE WITNESS:  Sure.

19    THE COURT:  Down near the bottom.  The third

20  says, "Because the 2014-'15 Code of Student Conduct

21  does not explicitly define 'consent,' the panel

22  referred to the current Sexual and Gender-Based

23  Harassment, Sexual Violence, Relationship and

24  Interpersonal Violence and Stalking Policy" -- and this

25  is the language I want to focus on -- "which codified

1    Brown University's existing community standards with

2    respect to the, 'maintaining a safe learning, living

3    and working environment where healthy, respectful and

4    consensual conduct represents campus social norms."

5         So the panel reaches a conclusion that the

6    current policy codified Brown University's existing

7    community standards, but you just said that up until

8    this point under the '14-'15 policy there was no

9    definition of consent and every panel used something

10   different.

11        THE WITNESS:  Panels have the opportunity to use

12   whatever they would like.  I have not gone through -- I

13   don't know exactly what each panel used, but, yes, they

14   had the opportunity to use whatever information they

15   would like.  And I know some went to certain websites

16   and others pulled from, for example, a dictionary.

17        THE COURT:  Okay.  So do you think that there's

18   consistency between what a panel used before the

19   '15-'16 Title IX Policy was developed and what's in the

20   Title IX Policy?  Do you think there's consistency

21   there, or are they different?

22        THE WITNESS:  If I understand your question, so

23   effectively is what they used in '14-'15 what is now

24   contained in the '15-'16 policy?

25        THE COURT:  That's a good paraphrase.

1           THE WITNESS:  Okay.  So I wasn't here but that's

2    the information that I've gathered from members of the

3    Sexual Assault Task Force.  Gretchen Schultz was also

4    part of the Sexual Assault Task Force.  Our "consent"

5    definition in the current policy is very lengthy and

6    covers a lot of ground.  I know I read it into the

7    record yesterday, and it was very lengthy.  So I know

8    that that was pulled from.  The Sexual Assault Task

9    Force had representation from a wide range of people,

10   students being part of that.  Bita Shooshani, who was a

11   former sexual assault advocate on campus, for example,

12   participated in that.  People like that.

13          So she would have been, for example, a person

14   who worked in the office that had the website where

15   that information was pulled from.

16          People in Student Conduct participated in the

17   Sexual Assault Task Force.  So in having that

18   representation, my understanding is that what

19   ultimately became our "consent" definition pulled from

20   those areas, which are likely the same areas that the

21   panels pulled from in the '14-'15 academic year.

22          THE COURT:  Okay.  I might have a few other

23   questions but those were the main areas, I think.

24          THE WITNESS:  Okay.

25          THE COURT:  I want to come back to the -- I know

1   we're running out of time with you so I'll try to be

2   quick.

3            I do want to come back to this letter you

4   received and information you received from Laura Dunn.

5   And I guess the question is -- I want to just -- I may

6   have misunderstood something.  Were you saying that

7   it's okay to receive information from an advocate such

8   as Laura Dunn, for you to receive that, but if the

9   advocate or advisor is an attorney like Mr. Ratcliffe

10  that that communication has to go to General Counsel?

11           THE WITNESS:  Advisors reach out to me all the

12  time and including, as Mr. Ratcliffe indicated, he had

13  sent me letters or was cc'd on information that Beau

14  had sent me; Mr. Ratcliffe has called me directly, et

15  cetera, to request extensions, for example, on behalf

16  of his client.

17           So advisors do reach out to me.  The role of

18  advisors is prescriptive in the complaint process, not

19  every advisor is an attorney.  But when an advisor is

20  either calling me or reaching out from a letter that is

21  signed, I either write back to the student and cc the

22  advisor to indicate I'm talking back to the student to

23  the best of my ability; or in the event that's it's

24  more appropriate for General Counsel to respond, I

25  reach out to General Counsel and say can you follow-up

1    to this letter if the response is more appropriate to

2    go to the attorney directly.

3         So that's generally how those things are

4    handled.  In that case, the reference that

5    Mr. Ratcliffe raised yesterday, I was trying to not

6    write back to Laura so, therefore, most of what she

7    contained in the letter and in the statement was the

8    same and was addressed by Djuna's next draft and,

9    therefore, I didn't have to communicate with her again.

10         THE COURT:  Okay.  I think that's all I have.

11         Do either of you feel compelled to follow-up on

12    anything I asked about?

13         MR. RICHARD:  None for Brown, your Honor.

14         MR. RATCLIFFE:  No, your Honor.

15         THE COURT:  Okay.  I think we're right on time.

16    You may step down.  Thank you very much.

17         All right.  I think we'll take our morning

18    break.  We'll just take ten minutes and then we'll

19    reconvene.  Okay?

20         (Recess.)

21         THE COURT:  Mr. Ratcliffe, are you ready to call

22    your next witness?

23         MR. RATCLIFFE:  Yes.  Djuna Perkins.

24

25         **DJUANA PERKINS, PLAINTIFF'S WITNESS, SWORN**

1          THE CLERK:  Please state your name and spell

2     your last name for the record.

3          THE WITNESS:  Djuna Perkins, P-E-R-K-I-N-S.

4     First name, too?  D-J-U-A-N-A.

5          THE COURT:  Good morning, Ms. Perkins.

6          THE WITNESS:  Good morning.

7          THE COURT:  You may inquire, Mr. Ratcliffe.

8              **DIRECT EXAMINATION BY MR. RATCLIFFE**

9     **Q.**   Good morning, Ms. Perkins.

10    **A.**   Good morning, Mr. Ratcliffe.

11    **Q.**   So you're an attorney?

12    **A.**   Yes.

13    **Q.**   And you graduated from Boston University in 1992?

14    **A.**   Yes.

15    **Q.**   And your first job out of law school was as an

16    assistant attorney general in Massachusetts?

17    **A.**   Yes.

18    **Q.**   And you were employed as an assistant attorney

19    general from 1993 to 1997?

20    **A.**   Yes.

21    **Q.**   And you also worked in the Suffolk County District

22    Attorney's Office?

23    **A.**   Yes.

24    **Q.**   And you worked primarily with domestic violence

25    matters in the Suffolk County District Attorney's

1    Office?

2    **A.**    Yes.

3    **Q.**    In fact, your final position was the role of the

4    Chief of the Domestic Violence Unit?

5    **A.**    Yes.

6    **Q.**    As the Chief of the Domestic Violence Unit, what

7    did you do?

8    **A.**    I investigated and prosecuted and supervised the

9    prosecution of hundreds of cases of domestic violence,

10    including those involving sexual assault throughout

11    Suffolk County, which included the City of Boston,

12    involving sexual violence and domestic violence.

13    Domestic violence including sexual assault.

14    **Q.**    And then you had a period of time after leaving

15    the District Attorney's Office with a private firm in

16    Boston?

17    **A.**    Yes.

18    **Q.**    And at that firm, you continued to have

19    involvement with respect to domestic violence issues?

20    **A.**    Not so much domestic violence issues as sexual

21    assault issues.

22    **Q.**    And in 2012, you started your own practice?

23    **A.**    Yes.

24    **Q.**    And you focused on sexual misconduct in schools?

25    **A.**    And workplaces, yes.

1    **Q.**   And you've done Title IX investigations before?

2    **A.**   Yes.

3    **Q.**   And this was your -- you were retained to do a

4    Title IX investigation at Brown University?

5    **A.**   Yes.

6    **Q.**   This was your first Brown case?

7    **A.**   Yes.

8    **Q.**   And you were contacted by Amanda Walsh?

9    **A.**   Yes.

10   **Q.**   And you and Amanda Walsh, your paths have crossed

11   in the past?

12   **A.**   Yes, professionally.

13   **Q.**   Presenting at conferences?  How did your paths

14   cross?

15   **A.**   I know that I got to know her when I was at the

16   firm.  I don't know what year and what the precise

17   circumstances were.  I just have a memory in my mind of

18   knowing who she was and knowing her and her work.

19   **Q.**   And her and her work was what?

20   **A.**   At the time, she worked at the Victim Rights Law

21   Center.

22   **Q.**   And what's your understanding of what the Victims

23   Rights Law Center is?

24   **A.**   It's a non-profit that provides legal assistance

25   to victims of sexual violence.

1    **Q.**    Now, you were retained by Brown University?

2    **A.**    Correct.

3    **Q.**    And you prepared a retainer letter?

4    **A.**    Yes.

5           MR. RATCLIFFE:  Exhibit 9.

6    **Q.**    Showing you what's previously entered as a full

7    exhibit as Exhibit 9, do you recognize that document?

8    **A.**    Yes.

9    **Q.**    It says, "DP Law Engagement Agreement."  Did you

10   prepare this document?

11   **A.**    Yes.

12   **Q.**    It went back and forth.  Some changes requested by

13   Brown and eventually you had a final, right?

14   **A.**    I think that there was only one round of requested

15   changes.

16   **Q.**    But it wasn't as if you sent a document to Brown,

17   and then Brown just executed it?  They commented and

18   sent it back to you with a couple of changes?

19   **A.**    Correct.  There were some minor changes.

20   **Q.**    And this document indicates what your role is,

21   does it not?

22   **A.**    Yes.

23   **Q.**    And you were not being hired as an attorney?

24   **A.**    Correct.

25   **Q.**    You were being hired for fact-finding services?

1     **A.**   Yes.

2     **Q.**   And what is fact-finding services?

3     **A.**   Investigating reports of sexual misconduct.

4     **Q.**   Okay.  But what particular with respect to

5     investigating reports of sexual misconduct?

6     **A.**   So I see it as my role to identify relevant

7     witnesses, to interview all those relevant witnesses,

8     to review -- to request, identify and request any

9     documents I think might be relevant and to evaluate

10    that evidence.  Generally, I look to the Generally

11    Accepted Rules of Evidence even though those are not

12    required to be followed in Title IX cases, but I

13    generally do keep those in mind.

14         I try to evaluate evidence, at times comment on

15    credibility.  Some of the issues depend on -- make

16    findings of fact.  I'm sorry.

17    **Q.**   In deciding what to do for a particular

18    institution, do you look at any documents?

19    **A.**   Yes.

20    **Q.**   And what do you look at?

21    **A.**   I typically will look at the initial complaint,

22    whatever it is, how ever it is that it had come into

23    the institution.  I look at the policies, the current

24    policy.  That's more important when I'm making a --

25    when I'm analyzing the facts as they apply to the

1    policy.  Some schools like Brown, my role is only to

2    fact-find.  It's not to draw any what we would call the

3    equivalent of legal conclusions.

4    **Q.**   You said your role was to fact-find, not to draw

5    any legal conclusions?

6    **A.**   Correct.

7    **Q.**   In fact, that was specifically conveyed to you by

8    Amanda Walsh, correct?

9    **A.**   Correct.

10    **Q.**   And that's a conclusion that you drew from

11    reviewing the Brown University's Title IX complaint

12    policy also?

13    **A.**   I believe that actually Amanda just told me that.

14    That's a question that I typically would ask, you know,

15    exactly what am I doing.  So I think that that's where

16    my first knowledge of my role came.

17    **Q.**   Now, after receiving -- before executing the

18    engagement agreement, did you receive any documents

19    regarding the complaint that you were engaged to

20    investigate?

21    **A.**   I don't believe so.  I believe we did the

22    engagement agreement first and then Amanda sent the

23    initial documents on the case.

24    **Q.**   So the engagement agreement is dated November 4,

25    2015?

1    **A.**    Yes.

2    **Q.**    And I believe that the e-mail you had a couple of

3    days before you got the engagement letter back, signed

4    engagement letter back to Amanda?

5    **A.**    Yes.

6    **Q.**    And it looks like you got it back on the 6th of

7    November at 10:45 a.m.?

8    **A.**    Yes.

9    **Q.**    And at that point -- so is the first document you

10   received the -- and we're not using any last names

11   here, so you had received Allie's complaint?

12   **A.**    I believe so.

13   **Q.**    You didn't receive Allie's complaint and Beau's

14   response at the same time, did you?

15   **A.**    I may have received it the same day but in two

16   separate e-mails.

17   **Q.**    So did you do anything to begin the investigation

18   immediately upon sending the signed retainer agreement

19   back to Brown University?

20   **A.**    I couldn't have until I got their contact

21   information.

22   **Q.**    So there was some sort of a time lag?

23   **A.**    Yes.  I believe so.  Between the time that we

24   signed the engagement letter and the time that Amanda

25   sent me those initial documents.

1  **Q.**  So what's your best memory of what you received in

2  your initial packet from Amanda?

3  **A.**  I believe that there were two e-mails that Amanda

4  sent on the same day.  Each contained the -- the

5  complainant's contained the complaint and the exhibits

6  attached to the complaint.  And then another e-mail

7  contained your client's response to the complaint as

8  well as the exhibits that he attached.

9  **Q.**  Now, when you received the response from my

10  client, Beau, were there additional e-mails attached to

11  his complaint that were not included -- strike that.

12  Did Beau submit e-mails to you that Allie had

13  not submitted or attached to her complaint?

14  **A.**  E-mails?

15  **Q.**  Or text messages.

16  **A.**  Yes.  Among his exhibits were a complete set of

17  the texts between the two of them.

18  **Q.**  And which text messages were not included in

19  Allie's submission of text messages that were included

20  in Beau's submission of text messages?

21  **A.**  So I believe that in her text messages, in her

22  version of the text messages what was missing is a few

23  text messages leading up to the night of November 7th

24  and text messages roughly from after -- I believe her

25  text messages went from about November 6th to around

1    the middle of November or something.

2    **Q.**   And is it your memory that the majority of the

3    text messages not submitted by Allie related to

4    post-encounter communications between Allie and Beau?

5    **A.**   Yes.

6    **Q.**   And those post-encounter communications show

7    that -- what did those post-encounter communications

8    show?

9    **A.**   In general, they just showed that the complainant

10   seemed to continue to be interested in the respondent

11   after that encounter that night; that she would

12   periodically reach out to him to initiate contact; and

13   that he pretty clearly rejected her fairly quickly

14   afterward.

15          There were a few cordial messages kind of in the

16   spring.  There was one conversation about the fact that

17   he had been upset with her for what he called spreading

18   rumors about him.  And she responded and apologized.

19   That was the basic substance of what was in those text

20   messages, at least from the ones that Beau had

21   submitted.

22   **Q.**   Do you recall that even up until Beau's birthday

23   in March of 2015, she actually sends him a happy

24   birthday text message?

25   **A.**   Yes.

1    **Q.**   And that's, I believe, March 31st?

2    **A.**   I don't know what the date was, but that sounds

3    right.

4    **Q.**   Did you ever inquire of Allie as to why she didn't

5    include post-encounter text messages with her

6    complaint?

7    **A.**   I did not.  I don't think I realized until after I

8    really had a chance to go over the text messages in

9    depth.  There were many, many of them so I wasn't quite

10   digesting it all until toward the end of the

11   investigation.  However, she had told me the substance

12   of many of those things.  And I believe I did ask her

13   about the substance of those missing text messages and

14   she acknowledged that they had taken place.

15   **Q.**   She had acknowledged they had taken place after

16   Beau had submitted the text messages; correct?

17   **A.**   Yes.

18   **Q.**   So you never inquired of her as to whether or not

19   she decided not to include the post-encounter text

20   messages because it was evidence that the encounter

21   was, in fact, consensual?

22   **A.**   I'm sorry.  Could you repeat the question.

23   **Q.**   Obviously, an inference could be drawn from the

24   post-encounter text messages that the encounter on

25   November 10, 2014, was consensual; correct?

1    **A.**   Could an inference be drawn?  Maybe.  Maybe not.

2    **Q.**   Well, okay.  The text messages indicate that the

3    complainant is continually contacting the respondent

4    and being extremely cordial?

5    **A.**   Correct.  Well, not always but in general, yes.

6    **Q.**   In general, yes.  And that they -- and that she

7    is -- and I believe you've stated that she is actively

8    pursuing him?

9    **A.**   I should correct that and say she was certainly

10   interested in a relationship with him and did reopen

11   communications from time to time.

12   **Q.**   And you've been involved in numerous --

13   investigation of numerous sexual assault cases;

14   correct?

15   **A.**   Yes.

16   **Q.**   And in fact, I believe you said you -- by the time

17   you were engaged by Brown, you probably handled 40

18   Title IX investigations?

19   **A.**   Yes.

20   **Q.**   That was at your deposition; correct?

21   **A.**   Yes.

22   **Q.**   So in your experience as a Title IX investigator

23   involving college students, is it common for a

24   complainant after an alleged assault to continue to

25   pursue the respondent for a relationship?

1    **A.**   I don't know if the word is "common," but it

2    certainly does happen.  I certainly have seen it many

3    times.

4    **Q.**   Now, in this case, my question to you, and I don't

5    know if you answered it, was an inference could be

6    drawn, could it not, that Allie did not provide the

7    post-encounter text messages because they didn't help

8    her case?

9    **A.**   Perhaps, yes.

10   **Q.**   Well, you say perhaps.  Did you think that the

11   post-encounter text messages helped Allie's case?

12   **A.**   I wasn't asked to draw that -- to have an opinion

13   about that.

14   **Q.**   You weren't asked by Brown to have an opinion

15   about that?

16   **A.**   Right.

17   **Q.**   Because you weren't asked by Brown to have an

18   opinion about any legal issues?

19   **A.**   I was not asked by Brown to draw an ultimate legal

20   conclusion about whether the facts violated the policy.

21   **Q.**   I believe you testified, did you not, that Amanda

22   Walsh told you that your sole role was as a

23   fact-finder?

24   **A.**   Yes.  But there's obviously some -- obviously, I

25   have legal framework in my brain to a certain extent

1    that is there even in fact-finding.

2    **Q.**   So I believe you testified that you weren't hired

3    as -- excuse me.  You weren't hired to make a

4    determination as to whether or not the text messages

5    that post-date the encounter helped or hindered Allie's

6    case; correct?

7    **A.**   Correct.

8    **Q.**   And but as you said, you're a fact-finder but you

9    also have some legal framework with respect to that;

10   correct?

11   **A.**   Correct.

12   **Q.**   And you've tried cases?

13   **A.**   Many.

14   **Q.**   And when you were a prosecutor trying domestic

15   violence cases, if there was evidence after an alleged

16   assault that the complaining witness continued to

17   pursue the defendant in a criminal case, that's

18   something that you believed would help your case or

19   hurt your case?

20   **A.**   In general, based on my knowledge of juror

21   perceptions about sexual misconduct and sexual assault,

22   I would think that it would hurt my case.  However,

23   there's also a jury -- any panelist, fact-finder could

24   decide to accept the explanation given by the person

25   who pursued the relationship afterward.  So it could go

1    either way.

2    **Q.**   So Allie, as someone who's not a trained attorney

3    and someone just, you know, putting together a

4    complaint, do you think it would be reasonable for --

5    would it be reasonable for Allie to conclude that she

6    looks at all the messages and she says these messages

7    after this date don't help me?  Would that be a

8    reasonable conclusion for Allie to draw?

9    **A.**   It's pretty hard for me to speculate what would be

10   reasonable for her.

11   **Q.**   Well, a person in her position, not an attorney?

12   **A.**   It could be.  First of all, she always accepted

13   that those -- I believe that she may have told me in

14   her very first interview that she was looking --

15   because I believe I asked whether there was contact

16   afterward and why.  I believe that she said that she

17   wanted a relationship with him.

18          So whatever was in those text messages, the fact

19   that she didn't include them didn't really detract from

20   what she had already conceded, which is that she was

21   interested in pursuing a relationship with him.

22          And I should also say that she was represented

23   by counsel.  I have no idea what their conversations

24   were or what their strategies were, so I don't know if

25   this is something that -- if that decision to leave

1    those messages out was hers and something that she did

2    -- I'm sorry.  Or something that she did on advice of

3    counsel.

4    **Q.**    In any event, in your role as fact-finder, you

5    never inquired as to the basis for leaving them out?

6    **A.**    Correct.  But I did include in my report the fact

7    that they had been left out by her so that the panel

8    could consider that.

9    **Q.**    You included in your report that she agreed that

10   those text messages that Beau provided were accurate

11   text messages?

12   **A.**    I also included in the report the fact that she

13   had not included the post-incident text messages in her

14   exhibits so that the panel could weigh for themselves

15   whether that was material or not.

16        MR. RATCLIFFE:  I'd move to strike that last

17   comment, your Honor.

18        I'll withdraw it.

19        THE COURT:  Overruled.

20   **Q.**    So the complaint in this matter involved a single

21   encounter on November 10, 2014; correct?

22   **A.**    Yes.

23   **Q.**    Okay.  And so what did you do to investigate this

24   complaint?

25   **A.**    First I read both -- all the materials submitted

1    by both students.  I then met with the complainant and

2    interviewed her at length.  And she was there with her

3    attorney.  I think her attorney was actually present by

4    phone.  I then interviewed your client.  I believe that

5    there was some delay in our ability to get -- to

6    interview him so I may have interviewed some of the

7    witnesses in between.  I can't quite recall.  But the

8    report lists the dates of all the interviews so that

9    would be easy to look at.

10        I then interviewed I want to say 13 or 14

11   witnesses, but of course all of that is in the report

12   as well.  I reviewed documents and then I remet -- you

13   know, after I met with the respondent, I interviewed,

14   reinterviewed the complainant so that she would have an

15   opportunity to respond to additional material that the

16   respondent had raised.  I also interviewed the

17   respondent a second time as well.

18   **Q.**   Now, after you interviewed everybody and looked at

19   all the evidence, you prepared a report?

20   **A.**   Yes.

21   **Q.**   And that's your role -- that's what you were hired

22   to do?

23   **A.**   Yes.

24   **Q.**   Now, I am showing you what's been previously

25   introduced as a full exhibit, Exhibit Number 10 in this

1    matter, and ask you if you recognize that document.

2    **A.**    I do.

3    **Q.**    What is it?

4    **A.**    It appears to be the final version of the report.

5    **Q.**    Are you sure about that?  Let me bring this up a

6    little bit.

7    **A.**    Oh, I'm sorry.  It looks like it's the draft

8    report that I submitted to Amanda.

9    **Q.**    And this draft report to your knowledge wasn't

10   shared with either the complainant or the respondent?

11   **A.**    Correct.

12   **Q.**    And did you know from Amanda ahead of time that

13   this draft report was basically for her eyes only?

14   **A.**    No.

15   **Q.**    So you just -- you sent the report to her and you

16   didn't --

17   **A.**    I didn't know who she would share it with, no.

18   **Q.**    All right.  Now, in the draft report, you refer to

19   Section III, Relevant Policy Sections?

20   **A.**    Yes.

21   **Q.**    And you're referring to the Title IX Brown

22   University's Sexual and Gender-Based Harassment, Sexual

23   Violence, Relationship and Interpersonal Violence and

24   Stalking Policy?

25   **A.**    Yes.

1    **Q.**   Why did you refer to those sections?

2    **A.**   When I was preparing to write the report, Amanda

3    said that the University had a format, a template of

4    the report that had particular sections in it and they

5    wanted me to use that.  So I received a template of a

6    report from another investigator in the office,

7    Jessica -- I'm sorry, at Brown, Jessica Katz.  That

8    template had this paragraph three in it that said

9    Relevant Policy Sections.  I think that -- so I just

10   modified that template to fit as best I could what was

11   in -- what was relevant to this case.

12   **Q.**   So when you said the template had relevant policy

13   sections, it had -- that's something that you would --

14   you would include relevant policy sections in your

15   report; correct?

16   **A.**   Correct.  But for me, they were not particularly

17   relevant because I was not analyzing whether or not the

18   policy -- the facts violated the policy.  It was just,

19   I think, to point the panel in the direction of which

20   policies were at play.

21   **Q.**   But in any event, the template was, just so I'm

22   clear, the template that you received just said that

23   you should have a section that says relevant policy

24   sections; correct?

25   **A.**   No.  It was filled in from another -- as if it had

1    been from a different case so I was just deleting

2    language from that one and inserting new language.  I

3    wasn't sure what -- I didn't know what the old case was

4    about so I wasn't sure exactly what the -- how much of

5    the material from the old case was standard or was

6    particular to that case.

7    Q.   But in any event, when you say you took a

8    template, you didn't go to the old -- this information

9    that you said were the relevant policy sections, you

10   didn't get that information, that exact information

11   from the prior case; correct?

12   A.   That's true.

13   Q.   So basically, you did some analysis to determine

14   what the relevant policy sections were?

15   A.   Correct.

16   Q.   And so you looked at the Title IX Policy?

17   A.   I looked at what was on the website, on Brown's

18   website at the time I was writing the report, which

19   would have been -- for all I know it's still the one

20   that's there.  But I just used the one that was from

21   the website because I also knew that Amanda was going

22   to be reviewing it and would correct any -- if I was

23   referring to the wrong policy.

24        MR. RATCLIFFE:  Move to strike, your Honor, as

25   non-responsive.

1        THE COURT:  I'll strike it.  The question was

2    did you look at the Title IX Policy.  So you can answer

3    that question and then we'll see where the questions go

4    from there.

5    **A.**   I looked at the Title IX Policy that was on the

6    website at the time I wrote the report, on Brown's

7    website.

8        MR. RATCLIFFE:  Exhibit 4.

9    **Q.**   I'm showing you what's been previously marked and

10   introduced as Exhibit 4.  Is that what you looked at on

11   Brown University's website?

12   **A.**   Not in this format.  And I cannot say that I

13   looked at it -- that I read it word-for-word.  But it

14   appears to be a Title IX Policy of Brown University.

15   **Q.**   So I just want to get your methodology down.  So

16   you went to the Brown University -- actually went to

17   the Brown University website to pull up the Title IX

18   Policy on the website?

19   **A.**   Yes.

20   **Q.**   And you then went to look for what offense would

21   be the sexual misconduct offense; correct?

22   **A.**   Correct.

23   **Q.**   And you drew the conclusion that the operative

24   offenses were VII(a) and VII(b)?

25   **A.**   Yes.

1    **Q.**   And you also drew the conclusion that they were

2    relevant definitions?

3    **A.**   Yes.

4    **Q.**   And those are -- I believe my prior question was

5    that you went to the Brown University website to

6    determine which provisions of the policy, the Title IX

7    Policy would apply to the -- would be the relevant

8    policy sections?

9    **A.**   Yes.

10   **Q.**   And you determined that VII(a) and VII(b) were the

11   offenses, VII(a) being sexual and gender-based

12   harassment and VII(b) being sexual assault; correct?

13   **A.**   Yes.

14   **Q.**   And then you also referenced definitions as

15   relevant policies; correct?

16   **A.**   Yes.

17   **Q.**   And those definitions were of "consent."

18   **A.**   Yes.

19   **Q.**   And you got that definition of "consent" from the

20   Title IX Policy, right?

21   **A.**   I didn't include the specific language of the

22   definition, but yes.

23   **Q.**   Well, you referenced it?

24   **A.**   I referenced it, yes, based on what I saw in the

25   policy on the website.

1    **Q.**   You also referenced the "consent" definition,

2    continues to the following page and below that is the

3    definition VIII(b) for "coercion," you referenced that?

4    **A.**   Yes.

5    **Q.**   In any event, you did receive a -- you had some

6    communication with Amanda Walsh regarding whether

7    those -- what you referenced as the relevant policy

8    sections, whether or not they actually were the

9    relevant policy sections; correct?

10   **A.**   Yes.

11   **Q.**   And in fact, Amanda Walsh sent you an e-mail back

12   telling you that they were not the relevant policy

13   sections?

14   **A.**   Yes.

15   **Q.**   And actually sent you a red-line version of your

16   report excising those relevant policy sections?

17   **A.**   Yes.

18   **Q.**   Now, you prepared a second draft of your report;

19   correct?

20   **A.**   Yes.

21   **Q.**   And that was shared with the complainant and

22   respondent?

23   **A.**   Yes.

24   **Q.**   And --

25   **A.**   First I believe I sent it to Amanda.

1    **Q.**   So you sent it to Amanda and then Amanda approved

2    it and then you sent it to the students?

3    **A.**   I can't recall if I sent this version to the

4    students.  There was some back and forth about

5    redaction and who was going to do the redaction, but,

6    yes, ultimately Amanda approved the revisions and then

7    it was sent to the students.

8    **Q.**   The report that was shared with the students, the

9    relevant policy sections, do you recall what relevant

10   policy sections you included in your interim or the

11   second draft?

12   **A.**   I don't recall specifically what the, you know,

13   section and numbers were, but they were the correct

14   version as to what was applicable to the case.

15   **Q.**   And that was the 2014-'15 Code of Student Conduct?

16   **A.**   Correct.

17   **Q.**   Now, I believe you had discussions with Amanda

18   Walsh regarding whether or not you should actually

19   include the entire section of the -- when you're

20   including relevant -- the relevant policy sections,

21   whether or not you should actually put the whole

22   relevant policy section or reference the entire

23   relevant policy section in your report, did you not?

24   **A.**   You mean the language?

25   **Q.**   The language, like actually copy it.

1    **A.**   I don't recall.

2    **Q.**   Isn't it true that Amanda Walsh told you that --

3    you didn't put it in because Amanda Walsh told you that

4    the panel would have the proper policy in front of them

5    and didn't need to be in the report?

6    **A.**   That sounds right.

7    **Q.**   Is it right?

8    **A.**   As I said, I don't recall specifically, but it

9    sounds reasonable.

10   **Q.**   Do you recall -- did you testify -- do you recall

11   testifying at your deposition that I believe that

12   Amanda -- basically that Amanda -- that the panel would

13   have the Code in front of them?

14   **A.**   Yes.

15   **Q.**   Okay.  And that because the panel would have the

16   Code in front of them, they didn't need it to be

17   rewritten in the report?

18   **A.**   I don't recall testifying that at my deposition.

19   **Q.**   Top of page 49?

20        THE COURT:  Why don't you use the ELMO so we can

21   all see it.

22   **A.**   Okay.

23   **Q.**   I'll go to the bottom of 48.

24   **A.**   Oh, okay.  I did.  I stand corrected.

25   **Q.**   "Did you have any discussions with Amanda as to

1   why not to include the text of the policy?"  And you

2   responded, "No."  And then you said, "Well, I think

3   that we maybe did.  Maybe she said -- I believe she

4   might have said that the panel would have the Code, the

5   relevant full Code with them so we didn't need the

6   text."

7   **A.**   I'm sorry.  Where are you?

8   **Q.**   Top of the page.

9   **A.**   I can't see the top.

10       Yes, I said that.

11  **Q.**   So basically, you didn't put the reference to the

12  text of 2014 Code because Amanda told you that the

13  panel would have that?

14  **A.**   Yes.

15  **Q.**   Now, after your initial report was shared with the

16  students, each student provided comments; correct?

17  **A.**   Yes.

18  **Q.**   And there were a number of comments provided by

19  Beau; correct?

20  **A.**   Yes.

21  **Q.**   Okay.  I'm showing you what has been previously

22  marked as Exhibit 16.  Do you recognize that e-mail?

23  **A.**   Yes.

24  **Q.**   And that's an e-mail from Beau to you regarding

25  his requested revisions to the investigative report?

1    **A.**    Yes.

2    **Q.**    Show you the bottom of the page.  So Beau was

3    concerned about reference in your report to coercion;

4    correct?

5    **A.**    Yes.

6    **Q.**    And he indicates that (Reading:)  Quite a bit of

7    your report, including Footnote 22, focuses on the

8    possibility that I coerced Allie to engage in sexual

9    conduct.  That, however, is not part of the 2014

10   definition of this offense.  The term "coerce" does not

11   appear in that definition so I respectfully suggest

12   that your statement in Footnote 22 that the central

13   issue in this case is whether the consent was obtained

14   through coercion is incorrect.

15          In any event, because panels are now trained to

16   apply a different definition of sexual misconduct than

17   what applied in my case, this distinction is important

18   and should be conspicuously set forth in your report.

19   Furthermore, your report does not contain a definition

20   of "coercion," which is the use of force or

21   intimidation to obtain compliance.  There's absolutely

22   no evidence that I intimidated or threatened the

23   complainant in order to satisfy my sexual desires.

24          How did you address that comment?

25   **A.**    I addressed it by including the information that I

1    think is now part of Footnote 26 in the final version

2    of the report.

3    **Q.**   Is it your memory that the draft investigative

4    report contained 28 pages?

5    **A.**   That sounds right.

6    **Q.**   And that the final investigative report contained

7    29 pages?

8    **A.**   That sounds right.

9    **Q.**   So Exhibit 13 has previously been introduced as

10   the draft report.  Now, Footnote 22 is, (Reading:)

11   The messages in this document are not dated but --

12   redacted -- recalled receiving a series of text

13   messages along these lines on December 29, 2014.

14        So that references text messages between Allie

15   and Witness 9; correct?

16   **A.**   Correct.

17   **Q.**   And I believe that Allie submitted text messages

18   to you to show that sometime in December of 2014 she

19   began to communicate with Witness 9 regarding the

20   circumstances of what happened on November 10, 2014?

21   **A.**   I can't specifically recall whether she said what

22   the purpose of giving them, submitting them was, but I

23   think that they actually, based on the text messages

24   and the statements of both students said that they

25   began communicating about it, whether verbally or by

1   text, in November.

2   **Q.**   And up until that point -- Allie told you that the

3   first person that she told that -- strike that.

4        There was evidence from other witnesses that you

5   interviewed that Allie had referred to the encounter

6   between she and Beau as a hookup?

7   **A.**   Yes.

8   **Q.**   And that those witnesses drew their conclusion

9   based on Allie's statement that any sexual activity

10   that had occurred was consensual?

11   **A.**   Yes.

12   **Q.**   And at some point, Allie starts to communicate

13   with Witness 9 about Beau?

14   **A.**   Yes.

15   **Q.**   And at some point, Allie says to Witness 9 what

16   happened in the room really wasn't consensual.  He

17   coerced me into having sex or having sexual relations,

18   words to that effect; correct?

19   **A.**   Yes.

20   **Q.**   Okay.  And this Footnote 22 is addressing --

21   first, it's addressing Beau's request that if Allie is

22   going to give you text messages between she and Witness

23   9, she should give you the entire set of text messages;

24   correct?

25   **A.**   I'm sorry.  Could you repeat that.

1  **Q.**   Beau wanted all of the text messages during that

2  timeframe between Witness 9 and Allie; correct?

3  **A.**   Yes.

4  **Q.**   And the reason that he was asking for those was,

5  one, because Allie had submitted certain texts?  She

6  gave you certain texts, communications between she and

7  Witness 9?

8  **A.**   Is that the question?  Yes, she did.

9  **Q.**   And those texts supported those allegations

10  because she's saying what really happened in the room

11  wasn't consensual?

12  **A.**   She may have, yes.

13  **Q.**   Well, the text messages between Witness 9 and

14  Allie and I believe you refer to them in your

15  deposition as sort of a fresh complaint, did you not?

16  **A.**   Yes.

17  **Q.**   What is a fresh complaint?

18  **A.**   Well, in Massachusetts now we actually call it

19  first complaint, but fresh complaint is basically

20  evidence given to a first report or a fresh report of

21  sexual assault to another person.

22  **Q.**   So this is her first report of sexual assault to

23  her friend, Witness 9?

24  **A.**   It may have -- I believe that that was the first

25  time she referred to it as a sexual assault.  It was

1    not the first time she had discussed it.

2    **Q.**   Well, in any event, you recall the text messages

3    and at one point does not Witness 9 says, OMG, my God,

4    he assaulted you, or words to that effect?

5    **A.**   Correct.

6    **Q.**   So Beau asked you, did he not, look, you've got --

7    Allie gave you certain text messages between she and

8    Witness 9.  Let's get all the text messages.

9    **A.**   He did ask for that.

10   **Q.**   Okay.  And you did not make any attempt, did you,

11   to get all the text messages?

12   **A.**   Correct.

13   **Q.**   And that's because you didn't think they were

14   relevant?

15   **A.**   Not based on what Beau -- not based on the reasons

16   Beau gave for requesting them.

17   **Q.**   And the reasons that he gave for requesting them

18   were what?

19   **A.**   He said that they would be -- provide great

20   context and information relevant to the complaint.

21   **Q.**   And upon what -- you're the fact-finder?

22   **A.**   Correct.

23   **Q.**   Upon what facts did you determine that they would

24   not provide great context and be relevant to an

25   analysis of the complaint?

1    **A.**    I first looked at -- from Beau's point of view, on

2    his best day what would he be hoping for to find in

3    those text messages.  And given the evidence that

4    already existed, that is that she couldn't stand him;

5    that she first came to the apparent realization that

6    this was a sexual assault when Witness 9 told her, OMG,

7    what you're saying is a sexual assault, she's already

8    locked herself into a version of events with Witness 9.

9    It was very unlikely, given that, that there would be

10   any other evidence in the text messages that would

11   contradict that version of events.

12        There was also already plenty of evidence that

13   showed that she was very angry at him; that she still

14   wanted to be with him after the event occurred.  There

15   was plenty of evidence that any panel could point to to

16   say this was, in fact, a consensual event.  Therefore,

17   the likelihood of finding any additional helpful

18   information that would further that case was very

19   small.  And I felt that it was intrusive on the part of

20   both students without more specific reasons than what

21   Beau had given.

22   **Q.**    So you knew that you had Allie, who when she

23   initially filed her complaint didn't give you all of

24   the relevant communications between she and Beau?

25   **A.**    Correct.

1    **Q.**   And you now have Allie giving you communications

2    between she and Beau to establish this fresh complaint,

3    but she doesn't give you the entire universe of those

4    communications?

5    **A.**   Correct.  But the important question was what

6    would be in those missing text messages.

7    **Q.**   And because you didn't get them, you don't know,

8    do you?

9    **A.**   Correct.

10   **Q.**   And there's a lot of your report that deals with

11   Beau's conspiracy allegation?

12   **A.**   I would not characterize it that way, no.

13   **Q.**   Well, there's -- let's just get back to what we

14   were discussing on Footnote 22.

15        So the messages in this document are not dated

16   but Allie recalled receiving a series of text messages

17   along these lines on December 29, 2014.  The

18   respondent -- I believe that should be Witness 9,

19   recalled receiving a series of text messages along

20   these lines on December 29, 2014.

21        The respondent requested a complete set of

22   electronic communications between the complainant and

23   Witness 9 to support his claim that the two conspired

24   to fabricate the claims against him.

25        As discussed further below, Witness 9 and

1      complainant fully admit that the respondent's behavior

2      was a frequent subject of discussion and they both

3      fully admit that they harbor significant animus towards

4      him.   Neither is enough to suggest that the complainant

5      fabricated the facts underlying the allegations of the

6      complaint as the complainant's reaction is a typical

7      response to perceived inappropriate behavior.

8            More importantly, asking the complainant and

9      Witness 9 to disclose all their communications is

10     overly burdensome where a central issue in this case is

11     not whether certain sexual acts occurred or even

12     whether the complainant literally consented to them,

13     but whether a consent was obtained through coercion.

14           Given the number of interviews and documents

15     reviewed in this case, complete communications between

16     Witness 9 and the complainant are unlikely to lead to

17     the discovery of any non-duplicative evidence that

18     tends to undermine the complainant's claim that she was

19     coerced.

20           So your conclusion as the fact-finder was that

21     the central issue in the case was whether or not Allie

22     was coerced into having sexual relations with Beau on

23     November 10, 2014?

24     **A.**   Well, it was whether or not it was consensual, but

25     consensual consent includes coercion.

1    **Q.**   You're the one that says the central issue is

2    whether or not she was coerced?

3    **A.**   Correct.

4    **Q.**   And actually, the central issue in the case, was

5    it not, as to whether or not there was a violation of

6    the 2014-'15 Code of Student Conduct, which references

7    non-consensual sexual conduct; correct?

8    **A.**   Both statements are true.

9    **Q.**   Well, in your report, the relevant policy section

10   that you reference is III(a) and III(b); correct?

11   **A.**   You mean in the final version of the report?

12   **Q.**   Yes.  Or in the interim version, not the one that

13   just went to Amanda Walsh, but the one that the

14   students received.

15   **A.**   Correct.

16   **Q.**   And the offense is non-consensual physical contact

17   of a sexual nature or sexual misconduct that includes

18   penetration; correct?

19   **A.**   According to what is listed here, yes.

20   **Q.**   Did you read that when you prepared your report?

21   **A.**   I may not have.  I may have -- I'm sure I scanned

22   it at some point during the investigation.

23   **Q.**   So I'm just -- you prepared a report saying what

24   the central issue is, but is it your testimony that

25   prior to stating that the central issue in the case is

1    whether or not there was -- the sexual conduct was

2    induced by coercion, you hadn't read this policy Code?

3    **A.**    No.  I had read it.  I just hadn't delved into it

4    particularly.

5    **Q.**    Okay.  So what do you mean you hadn't delved into

6    it particularly?

7    **A.**    I had read it to see what was there, but it's not

8    like I sat and analyzed it particularly.

9    **Q.**    Well, there's a comment to the Code; correct?  Do

10   you recall reading that?

11   **A.**    What did you say?

12   **Q.**    Do you recall reading the comment to the Code of

13   Conduct, Code of Student Conduct -- did you read this

14   comment?

15   **A.**    Did I read the comment?

16   **Q.**    Yes.

17   **A.**    Probably.

18   **Q.**    And do you recall whether the comment referenced

19   coercion?

20   **A.**    I don't recall.  I mean, I can read it and tell

21   you if it does but --

22   **Q.**    So I just want to get how you went about drafting

23   that Footnote 22 and what you looked at.  You don't

24   actually recall in determining what the central issue

25   in the case was looking at the Code itself?

1    **A.**   I don't have a specific recollection.  I do recall

2    talking to Amanda about it.

3    **Q.**   Okay.  Tell us about those communications.

4    **A.**   So we had a conversation about Beau's comments on

5    the report and how to respond to them and whether one

6    of them was about this Footnote 22.  I believe we had a

7    conversation about whether or not the '14-'15 Code

8    specifically outlined -- had coercion in it as part of

9    the Code.  Amanda said that it didn't but that the

10   University felt comfortable that it was included in a

11   broader sense within the general definition of

12   "consent" in the '14-'15 Code.  So that was the basis

13   on which I wrote the footnote.

14   **Q.**   And did -- Amanda didn't tell you the basis for

15   her drawing that conclusion, did she?

16   **A.**   No.

17   **Q.**   And I believe that -- now, does coercion require

18   fear?

19   **A.**   It depends on the definition.

20   **Q.**   Okay.  So in fact, you testified at your

21   deposition, did you not, that coercion depends on the

22   way the institution defines it so far as it may or

23   might not require placing the victim in fear.

24   **A.**   Physical fear.  If I didn't say physical fear, I

25   meant that's what it meant.

1    **Q.**   Do you want me to bring that up on the screen?

2    **A.**   Sure.

3    **Q.**   "Question:  So it's your testimony that coercion,

4    in order to have coercive conduct the person being

5    placed under, being coerced, does not have to act out

6    of any fear?"

7            And then what your response is:  "I mean, as I

8    said, it depends on the way the institution defines it.

9    Some define it as, you know, the difference in social

10   status.  I suppose fear of social pressure.  I think

11   it's better fear, social or some kind of pressure,

12   whether it's financial or physical or some other kind

13   of social pressure."

14           So coercion involves being placed in some type

15   of fear?

16   **A.**   Yes.

17   **Q.**   And is it your testimony that whether or not that

18   fear is -- some universities say the fear has to be

19   physical fear?

20   **A.**   Yes.

21   **Q.**   And some universities say it could be this other

22   social type fear?

23   **A.**   Yes.

24   **Q.**   But Brown didn't define, at least in 2014 -- well,

25   actually in 2014-'15, they didn't define -- I mean,

1    "coercion" was nowhere in the Code of Student Conduct

2    in 2014-'15; correct?

3    **A.**   The word "coercion" was not in there I don't

4    believe.

5    **Q.**   In any event, Brown didn't define what type of

6    fear, whether it be this social fear or physical fear?

7    **A.**   Didn't define "fear"?

8    **Q.**   Well, there was no -- somebody in Beau's

9    situation, you said in your report -- Beau gets your

10   report and you say the central issue is coercion;

11   correct?

12   **A.**   Yes.

13   **Q.**   And so Beau reading that, what does she mean by

14   "coercion"?  There's nothing in your report that says

15   what type of fear or even if fear is required; correct?

16   **A.**   Correct.

17   **Q.**   So he wouldn't know whether or not you're alleging

18   when you say "coercion" that Allie was actually placed

19   in fear?

20   **A.**   I don't know what he would know.  He certainly

21   wouldn't know it from the report, though.

22   **Q.**   He wouldn't know it from the report.  And the

23   panel wouldn't know it from the report either, would

24   they?

25   **A.**   Not from the report, no.

1    **Q.**    And I believe that when we got on to issue of

2    fear, Allie expressed different types of, you know, the

3    fear that she described and I believe it was in your

4    deposition but we can look at it, but you said that she

5    was kind of going along to get along?

6    **A.**    I believe I said that.

7    **Q.**    And that the second one was she didn't want to

8    make a big deal out of it, to be a drama queen, words

9    to that effect?

10   **A.**    Yes.

11   **Q.**    The third one was that she felt afraid of him

12   physically because he was bigger than her and they were

13   in a small room and that was sort of isolated?

14   **A.**    Yes.

15   **Q.**    And the fourth one, that she was going to have to

16   be around him, that she was going to have to be around

17   him on mock trial for the next two-and-a-half years and

18   didn't want to make things socially awkward?

19   **A.**    Yes.  Those are the reasons that she gave that I

20   reported.

21   **Q.**    Those are the reasons that she was in fear?

22   **A.**    Correct.

23   **Q.**    Those were the reasons that she was -- felt

24   coerced by Beau on November 10, 2014?

25   **A.**    Those are the reasons that she said she felt

1    coerced, yes.

2    **Q.**   Did you put those when you defined what "coercion"

3    was that the fear that she was afraid of was those four

4    things?  Is that in your report?

5    **A.**   Sorry.  What is in my report?

6    **Q.**   You admit, do you not, that coercion involves some

7    type of fear?

8    **A.**   Yes.

9    **Q.**   And the fear would either be physical or some

10   other social type fear?

11   **A.**   Yes.

12   **Q.**   Now, when you're drafting this footnote regarding

13   coercion --

14   **A.**   Yes.

15   **Q.**   -- first you didn't state -- you didn't give any

16   guidance, we've already established that, as to the

17   type of fear, whether it is physical fear or some sort

18   of social or emotional fear; correct?

19   **A.**   That was not my role, so correct.

20   **Q.**   That wasn't your role?

21   **A.**   To define "coercion"?  No.

22   **Q.**   That's because you're the fact-finder?

23   **A.**   Correct.

24   **Q.**   But it was your role to say that the central issue

25   in the case -- let me go back to this.

1      The central issue in this case is not whether

2  certain sexual acts occurred or even whether the

3  complainant literally consented to them, but whether

4  the consent was obtained through coercion.

5      So that footnote putting the central issue of

6  the case, is that within your role as a fact-finder?

7  **A.**   Yes, in a sense because it's sort of guiding the

8  panel on what facts they need to focus on.

9  **Q.**   But in guiding the panel, you don't reference what

10  "coercion" is?

11  **A.**   Correct.  Because that was not for me.  That was

12  for whoever was in charge of the panel during

13  deliberations.

14  **Q.**   So it would be for the person in charge of the

15  panel to tell the panel this is what "coercion" means?

16  **A.**   Correct.

17  **Q.**   Well, initially when you sent your report to

18  Amanda Walsh, you did reference a definition of

19  "coercion," did you not?

20  **A.**   If you're talking about paragraph III on the first

21  page, yes.

22  **Q.**   Yes.  So initially, when you did your report, you

23  referenced a definition of "coercion," which is in the

24  2015-'16 Title IX Policy?

25  **A.**   Because I didn't know that there was any

1    substantive change.

2    **Q.**    That's not what I asked you.  I just asked you,

3    you referenced a definition of "coercion" in the

4    2015-'16 policy?

5    **A.**    Correct.

6    **Q.**    And that's so when the panel is looking at what

7    the central issue in the case, which you've said is

8    coercion, they can have a definition?

9    **A.**    Correct.

10   **Q.**    But when Amanda told you to take out reference to

11   2015-'16 Code, you didn't put any definition of

12   "coercion" in your report.

13   **A.**    Correct.

14   **Q.**    So the panel would have no guidance from reading

15   your report as to what you meant when you said the

16   central issue was whether or not Allie was coerced?

17   **A.**    They have no guidance from the report.  They may

18   have had guidance from other sources.

19   **Q.**    Well, as the fact-finder you realize that in

20   presenting the report, do you not, that your report is

21   pretty much all that the panel has?

22   **A.**    No.

23   **Q.**    What else do they have?

24   **A.**    They had a conversation with me.  They had a

25   conversation with both students.  And I believe that

1    there were, based on my understanding of the process,

2    they had conversations with Amanda Walsh and Gretchen

3    Schultz, I think is her name.

4    **Q.**   But in preparing for the hearing, what information

5    would they have as to when you say the central issue is

6    coercion, what does that mean?

7    **A.**   I don't know what they would have.

8    **Q.**   And when you were defining "coercion" and saying

9    what the central issue is, did you set out or you

10   didn't set out the type of coercion, the four things

11   that Allie told you were the fear that she was placed

12   in by Beau on November 10, 2014?

13   **A.**   I believe all four of those things are in the

14   report.  They may not be all in one paragraph but they

15   are all there.

16   **Q.**   And when you talk about coercion, there's nothing

17   in the report that would lead the reader to believe

18   that the fear, these four things that we've discussed

19   that she felt, were, in fact, reasonable?

20   **A.**   That was not my role to determine what was

21   reasonable.  That was for the panel.

22   **Q.**   And you understand, I mean, correct me if I'm

23   wrong, that generally coercion is that someone is

24   reasonably placed in fear of imminent harm.

25   Reasonably; correct?  It's a reasonable person

1  reasonable standard?

2  **A.**   I'm sorry.  What's the question?

3  **Q.**   That coercion is generally a reasonable person

4  standard, that the person is coerced and is placed in

5  reasonable fear of immediate or future harm?

6  **A.**   Yes.

7  **Q.**   And you have no discussion at all about whether or

8  not those things that Allie felt on November 10, 2014

9  were reasonable, did you?

10  **A.**   Correct.  Because that was not my role.

11        THE COURT:  Okay.  Let's pause here and take a

12  lunch break.  But before we do, and just so it's in the

13  same place in the record, I want to follow-up on just

14  one point because I want to make sure I understand your

15  testimony.

16        Mr. Ratcliffe asked you about four things that

17  Allie feared.  And he was referring to your deposition.

18  He walked you through those four things.  You just said

19  those are in your report but they're not all in one

20  specific place.  I just want to be clear.  Are those

21  the four things that she described as what she feared

22  to explain why she engaged in the sexual behavior with

23  Beau?

24        THE WITNESS:  Yes.

25        THE COURT:  Okay.  They're not fears that she

1    had afterwards about the behavior that occurred

2    afterwards.  It was about this is why I went along and

3    did what I did that night?

4              THE WITNESS:  Correct.  It was about --

5              THE COURT:  I just wanted to be clear.  I

6    thought that's what you were saying.  I just wanted to

7    be clear on that.

8              We'll take -- I know that you have to get back.

9    We'll take a one-hour lunch break.  I want to try to

10   get you through this testimony today.

11             THE WITNESS:  Okay.  Great.  Thank you.

12             THE COURT:  So we'll be back at 1:30.

13             All right.  We'll be in recess.

14             (Lunch recess.)

15             THE COURT:  Welcome back, everyone.

16   Mr. Ratcliffe, you can continue now with your

17   examination.  So you may proceed.

18   Q.    Prior to the break we were discussing fear, the

19   four types of fear that Allie had felt that evening on

20   November 10, 2014; correct?

21   A.    Yes.

22   Q.    And you said that you didn't reference the fear in

23   Footnote 22 in your interim or I guess we called it the

24   initial report or the interim report because it was the

25   second version, but it's interspersed throughout the

1    report; correct?

2    **A.**    I believe so, yes.

3    **Q.**    I believe you testified, and correct me if I'm

4    wrong if you didn't, do you recall going to the hearing

5    on April 14, 2016?

6    **A.**    Yes.

7    **Q.**    And the panel had certain questions for you;

8    correct?

9    **A.**    Yes.

10   **Q.**    And do you recall being asked a question by KT,

11   which I believe is Kate Trimble, one of the panel

12   members, about the basis for the complainant's fear and

13   she said, That's not leaping out at me?  Do you recall

14   being asked that question?

15   **A.**    Yes.

16   **Q.**    And do you recall how you answered that question?

17   **A.**    Not precisely, no.

18   **Q.**    Do you recall if you said, That's not entirely

19   clear?

20   **A.**    Yes.  Now that you say that.

21   **Q.**    You didn't point her to the provision, to the

22   parts of your investigation report where you discuss

23   the basis for Allie's fear that she was going to be on

24   moot court or a trial team for the next two-and-a-half

25   years and she didn't want to have this -- more the

1    social type fear; correct?

2    **A.**   I don't think I pointed them to places in the

3    report where that appeared.  I may have said in

4    substance some of those things.

5    **Q.**   But Amanda's notes just indicate, I can show them

6    to you, they're not your notes, but is that consistent

7    with your -- can you see?  I'm showing you what was

8    previously marked as Exhibit 24.

9    **A.**   Yes, I see.  It's not reflected in Amanda's notes

10   whether I highlighted these specific issues; however,

11   the questions before that I believe was similar in

12   substance and the panelist asked me if I could clarify

13   why she didn't get up and leave, and in there I

14   discussed some of those things.

15   **Q.**   So you told them that she felt like she couldn't

16   leave because John was standing at the light with her?

17   **A.**   Yes.

18   **Q.**   Well, there was a period of time, I believe you

19   testified to this at your deposition, that Allie agreed

20   that there was a period of time between the light

21   coming on and her going to turn out the light that she

22   could have left?

23   **A.**   Yes.

24   **Q.**   Okay.  And is that in here, that you reference

25   that in here, that when you responded to the question,

1    please clarify Ann's explanation for why she didn't get

2    up and leave during the event, you then say, at least

3    in Amanda's notes, She said she felt she couldn't leave

4    because John, which would be Beau, standing at light

5    with her.

6         So correct me if I'm wrong, I believe what she

7    told you was that she was performing oral sex on Beau.

8    **A.**    Yes.

9    **Q.**    The light came on; correct?

10   **A.**    Yes.

11   **Q.**    She walked over to turn out the light; correct?

12   **A.**    Yes.

13   **Q.**    And Beau's pants were around his ankles?

14   **A.**    Yes.

15   **Q.**    And he moved over to help her because she couldn't

16   turn out the light?

17   **A.**    Yes.

18   **Q.**    And so during the entire period of time that she

19   was at the light, Beau was not standing next to her;

20   correct?

21   **A.**    I think that's probably true, yes.

22   **Q.**    That's not indicated in your response.  You didn't

23   tell them that, did you?

24   **A.**    I did not.  However, what I told them was that he

25   was shuffling and his pants were down around his ankles

1   so one could think -- and I'm reading from the exhibit,

2   one could think he wasn't as free to do something to

3   her if she tried to leave.

4          I also mentioned the fact that she talked about

5   them being on mock trial for two-and-a-half years and

6   wanted to get out of the situation.

7          Sorry.  I'm a fast talker.

8          Reading from the exhibit I said, I told the

9   panel that there was information that his pants were

10  down and he was shuffling so one could think he wasn't

11  as free to do something to her if she tried to leave.

12  She also said they would be on mock trial for

13  two-and-a-half years and wanted to get out of the

14  situation without creating some kind of controversy

15  that would be unfixable.

16  **Q.**   Now, again, I believe you testified, and correct

17  me if I'm wrong, that you didn't make any -- your

18  report doesn't have any credibility assessments in your

19  report; correct?

20  **A.**   I think they do not.  It does not.

21  **Q.**   It does not.  And at the hearing, you were asked

22  basically to make a credibility assessment, were you

23  not?

24  **A.**   I interpreted it as sort of a global credibility

25  request to assess credibility, yes.

1  **Q.**   And that's accurately reflected -- if I could just

2  ask you -- a witness asked, back to coercion, on the

3  panel, B.R., looks like Besenia Rodriguez, "Can you

4  provide more information about that last paragraph.

5  What is the gap between perception of coercion and

6  coercion that is a policy violation?"

7         Do you recall that question being asked of you?

8  **A.**   Yes.

9  **Q.**   And then you respond, "I think that's really the

10  ultimate question for the panel.  My impression is that

11  she believes she is telling the truth as does the

12  respondent.  If you have two parties that are both

13  credible, the question becomes does her truth amount to

14  a violation.  I don't think either are intentionally

15  lying in this case.  Is what she thinks is coercion

16  really coercion is the question for the panel.  And

17  Gretchen Schultz follows up -- do you recall responding

18  that way?

19  **A.**   Yes.

20  **Q.**   And then Gretchen Schultz follows up, "Doesn't

21  someone have to be lying?  She says she said no and he

22  said she's an enthusiastic partner."  And then you

23  respond, "If you look at the text messages, it does

24  show that he is persistently making things sexual.

25  Even though she is a willing participant at times, he

1    does convert things into something sexual.  He did say

2    he asked for consent and that she was enthusiastic but

3    that isn't consistent with the text messages where you

4    can see her hesitation.  The idea that she was

5    willingly jumping into this sexual encounter doesn't

6    match, but that's for the panel to decide.  Her version

7    appears to be more consistent with the pattern that is

8    in the text messages.  Her actions after the incident

9    are difficult to reconcile.  Specifically, there is the

10   possibility that she would not have done anything about

11   it or filed a complaint if a relationship had come from

12   it.  She may say she would have forgiven him or thought

13   about the incident in a different way.

14        Aren't you, in effect, making the ultimate

15   decision for the panel when you responded that way?

16   **A.**   No.

17   **Q.**   Why not?

18   **A.**   Because I'm highlighting facts that they can look

19   at but I clearly say that's for the panel to decide.

20   **Q.**   Even though you tell them that her version --

21   **A.**   Appears to be more consistent with the pattern in

22   the text messages.  And they had the text messages to

23   read for themselves.

24   **Q.**   And those are the text messages that pre-date the

25   encounter?

1    **A.**    And post-date.  They had all of the text messages

2    between the parties.

3    **Q.**    So you believe it's your role as a fact-finder to

4    provide a response such as that to the panel?

5    **A.**    Yes.

6    **Q.**    And that's based on your reading of the complaint,

7    the Title IX Complaint Policy?

8    **A.**    Yes.  And discussions with Amanda.

9    **Q.**    What were those discussions?  What did Amanda tell

10   you with regard to ultimate responsibility?

11   **A.**    Of course that's for the panel to decide.

12   **Q.**    What in your discussions with Amanda led you to

13   believe that it's proper to say that her version -- he

14   did say he asked for consent and that she was

15   enthusiastic but that is inconsistent with the text

16   messages where you can see her hesitation.  The idea

17   that she was willingly jumping into this sexual

18   encounter doesn't match but that's for the panel to

19   decide.  Amanda told you that, telling the panel that,

20   words to that effect were proper?

21   **A.**    Of course not.

22   **Q.**    What did she say?

23   **A.**    I believe in preparation for the hearing, I looked

24   at the policy that described what would happen at the

25   hearing.  I knew that the panel might ask me some

1    questions.  I had no idea what questions they would

2    have.  And at some point, Amanda and I, when I was

3    writing the report, had talked about how much I should

4    highlight different kind of inferences that could be

5    drawn by various pieces of evidence.  And she said that

6    that was okay and appropriate to do as long as I'm

7    not -- my role is more to highlight for the panel

8    here's something you could consider.  It's up to you to

9    actually make the final decision.

10   **Q.**   Now, when we were discussing, we went over

11   Footnote 22 and you said that was replaced by Footnote

12   27 or 29?

13   **A.**   I believe that Footnote 22 was revised and in the

14   final version of the report it was renumbered because

15   of other footnotes and it became, I think, Footnote 26.

16   **Q.**   And what's your memory of what the revision --

17   let's put up Footnote 26.

18         So Beau requested that you take out Footnote 22

19   and remove the reference to coercion.  And how did you

20   revise Footnote 22 into Footnote 26, if you recall, as

21   you look at that?

22   **A.**   I believe I included an excerpt from the 2014 Code

23   of Student Conduct that defined "consent."

24   **Q.**   Right there?

25   **A.**   Yes.

1  **Q.**   (Reading:)  The 2014 Code of Student Conduct

2  forbids non-consensual physical contact of a sexual

3  nature.  Implicit in any common understanding of

4  "consent" is that it is freely and voluntary given.

5  Thus consent obtained by coercion does not constitute

6  consent.

7       Given the number of interviews and documents

8  reviewed in this case, the complete communications

9  between Witness 9 and the complainant are unlikely to

10 lead to the discovery of any non-duplicative evidence

11 that tends to undermine the complainant's claim that

12 she was coerced.

13      So the amendment that you made was that you

14 referenced the 2014-'15 Code of Student Conduct?

15 **A.**   Yes.

16 **Q.**   And you didn't specify the fear or the

17 reasonableness of the fear that the complainant would

18 have had to have experienced in order to be coerced?

19 **A.**   Correct.

20 **Q.**   So it was for the panel just to determine based on

21 your referencing the 2014-'15 Code as to whether or not

22 Allie was coerced on the evening of November 10, 2014?

23 **A.**   No.  It was up to the Chair of the panel to

24 appropriately instruct the panel.

25 **Q.**   Appropriately --

1    **A.**    About what standards to apply.

2    **Q.**    About whether the coercion, the definition of

3    "coercion" would include being placed in fear or

4    reasonable fear of impending future harm or immediate

5    harm; correct?

6    **A.**    Yes.

7    **Q.**    And you viewed it in your role as a fact-finder to

8    include this information that implicit in any common

9    understanding of "consent" is that it's freely and

10   voluntarily given, thus consent obtained by coercion

11   does not constitute consent.

12   **A.**    Not exactly.  I did not exactly view that as my

13   role as a fact-finder.  There's an awkwardness in the

14   policy permits the student to respond to the report.

15   The question that -- the point that Beau was raising in

16   his response was really more of a legal question.  So

17   Amanda and I talked about it and sort of -- I think I

18   suggested the response and she agreed that that was an

19   appropriate response.

20   **Q.**    So the question that he was raising is that it

21   shouldn't be there in the first place; correct?

22   **A.**    Correct.

23   **Q.**    So he was saying take it out, and basically you're

24   saying that's why it stays in; correct?

25   **A.**    I don't know what you mean.

1    **Q.**   Beau is not saying give me a definition of -- put

2    a definition of "coercion" in your report, is he?

3    **A.**   I think he was saying that.  Secondarily to -- I

4    think the basic gist of it that I recall is him saying

5    I don't think there should be any coercion stuff in the

6    report because there was no definition of coercion and

7    you don't define -- actually, I don't think he even

8    said -- anyway, obviously the letter that he wrote is

9    what he said.

10   **Q.**   I'll put that up.  So what he was saying is you

11   should take it out; correct?  This first says you

12   should take it out.  (Reading:)  Quite a bit of your

13   report including Footnote 22 focuses on the possibility

14   that I coerced Allie to engage in sexual conduct.

15   That, however is not part of the 2014 definition.  The

16   term "coerced" does not appear in the definition.

17        And then he respectfully requests that you take

18   it out.

19   **A.**   Right.  So he's saying really based on a legal

20   issue.

21   **Q.**   Then goes on to say that, (Reading:)  Furthermore,

22   the report does not contain a definition of "coercion"

23   with the use of force or intimidation to obtain

24   compliance.  There's absolutely no evidence that I

25   intimidated or threatened the complainant in order to

1    satisfy my sexual desires.

2         Basically he was asking you to put something in

3    with respect to your "coercion" definition that

4    indicates there be some fear involved; correct?

5    **A.**   Yes.

6    **Q.**   And you decided not to do that?

7    **A.**   Correct.

8    **Q.**   What you decided to put in was --

9    **A.**   Actually, I'm sorry.  What the line says actually

10   is -- I read this paragraph as asking for a specific

11   definition of "coercion" that included intimidating or

12   threatening the complainant to satisfy his sexual

13   desires, and I was not going to put in a specific

14   definition because it's not mine to define.

15   **Q.**   Well, you had discussions with Amanda; correct?

16   **A.**   Correct.

17   **Q.**   And you knew that this was an issue?

18   **A.**   Yes.

19   **Q.**   Well, you had said it's the central issue.

20   **A.**   Yes.

21   **Q.**   And you're saying that the central issue of the

22   case is coercion; correct?

23   **A.**   Yes.

24   **Q.**   And you've admitted that there are different

25   understandings of "coercion;" correct?

1    **A.**    Yes.

2    **Q.**    And one of those understandings would require that

3    the complainant be placed in reasonable fear of

4    immediate or future harm?

5    **A.**    Yes.  But that's not what you asked.

6    **Q.**    That's one of the definitions; correct?

7    **A.**    Correct.  But that's not what you asked in the

8    letter.

9    **Q.**    Another one of the definitions would be that --

10   and then there was also a subissue with respect to

11   coercion as to whether or not the fear has to be some

12   sort of physical fear that the complainant would be

13   placed in; correct?

14   **A.**    There are some definitions that use that, yes.

15   **Q.**    And there are others that say that, well, if they

16   had some social fear, that that would be sufficient for

17   coercion; correct?

18   **A.**    Yes.

19   **Q.**    And you don't address any of that with respect to

20   the central issue of the case?

21   **A.**    Correct.

22   **Q.**    All that you say is, (Reading:)  Implicit in any

23   common understanding of consent is that it's freely and

24   voluntarily given.  Thus, consent obtained by coercion

25   does not constitute consent.

1    **A.**   Correct.  That was as far as I felt comfortable

2    going without more specific definition.

3    **Q.**   Now, in connection with that request, in

4    connection with Beau's objections, he had an objection

5    on pages 26 and 27 of your report; correct?

6    **A.**   I'm sorry.  Say that again.

7    **Q.**   Beau had an objection to certain character

8    evidence being included in your report; correct?

9    **A.**   Certain evidence being included in the report,

10   yes.

11   **Q.**   And that was evidence that was not specifically

12   related to the interaction between Beau and Allie

13   before, during or after the sexual encounter?

14   **A.**   He objected to the inclusion of any evidence

15   related to Witness 9.

16   **Q.**   And other prior bad acts or character evidence for

17   want of a better word; correct?

18   **A.**   Related to Witness 9.

19   **Q.**   Okay.  Well, it was related to Witness 9, but it

20   was information that you had obtained not just from

21   Witness 9 but other witnesses that you interviewed;

22   correct?

23   **A.**   Yes.

24   **Q.**   And it was involving Beau's interaction with

25   Witness Number 9?

1    **A.**   Correct.

2    **Q.**   And the reason why Witness Number 9 may not like

3    Beau?

4    **A.**   Correct.

5    **Q.**   And a lot of that was evidence that didn't place

6    Beau in the best light; correct?

7    **A.**   Yes.

8    **Q.**   And one of it was that Beau had violated a

9    no-contact order?

10   **A.**   I think that's in there, yes.

11   **Q.**   Okay.  And so you had some -- and Beau objected to

12   that?

13   **A.**   Yes.

14   **Q.**   And I believe it was your testimony the reason

15   that you put it in there was because Beau was alleging

16   a conspiracy?

17   **A.**   Yes.

18   **Q.**   Okay.  And the conspiracy being that Allie and

19   Witness 9 were out to get him?

20   **A.**   Yes.  And had, therefore, fabricated the

21   allegations.

22   **Q.**   And you had some discussions with Amanda regarding

23   whether or not you should just tell Beau remove the,

24   you know, remove the conspiracy claim; we'll take all

25   this evidence out?

1    **A.**   Yes.

2    **Q.**   And in fact, you suggested that, that someone

3    could reach out to Beau and suggest that to him?

4    **A.**   Yes.

5    **Q.**   Say if you want to take it out, we'll take it out

6    but you've got to take out the conspiracy claim;

7    correct?

8    **A.**   Correct.

9    **Q.**   And Amanda did not approve that; correct?

10   **A.**   I don't recall what exactly -- I believe I said at

11   the deposition I don't recall exactly what happened,

12   but, yes, the ultimate result was that it obviously

13   stayed in.

14   **Q.**   And that wasn't a decision that you made.  That

15   was a decision that Amanda made; correct?

16   **A.**   Yes.  I think, yes.

17       MR. RATCLIFFE:  Can I have a moment, your Honor?

18       THE COURT:  Yes.

19       (Pause.)

20       MR. RATCLIFFE:  No further questions.

21       THE COURT:  Thank you.

22       All right.  You may inquire, Mr. Richard.

23       MR. RICHARD:  May I have a moment, your Honor,

24   to organize my papers?

25       THE COURT:  Yes.

1    <u>**CROSS-EXAMINATION BY MR. RICHARD**</u>

2    Q.   Good afternoon, Ms. Perkins.

3    A.   Good afternoon.

4    Q.   We established through Mr. Ratcliffe's direct

5    examination that you were hired by Brown in early

6    November?

7    A.   Yes.

8    Q.   I'm showing you what has been marked as Exhibit

9    17.  I think I may have the wrong exhibit.

10         Exhibit 17.  Do you recognize this document?

11   A.   Yes.

12   Q.   What is it?

13   A.   That appears to be the e-mail that I sent to Beau

14   with the finalized report and exhibit.

15   Q.   That's dated March 12th?

16   A.   Correct.

17   Q.   So you spent approximately four months on the

18   investigation?

19   A.   Yes.

20   Q.   I'm not holding you to the precise amount, but

21   approximately how many hours did you spent conducting

22   the investigation?

23   A.   I would say -- I would say at least -- I would say

24   at least 80 to 100.

25   Q.   As you conduct the investigation, what is the

1    process that you undertake to compile information?

2    **A.**    So part of it is from documents that I received

3    from the University, the original complaint, exhibits,

4    any other University information I need.   Sometimes

5    it's getting a no-contact order, e-mails between

6    administrators and students and staff to establish

7    different facts.

8         I then interview students.   The interviews of

9    students are typically very long.   You know, an

10   interview with the principal parties typically last

11   anywhere between two and four hours in the first

12   interview, and I would say one and two for the second

13   interview.   Sometimes there's a third interview.

14   Depending on -- you know, it's very important to me

15   that both students get a chance to respond to things

16   that the other has said so I go back and forth a little

17   bit until I kind of narrowed those issues.

18        I speak to all the witnesses that I believe have

19   relevant evidence, whether they are identified by the

20   students themselves or that I learn of through

21   interviewing other people or interviewing them.   I

22   typically interview at least one or two fresh complaint

23   witnesses.   I typically am trying to get information --

24   **Q.**    What is a fresh complaint witness?

25   **A.**    Fresh complaint witness is someone who has

1    received information about a complaint of sexual

2    misconduct from the complainant within a relatively

3    short period of time after the event or at least the

4    first person who was told that sexual misconduct had

5    occurred.

6            But I also look for admissions potentially made

7    by the respondent student.  I try to get the history of

8    the whole relationship between them leading up to the

9    event, if there is one.  Sometimes if there's a party,

10   and this was not that case, but I'll interview lots of

11   people at the party.

12   **Q.**   Let me ask you this.  Focus on Exhibit 19, which

13   is the final report.  You've identified the parties and

14   the dates on which you interviewed each of them?

15   **A.**   Yes.

16   **Q.**   Is there a reason why you interviewed the

17   complainant three times and the respondent twice?

18   **A.**   Yes.  I believe that the respondent in his second

19   interview -- not in the second interview.  I believe

20   that the respondent just as the investigation was

21   concluding identified two new witnesses, one of whom

22   was the roommate of the complainant, and one of whom

23   was a fraternity brother of his who had allegedly

24   overheard a conversation between Witness 9 and the

25   complainant shortly before the complaint was filed.

1          Because of that, I did feel that those people

2     were important to interview, and I did.  When I had the

3     information that I received from them, I felt it was

4     only fair to the complainant to come back to her and

5     question her about what those two witnesses provided.

6     **Q.**   Witness 1, who was that?

7     **A.**   I believe that Witness 1 is -- was the roommate of

8     the complainant at the time of the event.

9     **Q.**   The interview occurred on February 12th?

10    **A.**   Of her, yes.

11    **Q.**   Is that the interview that occurred after your

12    session with Beau?

13    **A.**   I believe so, yes.

14    **Q.**   When a student identifies a potential witness, do

15    you always interview the witness or do you decide

16    whether or not to do so?

17    **A.**   No.  I definitely decide whether or not to do so.

18    **Q.**   Were there any witnesses in this case that were

19    identified that you did not interview?

20    **A.**   There were few.  Some who just did not respond to

21    requests for interviews.  Or -- I can't recall in this

22    case if there was somebody who refused to participate.

23    There may have been one or two.  If so, I always put

24    that in the report.

25    **Q.**   Let me just take a step back.  How many

1   investigations have you conducted for a university?

2   **A.**   I would say about 40.

3   **Q.**   What's the timeframe of those investigations?

4   During what period of time have you conducted those

5   investigations?

6   **A.**   You mean beginning in -- I would say beginning I

7   think in the summer of 2011, around then to the

8   present.

9   **Q.**   Are there differences between the models that

10  universities use?

11  **A.**   Yes, there are some.  Some want me to just do

12  interviews and investigate, report back kind of in a

13  linear fashion, report what each witness said.  There

14  are some institutions that want me to analyze whether

15  or not the facts violate their policies.  Then there

16  are some who want me to sort of take it one step

17  further and ask for sanction recommendations.

18          There are also differences in the way the models

19  work.  Some are the single-investigator model with no

20  hearing, in other words, where the panel does not see

21  the students.  There are some models where the panel

22  sees the students and then makes the ultimate

23  determination.  There are some models where panels ask

24  me questions; some where they don't.

25  **Q.**   In your final report, Footnote 1, which is on the

1    screen, why did you insert that footnote?

2    **A.**   Okay.  Because the complainant felt -- the

3    complainant had included material in her complaint

4    related to other students, including Witness 9 and

5    another student and -- oh, I'm sorry and also Witness

6    8.  Witness 8, 9 and 10.  And I felt that these -- that

7    the substance of the incidents that had happened with

8    those witnesses were not sufficiently related to what

9    had happened in the complainant's case to include them,

10   but I wanted it to be clear that that was the reason.

11   It wasn't that I didn't consider them.  It was that I

12   considered them and thought that whatever they would

13   provide would be more prejudicial than probative.

14            THE COURT:  Could I ask you just to slow way

15   down.

16            THE WITNESS:  Sorry.  Just off the record for a

17   minute.

18            (Discussion off the record.)

19   **Q.**   In the report, pages one through two --

20   **A.**   Should I repeat the previous answer about Footnote

21   1?

22            THE COURT:  No.  It's in the record and I have

23   it.

24   **Q.**   Witness Number 8 provides an explanation of the

25   testimony.  Why did you use that?

1    **A.**    Because I felt that it was important to explain

2    why that information was not being included.

3    **Q.**    Is it the same for Witnesses 9 and 10?

4    **A.**    Yes.

5    **Q.**    And this relates to Footnote 1?

6    **A.**    Yes.

7    **Q.**    Would you identify the information listed under

8    "Information"?

9    **A.**    Yes.  So these are basically a list of the

10   exhibits that I included with the report.  They are not

11   a complete list of everything I reviewed or received,

12   but it's what I felt was sort of the important things

13   to include.

14   **Q.**    And what is the difference between Appendix C and

15   D?

16   **A.**    Appendix C was the text messages between the

17   complainant and the respondent submitted by the

18   complainant; and Appendix D was the same text messages

19   but the versions submitted by the respondent.

20   **Q.**    Page three is a footnote explaining those text

21   messages.  Can you describe for the Court the reasoning

22   for that footnote?

23   **A.**    Yes.  So I did think it was important to include

24   both exhibits, both versions of the text messages

25   submitted by each of the students because they were

1    different.  Beau's was complete and appeared to be

2    complete while the rest of the complainant's version of

3    the text messages was not complete.  I did ask the

4    complainant about the texts prior to the event, prior

5    to the incident, why she had not included those and so

6    I felt that it was important to include that

7    explanation and that the panel could accept or reject

8    the explanation or draw an inference that there was

9    some motive on her part to cloud their view of the

10   truth.

11   **Q.**    And Appendix E are photos?

12   **A.**    Yes.

13   **Q.**    You took them?

14   **A.**    Yes.

15   **Q.**    Why were they included?

16   **A.**    Because I typically go to the site, to the site of

17   any incident to see if any information might be helpful

18   from physically looking at it.

19         In this case, the locker room was small and it

20   showed whether or not -- there was some question

21   between the two of them about whether or not there was

22   a power outlet in the room so I wanted to see whether

23   or not there was.  I also wanted to look at the light

24   switch and look at the room in terms of whether or not

25   there was a reasonable opportunity for the complainant

1    to leave if she chose.  But also it just kind of gave

2    context for the way both parties described the event.

3    **Q.**    And Appendix F, as in Frank, why did you include

4    those items?

5    **A.**    Appendix F was an excerpt of text messages between

6    the respondent and Witness 8 that were submitted by

7    Witness 8.  I only took an excerpt of the larger set of

8    text messages that Witness 9 -- I'm sorry, Witness 8

9    gave me.  And it was just because the rest was not

10   particularly relevant but what was included was.

11   **Q.**    Why did you deem what was included to be relevant?

12   **A.**    Okay.  Because these text messages were a

13   conversation about -- in which the complainant had

14   agreed to put in a good word for the respondent when he

15   was pursuing another woman.  So it was to corroborate

16   that.  And also to corroborate the claim that the

17   complainant had signed the respondent for dating

18   websites in early December 2014.  So both of those to

19   some extent corroborated the respondent's claims that

20   she was conspiring against him.

21   **Q.**    What is included in Appendix G?

22   **A.**    Appendix G was the excerpt of text messages

23   between respondent and Witness 9.  They were, again, an

24   excerpt only because there was a lot of other material

25   in the complete set of the text messages that I had

1    received from Witness 9 that I felt were more

2    prejudicial than probative.  The ones I included, I

3    believe, were -- statements made were included because

4    they contained statements of the respondent with

5    respect to his state of mind on the night of November

6    9th -- 10th, sorry.

7    Q.   When you're conducting your investigations, how is

8    it that you request information?

9    A.   So I will ask them if they I will -- I always ask

10   them for text messages with the other parties.  I will

11   also ask them for Facebook messages, any Snapchat

12   recordings they might have made, any kind of social

13   media contact because often they're a contemporaneous

14   record of what was going on at the time and they are

15   tremendously helpful in creating a timeline of events.

16   But I cannot require them.  I have no subpoena power so

17   the students can say no or they can certainly say, "I

18   don't have them."  And that may or may not be true.

19   They could -- they also -- they might give them.  If I

20   ask for something and they just won't give it to me,

21   even though they say they have it, I will include that

22   fact in the report.  If they say that they don't have

23   it, I typically include that fact in the report as

24   well.

25   Q.   The report lists information provided but not

1    considered in your rationale?

2    **A.**    Yes.

3    **Q.**    I'd like to just go through each of these.  Would

4    you identify what information was provided under number

5    one?

6    **A.**    It appears that I received text messages between

7    the respondent and Witness 10 submitted by Witness 10.

8    I think that these may have been primarily related --

9    there was some contact between the respondent and

10   Witness 10 but it was pretty minimal, and it related

11   to -- I wanted to say it related to drug use or

12   something, which was clearly not relevant to what we

13   were talking about, and the contact between them was

14   not significant enough one way or the other to make

15   them germane to any real issue here.

16   **Q.**    Why didn't you include the information listed in

17   item two?

18   **A.**    Because these were messages between Witness 9 and

19   the respondent, the bulk of which contained pretty

20   prejudicial material because essentially the facts were

21   that he had been sexually harassing Witness 9.  And

22   other than the limited content that I included in the

23   report, which was only important to show the state of

24   mind of the complainant and Witness 9 in filing the

25   complainant's complaint, other than that the rest of

1    the sexually harassing conduct that was in these text

2    messages was more prejudicial than probative.

3    **Q.**   And item three, why was that information excluded?

4    **A.**   Mostly -- this was an e-mail written by the

5    respondent to mock trial members about -- in the summer

6    of 2015 and his statements of interest in becoming an

7    E-Board member in the spring and summer of 2015 because

8    they were really -- they were made so long after the

9    fact that they weren't going to really prove or

10   disprove any material fact.  They were essentially

11   apologies for his behavior, which didn't really help

12   determine one way or the other.  They were vague.  They

13   didn't specifically refer to any event so I did not

14   include those.

15   **Q.**   The last item, why was that excluded?

16   **A.**   The Facebook post provided by Witness 9 was a

17   photo that she had posted of a friend from high school.

18   She had told me that after this event she had received

19   almost immediate contact from the respondent saying,

20   "Is that your boyfriend?"  So that may be important in

21   a different case, but it was not relevant in the case

22   involving Allie.  There was no allegation that Allie

23   ever knew about this Facebook post.

24   **Q.**   And your meetings with Beau first went on November

25   19, 2015, where did that occur?

1    **A.**    At Brown.

2    **Q.**    How long did it last?

3    **A.**    I don't specifically recall, but I want to say

4    probably roughly three hours.

5    **Q.**    Was he accompanied by anyone?

6    **A.**    He was.  He was accompanied by Mr. Ratcliffe.

7    **Q.**    Were there specific topics that you -- going into

8    that meeting, what were the issues that you wished to

9    address?

10   **A.**    You know, my first concern -- in every interview

11   with students, I want to create an atmosphere where

12   they feel comfortable about what happened to them.  I

13   basically let them tell me whatever they want to tell

14   me and then it's up to me to sort out what should be

15   considered or not considered.  But I feel like it's

16   very important for the person speaking to be able to

17   feel like they got everything off their chest that they

18   needed to.

19          I then go back and ask more specific questions

20   that relate to, so in Beau's case, more specifically

21   what was in the complaint and get him to give responses

22   to each of those things.  Then at the end, I'd go

23   over -- I would also go over text messages so there was

24   hundreds of pages of text messages between them.

25   Sometimes I'm going through the text messages to ask

1   for context of particular conversations, e-mails

2   between them.

3          I believe we also talked about mock trial.  I

4   was trying to figure out how much that was important or

5   not in the whole scheme of things because there was a

6   lot of questions about the mock trial process and how

7   it works and things like that.

8          Then at the end, we talk about -- we talk about

9   any other witnesses he thinks I should talk to, any

10  other documents he thinks should be provided.

11  **Q.**   Did he identify witnesses for you?

12  **A.**   He did.  I can't recall if those were -- those

13  might have been in his response already.  It's not --

14  if I didn't receive them in a formal, you know, e-mail

15  or something, he may have told me some names.  He

16  definitely named the last two witnesses that I

17  interviewed.

18  **Q.**   Those were who?

19  **A.**   That was the complainant's roommate and his

20  fraternity brother who had overheard a conversation in

21  the dining hall between the complainant and Witness 9.

22  **Q.**   That roommate that you mentioned, that being

23  Witness 1?

24  **A.**   Yes.

25  **Q.**   Identified on page 16?

1    **A.**    Yes.

2    **Q.**    When did you interview Witness 1?

3    **A.**    I want to say February?  I think maybe before it

4    came up that I interviewed her on February 12th.

5    **Q.**    Did you know of this witness prior to that time?

6    **A.**    No.  I believe that the complainant had told me

7    that when she got home from Faunce Hall that night,

8    when she got to her room, her roommate was asleep.  So

9    no, I had not -- and she said that she had not spoken

10   at length to her roommate.  She hadn't really told her

11   roommate about it.

12   **Q.**    Just for clarification, the report states

13   Witness 1 --

14   **A.**    I'm sorry.  Friend of.  Friend of the roommate.

15   Sorry.

16   **Q.**    And when you interviewed Witness 1, what

17   particularly were you seeking to inquire about?

18   **A.**    To find out what statements of the complaint --

19   if, in fact, the respondent was correct that there had

20   been some conversation immediately after the event had

21   occurred, I wanted to know what that conversation would

22   have been.  So I was looking for statements from the

23   complainant about the event.

24   **Q.**    Witness 11 was interviewed?

25   **A.**    That's the dining hall witness?  Yes.

1        Witness 11, it looks like I interviewed him on

2    February 12th by phone.

3    **Q.**    Were both these individuals identified by Beau

4    during your February 2 meeting?

5    **A.**    Yes.

6    **Q.**    Pages 28 and 29.  Is this the summary of your

7    interaction with Witness 11?

8    **A.**    Yes.

9    **Q.**    And what --

10   **A.**    It is a summary.  It is not the total of

11   everything that Witness 11 told me.

12   **Q.**    What was the total of what Witness 11 told you?

13   **A.**    So in addition to the summary that's contained

14   here, Witness 11 had told me that he -- he asked me if

15   I was going to -- he told me that the reason he hadn't

16   initially responded to requests to interview him was

17   because he was afraid of retaliation from the

18   respondent.  He said that he knew of two other women, I

19   believe it was two other women who had unpleasant

20   experiences with the respondent but didn't want the

21   respondent to know that he knew about them.  And at the

22   same time he said, "But I did hear of this conversation

23   in the Ratty," which is the dining hall, one of the

24   dining halls, "and this is what -- what I'm telling you

25   is true."

1          I'm sorry.  He also talked about an incident

2     that occurred shortly before the interview in which the

3     respondent had been very out of control at a social

4     function that he and a group of fraternity brother were

5     at to the point -- sorry.  An incident shortly before

6     the interview that the respondent had become very out

7     of control at a social event that the witness and other

8     fraternity brothers had attended at a local bowling

9     alley, I think, to the point where the fraternity

10    brothers had to try to get him under control.

11    **Q.**    At some point, you started to write the report?

12    **A.**    Yes.

13    **Q.**    When do you make the determination to put pen to

14    paper?

15    **A.**    Not until -- really not until the last witness's

16    interview is complete because I don't want to make any

17    prejudgments until I really have a chance to look at

18    all the evidence, compare stories, compare versions of

19    events, look at all the documents, see if the dates

20    match, you know, are consistent with what people are

21    saying and the substance of the documents is consistent

22    with what people say.  So I really don't like to start

23    until after the last interview.

24    **Q.**    How do you determine when your investigation is

25    complete?

1    **A.**   Good question.  When the evidence starts to become

2    duplicative and I'm not learning anything new that

3    would help convince anyone one way or the other about

4    the material issues in the case.

5         And to a certain extent, sometimes I also

6    interview people who I doubt will have any relevant

7    information but the student is so adamant and it is so

8    important to the student that I interview that witness

9    that I do, and then I will simply include -- if I don't

10   include information from that witness, I'll include an

11   explanation about why in the report.

12   **Q.**   When you finalize the report you prepare for the

13   student, do you receive feedback?

14   **A.**   Yes.

15   **Q.**   How do you determine how to weigh that feedback?

16   **A.**   Sometimes if it's a factual thing where the

17   student says you said I said X, Y, Z, I really said A,

18   B, C, I will go back to my notes and see if I have a

19   definitive version and/or a clear memory that they in

20   fact said what I said they said.  If there's some

21   question like there's nothing specific in my notes, I

22   will probably change it to what the student is now

23   saying.  Of course, I'm human.  I sometimes can mishear

24   what people say and sometimes miswrite what people say,

25   but I do try to be very accurate.  I take notes during

1   my interviews that are not as good as a stenographer's

2   but they're pretty good.  And I try to get down exact

3   quotes as best I can on the important issues.

4   **Q.**   In this case, did you receive feedback from both

5   students?

6   **A.**   Yes.

7   **Q.**   And what particularly do you recall as far as your

8   assessment of Allie's feedback?

9   **A.**   I do recall a couple of the main issues.  I think

10   there may have been some typos that, of course, I was

11   going to correct.  I remember one issue being about the

12   explanation of why she had deleted her text messages.

13   There was something about the explanation had to do

14   with whether she was on birth control or not and she

15   didn't want that in the report.

16        Another issue was about the events that

17   triggered the conversation in the dining hall.  She

18   thought that I had gotten that wrong in terms of what

19   she had said and I agreed with her.  I did change that.

20        She wanted me to include the information from

21   Witnesses 8, 9 and 10 that we talked about earlier that

22   had to do with other students having sort of, for lack

23   of a better term, sexually harassing experiences with

24   Beau, and I did not include those.

25   **Q.**   What do you recall about the assessment of those

1     comments that Attorney Ratcliffe showed you?

2     **A.**   Well, of course, now that we've testified a lot

3     about the coercion footnote that's what's most

4     prominent in my mind.  There were other changes that he

5     requested that I made.

6     **Q.**   What about the character evidence?

7     **A.**   Oh, the character evidence.  Right.  This is

8     discussion of Witness 9.  Beau had raised the issue of

9     conspiracy from the outset in which he said that the

10     complainant and Witness 9 were conspiring against him

11     and, you know, therefore, Allie was fabricating the

12     allegations of the complaint.  So it was only fair to

13     allow Allie to provide an explanation of what had

14     really gone on.  I also had interviewed Witness 9 and

15     said -- and had gotten her version of events and some

16     of the other witnesses had also mentioned some of these

17     events so those had come out as well.

18        So Beau then was upset that the explanation was

19     included in the report but he, along with very able

20     counsel, Mr. Ratcliffe, chose to make that part of his

21     defense.

22        I did run down as best I could what he thought

23     the conspiracy could have been based on, and he said it

24     was this conversation in the dining hall that made him

25     think there was a conspiracy.  So that was partly why I

1    interviewed that witness.  And because of the -- oh, I

2    think there was another -- he thought that because of

3    some negative impact that he experienced on mock trial,

4    he thought that that was also evidence of the

5    conspiracy.  So -- it was only fair to include what her

6    response was.  Because if, in fact, everything she said

7    was true, there would be an alternate explanation of

8    why she would be mad at him or upset with him or want

9    to bring a complaint against him; ergo, he committed

10   these acts toward her that were not consensual.

11        So I felt it was important to look at those, but

12   I didn't find any evidence of that.  So getting back to

13   his responses to the report, there was really nothing

14   to change there.

15   **Q.**   How do you ensure that your report will be

16   balanced?

17   **A.**   I try really hard.  You know, one of my favorite

18   quotes is a quote from John Adams, and I talk about

19   this when I do training for colleges, about how every

20   person is entitled to as much impartiality as the lack

21   of humanity will allow.

22        The reason I love that quote is because it says

23   right in there that no human being is perfectly

24   impartial.  It's impossible.  But because of that,

25   because I'm very aware of that, I constantly am trying

1      to question which way I'm thinking in terms of, as

2      people like to say, checking my bias at the door.

3             I really do try in every interview with students

4      to really understand what their point of view was and

5      what their state of mind and their rationale and ways

6      of thinking.  In the moment that I am with them in the

7      interview room, I am with them.  I feel like that's my

8      role and that that helps me to remain fair and

9      impartial because it allows me to get all the

10     information and then weigh it at the end.

11     **Q.**   How do you distinguish between what falls within

12     your role and the panel's role?

13     **A.**   Primarily, that's what's in the policy.  You know,

14     whatever the institution's policy is.  In this case, I

15     was primarily to be a fact-finder but also it was -- I

16     was told that it was appropriate for me to analyze

17     evidence to some extent.  It can be -- I think that

18     often panelists are very nervous.  Of course they're

19     not lawyers and they're just regular people, and so I

20     feel like it's important to highlight for them in some

21     ways what is relevant or not, whether it's an admission

22     or inconsistent statement or the importance of

23     corroboration, things like that.

24            MR. RICHARD:  May I have a moment, your Honor?

25            THE COURT:  Yes.

1       (Pause.)

2           MR. RICHARD:  Nothing further, your Honor.

3           THE COURT:  Okay.  Thank you.

4           Mr. Ratcliffe, redirect?

5           MR. RATCLIFFE:  No redirect.

6           THE COURT:  Okay.  Thank you.  All right.  I

7   have a few questions and then we'll get you out of

8   here.

9           So there was one question I meant to ask

10  Ms. Walsh and I forgot to, but I think you're in just

11  as good a position to answer it.  I think I know the

12  answer to it.  It has to do with the burden of proof

13  and the preponderance of the evidence standard.  It's

14  my understanding that that's driven by the

15  recommendation of the OCR; correct?

16          THE WITNESS:  Yes.

17          THE COURT:  Do you know of any schools that

18  don't use a preponderance of the evidence standard?

19          THE WITNESS:  Not anymore.  I think that they

20  would be probably the subject of an audit by OCR if

21  that were the case.  Certainly the trends -- I haven't

22  worked with any school that is using anything other

23  than that.  If I did, I would be telling them to look

24  at their policies again because it would make me

25  uncomfortable that they were going to face something

1    that they wouldn't want to face.

2           THE COURT:  Okay.  I want to ask you some

3    questions about both your report and the questions that

4    were posed to you by the panel.

5           So I believe you stated that in your report your

6    goal was to not make any credibility findings between

7    the versions offered by Allie and Beau; is that correct

8    or not?

9           THE WITNESS:  No.  It wasn't that it was my goal

10   not to.  It's just that I didn't.

11          THE COURT:  All right.  Well, did you do it

12   accidentally?

13          THE WITNESS:  In some ways.  Probably had I had

14   more time to sit and really think about particular

15   statements and whether I thought those were credible, I

16   would have, but I simply did not have the time.  It was

17   very important that we get the report done at that

18   point, and it wasn't critical that I make those

19   determinations at least as between the principals

20   because they were going to be seen by the panel.

21          THE COURT:  Okay.  So let me make sure I have

22   this straight.  So it's your view that the report that

23   you drafted did not make credibility findings, right?

24          THE WITNESS:  Not in so many words, no.

25          THE COURT:  It's not right?

1          THE WITNESS:  Right.

2          THE COURT:  So you believe the report does make

3     credibility findings?

4          THE WITNESS:  No.  There's nothing in the

5     report, there's no section that says credibility

6     findings and itemizing them one by one.  There's

7     certainly facts within, embedded within the report from

8     which a panelist could have said, Okay, based on this,

9     the statement is therefore not credible.  But that

10    sentence is not in there.

11         THE COURT:  Right.  I'm not asking you what a

12    panelist could conclude.  I'm just asking you whether

13    you drew any conclusions about credibility and

14    expressed them in your report.

15         THE WITNESS:  I did not express any conclusions

16    about credibility specifically in the report.

17         THE COURT:  But now what I think I'm hearing you

18    say is that it may be that some of your thoughts about

19    credibility could be inferred from what you wrote in

20    the report; is that fair?

21         THE WITNESS:  Yes.

22         THE COURT:  Okay.  And to the extent that some

23    of those thoughts, your views about credibility are

24    reasonably inferred from your report, is it fair to say

25    that they're consistent with what you said to the panel

1     when you were with them and they were asking you

2     questions?

3          THE WITNESS:  In general, yes.  But just now in

4     rereading the notes about what happened at the panel,

5     there was -- the statement -- and actually, I think I

6     told them -- or I said to them later.

7          So there was one statement that I made to the

8     panel that was not specifically included in the report

9     that could be seen as a credibility determination and

10    that was the statement about whether or not she was an

11    enthusiastic participant, which is what his claim was.

12    As I was preparing for the hearing, I was rereading the

13    report and the text messages between them and suddenly

14    saw this sort of pattern in the text messages of where

15    he would consistently return the conversation, resolve

16    the issue of, Oh, we're just going to be friends.  If

17    we see this movie tonight, it's going to be platonic.

18    And then he would switch back around and say, Well,

19    but, you know, I'm interested in you or I might make

20    you get hot, then we'll do something.  Things like

21    that.

22         So I suddenly saw that pattern which I hadn't

23    really noticed particularly before.  And then I thought

24    about it in relation to what was going on and how each

25    of them talked about what happened in the room that

1      night.  And so in thinking about that, her version of

2      events was somewhat more what happened in the room that

3      night where she was resistant but ultimately caved, for

4      lack of a better word, was more consistent with the

5      text message pattern than it was with his version of

6      events, which was that she was suddenly very

7      enthusiastic and, you know, eager to be involved.

8              Had I spent more time with the report, I

9      probably would have included in the report a

10     credibility finding that that particular statement that

11     he made was not credible in light of those other text

12     messages and the quality of both of their statements

13     about what happened that night.  Other than that, I

14     felt that they were both generally believable.

15             THE COURT:  Okay.  So that brings me to the

16     statement that's in Ms. Walsh's notes.  You've reviewed

17     that?

18             THE WITNESS:  Yes.

19             THE COURT:  We can put it back up on the -- in

20     fact, let's do that.

21             What exhibit is this?

22             MR. RICHARD:  Is this the red-line?

23             THE COURT:  No.  This is the notes.

24             MR. RICHARD:  Exhibit 24.

25             THE COURT:  Twenty-four?

1    MR. RICHARD:  Yes.

2    THE COURT:  Can you just put that up.

3    MR. RICHARD:  Is there a page number?

4    THE COURT:  Well, looks like page two, I think.

5    So first of all, let me just get clear.  The

6    paragraph there where you're responding to Gretchen

7    Schultz's question, "Doesn't someone have to be lying?

8    She says she said no, and he says she's an enthusiastic

9    partner" --

10    THE WITNESS:  Um-hum.  (Affirmative.)

11    THE COURT:  -- the notes describing your

12    response, do you -- I don't think you were asked this

13    question.  I just want to be clear.

14    Do you feel that those notes are an accurate

15    representation of your response?  They're almost like a

16    transcript so I just want to make sure you feel that

17    Amanda Walsh took a complete version of what you had to

18    say.

19    THE WITNESS:  Yes.  It's generally accurate.

20    Yes.

21    THE COURT:  There's nothing more that you said

22    that she didn't get down or anything.

23    THE WITNESS:  No.

24    THE COURT:  All right.  So in that statement

25    that you've made there is consistent with the statement

1    you just said, if you had had more time, you would have

2    basically put that into your report I think is what you

3    just said, right?

4            THE WITNESS:  Yes.

5            THE COURT:  But you didn't have a chance to put

6    it in your report, but you did convey it to the panel

7    in this answer?

8            THE WITNESS:  Yes.

9            THE COURT:  Okay.  So I think you were a little

10   equivocal about this when Mr. Ratcliffe was asking you

11   questions.  But the statement that you make, the idea

12   that she was willingly jumping into this sexual

13   encounter doesn't match -- I should back up.

14           First, you say if you look at the text messages,

15   it does show that he is persistently making things

16   sexual even though she is a willing participant at

17   times.  He does convert things into something sexual.

18   He did say he asked for consent and she was

19   enthusiastic, but that isn't consistent with the text

20   messages where you can see her hesitation.  The idea

21   that she was willingly jumping into the sexual

22   encounter doesn't match, but that's for the panel to

23   decide.

24           Now, you would agree, wouldn't you, that you're

25   making a credibility determination there in response to

1    Gretchen Schultz's question that somebody is telling

2    the truth and somebody is lying.  Would you agree that

3    you're telling the panel that you believe Allie and you

4    don't believe Beau?

5              THE WITNESS:  Yes.

6              THE COURT:  All right.  And that should include

7    the next statement, Her version appears to be more

8    consistent with the pattern that's in the text

9    messages, right?

10             THE WITNESS:  Yes.

11             THE COURT:  So then you say, Her actions after

12   the incident are difficult to reconcile, right?

13             THE WITNESS:  Correct.

14             THE COURT:  So that is a reference to this

15   abundance of text messages between them that is both

16   sexual and happy or ebullient, right?  Is that what

17   that's a reference to?

18             THE WITNESS:  Her actions after the incident.

19             THE COURT:  As well as what she is telling her

20   roommates and the other things that you gathered from

21   the witnesses, right?

22             THE WITNESS:  Yes.  Yes.

23             THE COURT:  All right.  So then you say that's

24   difficult to reconcile.  I just want to be sure I'm

25   understanding what you're saying here.

1          So you're saying that's difficult to reconcile

2     with the conclusion that you just told them, which is

3     that her version is more credible than his version,

4     right?

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Is that what you're saying?

7          THE WITNESS:  Yes.

8          THE COURT:  Okay.

9          THE WITNESS:  Or difficult to reconcile with the

10    idea that what happened that night was not consensual.

11         THE COURT:  Exactly.

12         THE WITNESS:  Right.

13         THE COURT:  Then the next sentence is,

14    Specifically, there is a possibility that she would not

15    have done anything about it or filed a complaint if a

16    relationship had come from it.  She may say she would

17    have forgiven him or thought about the incident in a

18    different way.

19         So in that statement, you seem to be -- you

20    don't have to agree with me.  If I'm misconstruing

21    this, you just tell me.  You seem to be characterizing

22    her actions after the incident as not reflective of

23    whether it was consensual or not, but rather reflective

24    of her state of mind about the possibility of a

25    relationship.

1          In other words, you seem to be providing the

2     panel with a way to reconcile those post-event actions

3     and text messages with that last sentence.

4          THE WITNESS:  That was not my intent.  I was

5     just trying to lay out all the facts before them.  I

6     think the point that Mr. Ratcliffe was trying to get

7     out is if you were a victim of sexual assault why would

8     you --

9          THE COURT:  Okay.  So let me ask you another

10    question.  If that wasn't your intent to give the panel

11    a way to reconcile the statements, then why wouldn't

12    you have said effectively, Her actions after the

13    incident are difficult to reconcile.  They may indicate

14    that the event was consensual, or they may indicate

15    that Allie is not telling the truth, or they may

16    indicate that Beau's version is more likely correct

17    than Allie's version, or something like that.  That's

18    what I'm trying to figure out.  If it was your view

19    that the post-event actions cast doubt on her

20    credibility, you didn't say that to the panel.  You

21    characterized them as explainable by this possibility

22    of an ongoing relationship.

23          THE WITNESS:  When I said they're difficult to

24    reconcile, I thought that that is what I was saying was

25    that on the other hand there's other evidence that

1    could be considered exculpatory including the

2    possibility that she wouldn't have done without all

3    that --

4              THE COURT:  That's what I'm trying to get to.

5    So what you meant was what you just said, which is her

6    version appears to be more credible and consistent with

7    the pre-encounter text banter --

8              THE WITNESS:  Right.

9              THE COURT:  -- but her post-encounter actions

10   cast doubt on that.  You're saying now that's what you

11   meant to convey?

12             THE WITNESS:  Yes.  And I thought I did convey

13   that.

14             THE COURT:  In light of my questions to you, do

15   you think you actually conveyed that?

16             THE WITNESS:  You know, I do.  I mean, as I read

17   it, yes.  It's not like I get the questions ahead of

18   time and I get to write out well-crafted and thoughtful

19   responses.

20             THE COURT:  Well, this is a pretty obvious

21   question.  You must have known you were going to get

22   this question, Who's telling the truth, him or her.

23   This isn't a mystery.

24             THE WITNESS:  Right, but I think that my

25   answer -- I think that I was trying in my answer to be

1    even-handed to say it's possible that something else

2    could have happened completely irrespective of what the

3    pattern of text messages had been that night.  It could

4    have been totally unrelated because look at these

5    potentially exculpatory facts that this took place

6    afterwards.  Or you could say it's consistent -- they

7    could conclude it's consistent with the pattern and

8    there's an explanation for the post-incident behavior.

9         In any event, it appears from reading this

10   pretrial memo, because I didn't know anything about the

11   deliberative process until I was called to testify, it

12   appears that the panel drew their conclusions based on

13   a completely different thing.

14        THE COURT:  None of that is evidence until they

15   testify.  So they haven't testified so there's no

16   evidence on what they based their conclusion on.

17   Counsel have made representations what they think it

18   will be, but we'll hear from the panel members.  But I

19   think I've got what you feel about the answer.

20        I want to come back --

21        THE WITNESS:  I'm sorry.  In the room there's

22   also body language from the panelists.  There's verbal

23   conversation and non-verbal conversation.  So I read

24   them to be understanding what I was saying in the way

25   that I meant it as best anyone can.  I didn't sense any

1    confusion on their part about what I meant.  They

2    didn't ask any follow-up questions.  They didn't say,

3    What are you trying to say about that.

4            THE COURT:  You've got to explain that to me.

5    What body language did they use to convey to you that

6    they understood what you meant by that was that they

7    could take her post-encounter activities as undermining

8    her credibility and making his credibility or his story

9    more credible?  Explain to me exactly what body

10   language they were conveying that with.

11           THE WITNESS:  I believe they just nodded and did

12   not look confused.  Also at the end, someone made a

13   comment about -- someone made a comment saying thank

14   you so much, it was a lot of work.  And I said

15   something like, Good luck.  This is a difficult one.

16   Or something like that.  Or complicated, something like

17   that.

18           THE COURT:  So I want to go to your report.

19   That's Exhibit 18.  Do you have a copy of your report

20   in front of you?

21           THE WITNESS:  No.

22           THE COURT:  Might be easier if we just gave you

23   a copy of your report.  Could one of you just do that,

24   please.

25           MR. RICHARD:  Excuse me, your Honor.  Final

1  report?

2         THE COURT:  Yes.

3         Now, I'm not going to belabor a lot of this

4  because Mr. Ratcliffe asked you a number of questions

5  about it, but I do want to come back to this business

6  about not collecting the full body of text messages

7  between the complainant and Witness Number 9 and that's

8  discussed in Footnote 26.

9         And you were asked a lot of questions about

10  that.  But you say in that footnote, As explained in

11  greater detail later -- and I believe that is a

12  reference to the second to the last paragraph of the

13  report so if you could turn to page 29, I think what

14  you're referring to there is how you have assessed

15  things with respect to those text messages and the

16  claim that there was a conspiracy between the

17  complainant and Witness Number 9 to get him.

18         THE WITNESS:  Yes.

19         THE COURT:  So what you say here is that you

20  tell the panel -- back up.  You start by saying, By the

21  respondent's own admission, he treated the complainant

22  poorly.

23         And there's one or two other places where you

24  note that in the report.  And I'm just wondering -- and

25  then you say, Regardless of whether their sexual

1    activity was consensual or not.

2         What does whether he treated her poorly have to

3    do with it?

4         THE WITNESS:  Because it went to an explanation

5    for why she would have disliked him.  Because even if

6    the sexual activity was consensual, and his defense

7    was, and this was raised clearly in his response, that

8    I'm a jerk but I didn't commit sexual misconduct, so

9    either way, whether the activity was consensual or not,

10   there was a reasonable explanation for her to be angry

11   with him.

12        THE COURT:  All right.  So then you go on to say

13   that, Her dislike of him is reasonable even if he

14   didn't assault her, et cetera.  And that the

15   complainant and Witness 9's negative feelings toward

16   the respondent do not assist the panel in evaluating

17   whether the complainant's claims are fabricated,

18   neither does the conversation overheard by Witness 11

19   because there's no evidence that their reasons for

20   "wanting to get him" were unfounded or that they wanted

21   to take any action other than that to which they were

22   entitled.

23        Now, I'm wondering how it is that you have

24   reached here the conclusion that looking at the full

25   body of text messages could not be informative before

1      you see them.

2           THE WITNESS:   Because there were already -- the

3      text messages that we did have, that I did have, were

4      already so clearly demonstrative of precisely the

5      information that the respondent wanted to convey, which

6      was that they couldn't stand him and that they, you

7      know, didn't like him and wanted to take action against

8      him.   And specifically, one of those first text

9      messages, which is in December, is clearly where she

10     discloses for the first time to Witness 9 that this

11     event had occurred, and it's Witness 9 who said, OMG,

12     that's sexual assault.

13           So once they're kind of in that mode, you'd

14     think that on his best day what he'd be looking for is

15     a statement like, Oh, actually, it was super fun; I had

16     a really great time.

17           But once she has locked herself into that

18     version of events with her friends, very unlikely that

19     there's going to be some piece of evidence later on,

20     some text message that said, yes, it's true, I really

21     had a super fun time and we're just going to keep going

22     on this because he's a jerk.   That fact was also

23     corroborated or that inference was also corroborated by

24     the behavior of the complainant with respect to the

25     outside world, that is the mock trial team, how she

1    talked about it, presented it.

2         So there just seemed to be a very small

3    likelihood that that would be the case.

4         Plus, because these two were so close, it was

5    likely that it was going to really be that there would

6    be many, many messages and that it would really bog

7    down the investigation.  And these are, unlike in a

8    civil case, where of course you'd get access to that

9    because maybe there'd be some nugget that would either

10   lead you to that conclusion or some other relevant

11   conclusion, these cases are supposed to be completed

12   within 60 days.

13        There had already been significant delay in the

14   case primarily because of the respondent's scheduling

15   issues.  I think in one case I had to wait four weeks

16   or so to interview him.

17        Also, he had said, Here's why I think there's a

18   conspiracy and it's based on the conversation in the

19   dining hall.  So I did investigate those potential

20   defenses.  If there had been some nugget anywhere that

21   would have suggested that I would find something

22   helpful to him in those text messages between the two

23   students, I would certainly have asked for them, but

24   under the circumstances it felt just -- and also his

25   specific request for them were very vague.  It was

1   not -- it was just it would be helpful to provide

2   general context about the relationship.

3         So you know, sort of on balance weighing

4   everything that I had to get done, it was not likely

5   that there was going to be something there that I would

6   need to do, and I didn't want to waste time going down

7   that road.

8         THE COURT:  I understand that.  You may be

9   right.  I think it would have been a lot of text

10  messages.  There's no question that people text a lot.

11        THE WITNESS:  A lot.

12        THE COURT:  I get that.  But I thought I read in

13  your retainer agreement that you have a paralegal or

14  someone who works with you?  Isn't that part of your

15  office setup?

16        THE WITNESS:  Sometimes, yes.

17        THE COURT:  Brown was paying you not only for

18  your services but for the services of people who work

19  in your office.

20        THE WITNESS:  I did not use a paralegal in this

21  case.

22        THE COURT:  But you could have.  It was part of

23  your retainer agreement.

24        THE WITNESS:  At the time, I don't think that I

25  had anybody working as a paralegal at the time.  I also

1    am conscious of the costs of the investigation, which I

2    think are -- they can be really prohibitive so I don't

3    want to make it impossible for universities and schools

4    to do a decent job.

5         THE COURT:  I understand.  I guess what I'm

6    getting at is you, in this paragraph, you seem to be

7    explaining to the panel that this is not something that

8    they should be concerned about or get into because --

9    and you're providing them an explanation for the

10   animosity and that they need not worry about

11   conversations that might have occurred between

12   complainant and Witness 9.  And I assume the panel

13   follows your direction.

14        But it is possible that that text message chain,

15   if it's anything like all these other text messages

16   that occurred between the complainant and the

17   respondent, might convey some information that could be

18   informative in a case that you just characterized as

19   one which you told the panel, Good luck, or this is

20   close, or whatever it is you said to them.  That's what

21   I'm trying to -- I'm trying to reconcile that.

22        But I think I understand.  You made a judgment

23   and that's your job to make judgments about the

24   evidence.  I don't want you to interpret any of my

25   questions as being judgmental.  They're not.  But it's

```
1     my way of trying to get to the heart of the matter.
2          All right.  Does counsel wish to follow-up on
3     anything I asked about?
4          MR. RATCLIFFE:  No, your Honor.
5          MR. RICHARD:  No, your Honor.
6          THE COURT:  All right.  Then I think your
7     testimony is complete.  You may step down.
8          THE WITNESS:  Thank you, your Honor.
9          THE COURT:  Thank you.  We'll take a ten-minute
10    break.
11         (Recess.)
12         THE COURT:  Okay.  Mr. Ratcliffe, are you ready
13    to call your next witness?
14         MR. RATCLIFFE:  Yes.  Beau.
15         THE COURT:  Before the witness is sworn, I think
16    the witness's name has been made -- referred to many
17    times.  I'm going to let him be sworn in in the normal
18    course.  When it comes time for redacting the
19    transcript, you can just take care of that.  You
20    mentioned his name numerous times.
21         So let's swear the witness.
22    **BEAU ███████████, PLAINTIFF'S WITNESS, SWORN**
23         THE CLERK:  Please state your full name and
24    spell your last name for the record.
25         THE WITNESS:  Beau ███████████,
```

1 ███████████████████.

2       THE COURT:  Okay.  Good afternoon,

3 Mr. ████████.

4       THE WITNESS:  Good afternoon.

5       THE COURT:  You may proceed.

6 **<u>DIRECT EXAMINATION BY MR. RATCLIFFE</u>**

7 **Q.**   You were a student at Brown University?

8 **A.**   Yes.

9 **Q.**   What year did you -- how many years have you

10 completed?

11 **A.**   Three.

12 **Q.**   So you completed your junior year?

13 **A.**   That's correct.

14 **Q.**   So when did you apply to Brown University?

15 **A.**   In the spring of 2013.

16       THE COURT:  Could you get a little closer to the

17 microphone, please.

18 **A.**   In the spring of 2013.

19 **Q.**   And did you apply to other schools?

20 **A.**   Yes, I did.

21 **Q.**   And were you accepted at other schools?

22 **A.**   I was.

23 **Q.**   And what schools were those?

24 **A.**   Cornell, University of Chicago, Johns Hopkins,

25 Rutgers, a few others.

1  **Q.**   Okay.  Why did you choose Brown?

2  **A.**   I chose Brown because I thought it would be fun to

3  go to, and also because it would have the best chance

4  of getting me into Harvard Law School given the

5  acceptance rate of Brown graduates to Harvard.

6  **Q.**   You said Harvard Law School.  Did you have law

7  school aspirations?

8  **A.**   Yes.

9  **Q.**   And did your family pay tuition for Brown

10  University?

11  **A.**   Yes.

12  **Q.**   And do you know if they prepared the tuition?

13  **A.**   Yes.

14  **Q.**   So they paid all four years at once?

15  **A.**   That's correct.

16  **Q.**   Do you know approximately how much money that was?

17  **A.**   Yes.  It was $177,600.

18  **Q.**   That was just for tuition?

19  **A.**   I believe so.

20  **Q.**   Now, when you went to Brown University, did you --

21  did you attend orientation?

22  **A.**   Yes.

23  **Q.**   And as part of the orientation, were you directed

24  -- or at some point were you directed to look at the

25  Code of Student Conduct?

1    **A.**    Yes, we were.

2    **Q.**    Do you recall if you actually reviewed the Code of

3    Student Conduct?

4    **A.**    I did.

5    **Q.**    And were you given a hard copy of it or was it --

6    **A.**    No.

7    **Q.**    So how did you view it?

8    **A.**    Online.  On the Internet.

9    **Q.**    So what year -- so that was this 2013-'14?

10   **A.**    Yes.

11   **Q.**    And you've been here during the trial, the Code of

12   Student Conduct was put up.

13          So a document similar to Exhibit 2 although

14   online it was called the Code of Student Conduct at

15   Brown University?

16   **A.**    Yes.

17   **Q.**    And at some point, did you review the 2014-'15

18   Code of Student Conduct?

19   **A.**    I did.

20   **Q.**    2014-'15, that was when you were a sophomore?

21   **A.**    Yes.  It was e-mailed out to the student body.

22   **Q.**    When the Code of Student Conduct was e-mailed to

23   you, was there any directions with the e-mail?

24   **A.**    I don't remember.

25   **Q.**    But the Code of Student Conduct was sent to you

1      for what purpose?

2      **A.**   To review it.  To notify the students that there

3      was a new Code.

4      **Q.**   You viewed it online again?

5      **A.**   Yes.

6      **Q.**   And did you read -- again, in 2014, you read it?

7      **A.**   Yes.

8      **Q.**   Now, in connection with this case, you've

9      obviously reread the Code of Student Conduct?

10     **A.**   Many times.

11     **Q.**   Now, when you -- you received a complaint in this

12     matter?

13     **A.**   Yes.

14     **Q.**   And at some point, did you refer to the 2014-'15

15     Code of Student Conduct?

16     **A.**   Yes, I did.

17     **Q.**   And was there a -- why was that?

18     **A.**   I wanted to know what the violation that I was

19     being charged with was.

20     **Q.**   And do you recall an e-mail being forwarded to

21     you, which has previously been introduced as Exhibit 7?

22     **A.**   Yes, I do.

23     **Q.**   And what was your understanding after having read

24     that e-mail?

25     **A.**   My understanding was that the 2014-'15 Code of

1   Student Conduct applied since the alleged incident took

2   place in 2014.

3   Q.   Now, when -- so the complaint against you, you

4   said what did it allege?

5   A.   It alleged sexual misconduct.

6   Q.   Then did you look at a specific portion of the

7   Code of Student Conduct when you received the

8   complaint?

9   A.   Yes.  Section III.

10   Q.   And did you read it?

11   A.   Yes.

12   Q.   And this is what you read?

13   A.   Yes.

14   Q.   And there's a comment there?

15   A.   There is.

16   Q.   And did you consider the comment?

17   A.   Of course.

18   Q.   And what did you consider the comment to mean?

19   A.   I considered the comment to mean an interpretation

20   of Section III(a) and Section III(b).

21   Q.   And did you draw any conclusions as a result of

22   reading the conduct?

23   A.   Yes, I did.  I read the Conduct and I understood

24   it to mean, as I had previously understood it to mean,

25   that using force, threat, intimidation or if the

1    student was impaired would constitute sexual assault.

2    **Q.**   Or sexual misconduct?

3    **A.**   Yes.  I apologize.

4    **Q.**   Now, did you, in reading the Code, did you read

5    the -- did you ever read a section that dealt with the

6    affected comment or how comments should be interpreted?

7    **A.**   Yes.  I do recall reading those.

8    **Q.**   And that states, (Reading:)  The comments

9    contained herein are offered as a guide to understand

10   the University's policies and not to be confused with

11   the policies themselves.

12       What was your understanding as a result of

13   reading that?

14   **A.**   My understanding was that they were offered to be

15   a guide and not binding upon the University.

16   **Q.**   And what was your understanding of as "to be a

17   guide"?

18   **A.**   That it was the University's interpretation and

19   how the students -- how myself should understand

20   Section III of the Code of Conduct.

21   **Q.**   In preparing for the defense of this case, did you

22   look at the -- I'm going to show it to you, previously

23   entered as Exhibit 4, the Title IX Policy?

24       THE COURT:  Mr. Ratcliffe, I'm actually

25   struggling a little bit to understand what the

1    relevance of this testimony is other than I assume you

2    need a little bit of this testimony in order to support

3    your motion to amend the complaint to add a promissory

4    estoppel count.  And I think that you've pretty much

5    laid that out except you haven't asked him questions of

6    reliance on it, but I assume you're going to do that.

7            But beyond that, what value is testimony from --

8            MR. RATCLIFFE:  Just with respect to his

9    understanding of the Code, his understanding of what he

10   read and his understanding of what he was being charged

11   with.

12           THE COURT:  I think that's, frankly, in all of

13   the materials.

14           MR. RATCLIFFE:  I'll move on.

15           MR. RICHARD:  Your Honor, just contextually,

16   this is an issue that has come up in discovery.  It

17   will be a topic of my examination as well.  I believe

18   we're dealing with the expectations of the student and

19   interpretation of the Code and the relevance of those

20   expectations and breach of contract claim.  The

21   standard is reasonable expectation of the students so I

22   think both of us intend to ask those questions.

23           THE COURT:  All right.  So I understand.  Then I

24   think you should really zero in on that and Mr. Richard

25   can zero in on that as well.

1    **Q.**    When you went to the hearing, what were your

2    expectations regarding what standard was going to be

3    applied by the Title IX panel?

4    **A.**    I'm sorry.  By "standard," do you mean --

5    **Q.**    Which Code?

6    **A.**    The 2014-2015 Code.

7    **Q.**    And why was that?

8    **A.**    Because the incident took place in 2014.

9    **Q.**    Anything else?

10   **A.**    Because of the letter you just showed me.

11   **Q.**    In connection with preparing for the -- let me

12   just ask you another question.

13          At the hearing, you were on the phone when Allie

14   was providing her explanation or her testimony before

15   the panel?

16   **A.**    Yes, I heard that.

17   **Q.**    And what did you hear her talk about?

18   **A.**    I heard her talk about false accusations against

19   myself, and allegations that I had manipulated her into

20   a sexual encounter, and allegations that I violated the

21   2015-2016 Title IX Policy.

22   **Q.**    And you heard her specifically reference the Title

23   IX Policy?

24   **A.**    I believe so.

25   **Q.**    And did you hear her reference definitions?

1   **A.**   I don't remember.

2   **Q.**   What was your reaction when she was referencing

3   the Title IX Policy?

4   **A.**   I mean, I thought it wasn't fair, and I thought

5   that I was being charged with violating something that

6   didn't exist at the time of the alleged conduct.

7   **Q.**   Well, as a result of being at the hearing and

8   hearing Allie talk about the 2015-2016 policy, did you

9   do anything?

10       Let me ask you another question.  Did you

11   receive a letter the following day from Amanda Walsh?

12   **A.**   Yes.

13   **Q.**   Okay.  And that letter has been -- I can put it

14   up.

15       MR. RATCLIFFE:  Twenty-six.

16   **Q.**   Is that a copy of the letter you received?

17   **A.**   Yes.  I saw this earlier yesterday.

18   **Q.**   What was the conclusion that you drew from

19   receiving that letter?

20   **A.**   That the panel was going to disregard Allie's

21   references to the 2015-2016 Policy and instead relied

22   upon the 2014-2015 Code of Student Conduct.

23   **Q.**   Now, prior to the hearing, were you ever told by

24   anybody at Brown University that the Title IX panel

25   would consider the 2015 Title IX Policy?

1    **A.**    No.

2    **Q.**    When you were at the hearing, you went into the

3    hearing room with your counsel?

4    **A.**    Yes.  With yourself, Mr. Ratcliffe.

5    **Q.**    Okay.  And describe the makeup of the panel.  How

6    many people were present?

7    **A.**    Three women, two I think Brown faculty members and

8    one undergraduate student.

9    **Q.**    And there was -- what was the gender of the panel?

10   **A.**    All female.

11   **Q.**    Did you have any concerns about the panel?

12   **A.**    Yes.

13   **Q.**    What were they?

14   **A.**    I was concerned that the panel was all female and,

15   additionally, I recognized one of the panel members.

16   **Q.**    Who was the panel member that you recognized?

17   **A.**    Kimberley Charles.

18   **Q.**    Did you know her beforehand?

19   **A.**    I actually was in a class with her that spring

20   semester.

21   **Q.**    When you got the list of the panel members, did

22   you know that Kimberley Charles was in a class with

23   you?

24   **A.**    No.

25   **Q.**    So got to the hearing and you just recognized her

1    from sight?

2    **A.**    Yeah.  It was the 2013 class, but I didn't know

3    her name.

4    **Q.**    Now, did you have any concerns that there were no

5    men on the panel?

6    **A.**    I did.

7    **Q.**    Why was that?

8    **A.**    I felt that men and women inherently have

9    different perspectives regarding issues of -- issues of

10   sex essentially.

11   **Q.**    And you were actually called to provide your

12   testimony first; correct?

13   **A.**    Yes.

14   **Q.**    And did you -- were you concerned about that?

15   **A.**    I was, and I asked if I could give a response to

16   Allie's statement.

17   **Q.**    You were the person who was defending this case,

18   right?

19   **A.**    Yes.

20   **Q.**    Now, you received the panel decision in this

21   matter?

22   **A.**    I did.

23   **Q.**    I believe you were here when Amanda Walsh

24   testified.  You received a phone call from her?

25   **A.**    Yeah, she called me.

1    **Q.**    And this is the letter -- did she follow-up that

2    phone call with a letter?

3    **A.**    Yes.

4    **Q.**    And you've looked at this letter, and you've read

5    it a number of times?

6    **A.**    Yes.

7    **Q.**    And how did you feel after receiving this letter?

8    **A.**    I was shocked, first of all, by the fact that I

9    was found responsible for something I didn't do; and

10   secondly, for the fact that the panel relied upon the

11   2015-2016 Title IX Policy when I had been assured that

12   the 2014-2015 Code of Student Conduct would be used.

13   **Q.**    Did you appeal?

14   **A.**    Yes.

15   **Q.**    And what was the basis of the appeal?

16   **A.**    The basis of the appeal was substantial procedural

17   error as well as that the decision was manifestly

18   contrary to the evidence.

19   **Q.**    And did you -- and you prepared --with the

20   assistance of counsel, you prepared an appeal letter;

21   correct?

22   **A.**    That's correct.

23   **Q.**    This has been previously introduced, and the

24   appeal addresses the issues that you were raising in

25   the appeal; correct?

1    **A.**    Yes.

2    **Q.**    And the one being that the procedural error being

3    the 2014-'15 Code was applied?

4    **A.**    Yes.

5    **Q.**    And excuse me, the 2015-'16 Code definition.

6    **A.**    Yes.

7    **Q.**    Now, were you given an opportunity to orally

8    advocate your position at the appeal?

9    **A.**    No, I was told that I couldn't.

10   **Q.**    And did you expect that anybody would get that

11   opportunity?

12   **A.**    No.

13   **Q.**    Okay.  And did you get the appeal letter?

14   **A.**    I'm sorry?

15   **Q.**    Did you receive a reply with respect to the

16   appeal?

17   **A.**    Yes.  My appeal was denied.

18   **Q.**    And with respect to the procedural error, what's

19   your understanding of what the appeals panel concluded?

20   **A.**    That there was no procedural error.

21          MR. RATCLIFFE:  Could I have a moment, your

22   Honor?

23          THE COURT:  Yes.

24          (Pause.)

25          MR. RATCLIFFE:  Nothing further, your Honor.

1          THE COURT:  Okay.  Thank you.

2          Mr. Richard.

3          MR. RICHARD:  Thank you, your Honor.

4          Your Honor, I'll still refer to the witness by

5     his first name.

6          THE COURT:  That's fine.

7          **CROSS-EXAMINATION BY MR. RICHARD**

8     **Q.**   Good afternoon, Beau.

9     **A.**   Good afternoon, Mr. Richard.

10    **Q.**   When you enrolled in Brown University during the

11    '13-'14 academic year, you mentioned that you read the

12    Code of Student Conduct?

13    **A.**   Yes.

14    **Q.**   Did you read it cover to cover?

15    **A.**   I don't know if there was a back cover, but I read

16    the entirety of it, yes.

17    **Q.**   And the same would be true for the '14-'15 Code of

18    Student Conduct during your sophomore year?

19    **A.**   Yeah, I read the whole thing.

20    **Q.**   Had you read the whole thing prior to November 10,

21    2014?

22    **A.**   Yes.

23    **Q.**   I'm referring to Exhibit 2, which is the '14-'15

24    Code.  I can show you the '13-'14 Code, but we're all

25    in agreement here that there was no change in Offense

1    III in its wording between '13-'14 and '14-'15;

2    correct?

3    **A.**   That's correct.  I reviewed them during the

4    deposition.

5        MR. RICHARD:  One moment, your Honor.  I need to

6    find an exhibit.

7    **Q.**   Exhibit 16.  Do you recognize this e-mail?

8    **A.**   Yes.

9    **Q.**   What is it?

10   **A.**   It's my response to Djuna's report requesting

11   certain changes.

12   **Q.**   And this is the substance of your request for

13   changes; correct?

14   **A.**   Yes, and the attached document.

15   **Q.**   The hearing in this matter occurred on April 14th,

16   2016?

17   **A.**   I honestly don't remember the date but that sounds

18   about right.

19   **Q.**   So these comments were made approximately a month

20   beforehand?

21   **A.**   Sure.

22   **Q.**   You referred to the standard in the '14-'15 Code

23   that we just reviewed the Offense III standard.  And

24   you state that in that version of the Code, '14-'15

25   Code, the definition of "sexual conduct" is vastly

1    different than what it is now.  What were you comparing

2    it to?

3    **A.**    The 2015-2016 Title IX Policy.

4    **Q.**    If no one had mentioned to you that that policy

5    applied in the proceedings, why were you making that

6    comparison?

7    **A.**    Because Djuna Perkins essentially alluded to that

8    policy in her draft report.

9    **Q.**    As far as the terms of Offense III, what was your

10   understanding of the comment that states that the

11   offense encompasses a broad range of behaviors?

12   **A.**    My understanding was that if an individual were to

13   use force, threat, intimidation or advantage gained

14   through another student's incapacitation, it would

15   constitute sexual misconduct.

16   **Q.**    So your understanding, if I'm understanding your

17   testimony correctly, is that the examples listed after

18   the comma and the "including" were an exclusive list?

19   **A.**    Yes.

20   **Q.**    So the broad range of behaviors could only include

21   the examples specifically mentioned in this comment?

22   **A.**    To constitute a violation of Section III(a) and

23   (b), yes.

24   **Q.**    And you go on to say that the definition -- strike

25   that.

1        You go on to say that the offense does not

2    include a definition of "coercion;" correct?

3    **A.**    I'm sorry.  Could you repeat.

4    **Q.**    Sure.  After your citation to the offense in the

5    middle of this document, you start at the bottom, Quite

6    a bit of the report, your report, including Footnote 22

7    focuses on the possibility that I coerced Allie to

8    engage in sexual conduct.

9        Why were you addressing coercion?

10   **A.**    Because it was the word that Djuna had used.

11   **Q.**    And you felt that coercion was not part of the

12   broad range of offenses?

13   **A.**    Coercion in the sense that she had used it.

14   **Q.**    Well, in what offense did she use it?

15   **A.**    She used in synonymously with manipulation.

16   **Q.**    Was the word "manipulation" ever mentioned her

17   draft report?

18   **A.**    No.

19   **Q.**    So how do you know she used it synonymously with

20   manipulation?

21   **A.**    Well, the way that I had understood the word

22   "coercion" to mean, as I mentioned previously, is the

23   use of a threat of force.  And in the context Djuna was

24   not using it to mean that.

25   **Q.**    Where did you get that definition?

1   **A.**   From the training I received at Brown University.

2   **Q.**   Go on to the next page.  You say, Furthermore,

3   your report does not contain a definition of

4   "coercion," which is use of force or intimidation to

5   obtain compliance.

6          Correct?

7   **A.**   Correct.

8   **Q.**   And is that the definition you got from a

9   dictionary?

10  **A.**   I don't remember.

11  **Q.**   Did you provide a citation?

12  **A.**   I don't remember.

13  **Q.**   Well, it says, Coercion is the use of force.

14  That's one of the examples; correct?

15  **A.**   Yes.

16  **Q.**   And one of the examples listed in the comment is

17  use of force?

18  **A.**   Yes.

19  **Q.**   And you go on to say "or" that's something

20  different, intimidation to obtain compliance; correct?

21  **A.**   Yes.

22  **Q.**   Intimidation is listed as one of the examples in

23  the comment?

24  **A.**   Yes.

25  **Q.**   So are you acknowledging to Ms. Perkins that

1    coercion is within the scope of broad range of

2    behaviors?

3    **A.**    The way I define "coercion" is force or the threat

4    of force or rather intimidation.  The way Djuna used

5    "coercion" was different.

6    **Q.**    So were you acknowledging that the word "coercion"

7    could fall within the broad scope of behaviors as you

8    understood it?

9    **A.**    As I define the word "coercion," yes.  It was

10   force or the threat of force, which is what the comment

11   says.

12   **Q.**    Then why were you criticizing her for using the

13   word "coercion"?

14         MR. RATCLIFFE:  Objection, your Honor.  I

15   believe this is being argumentative.

16         THE COURT:  Overruled.

17         Go ahead.

18   **A.**    Because she was using "coercion" in a different

19   way.

20         THE COURT:  What exhibit is it that you're

21   referring to?

22         MR. RICHARD:  Your Honor, this is Exhibit 16.

23   **Q.**    Show you Exhibit 24, which you know from this

24   lawsuit and trial --

25   **A.**    Yes.

1    **Q.**   -- are the notes that Amanda Walsh took?

2    **A.**   That's correct.

3    **Q.**   And at the bottom of the page, she represents that

4    you said the investigator conflated the two different

5    policies.

6          Did you say there was a conflation of two

7    policies?

8    **A.**   I did.

9    **Q.**   Which two policies were you referring to?

10   **A.**   The 2014-2015 Code of Student Conduct and the new

11   2015-2016 Title IX Policy.

12   **Q.**   So you raised the '15-'16 Title IX Policy as well

13   as Allie?

14   **A.**   I'm sorry?

15   **Q.**   You mentioned Allie raised the '15-'16 policy at

16   the hearing; correct?

17   **A.**   Could you repeat the question.

18   **Q.**   When Allie came in to speak after you did and you

19   listened, you heard her mention the '15-'16 policy;

20   correct?

21   **A.**   Yes.

22   **Q.**   You also mentioned it when you spoke?

23   **A.**   I mentioned that that policy did not apply to this

24   case.

25   **Q.**   So how is it that the investigator conflated the

1    two policies?

2    **A.**    I don't understand the question.

3    **Q.**    You said the investigator conflates two different

4    policies.

5    **A.**    Yes.  By the use of the word "coercion."

6    **Q.**    But you testified a few moments ago that coercion

7    could include intimidation and fear; correct?

8    **A.**    I testified that coercion was the use of force or

9    the threat of use of force.  That's not how Djuna

10   Perkins used the word in her report.

11   **Q.**    You say that the current policy covers all aspects

12   of sexual assault.  What do you mean by that?

13   **A.**    I meant to include the inclusion of manipulation,

14   which is included in the 2015-2016 Title IX Policy.

15   **Q.**    But the old policy only covered force or threat of

16   force?  Is that your understanding?

17   **A.**    As well as if a student was incapacitated.

18   **Q.**    So again, the broad range of behaviors could only

19   include, in your view, the examples listed in the

20   comment?

21   **A.**    That's what I believed it included in my view,

22   yes.

23   **Q.**    Exhibit 30.  Do you recognize this document?

24   **A.**    Yes.

25   **Q.**    What is it?

1    **A.**   It's my appeal of the Title IX panel decision.

2    **Q.**   And you raise as one of the grounds your

3    contention that the panel should have applied the

4    definition as stated in the '14-'15 Code?

5    **A.**   Yes.

6    **Q.**   You state in the middle that it's your

7    understanding that the Code says what isn't okay to do,

8    but doesn't say what it is okay to do?

9    **A.**   That's what the Code says.

10   **Q.**   Where did you get that understanding?

11   **A.**   From what the Code says.

12   **Q.**   What do you mean when you say the Code says what

13   you can't do as opposed to what you can do?

14   **A.**   Well, for example, Section III says that a broad

15   range of behaviors including acts of force, threat,

16   intimidation or advantage gained by the offended

17   student's mental or physical incapacity or impairment

18   of which the offending student was aware or should have

19   been aware, dot, dot, dot --

20        THE WITNESS:  I'm sorry.  I know I'm speaking

21   fast.  Do you want me to just go over --

22   **A.**   -- or impairment of which the offending student

23   was aware or should have been aware are examples of

24   things that are violations of the Code of Conduct.

25   **Q.**   You then cite the '14-'15 Code, specifically

1    Offense III; correct?

2    **A.**   Yes.

3    **Q.**   The last paragraph has a series of questions.  Why

4    did you list those questions in your appeal?

5    **A.**   To indicate what the relevant questions that the

6    panel should have asked in determining the finding of

7    my hearing.

8    **Q.**   In fact, you say after these four questions, if

9    the panel answered no to any of these questions they

10   should have found you not responsible; correct?

11   **A.**   Yes.

12   **Q.**   So the first question is, Did John Doe use

13   physical force to overpower Allie; correct?

14   **A.**   Yes.

15   **Q.**   Does that come from the first example?

16   **A.**   That's correct.

17   **Q.**   Second question is, Did John Doe threaten Allie?

18   **A.**   Yes.

19   **Q.**   Does that second question follow the second

20   example?

21   **A.**   It does.

22   **Q.**   The same would go for the third and fourth?

23   **A.**   Yes.

24   **Q.**   So again, in your appeal, you're contending that

25   the broad range of behaviors only include the example

1   cited in the comment after the comma and the word

2   "including"?

3   **A.**   Yes.

4   **Q.**   One of your questions indicates, Did Beau

5   intimidate Allie or place her in fear; correct?

6   **A.**   Yes.

7   **Q.**   Where in the examples cited in the comment is

8   there any reference to placing someone in fear?

9   **A.**   That was my understanding of what "intimidation"

10  meant.

11  **Q.**   But you say, Did Beau intimidate or place her in

12  fear?

13  **A.**   Intimidate her or, in other words, place her in

14  fear.

15  **Q.**   Are they two different things?

16  **A.**   No.

17  **Q.**   During the summer of 2013, after you were accepted

18  to Brown, do you recall that you had to take an online

19  tutorial?

20  **A.**   Yes, I did.

21  **Q.**   It was mandatory?

22  **A.**   I think so.

23  **Q.**   And wasn't its stated purpose to introduce you to

24  the principles of Brown University?

25  **A.**   I don't remember what the stated purpose was.

1    **Q.**   You recall at your deposition we went over the

2    tutorial and you acknowledged taking it?

3    **A.**   Yes.

4           MR. RICHARD:  Exhibit 40, your Honor.

5           MR. RATCLIFFE:  No objection to the tutorial,

6    your Honor.

7           THE COURT:  All right.  Forty will be full

8    without objection.

9           (Plaintiff's Exhibit 40 admitted in full.)

10   **Q.**   This is a printout of the tutorial.  We reviewed

11   this at your deposition; correct?

12   **A.**   I think so, yes.

13   **Q.**   The start of the tutorial addresses you as an

14   incoming student; correct?

15   **A.**   It does.

16   **Q.**   And it indicates that prior to your arrival at

17   Brown, it is essential you understand the values and

18   principles of our community?

19   **A.**   Yes.  That's what it says.

20   **Q.**   So as you took this, you understood that this was

21   your introduction to the principles of the Brown

22   community?

23   **A.**   That's correct.

24   **Q.**   There was a section in this tutorial, I'm not

25   going to go all through 100 plus questions, but there

1    was a section dealing with sexual assault issues;

2    correct?

3    **A.**   Yes, there was.

4    **Q.**   And question 95 were a series of true/false

5    questions; correct?

6    **A.**   That's correct.

7    **Q.**   And one of those questions asked you to respond

8    true or false if consent may be invalidated if there is

9    coercion, intimidation or threat, or if advantage was

10   gained over someone because of mental or physical

11   incapacity.  Do you recall how you answered that?

12   **A.**   I answered that true.

13   **Q.**   So upon taking this tutorial and introducing

14   yourself to the Brown community standards, you

15   understood that consent could be invalidated if there

16   was coercion?

17   **A.**   Yes, that's correct.

18   **Q.**   But you subsequently in your case challenge the

19   use of the word "coercion.  "Why is that?

20   **A.**   Because "coercion" was used in a different

21   meaning.

22   **Q.**   Than what?

23   **A.**   I'm sorry?

24   **Q.**   Used in a different meaning than what?

25   **A.**   Than it is here.

1    **Q.**    How is it used here?

2    **A.**    Here it's used to indicate force.

3    **Q.**    Does it say that?

4    **A.**    I understood it to mean if there is coercion

5    meaning force, intimidation, threat or if the person is

6    mentally or physically unable to communicate

7    willingness, just as the Code says.

8    **Q.**    Do you recall as part of this tutorial that there

9    was a link to a video?

10    **A.**    I remember seeing the video.  I don't know if it

11    was linked to the tutorial.

12    **Q.**    The name of the video was "Brown Students Ask for

13    Consent;" correct?

14    **A.**    Yes.

15    **Q.**    And you've seen the video more than one time,

16    haven't you?

17    **A.**    I have.

18    **Q.**    How many times have you seen it?

19    **A.**    Seven?

20    **Q.**    Seven times prior to November 10th, 2014?

21    **A.**    No.

22    **Q.**    So you saw it before November 10, 2014, again to

23    the best of your recollection how many times?

24    **A.**    You're asking me how many times I saw it before

25    November --

1    **Q.**   November 10, 2014.

2    **A.**   Approximately three.

3          MR. RICHARD:  Your Honor, I have marked that

4    video as an exhibit in this case and given it to the

5    clerk.  It's a four-minute video, and I'd move for its

6    admission; and with the Court's permission I'd like to

7    just play it and ask the witness a few questions.

8          MR. RATCLIFFE:  No objection.

9          THE COURT:  That's fine.  What exhibit number is

10   it?

11         MR. RICHARD:  I believe it's the last one, your

12   Honor.  It is Exhibit 46.

13         THE COURT:  All right.  Exhibit 46 will be full

14   and you may play it.

15         (Plaintiff's Exhibit 46 admitted in full.)

16         (Video played.)

17   **Q.**   Mr. ███████████, you saw this video when you took

18   the online tutorial?

19   **A.**   I believe so, yes.

20   **Q.**   So you understood at the time you took it that

21   this video was part of values and principles of the

22   Brown community, isn't that true?

23   **A.**   Yes.

24   **Q.**   You saw this video the second time when?

25   **A.**   During orientation.

1    **Q.**   That would have been in September of 2013?

2    **A.**   Yes.

3    **Q.**   And you indicated you may have seen it a third

4    time before November 10, 2014.  Do you recall when that

5    was?

6    **A.**   No.

7    **Q.**   And the video mentions "coercion," does it not?

8    **A.**   Yes.

9    **Q.**   What's your understanding of "coercion"?

10   **A.**   Force or the threat of force.

11   **Q.**   After seeing that video and reading the Code, did

12   you believe that the broad range of behaviors was only

13   the four examples listed within it?

14   **A.**   I believed that the only violations of the Code of

15   Conduct were what was listed in the Code of Conduct.

16   **Q.**   Which were those four examples?

17   **A.**   I believe it was four.

18   **Q.**   You mentioned training at orientation.  What was

19   that?

20   **A.**   First, we sat through a video presentation.  I

21   believe they showed the same video.  Then there was a

22   play, then we went and met with our residential peer

23   leaders and individuals living in our residence halls

24   and filled out another quiz and talked to people in our

25   unit about consent.

1  **Q.**   So the first session was at the Pizzitola Sports

2  Arena?

3  **A.**   That's correct.

4  **Q.**   It was approximately 90 minutes long?

5  **A.**   Approximately.

6       MR. RICHARD:  Your Honor, Exhibit 42.

7       THE COURT:  Any objection?

8       MR. RATCLIFFE:  No objection.

9       THE COURT:  Forty-two will be full.

10       (Plaintiff's Exhibit 42 admitted in full.)

11  **Q.**   Do you recognize this as the orientation pamphlet

12  that you received?

13  **A.**   It was.

14  **Q.**   It's a little difficult to read because of the

15  shading.  I can give you a copy of that.

16  **A.**   Also, Mr. Richard, I apologize.  I don't actually

17  know if that video was linked to the quiz we filled out

18  online.  I'm not entirely certain that that was the

19  case.

20  **Q.**   But you recall seeing it at least twice before

21  November 10th?

22  **A.**   Absolutely.  Absolutely.

23       MR. RICHARD:  Your Honor, may I approach just to

24  give the witness a hard copy?

25       THE COURT:  Yes.

1    **Q.**    Do you recall the "Speak About It" presentation?

2    **A.**    Yes.

3    **Q.**    That was the play?

4    **A.**    Yes, it was.

5    **Q.**    Okay.  And one of the topics that it addressed was

6    how to negotiate consent; correct?

7    **A.**    Yes.  That's what pretty much the whole play was

8    about.

9    **Q.**    What specifically do you recall about how they

10    presented the negotiation of consent?

11    **A.**    The only skit I really remember from that play is

12    one where there was a drunk student and they said that

13    consent can't be obtained through incapacitation.

14    **Q.**    Did the play have any discussion about coercion?

15    **A.**    Not that I can remember.

16           MR. RICHARD:  One minute, your Honor, just to

17    find an exhibit.

18           THE COURT:  Sure.

19    **A.**    It may have.  It was certainly referenced during

20    the presentation overall.  In the video, at least.  I

21    just don't know if it was in the play.

22    **Q.**    Okay.  But you remember the presentation as a

23    whole to address issues of coercion?

24    **A.**    Sure.

25    **Q.**    And your recollection is only if there was

1  intimidation or threat of force I believe is your

2  definition?

3  **A.**   Or use of force.

4  **Q.**   During the presentation, was there a PowerPoint?

5  **A.**   Yes, there was.

6  **Q.**   And do you recall during the PowerPoint there was

7  a slide about "Brown Students Ask for Consent"?

8  **A.**   I did.  They printed the slide out and posted it

9  throughout campus.

10        MR. RICHARD:  This is Exhibit 43.  It's the

11  PowerPoint presentation.  It's a full exhibit, but I

12  only intend to ask about the last page.

13        MR. RATCLIFFE:  No objection.

14        THE COURT:  Is 43 the entire PowerPoint?

15        MR. RICHARD:  Your Honor, I would just intend to

16  introduce the last page.

17        MR. RATCLIFFE:  Why don't we just mark the whole

18  thing.

19        THE COURT:  Just put the whole thing in and then

20  you can focus on the last page.

21        (Plaintiff's Exhibit 43 admitted in full.)

22  **Q.**   This slide was presented at the orientation?

23  **A.**   Yes.  It was the last one, I believe.

24  **Q.**   And do you recall what was discussed about it?

25  **A.**   During the presentation, they gave examples of

1    things to say to your partner listed in the bubble.

2    **Q.**    And you've seen this all around campus; correct?

3    **A.**    Yes.

4    **Q.**    And you saw it around campus prior to November

5    10th, 2014; correct?

6    **A.**    I don't remember.

7    **Q.**    You certainly saw it at orientation?

8    **A.**    On the slide show, yes.

9    **Q.**    In addition to the bubbles, there is the statement

10   at the bottom.  It says, (Reading:)  This is meant to

11   help manage people take care of themselves and each

12   other.  People who do not have good intentions may

13   manipulate the language of consent to hurt someone.

14           Have you ever seen that language?

15   **A.**    That's what it says on the slide.

16   **Q.**    Have you ever seen it?

17   **A.**    I don't understand.

18   **Q.**    Well, the slide references manipulation; correct?

19   **A.**    It mentions manipulation in the language of

20   consent, yes.

21   **Q.**    And your position in this case is that the word

22   "manipulation" had no role in the broad range of

23   behaviors subject to Offense III?

24   **A.**    That's correct.

25   **Q.**    There's a website listed in the bottom right-hand

1    corner.  Have you ever viewed that website?

2    **A.**   I don't remember.

3    **Q.**   Do you know if Brown published its materials to

4    students about issues of sexual assault?

5    **A.**   Yes, it does.

6    **Q.**   Consent?

7    **A.**   Yes.

8    **Q.**   Is it online?

9    **A.**   Yes, it is.

10   **Q.**   Have you ever viewed it?

11   **A.**   Yes.  I don't know what the website was, though.

12   I Googled the policies by name.

13   **Q.**   And again, based upon viewing the information on

14   those websites, it's your understanding that the broad

15   range of behaviors could only include four cited --

16   **A.**   I'm sorry.  Are you referring to the 2014-2015

17   Code?

18   **Q.**   Yes.

19   **A.**   Yes.

20   **Q.**   After the session at the Pizzitola Center, was

21   there an additional session?

22   **A.**   Yes, there was.

23   **Q.**   What was that?

24   **A.**   As I mentioned earlier, we met with our RPLs and

25   people in our unit and we talked about consent, filled

1    out another quiz.

2    **Q.**    And what did they talk about consent?

3    **A.**    We talked about how sexual encounters required

4    consent and what would constitute a non-consensual

5    encounter.

6    **Q.**    And do you recall that I showed you a copy of the

7    quiz at your deposition; correct?

8    **A.**    Yes, I do.

9    **Q.**    And one of the topics that that quiz addressed is

10   giving and receiving consent is a continuous process

11   and one where both parties are actively and

12   enthusiastically involved in the decision-making.

13         Is that correct?

14   **A.**    Yes, that's what it said.

15   **Q.**    So do you recall any discussion at the training

16   about consent being a continuous process?

17   **A.**    Yes.

18   **Q.**    How long was that session?

19   **A.**    About 40 minutes.

20   **Q.**    So between the Pizzitola Center presentation and

21   the follow-up smaller unit sessions, it was

22   approximately two plus hours?

23   **A.**    Yes.

24   **Q.**    Did you ever receive any additional training at

25   Brown concerning the issue of consent in sexual

1    relations?

2    **A.**    Yes, I did.

3    **Q.**    When did that occur?

4    **A.**    Either in the spring of my freshman year or the

5    fall of my sophomore year.

6    **Q.**    And that was before November 10th, 2014?

7    **A.**    Yes, it was.

8    **Q.**    And didn't that session also address the issue of

9    coercion?

10    **A.**    I don't remember.  I believe so.  Yes, it did.  It

11    did.

12    **Q.**    So based upon all of the training that you

13    received prior to November 10th, 2014, was it your

14    understanding that the word "coercion" did not fall

15    within the broad ranges of behavior that fell under

16    Offense III?

17    **A.**    It depends how you define the word.  I'm sorry.

18    It depends.

19    **Q.**    Depends on what?

20    **A.**    How you define the word.

21    **Q.**    Was there ever any discussion of "manipulation" at

22    any of these trainings?

23    **A.**    Not that I recall.

24    **Q.**    I believe you testified on your direct examination

25    that men and women have different perspectives on

1    consent?

2    **A.**    No.  I said sex, I believe.

3    **Q.**    Sex?  Did they have different perspectives on

4    consent?

5    **A.**    I don't think so.

6    **Q.**    And at the hearing panel, you felt that you did

7    not have a fair panel because there were three women

8    there; correct?

9    **A.**    Yes.  Partially.

10   **Q.**    Isn't it true that one of those women panelists

11   voted to find you not responsible?

12   **A.**    Yes, that's true.

13   **Q.**    And in your appeal, isn't it true that one of the

14   women panelists voted to grant your appeal on

15   procedural grounds?

16   **A.**    That's true.

17        MR. RICHARD:  One moment, your Honor.

18        THE COURT:  Yes.

19        (Pause.)

20        MR. RICHARD:  No further questions, your Honor.

21        THE COURT:  Thank you.

22        Is there any further redirect?

23        MR. RATCLIFFE:  Just one.  I want to just

24   publish and just have Beau identify the rest of Exhibit

25   43.

1        **REDIRECT EXAMINATION BY MR. RATCLIFFE**

2    **Q.**   So these were the slides that were shown at

3    orientation; is that correct?

4    **A.**   Yes.

5    **Q.**   So the first one was just this way?  Does Brown --

6    Brown always puts Brown on everything they have, right?

7    **A.**   Yes.

8    **Q.**   The next slide was they give you an overview of

9    Rhode Island law.

10   **A.**   That's correct.

11   **Q.**   First degree sexual assault, second degree sexual

12   assault?

13   **A.**   That's correct.

14   **Q.**   Do you recall sitting there and them telling you

15   about if you sexually penetrate someone with force,

16   that could be first degree sexual assault under Rhode

17   Island law; correct?

18   **A.**   Absolutely.

19   **Q.**   And that if you have physical contact of a sexual

20   nature without consent, you know, basically touching

21   certain parts, that could be second degree sexual

22   assault, right?

23   **A.**   Yes.

24   **Q.**   They went on to talk about what "mentally

25   incapacitated" is; correct?

1    **A.**    They did.

2    **Q.**    Physically helpless?

3    **A.**    Yes.

4    **Q.**    Then the final slide before the talking heads

5    part, they actually published Brown's Sexual Misconduct

6    Policy, did they not?

7    **A.**    Yes, they did.  That's Section III and the comment

8    from the 2014 -- or I guess the 2013-2014 Code.

9              MR. RATCLIFFE:  Nothing further.

10             MR. RICHARD:  May I ask one question, your

11   Honor?

12             THE COURT:  Certainly.

13             **RECROSS-EXAMINATION BY MR. RICHARD**

14   **Q.**    After Brown showed the students the sexual

15   misconduct policy, was the next topic the talking head

16   slide?

17   **A.**    Yes.

18             MR. RICHARD:  No further questions.

19             THE COURT:  Could you leave that slide up,

20   please.

21             MR. RICHARD:  I'm sorry, your Honor.

22             THE COURT:  Okay.  Thank you.

23             I have some questions for you.  I'm going to

24   refer to you as Beau consistent with my prior ruling.

25             So let's just start with that slide.  There's

1       the statement at the bottom you were asked a question

2       about, and I don't think I heard a clear answer on

3       that.

4               So the statement says, (Reading:)  This is meant

5       to help well-meaning people take care of themselves and

6       each other in sexual situations.  People who don't have

7       good intentions may manipulate the language of consent

8       to hurt someone.

9               Now, I know you said -- I think you said that

10      you've seen that poster or slide all over campus in

11      different places, right?

12              THE WITNESS:  Yes, your Honor.

13              THE COURT:  And does that include everything on

14      the page, including that statement there at the bottom?

15              THE WITNESS:  To be completely honest, your

16      Honor, I don't really read the fine print on the flyers

17      around campus.  I just recognized the top.  I assume

18      it's the same, but I can't say for certain.

19              THE COURT:  But you've seen the poster around,

20      right?

21              THE WITNESS:  Yes, I have, your Honor.

22              THE COURT:  You're saying you're just not sure

23      you've ever focused on that language at the bottom; is

24      that right?

25              THE WITNESS:  Other than during the PowerPoint

1    presentation.

2            THE COURT:  Okay.  All right.

3            Now, a lot has been made here both before the

4    panel and in this litigation about the claim that the

5    Title IX, so-called Title IX Policy, '15-'16 policy

6    applies a different standard.  I think the words you

7    used was vastly different than the '14-'15 standard.

8            And you have stated that you believe, your

9    understanding of "coercion" as it's used in the

10   '14-'15 -- let me just back up.

11           So your understanding is that "coercion" is

12   included in the '14-'15 sexual misconduct description

13   when it talks about non-consensual physical contact of

14   a sexual nature.  You agree that "coercion" is included

15   in that depending -- if I heard you correctly,

16   depending on how you define "coercion."  Is that what

17   your position is?

18           THE WITNESS:  That's correct, your Honor.  And I

19   define "coercion" as the threat of force or use of

20   force.

21           THE COURT:  All right.  So that's what I want to

22   get to.

23           So your understanding of what Brown's policy is

24   that makes up the contract that you say has been

25   violated in this litigation, your understanding of

1    that, that definition of use of force or intimidation

2    to obtain consent, where did you get that?

3         THE WITNESS:  I'm sorry?

4         THE COURT:  Where did you get that?  Where did

5    you get that definition of "coercion"?  I don't think

6    I've seen that anywhere in these materials.  So where

7    did you get that?

8         THE WITNESS:  From the training I received.

9    That was what I understood it to mean.  It was always

10   used synonymously with force or threat of force.

11        THE COURT:  Okay.  So we've gone through the

12   training that you received, the PowerPoint and the

13   questions that you answered, right?

14        THE WITNESS:  Yes.

15        THE COURT:  Consent may be invalid if there is

16   coercion, intimidation or threat or if advantage is

17   gained because a person is mentally or physically

18   unable to communicate willingness.  That roughly

19   correlates with the comment to III of the '14-'15

20   policy, roughly.  I don't see this definition of use of

21   force or intimidation as a definition of "coercion".

22        Where in the training or the PowerPoints or the

23   questions and answers or the policy, where are you

24   getting that?

25        THE WITNESS:  Sure.  Well, in the 2014-2015

1    Code, the only difference between that and the answer

2    to the online quiz that you've just referred to is the

3    difference between the word "coercion" and "force."  So

4    I assumed in that case that the words were used

5    interchangeably.

6         Additionally, in other trainings that I've

7    received, the safe training issued to my fraternity for

8    an hour, the discussions with the RPLs as well as the

9    discussions during the 90-minute presentation use

10   "coercion" as a word that meant force or threat of

11   force.  That's how I understood it.

12        THE COURT:  Well, all I know and all I can make

13   a decision on is the evidence that's in the record.

14   All right?

15        So you're saying that the word "coercion" and

16   the word "force" have been used interchangeably?  Is

17   that what you're saying?

18        THE WITNESS:  Yes.  Force is a mechanism of

19   coercion.

20        THE COURT:  Well, sure.  It is a mechanism of

21   coercion.  It could be.  But I'm trying to get at where

22   the definition comes from, that force -- your

23   definition, as I understand it and as you have stated

24   it, is the use of force or intimidation to obtain

25   consent, right?

1          THE WITNESS:  Yes, your Honor.

2          THE COURT:  So the words I've seen in this,

3     let's take this question and answer tutorial.  It says,

4     Coercion, intimidation, threat.  So it uses the word

5     "coercion" separately from the word "intimidation."

6          THE WITNESS:  That's correct.

7          THE COURT:  Right?  The word "force" isn't

8     mentioned anywhere in here, right?

9          THE WITNESS:  That's correct, your Honor.

10         THE COURT:  So, again, how do you get to this

11    definition that coercion can only be the use of force

12    or intimidation?

13         THE WITNESS:  My understanding was that the way

14    that the Code defined it -- or not defined it but that

15    the Code prohibited using force, threat, intimidation

16    to obtain consent and that the word "coercion" used to

17    reference that can refer to using force, threat or

18    intimidation.

19         THE COURT:  So is it your position in this

20    litigation and in the hearing before the panel that

21    methods of coercion to obtain consent that don't

22    involve force or intimidation are permitted under

23    Brown's policy?

24         THE WITNESS:  Under the 2014-2015 Code of

25    Student Conduct, yes.

1          THE COURT:  You believe that's the standard?

2          THE WITNESS:  Yes.

3          THE COURT:  Okay.  So let me ask you a couple of

4    questions then.

5          If one student offers another student $1,000 to

6    have sex with him, is that permitted under the 2014-'15

7    policy?

8          THE WITNESS:  I don't know.

9          THE COURT:  Well, I'm asking you.  I'm asking

10   what your view is, what your expectations are of that

11   policy.

12         THE WITNESS:  I don't know if there are other

13   relevant sections that might apply, but pursuant to

14   Section III, yes, it would not constitute -- I

15   apologize.  No, it would not constitute a violation.

16         THE COURT:  So in your view that would not

17   constitute a violation.  Under this section, let's put

18   aside any other sections.  We're talking about this

19   section.

20         This section talks about non-consensual contact,

21   physical contact of a sexual nature, right?

22         THE WITNESS:  Yes, it does, your Honor.

23         THE COURT:  So what we're talking about is

24   consent.  Something is either consensual or it's

25   non-consensual.

1    THE WITNESS:  That's correct.

2    THE COURT:  So your view if a student offers

3  another $1,000, then that would be consensual?

4    THE WITNESS:  Under Section III of the policy.

5    THE COURT:  Okay.  What if a student offers

6  another student drugs?

7    THE WITNESS:  Again, both instances would

8  probably be violations of Rhode Island law, but in

9  terms of a policy violation, I don't believe that they

10  would be a policy violation under Section III.

11    THE COURT:  Would that answer change at all, the

12  first question about $1,000 or the second question

13  about the drugs, would it change at all if the offering

14  student knew, for example, that the other student was

15  poor, destitute, didn't have any money, came from a

16  really poor family?  Does that change your answer?

17    THE WITNESS:  No.

18    THE COURT:  Okay.  Would it change your answer

19  if he knew the other person was recovering from an

20  addiction and offered drugs?

21    THE WITNESS:  I do not believe it would be a

22  policy violation under Section III, your Honor.

23    THE COURT:  Okay.  What if one student said to

24  another that you can join our fraternity on the

25  condition that you have sex with me?

1          THE WITNESS:  That sounds certainly immoral,

2   might be a hazing violation, but I don't believe it

3   would be a violation of Section III.

4          THE COURT:  What about if a student says to

5   another I'll vote for you for captain of the team but

6   you have to have sex with me?

7          THE WITNESS:  I'm not sure.  Whereas if the

8   hypothetical were if you don't have sex with me then I

9   won't vote for you might constitute a threat.

10          THE COURT:  So that's the corollary.  If you

11   don't have sex with me then I'll vote for somebody

12   else?

13          THE WITNESS:  That might constitute a threat,

14   yes, your Honor.

15          THE COURT:  So the question in all of these

16   hypotheticals, if sex occurs between the two people in

17   any of those hypotheticals, is the sex consensual under

18   the '14-'15 policy?

19          THE WITNESS:  I'm sorry.  What was the question?

20   I apologize.

21          THE COURT:  The question is if sex occurs

22   between two people in any of the hypothetical examples

23   I've given you, is that sex consensual under the

24   '14-'15 policy?

25          THE WITNESS:  With the exception of the last

1    answer, which I'm not sure about, yes.

2         THE COURT:  Okay.  And you believe that is an

3    accurate description of what the community standards of

4    Brown as reflected in all of these materials was under

5    the '14-'15 policy?  That's what you -- that's how you

6    interpreted all of these materials, the policy itself

7    as well as the ancillary materials you've just been

8    asked a bunch of questions about?

9         THE WITNESS:  I'm not sure I understand your

10   question.  If you could rephrase.

11        THE COURT:  What you just expressed, that all of

12   those situations would not be a violation of the

13   '14-'15 policy with the possible exception of the last

14   one involving the vote for captain of the team, you

15   believe that that is consistent with both the '14-'15

16   policy as well as all the ancillary materials, training

17   materials that you've been asked all these questions

18   about?

19        THE WITNESS:  I don't believe that all of those

20   scenarios would follow the training materials

21   precisely.  However, none of them would be a violation

22   of the 2014-2015 Code of Student Conduct Section III.

23        THE COURT:  So wait a second.  You think those

24   examples could be inconsistent with the training but

25   consistent with or not violative of the policy?

1          THE WITNESS:  I don't remember all of the

2     examples so I was thinking of them in terms of

3     violations of the policy because it's my contention

4     that there were some instances of training that were

5     not necessarily directly from the policy but rather

6     suggestions from the Brown Health Services as to what

7     students should do, not necessarily what would

8     constitute a policy violation.

9          THE COURT:  Well, isn't what you learned in

10     orientation and received as information from all the

11     different training offices, whether it's Health

12     Services or Title IX or Student Life, it all

13     constitutes a reflection of what the standards are of

14     the community, doesn't it?

15          THE WITNESS:  Yes.

16          THE COURT:  So your expectation has to be

17     consistent, or one would think it would be consistent

18     with not just the policy but what you're told the

19     policy means under the standards of the University,

20     right?

21          THE WITNESS:  I apologize.  I'm not sure I

22     followed that.

23          THE COURT:  Okay.  Well, we're talking here

24     about your expectations as a party to a contract with

25     the University.  And you have expectations that are

1    based on what's in the policy on student conduct.

2           THE WITNESS:  Right.

3           THE COURT:  But the attorneys have been

4    presenting evidence of other things that reflect what

5    that contract, what that policy means that would go

6    into what your expectation was.  Do you follow me?

7           THE WITNESS:  I'm following you, yes.

8           THE COURT:  So all of these things that have

9    been made part of the evidence are what reasonably make

10   up your expectation as to what this policy means,

11   right?

12          THE WITNESS:  I was under the understanding that

13   the only policy violations that a student could be

14   tried for are those in the Code of Student Conduct.

15          THE COURT:  So are you saying that all of this

16   training and the material is irrelevant if it goes

17   beyond what you believe the language of the policy is?

18          THE WITNESS:  It's certainly not irrelevant.  I

19   think it's something that students should follow but

20   it's not a policy violation.

21          THE COURT:  Okay.  So I guess I'm just a little

22   confused because you seem to be saying on one hand that

23   the term "coercion" is -- your definition of it derives

24   from both what's in the language of the policy, but

25   also from the way in which that term is used or the

1    words that it is combined with in these other training

2    materials.  But then you also seem to be saying that if

3    these training materials say something beyond what's in

4    the language of the policy, then they don't apply or

5    they don't matter.

6         So I'm a little confused by your answer so why

7    don't you try to clarify that for me.

8         THE WITNESS:  Sure.  So my understanding is that

9    "coercion," as I understand it, means force or the

10   threat of force, that those two things specifically

11   constitute policy violations at Brown University

12   pursuant to Section III of the 2014-2015 Code of

13   Student Conduct.

14        I've understood in this case that coercion has

15   been used separately with a different meaning by Djuna

16   Perkins as well others to mean manipulation or

17   something other than the way that the Code defines

18   violations of Section III.  Meaning that Djuna Perkins

19   used "coercion" to refer to manipulation, which is

20   included in the 2015-2016 Title IX Policy, which was

21   not included in the 2014-2015 Code of Student Conduct.

22        So when she referred to "coercion," she was

23   referring to manipulation.  Whereas when I used the

24   word "coercion," or the word "coercion" was used in

25   training materials, it was referred to, or rather I

1    perceived it to be referred to as force or the threat

2    of force, which is consistent with the Code that we

3    were told to follow.

4              THE COURT:  Okay.  That's all I have.

5              Do either of you wish to follow-up?

6              MR. RICHARD:  I have no questions, your Honor.

7              MR. RATCLIFFE:  No further questions.

8              THE COURT:  Okay.  You can step down.  Thank you

9    very much.

10             THE WITNESS:  Yes, your Honor.

11             THE COURT:  All right.  We're probably at a

12   pretty good time to break for the day.  So we can go

13   off the record.

14             (Discussion off the record.)

15             (Adjourned at 4:40 p.m.)

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

        I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on August 5, 2016, and incorporating redactions of personal identifiers requested by the following attorney of record:  J. Richard Ratcliffe, in accordance with the Judicial Conference policy.  Redacted characters appear as a black box in the transcript.


                /s/ Anne M. Clayton
        _____
             Anne M. Clayton, RPR


             August 29, 2016
        _____
                Date