UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                               )
JOHN DOE,                      )
                               )
          Plaintiff,           )
                               )
          v.                   )      C.A. No. 16-017 S
                               )
BROWN UNIVERSITY,              )
                               )
          Defendant.           )
_____)
```

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

WILLIAM E. SMITH, Chief Judge.

This case arises out of a disciplinary proceeding in which Brown University ("Brown" or "University") found John Doe ("John" or "Doe") responsible for sexual misconduct against fellow student Ann Roe ("Ann").[1] The parties agreed to waive the jury demand and hold an expedited consolidated bench trial on both the merits of Plaintiff's case and his request for a preliminary injunction, which was conducted on July 19-22, 2016. The parties submitted Proposed Findings of Fact and Conclusions of Law (ECF Nos. 50 ("Doe's Post-Trial Brief") and 55 ("Brown's Post-Trial Brief")), and the Court heard closing arguments on

---

[1] Prior to trial, Doe filed a motion to proceed pseudonymously (ECF No. 48), which the Court granted. The parties agreed to use the students' true first names at trial for the convenience of the witnesses; however, in spite of the fact that it is arguably paternalistic, to preserve the students' anonymity, the Court uses "John Doe" for Plaintiff and "Ann Roe" for the alleged victim throughout its Findings of Fact and Conclusions of Law.

August 16, 2016.  On August 23, 2016, the Court found that Doe "is likely to succeed (at least partially) on the merits of his breach of contract claim" and issued a preliminary injunction, allowing John to return to Brown for the fall semester under the same conditions previously imposed.  (Preliminary Injunction Order 2, ECF No. 57.)

It is important to make it unequivocally clear at the outset that the Court's only role in this case is to determine whether Doe's disciplinary "process [was] carried out in line with [the Plaintiff] student's reasonable expectations" based on the policies in place at the time of the incident.  <u>Havlik v. Johnson & Wales Univ.</u>, 509 F.3d 25, 34 (1st Cir. 2007).  It is not the Court's role to determine the facts of what happened between John and Ann; to decide whether the Court would have, in the panel's position, found John responsible for sexual misconduct; to evaluate whether the Court would have made the same judgment calls on evidence and other issues as Brown did; or to determine whether the procedure John received was optimal. This Court is not a super-appeals court for sexual misconduct cases, nor is it an advisor to Brown on how it should handle these messy and unfortunate situations.

Moreover, the Court is an independent body and must make a decision based solely on the evidence before it.  It cannot be swayed by emotion or public opinion.  After issuing the

preliminary injunction this Court was deluged with emails resulting from an organized campaign to influence the outcome. These tactics, while perhaps appropriate and effective in influencing legislators or officials in the executive branch, have no place in the judicial process. This is basic civics, and one would think students and others affiliated with a prestigious Ivy League institution would know this. Moreover, having read a few of the emails, it is abundantly clear that the writers, while passionate, were woefully ignorant about the issues before the Court. Hopefully, they will read this decision and be educated.

Although a very close call, for the reasons explained below, the Court finds that certain procedures Brown employed in conducting Doe's hearing fell outside of a student's reasonable expectations based on the Code of Student Conduct at Brown University 2014-15 (the "2014-15 Code"), and that these procedural errors likely affected the panel's decision in Doe's case.[2] Accordingly, Doe is entitled a new hearing that remedies these infirmities. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law. To the extent that any finding of

---

[2] This is not to say that the Court passes judgment on whether the <u>outcome</u> – that Doe was found responsible – was an error. The Court makes no finding as to Doe's responsibility; that is for the Brown panel to decide if it chooses to re-present the matter after correcting the errors cited.

fact reflects a legal conclusion, it should be to that extent deemed a conclusion of law, and vice versa.

I.   Findings of Fact

A.   Doe's Enrollment and Orientation at Brown

Doe applied for admission to Brown in the spring of 2013. (Trial Tr., vol. II, 186:15-16, ECF No. 52.)  He was accepted, chose to enroll, and his family prepaid four years of tuition, totaling $177,600.  (Id. at 187:2-20.)

Prior to arriving on campus, Doe completed Brown's 2013 New Student Tutorial ("Tutorial"), which dealt with sexual encounters and relationships and was required for all incoming students.  (Id. at 209:18-23.)  While completing the Tutorial, Doe watched a video entitled "Brown Students Ask For Consent." (Id. at 212:13-15, 213:18-20; Ex. 46.)  In the video, Brown students are interviewed and answer a series of questions: "What is consent?"; "What is not consent?"; "Do you have consent?"; and "How do you ask for consent?"  (Brown Students Ask for Consent Video, Ex. 46.)  The students' responses to these questions included the following:

> Consent is asking and hearing a yes. . . . Consent is active, not passive.  It means being fully engaged and not just going along.  Consent is giving permission without feeling pressured. . . . I do not obtain consent by pressuring someone, by threatening someone, by coercing someone, or by forcing someone. . . . Not now, means no.  No does not mean keep trying.  It means stop. . . . I'm not sure I'm ready, means no. .

> . . Silence is not consent.  People sometimes freeze
> and cannot speak.  The absence of yes, means no.

(Id.)  Doe testified at trial that he understood that the video stated values and principles of the Brown community.  (Trial Tr., vol. II, 213:21-24, ECF No. 52.)

Doe also completed a series of questions with the Tutorial. Question 95, section 4.7 of the Tutorial instructed Doe to provide "True" or "False" responses to a series of statements. Doe responded "True" to the following "statement[] about sexual consent": "Consent may be invalid if there is coercion, intimidation, or threat, or if advantage is gained because a person is mentally or physically unable to communicate unwillingness."  (Tutorial 23, Ex. 40; Trial Tr., vol. II, 211:5-13, ECF No. 52.)  Doe testified that, by completing the Tutorial, he understood that under Brown's community principles, coercion may invalidate consent.  (Trial Tr., vol. II, 211:14-18, ECF No. 52.)  However, he understood coercion to require "force or threat of force."  (Id. at 214:10-11.)

Doe attended freshmen orientation at Brown in the fall of 2013.  (Id. at 187:21-23.)  As part of the orientation, Doe was provided with a copy of the Code of Student Conduct at Brown University 2013-2014 (the "2013-14 Code"), which he reviewed. (Id. at 187:24-188:5.)  Doe also attended a 90-minute session about consent, during which he again watched the "Brown Students

Ask for Consent" video. (Id. at 213:25-214:3, 214:19-22.) The presentation included a PowerPoint, the last slide of which was likewise titled "Brown students ask for consent" and depicted statements and questions relating to consent (e.g., "I'd like to talk about this first," "Are you okay with this?," "If you change your mind, we'll stop."). (Id. at 217:5-6; Brown Consent Presentation 6, Ex. 43.) This slide was also made into a flyer and posted around campus. (Trial Tr., vol. II, 218:3-4, 225:20-22, ECF No. 52.) The bottom of the slide has a sentence in small print that states: "This is meant to help well-meaning people take care of themselves and each other in sexual situations. People who don't have good intentions may manipulate the language of consent to hurt someone." (Trial Tr., vol. II, 225:5-9, ECF No. 52; Brown Consent Presentation 6, Ex. 43.) Other than this quote, Brown did not present any evidence that "manipulation" was addressed at the orientation.

In addition to the 90-minute presentation, Doe participated in a smaller group interactive session about sexual relationships and consent, which was hosted by residential peer leaders and lasted about 40 minutes. (Trial Tr., vol. II, 219:21-220:20, ECF No. 52.) Prior to November 10, 2014, Doe attended another training session at Brown addressing consent in sexual relationships. (Id. at 220:25-221:8.) The training included a discussion of the impact of coercion upon consent.

(Id. at 221:9-12.) However, there was no discussion of manipulation at any of these trainings. (Id. at 221:22-24.)

B.    The 2014-15 Code of Student Conduct

Doe completed his freshman year and re-enrolled in the fall of 2014, at which time Brown emailed him the 2014-15 Code. (Id. at 188:18-189:4.) The 2014-15 Code prohibits sexual misconduct as follows:

III. Sexual Misconduct

a.    Sexual Misconduct that involves non-consensual physical contact of a sexual nature.

b. Sexual Misconduct that includes one or more of the following: penetration, violent physical force, or injury.

Comment: Offense III encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity or impairment of which the offending student was aware or should have been aware. Harassment, without physical contact, will not be deemed sexual misconduct under these provisions. Violations of Offense IIIb will result in more severe sanctions from the University, separation being the standard. Note: Some forms of sexual misconduct may also constitute sexual assault under Rhode Island criminal laws and are subject to prosecution by State law enforcement authorities – which can take place independent of charges under the University's Student Code of Conduct.

(2014-15 Code 4, Ex. 2.)[3] The Code also notes that its comments "are offered as a guide to understanding the University's

---

[3]    Section III and the definition of sexual misconduct are identical in the 2013-14 and 2014-15 Codes of Student Conduct. (Compare 2014-15 Code 5, Ex. 2, with 2013-14 Code 4, Ex. 1.)

policies, and are not to be confused with the policies themselves. As such these comments are not binding upon the University or its designated representatives." (Id. at 3 n.1.) Doe read the 2014-15 Code in its entirety. (Trial Tr., vol. II, 199:18-20, ECF No. 52.)

Doe claims that his interpretation of the "broad range of behaviors" identified in the Comment to Section III only includes conduct enumerated in the Comment, namely force, threat, intimidation, or incapacitation (Id. at 201:17-24.) He admitted at trial that, under his interpretation, offering a poor student $1,000 or a recovering drug addict drugs in exchange for sex would not be considered sexual misconduct. (Id. at 229:20-232:4.)

The 2014-15 Code also gives students a number of rights in disciplinary proceedings, including "[t]o be assumed not responsible of any alleged violations unless she/he is so found through the appropriate student conduct hearing" and "[t]o be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." (2014-15 Code 7, Ex. 2 (emphasis added).) Regarding appeals, the 2014-15 Code states:

> Appeals will normally be considered only when: (1) there is relevant new evidence that was not reasonably available to be presented to the original hearing authority and that in the judgment of the Appeal Officer the introduction of the information may have

changed the finding by the original hearing authority;
or (2) when a substantial procedural error by the
University or hearing body/officer is demonstrated and
in the reasonable judgment of the Appeal Officer such
error is sufficient enough that it may have affected
the decision of the original hearing authority.

(Id. at 10-11.)

C. The Sexual Assault Task Force and the New 2015-16
Title IX Policy and Complaint Process

During the fall 2014 semester, Brown convened a Task Force
on Sexual Assault ("Task Force"), which included members of
Brown's administration, faculty, and student body, to review
Brown's practices, policies, and procedures addressing issues of
sexual assault and sexual misconduct. (Trial Tr., vol. I,
144:25-145:12, ECF No. 51; Trial Tr., vol. IV, 125:10-21, ECF
No. 53.) Based on the Task Force's recommendations, in the fall
of 2015, Brown adopted a new Sexual and Gender-Based Harassment,
Sexual Violence, Relationship and Interpersonal Violence and
Stalking Policy ("Title IX Policy") (Ex. 4). (Trial Tr., vol.
I, 147:24-148:13, ECF No. 51.)

The Title IX Policy defines "consent" as follows:

Consent is an affirmative and willing agreement to
engage in specific forms of sexual contact with
another person. Consent requires an outward
demonstration, through mutually understandable words
or actions, indicating that an individual has freely
chosen to engage in sexual contact. Consent cannot be
obtained through: (1) manipulation; or (2) the use of
coercion or force; or (3) by taking advantage of the
incapacitation of another individual.

Silence, passivity, or the absence of resistance does not imply consent. It is important not to make assumptions; if confusion or ambiguity arises during a sexual interaction, it is essential that each participant stops and clarifies the other's willingness to continue.

Consent can be withdrawn at any time. When consent is withdrawn, sexual activity must cease. Prior consent does not imply current or future consent; even in the context of an ongoing relationship, consent must be sought and freely given for each instance of sexual contact.

An essential element of consent is that it be freely given. Freely given consent might not be present, or may not even be possible, in relationships of a sexual or intimate nature between individuals where one individual has power, supervision or authority over another. More information, policy and guidance regarding such relationships can be found below.

In evaluating whether consent was given, consideration will be given to the totality of the facts and circumstances, including but not limited to the extent to which a complainant affirmatively uses words or actions indicating a willingness to engage in sexual contact, free from manipulation, intimidation, fear, or coercion; whether a reasonable person in the respondent's position would have understood such person's words or acts as an expression of consent; and whether there are any circumstances, known or reasonably apparent to the respondent, demonstrating incapacitation or fear.

(Title IX Policy 6-7, Ex. 4.) Coercion is defined as "verbal and/or physical conduct, including manipulation, intimidation, unwanted contact, and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to compel someone to engage in sexual contact." (Id.

at 7.) Unlike the Title IX Policy, the 2014-15 Code did not give a specific definition of consent. (Trial Tr., vol. II, 79:6-17, ECF No. 52.) When adjudicating student disciplinary cases involving sexual misconduct charges under the 2014-15 Code, the Student Conduct Boards would look to available sources to define "consent" for purposes of their deliberations, including the dictionary and Brown's sexual education website. (Id. at 75:11-76:11.)

In the fall of 2015, Brown also adopted a new Complaint Process Pursuant to the Title IX Policy ("Complaint Process") (Ex. 3), which delineates the procedures for the receipt, investigation, and informal and formal resolution of complaints alleging student sexual misconduct. (Trial Tr., vol. II, 4:5-24, ECF No. 52.) Unlike the previous model where evidence was presented directly to a hearing panel, the new Complaint Process uses an "investigator model" for handling sexual misconduct cases. (Trial Tr., vol. I, 38:1-12, ECF No. 51.) Under this model, there is a single investigator, whose role is to gather "information through interviews of the complainant, respondent, and witnesses and synthesize the information in a report." (Complaint Process 3, Ex. 3.) "The investigator has the discretion to determine the relevance of any witness or other evidence and may exclude information in preparing the investigation report if the information is irrelevant,

immaterial, or more prejudicial than informative." (Id.) The Complaint Process dictates that "[t]he investigator's report will include credibility assessments based on their experience with the complainant, respondent, and witnesses, as well as the evidence provided." (Id. at 4.) However, it also states that "[t]he investigator will not make a finding or recommend a finding of responsibility." (Id.) The investigator model has become increasingly popular among colleges and universities, particularly "peer institutions of Brown." (Trial Tr., vol. II, 57:15-20, ECF No. 52.)

Under the Complaint Process, Brown has established a Title IX Council to adjudicate charges and review appeals. (Complaint Process 5-6, Ex. 3.) At the hearing to adjudicate charges, the Chair of the Title IX Council presides as a non-voting panelist and three members of the Title IX Council preside as voting panelists. (Id. at 5.) The Title IX Council Chair "is responsible for the administration of the hearing process, including procedural matters and decisions leading up to the hearing, determinations about information that will be considered or not, appropriate and inappropriate lines of questioning, and the overall decorum and conduct of the proceedings." (Id.) The panel's role is "to review the information presented in the investigation report and to determine if an individual or individuals violated the

University policy (and, if yes, to determine an appropriate sanction)." (Id.)

During the hearing, the panel "convene[s] with the investigator (although the Chair has the discretion to determine if a meeting with the investigator is not necessary)" and raises any questions regarding the investigator's report. (Id.) The complainant and respondent are not allowed in the hearing room during this phase of the proceeding. (Id.) The panel may also request to hear from one or more witnesses, however, the Chair has complete discretion to approve or deny those requests. (Id.) The complainant and respondent may appear separately before the panel to make an oral statement regarding the facts and be questioned by the panel. (Id.) Throughout the hearing process, "[t]he presumption is that the investigator has identified and interviewed all relevant witnesses and supplied the information necessary for the hearing panel to render its decision and determine sanctions." (Id.) The panel convenes to deliberate and render a decision, by majority vote, regarding whether or not the respondent has violated University policy by a preponderance of the evidence. (Id.) This process marks a significant departure from Brown's former adjudication system, in which the panel would review all of the evidence and hear the witnesses live, and then make findings. (Trial Tr., vol. IV, 139:21-140:14, ECF No. 53.)

Under the Complaint Process, Brown seeks to complete the investigation and the panel hearing within 60 days in accordance with guidance from the Department of Education's Office for Civil Rights ("OCR"). (Id. at 6-7; Trial Tr., vol. I, 164:5-17, ECF No. 51.) Both the complainant and respondent have the right to appeal a Title IX Council panel's decision "based on the limited grounds of substantial procedural error that materially affected the outcome and/or material, new evidence not reasonably available at the time of the hearing." (Complaint Process 6, Ex. 3.) Each student may file a written response to the other student's appeal. (Id.)

Appeals are reviewed by an appellate panel comprised of the Title IX Council Chair as a nonvoting member and three voting members. (Id.) If the appellate panel grants an appeal based upon a substantial procedural error, the matter will be heard by a new hearing panel. (Id.) If the appellate panel grants an appeal based upon the discovery of new evidence, the matter will be remanded back to the same panel that initially heard the case for reconsideration in light of the new evidence. (Id.) "Following reconsideration, the finding of the hearing panel or the sanction imposed by the decision-maker will be final and not subject to further appeal." (Id.)

D.    Selection and Training of Title IX Council Members

Gretchen Schultz, a tenured professor of French Studies, serves as the Title IX Council Chair. (Trial Tr., vol. II, 29:5-12, ECF No. 52; Trial Tr., vol. IV. 30:11-13, ECF No. 53.) Schultz previously served on the Task Force and presided on Student Conduct Board panels that adjudicated sexual misconduct charges under the Code. (Trial Tr., vol. IV, 32:19-22, 45:2-5.) Brown's Title IX Council is comprised of faculty, staff, undergraduates, graduate students, and a medical student. (Trial Tr., vol. I, 153:11-16, ECF No. 51.)  Throughout the 2015-16 academic year, Brown's Title IX Officer, Amanda Walsh, oversaw the selection of the Title IX Council. (Id. at 153:10-156:4.)  She attempted to find members who would approach the cases fairly and offer balanced viewpoints. (Id.)

All of the Title IX Council members were required to complete at least five hours of training before becoming eligible to serve on a hearing panel. (Id. at 158:24-159:19.) Walsh presented a two hour training session, which gave an overview of Title IX and Brown's policies and procedures. (Id. at 162:14-163:9; Walsh Title IX Presentation, Ex. 45.)  Walsh testified that she informed panelists that while they may believe a complainant or feel sympathy for him or her, it does not necessarily mean that they should find the respondent to be "responsible." (Trial Tr., vol. I, 169:17-170:10, ECF No. 51.)

Walsh emphasized that a finding of "responsible" must be supported by a preponderance of the evidence. (Id.) During training, panelists were also instructed that they are "supposed to consider all of the evidence." (Trial Tr., vol. III, 45:9-12, ECF No. 54.)

Alana Sacks, a Sexual Harassment & Assault Resources & Education ("SHARE") advocate, presented a training session to Title IX Council members regarding the impacts of trauma on sexual assault victims. (Trial Tr., vol. I, 160:1-16, ECF No. 51.) Brown states that it provided this training to comply with guidance documents issued by OCR, which state that decision-makers in Title IX processes should understand the potential impacts of trauma. (Id. at 160:7-16.) During her presentation, Sacks stated that some reactions of sexual assault survivors might be counterintuitive, for example not being able to recount a consistent set of facts, or "communicating with someone who has assaulted them or having any kind of interaction with someone who has assaulted them." (Tr. of Deposition of Alana Sacks, 72:23-74:11, Ex. 48.)

At another training session, Mark Peters, Brown's Men's Health Coordinator, addressed the social norms and expectations of males. Walsh testified that she chose this session to offer "another point of view or additional contextual information." (Trial Tr., vol. I, 160:17-23, ECF No. 51.) The Title IX

Council members also participated in a mock hearing addressing a fictional disciplinary case. (Id. at 161:14-21.)

E.   Ann's Complaint and Doe's Response

During late September or early October 2015, Ann met with Walsh to discuss an encounter that Ann had with Doe approximately one year prior, in November 2014. (Trial Tr., vol. II, 9:9-19, ECF No, 52.) Ann asked about options available to her. (Id. at 9:20-23.) Walsh reviewed Brown's remedial and safety resources, such as confidential SHARE advocates, the chaplain's office, and counseling and psychological services. (Id. at 9:24–10:5.) Walsh also indicated that Ann may file a report with Brown's Title IX Office, as well as with the Providence Police Department or Brown's Department of Public Safety. (Id. at 10:6-9.)

On Friday, October 30, 2015, Ann filed a complaint in the Title IX Office alleging that Doe had sexually assaulted her on November 10, 2014. (Ann's Complaint, Ex. 5; Trial Tr., vol. I, 32:22, ECF No. 51.) Specifically, Ann alleged the following:

> On November 10, [2014] I got into campus very late due to travel delays. Around 2am, I met [John] at the campus center to watch a movie in a public place. When I arrived at the campus center he brought me back to a secluded room and had his laptop up for the movie. Once he started the movie, he physically grabbed my face to kiss me. I immediately turned my head away to ·indicate my lack of consent and verbally told him that I don't want to kiss him. This also was meant to confirm that his sexual advances were unwanted. Rather than respecting my wishes, [John]

17

kissed me on the cheek and then asked, "may I?" I was upset and confused, so asked, "may I what?" [John] then forced his fingers into my vagina to sexually assault me. I froze and did not respond. In my head, all I could think is that I wanted this to be over with, so when he kept kissing me I didn't resist. During the assault he said, "I know you want to fuck me right now." Fearing he would do more to me, I told him I really couldn't as an attempt to avoid him raping me. He replied, "well at least give me a blowjob then." I repeatedly stated that I did not want to and tried to avoid angering him by stating "I really shouldn't" and "I wasn't sure," but I never wanted to and wanted to leave as soon as possible. [John] kept replying, "I know you want to" and I knew I wasn't going to be able to leave unless it happened. I felt I had no choice to avoid being raped, so submitted to this coercive badgering out of fear and gave him oral sex. At one point, I stopped the oral sex and he said "put my dick back in your mouth." Around 3 a.m., I finally could leave and told him on the way out, that he was the kind of person that makes people do things they don't want to do. He again said, "I know you wanted to" as I was leaving. I then went home in shock and upset about what happened and just wanted to sleep.

(Ann's Complaint 2, Ex. 5.) Ann's Complaint also described and attached numerous text messages that the two students had exchanged leading up to the encounter, many of which are very sexually explicit. (Id. at 1-2; see Text Messages 1-133, Ex. 19.) Ann acknowledged that she had "engaged in some banter" and "discussed a fantasy," but stated that she had made clear that she did not want to have a sexual relationship with John. (Ann's Complaint 1-2, Ex. 5.) Ann's Complaint did not include any text messages from after the incident. (Trial Tr., vol. II, 91:3-6, ECF No. 52.)

18

Walsh promptly contacted Doe to inform him of Ann's Complaint. (Trial Tr., vol. II, 10:10-14, ECF No. 52.) During the evening of Sunday, November 1, 2015, Walsh sent an email to Doe requesting that he meet with her the next day. (Id.) On Monday, November 2, 2015, Walsh met with Doe to discuss Ann's Complaint. (Id. at 10:22-11:12.) Walsh provided Doe with a copy of Ann's Complaint and the Complaint Process; informed Doe that if he needed academic assistance, he should contact Dean Suarez in Brown's Office of Student Life; informed Doe of his right to an advisor; and alerted Doe that he could seek confidential support at Counseling and Psychological Services (CAPS). (Id. at 11:2-22; 11/3/15 Letter from Walsh to Doe, Ex. 6.)

Under the Complaint Process, a respondent has five business days to submit a statement in response to a complaint. (Complaint Process 3, Ex. 3.) Walsh agreed to Doe's request for an extension due to his course work and a mock trial tournament during the response period. (11/3/15 Letter from Walsh to Doe, Ex. 6.) Walsh granted a 24 hour extension, allowing Doe to file his statement by 5 p.m. on Tuesday, November 10, 2015. (Id.; Trial Tr., vol. II, 12:1-12, ECF No. 52.)

On November 10, 2015, Doe filed his statement responding to Ann's Complaint. (Doe's Response to Complaint, Ex. 8; Trial Tr., vol. I, 43:15-22, ECF No. 51.) Doe presented a different

interpretation of the text messages, noting that, based on Ann's participation in explicit sexual banter and discussion of fantasies, "she did appear open to a sexual relationship with me." (Doe's Response to Complaint 2, Ex. 8.) He also had a very different version of the encounter on November 10, 2014, stating that "[Ann] was an active participant, got up two or three times to turn off the lights, and then cuddled with me. Had she been afraid at any point, she could have yelled for help as there were other people in the building, or simply left. She did neither. In fact, she seemed to enjoy herself." (Id. at 4.) According to Doe, he and Ann were "squeez[ing] each other tightly and vigorously kiss[ing]" and "Ann pushed me on my back and got on top of me with her legs straddling me." (Id.) Doe continued, "I reached my hand into Ann's pants after she told me that I could. She subsequently lifted her butt up and pulled her sweatpants down as I helped her. . . . After I finished fingering [Ann] she told me that it was her turn. She unzipped my pants and together we pulled them down to my ankles. She then proceeded to give me oral sex." (Id. at 4-5.) He also noted that "[t]he lights came back on" several times through the encounter, "and each time, Ann got up, turned them off, and came back over to me." (Id. at 4.) Doe further explained that Ann continued to pursue him after November 10, 2014, and that she offered no reasonable explanation for her delay in filing her

Complaint. (Id. at 4-5.) He attached "a complete, unedited log of [their text messages]," noting that the log "begins a day earlier than what Ann provided [with her Complaint] and includes subsequent texts that she deleted from what she provided." (Id. at 1.) These text messages included the following exchange several days after the incident:

> Respondent: Remember to pretend like you didn't give me a mind blowing blowjob [winking emoji]

> Complainant: Only if you remember to pretend you're not imagining fucking the shit out of me the whole time . . .

> Respondent: Only if I pretend like you don't want me to fuck you until you orgasm the whole time

> Complainant: Good. So no one will suspect how much you want to cum inside me in Cali [smiling emoji]

> Respondent: And no one will suspect how much you want me to make you my little slut for a night

> Complainant: Perfect, sounds like we've got a plan [winking emoji] [I]m super pumped for the drunk scrimmage but more excited to see you finally! Haha

(Perkins Report 23, Ex. 18 (quoting Text Messages 134-35, Ex. 19).)

As permitted under the Complaint Process, Ann and Doe retained attorneys to act as their advisors. (Trial Tr., vol. II, 5:16-17, ECF No. 52.) Ann selected Attorney Laura Dunn of SurvJustice, who was assisted by Attorney Myka Held of that organization, and Doe selected Attorney J. Richard Ratcliffe. (Id. at 5:19-25.) Shortly after Doe received Ann's complaint,

Brown informed Attorney Ratcliffe on November 4, 2015 that the University would apply the Complaint Process to investigate and adjudicate the matter. (11/4/15 Email from Michael Grabo to Ratcliffe, Ex. 7.) Because the November 10, 2014 incident between Doe and Ann occurred during the 2014-15 academic year, however, the substantive charges were based on the 2014-15 Code. (Id.)

    F.   The Investigation

Consistent with the Complaint Process, Brown hired an external investigator, Attorney Djuna Perkins, to investigate Ann's allegations and Doe's defenses. (Perkins Engagement Letter, Ex. 9.) Perkins' investigation spanned over four months from her engagement by Brown on November 4, 2015 to the completion of her report on March 12, 2016. (See id.; 3/12/16 Email from Perkins to Doe attaching Final Report, Ex. 17.) Perkins spent 80-100 hours conducting the investigation and drafting her report. (Trial Tr., vol. II, 144:21-25, ECF No. 52.)

Perkins interviewed Ann on November 13, 2015, January 8, 2016, and February 17, 2016. (Perkins Final Report 1, Ex. 18.) She interviewed John on November 19, 2015 and February 2, 2016. (Id.) Between December 3, 2015 and February 12, 2016, Perkins interviewed 11 witnesses identified by Ann and John. (Id. at 1-

2.) She attempted to reach three other witnesses who did not respond or declined to be interviewed. (Id. at 2.)

One of the witnesses whom Perkins interviewed had seen Ann shortly after the incident and recounted the following:

> Witness 1 said she told the Complainant about her day, and then the Complainant said, "Oh my God, I have to tell you something. Do you guys remember that guy [the Respondent] I've been telling you about?" When Witness 1 and the Complainant's roommate said they did, Witness 1 said the Complainant said, "I just hooked up with him. It was like really weird because we were just in Faunce and hooked up." The Complainant told them she and the Respondent had gone to some out-of-the-way room in Faunce and turned the lights off. Witness 1 said the Complainant made the whole thing sound "sexy and cool." Witness 1 said [Ann's roommate] asked if they had sex and the Complainant said, "No, but it was really hot. I mean, you know it wasn't recripocal because he only fingered me – he didn't eat me out — but we might hook up again, I don't know." Witness 1 said the Complainant made it sound as if she wished they had done more. The Complainant also said she had given the Respondent a "blowjob." Witness 1 could not recall if the Complainant provided any other details of their encounter. Witness 1 said when the Complainant told the story, she was her typical "happy, bubbly" self. Witness 1 did not recall the Complainant saying she did not want any of the sexual activity to occur, and never mentioned that the Respondent had pressured her into hooking up or doing any of the things they did.

(Perkins Final Report 16-17, Ex. 18.)

Perkins reviewed and included in her report the entire set of text messages between John and Ann. (Id. at 2-3 n.3.) She also included an excerpt of a set of text messages involving John and another female student (Witness 8), for the limited purpose of corroborating the fact that Ann had put in a "good

word" for John with Witness 8; and an excerpt of text messages
between John and Ann's friend, Witness 9, to be considered "only
to the extent they may shed light on the Respondent's state of
mind on the night of November 10, [2015], and to the extent they
may shed light on the Respondent's claim that the Complainant
conspired with Witness 9 to fabricate the allegations." (Id. at
2-3.)   Perkins reviewed, but elected not to present to the
panel, other text messages between John and Witness 9, and
between John and another female student (Witness 10), due to a
concern that their prejudicial impact would outweigh their
probative value.   (Id. at 3.)   Perkins further declined to
consider communications that John sent to mock trial members and
its governing board during the summer of 2015, again out of
concern about their potential prejudicial impact to him.  (Id.)
Finally, Perkins declined to consider a Facebook posting
provided by Witness 9 because it was not directly relevant to
the allegations in Ann's complaint against John.  (Id.)

As noted above, John claimed that Ann and Witness 9 had a
"conspiracy" to fabricate the claim against him.  He based this
allegation on the following conversation overheard by Witness
11:

> On October 30, 2015, [Witness 11] states that he was
> in the Ratty in line to get food when he recognized
> the Complainant directly ahead of him in line.  The
> Complainant was talking to a female friend.  The
> friend was crying and the Complainant was comforting

her. The friend said, "We failed. We messed up. It
didn't work. Every time we try and get him on
something it doesn't work." Witness 11 states that
several times he heard the Complainant and her friend
say the Respondent's name. He also recalled the
Complainant saying, "We'll get him. My uncle is an
important lawyer in New York and [the Respondent]
can't keep countersuing us." Witness 11 also heard
one of them say, "We'll figure this out, we'll get
[Witness 14] to do something."

(Id. at 28-29.) Ann and Witness 9 described a series of events

leading up to this conversation in which John had behaved badly,

including the violation of a no-contact order. (Id. at 27-29.)[4]

On February 29, 2016, Perkins sent an initial draft of the

investigation report to Walsh for review. (See Perkins Report

First Draft, Ex. 10; 02/29/16 Email Chain between Walsh and

Perkins, Ex. 11.) Walsh responded that day with her red-lined

revisions and comments. (See 02/29/16 Email Chain between Walsh

and Perkins, Ex. 11; Walsh Redline of Draft Report, Ex. 12.) In

a section entitled "Relevant Policy Sections," Perkins' listed:

(1) Offenses VII.A and VII.B and the definitions of consent and

coercion in Brown's Title IX Policy, and (2) Brown's 2014-15

Code. (Perkins Report First Draft 1, Ex. 10.) In her

revisions, Walsh rewrote the language under the "Relevant Policy

Sections" to cite only to Offense III of the 2014-15 Code.

(Walsh Redline of Draft Report 1, Ex. 12.) Walsh stated that

she deleted the citations to the offenses and definitions under

---

[4] For ease of reference, the Court will refer to this
information about John as the "character evidence."

the Title IX Policy because the disciplinary case involved charges against Doe under the 2014-15 Code. (Trial Tr., vol. II, 21:15-19, ECF No. 52.)

Perkins also informed Walsh that "the Respondent's 'conspiracy' claim . . . forced me to include some information about the Respondent's interaction with [Witness 9]. I felt it was important to include some discussion of the claim because he was so adamant about me interviewing [Witness 11] and I think it is this conversation that convinced him there was some sort of conspiracy against him." (02/29/16 Email Chain between Walsh and Perkins 1, Ex. 11.) She added that "if, now that he sees this explanation, he accepts it, I thought it would be easy to simply redact that section so that there is no mention of the [Witness 9]-Respondent interactions." (Id.) Walsh concurred with this decision. (Id.; Trial Tr., vol. II, 23:23 – 24:12, ECF No. 52.)

After receiving Walsh's input, Perkins revised the draft. (Trial Tr., vol. II, 104:16-21, ECF No. 52.) On March 1, 2016, a draft of the investigation report was shared with John and Ann, consistent with the Complaint Process. (See Perkins Report Second Draft, Ex. 13.) On March 4, 2016, John and Ann submitted their comments and proposed revisions to the draft report. (See Ann's Request for Revisions, Ex. 14; John's Request for Revisions, Ex. 16.)

As his first point, John cited to Offense III in the 2014-15 Code, claiming that it is "vastly different" than what is stated in the current Title IX Policy. (Doe's Request for Revisions 1, Ex. 16.) John also took issue with footnote 22 of the draft report, stating the following:

> Quite a bit of your report, including footnote 22, focusses [sic] on the possibility that I coerced [Ann] to engage in sexual conduct. That, however, is not part of the 2014 definition of this offense. The term coerce does not appear in that definition, so I respectfully suggest that your statement in footnote 22 that "the central issue in this case . . . . [is] whether the consent was obtained through coercion" is incorrect. In any event, because panels are now trained to apply a different definition of sexual misconduct than what applies in my case, this distinction is important and should be conspicuously set forth in your report. Furthermore, your report does not contain a definition of "coercion," which is the "use of force or intimidation to obtain compliance." There is absolutely no evidence that I intimidated or threatened the Complainant in order to satisfy my sexual desires.

(Id. at 1-2.) Citing again to footnote 22 of the draft report, John further claimed that the investigator should have obtained a full set of text messages between Ann and Witness 9 based upon his conspiracy claim. (Id.) Doe's letter also referred to the character evidence in the section of the Report about his conspiracy claim. (Id. at 3-6.) Doe contended that "[t]hese paragraphs far outweigh any relevance they have to the issues the panel must consider and should be removed." (Id. at 6.)

Ann requested a number of changes to the report as well. (See Ann's Request for Revisions, Ex. 14.) Her advisor also wrote a letter requesting certain changes, including that the excluded text messages between Doe and Witness 9 be considered as evidence of a pattern of behavior. (See id. at 19-20.)

After considering both students' comments and incorporating certain of their proposed revisions, Perkins finalized her report and issued it on March 12, 2016. (See 03/12/16 Email from Perkins to Doe, Ex. 17; Perkins Final Report, Ex. 18.) In response to Doe's comments, Perkins rewrote footnote 22 in the draft report, which became footnote 26 in the final report. (Compare Perkins Report Second Draft 15, n.22, Ex. 13, with Perkins Final Report 15-16, n.26, Ex. 18.) Among her revisions, Perkins added language in the footnote stating that "[t]he 2014 Code of Student Conduct forbids 'non-consensual physical contact of a sexual nature.' Implicit in any common understanding of consent is that it is freely and voluntarily given. Thus, consent obtained by coercion does not constitute consent." (Perkins Final Report 15-16 n.26, Ex. 18.)

Perkins did not request the text messages between Ann and Witness 9. When questioned about this decision at trial, Perkins stated that early on, Ann had texted Witness 9 about what happened with John, and Witness 9 stated "OMG, that's sexual assault." (Trial Tr., vol. II, 181:9-13, ECF No. 52.)

Perkins concluded that "once [Ann] has locked herself into that version of events with her friends, very unlikely that there's going to be some piece of evidence later on, some text message that said, yes, it's true, I really had a super fun time and we're just going to keep going on this because he's a jerk." (Id. at 181:18-23.) Additionally,

> because these two were so close, it was likely that it was going to really be that there would be many, many messages and that it would really bog down the investigation. And these are, unlike in a civil case, where of course you'd get access to that because maybe there'd be some nugget that would either lead you to that conclusion or some other relevant conclusion, these cases are supposed to be completed within 60 days. There had already been significant delay in the case . . . .

(Id. at 182:5-13.) Perkins also noted that because she did not have subpoena power, the students would have been free to refuse that request. (Id. at 153:17-19.)

Perkins decided not to remove the character evidence; however, the Final Report contained the following limiting instruction:

> The incidents on the following pages (through the second to last paragraph before the Conclusion on the last page) are relevant only to the extent that they provide context for the Complainant's and Witness 9's state of mind toward the Respondent and the Complainant's motives in bringing the Complaint. They are not relevant for any other purpose and should not be considered as evidence that the Respondent committed the acts alleged in the Complaint.

(Perkins Final Report 27, Ex. 18.)  In footnote 43 relating to a September 26, 2015 interaction between Doe and Witness 9, the Report likewise stated "[t]his incident is relevant to the extent it provides context for the Complainant's and Witness 9's state of mind toward the Respondent and the Complainant's motives in bringing the Complaint," but "[i]t is not relevant for any other purpose and should not be considered evidence that the Respondent committed the acts alleged in the Complaint." (Id. at 27 n.43.)

G.    The Title IX Council Hearing

After Perkins' issuance of the finalized investigation report, Walsh addressed the composition of the Title IX Council panel that would preside at the hearing. (Trial Tr., vol. II, 26:1-3, ECF No. 52.)  Walsh reviewed all of the Title IX Council members who had no conflicts in the matter, had completed the required training, and had scheduling availability. (Id. at 26:4-14, 26:24-27:8, 27:15-18.)  Walsh stated that she considered as panelists all three male Title IX Council members who had completed five hours of training, but each had a conflict that precluded him from presiding. (Id. at 27:16-28:5.)  Specifically, a male undergraduate on the Title IX Council participated in the mock trial program and knew John and Ann; another male undergraduate had a friendly relationship with Ann; and a male administrator, Brown's Director of Student

Activities, was familiar with the mock trial program and its participants. (Id. at 27:16–28:5.)

Walsh scheduled the Title IX Council hearing to occur on April 14, 2016 before Schultz, as the Title IX Council Chair and a non-voting panelist, and the following three voting panelists: Besenia Rodriguez, Brown's Associate Dean for Curriculum; Kate Trimble, Deputy Director of Brown's Swearer Center; and Kimberly Charles, a senior undergraduate student. (Id. at 26:16-18, 27:10-14, 29:5-6; Panel Findings 1, Ex. 27.) Consistent with the Complaint Process, the panelists received the investigation report and the various appendices attached to it (including all of the text messages between John and Ann) prior to the hearing. (Trial Tr., vol. II, 30:1-17, ECF No. 52; Trial Tr., vol. III, 72:23-73:5, ECF No. 54.) They also received copies of the 2014-15 Code and the Complaint Process. (Trial Tr., vol. I, 102:18-20, ECF No. 51; Trial Tr., vol. II, 30:5-9, ECF No. 52.) Walsh additionally provided Schultz, as the Title IX Council Chair, with two items that were not included in the panelists' packets. (Trial Tr., vol. II, 32:11-34:2, ECF No. 52.) One was John's conduct history because such information would only be considered in the sanctioning deliberations if the voting panelists found John to be responsible for the charges. (Id. at 32:16-19.) The other was the Title IX Policy. (Id. at 32:19-21). Walsh stated that she included the Title IX Policy in

Schultz's materials because there was no definition of consent in the 2014-15 Code, and she wanted the panelists to have the Title IX Policy as an option to consider during their deliberations if they elected to do so. (Id. at 32:23-34:2.) She did not include the Title IX Policy in the panelists' packets because she did not want them to think that they were required to consider it. (Id.)

On April 14, 2016, Walsh and Schultz met before the start of the Title IX Council hearing. (Id. at 30:20-32:5, 34:5-9; Trial Tr., vol. I, 103:18-20, ECF No. 51.) Walsh told Schultz that the Chair's packet included the Title IX Policy, which the other panelists did not receive. (Trial Tr., vol. I, 103:21-104:1, ECF No. 51; Trial Tr., vol. II, 34:5-9, ECF No. 52.) Schultz, the three voting panelists, and Walsh convened at the start of the hearing. (Hearing Notes 1, Ex. 24.) Throughout the hearing, Walsh took detailed notes on her laptop computer. (Hearing Notes, Ex. 24; Trial Tr., vol. I, at 104:10-12, ECF No. 51; Trial Tr., vol. II, at 34:15-18, ECF No. 52.) Schultz first reviewed a hearing checklist, which addressed the standard of evidence, clearance of conflicts, the Chair's role to administer the hearing process, the voting panelists' roles, confidentiality, and sanctions upon a finding of responsibility. (Hearing Notes 1, Ex. 24; Hearing Checklist 1-2, Ex. 23.) After reviewing the checklist's items, Schultz reminded the panelists

that the charges against John were brought under the 2014-15 Code because the incident at issue occurred on November 10, 2014, and Schultz read through Offense III of the 2014-15 Code. (Hearing Notes 1, Ex. 24.) Schultz reminded the panel that the 2014-15 Code did not define consent. (<u>Id.</u>) She then read the current definition of consent in the Title IX Policy and told the panel that, although they were not required to use that definition, "it may be helpful in thinking about how the University has viewed consent." (<u>Id.</u>)

Perkins appeared before the panel and answered a number of questions, which are documented in Walsh's notes. (<u>Id.</u> at 1-2.) Among the questions was an inquiry from Schultz after Perkins stated that she found both Doe and Ann credible: "Doesn't someone have to be lying? [Ann] says she said no and [John] says she's an enthusiastic partner." (<u>Id.</u> at 2.) Perkins responded as follows:

> If you look at [the] text messages, it does show that [John] is persistently making things sexual even though [Ann] is a willing participant at times. He does convert things into something sexual. He did say he asked for consent and she was enthusiastic, but that isn't consistent with the text messages where you can see her hesitation. The idea that she was willingly jumping into this sexual encounter doesn't match, but that's for the panel to decide. Her version appears to be more consistent with the pattern that is in the text messages.

(<u>Id.</u>)

After the panel's session with the investigator, the Chair asked the panelists whether they would like to hear from John or Ann next. (Id.) The panelists chose to meet with John first. (Id.) When John and his advisor appeared before the panel, Ann and her advisor were in another room and listened by telephone. (Id.) John began by asking if he would be allowed to present a rebuttal after Ann's presentation, and Walsh responded that the process does not permit rebuttal statements and the panel had decided to hear him first. (Id.)

John denied any non-consensual sexual misconduct, calling the case a "lie that got bigger." (Id. at 3.) He stated his version of the events leading up to, during and after the November 10, 2014 incident. (Id.) John also argued that the investigator's references to "coercion" were improper under the 2014-15 Code. (Id.) He contended that the 2014-15 Code "requires force or threat of force" and "[i]f Complainant attempts to allege that there were [attempts of coercion], they wouldn't fall under [the Code]." (Id.)

Ann next appeared before the panel with her advisor, while John and his advisor adjourned to another room and listened by telephone. (Id. at 4.) Ann described the November 10, 2014 incident very differently, claiming that John sexually assaulted her. (Id.) Ann referred to the definition of consent under the

Title IX Policy and stated that consent cannot be obtained through manipulation, coercion or force. (Id.)

Following Ann's appearance, the panel prepared to proceed to its deliberations. (Id.) Walsh reminded the panel that they were provided the 2014-15 Code because the case involved a November 10, 2014 incident. (Id. at 5.) They were provided with the Complaint Process because its procedural measures were in effect as of the filing of Ann's Complaint on October 30, 2015. (Id.) Walsh left the hearing room after these comments, as the Title IX Officer does not participate in the panel's deliberations. (Id.; Trial Tr., vol. II, 41:22–42:2, ECF No. 52.)

H.    The Panel's Deliberations and Decision

During the panel's deliberations, Schultz, as the Title IX Council Chair, acted as a facilitator of the discussions by asking questions, offering guidance, and conducting straw votes of the three voting panelists. (Trial Tr., vol. III, 82:22–83:5, ECF No. 54; Trial Tr., vol. IV, 134:7-21, ECF No. 53.) Schultz also told the voting panelists that the Title IX Policy had codified Brown's community standards. (Trial Tr., vol. IV, 90:20-25, ECF No. 53.)

Schultz testified that the panel's deliberations were "lengthy." (Trial Tr., vol. IV, 134:13, ECF No. 53.) Panelist Besenia Rodriguez likewise testified that the panel spent "quite

a while" in its deliberations and "a lot of time" discussing the case. (Trial Tr., vol. III, 81:4-7, ECF No. 54.) In addition, Perkins, Rodriguez, and Schultz all felt that this case was "difficult." (Trial Tr., vol. II, 178:15-18, ECF No. 52; Trial Tr., vol. III, 23:7-9, ECF No. 54; Trial Tr., vol. IV, 64:17-20, ECF No. 53.) Both Schultz and Rodriguez testified that Ann gave John "mixed signals" or "mixed messages" in her texts, both before and after the incident. (Trial Tr., vol. III, 23:13-15, ECF No. 54; Trial Tr., vol. IV, 65:12-14, ECF No. 53.) Schultz found both parties to be "unappealing" (Trial Tr., vol. IV, 65:15-18, ECF No. 53), and Rodriguez did not find either witness wholly credible. (Trial Tr., vol. III, 23:10-12, ECF No. 54.)

Rodriguez testified at trial that she did not consider any of Ann's post-encounter conduct, including the text messages and the testimony of Witness 1, as "evidence as to whether or not [Ann] had been sexually assaulted one way or another." (Trial Tr., vol. III, 42:17-22, 45:5-8, ECF No. 54.)[5] This was, at least in part, based on the SHARE Advocate training about counterintuitive behaviors exhibited by sexual assault survivors. (Id. at 42:23-43:17, 52:11-25.) Rodriguez concluded, based on the SHARE presentation, "that it was beyond

---

[5] Although Rodriguez repeatedly attempted to walk back her testimony by stating that she did in fact consider all the evidence, the Court finds her initial statements on the subject the most credible.

[her] degree of expertise to assess [Ann]'s post-encounter conduct . . . because of a possibility that it was a response to trauma." (<u>Id.</u> at 55:16-21.) Rodriguez also testified that she had considered the fact that Doe had previously violated a no-contact order as evidence that he "did not accept boundaries." (<u>Id.</u> at 24:4-7, 26:9-16.)

The panel decided to use the definitions in the Title IX policy, and by a 2-1 vote, found Doe responsible. (Panel Findings 1, Ex. 27; Trial Tr., vol. III, 88:6-8, ECF No. 54.) They next addressed the sanction. (<u>Id.</u> at 88:12-89:23.) Schultz advised the panel that John had previously been placed on probation by the University for no-contact order violations. (<u>Id.</u>) The panel determined that John should be suspended and kept off campus until after Ann graduated. (<u>Id.</u>)

Schultz informed Walsh of the panel's decision. (Trial Tr., vol. II, 43:16-25, ECF No. 52.) During the afternoon of April 14, 2016, Schultz prepared a draft of the Title IX Council's findings and sent it to the panelists for review. (04/14/16 Email from Schultz to Panelists and Walsh, Ex. 25.) She later forwarded the email and its attachment to Walsh. (<u>Id.</u>) The next day, Walsh sent the following letter to John and Ann:

> During both statements [at the hearing], references were made to the relevant policy and procedures applicable in this matter. As Djuna

Perkins cites in her investigation report, the relevant policy is the *2014-2015 Code of Student Conduct*. The relevant process is Brown's Complaint Process, which was in effect at the time the Complaint was submitted. The panel was provided with the *2014-2015 Code of Student Conduct* and instructed to review Section III (Sexual Misconduct) of the listed Offenses when determining whether a violation of the policy occurred.

I've attached both documents for your reference. Please let me know if you have any questions.

(04/14/16 Letter from Walsh to Doe and Ann, Ex. 26.) Walsh stated that she wrote this letter to the students because of Ann's statements to the panel referencing the Title IX Policy. (Trial Tr., vol. II, 44:8-22, ECF No. 52.) Also, during a meeting that Walsh had with Ann and her advisor on April 14, 2016 after the hearing, Walsh told them several times that the "panel was under no obligation to use the 'consent' definition [in the Title IX Policy] and that the applicable Code was '14-'15 Code," but it seemed to Walsh that Ann and her advisor were still not clear on this issue. (Id.)

On April 19, 2016, Schultz issued the panel's written decision, which states as follows:

Because the 2014-15 Code of Student Conduct does not explicitly define consent, the panel referred to the current [Title IX] Policy, which codified Brown University's existing community standards with respect to "maintaining a safe learning, living, and working environment where healthy, respectful, and consensual conduct represents campus cultural norms" (II).

The current policy defines consent as "an affirmative and willing agreement to engage in

38

specific forms of sexual contact with another"
(VIIIa). Moreover, "consent cannot be obtained
through (1) manipulation or (2) the use of coercion."
Coercion is then defined as involving "verbal and/or
physical conduct, including manipulation,
intimidation, unwanted contact" (VIIIb).

Prior to the encounter, the Respondent himself
stated his intent to manipulate in text message:
"When the Complainant accuses the Respondent of trying
to manipulate her, the Respondent says, 'I'm trying to
manipulate you a lot' Appendix D at 97" (investigative
report, p. 8). Moreover, text messages record both
the Complainant's assertion that she is not interested
in sexual activity and the Respondent's refusal to
accept this limit: "When [Complainant] replies that
she just wants to be friends, the Respondent says, 'So
do I. I just want you to be a friend I fuck the shit
out of' [Appendix D at 98]. When she replies that she
doesn't know how to make herself more clear, he says,
'I get it. Just not accepting' (Appendix D at 98)"
(investigative report, p. 8). Given the Respondent's
refusal to accept "no" during his text exchanges with
the Complainant, the panel determined that, during
their encounter in the locker room, it was more likely
than not that a) the Complainant held to this limit,
b) the Respondent persisted in his refusal to accept
it, and c) the Respondent did not ask for or receive
consent as he claims to have done.

In determining an appropriate sanction, the panel
was guided by the 2014-15 Code of Student Conduct,
which states that "Violations of Offense IIIb will
result in more severe sanctions from the University,
separation being the standard." It also took into
consideration prior findings in which the Respondent
was found responsible for violating the Code of
Student Conduct, as well as his violation of a No
Contact Order.

(Panel Findings 1-2, Ex. 27.)

The next day, John obtained a temporary restraining order

("TRO") from this Court based on his likelihood to succeed on

the merits of his breach of contract claim that Brown improperly

39

used the Title IX Policy instead of the 2014-15 Code. (ECF No. 15.)

I.        Appeals Filed by John and Ann

Both Ann and John appealed from the panel's decision on April 25, 2016. (Ann's Appeal, Ex. 29; Doe's Appeal, 30.) Ann appealed from the imposed sanction, arguing that John should have been expelled from Brown. (Ann's Appeal 1, Ex. 29.) She cited to a Facebook posting that John made within a few hours after the issuance of the decision, which she claimed was seen by many students and sought to perpetuate a hostile educational environment and retaliate against her. (Id.)

John based his appeal on "substantial procedural error and the overwhelming weight of the evidence that is contrary to the Panel's finding." (John's Appeal 1, Ex. 30.) John claimed that the hearing panel should not have referenced the Title IX Policy because it "substantively changed Brown's definition of sexual misconduct." (Id. at 1.) He noted that "manipulation" is not included in Offense III of the 2014-15 Code, but is within the scope of the 2015-16 Title IX Policy. (Id. at 2). He further contended that "'manipulation' is not comparable to the examples of sexual misconduct provided in the 2014 Code." (Id.) John also argued that procedural errors occurred during Perkins' investigation, specifically the fact that she did not obtain and

40

review texts between Ann and Witness 9. (Id. at 6). He also challenged Perkins' inclusion of the character evidence. (Id.)

On April 26, 2016, Walsh wrote a letter to Schultz to inform her that the Court had entered a TRO against Brown. Walsh suggested to Schultz that, as the Title IX Council Chair who would preside over the appeal panel, "[i]t would be in the University's best interests to address the Court's concerns regarding any procedural errors before the case becomes final." (04/26/16 Letter from Walsh to Schultz, Ex. 31.) Walsh and Schultz also met a day or two later to discuss the upcoming appellate process because it was the first appeal to be heard by the Title IX Council under the Complaint Process. (Trial Tr., vol. I, 132:2-6, ECF No. 51.) On April 29, 2016, Walsh took a maternity leave from the University. (Id. at 132:15-25.)

John and Ann each filed responses to the other party's appeal. (John's Response to Ann's Appeal, Ex. 32; Ann's Response to John's Appeal, Ex. 33.) John also attempted to submit a sur-reply to Ann's response to his appeal, which he submitted to Jessica Katz in Brown's Title IX Office. (John's Sur-Reply, Ex. 34.) Specifically, he contended that Ann made a misrepresentation on page 4 of her response, where she wrote that "[u]nder the 2014-15 Code of Student Conduct, sexual misconduct is committed 'against a person's will' . . . ." (Id. at 1.) John argued that Ann had purposefully misstated the

Code's language and should be sanctioned by the University. (Id.) On May 9, 2016, Katz informed John that the Complaint Process does not allow for a sur-reply, so the Title IX Office would not submit John's filing to the appeal panel. (05/09/16 Email from Katz to Doe, Ex. 35.) She also noted that the Title IX Office does not handle complaints of misrepresentation, which are addressed in Brown's Office of Student Life. (Id.) Katz advised John to contact the Office of Student Life if he had any questions regarding its process in handling misrepresentation complaints. (Id.)

Schultz, as the Title IX Chair, presided over the appeal panel as a non-voting member. The three voting panelists were Amariah Becker, a graduate student; Alexandra Karppinen, Manager of Athletic Parents and Stewardship Advancement; and Colin Sullivan, Deputy Director of Athletics. (Appeal Panel Findings, Ex. 36.) Prior to the appeal board's meeting, Schultz had shared with the panelists Walsh's letter regarding the Court's entry of the TRO. (Trial Tr., vol. IV, 8:16–9:18, ECF No. 53.) The appeals panel met for over two hours to review the students' respective appeals. (Id. at 10:1-2.) As the Title IX Council Chair, Schultz acted as the moderator and facilitated the appeal panel's discussions. (Id. at 10:4-5; Trial Tr., vol. III, 130:11-22, ECF No. 54.) Schultz also told the appeal panel that the Title IX Policy's definition of consent was written to

42

reflect Brown's community values. (Trial Tr., vol. III, 140:15-143:18, ECF No. 54; Trial Tr., vol. IV, 89:15-90:1-14, ECF No. 53.)

After considering John's arguments, the panel denied his appeal.  They determined unanimously that it was reasonable for the hearing panel to consider whether there had been manipulation in determining the issue of consent.  (Id. at 15:5-8.)  However, one panelist voted in favor of granting Doe's appeal because it was a procedural error to provide the panel with the Title IX Policy definition.  (Id. at 15:19-16:13.) Regarding John's argument that the hearing panel's decision was against the weight of the evidence and "patently ridiculous," the appeal panel decided unanimously that the Complaint Process is limited to appeals based on procedural error or new evidence. (Id. at 17:1-13.)  Finally, the appeal panel addressed John's claims of deficiencies in the investigator's report, which he characterized as substantial procedural error.  (Id. at 17:14-22.)  Regarding John's contention that the investigator should have obtained the texts between Ann and Witness 9 because of his conspiracy defense, the panel concluded unanimously that the investigator's judgment regarding those texts was not a substantial procedural error.  (Id. at 19:12-20:1.)  The panel further determined unanimously that the investigator did not

commit a substantial procedural error by including the character evidence. (Id. at 20:18–21:12.)

The panel also denied Ann's appeal, finding that "the Facebook post in question is not pertinent to the case." (Appeal Panel Findings 1, Ex. 36; Trial Tr., vol. IV, 11:10-24, ECF No. 53.)

After the denial of the appeals, the Title IX Office issued a Suspension/Expulsion Authorization Form, which has the effect of placing a transcript notation that John has been suspended from Brown for disciplinary reasons. (Suspension/Expulsion Authorization Form, Ex. 37.)

II. Conclusions of Law

To prevail in a breach of contract claim, "a plaintiff must prove that (1) an agreement existed between the parties, (2) the defendant breached the agreement, and (3) the breach caused (4) damages to the plaintiff." Barkan v. Dunkin' Donuts, Inc., 627 F.3d 34, 39 (1st Cir. 2010) (citing Petrarca v. Fid. & Cas. Ins. Co., 884 A.2d 406, 410 (R.I. 2005)). "To establish causation, the plaintiff must prove that the defendant's breach was the 'but for' cause of the alleged damages." Id. (citing Wells v. Uvex Winter Optical, Inc., 635 A.2d 1188, 1191 (R.I. 1994)). "The relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." Havlik, 509 F.3d at 34

(citation omitted). Rhode Island courts interpret the terms of a student handbook "in accordance with the parties' reasonable expectations, giving those terms the meaning that the university reasonably should expect the student to take from them." Id. (citing Mangla v. Brown Univ., 135 F.3d 80, 84 (1st Cir. 1998)). Any "[a]mbiguities in a contract must be construed against the drafter of the document," Haviland v. Simmons, 45 A.3d 1246, 1259-60 (R.I. 2012), which in the case of a student handbook is the university.

However, "[b]ecause contracts for private education have unique qualities, we must construe them in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities." Gorman v. St. Raphael Acad., 853 A.2d 28, 34 (R.I. 2004); see also Schaer v. Brandeis Univ., 735 N.E.2d 373, 381 (Mass. 2000) ("[C]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities. . . . 'A college must have broad discretion in determining appropriate sanctions for violations of its policies.'" (quoting Coveney v. President & Trustees of the College of the Holy Cross, 445 N.E.2d 136, 139 (1983))). Therefore, the rules set out in a university's handbook are "enforceable as long as [they are] not against public policy or law." Gorman, 853 A.2d at 39. A rule "violates public policy only if it is: '[1] injurious to the

interests of the public, [2] interferes with the public welfare or safety, [3] is unconscionable; or [4] tends to injustice or oppression.'" Id. (quoting City of Warwick v. Boeng Corp., 472 A.2d 1214, 1218 (R.I. 1984)). Courts may also "provid[e] a judicial remedy to members of private voluntary organizations aggrieved by the arbitrary and capricious application of otherwise reasonable rules by the officers of those organizations." King v. Grand Chapter of Rhode Island Order of E. Star, 919 A.2d 991, 998 (R.I. 2007).

There are thus three broad questions the Court must answer in this case: 1) whether Brown's rules and procedures, on their face, violate public policy or the law; 2) whether Brown violated any of the specific terms of its contract and/or applied its rules arbitrarily and capriciously in Doe's case; 3) if there was a breach of contract, whether that breach caused Doe's damage.

On the first question, the Court finds that the procedures Brown has put in place for adjudicating sexual misconduct cases are not against public policy or the law. The problem in this case is that the process was not properly applied. Most importantly, Brown provided Doe's panel with a new written policy that was not in existence at the time of the incident, while explicitly telling Doe that the old policy would be used; and the panel used that new policy to find Doe responsible.

Based on this fundamental flaw in Doe's process along with several other less egregious errors discussed below, combined with the fact that the panel acknowledged, both by its 2-1 vote and through testimony at trial, that this was a very close case, Doe has proven by a preponderance of the evidence that Brown's breach caused his damage, and he is entitled to a new hearing.

To be perfectly clear, a student is not entitled to a perfect disciplinary process, and it is not the Court's role to be an appeals court for Brown's disciplinary decisions. Nor is it the case that any minor technical violation entitles a student to a new disciplinary hearing or a review by this Court. This case is uniquely postured in that the incident occurred in 2014, when the 2014-15 Code was in place, but the hearing was conducted in 2015, after Brown introduced its new Title IX Policy and Complaint Process. Most, if not all, of the issues in this case – including the main issue regarding the definition of consent - stem from this fundamental disconnect. While the new Complaint Process procedures applied, Doe retained his substantive rights under the 2014-15 Code. Some of these rights, such as the right to "[t]o be given every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer" (2014-15 Code 7, Ex. 2) are in tension with the Complaint Process, which allows the investigator substantial discretion to

determine what information to present to the panel. (See Complaint Process 3-4, Ex. 3.) Going forward, as cases are processed under the Complaint Process and the Title IX Policy, rather than the no longer effective Code, these types of issues no doubt will subside. However, for this case and any others remaining under the 2014-15 Code, Brown is contractually required to provide the rights it promised students in the Code.

A.   Brown's Overall Process for Adjudicating Sexual Misconduct Cases

As explained above, Brown, as a private university, has ample discretion in designing its disciplinary process; the Court may only intervene if the process violates public policy or the law. Gorman, 853 A.2d at 39. That is not the case here.

As explained above, Brown has adopted an "investigator model" for handling sexual misconduct cases. (Trial Tr., vol. I, 38:1-12, ECF No. 51.) There is a single investigator who gathers and reviews all the evidence, interviews witnesses, determines which evidence is relevant, and writes a thorough report, including only the relevant evidence. (Trial Tr., vol. II, 58:3-8, ECF No. 52; Complaint Process 3, Ex. 3.) The investigator is also permitted to make credibility findings; however he or she is not permitted to make a recommendation or finding on the ultimate question of responsibility. (Complaint Process 4, Ex. 3.) The case is decided by a three-person panel

that reviews the investigator's report, has an opportunity to ask the investigator questions, and may also hear from the Complainant and the Respondent. (Id. at 5.) The panel also has a Chair, who participates in the deliberations, but does not vote. (Id.)

Doe alleges that "Brown breached its contract with [him] by implementing a Title IX regime that encourages allegations of misconduct, offers accusers robust support and vigorously prosecutes complaints, while affording scant resources to the accused . . ." (Am. Compl. ¶ 99, ECF No. 19.) The Court disagrees. Both complainants and respondents have ample opportunity to participate in Brown's process. They review the investigator's report before it goes to the panel and may submit responses to the report. They also may both appear in front of the panel, and both have the right to appeal. Brown's choice to have a trained investigator conduct the investigation is reasonable, as is maintaining a three-person panel to make the final decision.[6]

---

[6] This case is very different than Doe v. Brandeis University, a recent decision in the District of Massachusetts where the court denied a motion to dismiss a breach of contract claim against Brandeis University based on the allegation that a student's sexual assault disciplinary process was fundamentally unfair. No. CV 15-11557-FDS, 2016 WL 1274533, at *31, 46 (D. Mass. Mar. 31, 2016). The system described in Brandeis was "a secret and inquisitorial process" where "the accused was not entitled to know the details of the charges," "the accused was not entitled to see the evidence," "the accused was not entitled

B.  Brown's Violations of Doe's Rights Under the 2014-15
Code
1.  Definition of Consent

Doe's primary argument is that the panel's use of the definition of consent from the 2015-16 Title IX Policy was a violation of his contractual rights.  As Doe stated in his pretrial memorandum, "a contract cannot be accepted before it is offered," and therefore Brown may not discipline a student for a violation of a policy that was not in effect at the time the conduct occurred.  (See Doe's Pretrial Mem. 16, ECF No. 44 (citing Haviland, 45 A.3d at 1257).)

As noted above, the 2014-15 Code does not define consent. It has a Comment that states: "Offense III [Sexual Misconduct] encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity or impairment of which the offending student was aware or should have been aware . . . ."  (2014-2015 Code 4, Ex. 2.)  By contrast, the 2015-16 Title IX Policy states that "[c]onsent cannot be obtained through: (1) manipulation; or (2) the use of coercion or force; or (3) by taking advantage of the incapacitation of another individual."  (Title IX Policy 6-7, Ex. 4.)  It goes on

to counsel," and "the Special Examiner prepared a detailed report, which the accused was not permitted to see until the entire process had concluded."  Id. at *3.  This is plainly not the same as Brown's process.

to provide specific definitions of "coercion," "force," and "incapacitation," but not "manipulation." (See id. at 7.) Coercion is defined as "verbal and/or physical conduct, including manipulation, intimidation, unwanted contact, and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to compel someone to engage in sexual contact." (Id.)[7]

It is undisputed that Brown informed both Doe and the panel that Doe's case was covered by the 2014-15 Code, which does not contain a definition of consent; that the panel was also told they could, but were not required to, consider the definition of consent from the 2015-16 Title IX Policy; and that the panel was further told by its chairperson, Gretchen Schultz, that the Title IX Policy definition of consent had codified community standards. The panel's decision then stated:

> Because the 2014-15 Code of Student Conduct does not explicitly define consent, the panel referred to the current [Title IX] Policy, which codified Brown University's existing community standards with respect to "maintaining a safe learning, living, and working environment where healthy, respectful, and consensual conduct represents campus cultural norms" (II).

---

[7] Doe also argues that, because manipulation is listed as a type of coercion, all manipulation must require fear, and therefore his conduct would not have qualified as a violation even under the Title IX Policy. This argument does not have merit as discussed below. See infra Section II.D.2.

The current policy defines consent as "an affirmative and willing agreement to engage in specific forms of sexual contact with another" (VIIIa). Moreover, "consent cannot be obtained through (1) manipulation or (2) the use of coercion." Coercion is then defined as involving "verbal and/or physical conduct, including manipulation, intimidation, unwanted contact" (VIIIb).

(Panel Findings 1, Ex. 27.) The panel went on to conclude: "Prior to the encounter, the Respondent himself stated his intent to manipulate" when he sent Ann a text message stating "I'm trying to manipulate you a lot." (Id.)

In cases adjudicated under the 2014-15 Code before the adoption of the new Title IX Policy, each panel determined its own definition of consent. (See Trial Tr., vol. II, 75:11-76:11, ECF No. 52.) Walsh testified that in the past, panel members had looked to different resources to define consent, including the dictionary. (Id.)[8] In Doe's case, however, instead of being allowed to freely decide the definition of consent under the 2014-15 Code, the panel was given the Title IX Policy. Although they were told that they did not have to use it, they were also told by Schultz that it codified Brown's community standards, and they did in fact use it as made clear by the panel's written decision. (Trial Tr., vol. IV, 90:20-25,

---

[8]    The dictionary definition of consent is simply "to give assent or approval." Full Definition of Consent, merriam-webster, http://www.merriam-webster.com/dictionary/consent (last visited Sept. 26, 2016).

ECF No. 53; Panel Findings 1, Ex. 27.) This issue was exacerbated by the fact that Doe was explicitly promised both before and after his hearing that the 2014-15 Code, and not the 2015-16 Title IX Policy, would govern his case. (See 11/4/15 Email from Grabo to Doe, Ex. 7; 4/15/16 Letter from Walsh to Doe, Ex. 26.) He was not informed in any way that the panel would be given the option to use the 2015-16 Title IX Policy definition, or that they would be told by their Chair that this definition codified the community standards. Indeed, the investigator's original report had the Title IX Policy listed as a relevant policy, but Brown's Title IX Officer, Amanda Walsh, deleted that reference before it was sent to the students. (Walsh Redline of Draft Report 1, Ex. 12.)

Brown argues that the Title IX Policy was not a new definition of consent: it merely codified the already-existing community standards of which all students should have been aware. Therefore, Brown argues, Doe should have reasonably expected that the definition of consent contained in the Title IX Policy would be used and that manipulation could and would be considered as a possible violation of the 2014-15 Code. In support of this position, Brown relied on the "Brown Students Ask for Consent" video, which says, among other things: "I do not obtain consent by pressuring someone, by threatening someone, by coercing someone, or by forcing someone." (Ex. 46.)

Brown also introduced the Tutorial Doe completed in the summer of 2013, in which he answered "True" to the following statement: "Consent may be invalid if there is <u>coercion</u>, intimidation, or threat, or if advantage is gained because a person is mentally or physically unable to communicate unwillingness." (Tutorial 23, Ex. 40; Trial Tr., vol. II, 211:5-13, ECF No. 52 (emphasis added).) However, neither the video nor the Tutorial specifically mentions manipulation.[9]

The critical question is what a reasonable student would expect the definition of consent to be under the 2014-15 Code. For this inquiry, we must start with the language of the Code. The Comment states: "Offense III encompasses a broad range of behaviors, including acts using force, threat, intimidation, or advantage gained by the offended student's mental or physical incapacity . . . ." (2014-2015 Code 4, Ex. 2.) The use of the word "including" indicates that a sentence "provides examples, but not an exclusive or exhaustive list." <u>Gen. Linen Serv., Inc. v. Gen. Linen Serv. Co.</u>, No. 12-CV-111-LM, 2015 WL 6158888, at *3 (D.N.H. Oct. 20, 2015) (citing <u>P.C. Pfeiffer Co., Inc. v.</u>

---

[9]    The only reference to manipulation in any of Brown's student training materials on consent was a note in small print on the bottom of the "Brown students ask for consent" slide: "This is meant to help well-meaning people take care of themselves and each other in sexual situations.  People who don't have good intentions may manipulate the language of consent to hurt someone." (Brown Presentation on Consent 6, Ex. 43.)

<u>Ford</u>, 444 U.S. 69, 77 n. 7 (1979)).[10]   Therefore, a reasonable student would understand that force, threat, or intimidation – <u>or other similar conduct</u> – could render an encounter non-consensual.   This is confirmed by the orientation video, which states, "I do not obtain consent by pressuring someone, by threatening someone, by coercing someone, or by forcing someone." (Brown Students Ask for Consent Video, Ex. 46.)

The question is thus whether a reasonable student would expect "manipulation" to be included in the types of conduct that negate consent under the 2014-15 Code.   Put another way, could manipulation of a student to engage in sexual conduct be the equivalent to force, threat, or intimidation?   According to Merriam Webster, "manipulate" means "to control or play upon by artful, unfair, or insidious means especially to one's own advantage."   Full Definition of Manipulate, Merriam-Webster, http://www.merriam-webster.com/dictionary/manipulate (last visited Sept. 26, 2016).   This definition encompasses a wide

_____

[10]   Contrary to Doe's argument at trial, it is not reasonable to read the Comment as limiting sexual misconduct under the Code to the listed examples.   <u>See</u> Black's Law Dictionary 1120 (9th ed. 2009) ("The term . . . <u>including</u> implies a partial list and indicates that something is not listed." (emphasis in original)).   Moreover, taken to its logical conclusion, Doe's reasoning is nothing short of absurd. This was evidenced by the Court's questioning at trial, where Doe admitted that, under his interpretation, offering a poor student $1,000 or a recovering drug addict drugs in exchange for sex would not be considered sexual misconduct. (<u>See</u> Trial Tr., vol. II, 229:20-232:4, ECF No. 52.)

range of actions, some of which would very likely rise to the level of sexual misconduct - for example, offering an addict drugs in exchange for sex (clearly "insidious") – and some of which would almost surely not (arguably "artful") – such as buying someone flowers or dinner with the hope of a sexual encounter. Yet it is not clear from the 2014-15 Code where the line between permitted and prohibited behavior is and whether Doe's conduct crossed that line. Because the Title IX Policy appears on its face to make <u>any</u> use of manipulation a violation, everything from a bribe to the old school use of presents and flattery, the Court finds that Brown materially altered the standard contained in the 2014-15 Code, and should not have given the Title IX Policy to Doe's panel. It is not clear to the Court whether Brown actually intends to make any and all forms of manipulation prohibited conduct under the Title IX Policy. If so, it may be helpful going forward to make this clear by defining what is meant by this term. For present purposes – and going forward with Doe's case if Brown chooses to do so – it must rest with the panel to deliberate and decide if Doe's behavior, including his use of the word "manipulation" (however they define it), is a type of conduct which would make a sexual encounter non-consensual and therefore a violation of the 2014-15 Code.

The next question is whether this procedural error actually affected the outcome of Doe's hearing. Doe must prove, by a preponderance of the evidence, that but for Brown's breach, he would not have been found responsible by the panel. Without question, this is a very close case. Both the original and appeals panel split 2-1. Perkins, Rodriguez, and Schultz all described this case as "difficult." (Trial Tr., vol. II, 178:15-18, ECF No. 52; Trial Tr., vol. III, 23:7-9, ECF No. 54; Trial Tr., vol. IV, 64:17-20, ECF No. 53.) Rodriguez testified that the panel spent "quite a while" in its deliberations and "a lot of time" discussing the case; Schultz likewise testified that the deliberations were "lengthy." (Trial Tr., vol. III, 81:4-7, ECF No. 54; Trial Tr., vol. IV, 134:13, ECF No. 53.) Schultz further testified that she found both parties to be "unappealing" (id. at 65:15-16), and Rodriguez stated that she did not find either witness wholly credible. (Trial Tr., vol. III, 23:10-12, ECF No. 54.) And both Schultz and Rodriguez indicated that Ann gave John "mixed signals" or "mixed messages" in her texts, both before and after the incident. (See id. at 23:13-15; Trial Tr., vol. IV, 65:12-14, ECF No. 53.) Moreover, the definition of consent the panel used was crucial to its decision. Panel members relied heavily on a text message John sent to Ann in which he stated "I'm manipulating you a lot." (Panel Findings 1, Ex. 27.) According to the panel, this text

"stated his intent to manipulate." (Id.; see also Trial Tr., vol. III, 76:25-77:6 [Rodriguez], ECF No. 54 ("Q. Was there any particular texts or series of texts that influenced your decision? A. There was a series that was actually mentioned in the findings letter that I found really the most, sort of clearest articulation, and that was a text in which the respondent -- they actually used the term 'manipulate.'").) Rodriguez further testified that she took the manipulation text as "a sort of standard for a whole series of texts." (Trial Tr., vol. III, 76:25-77:10, ECF No. 54.) If the panel had not been given the Title IX Policy definition that explicitly included "manipulation" as a virtual per se violation, it is likely they would not have zeroed in on this text message as an admission, and in turn, may have interpreted the complete set of text messages differently.

So while it is indeed a very close call (in no small part because it is extremely difficult to know with any certainty how a panel would have viewed the evidence if the procedural error had not occurred), the Court finds that Doe has proven by a preponderance of the evidence that Brown's breach caused his damage. Given the difficulty and closeness of this case, the fact that the panel split 2-1, and the other less significant procedural deficiencies discussed below, it is more likely than not that, absent Brown's procedural missteps, Doe's previous

panel would not have found him responsible. To be very clear, the Court is not in any way suggesting that it would be an error for a new panel to find Doe responsible. And if a new panel is convened and it finds him responsible, its finding will be binding (assuming no other contract violations occur) irrespective of this Court's conclusion. The preponderance of the evidence standard merely requires that the plaintiff tip the scale past a 50 percent likelihood of success.[11]

### 2. Investigator's Testimony before the Panel

The Complaint Process dictates that "[t]he investigator's report will include credibility assessments based on their experience with the complainant, respondent, and witnesses, as well as the evidence provided." (Complaint Process 4, Ex. 3.) However, it also states that "[t]he investigator will not make a finding or recommend a finding of responsibility." (Id.) Given that the outcome of many sexual misconduct cases such as this one will hinge on the credibility of the complainant and

---

[11] Doe also alleges that "Brown engaged in deceptive conduct and violated the covenant of good faith and fair dealing by advising John that the 2014-15 Code would apply, then purposefully reintroducing the 2015-16 Title IX Policy during the panel hearing, and subsequently assuring John that the panel remained true to its original representation." (Doe's Post-Trial Br. ¶ 150, ECF No. 50.) Because the Court finds that the panel's use of the 2015-16 Title IX Policy definition violated the terms of the contract, it need not reach the question of whether it violated the implicit covenant of good faith and fair dealing.

respondent, these responsibilities may frequently be at odds with each other; and indeed, that was the situation here. [12] Investigator Perkins testified before the panel:

> If you look at [the] text messages, it does show that [John] is persistently making things sexual even though [Ann] is a willing participant at times. He does convert things into something sexual. <u>He did say he asked for consent and she was enthusiastic, but that isn't consistent with the text messages where you can see her hesitation. The idea that she was willingly jumping into this sexual encounter doesn't match</u>, but that's for the panel to decide. Her version appears to be more consistent with the pattern that is in the text messages.

((Hearing Notes 2, Ex. 24.) (emphasis added).) In testifying that Doe's assertion that he asked for consent and that Ann was a willing participant was belied by the text messages, Perkins was effectively telling the panel that she thought they should find Doe responsible. Even though she qualified her statements with "that's for the panel to decide," she was quite clearly still making a <u>recommendation</u> of a finding of responsibility, in violation of the Complaint Process. Moreover, it is clear from the panel's findings that they accepted Perkins' assessment:

> Moreover, text messages record both the Complainant's assertion that she is not interested in sexual activity and the Respondent's refusal to accept this limit. . . . Given the Respondent's refusal to accept "no" during his text exchanges with the Complainant,

---

[12] It is not the Court's role to rewrite Brown's policy; however, one alternative Brown might consider is to allow the investigator make credibility determinations for all witnesses <u>except</u> the complainant and respondent. This would allow the panel to make their own determination of the parties' credibility when they appear at the hearing.

> the panel determined that, during their encounter in the locker room, it was more likely than not that a) the Complainant held to this limit, b) the Respondent persisted in his refusal to accept it, and c) the Respondent did not ask for or receive consent as he claims to have done.

(Panel Findings 1-2, Ex. 27.) Therefore the investigator's statement to the panel likely affected the panel's ultimate decision.[13]

### 3. Investigator's Report

Doe alleges several problems with Perkins' report (see Doe's Post-Trial Br. ¶¶ 134-37, ECF No. 50), all of which relate to his claim that Ann and Witness 9 had a conspiracy to fabricate a claim against him. He bases his conspiracy claim on the conversation that Witness 11 stated he overheard where Ann and Witness 9 discussed wanting to "get" John. Perkins decided that, if Doe wanted this information included, she would also have to include information on events leading up that conversation for context, including the fact that Ann and Witness 9 had obtained no-contact orders against Doe, which he had violated. (02/29/16 Email Chain between Walsh and Perkins 1, Ex. 11.) The Final Report included the character evidence, but cautioned:

---

[13] This is not to say that this is an unreasonable interpretation of the text messages. Had the panel arrived at this interpretation on their own, there would be no issue. The problem is that they seem to have been led to that conclusion by the investigator.

> The incidents on the following pages (through the
> second to last paragraph before the Conclusion on the
> last page) are relevant only to the extent that they
> provide context for the Complainant's and Witness 9's
> state of mind toward the Respondent and the
> Complainant's motives in bringing the Complaint. They
> are not relevant for any other purpose and <u>should not
> be considered as evidence that the Respondent
> committed the acts alleged in the Complaint</u>.

(Perkins Final Report 27, Ex. 18 (emphasis added).) Doe alleges

that "Brown's refusal to remove the [character evidence] had an

actual, prejudicial impact as evidenced by the testimony of

Prof. Besenia Rodriguez, who stated that such information caused

her to believe that John was someone who did not respect

boundaries." (Doe's Post-Trial Br. ¶ 137, ECF No. 50.)

Perkins' decision to include the character evidence with a

limiting instruction was, <u>in and of itself</u>, not a problem. The

Complaint process states that the investigator has "the

<u>discretion</u> to determine the relevance of any witness or other

evidence and <u>may</u> exclude information in preparing the

investigation report if the information is irrelevant,

immaterial, or more prejudicial than informative." (Complaint

Process 3, Ex. 3 (emphasis added).) Perkins, in her discretion,

determined that this information was relevant to the conspiracy

claim, in that it was necessary context for understanding the

overheard conversation where Ann and Witness 9 talked about

trying to "get" Doe. While the Court might have made a

different judgment call, it was both reasonable and within

Perkins' discretion to deem the character evidence relevant and include it with the limiting instruction, which clearly stated the limited use of this information.[14]  It is not the Court's role to reevaluate her discretionary calls so long as they are not against any of the explicit provisions of the contract or patently unreasonable.  See Schaer, 432 Mass. at 481 ("The complaint includes allegations of violation of basic fairness due to the improper admission of testimony from four witnesses. Although these statements would be excluded from a courtroom under the rules of evidence, a university is not required to abide by the same rules. . . . It is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject.").[15]

---

[14]  The fact that Rodriguez appears to have ignored Perkins' limiting instruction and considered the character evidence to determine that Doe does not accept boundaries (see Trial Tr., vol. III, 24:4-7, 26:9-16, ECF No. 54) is a different story. The Complaint Process states that "[i]nformation that does not directly relate to the facts at issue, but instead reflects upon the reputation, personality, qualities, or habits of an individual is character evidence and is not relevant to the determination of whether there is a policy violation" (Complaint Process 4, Ex. 3 (emphasis added)), yet Rodriguez clearly considered it for that purpose.  However, this issue will be remedied if and when Doe's case is heard by a new panel.  There is no evidence that anyone other than Rodriguez ignored the Perkins' instruction that the character evidence should not be used to determine responsibility.

[15]  Moreover, Perkins' decisions about character evidence were not one-sided; she chose to exclude text messages between Doe and other female students "because their potential prejudicial impact outweigh[ed] their probative value."

That said, when Perkins made the choice to include Doe's conspiracy claim and the accompanying character evidence, she had an obligation to present all relevant evidence related to that allegation. (See Complaint Process 4, Ex. 3 ("The investigator will produce a written report that contains the relevant information and facts learned during the investigation . . . .").) Doe "requested a complete set of electronic communications between the Complainant and Witness 9 to support his claim that the two conspired to fabricate claims against him." (Perkins Final Report 15 n.26, Ex. 18.) Perkins declined to request the text messages because she determined that:

> As discussed further below, Witness 9 and the Complainant freely admit that the Respondent's behavior was a frequent subject of discussion, and both freely admit that they harbor significant animus toward him. Neither is enough to suggest that the Complainant fabricated the facts underlying the allegations of the Complaint, as the Complainant's reaction is a typical response to perceived inappropriate behavior. More importantly, asking the Complainant and Witness 9 to disclose all their communications is overly burdensome where the central issue in this case is not whether certain sexual acts occurred or even whether the Complainant literally consented to them, but whether the consent was obtained through coercion. The 2014 Code of Student Conduct forbids "non-consensual physical contact of a sexual nature." Implicit in any common understanding of consent is that it is freely and voluntarily given.

(Perkins Final Report 3, Ex. 18.) She maintained this decision even though Ann's advisor argued that these text messages should be considered as pattern evidence. (See Ann's Request for Revisions 19-20, Ex. 14.)

Thus, consent obtained by coercion does not constitute consent. Given the number of interviews and documents reviewed in this case, the complete communications between Witness 9 and the Complainant are unlikely to lead to the discovery of any <u>non-duplicative</u> evidence that tends to undermine the Complainant's claim that she was coerced.

(<u>Id.</u> at 15-16 n.26 (emphasis in original).) At the end of her report, Perkins again concluded:

By the Respondent's own admission, he treated the Complainant poorly, regardless of whether their sexual activity was consensual or not. The Complainant's dislike of him is therefore reasonable even if he didn't assault her, as is her desire to seek support from other like-minded individuals. The Complainant's and Witness 9's negative feelings toward the Respondent do not assist the panel in evaluating whether the Complainant's claims are fabricated. Neither does the conversation overheard by Witness 11, because there is no evidence that their reasons for "wanting to get him" were unfounded, or that they wanted to take any action other than that to which they were entitled.

(<u>Id.</u> at 29 (emphasis added).) There are numerous problems with these two paragraphs.

First, this commentary on the merits of Doe's conspiracy claim comes, at a minimum, dangerously close to an improper recommendation on responsibility and effectively doubles down on the improper implicit recommendation made by Perkins discussed above. Perkins does not simply say that, based on her interviews, she found Ann credible; she says that there is <u>insufficient evidence</u> for the panel to find that Ann fabricated the claim, which of course she must have done if John were to be

believed. Second, Perkins' assessment that there was insufficient evidence to support Doe's fabrication claim was particularly problematic given that she had refused to ask for evidence that might have proven it so and been exculpatory to Doe.

There is no right to discovery in the Code or the Complaint Process, and generally this type of decision would be well within the discretion of the investigator. Overall, the investigation in this case was very thorough. Perkins spent 80-100 hours on her investigation (Trial Tr., vol. II, 144:21-25, ECF No. 52), including interviewing 11 witnesses in addition to Ann and John, and producing a 29-page singled-spaced report. (See Perkins Final Report, Ex. 18.) While the Court might have made a different decision on the text messages between Ann and Witness 9, Perkins' decision was not, on its own, unreasonable. The problem here was that Perkins made the initial decision to include the conspiracy claim and corresponding character evidence, but then chose not to complete the evidence-gathering and went on to say that there was insufficient evidence to support Doe's fabrication claim. Because of this, her failure to request the text messages between Ann and Witness 9 was a violation of Doe's right "[t]o be given every opportunity

to . . . offer evidence before the hearing body or officer."
(2014-15 Code 7, Ex. 2.)[16]

The investigator has a significant amount of discretion, and the Court will generally not second-guess her judgment calls. Here, however, there were a number of issues that, taken together, resulted in a report that did not adequately present Doe's evidence, as required by the 2014-15 Code.[17]

_____

[16] This should not be interpreted as saying that the Code obligates Brown to make any request for material that a student raises, no matter how tenuous; as explained above, nothing in the Code indicates that there is a right to discovery, nor to a perfect process. Similarly, the investigator has no subpoena power and thus students are free to refuse to supply the requested information. (Trial Tr., vol. II, 153:8-25.) The Court is merely saying that, in the context of the investigator's choice to include the conspiracy/character evidence material, and to say that there was insufficient evidence to support the conspiracy claim, not requesting the text messages prevented Doe from an opportunity to present relevant evidence to the hearing panel.

[17] The Court will not dictate how Brown should handle these issues if Doe receives a new hearing. One obvious solution would be for the investigator to determine that the overheard conversation, the text messages between Ann and Witness 9, and the character evidence are all irrelevant to the question of consent, and to redact that information from her report. While arguably this approach could run up against his right under the 2014-15 Code to have "every opportunity to . . . offer evidence before the hearing body or officer" (2014-15 Code 7, Ex. 2), it is clear that this right is not unlimited and an investigator must retain the discretion to make judgment calls about relevance. Those calls will be respected as long as they are not arbitrary or capricious. Another option might be to remove the paragraphs in which the investigator comments on the merits of Doe's fabrication defense – namely, footnote 26 from "As discussed further below" to "freely and voluntarily given," and the final paragraph of the report before "Conclusion" on page 29. As stated above, without the investigator's commentary that

67

4.  Doe's Request to Make a Rebuttal Statement

The 2014-15 Code gives Doe the right to have "every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." (2014-15 Code 7, Ex. 2 (emphasis added).) At the hearing, Doe was required to give his statement before Ann. (Trial Tr., vol. II, 36:10-23, ECF No. 52.) He asked for the opportunity to give a rebuttal, but that request was denied because the Complaint Process does not provide for rebuttal statements. (Id.)[18]

This is another, perhaps less critical, example of where the rights promised by the 2014-15 Code are in conflict with the later adopted Complaint Process. Again, Brown has every right to design its process so that each party presents in the order the panel requests, and may deny rebuttal statements. The problem is that, in this case, this process runs up against Doe's right to have "every opportunity to articulate relevant concerns and issues, express salient opinions, and offer

_____

Doe's defense lacks merit, the decisions to decline to request the text messages and to include the character evidence would be within her discretion. Again, however, it is Brown's choice how to proceed.

[18]  The Complaint Process dictates that "[t]he complainant and respondent will be granted the opportunity to appear before the hearing panel if they wish and make an oral statement regarding the facts," but does not include any right to make a rebuttal statement. (Complaint Process 5, Ex. 3.)

evidence before the hearing body or officer." (2014-15 Code 7, Ex. 2.) As the Court stated in a previous decision, "Brown chose to draft its Code to give students the right to 'every opportunity' to 'articulate relevant concerns' and 'offer evidence'; now it must abide by that decision." <u>Doe v. Brown Univ.</u>, No. CV 15-144 S, 2016 WL 715794, at *14 (D.R.I. Feb. 22, 2016). Therefore, for cases adjudicated under the 2014-15 Code, Brown must, if requested, allow respondents to give a rebuttal statement at the hearing.[19] That said, while this error, standing alone, would not be enough for Doe to get a new hearing because he has presented no evidence that, if he had been given the opportunity to give a rebuttal, the panel would not have found him responsible; when combined with other errors as set forth herein, it is clear that Doe's contract rights were violated.

C. Besenia Rodriguez's Testimony

Doe makes a number of arguments concerning the manner in which the panel weighed the evidence in his case. Specifically he contends:

> 141. The panel's failure to address Ann's delay in reporting violated John's right to panel consideration of all relevant evidence, that is, any facts or information presented in support of his assertion that the encounter was consensual and that Ann was subsequently motivated by hard

_____

[19] As noted below, this right does not extend to the appeal process. See infra Section II.D.3.

feelings. Moreover, it failed to consider that human memories are transient and susceptible to such factors as hindsight bias, suggestibility, and anger or hostility. . . .

142. Prof. Rodriguez'[s] failure to accord Ann's post-encounter texts, communications and actions face value violated John's right to a fundamentally fair hearing and panel consideration of all relevant evidence.

143. The panel's determination that previous sexual conduct is irrelevant, including Ann's sexual banter with John, violated John's right to a fundamentally fair hearing and panel consideration of all relevant evidence.

144. Brown's consideration of Ann's pre-encounter actions and texts, but only as evidence of her hesitation, placed John's defense at a decided disadvantage and violated his right to a fundamentally fair hearing.

145. Prof. Rodriguez'[s] disinclination to pass judgment on Ann's actions biased her in Ann's favor, thereby violating John's right to a fundamentally fair hearing and panel consideration of all relevant evidence.

(Doe's Post-Trial Br. ¶¶ 141-45, ECF No. 50 (citation omitted).) Because the Court has decided that Doe is entitled to a new panel due to Brown's procedural violations, these arguments are not outcome determinative. Some of panelist Besenia Rodriguez's testimony raises issues that should be addressed, as they may inform the way Brown chooses to instruct panelists going forward.

This is a challenging area because it is imperative that a court not overstep and substitute its judgment for that of the

panel.  Like jurors, panel members are entitled to give evidence the weight they deem appropriate, so long as they consider everything presented.  And the Court is conscious of the fact that, in general, litigants do not have a right to delve into the internal reasoning processes of the judge or the jury.

Some of Doe's assertions merely take issue with the way the panelists chose to weigh and interpret the evidence, which the Court will not disturb unless completely arbitrary.[20]  However, Rodriguez's testimony that she did not consider any of the post-encounter evidence in reaching her determination that Doe was responsible for sexual assault is concerning.  (See Trial Tr., vol. III, 45:5-8, ECF No. 54 ("Q. Okay.  You didn't consider [Ann's post-encounter statements] evidence as to whether or not she had been sexually assaulted one way or another?  A. I would say that's correct.")  Rodriguez stated that this was, in part, due to the training she had received by SHARE Advocate Alana

_____

[20]  For example, the panel's assessment that while "there was a lot of sexual banter, [Ann] seemed ultimately pretty clear in the mountains of sexting that she didn't want a sexual interaction" (Trial Tr., vol. IV, 64:22-24, ECF No. 53) was not an unreasonable conclusion; it was simply not the conclusion Doe wanted them to draw from the text messages.  Likewise, it appears the panel did consider the timing of Ann's Complaint. They merely did not draw the inference that Doe hoped they would.  (See Trial Tr., vol. III, 27:15-25 [Rodriguez], ECF No. 54 ("I was concerned about the lapse in time primarily because . . . I wondered about the, sort of the credibility or the authenticity of the interviews and of the statements given how much time had transpired since the event. . . .") (emphasis added).)

Sacks, which informed panelists that survivors of sexual assault sometimes exhibit counter-intuitive behaviors. (Id. at 52:11-25.) Rodriguez then concluded "that it was beyond [her] degree of expertise to assess [Ann]'s post-encounter conduct . . . because of a possibility that it was a response to trauma." (Id. at 55:16-21.) Similarly, she stated that she "was not equipped to judge [Ann's] behavior." (Id. at 48:13-14.) Yet this was precisely her job as a panel member: to interpret the evidence and make factual determinations about it.

Although Brown is certainly not required to provide the same procedural safeguards and instructions as a criminal or civil court, referencing the way this type of information would be dealt with in that context is instructive. In a criminal or civil trial, if certain evidence needs some kind of contextual explanation, like the counter-intuitive nature of a sexual assault victim's behavior, there would be an expert witness who would testify to give the jury a framework within which to view that evidence. However, the jury would also be instructed before deliberating that it is their role to weigh all the evidence, including evidence presented by experts, using their common sense and life experience. It appears what happened here was that a training presentation was given that resulted in at least one panelist completely disregarding an entire category of evidence. Although for the reasons stated, the Court need not

decide whether this rises to the level of arbitrary and capricious conduct, it clearly comes close to the line.

The Court is not suggesting that Brown is not permitted to give training on the effects of trauma, or that it should provide the same process that occurs in court. However, given Rodriguez's testimony, Brown would be wise to consider some sort of explicit instruction to panelists before they deliberate, reminding them that all the evidence in the investigator's report has been deemed relevant, and they, as fact-finders, are fully capable of, and obligated to, consider it. And moreover, if certain evidence could be considered counter-intuitive such that expertise may be helpful in order for the fact-finder to properly consider it, this could be presented through the investigator, which in turn would give both parties the notice and opportunity to deal with it. In contrast, if no one is making this claim, it might be useful to tell the panel this so that situations like this could be avoided.

D. Doe's Other Arguments Do Not Establish a Breach of Contract

The remainder of Doe's arguments do not amount to contract violations, as explained below.

1. Gender Makeup of Title IX Council

Doe alleges that:

Brown's maintenance of a Title IX Council with a 5:1 female to male ratio fails to meet reasonable

> expectations that panels will reflect the make-up of the Brown community and take account of the perspectives of both genders. This circumstance resulted in John's encounter with Ann being assessed from an entirely female point of view with no account for the differing perspectives on sex and relationships between men and women, and violated John's reasonable expectation to a fundamentally fair hearing.

(Doe's Post-Trial Br. ¶ 138, ECF No. 50.) First, there is no basis in the Code or the Complaint Process for Doe's claim that he is entitled to a panel that "reflect[s] the make-up of the Brown community and take account of the perspectives of both genders." (Id.)[21] This alone defeats Doe's claim, but in this case, his argument runs into additional problems. Doe had a male panelist on his appeal; that panelist voted against Doe, while two of the female panelists - one on the original panel and one on the appeals panel - voted to find him not responsible. Moreover, there is evidence that Brown attempted to find a male panelist for John's original panel, but all of those available had conflicts. (Trial Tr., vol. II, 27:15-28:13, ECF No. 52.) Accordingly, the Court finds that Doe's claims with respect to the gender makeup of the Title IX Council are without merit.

---

[21] The 2014-15 Code provides that a student has a right to "request that a hearing officer or member of a hearing body be disqualified on the grounds of personal bias" (2014-15 Code 7, Ex. 2), but there is no suggestion that Doe sought to exercise that right.

2.    Definition of Coercion

Doe argues that "[t]he panel's failure to focus on reasonable fear as an element of coercion violated John's right to be adjudged under the 2014-15 Code and the then-existing community norm" and "[t]he panel's finding of 'responsible' despite finding no force, threats, impairment, intimidation or fear violated John's right to be adjudged under the 2014-15 Code and the then-existing community norm." (Doe's Post-Trial Br. ¶¶ 146-47, ECF No. 50.)  Rather, Doe claims, even if the 2015-16 Title IX Policy codified community norms, Doe would still be not responsible under those norms.

Doe is correct that coercion under the Title IX Policy must include an element of fear.  That is not, however, true for manipulation.  Coercion is defined as "verbal and/or physical conduct, including manipulation, intimidation, unwanted contact, and express or implied threats of physical, emotional, or other harm, that would reasonably place an individual in fear of immediate or future harm and that is employed to compel someone to engage in sexual contact." (Title IX Policy 7, Ex. 4.)  Doe therefore argues that manipulation is a subset of coercion and also requires fear.  Yet in the previous section of the policy, manipulation is clearly listed as a separate category from coercion, force, and incapacitation.  (See id. at 6-7 ("Consent cannot be obtained through: (1) manipulation; or (2) the use of

coercion or force; or (3) by taking advantage of the incapacitation of another individual." (emphasis added).) If manipulation were merely a form of coercion, it would read out that separate term. Instead, it stands to reason that manipulation is a very broad term; and while more extreme forms of manipulation that place a person in fear also rise to the level of coercion, to qualify as manipulation, the conduct does not need to include the element of fear. Therefore, under the Title IX Policy, manipulation that does not place the other person in fear could still negate consent. And, more to the point, the new panel's task will be to consider whether manipulation, however they define it, makes sexual encounters non-consensual.

    3.   Right to Appeal Based on Insufficient Evidence

    Brown's Title IX Complaint Process allows appeals "based on the limited grounds of substantial procedural error that materially affected the outcome and/or material, new evidence not reasonably available at the time of the hearing." (Compl. Process 6, Ex. 3.) Doe contends that "[t]he appeals panel's reliance on the 2015-16 Complaint Process in refusing to consider John's claim that the decision against him was arbitrary violated John's more expansive appellate rights under the 2014-15 Code." (Doe's Post-Trial Br. ¶ 149, ECF No. 50.) The 2014-15 Code states that "[a]ppeals will <u>normally</u> be

considered only" on the grounds of procedural error or new evidence. (2014-15 Code 10, Ex. 2 (emphasis added).) Doe argues that this "suggests that other grounds may be considered under appropriate circumstances." (Doe's Post-Trial Br. ¶ 108, ECF No. 50.)

The First Circuit's decision in Havlik v. Johnson & Wales University, 509 F.3d 25, 34 (1st Cir. 2007), is instructive on this issue. There, the plaintiff argued "that the University breached its implied duty of good faith and fair dealing because the appeal officer (Sarawgi) was improperly influenced by the phraseology of [a] crime alert [naming the plaintiff] and her conversation with Martel [the University's vice-president for student affairs]." Id. at 35. The Court began by explaining that "[t]he relevant terms of the contractual relationship between a student and a university typically include language found in the university's student handbook." Id. at 34. "[I]f the university explicitly promises an appeal process in disciplinary matters, that process must be carried out in line with the student's reasonable expectations." Id. The Court found that "[i]n the absence of any probative evidence that the appeal officer ignored promised protections, improperly consulted certain proof, acted arbitrarily in carrying out the procedures limned in the handbook, or made her decision in bad

faith, there has been no showing that the plaintiff's reasonable expectations were thwarted."  Id. at 36 (citation omitted).

In this case, there is no indication that a student would reasonably expect a merits review on appeal.  Even under the 2014-15 Code, a reasonable student would expect that, in general, appeals will only be considered on limited grounds. Doe has made no showing that his case is one in which a reasonable student would expect procedures outside what is "normally" followed.[22]

---

[22]  Doe also argued in his pre-trial memorandum that "[t]o suggest that a patently ridiculous decision can only be overturned for new evidence or an error in procedure is to protect what is arbitrary" and "defies reasonable expectations." (Doe's Pre-trial Mem. 22, ECF No. 44.)  To the extent Doe is suggesting that the Court should overturn Brown's policy that appeals will only be entertained based on procedural error or new evidence, that argument is without merit.  As explained above, Brown may design its own procedures so long as they are not against public policy or the law.  Allowing appeals only on certain specific grounds does not meet this high bar, particularly where the decision was made by a multi-person panel.  Cf. Brandeis, 2016 WL 1274533, at *36 (finding that the inability of a respondent to "appeal on the ground that the Special Examiner's decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong" plausibly alleged fundamental unfairness under Massachusetts law because "[t]he Special Examiner, for all practical purposes, had the first and only say in determining John's guilt").  Unlike in Brandeis, Brown's system does not contain only one decision-maker.  It involves an investigator (who is not the decision-maker) and a panel of three decision-makers.  Therefore, the Court need not decide whether the failure to allow for a merits appeal from a single decision-maker, who also conducted the investigation, would be allowable under Rhode Island law.

4. Right to Submit Sur-reply on Appeal

Doe also claims that "Brown's refusal to provide John's sur-reply to the appeal's panel violated John's right to every opportunity to articulate relevant concerns and issues and express salient opinions." (Doe's Post-Trial Br. ¶ 148, ECF No. 50.) He further argues that "Brown's explanation for its refusal on the basis that its Complaint Process does not address sur-replies and therefore prohibits them is inconsistent with Ms. Walsh's claim that her editing of Ms. Perkins' report was permissible because the Complaint Process does not address or forbid it." (Id.)

As discussed above, the 2014-15 Code gives accused students the right to have "every opportunity to articulate relevant concerns and issues, express salient opinions, and offer evidence before the hearing body or officer." (2014-15 Code 7, Ex. 2 (emphasis added).) There is no such right attached to the appellate process in the Code. The Complaint Process dictates that "[w]ritten requests for appeal must be submitted within three (3) business days following delivery of the notice of the outcome" and "[e]ach party may respond in writing to any appeal submitted by the other party . . . within three days following delivery of notice of the written appeal." (Complaint Process 6, Ex. 3.) Brown was well within its discretion to prohibit Doe from filing a sur-reply with his appeal. It is irrelevant that

Walsh edited Perkins' report even though that was not specifically provided for in the Complaint Process. Where Brown's policies are silent, Brown may conduct proceedings in the way it sees fit, so long as it does not act arbitrarily and capriciously. There was nothing unreasonable about Brown's decision to prohibit Doe's sur-reply. As Walsh testified, "[t]he process . . . ha[s] to end somewhere." (Trial Tr., vol. II, 7:10-11, ECF No. 52.)

III. Motion to Amend

Prior to trial, Doe filed a Motion to Amend, which seeks to add claims for promissory estoppel and attorneys' fees to his Complaint. (ECF No. 45.) Brown filed an Objection (ECF No. 46) and a Supplemental Memorandum in Support of its Objection (ECF No. 47). For the reasons that follow, Doe's Motion to Amend is DENIED.

Leave to amend must be "freely given when justice so requires." Palmer v. Champion Mortgage, 465 F.3d 24, 30 (1st Cir. 2006) (quoting Fed. R. Civ. P. 15(a)). "That is not to say, however, that a district court lacks authority to deny a request to amend. In appropriate circumstances — undue delay, bad faith, futility, and the absence of due diligence on the movant's part are paradigmatic examples — leave to amend may be denied." Id. (citing Forman v. Davis, 371 U.S. 178, 182

(1962)).  In this case, Doe's Motion is denied because the claims he seeks to add are futile.

    A.    Promissory Estoppel

    Promissory estoppel is an equitable remedy that is generally used in the absence of a valid contract.  See E. Providence Credit Union v. Geremia, 103 R.I. 597, 601 (1968) ("Traditionally, the doctrine of promissory estoppel has been invoked as a substitute for a consideration, rendering a gratuitous promise enforceable as a contract.") (citing 28 Am. Jur. 2d); cf. Filippi v. Filippi, 818 A.2d 608, 626 (R.I. 2003) (noting that promissory estoppel has been applied where "one of the parties has deliberately failed to perform an act necessary to the formal validity of the contract" (quoting Alix v. Alix, 497 A.2d 18, 21 (R.I. 1985)).  Under Rhode Island law, "a promissory estoppel claim requires: '1) A clear and unambiguous promise; 2) Reasonable and justifiable reliance upon the promise; and 3) Detriment to the promisee, caused by his or her reliance on the promise.'"  Norton v. Hoyt, 278 F. Supp. 2d 214, 223 (D.R.I. 2003) (quoting Filippi, 818 A.2d at 625–26), aff'd sub nom. Norton v. McOsker, 407 F.3d 501 (1st Cir. 2005).

    In support of his promissory estoppel claim, Doe argues that he and his counsel detrimentally relied on Brown's representation that the 2014-15 Code would apply to his disciplinary proceeding, and were given no indication that the

panel would use the definition of consent from the Title IX Policy. Because of this representation, "John addressed only the 2014-15 Code" when he appeared before the panel, while the alleged victim, Ann, "focused on the 2015-16 Title IX Policy that the panel decided would control." (Doe's Pretrial Mem. 25, ECF No. 44.)

Doe fails to state a claim for promissory estoppel. There is no dispute that, based on the parties' valid contract, Brown had an obligation to adjudicate the substance of Doe's case under the 2014-15 Code rather than the 2015-16 Title IX Policy;[23] yet this is the same promise on which Doe bases his promissory estoppel claim. If Brown had represented to Doe something _different_ than what was promised in the contract, for example that the _procedures_ of the 2014-15 Code would apply, and he reasonably relied on that promise, he might state a claim for promissory estoppel. Here, however, it is merely duplicative of his breach of contract claim. See Doe, 2016 WL 715794, at *15 (dismissing promissory estoppel claim where both parties agreed that "the student-university relationship is governed by contract, which includes the reasonable expectations of students based on [Brown's] Code").

---

[23]    The parties disagree, of course, about whether or not Brown actually did conduct the hearing using the 2014-15 Code; Brown argues that the definition of consent from the 2015-16

B.   Attorneys' Fees

With respect to Doe's claim for attorneys' fees, Rhode Island law allows the Court to "award reasonable attorney's fees to the prevailing party in a breach of contract action <u>only if the Court finds that 'there was a complete absence of judiciable issue</u> of either law or fact raised by the losing party.'" <u>ADP Marshall, Inc. v. Noresco, LLC</u>, 710 F. Supp. 2d 197, 241 (D.R.I. 2010) (emphasis added) (quoting R.I. Gen. Laws § 9-1-45).   This case falls far short of meeting that high bar.

---

Title IX Policy merely codified the standard that was already implicit in the 2014-15 Code.

IV.  Conclusion

For the reasons set forth above, the Court concludes that Brown breached its contract with Doe by the manner in which it conducted his disciplinary hearing.  Brown is hereby ORDERED to vacate its finding and sanction against Doe and expunge his record accordingly.  However, nothing in this Order prevents Brown from re-trying Doe on the same charge with a new panel consistent with the policies and procedures that apply and with the Court's instructions contained herein.  Doe's Motion to Amend (ECF No. 45) is DENIED.

IT IS SO ORDERED.

_____
William E. Smith
Chief Judge
Date:  September 28, 2016